IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| HH LIQUIDATION, LLC, *et al.*[1], ) | Case No.: 15-11874 (KG) |
| ) | (Jointly Administered) |
| Debtors. ) | |
| ) | |
| OFFICIAL COMMITTEE OF UNSECURED ) | |
| CREDITORS OF HH LIQUIDATION, LLC, *et* ) | |
| *al.*, ) | |
| ) | Adv. No. 16-51204 (KG) |
| Plaintiffs, ) | |
| ) | |
| - against - ) | |
| ) | |
| COMVEST GROUP HOLDINGS, LLC, ) | |
| COMVEST INVESTMENT PARTNERS III, ) | |
| L.P., COMVEST INVESTMENT PARTNERS ) | |
| IV, L.P., COMVEST HAGGEN HOLDINGS III, ) | |
| LLC, COMVEST HAGGEN HOLDINGS IV, ) | **Objection Deadline: March 24, 2017 at 4:00 p.m.** |
| LLC, COMVEST ADVISORS, LLC, HAGGEN ) | **Hearing Date: April 5, 2017 at 2:00 p.m.** |
| PROPERTY HOLDINGS, LLC, HAGGEN ) | |
| PROPERTY SOUTH, LLC, HAGGEN ) | |
| PROPERTY NORTH, LLC, HAGGEN ) | |
| PROPERTY HOLDINGS II, LLC, HAGGEN ) | |
| SLB, LLC, JOHN CAPLE, CECILIO ) | |
| RODRIGUEZ, MICHAEL NIEGSCH, JOHN ) | |
| CLOUGHER, BLAKE BARNETT, WILLIAM ) | |
| SHANER and DERRICK ANDERSON, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY DEBTORS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) (7558); HH Operations, LLC (f/k/a Haggen Operations Holdings, LLC) (6341), HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC) (7257), HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC) (5028), HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC) (7687), and HH Legacy, Inc. (f/k/a Haggen, Inc.) (4583). The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

DOCS_LA:304269.9 33152/003

The Official Committee of Unsecured Creditors (the "Committee"), by its undersigned counsel, hereby moves (the "Motion") this Court for an order, pursuant to Rule 37(a)(3)(B)(iv) of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rule 7037 and Rule 9014(c) of the Federal Rules of Bankruptcy Procedure, compelling the Debtors in the above-referenced cases to produce documents to the Committee as plaintiff in the above-captioned adversary proceeding claimed by the Debtors to be subject to the attorney-client privilege and/or attorney work-product doctrine (together, the "Protections"). Pursuant to stipulations and orders granting the Committee standing, the Committee is prosecuting the Debtors' claims against their controlling equity holders, and certain non-debtor affiliates and directors and officers. The Debtors have no operations and no employees, and no legitimate reason to invoke the Protections for any purpose, much less for the purpose of protecting insiders and obstructing prosecution of the estates' claims. Yet, the Debtors are withholding hundreds of documents and information responsive to interrogatories on privilege grounds – documents and information that likely is already in the possession of at least some of the defendants.

The Committee is not seeking documents from a random third party who owes the estate no fiduciary duty: rather, the Committee seeks the Debtors' documents in support of the Debtors' claims that are being prosecuted derivatively by the Committee against insiders and non-debtor affiliates. The Court should find under these circumstances that the "fiduciary exception" to the Protections applies and compel the Debtors to provide the Committee with full and unfettered access to all of the information withheld on ostensible grounds of privilege. This

is the only way the Committee can effectively prosecute the well-pleaded causes of action the Debtors' estates possess against non-debtors and maximize the estates' recoveries.[2]

Had the Debtors not wisely conceded standing to the Committee to bring the claims asserted in the adversary proceeding and instead prosecuted the same claims in their own name and right, they would have had access to all of the Debtors' books and records to support that effort, including the documents responsive to the Committee's requests that are now being withheld based on the Debtors' invocation of the Protections. Since the Committee now stands in the shoes of the Debtors as plaintiff in the adversary proceeding, there is complete congruity between the interests of the Debtors and the Committee as the party prosecuting their claims on their behalf. Under the *Garner* doctrine the Committee is entitled to access to the Debtors' privileged information as if it were the Debtors prosecuting the claims. In this regard, it is not a waiver, but rather providing access to the privileged information to the party authorized to prosecute the Debtors' claims on their behalf. Simply put, the Committee should have the same ability to derivatively prosecute the claims as the Debtors would have had but for their conflicts of interest, particularly where the defendants (apparently) have access to the requested documents.

*Garner* requires a showing of good cause, which the Committee can readily satisfy. This case is about the defendants' conjuring up with the aid of their corporate counsel a highly complex corporate structuring and financing scheme akin to the structure this Court addressed in the Mervyn's chapter 11 case. *In re Mervyn's Holdings, LLC*, 426 B.R. 488 (Bankr.

---

[2] The Committee notes that in response to its lengthy and detailed complaint, none of the defendants in the adversary proceeding moved to dismiss pursuant to Bankruptcy Rule 7012; instead, each served an answer and affirmative defenses, and the parties are actively engaged in discovery with document production scheduled to be completed by April 7, 2017, and a fact discovery deadline of June 9, 2017.

D. Del. 2010). The Court found in similar circumstances that the complaint contained "detailed facts which, if proven true, make a troubling case of wrongdoing."

As set forth below, the Withheld Information regarding the design and implementation of this scheme is critically important to the effective prosecution of the estates' intentional fraudulent transfer and breach of fiduciary duty claims asserted in the adversary proceeding, and no purpose is served by the obstruction presented by the Debtors' assertion of privilege other than protecting insiders, in breach of their statutory and fiduciary duties to the estates and creditors. For the reasons set forth herein, the Committee respectfully requests that the Court grant the Motion.

## Jurisdiction

1. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1409(a). This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (L) and (O).

2. The statutory predicate for the relief requested is Rule 37(a)(3)(B)(iv) of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rule 7037 and Rule 9014(c) of the Federal Rules of Bankruptcy Procedure.

## Background

3. On September 8, 2015 (the "Petition Date"), the Debtors filed voluntary petitions with this Court under chapter 11 of the Bankruptcy Code. The Debtors are acting as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

4. On September 21, 2015, the United States Trustee for Region 3 appointed the Committee to represent the interests of all unsecured creditors in these cases pursuant to

section 1102 of the Bankruptcy Code [Docket No. 126]. The members appointed to the Committee are: (i) Unified Grocers, Inc.; (ii) PepsiCo, Inc.; (iii) Starbucks; (iv) Santa Monica Seafood; (v) United Food and Commercial Workers International; (vi) Valassis Communications Inc., Valassis Direct Mail, Inc.; and (vii) Spirit SPE HG 2015-1, LLC; c/o Spirit SPE Manager, LLC.

5. On January 14, 2016, the Committee, the Debtors, Comvest, the PropCo Entities, and Property Holdings II[3] executed and filed that certain *Stipulation and Order (1) Granting Derivative Standing to the Official Committee of Unsecured Creditors to Commence Litigation Against Haggen Property Holdings, LLC, Haggen Property South, LLC, Haggen Property North, LLC, Haggen Property Holdings II, LLC, Haggen Property Holdings III, LLC, Comvest Partners and/or Directors and Officers Thereof; and (2) Providing for a Litigation Standstill*, at Docket No. 1216 (the "Initial Standing Stipulation"). On January 15, 2016, the Court approved the Initial Standing Stipulation. *See* Docket No. 1235.

6. On April 29, 2016, the Committee and the Debtors executed and filed that certain *Stipulation and Order Granting Derivative Standing to the Official Committee of Unsecured Creditors to Commence Litigation Against Haggen SLB, LLC and/or its Past and/or Present Directors and Officers*, at Docket No. 1858 (the "Second Standing Stipulation" and together with the Initial Stipulation, the "Standing Stipulations"). On May 2, 2016, the Court approved the Second Standing Stipulation. *See* Docket No. 1858.

7. Pursuant to the Standing Stipulations, the Committee has derivative standing to assert and prosecute the claims asserted in the adversary complaint (the "Complaint") it filed on behalf of the Debtors and their bankruptcy estates on September 7, 2016, commencing the above-captioned adversary proceeding (the "Adversary Proceeding") against defendants

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Complaint.

Comvest Group Holdings, LLC, Comvest Investment Partners III, L.P., Comvest Investment Partners IV, L.P., Comvest Haggen Holdings III, LLC, Comvest Haggen Holdings IV, LLC, Comvest Advisors, LLC (together "Comvest"), certain non-debtor "Propco" affiliates holding valuable assets derived from the "Albertson's transaction," and current and former officers and directors of the Debtors.

8. In short, the Complaint seeks the avoidance of fraudulent transfers and monetary damages for egregious breaches of fiduciary duty arising from a *Mervyn's*-like scheme whereby Debtor HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) ("Holdings") acquired 146 supermarkets from Albertson's in early 2015, and then covertly siphoned away valuable real estate assets that Haggen acquired from Albertson's so they would not be available to satisfy the claims of the Debtors' suppliers, landlords, employees and other unsecured creditors. Those claims total over $100 million and remain unpaid after the Debtors sold all of their assets. The Committee alleges that this scheme was done at the direction, and for the benefit, of the Debtors' controlling shareholder, Comvest.

9. For at least the last five months, the Debtors have had no business and no employees to manage it. "Now that the Albertson's transaction has closed, the Debtors have sold or shut down substantially all of their assets and currently do not have any employees." *See* Docket No. 2290, ¶ 12, October 12, 2016. Blake Barnett, a defendant in this action, was identified in the First Day Declaration as the CFO [Docket No. 15], but now signs the monthly operating reports only as an "authorized signatory." *See* Docket No. 2485. Subsequent substantive declarations, such as those filed in support of asset sales, have been signed by the Debtors' financial advisors, Alvarez & Marsal.

10. On February 3, 2016, pursuant to the Initial Standing Stipulation, the Committee served its First Set of Document Requests to Haggen Holdings LLC (n/k/a HH Liquidation, LLC) ("Holdings"), its First Set of Document Requests to Holdings Opco South, LLC (n/k/a HH OpCo South, LLC) ("Opco South"), and its First Set of Document Requests to Holdings Opco North, LLC (n/k/a HH OpCo North, LLC) ("Opco North") (collectively, the "Document Requests"). The Document Requests sought certain documents and communications from Holdings, Opco South and Opco North (collectively, the "Debtors"). At the same time, the Committee also served interrogatories on each of the Debtors (collectively, the "Interrogatories").

11. On March 4, 2016, the Debtors served their objections to the Document Requests, and Holdings served its objections to the Interrogatories; OpCo South and OpCo North subsequently served their respective objections to the Interrogatories (the Debtors' objections to the Document Requests and Interrogatories are collectively referred to as the "Objections"). In their Objections, the Debtors relied upon, *inter alia*, the attorney-client privilege and/or the attorney work-product doctrine to shield from discovery nearly a thousand documents requested by the Committee.

12. On December 9, 2016, Holdings provided the Committee with (a) its "Redacted Privilege Log" in which it identified 259 responsive items (emails) that were redacted based on the assertion of the attorney-client privilege, and (b) its "Privilege Log" in which it identified 725 items (emails and documents) that were withheld based on the assertion of the attorney-client privilege as well as another 890 documents that were purportedly protected under the attorney work-product doctrine (the "Withheld Documents" and collectively, together with any information withheld in response to the Interrogatories, the "Withheld Information").

13. As further described below, the Committee believes that the Debtors have not established a basis for withholding the Withheld Information on privilege grounds and further that, in any event, the "fiduciary exception" to the attorney-client privilege under *Garner* and its progeny, including *Teleglobe* in this district, applies. The Committee and the Debtors exchanged written correspondence with respect to this dispute, copies of which are annexed hereto as Exhibits "A" and "B" and counsel met and conferred telephonically in a good faith, albeit futile, attempt to resolve the issues raised in this Motion. The Committee therefore seeks the Court's intervention to compel the Debtors to comply fully with its discovery requests.

## ARGUMENT

14. As the parties asserting the attorney-client privilege, the Debtors bear the burden of establishing each element of the privilege. *Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120, 126 (3d Cir. 1986); *Louisiana Municipal Police Employees Retirement System v. Sealed Air Corporation*, 253 F.R.D. 300, 305 (D. N.J. 2008); *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992) ("The burden of proving that the privilege applies to a particular communication is on the party asserting the privilege.").

A. **The Debtors Cannot Meet Their Burden of Demonstrating that the Privilege was Properly Invoked**

15. The Committee is the representative of the Debtors' estate for purposes of this litigation and is carrying out the Debtors' fiduciary duties in connection with it. In *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343 (1985), the Supreme Court held that a chapter 7 trustee controlled and could waive a corporate debtor's attorney-client privilege with respect to communications that occurred before the filing of the bankruptcy petition. In doing so, the Court stated, "Because the attorney-client privilege is controlled, outside of bankruptcy, by a corporation's management, the actor whose duties most closely

resemble those of management should control the privilege in bankruptcy, *unless such a result interferes with policies underlying the bankruptcy laws.*" *Id.* at 351 (emphasis added).

16. In *Weintraub*, the Supreme Court explained that permitting a debtor to assert the attorney-client privilege in a case in which the estate has (or may have) claims against related or insider parties would subvert bankruptcy policy.

> [T]he rule suggested by respondents—that the debtor's directors have this power—would frustrate an important goal of the bankruptcy laws. In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors. *See generally* 11 U.S.C. §§ 704(4), 547, 548. It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files. To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets. The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own conduct. *See generally In re Browy*, 527 F.2d 799, 802 (CA7 1976) (per curiam). Respondents contend that the trustee can adequately investigate fraud without controlling the corporation's attorney-client privilege. They point out that the privilege does not shield the disclosure of communications relating to the planning or commission of ongoing fraud, crimes, and ordinary torts . . . . The problem, however, is making the threshold showing of fraud necessary to defeat the privilege. *See Clark v. United States, supra*, 289 U.S., at 15, 53 S.Ct., at 469. Without control over the privilege, the trustee might not be able to discover hidden assets or looting schemes, and therefore might not be able to make the necessary showing.

*Id.* at 353-54. It is precisely because of "the proverbial problem of the fox guarding the henhouse" that courts have found that the Bankruptcy Code authorizes derivative suits by creditors' committees. *See Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Cop.)*, 330 F.3d 548, 573 (3d Cir. 2003) ("If no trustee is appointed, the debtor—really, the debtor's management—bears a fiduciary duty to avoid fraudulent

transfers that it itself made. One suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it."). Permitting the entity whose principals engineered the transactions at issue to invoke the attorney-client privilege and thus thwart the Committee's efforts to recover damages for the benefit of the estates would substantially defeat the Bankruptcy Code's goal of maximizing returns for creditors -- particularly where certain of those defendants (presumably the PropCo Entities, SLB Entities and Comvest) likely have access to the Withheld Information and according to the Debtors may assert an interest in blocking production of the Withheld Information to the Committee as Plaintiff.[4]

17.  Here, the Debtors are not operating and are liquidating and unsecured creditors are unlikely to obtain a meaningful recovery without the successful prosecution of these claims. The only apparent interest the Debtors have in invoking the Protections is protecting their insiders against the Debtors' own claims, which would be a blatant breach of their statutory and fiduciary duties. A non-operating but still undissolved corporation cannot meet its burden of establishing that the attorney-client privilege has been validly invoked when there is no management able to do so. *Gilliland v. Geramita*, 2006 WL 2642525, at *3 (W.D. Pa. Sept. 14, 2006). In that case, the burden never shifts to the plaintiff to demonstrate that the privilege either does not exist or has not effectively been waived. *Id.* at *4.

---

[4] The Debtors claim that certain defendants in the adversary proceeding "may have an interest in preserving the confidentiality of privileged communications because they were co-clients of Debtors' counsel at the time the communications were made." Ex. B at 5. The Debtors' claim highlights the unfairness of their position. The Debtors were forced to surrender control of this litigation to the Committee because of the obvious conflicts of interest presented by the prospect of the Debtors suing their controlling shareholder, and certain non-Debtor affiliates. If the Debtors and the Defendants can successfully shield the Withheld Information from discovery, then the Defendants will perversely benefit from the grant of derivative standing because they will face a weaker adversary than they would have had the Debtors' conflicts not prevented them from suing (*i.e.*, if the Debtors sued directly, they would have the Withheld Information they refuse to provide the Committee). Such a result would be grossly unfair and unjustifiable.

18. Where, as here, (a) pursuant to court order, a creditors' committee is pursuing claims derivatively on behalf of a debtors precisely because the debtors have a conflict of interest, (b) the debtors have no on-going business operations and no obvious interest to protect, (c) the only potential beneficiaries of the assertion of the Protections are the insiders accused of wrongdoing, (d) those very insiders should not be placed in a better litigation position as a result of the grant of derivative standing, and (e) the Committee's duties are to the estates and not to a particular creditor or group of creditors, the Court should find that the Committee controls the Protections with respect to the Withheld Information, a result that plainly advances, and does not interfere with, the policies underlying the bankruptcy laws, and that the Protections are not properly invoked by the Debtors.

B. **The Fiduciary Exception to the Attorney-Client Privilege Applies**

19. Even if the Protections were properly asserted, under the fiduciary exception to the attorney-client privilege, as articulated in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), *cert. denied*, 401 U.S. 974 (1971), production of the Withheld Information is warranted. *Garner* held that when a holder of the attorney-client privilege has a fiduciary duty to the party who seeks disclosure, a court may compel a waiver upon a showing of good cause. *Garner* involved a shareholders' derivative suit charging senior executives of a corporation with a failure to fulfill fiduciary responsibilities. Management refused to turn over to the shareholder-plaintiffs certain communications with corporate counsel. Plaintiffs argued that management had no right whatsoever to assert privileges against stockholders, while management contended that it had an "absolute" right to do so. *Id.* at 1097. *Garner* sought to balance the opposing interests in discovery and confidentiality. *Id.* at 1101–02. The court observed that "management does not manage for itself," but rather has "duties which run to the benefit ultimately of the stockholders," *id.* at 1101, and concluded, "where the corporation is in suit against its stockholders on charges

of acting inimically to stockholder interests, protection of these interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." *Id.* at 1103–04. On remand, the objection to disclosure based on the assertion of the corporation's attorney client privilege claim was overruled. *Garner v. Wolfinbarger*, 56 F.R.D. 499 (S.D. Ala. 1972).

20. *Garner* identified nine factors bearing on whether "good cause" exists, a list that in subsequent creditors' committee cases has often been reduced to four broad categories: "(1) the discovering party's stake in the fiduciary relationship; (2) the apparent merit of the claim; (3) the need of the discovering party for the information; and (4) the nature of the communication itself." *Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 342 B.R. 416, 424 (S.D.N.Y. 2006), *aff'd on reconsid'n*, 2006 WL 2883255 (S.D.N.Y. Oct. 06, 2006).[5]

21. *Heyman* is closely analogous. In that case, a creditors' committee prosecuted fraudulent transfer claims on behalf of the debtor's estate against a debtor's majority shareholder and affiliates. The district court applied *Garner* to compel disclosure of documents sought by the committee. *Id.* at 423-27. Because *Garner* was a shareholder derivative action, the court was required to weigh the competing ownership stakes of the plaintiff and defendant stakeholders in order to assess "the discovering party's stake in the fiduciary relationship." As a

---

[5] *Garner* articulated nine factors: (1) the number of shareholders and the percentage of stock they represent; (2) the bona fides of the shareholders; (3) the nature of the shareholders' claim and whether it is obviously colorable; (4) the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; (5) whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; (6) whether the communication related to past or to prospective actions; (7) whether the communication is of advice concerning the litigation itself; (8) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; (9) the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons. 430 F.2d at 1104.

creditors' committee case, the *Heyman* analysis was simpler. The court accepted the committee's contention that it represented the entire bankruptcy estate by seeking to set aside the transfers. ***"Where the party seeking discovery seeks to recover on behalf of the corporation, rather than on behalf of individual shareholders or claimants, courts bring a lesser degree of scrutiny to bear in determining whether good cause exists."*** *Id.* at 424-25 (emphasis added). As to the "apparent merit" of the claims, the court found them colorable as evidenced by the fact that they had withstood a motion to dismiss. *Id.* at 425.[6] The court credited the committee's contention that it needed the information to prove its claims and rebut defenses such as the shareholder's "assertion that the Spin-off was carried out in good faith and for valid business reasons" and that the information was not available from other sources. *Id.* Finally, the "nature of the communications" was to be addressed in the meet and confer process. Accordingly, the court held that "[b]ecause the *Garner* fiduciary exception has been extended to plaintiffs analogous to the Committee and because of the obvious and irreconcilable conflict presented to [the debtor] by the Committee's claims, it is appropriate to apply the *Garner* exception and require [the debtor] to produce its documents withheld on the basis of the attorney-client privilege." *Id.*[7]

---

[6] As noted above, here the defendants did not move to dismiss any of the claims asserted in the Adversary Complaint.

[7] The *Heyman* court also declined to extend *Weintraub* to a creditors' committee, but the case is distinguishable on that issue because the district court relied entirely on the fact that the committee was not managing the debtor. In that respect, *Heyman* failed to follow the Supreme Court's directive that this rule applies *"unless such a result interferes with policies underlying the bankruptcy laws."* In this case, allowing the Debtors to control the privilege interferes with the Bankruptcy Code's policy of maximizing the value of the estate for all stakeholders. In addition, *Heyman* emphasized that unlike a trustee, who owes a fiduciary duty to "the estate," the creditors' committee represented only its own constituency (a distinction that was also the basis for refusing to permit a committee to waive the debtor's attorney-client privilege in *In re Big M, Inc.*, 2013 WL 1681489, *1 (Bankr. D. N.J. April 17, 2013)). Here, the opposite is true. The Committee is standing in the shoes of the Debtors and their estates, and any recovery in this litigation will redound to the benefit of the estates, not to the Committee, or even to the general unsecured creditors alone, and will be distributed in accordance with the statutory priorities of the Bankruptcy Code. As *Weintraub* makes clear, where exercising the attorney-client privilege would injure creditors there is "nothing anomalous" in disenfranchising a debtor from controlling the privilege "rather, it is in keeping with the hierarchy of interests created by the bankruptcy laws." 471 U.S. at 355-56.

22.  Delaware courts have followed *Garner*, including in cases where committees prosecuted claims derivatively on behalf of bankruptcy estates. *Teleglobe USA Inc. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 383-86 (3d Cir. 2007); *Grimes v. DSC Comm. Corp.*, 724 A.2d 561, 568 (Del. Ch. 1998). For example, in *Teleglobe*, the debtors and their committee sued the controlling shareholder of the debtors' parent, from which they sought privileged communications. The court held that the privileged information is subject to turnover under the *Garner* fiduciary exception to the extent the controlling shareholder owed fiduciary duties to the debtors at the time of the privileged communications. Inasmuch as the parent's controlling shareholder had such a duty to the debtors only at times when the debtors and their parent were actually insolvent, the debtors were required to prove insolvency at the time of each privileged communication. *Id.* at 384.[8]

23.  Good cause exists to pierce the attorney-client privilege in this case in support of the Committee's prosecution of the estates' valuable causes of action against Comvest, the non-debtor affiliates holding tens of millions of dollars in cash and real estate, and the Debtors' past and present officers and managers. As in *Heyman*, the Committee seeks to recover on the Debtors' claims for the benefit of the estate as a whole, the claims are better than colorable, and the information is needed to prosecute the claims. As set forth below, each of the *Garner* factors is met.

---

[8] On remand in *Teleglobe*, the bankruptcy court found that the debtors had not proven that they were insolvent at the time of the allegedly privileged communications; therefore, the *Garner* exception did not apply. *In re Teleglobe Communications Corp.*, 392 B.R. 561 (Bankr. D. Del. 2008). This case, in contrast, far more closely resembles *Heyman*, in which a committee sought documents from a debtor to support the debtor's fraudulent transfer and other claims. Moreover, as alleged in the Adversary Complaint, the Debtors were rendered insolvent and undercapitalized from the moment the contrived Albertson's transaction was conceived and executed as evidenced by, *inter alia*, the Debtors' rapid collapse and descent into bankruptcy and total liquidation less than nine months from the closing.

1.  *The number of [creditors] and the percentage of [debt] they represent.*

24.  The Committee represents all of the general unsecured creditors in these cases, whose claims total well in excess of $100 million (the actual amount reflected in the Debtors' schedules is far greater, approximately $389 million consisting of $40 million in general unsecured claims at Holdings, $38 million at Haggen Operations Holdings LLC, $193.5 million at Opco South and $117.6 million at Opco North). Because the Committee is suing derivatively, any recovery it obtains will inure to the benefit of all of the Debtors' stakeholders (including all unpaid administrative and priority creditors, and after their claims are satisfied, the Debtors' general unsecured creditors) in accordance with any eventual plan of liquidation in order of priority.

2.  *The bona fides of the [creditors].*

25.  The Committee was duly appointed by the Office of the United States Trustee pursuant to Bankruptcy Code section 1102(a), and is acting in accordance with its statutory duty to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. § 1103. Moreover, the Complaint was filed pursuant to the Standing Stipulations authorizing the Committee to prosecute the claims on behalf of the Debtors and their bankruptcy estates.

3.  *The nature of the [creditors'] claims and whether they are obviously colorable.*

26.  The Complaint sets forth detailed allegations supporting its claims for, among other things, actual and constructive fraudulent transfers and breaches of fiduciary duty.

The Committee's claims are obviously colorable as evidenced by the defendants' decision to answer the Complaint without moving to dismiss any of the seventy-eight causes of action.

**4.  *The apparent necessity or desirability of the [creditors] having the information and the availability of it from other sources.***

27.  The Committee needs the Withheld Information to prove the transfers were fraudulent, both intentionally and constructively, and to disprove the principals' affirmative defenses, such as that the transfers were made in good faith. The Withheld Information may also be highly relevant to the breach of fiduciary duty and other claims asserted in the Adversary Complaint. Indeed, the Withheld Information could not be more relevant to the case, as the central issue in the Adversary Proceeding is whether the defendants concocted a scheme to hinder, delay and defraud Haggen's legitimate creditors in connection with the complex transactions they entered into in connection with the acquisition of 146 supermarkets and valuable underlying real estate from Albertson's. These complex transactions were undoubtedly developed with the significant input of the Debtors' corporate counsel and other professionals. These facts have been shielded from public scrutiny. Because Holdings is privately held and the Albertson's acquisition and related structuring and financing are so complex, the totality of the relevant circumstances surrounding this scheme can best be analyzed only through the transparent inspection of the Debtors' documents and communications by its managers, including documents and communications with the Debtors' pre-bankruptcy counsel involved in structuring the underlying transactions, facts that cannot be derived from another source. Notably, the individual defendants, likely the insiders who were communicating with the Debtors' professionals at the time, have had full access to the Withheld Information, yet the Debtors propose to deny that access to the Committee that is prosecuting the Debtors' claims.

**5.** *Whether, if the [creditors'] claims are of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality.*

28. The Committee alleges that the defendants, *inter alia*, devised and orchestrated a scheme to transfer property with actual intent to hinder, delay and defraud the Debtors' creditors.

**6.** *Whether the communications relate to past or to prospective actions.*

29. The Committee is informed and believes that the Withheld Information relates to, at the time communicated, an ongoing or prospective fraud insofar as the Complaint alleges a scheme intended to hinder, delay and defraud creditors, including the Debtors' unpaid general unsecured creditors who remain unpaid as a consequence of the transfers sought to be avoided.

**7.** *Whether the communications are of advice concerning the litigation itself.*

30. The Committee seeks to discover only communications made through the Petition Date; the Withheld Information sought by the Committee does not concern advice pertaining to this lawsuit which was not commenced until well after the Petition Date.

**8.** *The extent to which the communications are identified versus the extent to which the [creditors] are blindly fishing.*

31. In its Document Requests, the Committee sought very specific categories of documents and information. In response to the Objections, the Committee seeks the Withheld Information, which is a narrow, defined universe of approximately 1,000 documents identified in the Debtors' privilege logs. The Committee is not on a fishing expedition, but seeks targeted

discovery related to the allegations, claims and defenses asserted in the Adversary Proceeding, in particular the facts and circumstances surrounding the development and execution of the Albertson's Acquisition and related financings and transfers.

### 9. *The risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.*

32. The Debtors have liquidated and thus have no operating business and no trade secrets that would be compromised by the production of the Withheld Information. If the Debtors have particular concerns, the Withheld Information can be provided pursuant to the confidentiality agreement that is already in place.

33. This court should apply the *Garner* exception and order the Debtors to produce the Withheld Information. Under *Weintraub*, the Debtors have a fiduciary duty to creditors to ensure that the estates' valuable claims are prosecuted and maximized for the benefit of the estates. The Debtors cannot fulfill those fiduciary duties due to their obvious conflict and thus the Committee has stepped into its shoes for that purpose. The Committee has no divided loyalty. It represents the estate and all of the unpaid creditors in this case, and in this litigation is prosecuting the estates' claims. There is no legitimate dispute that the Committee's claims are colorable. The requested discovery is vital to the Committee's claims. It is likely that the defendants have access to the Withheld Information as insiders. The Withheld Information is not available from any other source. There are no trade secrets or other issues to justify the Debtors maintaining this information as confidential other than to shield their insiders from liability to the estates. All of these factors justify a finding that the Debtors cannot assert the attorney-client privilege as a basis for shielding the Withheld Information from the Committee.

## C. The Work Product Doctrine is Inapplicable

34. The Debtors refuse to share with the Committee certain documents or information that they assert constitute their attorneys' work product. The work product doctrine, codified in the Federal Rules of Civil Procedure, restricts "discovery of documents or other tangible things prepared in anticipation of litigation or for trial by or for another party." Fed.R.Civ.P. 26(b)(3).

35. The privilege log provided by the Debtors does not satisfy their burden of establishing that any of the Withheld Information was prepared in anticipation of this or any other litigation. All of the documents withheld on the basis of the attorney work-product doctrine were created (a) prior to the Petition Date, (b) before the Committee was formed, and (c) to the best of the Committee's knowledge, before the Debtors began to seriously consider the claims that are asserted in the Complaint. Consequently, the documents could not have been created "in anticipation of litigation" and thus the attorney work-product doctrine does not apply.

36. Nor, for that matter, are any of the Debtors "another party" to the litigation. The Committee is prosecuting the Debtors' claims in their stead. Whatever concerns the Debtors may have with disclosure "does not entitle an attorney to withhold from a client's trustee in bankruptcy work-product prepared for the client's pre-petition lawsuits, so long as the trustee and the client are not adverse in those suits." *In re Foster*, 188 F.3d 1259, 1272 (10th Cir. 1999). Thus, even if the Debtors' could meet their burden of establishing that the Withheld Information is attorney-work product, the Committee is not the Debtors' adversary. Rather, the Committee is bringing its claims derivatively on behalf of the Debtors and their estates and all of the same logic underlying the *Garner* doctrine applies with equal force

### Certification of Counsel Pursuant to Local Rule 7026-1(d)

37. On March 7, 2017, counsel for the Committee met and conferred telephonically with counsel for the Debtors in an attempt to resolve the disputes over the issues raised in this Motion but were unsuccessful.

### Conclusion

38. Based on the foregoing, the Committee respectfully requests that this Court enter an order (i) pursuant to Rule 37(a)(3)(B)(iv) of the Federal Rules of Civil Procedure compelling the Debtors to produce all Withheld Information, within three calendar days of issuance of the order, and (ii) granting such other and further relief as the Court deems just and proper.

Dated: March 10, 2017      **PACHULSKI STANG ZIEHL & JONES LLP**

By: */s/ Bradford J. Sandler*
Bradford J. Sandler (DE Bar No. 4142)
Robert J. Feinstein (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Colin Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705
E-mail:   bsandler@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         crobinson@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*