**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HH LIQUIDATION, LLC, *et al.*, | ) Case No. 15-11874 (KG) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| OFFICIAL COMMITTEE OF UNSECURED | ) |
| CREDITORS OF HH LIQUIDATION, LLC, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Adv. Pro. 16-51204 (KG) |
| | ) |
| -against- | ) |
| | ) |
| COMVEST GROUP HOLDINGS, LLC, COMVEST | ) |
| INVESTMENT PARTNERS III, L.P., COMVEST | ) |
| INVESTMENT PARTNERS IV, L.P., COMVEST | ) |
| HAGGEN HOLDINGS III, LLC, COMVEST | ) |
| HAGGEN HOLDINGS IV, LLC, COMVEST | ) |
| ADVISORS, LLC, HAGGEN PROPERTY | ) |
| HOLDINGS, LLC, HAGGEN PROPERTY SOUTH, | ) |
| LLC, HAGGEN PROPERTY NORTH, LLC, | ) |
| HAGGEN PROPERTY HOLDINGS II, LLC, | ) |
| HAGGEN SLB, LLC, JOHN CAPLE, CECILIO | ) |
| RODRIGUEZ, MICHAEL NIEGSCH, JOHN | ) |
| CLOUGHER, BLAKE BARNETT, WILLIAM | ) |
| SHANER and DERRICK ANDERSON, | ) RE: D.I. 57 |
| | ) |
| Defendants. | ) |

**DEFENDANTS' RESPONSE TO THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS' MOTION TO COMPEL DOCUMENT PRODUCTION BY DEBTORS**

**INTRODUCTION**

The Official Committee of Unsecured Creditors ("Committee") alleges that the Defendants "covertly siphoned away valuable real estate asserts that Haggen acquired from Albertson's" to harm the Debtors' unsecured creditors. Committee's Motion to Compel ("Motion") Motion ¶8. That theory—which underlies the Committee's Complaint as well as the current Motion to pierce the Debtors' privilege—is false.

As an initial matter, the structure of acquisition was transparent.  The acquisition had to be approved by the Federal Trade Commission.  Indeed, the nature of the acquisition also meant that the sellers (Alberston's and Safeway), the sale-leaseback partners (Spirit and Garrison), the line-of-credit lender (PNC Bank), and financial and industry consultants reviewed the structure of the acquisition at the different stages.  Each party had to be convinced that the Haggen Debtors could successfully and profitably operate the new stores.  As admitted by the Committee itself in its complaint, at the time of the closing of the transaction with Albertsons, the Debtors were flush with more than $100 million in cash (which included a $50 million equity infusion), access to a $200+ million line of credit, and complete ownership rights in companies that owned various real estate interests.

Undeterred by its own admissions, the Committee now attempts to use its Motion to pierce the privileged communications between the Debtors and their counsel, Akerman, LLP ("Akerman").  If successful, the Committee will use this ruling to gain access to not only all of Akerman's communications with the Debtors, but also nearly all of Akerman's communications with the Defendants, which were co-clients of Akerman along with the Debtors.  The Committee's argument for the privileged documents is undermined by the very cases the Committee cites in its Motion.  Moreover, the Committee has failed to present any argument that suggests the Debtors were insolvent in November 2014, the "key" element necessary to finding a *Garner* exception to the attorney-client privilege.   In short, the Court should deny the Committee's Motion.

## FACTUAL BACKGROUND

1.      As of 2011, Debtor Haggen, Inc. owned and operated 30 grocery stores in the states of Washington and Oregon. (See Complaint and Objection to Claims [Adv. Docket No. 1]

(the "Complaint') at ¶43).  In 2011, the Haggen family sold an 80% interest in Haggen, Inc. to Defendant Comvest Group Holdings, LLC ("Comvest").  (Id., ¶ 44).  Akerman represented Comvest in this transaction and thereafter continued to represent both Comvest and Haggen, Inc. in an on-going capacity.  (Affidavit of Michael Niegsch ¶3, attached hereto as Exhibit A).

2.     Over the course of the next three years, Haggen, Inc. streamlined its operations and closed a number of its non-performing stores.  (Id., ¶45).  By the summer of 2014, Haggen, Inc. was a profitable chain of eighteen stores and one stand-alone pharmacy.  (Id., ¶5).

3.     In the summer of 2014, two large grocery store chains, Albertson's and Safeway, were finalizing a potential merger.  (Id., ¶63).  But the Federal Trade Commission ("FTC") expressed concern over the size of the soon-to-be new company and required the companies to divest themselves of 168 stores.  (Id., ¶64).[1]

4.     In September 2014, Comvest requested Akerman to represent it and the soon-to-be created Haggen-related entities in connection with the potential acquisition of stores from Albertsons.  (Affidavit of Michael Niegsch, ¶6).  Per the FTC's directive that any prospective purchaser show how it would continue to operate the stores, Haggen prepared a bid for 146 of the Albertson's stores which it submitted to the FTC for approval.  (Complaint, ¶64).

5.     Haggen's bid not only included the specific terms of the Asset Purchase Agreement ("APA"), but also included a business plan to make the stores a successful going concern.  (Complaint, ¶64).  Haggen retained financial and industry consultants to aid in this business plan.  (Affidavit of Niegsch, ¶6).  As part of its bid, Haggen proposed creating a number of companies and subsidiaries under the umbrella of the ultimate parent company, Haggen Holdings, LLC ("HoldCo").  (Complaint, ¶82).  This new corporate structure separated the

---

[1] The evidence will show that there was a tight deadline to complete the deal, and as such, Albertson's and Safeway offered the stores at a significant bargain.

various Haggen-related companies into two groups: those that would hold property interests in the soon-to-be-acquired stores and those Haggen-related companies that were going to operate the grocery store business.   Id.   Haggen submitted the new corporate structure to the FTC as part of its bid process.   Defendants' Answer (the "Answer"), [Adv. Docket No. 24] at ¶82).   In January 2015, the FTC issue an order approving Haggen's bid for the 146 stores. (Complaint, ¶66).

6.      At the time of closing, Comvest invested $50 million in equity into the new Haggen entity.  (Complaint, ¶69).   Comvest also transferred the original 18-store Haggen, Inc. legacy entity into the operating entities, where it became a third-tier subsidiary to HoldCo.  (Id., ¶82).  In other words, Comvest placed new money and its valuable legacy grocery store chain at risk if the operations of the new stores failed.

7.      At the time of closing, the Debtors also had access to a $210 million revolving line of credit from PNC Bank, as well as a "Swing Loan" facility of another $23 million. (Complaint, ¶72).[2]

8.      Haggen purchased all 146 stores for $309 million.   (Answer, ¶5).   Haggen financed the deal by selling thirty nine (39) stores with real property interests to unrelated third parties (Spirit and Garrison) for $359 million.  (Complaint, ¶52).[3]  After paying Albertsons the total purchase price, the remaining $50.2 million of sales proceeds were not paid out as a

_____

[2] As the evidence will show, PNC evaluated the transaction and the business model (including the new corporate structure) before agreeing to provide the line of credit.

[3] Of the 146 stores, 79 stores were stores that had been leased by Albertsons from third-party landlords ("Leased Stores") and 67 stores were situated on fee-owned real estate or favorable long-term leases ("Real Property Stores").  (Complaint, ¶48).  The Committee does not believe these Leased Stores are relevant to their claims.  Id.  However, the Leased Stores were transferred directly to either Haggen Opco North, LLC ("Opco North") or Haggen Opco South, LLC ("Opco South"), depending on the store's location.  Debtors Opco North and Opco South paid nothing for these leasehold interests.

dividend, but were instead transferred to various Debtor entities. (Answer, ¶6).[4] Thus, the Debtors received a total of more than $100 million in cash, an 18-store profitable legacy enterprise, access to a credit line of more than $230 million, and complete ownership interests in real-estate holding entities.[5]

9.    From February 2015 through the beginning of June 2015, the 146 stores were transferred on a rolling basis and, during that time, Akerman continued to represent Comvest and HoldCo (and all of its first, second and third-tiered subsidiaries). (Affidavit of Michael Niegsch, ¶7). However, even before the first store transfer, Comvest and HoldCo (along with all of its first, second and third-tiered subsidiaries) became concerned that litigation might ensue with Albertsons over the deal. (Id, ¶9).[6]

10.    Despite the thoughtful business plans, and the approval of numerous sophisticated third parties, Haggen's acquisition was not successful. Akerman continued to represent Comvest and HoldCo (along with its first, second and third-tiered subsidiaries) until the Petition Date, September 8, 2015. (Id., ¶8).

11.    On September 21, 2015 the U.S. Trustee appointed the Committee. Immediately, the Committee accused the Defendants of carrying out fraudulent transfers as part of an overall scheme to defraud the Debtors' creditors. Thereafter, the Committee began negotiating an

---

[4] While 39 of the 67 Real Property Stores were sold to third-parties, the remaining twenty-eight (28) stores were owned by one of the non-Debtor Propco entities, Haggen Property Holdings III, LLC, Haggen Property North, LLC ("Propco North") or Haggen Property South, LLC ("Propco South"). As the Complaint makes clear, each of these entities were wholly owned subsidiaries (first or second-tier) of HoldCo. (Complaint, ¶82).

[5] Despite these admissions, the Committee nonetheless summarily concludes the Debtors were insolvent "…from the moment the transaction was conceived and executed…" (Motion, p.14, fn.8). The Committee has offered no evidence to support this conclusory allegation.

[6] Haggen would later sue Albertson's for effectively sabotaging its ability to operate the newly acquired stores. The lawsuit has since been settled.

agreement with the Debtors and the Defendants to obtain derivative standing to investigate and pursue claims against the Defendants.    The Committee, the Debtors and the Defendants thereafter entered into the Standing Stipulations. (Motion, ¶¶5,6).

12.    As part of the Standing Stipulations, the Committee agreed that, while it obtained the right to sue derivatively on behalf of the Debtors, the Debtors retained their right to any evidentiary privileges.  *See* Docket No. 1235.

13.    The Committee thereafter served numerous Requests for Production of Documents on the Debtors and the Defendants.  In response, and consistent with the terms of the Standing Stipulations, the Debtors asserted numerous privilege objections, withheld various documents ("Withheld Information") and produced a privilege log describing the Withheld Information. (Motion, ¶12).

14.    In response, the Committee did not engage in a meet and confer with the Debtors over whether certain privilege objections were appropriately lodged as to certain documents. Instead, the Committee globally objected to the Debtors' assertion of any evidentiary privilege; specifically, the Committee contended that the Debtors could not assert any privilege because the Committee, by obtaining limited standing to prosecute the claims against the Defendants, now possessed any privileges that otherwise belonged to the Debtors' estate. (Motion, Ex. A).   The Debtors disagreed.  The Committee now brings its Motion.

## ARGUMENT

## I.    THE COMMITTEE DOES NOT POSSESS THE DEBTORS' PRIVILEGES

15.    In its Motion, the Committee asserts that because it has been granted limited standing to pursue and prosecute claims against the Defendants, "it is carrying out the Debtors'

fiduciary duties in connection with [the litigation]." (Motion, ¶15).[7]   The Committee declares

that it necessarily follows that "the Committee controls the [evidentiary privileges] with respect

to the Withheld Information…and that the [evidentiary privileges] are not properly invoked by

the Debtors." (Motion, ¶18).  The opposite is true, as evidenced by the very cases the Committee

cites in its own Motion.

16.     Prior to bankruptcy, a corporation's management controls the company's

evidentiary privileges, including the attorney-client privilege. *Commodity Futures Trading

Commission v. Weintraub*, 471 U.S. 343, 348-49 (1985).

17.     When the company files for bankruptcy protection, the privileges are controlled

by the debtor-in possession.   *In re American Metrocomm Corp,* 274 B.R. 641, 654 (Bank. D.

Del. 2002)("In this Chapter 11 case, AMC is a debtor-in-possession.  Therefore, AMC controls

the attorney-client privilege with respect to both its pre-and post-petition communications with

Defendants." [citations omitted]).  In the event a trustee is appointed, the trustee controls the

privileges. *Weintraub*, 471 U.S. at 354.

18.     In the instant case, the Debtors are, in fact, debtors-in-possession.  Therefore, the

Debtors (and not the Committee) control the evidentiary privileges, including the attorney-client

privilege. *In re American Metrocomm Corp,* 274 B.R. at 654.

19.     Ignoring this Court's ruling *In re American Metrocomm Corp,* [8] the Committee

contends that because it obtained a limited right to prosecute claims against the Defendants, the

---

[7] The Committee fails to explain or present case law that identifies these purported
"fiduciary duties" or how the Committee is supposedly "carrying" them out.  As explained
below, case law makes it clear that merely because the Committee is prosecuting the Debtors'
claims, the Committee's fiduciary duties—even while prosecuting the litigation—remain to its
constituents (i.e., the group of unsecured creditors) and not to the estate.

[8] In its letter to Debtors' counsel, the Committee cited *In re American Metrocomm Corp*
favorably. (Motion, Ex. A).  But in its Motion, the Committee makes no reference to *Metrocomm*

7

control of the privileges necessarily transferred to it. (Motion, ¶16-18).  As a result, the Committee concludes it is entitled to waive the evidentiary privileges and force the Debtors to turn over otherwise privileged materials. Id.  The Committee is incorrect for several reasons.

20.     First, the Debtors' evidentiary privileges were not transferred to the Committee because the Committee was given only a limited right to pursue claims against the Defendants. The Committee's contention that by receiving any derivative standing it necessarily receives the debtors' evidentiary privileges has been rejected by various courts.  In *Official Committee of Asbestos Claims of G-I Holding, Inc. v. Heyman*, 342 B.R. 416, 421 (S.D. N.Y. 2006),[9] the creditors' committee argued (similar to the Committee here) that because it was given the power to "pursue and prosecute any and all claims and causes of actions belonging to the Debtor" against insiders and affiliates it necessarily meant that the *Weintraub* ruling should be extended to apply to a duly appointed creditors' committee.  The Court rejected this argument and refused to extend the "authority of the *Weintraub* trustee" to the creditors' committee because the committee, unlike a trustee: a) had no authority or responsibility to operate the debtor entity; and b) did not have to act in the best interest of the estate, but instead merely had to act in the best interest of their constituents (i.e., unsecured creditors).  *Heyman*, 342 B.R. at 423.  Similar reasoning applies to the Committee's position in the instant case.  *See also In re Big M, Inc.*, 2013 WL 1681489 (Bank. D.N.J. 2013) (Citing *Heyman* with approval and refusing the creditor committee's request to compel the debtor-in-possession to produce documents covered by the attorney-client privilege).

---

provides no explanation why *Metrocomm*'s holding that a debtor-in-possession retains its evidentiary privileges was inapplicable or distinguishable.

[9] The Committee contends *Heyman* was incorrectly decided, going against the Supreme Court's *Weintraub* holding. (Motion, p.13, n.7).  The Committee provides no case law to support this assertion.  At least one other court has cited *Heyman*'s reasoning with approval.  *See In re Big M, Inc.*, *infra*.

21.    To overcome *Heyman*'s ruling, the Committee attempts to distinguish its limited standing from the *Heyman* committee's standing by declaring that, unlike the *Heyman* committee,  it "is standing in the shoes of the Debtors and their estates…" (Motion, p.13, fn.7). The Committee does not define the elements necessary to determine when one is "standing in the shoes of the Debtors" or the legal significance of obtaining such a shoe-standing position.  To the extent the Committee contends that it has replaced the Debtors and overtaken all of their rights (as if by some type of novation), a plain reading of the Standing Stipulations reveals just the opposite.

22.    In the Standing Stipulation, the Committee neither replaced the Debtors nor inherited all of the Debtors' rights and privileges.   The derivative standing the Committee received was clearly limited.  In the Standing Stipulation, the Debtors retained their rights to: a) defend against any claim asserted by the Committee (¶2); b) raise any affirmative defense (Id.); c) assert evidentiary privileges (¶4); and d) object to any proposed settlement reached by the Committee (¶6).

23.    In contrast, the breadth of the committee's standing in *Heyman* was greater than that given the Committee in the Standing Stipulations, and yet the Court in *Heyman* found the committee did not obtain the right to the debtors' evidentiary privileges.   Simply put, the Committee's attempt to distinguish *Heyman* is unpersuasive. [10]

24.    The Committee's position that it controls the Debtors' evidentiary privileges also fails because the Debtors never agreed to transfer control of their evidentiary privileges to the Committee.  The Standing Stipulations explicitly reserved to the Debtors the right to assert their evidentiary privileges, including the attorney-client privilege.  *See* Docket No. 1235, ¶4.

---

[10] Although the Committee initially claims that its role is different than the *Heyman* committee's role (Motion, p.13, fn.7),  the Committee later acknowledges that its role in this matter is the same as the committee's role in *Heyman*.  (Motion, ¶23).

25.    Finally, even if the Debtors wanted to waive the evidentiary privileges and give the Withheld Information to the Committee, they are prohibited from doing so.  At the time the Withheld Information was created, the Debtors were co-clients with the Defendants, all using Akerman for legal representation. Akerman represented both the Debtors and the Defendants prior to, during and subsequent to the closing of the deal with Albertsons.  (Affidavit of Michael Niegsch, ¶¶6,7).  Thereafter, Akerman continued to represent its co-clients up until the Debtors filed their voluntary petition for bankruptcy.  (Id., ¶8).  In these "co-client" relationships, the Third Circuit has recognized that "one co-client does not have authority to waive the privilege with respect to another co-client's communications to their common lawyer."  *In re Teleglobe*, 493 F.3d 345, 379 (3d Cir., 2007).   Thus, the Committee is spending considerable time and money to seek privileged documents that it cannot use in this litigation because the evidentiary privileges also belong to the Defendants as co-clients, who will not waive them.[11]

26.    Because the Debtors are debtors-in-possession and because they have not—and cannot—waive the privileges attached to the Withheld Information, the Committee's argument that it has the authority of the *Weintraub* trustee should be rejected.

## II.    THE COMMITTEE HAS FAILED TO PROVE THAT THE DEBTORS WERE INSOLVENT AT THE TIME OF THE COMMUNICATIONS--THE "KEY" *GARNER* ELEMENT

27.    The Committee contends that even if the Debtors control the evidentiary privileges, the fiduciary exception articulated in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970) applies and the Committee should obtain all of the Withheld Information.  (Motion, ¶¶19,36).   Relying heavily on the analysis of the district court in *Heyman*, the Committee contends it has satisfied the four necessary elements to invoke the *Garner* exception.  (Motion,

---

[11] The Committee cited *In re Teleglobe* in its Motion, but did not distinguish or argue against its holding on the application of the co-client privilege.

¶21).  In doing so, the Committee ignores controlling Third Circuit precedent, failing to focus any of its argument on the issue the Third Circuit has declared is "the key" element---the Debtors' insolvency.

28.    The *Teleglobe* plaintiffs/debtors argued they were entitled to access certain otherwise privileged documents under the *Garner* exception to support their breach of fiduciary duty claim.  *In re Teleglobe*, 493 F.3d at 384.  In addressing the debtors' argument, the Third Circuit determined the analysis must first address whether the debtors were insolvent at the time the privileged communication was sent:  "The key, however, is insolvency.  If the Debtors were not insolvent…at the time of the otherwise privileged communications then BCE was the only beneficiary of the Debtors' success, and it could not, therefore, breach its fiduciary duty to itself."  Id.  If the debtors proved insolvency, the Third Circuit continued, they would still need to present a colorable claim of the breach of fiduciary duty as part of the requisite "good cause" needed to pierce the evidentiary privilege.  Id, 493 F.3d at 385.[12]  Because the debtors' solvency had not been addressed by the courts below, the Third Circuit remanded the matter back to the bankruptcy court to determine whether the debtors were insolvent.  Id, at 386.

29.    On remand, the bankruptcy court found the burden was on the debtors to prove that they were insolvent at the time of the privileged communications.  The bankruptcy court found that it was not enough for the debtors to merely make a "colorable showing of insolvency." *In re Teleglobe Communications Corp*, 392 B.R. 561, 598 (Bankr. D. Del. 2008). Rather, the debtors had to prove they were insolvent at the time of the communications in order

---

[12] The nine *Garner* factors the Committee identified in its Motion (Motion, p.12m fn.5) are only applicable in the "good cause" analysis.  These factors, and the four (4) *Heyman* factors, are only relevant if the Committee first proves the Debtors were insolvent.  *In re Teleglobe,* 493 F.3d at 385.

to apply the *Garner* exception.  <u>Id</u>.  Because they failed to present the necessary evidence to prove their insolvency, the court ultimately held, the *Garner* exception did not apply.

30.     In its Motion, the Committee fails to address the "key" element of insolvency.[13] Instead, the Committee has merely jumped ahead to the "good cause" analysis, which the Third Circuit held was only relevant after insolvency had been established.

31.     The Committee's only mention of the Debtors' insolvency in its Motion is the unsupported accusation that this case is a mirror of *In re Mervyn's Holdings, LLC*, 426 B.R. 488 (Bankr. D. Del. 2010)[14] and that the Debtors' insolvency from "the moment" the transaction closed was therefore self-evident.[15]    However, this case is nothing like *Mervyn's* and, as evidenced by facts the Committee itself has already admitted, the Committee has failed to prove the Debtors were insolvent.

32.     In *Mervyn's,* this Court denied the defendants' Rule 12(b)(6) motion to dismiss where the complaint alleged the defendants had orchestrated a leveraged buy-out that stripped the debtor of any interest in its real estate, left the debtor with less than $22 million of working capital, and an increased debt-load of more than $800 million which it could not meet. *Mervyn's*, 425 B.R. at 493, 497-98.  Based upon these factual allegations, this Court found a fraudulent transfer claim had been sufficiently alleged. <u>Id</u>.

33.     In contrast, the Committee has admitted the Debtors' financial situation after the close of the Albertson's transaction was the opposite of *Mervyn's*.  At the conclusion of its

---

[13] Presumably, the Committee has no evidence at the moment as to when the Debtors were insolvent, as the Committee contends that it is presently too "premature" to identify any evidence as to when any Debtor was insolvent.  (Committee's Response to Defendants' Interrogatory No. 11).

[14] *See* Motion, p.3 and ¶8.

[15] *See* Motion, p.14, fn.8.

transaction with Albertsons, the Debtors had: a) a $50 million infusion from Comvest; b) sales proceeds of $50.2 million from the independent, third-party purchasers; c) a profitable 18-store legacy chain; and d) access to a $200+ million line of credit, which at the time of the closing had not yet been tapped.  Additionally, Debtor HoldCo had complete ownership of three solvent and wholly owned subsidiaries (either first or second-tier) that owned twenty-eight (28) Real Property Stores, which had no mortgage.  The only debt the Debtors had at that time were its store lease obligations.[16]

34.     Simply put, the Committee has not only failed to prove that the Debtors were insolvent at the time "the Albertsons' transaction was conceived and executed," but it has admitted the opposite.  This case is not a *Mervyn's*-like scenario.  At a minimum, the Committee has failed to prove the the *Garner* exception, as articulated by the Third Circuit, is inapplicable.

## III.     THE WORK-PRODUCT PRIVILEGE IS APPLICABLE

35.     The Committee also contends that the Debtors' assertion of the work-product privilege is inappropriate.  (Motion, ¶¶34-36).  The Committee first claims that "the same logic underlying the *Garner* doctrine applies with equal force" to the Debtors' work-product privilege. This is incorrect.

36.     In *Teleglobe*, the Third Circuit expressly held that the *Garner* exception does not apply to the work-product privilege.  *Teleglobe*, 493 F.3d at 385. ("First, [BCE] argues that *Garner* does not apply to work product.  This is correct…").

37.     The Committee also contends that because all of the Withheld Information pre-dates the formation of the Committee and even the Petition date, that the documents could not have been created in "anticipation of litigation."    (Motion, ¶35).   However, there is no

---

[16] As the evidence will show, the FTC and multiple self-interested third parties were comfortable with the business plan for operating these stores.

requirement that when asserting the work-product privilege, the "anticipated litigation" must be the same litigation in which the documents are now sought. *In re Ford Motor Company*, 110 F.3d 954, 967 (3d Cird. 1997)(recognizing Rule 26(b)(3) requires only "that the material be prepared in anticipation of some litigation, not necessarily in anticipation of the particular litigation."). As set forth in the affidavit of Michael Niegsch, the Defendants anticipated litigation over the transaction early on, given the actions of Albertsons and others. (Affidavit of Michael Niegsch, ¶9). Thus, the Committee's claim that the Withheld Information could not have been prepared in anticipation of litigation is without merit.

38. Finally, the Committee contends that the privilege is inapplicable because the Debtors are neither adverse nor "another party," relying on language from *In re Foster*, 188 F.3d 1259 (10th Cir. 1999). The Committee is incorrect for several reasons. First, contrary to the Committee's unsubstantiated assertion, the Debtors and the Committee are not one and the same party. The plain language of the Standing Stipulations makes this clear, as the Debtors retain all of their rights, privileges and defenses. Second, as explained above, the Committee is not the equivalent of a bankruptcy trustee. Therefore, the *Foster* quote is inapplicable. Third, Rule 26(b)(3) plainly states that the privilege can be asserted against "any party." There is no requirement that the parties be adverse. Finally, to the extent a party must be adverse before the attorney can refuse to turn over his/her work product, the Defendants are clearly adverse to the Committee. As such, because Akerman had a co-client relationship with both the Debtors and the Defendants, the co-client privilege would preclude Akerman from turning over its work product to the Committee.

## <u>CONCLUSION</u>

For the foregoing reasons, the Defendants respectfully request the Court deny the Committee's Motion to compel.

This the 7th day of April, 2017.

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

*/s/ Kevin J. Mangan*
Kevin Mangan (DE Bar No. 3810)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone:  (302) 252-4361
E-mail:  kmangan@wcsr.com

-and-

Philip J. Mohr, Esq.
300 North Greene Street, Suite 1900
Greensboro, NC 27401
Telephone:  (336) 721-3577
E-mail:  pmohr@wcsr.com

-and-

KIRKLAND & ELLIS LLP
Stephen C. Hackney (admitted pro hac vice)
Richard U.S. Howell (admitted pro hac vice)
300 N. LaSalle St.
Chicago, IL 60654
Telephone:  (312) 862-7092
E-mail:  stephen.hackney@kirkland.com
E-mail:  richard.howell@kirkland.com

*Counsel to Defendants Comvest Group Holdings, LLC,*
*Comvest Investment Partners III, L.P., Comvest Investment*
*Partners IV, L.P., Comvest Haggen Holdings III, LLC,*
*Comvest Haggen Holdings IV, LLC, Comvest Advisors,*
*LLC, Haggen Property Holdings, LLC, Haggen Property*
*South LLC, Haggen Property North, LLC, Haggen*
*Property Holdings II, LLC, and Haggen SLB, LLC, and*

15

*John Caple, Cecilio Rodriguez, Michael Niegsch, John Clougher, Blake Barnett, William Shaner, and Derrick Anderson*