## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| HH LIQUIDATION, LLC, *et al.*,[1] | ) | |
| | ) | Case No. 15-11874 (KG) |
| Debtors, | ) | (Jointly Administered) |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS OF HH LIQUIDATION, LLC, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. Pro. 16-51204 (KG) |
| | ) | |
| -against- | ) | |
| | ) | |
| COMVEST GROUP HOLDINGS, LLC, *et al.,* | ) | |
| | ) | |
| Defendants.[2] | ) | |
| | ) | |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Filed:  August 25, 2017

**KIRKLAND & ELLIS LLP**
Stephen C. Hackney, P.C.
Richard U.S. Howell
Jeffery J. Lula
300 N. LaSalle St.,
Chicago, IL  60654
Telephone:  (312) 862-7092

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**
Kevin J. Mangan (DE Bar No. 3810)
222 Delaware Avenue, Suite 1501
Wilmington, DE  19801
Telephone:  (302) 252-4361

Philip J. Mohr, Esq. (NC Bar No. 24427)
300 North Greene Street, Suite 1900
Greensboro, NC 27401

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) (7558) ("Holdings"); HH Operations, LLC (f/k/a Haggen Operations Holdings, LLC) (6341) ("Operations"); HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC) (7257) ("OpCo South"); HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC) (5028) ("OpCo North"); HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC) (7687) ("Acquisition"); and HH Legacy, Inc. (f/k/a Haggen, Inc.) (4583) ("Haggen, Inc.").  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

[2]    The Defendants in this adversary proceeding are:  Comvest Group Holdings, LLC; Comvest Investment Partners III, L.P.; Comvest Investment Partners IV, L.P.; Comvest Advisors, LLC (collectively, "Comvest"); Haggen Property Holdings, LLC ("Property Holdings"); Haggen Property South, LLC ("PropCo South"); Haggen Property North, LLC ("PropCo North"); Haggen Property Holdings II, LLC ("Property Holdings II"); Haggen SLB, LLC ("Haggen SLB"); John Caple; Cecilio Rodriguez; Michael Niegsch; John Clougher; Blake Barnett; William Shaner; and Derrick Anderson.

# TABLE OF CONTENTS

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING** ........................ 1

**SUMMARY OF ARGUMENT** ..................................................................................... 4

**STATEMENT OF FACTS** ........................................................................................... 6

    A.    Comvest Partners Invests in Haggen .............................................. 6

    B.    Holdings Agrees to Acquire Assets from Albertsons ............................................. 7

    C.    Holdings Transfers Assets to Wholly-Owned Subsidiaries................................... 8

        1.    Holdings Transfers the Operational Assets to the OpCo Entities.............. 9

        2.    The PropCo Entities and the SLB Entities Acquire the Real Property Assets ......................................................................... 10

    D.    Spirit/GIG Purchase Real Property, Lease It to the OpCo Entities, and Obtain a Guarantee from Holdings ........................................ 11

    E.    Other Creditors of the OpCo Entities Seek, But Are Refused, Guarantees from Other Haggen Entities ................................................................ 12

    F.    Solvency.................................................................................... 13

    G.    Payment of Market Rents........................................................... 14

    H.    Recovery Analysis of Creditors' Claims ............................................. 15

**SUMMARY JUDGMENT STANDARD** .................................................................... 16

**ARGUMENT** ............................................................................................................ 16

**I.**    **THE COURT SHOULD DISMISS THE COMMITTEE'S SUBSTANTIVE CONSOLIDATION CLAIM (COUNT 72)** ................................................................ 16

**II.**   **THE COURT SHOULD DISMISS THE COMMITTEE'S CLAIMS ALLEGING FRAUDULENT TRANSFERS BY HOLDINGS BECAUSE THERE IS NO BENEFIT TO THE ESTATE AND HOLDINGS IS SOLVENT** ................................................................................................ 20

    A.    This Case Is Factually Distinct from *Mervyn*'s .................................... 20

    B.    The Committee's Fraudulent Transfer Claims on Behalf of Holdings Fail Because They are Not a Benefit to the Estate........................................ 25

    C.    No Transfers by Holdings Were Constructively Fraudulent ............................... 28

i

     D.     No Transfers by Holdings Were Actually Fraudulent .......................................... 29

**III.**    **"COLLAPSING" THE TRANSACTIONS CHANGES NOTHING ......................... 30**

**IV.**    **THE COMMITTEE CANNOT MEET ITS BURDEN TO SHOW THAT THE RENT PAYMENTS MADE TO THE PROPCO ENTITIES WERE CONSTRUCTIVELY FRAUDULENT ....................................................... 32**

**CONCLUSION ............................................................................................................. 33**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abeinsa Holding, Inc.*,
  562 B.R. 265 (Bankr. D. Del. 2016) ................................................................. 17

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
  390 B.R. 80 (S.D.N.Y. 2008) ........................................................... 5, 27, 28

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................. 16

*In re The Archdiocese of St. Paul*,
  553 B.R. 693 (Bankr. D. Minn. 2016),
  *aff'd* 562 B.R. 755 (D. Minn. 2016) ............................................................ 18

*Branch v. F.D.I.C.*,
  825 F. Supp. 384 (D. Mass. 1993) .............................................................. 29

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................. 16

*In re Circle Land and Cattle Corp.*,
  213 B.R. 870 (Bankr. D. Kan. 1997) ........................................................... 18

*Douglas v. Hill*,
  148 Wash. App. 760 (Ct. App. 2009) .......................................................... 28

*In re DRW Prop. Co. 82*,
  54 B.R. 489 (Bankr. N.D. Tex. 1985) .......................................................... 18

*In re Dunes Hotel Assocs.*,
  194 B.R. 967 (Bankr. D.S.C. 1995) ............................................................. 27

*re DVI, Inc.*,
  326 B.R. 301 (Bankr. D. Del. 2005) .......................................................... 5, 29

*In re Elrod Holdings Corp.*,
  421 B.R. 700 (Bankr. D. Del. 2010) ........................................................... 16

*Fidelity Nat'l Title Ins. Co. v. Schroeder*,
  179 Cal. App. 4th 834 (App. 5th 2009) ....................................................... 28

*In re First City Bancorporation of Texas, Inc.*,
  1995 WL 710912 (Bankr. N.D. Tex. May 15, 1995) ....................................... 29

iii

*Fisher v. Kelly,*
    30 Or. 1 (1896) ........................................................................................................28

*In re Global Grounds Greenery, LLC,*
    405 B.R. 659 (Bankr. D. Ariz. 2009) ....................................................................28

*In re Hamilton,*
    186 B.R. 991 (Bankr. D. Colo. 1995) ...................................................................18

*In re Ira S. Davis, Inc.,*
    1993 WL 384501 (E.D. Pa. Sept. 22, 1993) ........................................................18

*In re IT Grp., Inc.,*
    359 B.R. 97 (Bankr. D. Del. 2006) .......................................................................16

*In re Key3Media Grp., Inc.,*
    336 B.R. 87 (Bankr. D. Del. 2005),
    <u>aff'd,</u> 2006 WL 2842462 (D. Del. Oct. 2, 2006) ....................................................33

*In re Lease-A-Fleet,*
    141 B.R. 869 (Bankr. E.D. Pa. 1992) ...................................................................18

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.,*
    945 F.2d 635 (3d Cir. 1991) .................................................................................33

*In re Mervyn's Holdings, LLC,*
    426 B.R. 488 (Bankr. D. Del. 2010) ........................................................... *passim*

*In re New Life Adult Med. Day Care Ctr., Inc.,*
    2014 WL 6851258 (Bankr. D.N.J. Dec. 3, 2014) ...........................................25, 26

*Norris v. R & T Mfg.,*
    265 Or. App. 672 (Ct. App. 2014) .......................................................................28

*In re Nortel Networks, Inc.,*
    532 B.R. 494 (Bankr. D. Del. 2015) .....................................................................16

*In re Opus E., LLC,*
    528 B.R. 30 (Bankr. D. Del. 2015) .......................................................................26

*In re Owens Corning,*
    419 F.3d 195 (3d Cir. 2005) ...........................................................6, 17, 18, 19

*In re Pearlman,*
    462 B.R. 849 (Bankr. M.D. Fla. 2012) .................................................................18

*In re Pennsylvania Gear Corp.,*
    2008 WL 2370169 (Bankr. E.D. Pa. Apr. 22, 2008) ...........................................30

*In re R.H.N. Realty Corp.*,
    84 B.R. 356 (Bankr. E.D. Pa. 1992) ....................................................18

*Roth Steel Tube Co. v. C.I.R.*,
    800 F.2d 625 (6th Cir. 1986) ...........................................................15

*In re ShendaTech, Inc.*,
    519 B.R. 292 (D. Nev. 2014) ...........................................................28

*In re Trans World Airlines, Inc.*,
    163 B.R. 964 (Bankr. D. Del. 1994) ..................................................25

*United States v. Tabor Court Realty Corp.*,
    803 F.2d 1288 (3d Cir. 1986)...........................................................31

*Wellman v. Wellman*,
    933 F.2d 215 (4th Cir. 1991) ...........................................................26

**Statutes**

11 U.S.C.A. § 548(a)(1)(A) .................................................................29

11 U.S.C.A. § 548(a)(1)(B) .................................................................28

11 U.S.C. §105 .................................................................................18

11 U.S.C. §105(a) .............................................................................18

11 U.S.C. § 548 ................................................................................26

11 U.S.C. § 548(a)(1)(B)(ii)(III) ..........................................................29

11 U.S.C. § 550 ................................................................................25

11 U.S.C. §550(a) .............................................................................25

Ariz. Rev. Stat. §§ 44-1004(A)(2), 1005 ..............................................28

Bankruptcy Code §303 ......................................................................18

Cal. Civ. Code §§ 3439.04(a)(2), 3439.05.............................................28

California's Uniform Fraudulent Transfer Act .......................................28

Nev. Rev. Stat. §§ 112.180(1)(b), 112.190 ...........................................28

Nevada's Uniform Fraudulent Transfer Act ..........................................28

Or. Rev. Stat. §§ 95.230(a)(2), 95.240.................................................28

Oregon Uniform Fraudulent Transfers Act ........................................................................28

Uniform Fraudulent Transfer Act ......................................................................................28

Wash. Rev. Code §§ 19.40.041(a)(2), 19.40.051 ............................................................28

**Rules**

Fed. R. Civ. P. 56(a) .........................................................................................................16

Fed. R. Civ. P 56(c) ..........................................................................................................16

Local Rule 7007-2(b)(i)(E) ..............................................................................................6, 7

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

In 2011, Comvest Partners acquired a small grocery store chain named Haggen. It did so because it saw a business opportunity to partner with a well-respected, but recently struggling, local brand and help Haggen reach its full potential. With strategic guidance from Comvest, Haggen streamlined its portfolio of stores, improved its operational efficiency, and evolved the successful "Northwest Fresh" branding strategy. The eighteen Haggen stores improved their profitability—more than tripling their EBITDA. The partnership between Haggen and Comvest was a success.

Often this is where an investment story ends. But in late 2014, an unexpected opportunity arrived. Two of the largest supermarket chains in the country (Albertsons and Safeway) agreed to merge. The Federal Trade Commission agreed to allow the merger, but only if Albertsons and Safeway divested 164 stores. Because of antitrust concerns, the FTC did not want the sale to go to another large grocery store chain. Because of timing and logistical concerns, Albertsons wanted to sell as many stores as possible to a single purchaser. As a result of these circumstances, Albertsons was willing to sell the stores at a fraction of their value. Haggen was uniquely situated to capitalize on this forced divestiture: it was a smaller chain that did not pose antitrust concerns to the FTC, yet it also had significant operational experience, relationships with key service providers, and a sophisticated private equity partner who could assist with financing and complex strategic planning.

In order to win the bid, Comvest and Haggen needed to persuade the FTC that they were up to the task of integrating and running 146 new stores under the Haggen brand. They also needed to persuade Albertsons that their business plan was viable. If it proved otherwise and the FTC refused to approve the sale, Albertsons would suffer a $400 *million* breakup fee.

1

In late 2014, Comvest and Haggen worked collaboratively and extensively to diligence the opportunity and to prepare and fine-tune a proposal. Beyond their internal experience, they hired real estate consultants, operational consultants, and transactional attorneys. They negotiated with lenders, potential real estate purchasers, vendors, and wholesalers. They assessed risks of turning Albertsons and Safeway stores into Haggen stores and developed mitigants for those risks. They modeled many different scenarios. They structured a rolling acquisition strategy that allowed each store time to change over to the Haggen brand. They lined up additional management with extensive grocery experience. In the end, Haggen submitted a detailed bid to the sellers and the FTC along with plans to finance and operate the stores. It won.

On January 27, 2015, the FTC entered an order that Haggen Holdings, LLC ("Holdings") would acquire 146 of the stores being divested by Albertsons. The FTC stated that Haggen was a "highly suitable" purchaser and "well positioned to enter the relevant geographic markets." In February, 2015, the deal closed.

Haggen's bid to the FTC outlined a plan to finance the acquisition. As a simple asset purchase, Holdings would agree to acquire the operational assets and real estate, but none of the liabilities, from the sellers. Holdings then assigned these rights to its wholly-owned subsidiaries. Holdings placed the operations in subsidiaries on the left side of the corporate structure—*i.e.,* "OpCo." Holdings placed the real estate in subsidiaries on the right side of the corporate structure—*i.e.,* "PropCo." These PropCo subsidiaries would sell the real estate for 39 store locations to third parties. The Haggen entities were able to purchase the divested Albertons stores at such a discount that the real estate for 39 stores financed the entire purchase price.

From February through June 2015, the Haggen entities converted the 146 stores on a rolling basis. Haggen confronted a number of unforeseen difficulties: mistakes by vendors,

sabotage by competitors, and pricing snafus by its wholesalers.  The result was a massive drop off in sales at the new stores.  The Haggen and Comvest teams redoubled their efforts to try to stretch costs and improve sales, but Haggen's financial challenges mounted.  In August 2015, the PropCo subsidiaries made a secured $25 million intercompany loan to the OpCo subsidiaries to assist with liquidity issues.  In the end, this was not enough.  Holdings along with the OpCo subsidiaries entered bankruptcy.

With the benefit of hindsight, the Committee asserts that the Albertsons acquisition and the operating subsidiaries "were doomed to fail."  D.I. 1, ¶ 6.  The Committee alleges that Haggen never had a "viable plan."  D.I. 1, ¶ 137.   But that is not what numerous, sophisticated parties believed at the time.  Parties on every side of the Haggen transaction—including sellers, lenders, suppliers, financial consultants, real estate purchasers, appraisers, operational consultants, attorneys, private equity sponsors, and the FTC—vetted the approach.  They put their reputations and frequently their own money on the line.  The plan was ambitious but carefully considered.  Indeed, the Committee's own constituents—sophisticated trade creditors— extended trade credit without any guarantee from the OpCo subsidiaries' affiliates or parent.  If Pepsi and Starbucks thought the venture was doomed to failure, they had a funny way of showing it.

The Committee also asserts that the entire acquisition was a "Machiavellian scheme" whereby Holdings "covertly siphoned away valuable real estate assets" so those assets "would not be available to satisfy" the Debtors' unsecured creditors.  D.I. 1, ¶ 1.  This is not accurate.  Holdings, the Debtor who is alleged to have made most of the fraudulent transfers, is ***solvent***.  It has sufficient funds to pay all of its creditors.

And OpCo, who is alleged to have entered into above market leases, was very well capitalized.  The OpCo subsidiaries were created specifically for this transaction.  Prior to the transaction, they had no creditors and no assets—they had not previously conducted any business at all.  Holdings contributed the grocery store operations, inventory, and FF&E for the 146 acquired stores into the OpCo subsidiaries, and used those assets as collateral to obtain a $210 million revolving line of credit.

The OpCo subsidiaries also received a $50 million equity investment from Comvest.  Holdings also placed its profitable, 18-store Haggen enterprise—which Comvest valued at over $100 million—on the OpCo side of the corporate structure (even though it had no obligation to do so).  All told, the OpCo got over $150 million in assets, and gave nothing in return.  The Defendants did not place over $150 million of value in OpCo in an attempt to defraud OpCo's creditors—they did it because they believed OpCo would succeed.

But even the best-laid plans can go awry.  That is what happened to Haggen.  And based on the Committee's rhetoric, they would have this Court believe that Comvest walked away in the money.  The opposite is true:  Comvest lost not only its initial $50 million equity investment, but its $100 million 18-store legacy chain as well, and incurred millions in defending this lawsuit.

### SUMMARY OF ARGUMENT

1.      Defendants acknowledge that certain statements contained in their preliminary statement represent facts which are in dispute.  After over a year of the Committee casting false aspersions against Comvest (as well as the directors and officers of Haggen), Defendants eagerly anticipate telling their story at the October trial and proving that they did not engage in fraud, breaches of fiduciary duty, or any other improper actions alleged by the Committee.  However, many of the Committee's claims (and requested remedies) are so infirm that they do not

necessitate a trial.  Most of Committee's counts for fraudulent transfer as well as their claim for substantive consolidation are legally insufficient and there is no genuine dispute as to the facts establishing that insufficiency.  For that reason, as detailed below, Defendants file this motion.

2.      This Complaint seeks seeks a legal impossibility.  The Committee is attempting to reach property transferred from Holdings to the PropCo Entities, and use it to pay the creditors of the OpCo Entities.  But the OpCo Entities never owned this property in the first place.  And the Committee's legal theories do not make sense.  The Committee seeks to "collapse" the transaction, but does not actually ask the Court to unwind the transfers to Albertsons or to Spirit or GIG.  This "partial" collapse is the exact opposite of what the law requires.  *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 497 (Bankr. D. Del. 2010).  And even if the transaction is collapsed, there is still no fraudulent transfer from Holdings to avoid.  Holdings was and is solvent, and unwinding these transfers will do nothing to benefit the Holdings estate.  *See Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80 (S.D.N.Y. 2008).  The only transfers made by Holdings were to its own wholly-owned subsidiaries; these transfers harmed no one because the value of the transferred property is still available to satisfy Holdings' creditors.  *SeeIn re DVI, Inc.*, 326 B.R. 301, 306 (Bankr. D. Del. 2005).

3.      Counts 1–19 and 39–63 of the Committee's Complaint assert that Holdings fraudulently transferred property by assigning its purchase rights to its wholly-owned subsidiaries.  Defendants move for summary judgment on all of these claims.  No Court has ever held that a transfer from a solvent debtor to its wholly owned subsidiary is fraudulent, and no court has ever crafted a remedy to such a transfer that moves the property to an entity that never owned it.

4.      Counts 21, 23, 24, 26, 27, 29, 31, 32, 34, 35, 37, 38 allege constructive fraudulent transfers by the OpCo Entities in the form of rent payments to lease the underlying real property. In order to prevail on these claims, the Committee must prove that the rents paid were fraudulently inflated above-market rents.  None of the Committee's expert witness offer any testimony that these rents are above market, and Defendants seek summary adjudication of these counts.

5.      Defendants also seek judgment on Count 72, which seeks to substantively consolidate all of the Debtors with the non-Debtor PropCo and SLB Entities.  Defendants are entitled to judgment as a matter of law on this claim because consolidation will harm both creditors and equity holders of Holdings, and these creditors expressly relied on the corporation's separate existence. *In re Owens Corning,* 419 F.3d 195, 211 (3d Cir. 2005).

6.      Defendants do not move for summary adjudication on the Committee's claims regarding actual fraudulent transfer by the OpCo Entities (Counts 20, 22, 25, 28, 30, 33, and 36), breach of fiduciary duty, unjust enrichment, and other related claims.

## STATEMENT OF FACTS

The following "Statement of Facts" contains "all facts that should be known" in order for the Court to rule on this Motion.  Local Rule 7007-2(b)(i)(E).  Any factual concessions made in Defendants' Statement of Facts are made only for purposes of this Motion.

### A.      Comvest Partners Invests in Haggen

1.      Haggen, Inc. was founded by the Haggen family in 1933.  *See* D.I. 1, ¶ 43.  By 2011, Haggen, Inc. owned and operated 30 grocery stores in Washington and Oregon.  *See id.*

2.      In 2011, the Haggen family sold an 80 percent equity interest in Haggen, Inc. to Comvest Partners, a private equity firm, with the Haggen family retaining the remaining 20 percent equity interest.  *See* D.I. 1, ¶ 44.  To facilitate the transaction, Comvest created Holdings

and Acquisition, with Holdings owning 100 percent of Acquisition, and Acquisition owning 100 percent of Haggen, Inc.  *See id.*

3.      In December 2014, Haggen, Inc. operated 18 grocery stores and a stand-alone pharmacy in Washington in Oregon.  *See* D.I. 1, ¶¶ 5, 45. The 18-store enterprise generated $405.2 million in revenue and $21.5 million in EBITDA in 2014, and experienced year-over-year EBITDA growth of over 21 percent.  A-823 (Letter of Limited Partners in Comvest IV Fund, dated May 29, 2015).  Comvest valued Haggen, Inc. at approximately $100 million.  A-889 (M. Niegsch Dep. at 44:6–8).

**B.      Holdings Agrees to Acquire Assets from Albertsons**

4.      In March 2014, grocery operators Albertsons and Safeway executed a merger agreement.  *See* D.I. 1, ¶ 63.  As a condition to closing the merger, the FTC required Albertsons to divest 168 stores in eight states.  *See* D.I. 1, ¶ 64.  Recognizing an opportunity to expand at "forced-sale prices," Comvest and Haggen engaged numerous consultants and expended significant resources to vet the potential acquisition.  *See* D.I. 1, ¶ 5; A-201 (Project Tsunami Overview, November 2014).  Haggen then prepared and presented a comprehensive business plan to Albertsons and the FTC in furtherance of a bid to buy a subset of the to-be-divested Albertsons stores.  *See id.*

5.      On December 10, 2014, Albertsons and Holdings entered into an Asset Purchase Agreement (the "APA"), wherein Holdings agreed to buy 146 of the to-be-divested stores from Albertsons for $309 million (the "Albertsons Acquisition").  *See* D.I. 1, ¶¶ 5, 65; A-202 (Asset Purchase Agreement, dated December 10, 2014) ("APA").  Pursuant to the APA, Holdings agreed to acquire each of the 146 stores on a rolling basis, with Holdings paying the purchase price for each store on each store's "Closing Date."  *See* D.I. 1, ¶ 74.  Holdings also agreed to

purchase "all of the right title and interest" in and to "all assets" associated with the 146 stores. A-221 (APA).

6.      Thereafter, on January 27, 2015, the FTC issued an order approving Holdings' acquisition of the 146 stores from Albertsons.  *See* D.I. 1, ¶ 66.  The first store's "Closing Date" was February 12, 2015; the last store's "Closing Date" was June 19, 2015.  A-491 (Closing Statement, dated February 12, 2015); A-842 (Closing Statement, dated June 19, 2015).

### C.      Holdings Transfers Assets to Wholly-Owned Subsidiaries

7.      Shortly before signing the APA, Comvest and Haggen created several new entities—including the "OpCo Entities" (Operations, OpCo South, OpCo North, and Acquisition), the "PropCo Entities" (Property Holdings, PropCo South, and PropCo North), and the "SLB Entities" (Haggen SLB and Property Holdings II)—that it planned to utilize in effectuating the Albertsons Acquisition.  *See* D.I. 1, ¶ 79.  These new entities had no assets or liabilities as of the signing of the APA.  *See id.*  The relevant portion of the corporate structure as of the day the APA was signed is as follows.  *See* D.I. 1, ¶ 82.



8.      As part of the Albertsons Acquisition, Haggen entities acquired both the real property assets (the "Real Property Assets") and the non-real property assets (the "Operational Assets") associated with the 146 stores.  *See* D.I. 1, ¶ 48.

### 1.      Holdings Transfers the Operational Assets to the OpCo Entities

9.      Prior to the first Closing Date, Holdings transferred to Operations, and Operations transferred to OpCo North and OpCo South, the right to acquire all of the Operational Assets associated with the 146 stores at each Closing Date.[3]  A-504 (Contribution Agreement, dated February 12, 2015).  The Operational Assets included 79 leases with third parties to operate the stores at those locations.  *See* D.I. 1, ¶ 48.  Operations is a wholly-owned subsidiary of Holdings, and OpCo North and OpCo South are wholly-owned subsidiaries of Operations.  *See* D.I. 1, ¶¶ 19–21.  As a result, on each Closing Date, OpCo North and OpCo South acquired from

---

[3]     If the store was located in Washington or Oregon, then the non-real-property assets were transferred to OpCo North.  If the store was located in California, Nevada, or Arizona, then the non-real-property assets were transferred to OpCo South.  A-504 (Contribution Agreement, dated February 12, 2015).

Albertsons all of the Operational Assets associated with each store.   A-504 (Contribution Agreement, dated February 12, 2015).

2.      The PropCo Entities and the SLB Entities Acquire the Real Property Assets

10.      Of the 146 stores, 67 of them were located on real estate that Albertsons or Safeway owned prior to the Albertsons Acquisition (the "Real Property Stores").   *See* D.I. 1, ¶ 48.   Fifty-three of these stores were located on real estate that Albertsons or Safeway had owned in fee simple.   *Id.*; *see also id.* at Exs. A, B, E, F.   Fourteen of these stores were located on real estate that was subject to a long-term ground lease.   *Id.*   As described in more detail below, the real property associated with 20 of the Real Property Stores (the "Spirit Properties") was ultimately sold to an affiliate of Spirit Capital Realty ("Spirit"), and the real property associated with 19 of the Real Property Stores (the "GIG Properties") was ultimately sold to an affiliate of Garrison Investment Group ("GIG").   *See* D.I. 1, ¶¶ 99, 103.   The real property associated with the remaining 28 locations, including the 14 ground-lease locations, (the "Retained Properties") was acquired and retained by the PropCo Entities.   *See* D.I. 1, ¶ 117.   These transfers were disclosed in publicly recorded deeds.   *See, e.g.*, A-810 (Deed to PropCo North recorded 5/28/15).

11.      Prior to the Closing Date for each store located on Retained Properties, Holdings transferred to Property Holdings, and Property Holdings transferred to PropCo North and PropCo South, the right to acquire the Retained Properties.[4]   *See, e.g.*, D.I. 1, ¶ 117; A-806 (Contribution Agreement, dated May 15, 2015).   Property Holdings is a wholly-owned subsidiary of Holdings, and PropCo North and PropCo South are wholly-owned subsidiaries of Property Holdings.   *See* D.I. 1, ¶¶ 30–32.   As a result, on each Closing Date, PropCo North and

---

[4]      If the Retained Property was located in Washington or Oregon, the real property was transferred to PropCo North.   If the Retained Property was located in California, Nevada, or Arizona, then the real property was transferred to PropCo South.   *See, e.g.*, A-806 (Contribution Agreement, dated May 15, 2015).

10

PropCo South received the Retained Properties associated with each store.[5]  *See, e.g.*, D.I. 1, ¶ 117; A-806 (Contribution Agreement, dated May 15, 2015).

### D.    Spirit/GIG Purchase Real Property, Lease It to the OpCo Entities, and Obtain a Guarantee from Holdings

12.    Holdings agreed to sell the Spirit Properties to Spirit and the GIG Properties to GIG for approximately $358.8 million.  *See* D.I. 1, ¶¶ 95, 107.  These proceeds were then used to fund the overall purchase price owed to Albertsons.  *See id*.

13.    To effectuate the sale of the Spirit and GIG Properties, prior to the Closing Date for each Spirit and GIG Property, Holdings transferred the right to acquire the real property to the SLB Entities.  *See, e.g.*, A-785 (Contribution Agreement, dated February 26, 2015); A-802 (Contribution Agreement, dated March 9, 2015).  For the transfers made to Haggen SLB, Holdings transferred the right to acquire the real property to Operations, who transferred that right to Acquisition, who transferred that right to Haggen SLB.  *See, e.g.*, A-785 (Contribution Agreement, dated February 26, 2015).  Acquisition is a wholly-owned subsidiary of Operations, and Haggen SLB is a wholly-owned subsidiary of Acquisition.  D.I. 1, ¶¶ 19, 22, 34.  For the transfers made to Property Holdings II, Holdings transferred the right to acquire the real property directly to Property Holdings II, a wholly-owned subsidiary of Holdings.  *See, e.g.*, A-802 (Contribution Agreement, dated March 9, 2015); D.I. 1, ¶ 33.

14.    The OpCo Entities then entered into long-term leases with Spirit and GIG.[6]  *See* D.I. 1, ¶¶ 110–112; A-507 (Master Lease Agreement, dated February 12, 2015) (together with all

---

[5]    After receiving the Retained Properties, the PropCo Entities leased the fee-simple properties and subleased the ground lease properties to the OpCo Entities.  *See, e.g.*, D.I. 1, ¶¶ 126–27.

[6]    Spirit and GIG Properties located in Washington or Oregon were leased to OpCo North.  Spirit and GIG Properties located in California, Nevada, or Arizona were leased to OpCo South.  *See, e.g.*, D.I. 1, ¶ 114.

amendments thereto, the "Spirit Lease"); A-617 (Master Land and Building Lease, dated February 17, 2015) (together with all amendments thereto, the "GIG Lease").

15.     Spirit and GIG also required Holdings to guarantee the obligations of the OpCo North and South under the Spirit and GIG Leases.  A-829 (Amended and Restated Unconditional Guaranty of Payment and Performance, dated June 15, 2015) ("Spirit Guarantee"); A-789 (Amended and Restated Guaranty of Lease, dated February 26, 2015) ("GIG Guarantee"). Spirit's corporate representative testified that the guarantee from Holdings on the lease was a "feature that mitigates our risk in doing the transaction."  A-893–A-894 (D. Rosenberg Dep. at 52:18-53:6); *see also* A-895–A-896 (D. Rosenberg Dep. at 113:20–114:2).  He further testified that the guarantee would "protect [Spirit's] interest in the event that one of the other -- or that the rest of the properties within that entity [*i.e.*, the OpCo Entities] for some reason wasn't performing or able to perform."  A-894 (D. Rosenberg Dep. at 53:7–21).

**E.     Other Creditors of the OpCo Entities Seek, But Are Refused, Guarantees from Other Haggen Entities**

16.     Unified Grocers was unable to obtain a guarantee on payments from the OpCo Entities.  On December 18, 2014, Haggen, Inc., OpCo North, and OpCo South entered into a Supply Agreement with Unified Grocers, Inc. ("Unified Grocers Agreement"), wherein Haggen, Inc., OpCo North, and OpCo South agreed to buy approximately $13 million to $14 million in product and services a week from Unified Grocers.  A-441 (Unified Grocers Agreement); A-488–A-490 (Letters to Unified Grocers signed by J. Clougher, dated December 18, 2014); A-900 (M. Speiser Dep. at 51:6–11).  Thereafter, in January 2015, Unified Grocers met with Haggen representatives and requested that "PropCo" guarantee the Unified Grocers Agreement, but

Haggen representatives refused the request.[7]  A-901–A-902 (M. Speiser Dep. at 99:3–100:10).

Despite not receiving the guarantee, Unified Grocers extended credit to Haggen, Inc., OpCo

North, and OpCo South uninterrupted from February 2015 to August 2015.  A-903 (M. Speiser

Dep. at 168:11–15).  Unified Grocers has the largest unsecured claim at the OpCo Entities.  A-

884 (A&M Recovery Analysis at 2 & n.3).

**F.     Solvency**

17.     Defendants served their First Set of Interrogatories to the Committee on February

10, 2017.  A-853 (Defendants' First Set of Interrogatories to the Committee, dated February 10,

2017).   Interrogatory No. 11 asked, "For each Debtor, identify the date on which You contend

the Debtor became insolvent, and why you contend that the Debtor became insolvent on that

Date."  *Id.* at Interrog. No 11.  Interrogatory No. 12 asked, "For each of the PropCo Entities,[[8]]

identify the date on which You contend they became insolvent, and why you contend they

became insolvent on that date."  *Id.* at Interrog. No 12.

18.     The Committee responded to Defendants' First Set of Interrogatories on March

31, 2017.  A-866 (Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories

to Plaintiffs, dated March 31, 2017).    In response to Interrogatories Nos. 11 and 12, the

Committee objected on the ground that the interrogatories were "premature because it seeks

expert opinion," and promised to "provide expert disclosures" that would be responsive to the

interrogatories and "that will be deemed incorporated by reference herein."  *Id.* at Interrog. Resp.

Nos. 11 and 12.

---

[7]     Unified Grocers also never requested a guarantee from Holdings, despite knowing in December 2014 that
Holdings was the corporate entity that entered into the Albertsons Acquisition.  A-901–A-902, A-904 (M.
Speiser Dep. at 99:20–100:5, 169:3–6).

[8]     Defendants defined "PropCo Entities" in Defendants' First Set of Interrogatories to include both the PropCo
Entities and the SLB Entities, as defined herein.

19.     On July 14, 2017, the Committee provided their affirmative expert reports to Defendants.   Of the three reports, only the "Expert Report of David MacGreevey" (the "MacGreevey Report") offered an opinion as to the solvency of any entity.   In the MacGreevey Report, MacGreevey opines that "OpCo" was insolvent as of December 10, 2014, the "APA Signing Date."   A-017 (MacGreevey Report) "OpCo" is defined in the MacGreevey Report as Operations.   *See id.*

20.     The MacGreevey Report does not offer an opinion that Holdings, the PropCo Entities, or the SLB Entities were insolvent at any time.

### G.     Payment of Market Rents

21.     Interrogatory No. 8 in Defendants' First Set of Interrogatories asked, "Identify and explain the facts underlying Your contention in Paragraphs, 10, 57, 60, 79, 93, 94, 127, 129, 149, 737, 739, 741, etc. of Your Complaint that the rents that Operations, OpCo North and OpCo South paid to Garrison, Spirit, PropCo North and PropCo South were "above-market."   A-853 (Defendants' First Set of Interrogatories to the Committee, dated February 10, 2017 at Interrog. No 8).

22.     In response to Interrogatory No. 8, the Committee objected on the ground that the interrogatory was "premature because it seeks expert opinion," and promised to "provide expert disclosures" that would be responsive to Interrogatory No. 8 and "that will be deemed incorporated by reference herein."   A-866 (Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs, dated March 31, 2017 at Interrog. No. 8).

23.     On July 14, 2017, the Committee provided their affirmative expert reports to Defendants.   None of the Committee's three reports offered an opinion that the rents paid by the OpCo Entities to the PropCo Entities were "above-market."   A-912, A-913 (D. MacGreevey Dep. at 39:16–20; 40:2–5); A-918 (J. Howard Dep. at 117:11-25); A-923–A-928 (Expert Report

of Carol Flaton, dated July 14, 2017) (limiting her opinion to a recharacterization analysis of the PropCo Loan utilizing the 11-factor test in *Roth Steel Tube Co. v. C.I.R.*, 800 F.2d 625 (6th Cir. 1986)).

**H.    Recovery Analysis of Creditors' Claims**

24.    As part of the bankruptcy process, the Debtors' financial advisor, Alvarez & Marsal ("A&M") created a series of recovery analyses (the "A&M Recovery Analysis"), which estimate the recovery percentages for outstanding creditors' claims for Debtors "HoldCo" (*i.e.*, Holdings) and "OpCo" (*i.e.*, the OpCo Entities), as well as non-Debtor "PropCo."  A-883 (A&M Recovery Analysis, dated April 2017).  The A&M Recovery Analysis was compiled in April 2017 and represents the Debtors' current best estimate of recoveries by creditor.  *See* A-001 (Expert Report of Kevin Montague, dated July 14, 2017) (the "Montague Report").

25.    The A&M Recovery Analysis identifies the outstanding claimants at HoldCo and OpCo.  A-883 (A&M Recovery Analysis).  The Recovery Analysis then estimates these recovery percentages using a High Case, Mid Case, and Low Case.  *See id.*  Spirit and GIG are creditors at HoldCo by virtue of the guarantee provided by Holdings in conjunction with the Spirit and GIG Leases.  *See id.*

26.    The Recovery Analysis estimates that the creditors at HoldCo—including Spirit and GIG—will receive a 100 percent recovery on their claims as the proceeds available in its wholly-owned subsidiary, PropCo, flow into HoldCo.  A-883 (A&M Recovery Analysis; A-006–A-009 (Montague Report).

27.    On July 14, 2017, the Defendants provided the affirmative Expert Report of Kevin Montague.  A-001 (Montague Report).  The Montague Report analyzed the impact that substantive consolidation would have on the unsecured creditors'—including Spirit and GIG—recoveries at Holdings (a) if PropCo is combined with OpCo through substantive consolidation

and (b) if PropCo, OpCo, and  Holdings are combined through substantive consolidation.  *See id.* at 2.  Under the first scenario, HoldCo's unsecured creditors' estimated recovery would decline from 100 percent to between 22 and 48 percent.  *See id.*  Under the second scenario, HoldCo's unsecured creditors' estimated recovery would decline from 100 percent to between 21 and 45 percent.  *See id.*

28.    The Committee did not file a rebuttal expert report to the Montague Report.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A movant may show that a particular fact is not genuinely in dispute by citing to particular evidence in the record or by showing that "an adverse party cannot produce admissible evidence to support the fact."  *See* Fed. R. Civ. P 56(c).  Only facts that may affect the outcome of a suit are "material."  *See In re IT Grp., Inc.*, 359 B.R. 97, 99 (Bankr. D. Del. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  To defeat a motion for summary judgment, the Committee must "designate specific facts showing that there is a genuine issue for trial."  *In re Elrod Holdings Corp.*, 421 B.R. 700, 707 (Bankr. D. Del. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## ARGUMENT

## I.   THE COURT SHOULD DISMISS THE COMMITTEE'S SUBSTANTIVE CONSOLIDATION CLAIM (COUNT 72)

In Count 72, the Committee asks this Court to substantively consolidate the SLB Entities and the PropCo Entities (both non-debtors) with the "Debtors" so that they can be "administered and resolved in conjunction with Debtors' affairs."  D.I. 1, ¶ 727.  The result would be Holdings and its subsidiaries (both on the OpCo and PropCo side) being treated as a single entity.  *See In*

*re Nortel Networks, Inc.*, 532 B.R. 494, 554 (Bankr. D. Del. 2015) (Gross, J.) ("[S]ubstantive consolidation 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities, (save for inter-entity liabilities which are erased)." (citation omitted)). The Court should reject the Committee's substantive consolidation claim because Holdings' creditors would be harmed by such a consolidation.

The Third Circuit has declared that substantive consolidation is "extreme" and "imprecise" and therefore should be "rare" and a remedy "of last resort." *Owens Corning, 419 F.3d* at 211.[9]  There are only two situations that justify the extreme remedy of substantive consolidation:  "(i) prepetition [the entities] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id.*  Opponents of substantive consolidation can defeat the first rationale by showing that creditors would be "adversely affected and actually relied on the debtors' separate existence."  *Id.* at 212.  The second rationale contemplates a scenario where "[w]ithout substantive consolidation all creditors will be worse off[.]" *Id.* at 211 n.20.[10]  A "[m]ere benefit to the administration of the case" such as simplifying the issues is "hardly a harm calling substantive consolidation into play." *Id.*

In this case, the Committee's substantive consolidation claim violates the *Owens Corning* test because it would "deprive one group of creditors of their rights"—*i.e.*, Holdings' creditors—

---

[9]    "[B]ecause substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this 'rough justice' remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code)." *Id.*

[10]   Substantive consolidation is inappropriate where it would "deprive one group of creditors of their rights while providing a windfall to other creditors." *Id.* at 200; *c.f. In re Abeinsa Holding, Inc.*, 562 B.R. 265, 282 (Bankr. D. Del. 2016) ("nothing in the record demonstrating that the partial substantive consolidation harms any creditor or other stakeholder.").

"while providing a windfall to other creditors"—*i.e.*, OpCo's creditors.[11]  *See Owens Corning,* 419 F.3d at 200.   Based on the Debtors' own recovery analysis, which is consistent with Defendants' expert, as things currently stand, absent substantive consolidation, the creditors at Holdings expect to receive 100% payment on their claims (due in part to the value at the PropCo Entities).  *See* SOF ¶ 26; A-886 (A&M Recovery Analysis); A-006–A-009 (Montague Report). In contrast, the general Unsecured Creditors at the OpCo Entities expect to receive 0% under the low, medium, and high scenarios.  A-884 (A&M Recovery Analysis); A-004 (Montague Report).



The effect of substantively consolidating the entities would make assets in Holdings (including the Propco Entities' assets) available to the OpCo Entities' creditors to the detriment

---

[11]   Further, it is not even clear that the Bankruptcy Code authorizes the Court to consolidate non-debtor entities with a debtor entity outside of a plan process.  Many court have held that 11 U.S.C. §105 does not provide the necessary authority (and thus, the requisite subject matter jurisdiction) to substantively consolidate a non-debtor entity with a debtor.  *In re The Archdiocese of St. Paul*, 553 B.R. 693 (Bankr. D. Minn. 2016), *aff'd* 562 B.R. 755 (D. Minn. 2016);  *In re Pearlman*, 462 B.R. 849, 854-55 (Bankr. M.D. Fla. 2012); *In re Circle Land and Cattle Corp.*, 213 B.R. 870, 877 (Bankr. D. Kan. 1997); *In re DRW Prop. Co. 82,* 54 B.R. 489 (Bankr. N.D. Tex. 1985); *In re R.H.N. Realty Corp.*, 84 B.R. 356 (Bankr. E.D. Pa. 1992); *In re Ira S. Davis, Inc.*, 1993 WL 384501 (E.D. Pa. Sept. 22, 1993); *In re Hamilton*, 186 B.R. 991 (Bankr. D. Colo. 1995).  These courts have recognized that to drag unwilling entities (and their creditors) involuntarily into bankruptcy would likely violate their rights and violate the "stringent procedures and protections relating to involuntary bankruptcy cases imposed by §303 of the Bankruptcy Code."  *In re Pearlman*, 462 B.R. at 854 (Bankr. M.D. Fla. 2012).   As such, many courts have declined to provide this "type of relief [that is] fraught with conceptual problems" when a non-debtor entity is involved.  *In re Lease-A-Fleet*, 141 B.R. 869 (Bankr. E.D. Pa. 1992). The *Owens Corning* court specifically stated its decision did not address seeking substantive consolidation of non-debtors in the context of an adversary proceeding.  419 F.3d at 208 n.14 ("Whether §105(a) allows consolidation outside a plan is an issue we need not address…because, as we note below, consolidation, no matter how it is packaged, cannot pass muster in this case.").   As such, this lack of subject matter jurisdiction would be another basis for this Court to enter judgment in Defendants' favor on Count 72 of the Committee's complaint.

of Holdings' creditors, reducing Holdings' creditors' recovery from 100% to as little as 21%. *See* SOF ¶ 27; A-006–A-009 (Montague Report) ("By way of example, Spirit's unsecured claim at HoldCo would decrease in value from $19.3 million to $4.2 million."). And the OpCo Entities' creditors would receive a windfall, as their recoveries increase from 0% to over 20%. A-006–A-009 (Montague Report). Substantive consolidation does not allow for such blatant harm to one group for the benefit of another. *Id*

Substantive consolidation is also inappropriate here because the records show that Holdings' creditors "relied on the debtors' separate existence." *See Owens Corning*, 419 F.3d at 212. Spirit and GIG entered into leases with the OpCo Entities whereby the OpCo Entities agreed to pay rent to Spirit and GIG for use of the grocery stores. *See* SOF ¶ 14. Both Spirit and GIG negotiated for and received a guarantee on these rental payments from Holdings. *Id*. ¶ 15. In doing so, Spirit and GIG understood the separate corporate existence between the OpCo Entities and Holdings, recognized that there was value in having an otherwise separate entity be liable for the rental payments, and understood that through the guarantees they would have access to assets that they (and other creditors of the OpCo Entities) would otherwise not have. In other words, through these guarantees, Spirit and GIG (creditors of Holdings) "actually relied on the debtors' separate existence." As Spirit's corporate representative explained, having these guarantees provided a "feature that mitigates our risk in doing the transaction." *Id*. ¶ 15. Accordingly, the Committee cannot meet either prong of the stringent substantive consolidation test.

Importantly, the Committee bears the burden of proving that substantive consolidation is appropriate. *Owens Corning*, 419 F.3d at 212. And they have ***no*** evidence that substantive consolidation will not result in an impermissible windfall to the OpCo Entities' creditors while

reducing recoveries for the Holdings creditors.  **None** of the Committee's experts have opined that Holdings is insolvent, and none of their experts have opined that substantive consolidation will not lower recoveries for Holdings' creditors.  Given this complete lack of any evidentiary support, the claim for substantive consolidation fails.

## II.    THE COURT SHOULD DISMISS THE COMMITTEE'S CLAIMS ALLEGING FRAUDULENT TRANSFERS BY HOLDINGS BECAUSE THERE IS NO BENEFIT TO THE ESTATE AND HOLDINGS IS SOLVENT

The Court should reject the Committee's allegations of constructive and actual fraudulent transfers from Holdings (Counts 1–19, 39–63).  All of these claims fail because even if they are successful, they will only result in property being paid or returned to Holdings, and Holdings is already solvent.  Holdings' solvency is also fatal to all of the claims for constructive fraudulent transfer.  Finally, there is no evidence of any actual fraud, the transfers from Holdings were made to solvent, wholly-owned Holdings subsidiaries, and the transfers did not cause any prejudice to any Holdings creditor.

It is not even clear what form the Committee's requested relief would take.  The only transfers made by Holdings were contributions of the right to purchase the assets.  Those rights have already been exercised, and much of the property has been further transferred to Spirit, GIG, and Albertsons, in transfers that the Committee does not seek to unwind.  In any event, these claims all fail.

### A.    This Case Is Factually Distinct from *Mervyn's*

Throughout these proceedings, the Committee has insisted that this case is factually analogous to *In re Mervyn's Holdings, LLC*, 426 B.R. 488 (Bankr. D. Del. 2010) ("*Mervyn's*").  But *Mervyn's* dealt with gratuitous upstream transfers from a transferor that had owned the property for decades, and was rendered insolvent as a result.  This case is highly distinguishable.

In *Mervyn's,* Target sold the longstanding department store chain (which also had significant real property interests) to a private equity sponsor, who in turn stripped out all real estate interests from Mervyn's and placed it in a bankruptcy-remote entity. The sponsor then obtained liens against the real estate in order to pay Target for Mervyn's, with Mervyn's receiving nothing of value for its former real estate interests. At the time of the transaction, Mervyn's was an ongoing enterprise with many preexisting creditors and liabilities. *See Mervyn's*, 426 B.R. at 492-93.

For decades, Mervyn's LLC and its predecessor corporation had owned both operating assets and valuable real property. *Id.* As part of the 2003 sale, the real property was "stripped," transferred from Mervyn's LLC to bankruptcy-remote entities outside of the Mervyn's ownership structure for "virtually no consideration." *Id.* at 500. The "MDS Companies" that received the real property were ultimately owned by the same private equity sponsors, but were not subsidiaries of Mervyn's Holdings. *Id.* at 498.

The effect of this transaction was that the real estate assets were stripped from the company and transferred to a remote entity outside the reach of Mervyn's Holdings' creditors, in a transaction that allegedly rendered Mervyn's Holdings insolvent. *Id.* Mervyn's creditors went from holding claims against a solvent company with substantial real estate assets, to holding claims against an insolvent shell company. This is far different from the asset sale that took place here.

This case is different from *Mervyn's* for several reasons. First, the real property was never "stripped" from anyone. Unlike in *Mervyn's*, there was never a time when the operating assets and the real property were coupled in the same debtor, including a debtor that had then-existing debts and liabilities. The only company that ever owned both the real property and

operating assets together was Albertsons, who sold these assets to Holdings and its subsidiaries in arms-length transactions for fair consideration.  In *Mervyn's*, Mervyn's LLC was stripped of over $1 billion in real property, and received nothing in exchange.  Here, the OpCo Entities were given $150 million in value, and gave nothing in return.

Second, as a result of the stripping, Mervyn's LLC was wholly without assets to meet its obligations.  As this Court noted, Mervyn's LLC was left "with working capital as little as $22 million with additional debt totaling over $800 million."  *Id.*  In contrast, at the time the OpCo Entities opened their doors, they were flush with working capital and assets, having more than $100 million in cash, a $100 million legacy operation, and access to a $210 million line of credit.

Third, in *Mervyn's*, the real estate assets were beyond the use of any debtor to satisfy its creditors.  Here, the PropCo Entities are wholly owned subsidiaries of Holdings and the value of the real property (reflected in the value of Holdings' equity interest) is still available to satisfy the claims of Holdings' creditors.

In *Mervyn's,* the real property was stripped from Mervyn's LLC for no consideration, and placed in the external MDS Companies outside of the Mervyn's ownership structure:



In this case Holdings has access to and will use the real estate assets for the benefit of its creditors to enable them to obtain 100% payment on their claims, because the Propco Entities are wholly-owned by Holdings:



Finally, in *Mervyn's*, the transfers had a "devastating" effect on the transferring entity and, by extension, its creditors, since the transferor was rendered insolvent. *Id.* at 498. In the

instant case, the transferor (Holdings) has been and remains solvent and will use that which was transferred—the interests in real property—to make its creditors whole.

The Committee would like to use the real property and proceeds held by the PropCo Entities to pay the OpCo Entities' creditors. But unlike Mervyn's LLC (which owned the real property for decades), the OpCo Entities *never* owned the real property at issue. None of the OpCo Entities' creditors were harmed by the transfer of the real property to the PropCo Entities and the SLB Entities because these assets never belonged to the OpCo Entities in the first place. Thus, even if these transfers are unwound, they do not result in any property going to the OpCo Entities.

In order for this case to be analogous to *Mervyn's*, the real property would have had to have been transferred from the OpCo Entities, such that the fraudulent transfer claims could generate some recovery for the OpCo Entities' creditors. But the transfers of the real property into the PropCo Entities and the SLB Entities did not involve the OpCo Entities at all.

At bottom, the Committee is complaining that the OpCo Entities were not initially capitalized with the real property. Their claims are based on the *lack of transfer* of this real property to the OpCo Entities, and their proposed remedy is to give these entities property they never owned in the first place. This novel legal theory stretches the law past its breaking point— fraudulent transfer laws allow courts to unwind transfers of property back to the transferor; they do not provide a mechanism to create new transfers out of thin air.

Finally,[12] this case is distinguishable from *Mervyn's* because that case collapsed the *entire* transaction and unwound the payments made to the former owner of Mervyn's. *See*

---

[12]   This case is also distinguishable due to the procedural posture. While the *Mervyn's* court was bound to "accept as true all factual allegations," on the pending Motion to Dismiss, here, the Court has the benefit of evidence showing how the transaction was actually structured, as well as unrebutted evidence showing the solvency of Holdings. *Id.*

*Mervyn's*, 426 B.R. at 497.  Here, unlike *Mervyn's*, the Committee is conspicuously **not** seeking

to unwind all of the transfers.  There is no claim asserting that any of the payments to Albertsons

were fraudulent, and there is likewise no claim seeking to unwind rent payments to Spirit or

GIG.  The relief that the Committee seeks is thus simultaneously too broad and too narrow.  It

seeks to "unwind" transfers that never occurred and to recover property for the OpCo Entities'

estates that they never owned in the first place.  But the Committee is also seeking to unwind

only half of the transaction, collapsing and unwinding internal transfers to wholly-owned

subsidiaries, while leaving the related payments and transfers to Albertsons, Spirit, and GIG in

place.  This has no support in the law and is unlike anything that took place in *Mervyn's*.

> **B.      The Committee's Fraudulent Transfer Claims on Behalf of Holdings Fail Because They are Not a Benefit to the Estate**

All of the fraudulent transfer claims alleging transfers by Holdings must be rejected

because they offer no conceivable benefit to Holdings' estate.  Pursuant to Section 550(a) of the

bankruptcy code, "the trustee may recover, ***for the benefit of the estate***, the property

transferred." 11 U.S.C. § 550 (emphasis added).  No recovery is allowed if it would not provide

any benefit to the estate.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 969 (Bankr. D. Del.

1994).  This rule precludes recovery actions when the debtor/transferor is solvent and the estate's

creditors are all being paid in full.  *See In re New Life Adult Med. Day Care Ctr., Inc.*, 2014 WL

6851258, at *6 (Bankr. D.N.J. Dec. 3, 2014).

It is undisputed that Holdings is solvent.  Defendants' expert Kevin Montague has opined

that its assets exceed its liabilities by at least $31.2 million.  A-005 (Montague Report).[13]  In

sworn interrogatory responses, the Committee stated that all evidence that any debtors were

---

[13]    The Debtors' financial consultant found that Holdings' assets exceeded its liabilities by $40.8 million in the "Low Case."  A-886 (A&M Recovery Analysis).

insolvent would be identified in its expert reports.   A-866 (Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs, dated March 31, 2017).   The Committee has since provided its expert reports, and none of them offer any opinions or evidence that Holdings is insolvent.   A-021 (MacGreevey Report) (limiting his opinion to the OpCo Entities' insolvency).   At deposition, the Committee's experts have admitted that they are not opining that Holdings is insolvent.   A-912 (D. MacGreevey Dep. at 39:2–15) ("Q:   You are not offering any opinions as to the solvency or insolvency of the ProCo entities; correct?   A:   Correct. . . Q: [Y]ou are not offering any opinions as to the solvency or insolvency of Haggen Holdings LLC; correct?   A:   Correct."); A-908 (C. Flaton Dep. at 58:3–6) (same).   They have failed to rebut the undisputed evidence of solvency, and have failed to meet their burden of proving insolvency.   *In re Opus E., LLC*, 528 B.R. 30, 51 (Bankr. D. Del. 2015) ("The plaintiff bears the burden of proving insolvency by a preponderance of the evidence.").

Further, the claims relating to transfers made by Holdings offer no possible benefit to Holdings' estate and must be dismissed.   *New Life, Inc.*, 2014 WL 6851258, at *6 ("[T]here is no conceivable benefit to the estate, either directly or indirectly . . . [where] all non-priority general unsecured creditors of [the debtor are] paid in full with interest."); *see also Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir. 1991) ("[A] trustee or a debtor-in-possession of a bankruptcy estate cannot maintain an avoidance action under § 548 unless the estate would be benefitted by the recovery of the transferred property.").   This rule makes sense.   Creditors of Holdings are already going to receive full payment on their claims with interest.   It would be pointless to proceed to trial on fraudulent transfer claims when the result of that trial could not possibly benefit any Holdings creditor.

This is especially true given that the transfers that the Committee seeks to set aside were transfers made by Holdings to its own wholly-owned subsidiaries.  Even if the Committee succeeds on these claims, the remedy would be to transfer property (or the proceeds from the sales) *from* Holdings' wholly-owned subsidiaries *to* Holdings, benefiting nobody.  The result does not change if the Committee obtains a money judgment against Comvest, as that judgment would simply go to Holdings, providing no additional benefit to any Holdings creditor.  *In re Dunes Hotel Assocs.*, 194 B.R. 967, 985 (Bankr. D.S.C. 1995) ("[A] debtor may not use an avoidance action to create a windfall for itself where there is no creditor benefit.").

This case is analogous to *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80 (S.D.N.Y. 2008) ("Adelphia").  In *Adelphia*, creditors of a corporate debtor alleged fraudulent transfers made by that debtor's subsidiaries.  *Id.* at 86.  While the parent debtor was insolvent, the plan of reorganization provided that each of the alleged transferor subsidiaries would "pay all of its creditors in full with interest."  *Id.*  The alleged transferees moved to dismiss the fraudulent transfer claims, arguing that they were improper where the transferor debtor's creditors were all being paid in full.  *Id.* at 91.  The *Adelphia* court agreed, holding that where an alleged transferor's creditors receive full payment, there is no benefit to the estate in pursuing an avoidance action against that debtor.  *Id.* at 95.

*Adelphia* is on all fours, and it shows why the Committee's claims related to transfers by Holdings all fail.  In order to pursue a claim for fraudulent transfer by Holdings, the Committee must identify an actual Holdings creditor who will benefit from the recovery.  *Id.* These claims cannot be brought by or for the benefit of creditors who only hold claims against a different debtor, such as the creditors of the OpCo Entities.  *Id.*  Because all of Holdings' creditors are already receiving a full recovery, the Committee lacks standing to even bring a claim for

fraudulent transfer by Holdings.  *Id.* at 97[14] ("The Court finds as a matter of law that . . . all creditors of the Obligor Debtors have been paid in full and would not benefit from. . . recovery on the Fraudulent Transfer Claims. . . and that the [plaintiff] therefore lacks standing to assert these claims.").

### C.    No Transfers by Holdings Were Constructively Fraudulent

The fact that Holdings is solvent is also fatal to all of the claims of constructive fraudulent transfer by Holdings.  *See* 11 U.S.C.A. § 548(a)(1)(B).[15]  To succeed on a constructive fraudulent transfer claim, the Committee must prove that the transferor was "insolvent" at the time of the transfer, because of the transfer, or that the transfer would leave the transferor without the ability to pay its debts.  *Id.*[16]  The Committee alleged that Holdings was insolvent without support in the Complaint.[17]  But now the Committee concedes that Holdings

---

[14]  The OpCo Entities creditors also lack standing under the applicable state law claims, because each of these states require that a creditor hold a claim against the actual transferor in order to seek avoidance of a transfer. *In re Global Grounds Greenery, LLC*, 405 B.R. 659, 662 (Bankr. D. Ariz. 2009) (stating "[t]here is no dispute that the Uniform Fraudulent Transfer Act, as adopted in Arizona and elsewhere, only creates causes of action for creditors of the transferor"); *In re ShendaTech, Inc.*, 519 B.R. 292, 303-4 (D. Nev. 2014) (holding that, under Nevada's Uniform Fraudulent Transfer Act, a creditor is the only party with standing to bring a claim); *Fidelity Nat'l Title Ins. Co. v. Schroeder*, 179 Cal. App. 4th 834, 841, (App. 5th 2009) (holding that, under California's Uniform Fraudulent Transfer Act, a fraudulent transfer may only be attacked by the creditor injured from the transfer); *Douglas v. Hill*, 148 Wash. App. 760, 765 (Ct. App. 2009) ("under the definitions provided in the UFTA, a creditor need only have a right to collect a payment to void a fraudulent transfer"); *Norris v. R & T Mfg.*, 265 Or. App. 672, 676 (Ct. App. 2014) (holding that, to establish a claim under the Oregon Uniform Fraudulent Transfers Act, a plaintiff must prove that it "has a claim as a creditor that arose before or after the transfer was made"); *Fisher v. Kelly*, 30 Or. 1, 12 (1896) ("before a person can attack a transfer of personal property, either actual or constructive, he must show himself to be a creditor…").  The OpCo Entities have no claims against Holdings, the transferor.

[15]  Defendants seek summary judgment on the following Constructive Fraudulent Transfer Claims: 2, 4, 5, 7, 8, 10, 12, 13, 15, 16, 18, 19, 40, 42, 43, 45, 46, 48, 49, 51, 52, 54, 55, 57, 59, 60, 62, 63.

[16]  *See also* Ariz. Rev. Stat. §§ 44-1004(A)(2), 1005; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05; Nev. Rev. Stat. §§ 112.180(1)(b), 112.190; Or. Rev. Stat. §§ 95.230(a)(2), 95.240; Wash. Rev. Code §§ 19.40.041(a)(2), 19.40.051.

[17]  *See, e.g.* D.I. 1, ¶ 166 (Holdings "was insolvent, or Holdings became insolvent as a result of such transfers; (b) was engaged in business, or was about to engage in business, for which any property remaining with Holdings was unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.").

was solvent at the time of the transfers, and is solvent now.  *See supra* 12–13.  Because it is uncontested that Holdings has sufficient funds to pay all of its creditors, with interest, it is clear that the transfers did not cause Holdings to incur "debts that would be beyond the debtor's ability to pay as such debts matured."  11 U.S.C. § 548(a)(1)(B)(ii)(III).

### D.   No Transfers by Holdings Were Actually Fraudulent

The Committee's claims for actual fraudulent transfer by Holdings fail as well because there was no intent to hinder, delay or defraud any creditor of Holdings.  *See* 11 U.S.C.A. § 548(a)(1)(A).  The transfers at issue are the contribution of the right to purchase the real property to the PropCo Entities and the SLB Entities.  The Committee alleges that actual intent may be inferred because Holdings and its subsidiaries are under common control, but courts recognize that a transfer to a solvent, wholly-owned subsidiary does not amount to a fraudulent transfer.  *In re DVI, Inc.*, 326 B.R. 301, 306 (Bankr. D. Del. 2005) (Where a debtor "made a contribution to a solvent wholly-owned entity, the Committee would not be able to state a fraudulent transfer claim.").

The reasoning behind this rule is sound.  There cannot be an intent to defraud when one allocates property to its solvent, wholly-owned subsidiary because the transferor receives value equal to the transferred asset.  *See Branch v. F.D.I.C.*, 825 F. Supp. 384, 399–400 (D. Mass. 1993) ("The Court is aware of no case in which transfers to a solvent subsidiary have been determined to be for less than equivalent value.").  Here, it is undisputed that the non-debtor PropCo Entities are solvent, meaning that the value of the transferred property is ultimately available to satisfy any claims made by Holdings' creditors.  *See also In re First City Bancorporation of Texas, Inc*., 1995 WL 710912, at *18 (Bankr. N.D. Tex. May 15, 1995) ("[A] transfer to a wholly-owned solvent subsidiary is often for reasonably equivalent value, because the value of the parent's stock interest in the subsidiary may be correspondingly increased. . .").

Taking a step back, it is clear that there was no fraudulent intent because contributing the right to acquire the real estate to the PropCo and SLB Entities did nothing to protect those assets from Holdings' creditors. And the lack of actual intent is further evidenced by the fact that Holdings is and has always been solvent, and will be able to fully repay its creditors.

Further, almost all of the badges of fraud are absent here.[18]  *In re Pennsylvania Gear Corp.*, 2008 WL 2370169, at *10 (Bankr. E.D. Pa. Apr. 22, 2008) (identifying the common badges of fraud). The only badges of fraud that are superficially met are those due to the fact that Holdings and its subsidiaries are under common control. But those factors are present in every corporate structure involving wholly-owned subsidiaries, which is itself a ubiquitous business practice. A showing of actual fraudulent intent requires more than a multi-tiered corporate structure—at a minimum it requires some actual prejudice to the transferor's creditors, which is glaringly absent in this case.

## III.    "COLLAPSING" THE TRANSACTIONS CHANGES NOTHING

The Committee's Complaint contains several stray allegations suggesting that the contributions by Holdings should be "collapsed." *See, e.g.* D.I. 1, ¶¶ 11, 61. These allegations frankly make no sense. The Committee is not ***actually*** asking the Court to collapse the entire transaction, as it is not clearly seeking to unwind any transfers to Albertsons, Spirit, or GIG. Instead, the Committee seeks to cherry-pick isolated transfers within the transaction and collapse them, while leaving others alone. This is the exact opposite of what it means to collapse a transaction, and has no basis in the law. *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 497

---

[18]    The transfers of the real property to the PropCo Entities were not concealed in any way; to the contrary, the deeds conveying the property were ***publicly recorded***. *See, e.g.* Deed to PropCo North recorded 5/28/15 (AKER0000008789). Holdings was under no threat of suit. The transfers were not for substantially all of Holdings' assets, as it continued to own the valuable membership interests of its wholly owned subsidiaries. Holdings did not "abscond," it is willing and able to pay all of its creditors. Holdings received equivalent value for the transfers because the property was placed in its wholly-owned subsidiaries. And finally, Holdings has at all times been solvent.

(Bankr. D. Del. 2010) ("Instead of focusing on one of several transactions, a court should consider the overall financial consequences these transactions have on the creditors.").

In any event, collapse is inappropriate here, because the "overall financial consequences" are the same regardless of whether the transactions are viewed individually or together. *Id.* It is illustrative to review why collapse was necessary in *Mervyn's* to show why it would have no effect here. In *Mervyn's*, the Plaintiff was attempting to allege liability against Target, the former owner of Mervyn's LLC, as a transferee of the real property proceeds. *Id.* at 493. Target argued that all it received was money in exchange for membership interests, and it could not be liable as a transferee of the real property's proceeds. *Id.* at 497. The *Mervyn's* court thus needed to collapse all of the separate transfers into one transaction, so that it could show that Target effectively received the proceeds of the fraudulently transferred real property. *Id.* This is not the case here.

In the straight asset sale at issue in this case, nobody disputes that Albertsons effectively sold the real property to the PropCo Entities, which held the real property, and the SLB Entities, which sold their real estate interests to Spirit and GIG. Collapse is not needed to treat the PropCo Entities or the SLB Entities as transferees of the property.

Collapsing the transactions is also inappropriate because the contributions by Holdings had no effect on Holdings' creditors. In determining whether to collapse a transaction, "a court should consider the overall financial consequences these transactions have on the creditors." *Id*; *see also United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986).

In *Mervyn's*, the court found three consequences supporting collapse:

1.    The stripping of the real property from Mervyn's LLC;

2.    Increased rent paid by Mervyn's LLC; and

3.     The creation of a conflict of economic interest for Mervyn's Holdings because it was owned by the same PE Sponsors who owned the separate MDS Companies.

*Mervyn's*, 426 B.R. at 498.  None of these consequences are present here.

As explained above, the real property was not stripped from any Haggen entity.  The real property was sold directly from Albertsons, and then some of the real property was sold to Spirit and GIG in transactions that the Committee does not allege were fraudulent.  Unlike in *Mervyn's*, the real property was not transferred away from its long-time owner for "virtually no consideration."  *Id.* at 500.  Likewise, the OpCo Entities did not see any "increase" in rents, because they had never previously leased or operated the properties—they were new companies formed to run the new grocery stores.  There was no conflict of economic interest because the real property was not placed into entities outside of Holdings' ownership structure—they were placed in solvent, wholly-owned subsidiaries of Holdings.  *See supra* 7-9, 12-13.  Finally, there was no effect on Holdings' creditors because Holdings was and is solvent, and its creditors will all receive full payment with interest.

This is ultimately an academic point.  There were no fraudulent transfers of the real property regardless of whether the transactions are collapsed or not.  The transfer of the purchase agreements by Holdings was not fraudulent because Holdings was and is solvent, and there was no harm to any Holdings creditor.  Further, the Committee does not even allege that the sale of the real property from Albertons or to Spirit and GIG was fraudulent.

## IV.     THE COMMITTEE CANNOT MEET ITS BURDEN TO SHOW THAT THE RENT PAYMENTS MADE TO THE PROPCO ENTITIES WERE CONSTRUCTIVELY FRAUDULENT

The only fraudulent transfer claims for transfers made by the OpCo Entities are for rent payments made by OpCo North and South to the PropCo Entities to lease the Retained

Properties.[19]  Because OpCo North and South did not own any real property, these leases were necessary for the operation of OpCo North and South's grocery stores.  The Committee cursorily alleged in its complaint that these rent payments were "above market," but discovery has not borne this theory out.  D.I. 1, ¶¶ 57, 60, 127; *see also*, *e.g.*, D.I. 1, ¶¶ 316, 331, 338 ("OpCo North received less than reasonably equivalent value from PropCo North.").

The Committee bears the burden of proof of proving that these rental obligations were above market and that the OpCo North and South did not receive reasonably equivalent value under the leases with the PropCo Entities.  *See In re Key3Media Grp., Inc.*, 336 B.R. 87, 94 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006) (citing *Mellon Bank, N.A. v. Metro Commc'ns, Inc.,* 945 F.2d 635, 646 (3d Cir. 1991).  The Committee affirmed in response to Interrogatory No. 8 of Defendants' First Set of Interrogatories that it would "provide expert disclosures" that would be responsive and would "be deemed incorporated by reference herein."  A-866 (Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs, dated March 31, 2017 at Interrog. No. 8).  Their expert witnesses, in turn, confirmed that ***none*** of them were opining that the OpCo Entities had made any above-market rent payments.  A-912, A-913 (D. MacGreevey Dep. at 39:16–20; 40:2–5); A-918 (J. Howard Dep. at 117:11-25); A-923–A-928 (Expert Report of Carol Flaton, dated July 14, 2017).  Because the Committee cannot meet its burden to prove a core element of these constructive fraudulent transfer claims, the claims all fail.

## CONCLUSION

For the foregoing reasons, Defendants ask this Court to dismiss the Committee's substantive consolidation claim (Count 72), its "collapsed transaction" theory, its fraudulent

---

[19]    Counts 21, 23, 24, 26, 27, 29, 31, 32, 34, 35, 37, and 38.

transfer claims alleging fraudulent transfer by Holdings (Counts 1–19, 39–63), and its constructive fraudulent transfer claims against the PropCo Entities (Counts 21, 23, 24, 26, 27, 29, 31, 32, 34, 35, 37, and 38).

*Signature block on next page*

Dated:  August 25, 2017

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**


*/s/ Kevin J. Mangan*
Kevin J. Mangan (DE Bar No. 3810)
222 Delaware Avenue
Suite 1501
Wilmington, DE 19801
Telephone:  (302) 252-4361
E-mail:  kmangan@wcsr.com

-and-

Philip J. Mohr, Esq.
300 North Greene Street, Suite 1900
Greensboro, NC 27401
Telephone:  (336) 721-3577
E-mail:  pmohr@wcsr.com

-and-

**KIRKLAND & ELLIS LLP**
Stephen C. Hackney, P.C. (admitted *pro hac vice*)
Richard U.S. Howell (admitted *pro hac vice*)
Jeffery J. Lula (admitted *pro hac vice*)
300 N. LaSalle St.
Chicago, IL 60654
Telephone:  (312) 862-7092
E-mail:  stephen.hackney@kirkland.com
E-mail:  richard.howell@kirkland.com
E-mail:  jeffery.lula@kirkland.com


*Counsel to Defendants Comvest Group Holdings, LLC,*
*Comvest Investment Partners III, L.P., Comvest Investment*
*Partners IV, L.P., Comvest Haggen Holdings III, LLC,*
*Comvest Haggen Holdings IV, LLC, Comvest Advisors,*
*LLC Haggen Property Holdings, LLC, Haggen Property*
*South LLC, Haggen Property North, LLC, Haggen*
*Property Holdings II, LLC, and Haggen SLB, LLC, and*
*John Caple, Cecilio Rodriguez, Michael Niegsch, John*
*Clougher, Blake Barnett, William Shaner, and Derrick*
*Anderson*