## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HH LIQUIDATION, LLC, *et al.*, | ) | Case No.: 15-11874 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS OF HH LIQUIDATION, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No. 16-51204 (KG) |
| | ) | |
| COMVEST GROUP HOLDINGS, LLC, COMVEST | ) | |
| INVESTMENT PARTNERS III, L.P., COMVEST | ) | |
| INVESTMENT PARTNERS IV, L.P., COMVEST | ) | |
| HAGGEN HOLDINGS III, LLC, COMVEST | ) | |
| HAGGEN HOLDINGS IV, LLC, COMVEST | ) | |
| ADVISORS, LLC, HAGGEN PROPERTY | ) | |
| HOLDINGS, LLC, HAGGEN PROPERTY SOUTH, | ) | |
| LLC, HAGGEN PROPERTY NORTH, LLC, HAGGEN | ) | |
| PROPERTY HOLDINGS II, LLC, HAGGEN SLB, | ) | |
| LLC, JOHN CAPLE, CECILIO RODRIGUEZ, | ) | |
| MICHAEL NIEGSCH, JOHN CLOUGHER, BLAKE | ) | |
| BARNETT, WILLIAM SHANER and | ) | |
| DERRICK ANDERSON, | ) | |
| | ) | |
| Defendants. | ) | **Re:  D.I. 102** |

## MEMORANDUM OPINION

## INTRODUCTION

Defendants have moved for partial summary judgment (the "Motion") in this adversary proceeding on Plaintiffs' claims for substantive consolidation and fraudulent transfers.  The parties completed briefing on September 21, 2017, the Court heard argument on September 26, 2017, and trial is scheduled to begin on October 16, 2017.  Given the Court's schedule, the Court is unable to issue an opinion which fully

addresses the complex and important issues which the Motion addresses.    The adversary proceeding which the Official Committee of Unsecured Creditors of HH Liquidation, LLC (the "Committee") brought is an interesting one, and, were the Court not pressed for time, is surely worthy of a more comprehensive opinion carefully addressing all of the issues.    This abridged version will have to suffice under the circumstances.

## FACTS

In 1933, the Haggen family founded Haggen, Inc. ("Haggen") which successfully ran a chain of grocery stores in Washington and Oregon.  D.I. 1, ¶ 43.  By 2011, Haggen owned and operated 30 grocery stores and a stand-alone pharmacy.  *Id.*

In 2011, the Haggen family sold an 80 percent equity interest in Haggen to Comvest Partners ("Comvest"), a private equity firm.  D.I. 1, ¶ 44.  The Haggen family retained the remaining 20 percent interest.  *Id.*  Comvest undertook to streamline Haggen's store portfolios and improved its operational strengths.  The remaining 18 stores improved profitability, more than tripling EBITDA. A-823 (Letter, dated May 29, 2015).

Then, in late 2014, two large supermarket chains, Albertsons and Safeway, agreed to merge. D.I. 1, ¶¶ 5, 65; A-202 (Asset Purchase Agreement).  The Federal Trade Commission (the "FTC") approved the merger if Albertsons and Safeway divested 146 stores. D.I. 1, ¶ 64.

Comvest and Haggen did substantial work to prepare their proposal for the 146 stores.   On January 27, 2015, the FTC ordered that Haggen Holdings, LLC ("Holdings"), Haggen's wholly owned subsidiary, would acquire the 146 Albertsons stores (the "Purchase").  The purchase closed in February 2015.

Holdings acquired Albertson's operational assets and real estate but none of the liabilities of the 146 stores.  Holdings then placed the operational assets in wholly owned subsidiaries and the real estate in wholly owned subsidiaries.

The corporate structure appears as follows and shows which entities are Debtors:



The Purchase became quite complicated, and the Court will attempt to describe it.  Before any closing occurred, Holdings transferred to Haggen Operations Holdings, Inc. ("Operations"), which transferred to Haggen OpCo South, LLC ("OpCo South") and Haggen OpCo North, LLC ("OpCo North") (collectively, the "OpCo Entities")[1] the right to acquire all operational assets associated with the 146 stores in the Purchase.  A-504 (Feb. 12, 2015 Contribution Agreement).  The operational assets included leases

---

[1]  OpCo North operated the former Albertsons stores in Washington and Oregon.  OpCo South operated the former Albertsons stores in California, Nevada and Arizona.

with third parties.

Turning to the real estate acquisitions, Holdings transferred to Haggen Property Holdings, LLC, which then transferred to Haggen Property South, LLC and Haggen Property North, LLC (collectively, the "PropCo Entities")[2] the right to acquire the Albertsons' real estate. D.I. 1, ¶ 48.  Fifty-three of these stores were on property that Albertsons or Safeway owned in fee simple (*id*) and 14 stores were on property that was subject to a long-term ground lease.  *Id.*

Twenty properties (the "Spirit Properties") were sold to an affiliate of Spirit Capital Realty ("Spirit") and 19 of the properties (the "GIG Properties") were sold to an affiliate of Garrison Investment Group ("GIG").  D.I. 1, ¶¶ 99, 103.  PropCo Entities acquired 28 locations.  D.I. 1, ¶ 117.

Holdings sold the Spirit Properties to Spirit and the GIG Properties to GIG for $358.8 million.  D.I. 1, ¶¶ 95, 107.  Holdings did so by transferring the right to acquire the properties to Haggen SLB, LLC (the "SLB Entities").  A 785 (Feb. 26, 2015 Contribution Agreement), A 802 (March 9, 2015 Contribution Agreement).

The OpCo Entities entered into long term leases with Spirit and GIG.  D.I. 1, ¶¶ 110-112.  Holdings was required to guarantee their performance under the leases.  The OpCo Entities also entered into long term leases with the PropCo Entities.

As previously noted, SLB Entities sold the real property it had acquired for approximately $358.8 million.  Of that amount, approximately $232.4 million was transferred to Albertsons as the price for the Purchase and $76.2 million was

---

[2]  PropCo North holds the former Albertsons' real property in Washington and Oregon, while PropCo South holds the former Albertsons' real property in Nevada, California and Arizona.

transferred to Albertsons to pay for the 28 remaining parcels purchased from Albertsons. The remaining 28 parcels of real estate were then transferred to the PropCo Entities. A 493-495 (Comvest Response to Requests for Admissions No. 16); A 537 (Hooper Tr. at 132:5-6); A 245 (Anderson Tr. at 84).[3]

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) (made applicable by Federal Rule of Bankruptcy Procedure 7056) provides that summary judgment may be granted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as matter of law." Here, the initial burden is on Defendants to show the absence of disputed material facts at which point the burden shifts to the non-moving Committee to show the existence of material facts and therefore that summary judgment is inappropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Miller v. JNJ Logistics, LLC* (*In re Proliance Int'l, Inc.*) 514 B.R. 426, 429 (Bankr. D. Del. 2014). Where the non-moving party's evidence contradicts the movant's evidence, the Court will accept the non-movant's evidence as true. *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F. 3d 300, 302 n. 1 (3d Cir. 1995).

## **DISCUSSION**

The Defendants argue the following in support of the Motion:

1.     The Committee's effort is to "reach property transferred from Holdings to the PropCo Entities, and use it to pay the creditors of the OpCo Entities." Def'ts' Br., page 5. The Defendants further claim that the OpCo Entities never owned the

---

[3]   The Court recognizes that the properties mentioned do not total the 146 properties in the Purchase. The number of stores and real property is not germane to the Motion and the Court will clear up the matter at the upcoming trial.

property, that Holdings is solvent, and the Committee does not seek the unwinding of the transfers to Albertsons.

2.      In Counts 1-19 and 39-63, the Committee alleges fraudulent transfers. But, the Defendants argue, there are no court holdings that a transfer of property from a solvent debtor to its wholly owned subsidiary is fraudulent, nor has any court moved property to an entity that never owned it.

3.      The Committee alleges constructive fraudulent transfers in Counts 21, 23, 24, 26, 27, 29, 31, 32, 34, 35, 37 and 38 in the OpCo Entities' rent payments but there is no evidence that the rent payments are above market.

4.      In Count 72, the Committee seeks to substantively consolidate the Debtors with non-debtor PropCo and SLB Entities.  However, consolidation will harm Holdings' creditors and equity holders, Spirit, GIG and Unified Grocers, who relied on the separate existence of the corporations and, in any event, there is no basis in fact or law to consolidate debtors with non-debtors.

### Substantive Consolidation – Count 72

The Committee seeks the substantive consolidation of Holdings, the OpCo Entities and the PropCo Entities which would result in their being treated as a single entity.  The Defendants ask for summary judgment on the substantive consolidation claim.

The Defendants make several arguments in support of the Motion and against substantive consolidation.  For one, substantive consolidation is an extreme and precise remedy which courts should rarely employ.  *In re Owens Corning*, 419 F. 3d 195, 211 (3d. Cir. 2005).  Additionally, the PropCo Entities are non-debtors and the Court lacks

jurisdiction over them.  *See, e.g., In re the Archdiocese of St. Paul*, 553 B.R. 693 (Bankr. D. Minn.), *aff'd*, 562 B.R. 755 (D. Minn. 2016).    Finally, the Defendants argue that substantive consolidation would deprive some creditors of their rights while providing other creditors with a windfall.   Defendants argue that substantively consolidating Holdings, the OpCo Entities and the PropCo Entities would make assets held by Holdings and the PropCo Entities available to the creditors of the OpCo Entities which would reduce recoveries to Holdings Creditors from 100% to perhaps as little as 21%. A 006-009 (Montague Report).   In contrast, the OpCo Entities' creditors would receive a 20% recovery rather than nothing, i.e., a windfall.   The answers to the foregoing arguments according to the Committee defeat the Motion.

The Third Circuit has left open whether non-debtors (i.e., the PropCo Entities) may be consolidated with debtors.   *Owens Corning*, 419 F. 3d at 208, n. 13.    The Committee also distinguishes the cases Defendants cite for the argument against consolidating non-debtors and debtors.   The question is not answered with a definite "no."   For example, in *The Archdiocese of St. Paul* case, the court denied consolidation because it would violate Bankruptcy Code Section 303(a) which prohibits filing an involuntary petition against a corporation that is non-commercial but does not address commercial entities.   *See also Logistics Info. Sys. v. Braunstein* (*In re Logistics Info. Sys.*), 432 B.R. 1, 12 (D. Mass. 2010) (great weight of cases authorizes substantive consolidation of debtors and non-debtors).   The Defendants ignore a problem they created and which the Court wants to learn more about at a trial.   Comvest created Holdings, the OpCo Entities and the PropCo Entities and formed them to hold separate assets.   The OpCo Entities held operational assets and leased property from the PropCo

Entities which held the real property.  Then, in a matter of a few months the OpCo Entities were bankrupt and are unable to pay unsecured creditors anything while the PropCo Entities are flush with money.  The Court and the OpCo Entities' creditors need to see evidence at trial of why and how this happened.

Defendants next argue that if the Court substantively consolidated the Entities, then Holdings' creditors will receive less while the OpCo Entities receive a windfall. The Committee will have the opportunity at trial to prove what creditors did not know and relied upon and for Defendants to prove what they knew and relied upon.  After trial, the Court will be in a better position to determine the creditors' recovery rights. It is premature for the Court to make the determination on substantive consolidation now.

### Fraudulent Transfer Claims

Defendants' maintain numerous arguments against the Committee's fraudulent transfer claims.  First, Defendants claim that Holdings is solvent and was solvent when the transfers alleged to be fraudulent were made.  Solvency is measured when the transfers in question were made.  *In re R.M.L., Inc.*, 92 F. 3d 139, 154 (3d Cir. 1996).

Defendants also argue that the fraudulent transfer claims offer no benefit to the Holdings estate.  Were the Committee to prevail, the fraudulently transferred property would be returned to Holdings.

The immediate answer to Defendants' arguments at the summary judgment stage is this:  the Court wants to see whether substantive consolidation holds or fails. If the Committee prevails and the Court consolidates Holdings, the PropCo Entities and the OpCo Entities, Holdings may be insolvent and the return of assets to Holdings

may inure to the OpCo Entities' benefit.  The Court will revisit the issue following the soon scheduled trial.  Similarly, Defendants' argument that the rents the OpCo Entities paid were at or below market misses the Committee's point.  The undercapitalized OpCo Entities were unable to pay any rent on a long term basis.  The Court wants to hear more at trial.

The Court also finds on a preliminary basis that the facts presented are sufficiently similar to the basic facts in *In re Mervyn's Holdings, LLC*, 426 B.R. 488 (Bankr. D. Del. 2010) to cause concern to the Court and therefore deny the Motion.  In *Mervyn's*, like here, the owner of real property (Target Corporation) sold its interest in Mervyn's, LLC to a group of private equity firms who spun off real estate leaving the operational portion of Mervyn's, LLC undercapitalized and paying rent to the real estate holding entity.  The Court denied Target Corporation's motion to dismiss, finding that it could be liable as the transferee of a fraudulent conveyance.  The Court is unpersuaded that *Mervyn's* is not at least similar to the instant case.

The Defendants argue that *Mervyn's* is an entirely different case.  The Defendants contend that here, unlike in *Mervyn's*, the real estate was never "stripped" from anyone.  Albertsons was the only entity that owned both the real property and the operational assets, unlike *Mervyn's* where Mervyn's, LLC was "stripped" of real property worth over $1 billion.  Also, in *Mervyn's* there was no consideration paid for the stripping.  Here, the OpCo Entities received $150 million in value.

According to Defendants, there are other significant differences between *Mervyn's* and this case.  The OpCo Entities had a large amount of working capital while Mervyn's, LLC had very little.  Additionally, the value of the real property was

unavailable to satisfy the creditors in *Mervyn's* whereas the real property value is available to satisfy Holdings' creditors' claims.

Defendants miss the point of the Court's concern and why it is denying summary judgment. It is true that the structure in the *Mervyn's* transaction is not exactly the same as here. It is, however, sufficiently similar to raise concern. The Court wants to better understand why a corporate organization collapsed in a matter of a very few months leaving the OpCo Entities destitute while the PropCo Entities and Holdings are able to pay creditors' claims. The different status of the OpCo Entities, the PropCo Entities and Holdings with respect to their ability to satisfy creditors' claims is overwhelming, and it raises questions about the transactions at issue. Does the truth lie in the economic picture and status of Holdings, the OpCo Entities and the PropCo Entities, or the manner in which Comvest devised its corporate planning? Trial is needed to make the determination and to decide the applicability of *Mervyn's* to the case.

## CONCLUSION

The Court is denying the Motion for the foregoing reasons. The Court will issue an appropriate Order.

Dated: October 4, 2017

_____
KEVIN GROSS, U.S.B.J.