# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: )<br><br>HH LIQUIDATION, LLC, *et al.*,[1] )<br><br>       Debtors, )<br>‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾)<br><br>OFFICIAL COMMITTEE OF UNSECURED )<br>CREDITORS OF HH LIQUIDATION, LLC, *et al.*, )<br><br>       Plaintiffs, )<br><br>    -against- )<br><br>COMVEST GROUP HOLDINGS, LLC, *et al.*, )<br><br>       Defendants. )<br>‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾) | Chapter 11<br><br>Case No. 15-11874 (KG)<br>(Jointly Administered)<br><br><br><br><br>Adv. Pro. 16-51204 (KG) |

## DEFENDANTS' TRIAL BRIEF

Filed:  October 6, 2017

**KIRKLAND & ELLIS LLP**
Stephen C. Hackney, P.C.
Richard U.S. Howell
Jeffery J. Lula
300 N. LaSalle Street,
Chicago, IL 60654
Telephone:  (312) 862-7092

**WOMBLE CARLYLE
SANDRIDGE & RICE, LLP**
Kevin Mangan  (DE Bar No. 3810)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone:  (302) 252-4361

-and-

Philip J. Mohr, Esq.
300 North Greene Street, Suite 1900
Greensboro, NC 27401
Telephone:  (336) 721-3577

---

[1]   The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) (7558) ("Holdings"); HH Operations, LLC (f/k/a Haggen Operations Holdings, LLC) (6341) ("Operations"); HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC) (7257) ("OpCo South"); HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC) (5028) ("OpCo North"); HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC) (7687) ("Acquisition"); and HH Legacy, Inc. (f/k/a Haggen, Inc.) (4583) ("Haggen, Inc.").  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ............................................................................................................... 5

    A.    Comvest Partners Invests in Haggen—a Struggling Grocery Chain—and in Four Years Turns It Into a Profitable Business Valued at Over $100 Million ................................................................................................................ 5

    B.    The Albertson's/Safeway Merger Presents an Exciting Opportunity .................... 7

    C.    Comvest and Haggen Enlist Myriad Advisors to Assist in Diligence Before Presenting Their Plan to Interested Third Parties for Review ................... 8

    D.    Haggen Wins the Bid for the Albertson's Stores and Gains FTC Approval for the Transaction ........................................................................................... 12

    E.    Defendants' Business Decision to Use an OpCo/PropCo Structure Does Not Mean That the OpCo Entities Were Undercapitalized ................................. 13

    F.    The OpCo Entities Received Substantial Assets as Part of the Albertson's Acquisition ...................................................................................................... 16

    G.    Haggen Successfully Converted and "Haggenized" the 146 Stores ..................... 17

        1.    Haggen Developed a Conversion "Cadence" and Plan that Balanced Competing Priorities ................................................................. 17

        2.    Haggen Successfully Converts the Stores and Delivers on Haggen's Brand Promise ........................................................................ 18

    H.    Despite Substantial Planning, Unexpected Issues at the New Stores Proved Disastrous ....................................................................................................... 21

        1.    Pricing .................................................................................................. 21

        2.    Supply-Chain ....................................................................................... 23

        3.    Unfair Competition .............................................................................. 23

        4.    Haggen Suffered Significant Same-Store-Sales Declines ....................... 25

    I.    Defendants Provide Rescue Financing to OpCo to Try to Save the Company and Make Payroll .............................................................................. 25

ARGUMENT .................................................................................................................. 28

I.    **DEFENDANTS INTENDED HAGGEN TO SUCCEED AND WORKED TO MAKE IT SUCCEED**.................................................................. 29

II.   **DEFENDANTS ENGAGED IN A RIGOROUS PROCESS TO EVALUATE THE ALBERTSON'S ACQUISITION** ....................................... 32

III.  **THE OPCO ENTITIES' CREDITORS DID NOT RELY ON THE EXISTENCE OF REAL PROPERTY WHEN EXTENDING CREDIT** ................. 33

IV.   **THE COMMITTEE WILL NOT BE ABLE TO PROVE INSOLVENCY** ............. 35

V.    **THE PROCO LOAN SHOULD NOT BE RECHARACTERIZED INTO EQUITY** ........................................................................ 36

      A.    Intent is "Determinative," and the Parties Intended the PropCo Loan to be Debt.................................................................. 37

      B.    The *AutoStyle* Factors Support Characterizing the PropCo Loan as Debt........... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AutoStyle Plastics, Inc.*,
　269 F.3d at 753 ............................................................................................37, 38, 39

*In re: Dornier Aviation (N. Am.), Inc.*,
　453 F.3d 225 (4th Cir. 2006) ......................................................................................39

*In re Mervyn's*,
　426 B.R. 488 (Bankr. D. Del. 2010) ..........................................................................17

*Sixty-01 Ass'n of Apartment Owners v. Parsons*,
　314 P.3d 1121 (Wash. 2013)......................................................................................34

*In re SubMicron Sys. Corp.*,
　432 F.3d 448 (3d Cir. 2006)..................................................................................37, 38

**Other Authorities**

66 Am. Jur. 2d Restitution and Implied Contracts § 22................................................29

Defendants[2] hereby submit this Trial Brief in accordance with the Court's Amended Scheduling Order (D.I. 70) and in advance of the trial on Plaintiff's Complaint (D.I. 1).

## PRELIMINARY STATEMENT

Defendants in this adversary proceeding invested heavily—in terms of money, reputation, and time—for the opportunity to convert the small but thriving Haggen grocery store chain into a powerful regional grocery operation.  Comvest Partners contributed $50 million in equity along with a successful portfolio company valued at over $100 million.  John Clougher and Derrick Anderson took on additional responsibility to grow a brand they believed in from eighteen to one hundred sixty-four stores.  Bill Shaner and Blake Barnett embraced the opportunity to expand Haggen into California, Arizona and Nevada.  John Caple and Michael Niegsch, who had already taken the original Haggen stores from the verge of bankruptcy to profitability, spent hundreds of hours analyzing, performing diligence on, and effectuating the Albertson's Acquisition.  Cecilio Rodriguez carefully pressure tested the recommendations of the Comvest deal team.  Each of these men put their time and professional reputations on the line as they pursued a unique and exciting investment.  These men did not approach these opportunities (and the associated risks) lightly. They worked hard; they engaged respected advisors; they collaborated; and they ultimately took a calculated risk to try to do something great.  As everyone now knows, the effort was unsuccessful. But sometimes a good process nevertheless yields a bad result.

The Official Committee of Unsecured Creditors (the "Committee") has spent well over a year casting Defendants as villains in various documents and arguments before this Court.  But the

---

[2]    The Defendants in this adversary proceeding are:  Comvest Group Holdings, LLC; Comvest Investment Partners III, L.P.; Comvest Investment Partners IV, L.P.; Comvest Advisors, LLC (collectively, "Comvest"); Haggen Property Holdings, LLC ("Property Holdings"); Haggen Property South, LLC ("PropCo South"); Haggen Property North, LLC ("PropCo North"); Haggen Property Holdings II, LLC ("Property Holdings II"); Haggen SLB, LLC ("Haggen SLB"); John Caple; Cecilio Rodriguez; Michael Niegsch; John Clougher; Blake Barnett; William Shaner; and Derrick Anderson.

evidence at trial will not support the Committee's naked and inflammatory accusations. These men are not fraudsters. They were not reckless. They were not cavalier about jobs. They did not engage in moral hazard. Instead they saw an opportunity to expand the successful Haggen brand when the Federal Trade Commission required Albertson's and Safeway to divest nearly two hundred stores for pennies on the dollar. Nobody doubted that it would be complicated to expand the Haggen brand—a brand which customers loved—from 18 stores in the Pacific Northwest to 164 stores across Washington, Oregon, California, Nevada and Arizona. Comvest and Haggen assessed the risks, developed mitigants to them, and ultimately presented these risks and opportunities to myriad other parties for review. Everyone agreed: they believed Haggen could pull it off. When the effort was ultimately unsuccessful, Defendants did not "slink away" with millions as the Committee alleges—instead they suffered significant losses, both financially and professionally.

Over the course of the trial, Defendants will put forward documents and testimony that tell the real story: Comvest partnered with a struggling chain of Haggen stores and restored them to profitability. Comvest and Haggen—along with its advisors and consultants—performed exhaustive diligence on the opportunity to acquire 146 stores at fire sale prices. Comvest invested nearly $200 million into the operations side of Haggen to support the acquisition. Over five months Haggen worked tirelessly to convert the 146 stores into new, attractive "Haggen" stores that would welcome new customers while keeping the old ones. Even as the stores struggled, Defendants worked to provide a loan to rescue Haggen from collapse. But in the end, that was not enough.

Defendants knew there were risks inherent to a deal where the "minnow was swallowing the whale," and that it would be challenging to convert 146 stores in under 5 months. The

unfortunate irony here is that the conversions actually went quite well, but problems arose in other areas where Haggen was relying on third parties.  These externalities are what drove the rapid decline in same store sales which, in turn, caused the acquisition to be unsuccessful.  First was pricing:  Haggen intended to maintain the Albertson's prices to retain the store's price-sensitive customers.  But Haggen received pricing information from Albertson's that was misleading and incorrect.  Worse, the pricing consultants and IT providers Haggen partnered with made myriad pricing errors leading customers to consistently encounter inadvertently high-priced items.  And the inefficient IT infrastructure at the stores made it difficult and time-consuming to fix the pricing issues as they were identified.  These issues snowballed to create a negative price perception for Haggen, a surefire way to lose customers quickly.  Second was supply:  Haggen received either too much or too little inventory from Albertson's and had rampant problems with its wholesaler, SuperValu.  As a result, customers often arrived to see embarrassing gaps on the shelves.  Third was unfair competition:  right as a new Haggen store was about to open, Albertson's would "coupon" the market to drive customers away from the store.  Not to be outdone, once competitors (like Ralph's and Trader Joe's) saw what Albertson's was doing, they piled on with their own aggressive couponing.  Haggen actually negotiated protections in its agreement with Albertson's to prevent this exact risk, but it was to no avail.  Indeed, Haggen threatened (and later pursued) legal action against Albertson's for this sabotage, but the damage was already done.

As the evidence comes in at trial, it will be clear that the Committee has failed to meet its burden in several key areas:

**Defendants Intended OpCo to Succeed**: The Committee cannot demonstrate that Defendants intended to hinder, delay or defraud OpCo's creditors.  Defendants used a standard OpCo/PropCo structure to maximize the value of both the operations and the real estate, which

had different investment horizons. Defendants intended for OpCo to succeed and placed a tremendous amount of value (in the form of equity, Haggen Inc., roughly $100 million in capital expenditures, cash flows from operations, pharmacy scripts, and more) into the OpCo side of the business. The evidence will show that Comvest voluntarily contributed its successful portfolio company, Haggen, Inc., to the OpCo side of the structure. It would be nonsensical for an entity looking to defraud OpCo's creditors to place a $100 million asset within their reach. In addition, after the final store converted from Albertson's to Haggen, Holdings routed the approximately $50 million of excess sale-lease back proceeds to the OpCo Entities to be used as operating capital. This is to say nothing of the time and resources expended setting up OpCo for success and resolving challenges at OpCo as they arose.

**Defendants Engaged in a Rigorous Fiduciary Process**: The witness testimony and documentary evidence will show that Comvest and Haggen spent hundreds of hours working to evaluate the Albertson's Acquisition with a careful eye. And it wasn't just Comvest and the Haggen management team. Instead they also involved more than a half dozen respected firms to consult and advise: grocery experts, real estate experts, financial advisors, operational consultants, and the Comvest Investment Committee. The risks were apparent and discussed in great detail before action was taken. Haggen and Comvest, along with many consultants and advisors, came up with reasonable projections about Haggen's anticipated cash flows and capital needs and used those projections to formulate a proposal. Once Comvest and Haggen decided to proceed, their proposal was vetted by multiple third parties who were incentivized to rigorously inspect the deal—PNC (who would arrange a $210 million loan to OpCo to fund operations), Albertson's and Safeway (who needed prospective buyers to pass muster for their merger to succeed), the sale-leaseback counterparties (who wanted successful tenants under the sale leaseback deals), and the

4

FTC and state attorney generals (who wanted to maximize the chance that the acquired stores would remain successful and competitive).  All of these parties reviewed Haggen's plan and believed it would work.  Nobody at the time believed that the approach would leave OpCo undercapitalized.  Nobody believed that OpCo was insolvent when the deal was signed.

**Absence of Any Creditor Reliance on the Value at PropCo**:  The Committee has the burden of showing that creditors actually relied on a mistaken understanding of Haggen's business structure when extending credit.  But *there is no evidence whatsoever of such reliance from any creditor*.  The evidence that does exist actually points to the exact opposite conclusion.  The only creditors on record regarding this issue either: (i) understood the structure before extending credit and sought and received guarantees from Holdings (Spirt and Garrison), (ii) understood the structure before extending credit and sought and did not receive a guarantee but extended credit nonetheless (Unified Grocers), or (iii) admitted that whether or not OpCo owned the real estate was not relevant to their decision to extend credit (Pepsi).

It is not unlawful to take a risk and fail.  Defendants poured time and money into the Haggen opportunity—a disproportionate amount of that money and effort went into OpCo.  The Committee has made broad promises that it will expose these Defendants' intentional fraud.  It will not come close to delivering on those promises at trial.

## BACKGROUND

A.     **Comvest Partners Invests in Haggen—a Struggling Grocery Chain—and in Four Years Turns It Into a Profitable Business Valued at Over $100 Million**.

Dorothy and Bennett Haggen opened their first grocery store in 1933.  Over the next 75 years, the business slowly grew, ultimately giving rise to a 30-store chain in Washington and Oregon.  As is fairly common in the industry, the Haggen Family owned their grocery stores in an OpCo/PropCo structure, with Haggen, Inc. (OpCo) owning the operations and Briarwood

Development (PropCo) owning the real estate.  By 2010, the business had begun to sputter.  As Haggen, Inc.'s former CFO testified, the legacy Haggen stores were "struggling"— they "weren't earning any money," they had a "very low EBITDA," and the "cash flow was anemic."[3]  Haggen, Inc. was in such "financial difficulty" that they "needed to determine whether or not we were going to sell Haggen or potentially bankrupt it if we didn't."[4]

Meanwhile, in 2010, John Caple joined Comvest Partners and was searching for a potential investment in grocery—an industry where he had significant experience.  Comvest is a private investment firm providing equity and debt capital primarily to middle-market companies across North America.  Comvest is operationally focused and looks to become a strategic partner with its portfolio companies.

Caple and his team scoured the country looking for grocery opportunities before finally landing on Haggen.  In 2010 and 2011, Comvest and the Haggen Family negotiated a deal, and Comvest ultimately acquired an 80 percent interest in Haggen in March 2011.  To facilitate the transaction, Comvest created Haggen Holdings, LLC ("Holdings") and Haggen Acquisition, LLC ("Acquisition"), with Holdings owning 100 percent of Acquisition, and Acquisition owning 100 percent of Haggen, Inc.  Comvest did not acquire Briarwood Properties and, thus, did not acquire the real estate on which the grocery stores sat.  The influx of new equity and the strategic partnership with Comvest allowed Haggen to avoid an in-court restructuring.

Comvest immediately began implementing changes to improve Haggen's operations, thereby boosting cash flows and profitability.  To that end, Comvest assisted Haggen in identifying 12 supermarkets that were underperforming, and Haggen closed those stores.  Haggen also

---

[3]    Hall Dep. at 59:6-9; 70:15–22.

[4]    Hall Dep. at 22:24–23:5.

invested $10 million to rebrand to "Haggen – Northwest Fresh." These rebranding efforts included store remodels, remerchandising, and new signage to take advantage of Haggen's brand recognition and to refocus the stores. Haggen soon had the best customer feedback of any of its competitors in the Pacific Northwest. By 2014, the remaining 18 stores were generating material profits. The trajectory only improved in late 2014 when Comvest brought in John Clougher—a former executive at Whole Foods with decades of grocery experience.[5] By 2015, Comvest estimated that the 18 Haggen stores had an enterprise value of over $100 million.

Thus, Haggen, through its partnership with Comvest, went from the verge of bankruptcy to a profitable grocery store chain over just a few years. Normally, this is where the investment story ends. But, in late 2014, a unique opportunity presented itself to Comvest and Haggen.

### B.    The Albertson's/Safeway Merger Presents an Exciting Opportunity.

In early 2014, Albertson's and Safeway, two of the largest grocery chains in the West, announced that Albertson's would acquire all the shares of Safeway. But the Federal Trade Commission filed a complaint to stop the merger due to concerns about anticompetitive effects. To settle that complaint, Albertson's and Safeway agreed to divest 168 stores. Because it was a forced divestiture, both the real estate and the operations of the stores would be sold at attractive prices. As a representative of Albertson's described, these stores "were going to be sold at, in our mind, pennies on the dollar versus what market value would have been."[6]

Potential purchasers, however, faced several difficulties. First, selling the stores to a larger grocery chain would not address the FTC's competition concerns. Second, small, unestablished

---

[5]    The Court does not need to take Defendants' word for this turnaround. The Committee's solvency expert, David MacGreevey, calculated that the 18 Haggen stores improved to $20.2 million of EBITDA in 2014. *See* MacGreevey Dep. at 47:23–48:13.

[6]    Ewing Dep. at 34:18–21.

grocery chains usually lacked the infrastructure, familiarity with vendors, and regional knowledge to operate the stores.  This left Haggen uniquely positioned—on the one hand, they were small enough not to raise anticompetitive concerns; on the other hand, Haggen had developed relationships with many of Albertson's key partners (including SuperValu and Unified Grocers) to provide short and long-term resources in critical areas like operations, marketing, merchandising, and human resources.  And Haggen had a private equity partner with significant financial and operational experience.

### C. Comvest and Haggen Enlist Myriad Advisors to Assist in Diligence Before Presenting Their Plan to Interested Third Parties for Review.

The opportunity was too good to ignore, so Comvest put together a deal team (the "Comvest Deal Team") led by Caple that also included Michael Niegsch and Lucas Scholl. Niegsch, then a Vice President at Comvest, had already been working with Haggen, and stepped into the role of "deal quarterback" for what would become known as the "Albertson's Acquisition."  Scholl was an associate and would spend many hours analyzing and modeling the deal under the direction of Niegsch and Caple.  As they performed their diligence, the Comvest Deal Team provided periodic presentations to Comvest's investment committee (the "Investment Committee")—a group of senior investment professionals and managers that carefully scrutinize all of Comvest's prospective deals.[7]

Any acquisition of this size would have risks and challenges associated with it.  Knowing this, Comvest and Haggen created a detailed and careful process utilizing a large number of outside opinions.  Comvest and Haggen hired multiple consultants to scrutinize and structure a potential deal.  They included:

---

[7]    At the time Comvest was contemplating the Albertson's Acquisition, the Investment Committee was made up of Michael Falk, Robert Priddy, Pete Kight, John Caple, Roger Marrero, Tom Clark, and Cecilio Rodriguez.

- A.T. Kearney ("ATK"):  ATK provided retail and grocery expertise, including expertise in grocery store conversions and assessing Haggen's likelihood of attracting and maintaining customers and sales in the to-be-acquired stores.  Todd Hooper led a large ATK team that assisted Haggen with its model, stores projections, and presentation to regulators;

- Holliday Fenoglio Fowler ("HFF"):  HFF provided real estate expertise, including analysis regarding potential sale-leaseback transactions and assistance in determining market rents to be applied at the acquired stores;

- OAG Consulting ("OAG"):  OAG was utilized to provide operational expertise.  In particular, Ira Genser at OAG worked on planning and logistics for deploying $105 million in capital expenditures for the newly-acquired stores.  He also helped structure the schedule or "cadence" for how to close, remodel, and quickly reopen 146 stores in under 5 months;

- Willard Bishop:  Comvest and Haggen understood pricing would be important as they opened new stores and, to that end, hired Willard Bishop for its expertise in that area;

- Akerman LLP ("Akerman"):  Comvest and Haggen utilized the Akerman law firm to provide legal assistance regarding the transaction; and

- Sagent Advisors ("Sagent"):  An investment bank hired to explore various potential transactions related to the Albertson's Acquisition and advise on the Albertson's Acquisition itself.

When Albertson's first began discussing a transaction with Haggen, it was to be for roughly 43 stores located in Washington and Oregon.  Over time, the number of stores grew.  Albertson's was motivated to close its merger,[8] and logistically it wanted a single buyer for as many of the stores as possible.  As the number of stores grew—ultimately to 146—the geographic scope also expanded from the Pacific Northwest to include California, Arizona and Nevada.  Each time additional stores were added, the Comvest Deal Team, along with its army of consultants and advisors, reassessed the risks and opportunities.  Each time the model changed, the projections were altered, and the potential sale-leaseback portfolio was reassessed.

---

[8]    Indeed, when another potential buyer for the California, Arizona, and Nevada locations dropped out, Albertson's was desperate to find a buyer for those locations, and Haggen stepped in to buy them at an even steeper discount.

It became clear to Haggen and Comvest that a winning bid would have to include stores outside of Washington and Oregon.  Accordingly, they expanded their team.  Haggen recruited William Shaner, an executive with significant grocery expertise who had served as the President and CEO of Save-A-Lot before opening his own consulting firm providing management advisory services.  Should they win the bid, Shaner would serve as CEO of the southern stores (OpCo South) while Clougher would serve as the CEO for the northern stores (OpCo North).  Blake Barnett, who had previously served as CFO of Albertson's for California, would be the CFO of the enterprise.  Comvest and Haggen highlighted this experienced Management Team to the FTC and Albertson's.  Comvest and Haggen also developed and expanded relationships with vendors and service providers that worked with the existing Albertson's and Safeway stores.  In particular, Haggen's partnership with SuperValu—which was already providing IT and other critical services to Albertson's stores—was a unique benefit to Haggen's capacity to handle the acquisition.

Comvest and Haggen also developed reasonable projections of what to expect in terms of retaining customers and boosting sales at each store that would be converted to a Haggen.  ATK brought specific expertise to this topic.  ATK studied Haggen's "Net Promoter Score," a critical index in retail that measures the willingness of customers to recommend a company's products or services to others.  ATK found that Haggen had the highest Net Promoter Score in the region.  ATK also conducted surveys to see what customers associated with Albertson's, Safeway, and Haggen.  These surveys demonstrated that Albertson's and Safeway customers focused on "location," "pricing," and "convenience."  Haggen customers cared about those issues, but also valued "quality," "local sourcing," "freshness," and "variety."  Based on these surveys, Haggen believed that they could retain a significant portion of the Albertson's and Safeway customers because the location, convenience, and pricing would not change.  Haggen also believed it could

bring in new customers by remodeling the stores during the conversions to "Haggenize" them with greater variety and quality. In addition, ATK looked at multiple additional factors that would play into generating customers and sales, including geography, remodeling stores, and pricing strategy. Armed with ATK's grocery expertise, an expanded Management Team, and key vendor relationships, Haggen was well-positioned to seize on this tremendous opportunity.

Next, Haggen, Comvest, and its consultants made presentations to a variety of third parties—all of which had an interest in closely scrutinizing the proposed transaction, including:

- Albertson's and Cerberus: It was critical for Albertson's (and its owner Cerberus) that any proposed deal be viable and eventually close. Otherwise, the Albertson's and Safeway merger would be in jeopardy—and Cerberus was on the hook for a $400 million "break fee" should that merger fail. Thus, Cerberus had great incentive to vet and only approve a bidder whose operational plan and resources would pass muster;

- Safeway: It was also in Safeway's interest to successfully complete the merger; they too would have vetted any potential buyer to ensure that the buyer could present the FTC with a reasonable business plan for maintaining the viability of the divested stores;

- The FTC: The FTC wanted to make sure that the new operators would be well-positioned to succeed as a competitive counterweight to the combined Albertson's-Safeway entity. In particular, the FTC cared to see that all stores would remain open and that the new owners would be viable. This would, of course, require review of the capitalization and projections of OpCo—all information that was presented to the FTC;

- State Attorney Generals: These parties were interested in the success of the grocery stores in Washington, Oregon, California, Nevada and Arizona;

- PNC and the "Bank Group"[9]: PNC served as the arranger and bookrunner for the Bank Group on a revolving line of credit to OpCo. As the prospective first lien lender to OpCo, PNC and the Bank Group diligenced the opportunity from a classic investment perspective. That would require review of the sales projections and EBITDA at the operating stores. Indeed, PNC and the Bank Group ultimately requested to increase the amount of the revolving line of credit shortly after signing—yet another indication that they were believers in OpCo's prospects; and

---

[9] The "Bank Group"—who each made "commitments" in varying amounts in support of the revolving line of credit—are as follows: PNC Bank, National Association; JP Morgan Chase Bank, N.A.; KeyBank, N.A.; U.S. Bank National Association; CIT Finance LLC; and Signature Bank.

- Spirit and GIG: As the sale leaseback counterparties, Spirit and GIG needed to know that the Haggen business would perform because these operating stores would be the source of their rental income.

*All of the above entities reviewed Comvest and Haggen's projections for OpCo and found*

*them suitable*.  The Committee paints Comvest and the Haggen management team as reckless and cavalier.  But these third parties belie that assertion.  If OpCo's sales and EBITDA projections were "ridiculous"—as the Committee has argued—then a lot of sophisticated parties whiffed on identifying them as such.  The only one saying that the projections were unreasonable at the time is the Committee's paid expert, David MacGreevey, who admits that he has no expertise in grocery store operations and has never generated same store sales projections for a grocery store.[10] Critically, the neutral parties that examined those predictions at the time found them reasonable.

### D.    Haggen Wins the Bid for the Albertson's Stores and Gains FTC Approval for the Transaction.

After months of diligence, hundreds of hours of analysis, and the creation of hundreds of models, Haggen and Comvest submitted a bid and hoped for approval.  They won.  On December 10, 2014, Albertson's and Holdings entered into an Asset Purchase Agreement (the "APA"), wherein Holdings agreed to buy 146 of the to-be-divested stores from Albertson's for $309 million.

Albertson's was not the only one that needed to approve Haggen's proposal, however.  As discussed above, Haggen had to demonstrate the business plan's viability to the FTC.  The Comvest Deal Team and Management Team developed strategies and models for delivering a successful enterprise, and then presented those plans to the FTC.  An important part of the presentation was that Haggen would agree to invest over $105 million to improve and "Haggenize"

---

[10]    MacGreevey Dep. at 23:23–25, 24:17–21.

the to-be divested stores.  Haggen also came up with a plan for how to successfully close, convert, and reopen 146 stores on a rolling basis.

Everyone that reviewed Haggen's proposal agreed:  Haggen had put forth a solid plan with a good chance to succeed.  In describing its approval of the transaction, the FTC wrote that Haggen was a "highly suitable" purchaser and "well positioned to enter the relevant geographic markets." In responding to public comment on the transaction, the FTC stated that it had "evaluated the business plan and finances of Haggen and found that Haggen is a sound candidate for purchase of the divested stores."

In the end, Comvest and Haggen seized the unique opportunity to turn Haggen into a regional grocery power.  To analyze the opportunity, they collaborated with ATK, HFF, OAG, Sagent, and others to ensure that Haggen would succeed.  To prepare their bid, they partnered with numerous third parties—including SuperValu, PNC, Spirit, and GIG.  They ran a detailed and effective process that took great pains to assess the risks.  The fact is that Comvest and Haggen truly believed that they would take their small but beloved grocery chain and turn it into a regional power.

> **E.    Defendants' Business Decision to Use an OpCo/PropCo Structure Does Not Mean That the OpCo Entities Were Undercapitalized**.

From the beginning, it was obvious that Haggen should utilize an OpCo/PropCo structure—the same structure previously utilized by the Haggen family.[11]  The reason for using such a structure, as described by Mr. Caple, was that Haggen had "very different strategies for those two sets of assets, and the view was it was better to have them in separate legal entities."[12]

---

[11]    The Court is already familiar with Haggen's corporate structure for the Albertson's Acquisition, which was explained in detail in the Defendants' summary judgment briefing.  The defined terms herein have the same meaning as ascribed to them in that briefing.

[12]    Caple Dep. at 104:21–105:6.

The OpCo and PropCo Entities would have "different capital structures with different lenders" as well as different exit strategies.[13]  With respect to the PropCo Entities' business, Comvest was not traditionally a real estate owner, rather it specialized in operational support for its portfolio companies.  Thus the intention was to "sell [the real estate assets] reasonably quickly."[14]   At deposition, Mr. Niegsch further explained:

> We were setting up a legal structure with the long-term success of both businesses in mind, because typically when Comvest acquires a business, it operates one business, it's an operating business.  In this scenario we were acquiring both operating assets and real estate assets.  And so our investment horizon for the operating business [was] very different from our investment horizon for the real estate business.  And to avoid disruption and to set up both of those businesses for long-term success, we put them in entities where their respective assets and liabilities went with each respective business.[15]

Because the OpCo and PropCo Entities were intended to have different business objectives and exit horizons, it did not make sense to combine them as doing so would limit the flexibility for achieving their respective business goals.

These sort of OpCo/PropCo structures are commonly used for reasons similar to those described by Mr. Caple and Mr. Niegsch.  Indeed, two of the Committee's experts have experience with such structures and explained why they are used.   Carol Flaton, the Committee's recharacterization expert, who has seen such structures dozens of times, explained:

> [An Opco/PropCo structure] is when you take a company and you divide the business out into the operating company and the related real estate to run the business, and you separate them into different legal entities, primarily to provide financing for those sides because those have market participants who have different appetite for financing.[16]

---

[13]   Caple Dep. at 106:7–14.

[14]   Caple Dep. at 105:23–106:6.

[15]   Niegsch Dep. at 140:10–141:5.

[16]   Flaton Dep. at 102:18–103:8.

And Mr. MacGreevey, the Committee's solvency expert, described his general understanding of the purpose of OpCo/PropCo structures:

> [I]nvestors in property or real estate may be a different set of investors and trade on markets under different parameters than the underlying OpCo company. So an OpCo/PropCo structure allows you to attract real estate investors to the PropCo and investors for whatever industry underlie the OpCo, and those companies or those entities may trade with different characteristics, they may sustain different capital structures, and certain investors or owners in those companies may find that advantageous.[17]

At bottom, real estate assets are different in nature from operating assets and it limits a company's access to capital markets, business objections, and exit opportunities to combine them all under one umbrella.

The Committee admitted during argument on Defendants' motion for summary judgment that there is nothing inherently wrong with an OpCo/PropCo structure, but argued that the problem here was that Comvest created an OpCo/PropCo structure where the OpCo Entities were undercapitalized from the beginning. That simply is not the case.

First, as described above, a tremendous amount of advisors, consultants and neutral third parties reviewed the models and projections for Haggen and agreed that Haggen was positioned for success. Had the structure been insolvent at the time of signing, many different parties should have (and would have) said so.

Second, as described in more detail below, the OpCo Entities were flush with cash, inventory, and assets (apart from the PNC loan) that could provide capital, all without any creditors. Indeed, the modeling at the time showed the OpCo Entities to be solvent even before Comvest put in its $50 million equity investment, which it expected to get back in the form of a dividend in relatively short order (because Comvest viewed the OpCo to be overcapitalized).

---

[17]    MacGreevey Dep. at 36:6–23.

Third, the only basis that the Committee has to claim that the OpCo Entities were insolvent at the time of the transaction will be the testimony of their paid expert, Mr. MacGreevey. But Mr. MacGreevey's solvency analysis turns on replacing the predictions that Comvest, Haggen, and ATK developed and presented to the Investment Committee and multiple third parties (including the FTC) with predictions that he thinks are more appropriate. Mr. MacGreevey did not develop those predictions himself, instead he took them directly from ATK. But ATK *never used the projections* that Mr. MacGreevey now claims were more appropriate. Mr. MacGreevey accuses Haggen of ignoring the work of their own consultant, ATK, yet it is Mr. MacGreevey that ignores ATK's work and instead cherry-picks one set of numbers—that ATK did not think were appropriate—to underpin his analysis.

The Committee cannot show that the OpCo Entities were insolvent at the time the APA was signed, and it conducted no solvency analysis as of any other date. It stands to reason, therefore—and many neutral parties agreed—that the OpCo Entities were adequately capitalized. What followed was a disastrous and unforeseeable decline in same store sales of such a magnitude that Haggen failed—and failed quickly. But nobody at the time reasonably contemplated same store sales declines near 30 percent. Instead, based on the heavily vetted projections that everyone had at the time, the OpCo Entities were adequately capitalized, and accordingly there was nothing wrong with using a common OpCo/PropCo structure.

### F.    The OpCo Entities Received Substantial Assets as Part of the Albertson's Acquisition.

As part of the Albertson's Acquisition, the newly-formed OpCo Entities received significant assets and few liabilities. The OpCo Entities obtained 146 fully outfitted grocery stores with all of the accompanying assets one would find in a typical store (i.e., inventory, furniture, fixtures, equipment, and even the cash in the registers). In addition, Comvest invested $50 million

16

in the OpCo Entities.  Comvest also placed its valuable, 18-store, Haggen, Inc. chain on the OpCo side of the corporate structure.  After the final store converted from Albertson's to Haggen, Holdings routed the remaining $50 million of excess sale-lease back proceeds to the OpCo Entities to be used as operating capital.

Finally, the OpCo Entities had access to PNC's $210 million asset based loan, which they did not even tap until May 2015, some three months after the first store converted.   Other than rent, the OpCo Entities had few, if any, liabilities arising from the APA.  Simply put, the OpCo Entities were not left with "little" working capital while facing crushing "additional debt."  *In re Mervyn's*, 426 B.R. 488, 498 (Bankr. D. Del. 2010).  Instead, the OpCo Entities were flush with cash.

**G.**    **Haggen Successfully Converted and "Haggenized" the 146 Stores**.

Once the deal was signed, Comvest and Haggen went to work implementing their plans for converting 146 stores over a matter of months.  This was an "all hands on deck" effort that required significant resources from management and the conversion teams.  The first store's "Closing Date" was February 12, 2015; the last store's "Closing Date" was June 19, 2015.  Each store was converted from the Albertson's or Safeway banner to the Haggen banner in 40 to 56 hours.

1.    Haggen Developed a Conversion "Cadence" and Plan that Balanced Competing Priorities.

Haggen and its consultants understood that successfully converting 146 stores in less than 5 months would be difficult.  The first challenge was to develop the right "cadence"—i.e. the schedule of when each store would be converted to the Haggen banner.  They had to balance several considerations.  There needed to be some geographic continuity to the conversion schedule, as it would be difficult to mobilize and manage multiple teams in multiple places at the same time. They preferred to acquire and convert the sale-leaseback stores early in the process, as the proceeds

generated by the sale of those stores would be used to pay the purchase price to Albertson's and provide working capital to operate the stores during the conversion cycle.  Haggen and its consultants discussed the cadence extensively, and ultimately arrived at a plan that balanced these issues.

Haggen and its consultants also developed detailed plans for converting each of the acquired stores.  It was important to deliver on Haggen's brand promise—"fresh," "local," and "quality" products—from the outset.  In other words, Haggen's objective was to "Haggenize" each store so that it was recognizable as a Haggen store when it reopened.[18]   The Management Team also wanted to provide continuity to Albertson's/Safeway's legacy customers.

The conversions themselves had two primary components:  substantial renovations to the exterior and interior of each store, and targeted "resets" of the merchandise sold in each store.  The renovations were aimed primarily at Haggenizing the stores—i.e. aligning the shopping experience with Haggen's brand.  The targeted "resets" were aimed at replacing and updating the store's merchandise.

2.     Haggen Successfully Converts the Stores and Delivers on Haggen's Brand Promise.

Overall the conversions were a success.  Haggen converted 146 stores in only 127 days, and did so slightly under budget.  Haggen had planned to spend approximately $105 million in renovation capital expenditures, or approximately $720,000 per store.  Despite coming in under budget, the stores underwent substantial renovation in an effort to align the shopping experience with Haggen's brand.  These renovations included the following:

---

[18]    This was especially important in California, Arizona, and Nevada, so the Management Team sent all of the store managers located in those states to the Pacific Northwest to see how a truly "Haggenized" store was managed and merchandised.

- "The produce departments were completely redone with display fixtures more closely representing our Haggen brand."

- Exterior signs were changed and "exterior walls got new décor."

- Lighting was "added or adjusted in the stores to better emphasize the freshness and quality of the product."

- Seafood cases were expanded and "state-of-the-art cases" were added.

- Haggen installed better fixtures, signage, and merchandising techniques in the floral section.

- The deli cases were added or changed to better reflect Haggen's quality image.

- "The floors were typically changed around the front-end registers to warm the stores up, have them be more appealing with a softer look to them."[19]

Haggen also executed on its plan to perform targeted resets:

- Haggen replaced the produce that was not of high enough quality or freshness, and donated much of it to local food banks;

- Changed the meat merchandise, "adding much more all natural, organic, free range, grass fed" and "healthier all natural" options;

- Adjusted the deli product with "fresher, higher quality product" and "more all-natural products;"

- Expanded the floral department "with a wider variety" of merchandise; and

- Adjusted the bakery product offering with "a higher quality fresh product" and "more product that would be baked in store rather than that thaw and sell.[20]

But the focus on quality and freshness was not to the exclusion of everything else.  Haggen also carried "a mainline product" so that customers would have a choice.

Haggen did not focus on resetting the "center aisles"—where customers typically find their canned, boxed, and packaged goods—during the conversion.  This was in part due to the short

---

[19]    Shaner Dep. at 45:16–47:5.

[20]    Shaner Dep. at 46:14–21, 54:19–55:4, 57:24–58:3.

conversion period, but was also because the center aisles of the stores were the strength of Albertson's and Safeway. This portion of the plan was also consistent with Haggen's desire to not disrupt or confuse the customer. For example, Haggen did not "move the Cheerios" so that customers would feel comfortable in the environment and not get frustrated finding things.

Consistent with ATK's analysis of customers, by keeping the store locations and "center-store" prices the same, Haggen could retain the Albertson's/Safeway customer that was focused on convenience, location and price. By remodeling the exterior to include new meat, seafood, produce and bakery displays, they could attract the Haggen customer that placed an emphasis on quality, variety, fresh products, produce, and bakery. An important aspect of this plan, discussed in greater detail below, was to keep pricing on like items the same. That way the Albertson's customer would find that a box of Cheerios would cost the same amount when the store closed on Monday as it would on Wednesday when the store reopened as a Haggen.

The changes that the stores underwent during the conversion process were significant. As Mr. Shaner explained in his deposition and will testify to at trial, the "conversion was amazing and it was meaningful." The customers would see the "extraordinary difference from the moment they pulled into the parking lot." "Even the store employees were, frankly, amazed at what we were able to do[.]" When customers "walk into the store," it would lead with "beautifully fresh produce" in "beautifully displayed fixtures" creating a sudden "wow factor for the customers when they did come into the store."[21] These substantial renovations and targeted resets constituted a considerable "Haggenization" of the stores, allowing Haggen to deliver on the brand promise that had been so successful in the then-existing 18-store chain.

---

[21]    Shaner Dep. at 141:14–142:1, 143:18–144:4.

**H.    Despite Substantial Planning, Unexpected Issues at the New Stores Proved Disastrous**.

While the physical conversions (including renovations and grocery resets) were successful, almost nothing else went according to plan.  There were unexpected and unforeseeable problems with pricing, supply chain, and unfair competition.  Despite diligent work by the Management Team and Comvest Deal Team to correct each issue as they arose, each problem exacerbated the next.  Even as the problems were corrected, the effect on customers lingered.

1.    Pricing

Haggen understood that it was inheriting customers from Albertson's and Safeway that valued the low prices provided by those stores. Haggen also understood that if customers developed a negative price perception of a grocery store brand then it would be very difficult to change it.  Accordingly, Haggen had a straightforward pricing strategy—keep the prices the same.

To do this, Haggen sought and received from Albertson's the pricing files for each store and put its faith in two experienced partners:  Willard Bishop and SuperValu.  Willard Bishop is a retailing consulting firm that specializes in, among other things, pricing.  Willard Bishop's primary responsibility was to help Haggen set initial prices for the merchandise in the newly-acquired stores and to ensure that those prices were in line with Haggen's pricing strategy.   SuperValu served as Haggen's "Business Process Outsource" ("BPO") provider for all 146 stores acquired from Albertson's.   In this role it provided IT support and infrastructure for pricing and merchandise.  SuperValu's IT infrastructure was already supporting the Albertson's stores, which represented over 70 percent of the stores being acquired by Haggen.  Haggen was comforted by the fact that the price maintenance software, PM2, had served Albertson's well in the very same stores that Haggen was acquiring.  By partnering with SuperValu rather than a brand-new BPO

provider, Haggen believed that the conversion would be smoother and there would be a lower the risk of conversion issues.

In short, Haggen believed that it had pricing covered.  It had hired a pricing consultant (Willard Bishop) to ensure that prices were set correctly and had retained the Albertson's BPO provider (SuperValu) to ensure that the correct prices made it to the shelves.  Unfortunately, from the outset, neither Willard Bishop nor SuperValu performed as expected.  One quirk with Albertson's pricing file was that many items were labeled "temporary price reductions" or "TPRs" (which suggested they were on short term sales).  It turned out that the TPRs used by Albertson's were not actually temporary.  Albertson's frequently kept TPRs in place for months or years— rather than a few days—such that the reductions reflected the customer's expected price.  When Haggen used the standard price rather than the "temporary" price, it was effectively raising prices on their customers.  On top of that, the pricing files that Haggen received from Albertson's were full of errors.  Willard Bishop failed to identify and correct those errors prior to uploading them into the PM2 system.  As a result, prices were too high on thousands of items when each store opened after the conversion.  This included some "insult prices" where the system priced items dozens or hundreds of multiples higher than they should have been.  These problems could not be easily corrected either as Haggen offered hundreds of thousands of SKUs.  Moreover, SuperValu's PM2 system was more antiquated and inflexible than expected, and required several days, and sometimes weeks, to make price changes.  With each new store opening, prior pricing problems would be fixed but new ones would arise.

Haggen immediately went to work in an attempt to correct these pricing issues.  Haggen leaned on Willard Bishop, hired additional staff to work in PM2, sought additional resources from Albertson's, and leveraged SuperValu to fix the pricing errors in PM2.  On multiple occasions,

SuperValu assured Haggen that the pricing errors were resolved, but store after store opened with incorrect pricing.   Ultimately, Haggen severed ties with Willard Bishop in March 2015 and Haggen's merchandising team began fixing the pricing files themselves.   In early April, Haggen took a one-week break from converting stores so that its personnel could focus on the pricing issue, but even then problems persisted.   Unfortunately, the pricing errors—and the negative price perception that they caused—devastated the newly-acquired stores and undermined the Haggen brand in new markets.

### 2.   Supply-Chain

Haggen also faced serious supply chain issues, which caused numerous product shortages and "out of stocks" in its stores.   These issues were particularly acute in Washington and Oregon, where SuperValu served as Haggen's primary wholesaler and distributor.   As a result of these problems, new stores frequently had popular items out of stock.   Unsurprisingly, customers were upset by large gaps on the shelves.   And upset customers are not return customers.

### 3.   Unfair Competition

Haggen also faced competition from Albertson's, Safeway, and others that were beyond expectation and outside the bounds of fair play and the restrictions in the APA.

In particular, Albertson's used Safeway's customer data against Haggen in violation of the APA to target Haggen's new customers.   Prior to its merger with Albertson's, Safeway had a loyalty program called "just for U."   The loyalty program allowed Safeway to collect extensive data about its customers, including names, addresses, and e-mail addresses.   It also allowed Safeway to track its customers' purchase history and shopping preferences, which in turn allowed Safeway to engage in targeted, customer-specific marketing campaigns.   Haggen identified this as a potential problem while it was negotiating the terms of the APA.   As a result, Haggen negotiated Section 21.6 of the APA, which prohibited Albertson's from using "any customer purchase history

data to create any specially-targeted offers or special incentives for customers of the Safeway 'just for U' loyalty program."

Haggen learned, however, that Albertson's and Safeway used this customer information as part of an aggressive couponing campaign in an attempt to drive Haggen out of business.  And Albertson's and Safeway also used ***Haggen's*** confidential information to do it.  In order for Haggen to take ownership of the 146 Albertson's and Safeway stores on a rolling basis, Haggen had to share its cadence with Albertson's.  Albertson's then used that confidential information to conduct targeted coupon campaigns in areas where Haggen was converting and opening a new Haggen location.  These couponing campaigns violated Section 21.2 of the APA, which forbade Albertson's from using "all confidential or proprietary information" for its commercial benefit.

These couponing campaigns had a cascading effect on Haggen's other grocery competitors. As Haggen would prepare to convert and reopen a store, Albertson's would flood the relevant market with coupons.  Competitors like Ralph's and Trader Joe's would see the actions by Albertson's and institute their own promotional deals in that market to counter Albertson's.  This would lead to escalation on both sides at the exact moment that the new Haggen stores were most vulnerable.  Once one Haggen store was finished, this pattern would repeat at the next store.

Albertson's and Safeway violated the APA in other ways as well:

- Haggen discovered evidence that Albertson's and Safeway would purchase inventory at a to-be-divested store, and then have the inventory diverted to another location that was not being divested.

- Haggen discovered evidence that Albertson's and Safeway were deliberately overstocking and understocking inventory at to-be-divested stores right before the closing.  Overstocking caused Haggen to incur substantial write-offs on perishable items that could not be sold.  Understocking caused large gaps on the shelves that could not be remedied during the brief conversion period.

- Haggen learned that Albertson's and Safeway did not continue to advertise for the to-be-divested stores in the ordinary course of business.  Specifically, Haggen discovered

that Albertson's and Safeway sought to provide those impacted customers with a different version of the ad and route them to their next closest non-divested store.

Based on these violations of the APA, Haggen sent a demand letter to Albertson's in June 2015 and later filed a lawsuit against Albertson's.

4.      Haggen Suffered Significant Same-Store-Sales Declines.

Right after the transaction closed, Haggen saw some good same store sales developments (the Comvest Deal Team and the Management Team were monitoring these results daily).  But the unforeseen problems—related to pricing, supply-chain, and unfair competition—soon caused substantial same-store-sales declines in the newly-converted Haggen stores.  The first closings mostly involved legacy Albertson's stores and Haggen was hopeful that the initial declines were both correctable and manageable.  Despite continuous efforts to address these issues, the same store sales declines worsened over time.  These declines were particularly acute in the legacy Safeway locations (where the "just for U" program had been in place), which experienced declines of 30 to 50 percent.  The legacy Albertson's stores performed better, but still suffered large declines.  Ultimately, these same-store-sales declines were too much to overcome.

**I.      Defendants Provide Rescue Financing to OpCo to Try to Save the Company and Make Payroll.**

As a result of the problems discussed above, the OpCo Entities faced a potential liquidity shortfall by the end of July 2015.  Although Comvest and Holdings believed that the OpCo Entities could remedy the shortfall if certain sales and cost-cutting metrics were achieved, the Investment Committee felt it prudent to secure funds to address the potential shortfall.

Given its collective $200 million investment in the OpCo Entities as of July 2015, Comvest's Investment Committee declined to provide any further equity infusion.  Comvest thus looked to determine whether the OpCo Entities could obtain a loan from a third-party lender. Because PNC and the Bank Group had a first lien on the OpCo Entities' operating assets, any

lender to the OpCo Entities would have had to take a second lien position. Although Comvest felt certain that a second lien position would be "money good," and that there were third-party lenders who would have loaned to the OpCo Entities, Comvest also knew that a third-party lender would need extensive time to conduct due diligence to evaluate the OpCo Entities' operating assets. The OpCo Entities needed the funds immediately and could not wait for such diligence.

As a result, Comvest decided that the PropCo Entities would make a secured loan to the OpCo Entities, taking the second lien position in the OpCo Entities' assets. In order to fund the loan, however, the PropCo Entities would first need to obtain a loan of their own, using their real estate as collateral. Niegsch contacted UBS because UBS had already conducted extensive due diligence on the PropCo Entities' real estate assets for a different loan that had not come to fruition. With the help of Akerman, in July 2015, Niegsch negotiated the terms of a $40 million loan with UBS, backed by a first lien on the PropCo Entities' real estate. As the parties approached the final stages of the loan negotiations, UBS demanded that the PropCo Entities and Comvest warrant that the OpCo Entities had not contemplated filing for bankruptcy. Although there had not been a discussion in July 2015 about the OpCo Entities filing bankruptcy, Comvest could not warrant that bankruptcy had been completely ruled out. When Comvest refused to provide the necessary warranty, UBS refused to provide the loan and walked away from the transaction altogether. By August, the OpCo Entities' need for liquidity for payroll was pressing. Rather than simply let the OpCo Entities free-fall into bankruptcy, Comvest took action.

Comvest immediately reached out to other third-party lenders to make the loan to the PropCos Entities. However, these lenders were demanding high fees (both closing and exit fees) for any loan, fees which Comvest believed were too expensive. As a result, Comvest requested that Citibank, with whom Comvest had a line of credit, advance $25 million from its credit line to

a newly-formed, wholly-owned subsidiary of Comvest, Haggen Property Lender. Citibank's loan to Haggen Property Lender was guaranteed by Comvest. Haggen Property Lender, in turn, entered into an agreement with PropCo North and PropCo South to loan them $25 million collectively (the "HPL Loan"). The HPL Loan was secured by a lien on the PropCo Entities' real estate and rents, and perfected with various UCC filings. Haggen Property Lender used the various terms from the never-consummated UBS loan as the terms of its loan with the PropCo Entities.

The PropCo Entities in turn provided a $25 million loan to the OpCo Entities (the "Propco Loan"), including a loan and security agreement and corresponding promissory notes. The PropCo Loan was perfected with the appropriate UCC filing statements. Niegsch, again with the help of Akerman, negotiated the terms of a forbearance agreement with PNC to obtain its permission to allow the PropCo Entities to place a second lien on the OpCo Entities' assets. As part of the agreement, however, PNC demanded a lien position in the PropCo Entities' real estate that was superior to Haggen Property Lender. The PropCo Entities and Haggen Property Lender agreed, and PNC obtained a $10 million first lien and a $15 million third lien on the PropCo Entities' real estate, with Haggen Property Lender's $25 million lien sandwiched in between.[22] PNC also agreed, as part of this transaction, to provide the OpCo Entities with an additional $20 million in liquidity under its credit facility with the OpCo Entities. In other words, the PropCo Entities used their real estate as collateral to provide additional liquidity in the OpCo Entities.

---

[22] Pursuant to the PropCo Intercreditor Agreement entered into between PNC, Haggen Property Lender and the PropCo Entities, the respective liens (exclusion of costs and fees) were as follows: first lien of $10 million in favor of PNC; second lien of $25 million in favor of Haggen Property Lender; and a third lien of $15 million in favor of PNC. In addition, as a result of the PropCo Loan, PNC also freed up an additional $20 million of credit for the OpCo Entities to use as part of their business operations.

The OpCo Entities used the $25 million from the PropCo Loan to pay operational expenses, including an immediate $7.5 million to meet payroll due at that time.[23] Thereafter, the OpCo Entities used the remainder of the proceeds from the PropCo Loan, as well as the increase in the PNC credit facility ($20 million), to fund operations.  In the end, the difficulties faced by the OpCo Entities were too much.  On September 8, 2015, Holdings, the OpCo Entities, and other affiliates filed a voluntary petition for bankruptcy.

## ARGUMENT

The Committee filed a 135-page Complaint with 78 largely overlapping counts.  Before Defendants discuss specific legal infirmities, it is useful to step back and look broadly at the Committee's story.  There are five core allegations that serve as the basis for nearly everything in the Complaint:

1. Defendants **intended** to harm and defraud creditors through the Albertson's Acquisition;

2. Defendants failed to follow a reasonable **process** to plan for and execute the operation of the new stores leading to unreasonable sales and EBITDA projections;

3. The Debtors were **insolvent** from the inception of the Albertson's Acquisition;

4. The OpCo Entities' creditors were deceived by Defendants because the **creditors relied** on the ability to recover on real estate; and

5. The PropCo to OpCo loan should be **recharacterized** as equity in disguise.

As Defendants disprove these assertions, the Committee's Complaint unravels.  Without intent, there can be no actual fraud.  Without insolvency, there can be no constructive fraud.  Without creditor reliance, there can be no substantive consolidation.  Without a failure of process, there can be no breach of the duty of care.  Without intent, there can be no breach of the duty of good faith.  Without insolvency, there can be no breach of the duty of loyalty.  Without intent or

---

[23]   The funds from the loan were drawn as follows: $7.5 million on 8/12/2015 and $17.5 million on 8/21/2015.

creditor reliance, there can be no equitable subordination. Without intent and creditor reliance, there can be no unjust enrichment.[24] Due to the Court's familiarity with these legal claims, and the mountain of disputed facts between the parties, Defendants will focus on the key factual allegations required to support the various claims. In particular, at trial, the witnesses, the documents, and common sense will support Defendants on each of these five core factual points.

## I.   DEFENDANTS INTENDED HAGGEN TO SUCCEED AND WORKED TO MAKE IT SUCCEED.

Defendants intended for the Albertson's Acquisition and the new Haggen stores to succeed. They did not intend to have the company go bankrupt and leave the final creditors without recourse. This intent is clear from the beginning. In 2011 Comvest invested over $30 million into the original Haggen, Inc. chain of grocery stores. Comvest—through Caple and Niegsch working alongside Haggen management—spent years improving them, addressing operational inefficiencies, negotiating the removal of underperforming stores, and recruiting new management. With Comvest's assistance, Haggen became a profitable chain with strong brand recognition that was worth over $100 million by 2015.

Defendants' intent is further clarified based on how Defendants structured and funded the Albertson's Acquisition. Defendants sold the Albertson's real estate to purchase the operating assets for the OpCo Entities. In addition, approximately $50 million in leftover proceeds from the sale of the real estate was routed to the OpCo Entities as additional working capital. Comvest also invested $50 million in equity. Crucially, Holdings placed its successful portfolio company (Haggen, Inc.), which it valued at over $100 million, on the OpCo side of the corporate structure.

---

[24] The Committee's unjust enrichment claims also fail because the alleged "enrichments" are governed by express contracts, including the OpCo lease agreements, the Asset Purchase Agreement, and the Contribution Agreements. 66 Am. Jur. 2d Restitution and Implied Contracts § 22 ("[A]n action for unjust enrichment cannot lie in the face of an express contract.").



In total, Defendants invested $200 million (plus the actual stores and operations) into the OpCo Entities. This does not include the time and attention they committed as well.

If Defendants were committing fraud as the Committee suggests, why would they place a $100 million asset on the OpCo side of the structure? If Defendants were cavalierly treating the OpCo Entities as a "free option" and leaving it undercapitalized, why would they put their beloved portfolio company onto the "insolvent" side of the business? If Defendants were engaging in a "Machiavellian scheme" to "covertly siphon[] away" assets so they would not be available to creditors, why would that scheme include voluntarily leaving 18 profitable grocery stores to creditors? The answer is that Defendants were not committing fraud; rather their intent was for the OpCo Entities to succeed. Comvest and Holdings were trying to build a grocery store empire, not defraud future creditors. Comvest and Holding invested more into Haggen than anyone else. When they failed to build that empire, they suffered more than anyone else. In other words, the Committee would have the Court believe that Comvest decided to engage in a fraud whereby they put more than $200 million dollars at risk in order to secret away less than $100 million in real estate value.

The Committee in its Complaint focused on allegations of "above market rents" "charged by the PropCo Entities to the OpCo Entities" as another indication of fraud. Compl. ¶ 127. The Committee argued that this was a way to strip assets out of the OpCo Entities. But facts are

stubborn.   Indeed, after several pointed discovery requests on this issue, the Committee has abandoned this claim, stipulating in the Pretrial Order that "Plaintiff will not offer any evidence that the rents paid by Operations and the OpCo Entities to the PropCo Entities were above-market." D.I. 135 at 21.  The Committee made a similar claim about "above-market leases" with Spirit and GIG at the "SLB Properties."  *See, e.g.*, Compl. ¶ 94.  Again discovery did not cooperate with the Committee.  Haggen's real estate consultant testified that the rents were market; Spirit testified that the rents were market; Spirit's appraiser wrote that the rents were "reflective of market rent levels;" GIG wrote that the "rent to sales" ratio was "low compared to national averages."[25] Perhaps most important, the Committee's own rent expert (James Howard) agrees that the rents paid prior to the bankruptcy were market (or even below market).[26]  Despite the rhetoric in the Complaint, the Court is unlikely to hear much about rents in the final trial.  This is but one obvious example of the Committee making promises in pleadings that it cannot keep.

If Defendants were indifferent to the OpCo Entities, one would expect Defendants to spend as little money and time as possible on the new stores.  The opposite is true.  They spent thousands of hours analyzing and vetting the Albertson's Acquisition.  They allocated $105 million (or $720,000 per store) in capital expenditures to improve the stores.  They hired experienced managers and executives.  When unexpected problems began to develop, Defendants did not

---

[25]    HFF testified that "we tried to set them all at market or below market."  West Dep. at 173:17–18.  Spirit testified that "we believed that the rents were in line with market or within the range of market."  Rosenberg Dep. at 131:16–18.  Spirit's appraiser Duff & Phelps wrote:  "we have analyzed individual market rents for each of the subject properties and believe that, the master lease is reflective of market rent levels."  (SRC_UCC00001707–39 at 1729).  GIG noted that the "rent to sales" ratio on their 19 properties was "low compared to national averages" and "considerably lower" than the amount paid by Spirit.  (GIG0003599).

[26]    Howard Dep. at 323:7–18 ("Q. Setting aside rental escalators, the year 1 rent in the Spirit and Garrison leases are below the market rent you have calculated for year 1 based on your comparable locations, correct?  A. That's what this would indicate, yes.  Q. And that's what your schedule would indicate; correct?  A. Correct.").  Indeed, according to Mr. Howard's analysis, the OpCo Entities would have paid Spirit and GIG $2.7 million **below market** in rent the first year.

exercise the so-called "free option"—instead, they doubled down and worked harder. When the OpCo Entities were struggling with liquidity in August 2015, Defendants did not leave them to freefall into liquidation, devastating any potential creditor recovery. They used the real estate assets in the PropCo Entities as collateral to loan money to the OpCo Entities for one last chance to turn around the business. They also negotiated an overadvance from PNC using their real estate assets as collateral to further help the OpCo Entities. These are not the actions of fraudsters. The fate of Haggen is a tragedy, but it is not fraud.

## II.   DEFENDANTS ENGAGED IN A RIGOROUS PROCESS TO EVALUATE THE ALBERTSON'S ACQUISITION.

The Albertson's Acquisition was ambitious but carefully considered. From the buyer's side, Caple and Niegsch spent hundreds of hours analyzing, performing diligence on, and effectuating the Albertson's Acquisition. They developed myriad financial models and sensitivities to evaluate the deal. The Investment Committee pressure tested the investment thesis. Haggen retained subject matter experts to assist: ATK provided expertise in grocery store conversions and the impact on sales; HFF provided real estate expertise and helped negotiate the sale-leaseback transactions; OAG provided operational support on the conversions; Willard Bishop provided expertise on grocery store pricing. They hired sophisticated legal counsel. They partnered with vendors, suppliers and service provides to maximize the chances of a successful conversion. And Comvest and Haggen not only needed to convince themselves that it was a good investment; they needed to convince multiple third parties that they had the financial and operational wherewithal to handle the acquisition as well.

The Court should ask whether these sophisticated third parties would have allowed this transaction to proceed if they believed it would fall apart. Would Spirit and GIG have agreed to the sale-leaseback transactions if they believed that the OpCo Entities—who were paying them

rent—would fail?  Would PNC (and the Bank Group) have agreed to an asset-backed loan to the

OpCo Entities if it was not comfortable with the business plan?  Would the FTC and multiple

states' attorney generals have agreed to green light the acquisition if they believed that the OpCo

Entities would not provide a competitive counterweight vis-à-vis the Albertson's combined entity?

Would Albertson's and Cerberus have selected Holdings' bid—and risk a $400 million break-up

fee—if they thought that Haggen and Comvest could not handle the acquisition?  The answer is

obvious.  Defendants were able to persuade all of these parties because—with the help of their

advisors—they had developed a reasonable, considered plan for how to acquire, convert, and

operate the new stores.

Now with the benefit of hindsight, the Committee claims that the plan was "doomed to

fail."  But the fact that Haggen did not succeed is not proof that the process or the plan was bad.

The Committee will tell the Court that Haggen's "base case" projections were too ambitious.  But

that is not what Haggen's consultants said at the time.  That is not what the various third parties

said at the time.  The process here was robust and appropriate.

### III.    THE OPCO ENTITIES' CREDITORS DID NOT RELY ON THE EXISTENCE OF REAL PROPERTY WHEN EXTENDING CREDIT.

Throughout the case, the Committee has alleged that "[u]nsuspecting creditors" of the

OpCo Entities "*believed* they could look to all of Haggen's assets for satisfaction," including real

estate assets that were always held by the PropCo Entities.  Compl. ¶ 59 (emphasis added).   It is

time to put this story to rest.

The largest creditors at the OpCo Entities—names like Pepsi, Starbucks, Unified Grocers,

TopCo, and Moneygram—are sophisticated businesses.  If it were crucial to these creditors that

the OpCo Entities own real estate before they extended credit, they could have easily checked the publicly recorded deeds.[27]

| Property Sales (since 7/31/1999) | | | | | | |
|---|---|---|---|---|---|---|
| Transfer Date | Receipt Date | Sales Price | Excise Number | Deed Type | Grantor (Seller) | Grantee (Buyer) |
| 6/20/2016 | 6/28/2016 | $3,250,000 | 1106616 | BS | HAGGEN PROPERTY NORTH LLC | ALBERTSONS LLC |
| 3/2/2015 | 5/28/2015 | $2,929,109 | 1076295 | BS | ABS WA-O LLC | HAGGEN PROPERTY NORTH LLC |
| 3/21/2013 | 4/4/2013 | $0 | 1021525 | WW | NEW ALBERTSON'S INC | ABS WA-O LLC |
| 6/1/2006 | 6/13/2006 | $0 | 106128 | W | ALBERTSON'S INC | NEW ALBERTSON'S INC |

And it was not as though Holdings used vague or deceptive names for the OpCo Entities. To the contrary, creditors were extending credit to entities called Haggen *Operations* Holdings, LLC, Haggen *OpCo* South, LLC, and Haggen *OpCo* North, LLC.

To be clear, nothing prevented the various creditors at the OpCo Entities from asking Holdings or the PropCo Entities for a guarantee. Both Spirit and GIG negotiated guarantees from Holdings as part of signing leases with the OpCo Entities. In contrast, in January 2015, Unified Grocers requested that "PropCo" guarantee the Unified Grocers Agreement. Haggen refused the request.[28] Despite not receiving the guarantee, Unified Grocers extended credit uninterrupted from February 2015 to August 2015 on approximately $13-14 million in product and services a week.[29] Unified Grocers has the largest unsecured claim at the OpCo Entities.[30]

████████████████████████████████████████████

██████████  ██  █████████████████████████████

---

[27] Publicly recorded deeds constitute constructive notice. *See, e.g.*, *Sixty-01 Ass'n of Apartment Owners v. Parsons*, 314 P.3d 1121, 1125 (Wash. 2013) ("A recorded deed constitutes constructive notice of the interest acquired.").

[28] Speiser Dep. at 99:3–100:10.

[29] Speiser Dep. at 168:11–15.

[30] A&M Recovery Analysis at 2 & n.3.

█  ███████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

███████████████████████████████████████████████████████

███  In addition, some creditors—such as Starbucks, Moneygram, and TopCo—extended credit after receiving a copy of the OpCo Entities' *pro forma* financial statements.[33]  As such, these creditors had in their possession financial statements from the OpCo Entities showing that "OpCo" did not own the real property upon which the stores operated.

In addition to the discovery summarized above, Defendants sent an interrogatory to the Committee asking:  "For each Committee Member, describe all due diligence performed by the Committee before extending [credit] to any and all of the Debtors."  The Committee responded that this request "seeks information that is not within Plaintiff's knowledge, possession, custody or control."  In other words, the Committee does not know—and will not present evidence to this Court—what any of its constituent creditors actually did before extending credit.  It is the Committee's burden to establish that the OpCo Entities' creditors mistakenly thought that the OpCo Entities owned real estate and relied on that mistake to extend credit.  Not only can the Committee not meet that burden, the factual record says the opposite.

## IV.   THE COMMITTEE WILL NOT BE ABLE TO PROVE INSOLVENCY.

<u>Holdings was solvent:</u>  In the Complaint, the Committee repeatedly alleges that Holdings was "insolvent."  But today Holdings has more assets than liabilities by almost $40 million.  In response to discovery requests, the Committee was unable to provide any support in favor of

---

██  ████████████████████████████████████

[33]  Moneygram, TopCo, and Starbucks all received a copy of OpCo's *pro forma* financial statement in January and February 2015.  *See* STARBUCKS-000080-81 (Starbucks received OpCo pro forma); HAGGEN00072833-34 (TopCo received OpCo pro forma); OAG0007242-45 (Moneygram received OpCo pro forma).  The pro forma does not identify any real property and has a substantial line item for "rent expense."

Holdings' alleged insolvency.[34]  While the Committee is putting forward an expert to speak to solvency, that expert will offer no opinion that Holdings is or ever was insolvent.

The OpCo Entities were solvent as of the signing of the Asset Purchase Agreement:  The Committee will offer expert testimony from Mr. MacGreevey that the OpCo Entities were insolvent as of December 10, 2014—the date the parties signed the APA.  He opines that there were several unjustified assumptions in Haggen's "Management Base Case" and that his adjusted projections show the OpCo Entities hitting a liquidity crunch in mid to late 2015.   Mr. MacGreevey, who has no expertise in the grocery industry, bases his analysis largely off using same store sales decline projections that he claims are from ATK.  Yet ATK never used those projections when they worked with the Comvest Deal and Management Teams and other consultants to determine reasonable same store sales growth projections.  Defendants' expert, Kevin Montague, as well as fact witnesses will explain that the Management Base Case was reasonable and vetted by many third parties.  Notably, Mr. MacGreevey admits that, even with his "corrected" assumptions, the OpCo Entities were (a) projected to remain balance sheet solvent and (b) projected to be a successful business with year-over-year growth so long as the OpCo Entities could survive the short-lived liquidity crunch.

## V.    THE PROCO LOAN SHOULD NOT BE RECHARACTERIZED INTO EQUITY.

The Committee's claim to recharacterize the PropCo Loan is a bit of an outlier—but that does not mean it will be any more likely to succeed.  *First*, the intent of the parties is "the determinative inquiry," and Defendants and the Committee agree that the parties to the loan intended it to be debt.  *In re SubMicron Sys. Corp*., 432 F.3d 448, 457 (3d Cir. 2006).  *Second*,

---

[34]    Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories, dated March 31, 2017.

even if the Court were to undertake the *AutoStyle* multi-factor analysis, the relevant factors overwhelmingly support identifying the PropCo Loan as debt.

### A.    Intent is "Determinative," and the Parties Intended the PropCo Loan to be Debt.

The Committee's claim for recharacterization of the PropCo Loan from debt into equity overlooks the fact that the "***determinative inquiry***" on this issue "is the ***intent of the parties*** as it existed at the time of the transaction." *In re SubMicron*, 432 F.3d at 457 (emphasis added); *see also id.* at 456 (Courts "must look to the facts on a case by case basis, focusing on the ***intent of the parties***." (emphasis added)). The evidence that will be presented at trial will demonstrate overwhelmingly that the PropCo Loan was intended to be just that—a loan.

As an initial matter, the parties involved in this transaction will all testify that they intended the PropCo Loan to be a loan, not equity.  And the economic realities surrounding the transaction demonstrate the same thing.  The OpCo and PropCo Entities signed a formal loan agreement and executed numerous related documents including UCC filings and a guarantee.  The PropCo Entities also negotiated a formal Intercreditor Agreement with PNC—the asset-backed lender for the OpCo Entities.  Moreover, the PropCo Entities were well aware that the OpCo Entities were struggling—there was simply no equity infusion in the offing under those circumstances.

The Committee has all-but conceded that the parties intended the PropCo Loan should be treated as debt.  The Committee's "recharacterization expert" admitted that, based on her review of the record, the "PropCo lenders" intended the loan to be "debt" not equity:

> Q.  And you also don't have any opinions as to the PropCo lenders' intent, correct?
>
> A.   The PropCo lenders' intent. Well, I reviewed a series of documents and their intent.  Are we talking about as it relates to this transaction?
>
> Q.  Uh-huh.  Yes.

> A.  Okay.  *So their intent was that it was a piece of debt that was an extension of credit to the OpCo entities*.
>
> Q.  That was the intent of the PropCo lenders, correct?
>
> A.  I think that, based on what I reviewed, that's what I believe.
>
> Q.  Okay.  *So you believe their intent was that it would be debt, correct?*
>
> A.  *Yes.*

Flaton Dep. at 123:14–124:9.  Ms. Flaton likewise admitted that the OpCo Entities intended the PropCo Loan to be debt, and that the loan documents unambiguously refer to a debt obligation.[35] In sum, the intent of the parties is "determinative," and Defendants and the Committee agree that the parties intended the PropCo Loan to be a debt instrument.  *In re SubMicron*, 432 F.3d at 457.

**B.    The *AutoStyle* Factors Support Characterizing the PropCo Loan as Debt**.

Even if this Court were to look to the eleven *AutoStyle* factors for guidance regarding the whether the PropCo Loan is debt or equity, these factors clearly weigh in favor of classifying the PropCo Loan as debt:

- First Factor - Instrument Name:  The PropCo Entities signed a 107-page written agreement titled "Term Loan and Security Agreement" with the OpCo Entities.

- Second Factor - Fixed Maturity:  Though a specific date is absent, the PropCo Loan provides that the loan's maturity date is April __, 2016.  *See* PropCo Loan Agreement at § 13.1.  To infer that the parties intended no maturity date at all, as the Committee's expert suggests, is unreasonable and would render several of the Loan Agreement's provisions meaningless as they rely on the defined term Maturity Date.

- Third Factor - Fixed Interest:  The PropCo Loan provides that the interest shall accrue at 8% per annum and that all accrued and unpaid interest is due in full on the Maturity Date.  *Id.* § 3.1.  In the event of a default, the interest rate increases to 12%.  *Id.*

- Fourth Factor - Source of Repayment:  The PropCo Loan and the Intercompany Note provide that the PropCo Entities have an absolute right to payment—*i.e*., repayment is not contingent on success of the business.  PropCo Loan Agreement at §§ 2.3, 2.6;

---

[35]  *Id*. at 124:7–125:3, 144:7–15.

Intercompany Note at 1.  The express terms of the PropCo Loan requires full repayment upon maturity of the loan.  PropCo Loan Agreement at § 2.3.

- Seventh Factor - Security:  Under the PropCo Loan, the OpCo Entities pledged all of their assets as security for the loan.  *Id.* at § 4.1.

- Tenth Factor - Use of Proceeds:  The PropCo Loan states that the proceeds were to be used to fund working capital obligations.  *Id.* § 2.5.  Witnesses at trial will confirm this to be true.

The remaining factors are either neutral or only slightly weigh in favor of finding that the PropCo Loan was an equity contribution.[36]

At its core, the PropCo Loan is a textbook example of "rescue financing," which the Court should encourage as it allows cash-strapped companies, like the OpCo Entities, to gain some runway in an attempt to avoid a bankruptcy filing.  That the PropCo Loan originated from the PropCo Entities should not cause the court any concern.[37]   Good-faith attempts to avoid restructuring and save struggling companies should be encouraged, not thwarted as the Committee attempts to do here.  This analysis combined with the previous discussion on the parties' intent makes clear that the evidence at trial will not support recharacterizing the PropCo Loan as equity.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, Defendants respectfully request that this Court deny all relief requested in the Committee's Complaint.

---

[36]   Specifically, the OpCo Entities' capitalization at the time of the loan (fifth factor) and insider status of the PropCo Entities (sixth factor) support an equity determination.  The facts are mixed on whether the OpCo Entities had the ability to obtain financing from outside lending institutions (eighth factor) because they had limited time to check the market.  The two remaining factors, subordination (ninth factor) and presence or absence of a sinking fund (eleventh factor), should be considered neutral.  For example, although no sinking fund was established here, courts recognize that when a loan is secured by a lien, which the PropCo Loan was, then the need for a sinking fund is obviated.  *See e.g. In re AutoStyle Plastics, Inc.,* 269 F.3d at 753.

[37]   *In re: Dornier Aviation (N. Am.), Inc.,* 453 F.3d 225, 234 (4th Cir. 2006) ("In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans.").

Dated:  October 6, 2017

**KIRKLAND & ELLIS LLP**
Stephen C. Hackney, P.C. (admitted *pro hac vice*)
Richard U.S. Howell (admitted *pro hac vice*)
Jeffery J. Lula (admitted *pro hac vice*)
300 N. LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-7092
E-mail:  stephen.hackney@kirkland.com
E-mail:  richard.howell@kirkland.com
E-mail:  jeffery.lula@kirkland.com

-and-

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**


*/s/ Kevin J. Mangan*
Kevin Mangan (DE Bar No. 3810)
222 Delaware Avenue
Suite 1501
Wilmington, DE 19801
Telephone:  (302) 252-4361
E-mail:  kmangan@wcsr.com

-and-

Philip J. Mohr, Esq.
300 North Greene Street, Suite 1900
Greensboro, NC 27401
Telephone:  (336) 721-3577
E-mail:  pmohr@wcsr.com

*Counsel to Defendants Comvest Group Holdings, LLC, Comvest Investment Partners III, L.P., Comvest Investment Partners IV, L.P., Comvest Haggen Holdings III, LLC, Comvest Haggen Holdings IV, LLC, Comvest Advisors, LLC Haggen Property Holdings, LLC, Haggen Property South LLC, Haggen Property North, LLC, Haggen Property Holdings II, LLC, and Haggen SLB, LLC, and John Caple, Cecilio Rodriguez, Michael Niegsch, John Clougher, Blake Barnett, William Shaner, and Derrick Anderson*