## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | )    Chapter 11 |
| HH LIQUIDATION, LLC, *et al.*,[1] | ) |
| | )    Case No. 15-11874 (KG) |
| Debtors, | )    (Jointly Administered) |
| | ) |
| | ) |
| OFFICIAL COMMITTEE OF UNSECURED | ) |
| CREDITORS OF HH LIQUIDATION, LLC, *et al.,* | ) |
| | ) |
| Plaintiffs, | )    Adv. Pro. 16-51204 (KG) |
| | ) |
| -against- | ) |
| | ) |
| COMVEST GROUP HOLDINGS, LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Filed:  November 15, 2017

**KIRKLAND & ELLIS LLP**
Stephen C. Hackney, P.C.
Richard U.S. Howell
Jeffery J. Lula
300 N. LaSalle Street,
Chicago, IL 60654
Telephone:  (312) 862-7092

**WOMBLE BOND DICKINSON (US) LLP**
Kevin Mangan  (DE Bar No. 3810)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone:  (302) 252-4361

-and-

Philip J. Mohr, Esq.
300 North Greene Street, Suite 1900
Greensboro, NC 27401
Telephone:  (336) 721-3577

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) (7558) ("Holdings"); HH Operations, LLC (f/k/a Haggen Operations Holdings, LLC) (6341) ("Operations"); HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC) (7257) ("OpCo South"); HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC) (5028) ("OpCo North"); HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC) (7687) ("Acquisition"); and HH Legacy, Inc. (f/k/a Haggen, Inc.) (4583) ("Haggen, Inc.").  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA 98226.

### TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

FINDINGS OF FACT........................................................................................................... 4

I.      PARTIES:  DEFENDANTS & DEBTORS ................................................... 4

        A.     Comvest Partners ......................................................................... 4

        B.     Haggen (Corporate Entities) ........................................................ 6

        C.     Haggen (Individual Defendants)................................................... 7

II.     IN 2011, COMVEST INVESTED IN A STRUGGLING HAGGEN
        GROCERY STORE CHAIN, IMPROVED ITS PERFORMANCE, AND
        CREATED A PROFITABLE PARTNERSHIP. ........................................ 9

III.    THE ALBERTSON'S/SAFEWAY MERGER PRESENTS AN EXCITING
        OPPORTUNITY TO GROW THE SUCCESSFUL HAGGEN BRAND.................. 12

IV.    COMVEST AND HAGGEN HIRE MULTIPLE CONSULTANTS TO
        SCRUTINIZE AND STRUCTURE THE POTENTIAL ACQUISITION. ............... 14

V.     HAGGEN'S BUSINESS PLAN AND FINANCIAL PROJECTIONS WERE
        VALIDATED BY NUMEROUS THIRD-PARTIES WHO HAD TO
        APPROVE THE ALBERTSON'S ACQUISITION OR WHO AGREED TO
        PARTNER WITH HAGGEN. ...................................................................... 19

VI.    TO FACILITATE THE ALBERTSON'S ACQUISITION, HOLDINGS
        CHOSE AN OPCO/PROPCO CORPORATE STRUCTURE FOR
        BUSINESS AND FINANCING REASONS. ................................................. 23

VII.   THE ALBERTSON'S ACQUISITION INVOLVED SEVERAL STEPS................. 25

        A.     Holdings Created A New Corporate Structure. ................................... 26

        B.     Holdings Transferred to Its Subsidiaries the Right to Acquire Assets from
              Albertson's. ............................................................................. 26

             1.     Holdings Transfers the Operating Assets to the OpCo Entities................ 26

             2.     Holdings Transferred the Real Estate Assets to the PropCo Entities
                 and SLB Entities. ................................................................. 27

        C.     Haggen Financed The Acquisition Through A Sale-Leaseback With Spirit
              and GIG..................................................................................... 28

D.    The OpCo Entities Entered Leases With the PropCo Entities and Spirit and GIG..................................................................................................... 29

E.    PNC Entered Into a $210 Million Asset-Based Lending Agreement With the OpCo Entities. ................................................................................... 29

F.    Comvest Invested $50 Million in Equity as Well as Its Haggen, Inc. Portfolio Company Into OpCo................................................................. 30

VIII.   THE OPCO ENTITIES RECEIVED SUBSTANTIAL ASSETS AND LIQUIDITY AS A RESULT OF THE ALBERTSON'S ACQUISITION AND RELATED TRANSACTIONS................................................................. 31

IX.   THE RENTAL OBLIGATIONS ASSOCIATED WITH THE PROPCO LEASES AND THE SLB LEASES WERE SET AT MARKET RATES. ................. 31

A.    The Rents on the PropCo Leases Were Market. ....................................... 32

B.    The Rents on the SLB Leases Were Market. ............................................ 32

X.    HAGGEN SUCCESSFULLY CONVERTED AND "HAGGENIZED" 146 STORES IN UNDER 150 DAYS. ............................................................... 33

XI.   HAGGEN AND COMVEST RELIED ON REASONABLE SAME STORE SALES GROWTH PROJECTIONS IN CAPITALIZING THE OPCO BUSINESS. ................................................................................................ 36

XII.   DESPITE SUBSTANTIAL PLANNING, POST-CONVERSION ISSUES AT THE NEW STORES PROVED DISASTROUS. .......................................... 41

A.    Pricing Problems ...................................................................................... 42

B.    Supply Chain Issues ................................................................................. 45

C.    Unfair Competition .................................................................................. 45

XIII.   THE PROPCO ENTITIES MADE A $25 MILLION RESCUE LOAN IN AUGUST 2015 TO THE OPCO ENTITIES. .............................................. 47

XIV.   DEBTORS FILED FOR BANKRUPTCY.................................................... 54

XV.   THERE IS NO EVIDENCE THAT ANY CREDITOR RELIED ON THE ALLEGED CORPORATE UNITY OF THE DEBTORS AND DEFENDANTS WHEN EXTENDING CREDIT. ..................................... 55

A.    Spirit & GIG ............................................................................................ 55

B.    Unified Grocers........................................................................................ 56

C.      Pepsi ....................................................................................................... 56

D.      MoneyGram, TopCo, and Starbucks .................................................. 57

E.      Vendors .................................................................................................. 57

F.      No Evidence of Creditor Reliance ...................................................... 58

XVI.   **THE COMMITTEE FAILED TO OFFER ANY EVIDENCE PROVING OR QUANTIFYING DAMAGES** ......................................................... **59**

**CONCLUSIONS OF LAW** ................................................................................... **59**

I.      **THE COMMITTEE HAS FAILED TO PROVE ACTUAL FRAUD.** ...... **59**

II.     **THERE IS NO BASIS TO PIERCE THE CORPORATE VEIL OR DISREGARD THE DEBTORS' CORPORATE FORM.** .......................... **60**

III.    **THE COURT SHOULD REJECT THE COMMITTEE'S CLAIM FOR SUBSTANTIVE CONSOLIDATION (COUNT 72) BECAUSE THE COMMITTEE CANNOT MEET ITS BURDEN AS TO ANY ELEMENT OF THE *OWENS CORNING* TEST** ................................................................ **62**

A.      Legal Standard for Substantive Consolidation ..................................... 62

B.      The Committee Failed to Prove Any Actual or Reasonable Creditor Reliance on the Debtors' Supposed Unity With the PropCo and SLB Entities. ................................................................................................. 65

C.      Holdings' Creditors Would Be Harmed by Substantive Consolidation. .............. 69

IV.     **THE COURT SHOULD REJECT THE HOLDINGS FRAUDULENT TRANSFER CLAIMS (COUNTS 1–19, 39–65)** ........................................... **70**

A.      Legal Standard for Fraudulent Transfer .............................................. 71

B.      All of the Committee's Fraudulent Transfer Claims (Both Actual and Constructive) Involving Transfers By Holdings Fail Because Holdings' Creditors Are Being Paid in Full. ........................................ 73

C.      The Committee Has Failed to Prove that Holdings Intended to Delay, Hinder, or Defraud Its Creditors. ......................................................... 77

D.      The Constructive Fraudulent Transfer Claims Against Holdings Fail Because Holdings Was Solvent at the Time of the Transfer. ................ 80

E.      The Constructive Fraudulent Transfer Claims Against Holdings Fail Because Holdings Received Reasonably Equivalent Value. ................. 81

iv

F.    This Case Is Highly Distinguishable from *Mervyn's*............................................ 82

**V.    THE COURT SHOULD REJECT THE OPCO ENTITIES' FRAUDULENT
TRANSFER CLAIMS (COUNTS 20–38)...................................................................... 87**

A.    The Constructive Fraudulent Transfer Claims Fail Because The PropCo
Leases Were For Reasonably Equivalent Value. ..................................................... 87

B.    The Actual Fraudulent Transfer Claims Fail Because the PropCo Entities
Did Not Intentionally Defraud the OpCo Entities' Creditors Through the
Payment of Market Rent. ......................................................................................... 90

**VI.    THE COURT SHOULD REJECT THE COMMITTEE'S BREACH OF
FIDUCIARY DUTY CLAIMS AT HOLDINGS (COUNTS 66 & 68)...................... 91**

A.    Legal Standard for Breach of Fiduciary Duty......................................................... 91

B.    The Committee Wrongly Asserts That A Solvent Holdings Should Act In
The Interest Of Holdings' Subsidiaries Or Creditors. ........................................... 94

C.    The Committee's Duty of Care Claim Fails Due to an Enforceable
Exculpatory Clause. ................................................................................................ 95

D.    The Committee Failed to Prove that Comvest and Holdings' Managers
Breached Their Fiduciary Duties to Holdings (Counts 66 and 68). ...................... 96

1.    The Committee Failed to Prove That Comvest Was On Both Sides
of the Transaction. .................................................................................... 96

2.    The Committee Failed to Prove that the Comvest Managers Were
Not Independent and Disinterested............................................................ 99

3.    Comvest and Holdings' Managers Did Not Breach the Duty of
Loyalty or Act in Bad Faith. ................................................................... 100

E.    The Committee Has Failed to Prove Any Damages. ........................................... 102

**VII.    THE OFFICERS AND DIRECTORS DID NOT BREACH THEIR
FIDUCIARY DUTIES (COUNT 67)............................................................................ 103**

A.    John Caple Did Not Breach Any of His Fiduciary Duties to Any of the
Debtors. ................................................................................................................. 104

B.    Cecilio Rodriguez Did Not Breach Any of His Fiduciary Duties to Any of
the Debtors. ........................................................................................................... 106

C.    John Clougher Did Not Breach Any of His Fiduciary Duties to Any of the
Debtors. ................................................................................................................. 107

v

D.      William Shaner Did Not Breach Any of His Fiduciary Duties to Any of the Debtors. ...................................................................................... 109

E.      Blake Barnett Did Not Breach Any of His Fiduciary Duties to Any of the Debtors. ...................................................................................... 110

F.      Derrick Anderson Did Not Breach Any of His Fiduciary Duties to Any of the Debtors. ...................................................................................... 111

G.      The Committee Is Estopped From Challenging The Decision To Enter The PropCo Leases or Spirit/GIG Leases If They Were Assumed In The Bankruptcy. ...................................................................................... 113

H.      The Committee Failed To Prove Damages. ........................................ 114

VIII.   **THE COMMITTEE LACKS STANDING TO PURSUE BREACH OF FIDUCIARY DUTY CLAIMS AGAINST LIMITED LIABILITY COMPANIES. ............................................................................................ 114**

IX.     **THE COURT SHOULD REJECT THE COMMITTEE'S UNJUST ENRICHMENT CLAIMS (COUNTS 73–75). ........................................ 116**

A.      Choice of Law ..................................................................................... 116

B.      Legal Standard for Unjust Enrichment .............................................. 117

C.      All of the Committee's Unjust Enrichment Claims Fail Because There Are Express, Written Contracts Governing the Transactions. .................. 119

        1.      Allegations Against the PropCo Entities Are Governed By Written Contracts (Count 75). ........................................................... 119

        2.      Allegations Against the SLB Entities Are Governed By Written Contracts (Count 74). ........................................................... 120

        3.      Allegations Against Comvest Are Governed By Written Contracts (Count 73). ........................................................................ 120

D.      Separately, the Committee Cannot Satisfy the Elements of Unjust Enrichment. ......................................................................................... 121

E.      The Committee Has Not Provided Sufficient Evidence to "Value" the Alleged Enrichment. .......................................................................... 123

X.      **THE COMMITTEE'S RECHARACTERIZATION CLAIM (COUNT 71) IS NOT SUPPORTED BY THE FACTS ..................................................... 124**

A.      Legal Standard for Recharacterization .............................................. 125

KE 50077321.25

B.      The Parties To the PropCo Loan Intended It To Be Secured Debt—Not An Equity Contribution. ....................................................................................... 126

C.      Even If The Court Evaluates The Intent Through The Various Multi-Factor Tests, The Evidence Is Clear That The PropCo Loan Is Debt................. 129

        1.      The Eleven *AutoStyle* Factors Weigh in Favor of Treating the PropCo Loan as Debt. ............................................................................ 130

        2.      The Additional Factors Identified by Delaware Courts Support the Treatment of the PropCo Loan as Debt. .................................................. 138

D.      The PropCo Loan Was Rescue Financing That Benefited OpCo's Creditors........................................................................................................... 139

**XI.    THE COURT SHOULD REJECT THE COMMITTEE'S EQUITABLE SUBORDINATION CLAIMS (COUNTS 69, 70, AND 77). ..................................... 141**

A.      Legal Standard for Equitable Subordination....................................................... 141

B.      The PropCo Entities Did Not Act Inequitably In Making a Secured Loan to the OpCo Entities............................................................................................ 143

C.      The PropCo Loan Did Not Harm the OpCo Entities' Unsecured Creditors....... 147

D.      The PropCo Proofs of Claim Should Not Be Equitably Subordinated Either................................................................................................................... 150

KE 50077321.25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
   390 B.R. 80 (S.D.N.Y. 2008)............................................................................. *passim*

*ALT Hotel, LLC v. Diamondrock Allerton Owner, LLC*,
   479 B.R. 781 (Bankr. N.D. Ill. 2012) ...................................................................60

*In re Alternate Fuels, Inc.*,
   789 F.3d 1139 (10th Cir. 2015) ...................................................................140, 142

*Americas Mining Corp. v. Theriault*,
   51 A.3d 1213 (Del. 2012) ...............................................................................92, 93

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
   545 A.2d 1171 (Del. 1988) ...................................................................................93

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
   650 A.2d 1270 (Del. 1994) .................................................................................109

*In re Auto–Train Corp.*,
   810 F.2d 270 (D.C. Cir. 1987)..............................................................................62

*In re AutoStyle Plastics, Inc.*,
   269 F.3d 726 (6th Cir. 2001) ........................................................................ *passim*

*In re Bauman*,
   535 B.R. 289 (Bankr. C.D. Ill. 2015)..............................................................79, 80

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
   563 F.2d 692 (5th Cir. 1977) .............................................................................141

*Boston Trading Grp., Inc. v. Burnazos*,
   835 F.2d 1504 (1st Cir. 1987)..............................................................................71

*Branch v. F.D.I.C.*,
   825 F. Supp. 384 (D. Mass. 1993) .......................................................................81

*In re Broadstripe, LLC*,
   444 B.R. 51 (Bankr. D. Del. 2010) ...................................................130, 133, 136

*Cede & Co. v. Technicolor, Inc..*,
   634 A.2d 345 (Del. 1993) ...................................................................91, 105, 106

*Wallace ex rel. Cencom Cable Income Partners II, Inc., LP v. Wood*,
   752 A.2d 1175 (Del. Ch. 1999) ................................................................................60

*Cline v. Grelock*,
   2010 WL 761142 (Del. Ch. Mar. 2, 2010) .....................................................93, 102

*CMV V., LLC v. Bax*,
   6 A.3d 238 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011)......................114, 115

*Coffin v. Malvern Fed. Sav. Bank*,
   90 F.3d 851 (3d Cir. 1996) .....................................................................................69

*In re Color Tile, Inc.*,
   2000 WL 152129 (D. Del. Feb. 9, 2000) ..............................................................125

*Comm. of Unsecured Creditors of Champion Enter., Inc. v. Credit Suisse (In re*
   *Champion Enter., Inc.)*,
   2010 WL 3522132 (Bankr. D. Del. Sept. 1, 2010) ...............................................144

*Continuing Creditors' Comm of Star Telecomms. Inc. v. Edgecomb*,
   385 F.Supp. 2d 449 (D. Del. 2004) ......................................................................109

*In re Crimson Expl. Inc. S'holder Litig.*,
   2014 WL 5449419 (Del. Ch. 2014) .................................................................91, 99

*Culverhouse v. Paulson & Co.*,
   133 A.3d 195 (Del. 2016) .......................................................................................60

*In re Direct Response Media, Inc.*,
   466 B.R. 626 (Bankr. D. Del. 2012) .....................................................................116

*In re: Dornier Aviation (N. Am.), Inc.*,
   453 F.3d 225 (4th Cir. 2006) ................................................................................140

*Douglas v. Hill*,
   148 Wash. App. 760 (Ct. App. 2009) .....................................................................73

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ....................................................................62

*In re DVI, Inc.*,
   326 B.R. 301 (Bankr. D. Del. 2005) ....................................................80, 97, 108

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*,
   702 A.2d 1228 (Del. 1997) ...................................................................................130

*In re EBC I, Inc.*,
   380 B.R. 348 (Bankr. D. Del. 2008) .......................................................................79

ix

*In re Epic Capital Corp.*,
   307 B.R. 767 (D. Del. 2004) .............................................................................141, 142, 145

*In re Exide Techs., Inc.*,
   299 B.R. 732 (Bankr. D. Del. 2003) ...................................................................................133

*In re Fedders N. Am., Inc.*,
   405 B.R. 527 (Bankr. D. Del. 2009) .................................................................72, 124, 134

*Fidelity Nat'l Title Ins. Co. v. Schroeder*,
   179 Cal. App. 4th 834 (App. 5th 2009) ........................................................................71, 73

*In re Filtercorp, Inc.*,
   163 F.3d 570 (9th Cir. 1998) ..............................................................................................145

*In re First City Bancorporation of Tex., Inc.*,
   1995 WL 710912 (Bankr. N.D. Tex. May 15, 1995)............................................................81

*Fisher v. Kelly*,
   30 Or. 1 (1896)......................................................................................................................73

*In re Fleming Cos., Inc.*,
   347 B.R. 163 (Bankr. D. Del. 2006) ..................................................................................115

*In re Friedman's Inc.*,
   452 B.R. 512 (Bankr. D. Del. 2011) ..................................................................................131

*In re Global Grounds Greenery, LLC*,
   405 B.R. 659 (Bankr. D. Ariz. 2009).................................................................................72

*In re Golden Guernsey Dairy, LLC*,
   548 B.R. 410 (Bankr. D. Del. 2015) ..................................................................................114

*H-M Wexford LLC v. Encorp, Inc.*,
   832 A.2d 129 (Del. Ch. 2003)..............................................................................................59

*In re Harold*,
   296 B.R. 868 (Bankr. M.D. Fla. 2003) ...............................................................................113

*In re Hedged-Invs. Assocs., Inc.*,
   380 F.3d 1292 (10th Cir. 2004) ..........................................................................................142

*In re HH Liquidation, LLC, et al*,
   Case No. 15-11874, D.I. 843 ......................................................................................53, 112

*In re Howland*,
   674 F. App'x 482 (6th Cir. 2017) .........................................................................................64

x

*In re Key3Media Grp., Inc.*,
    336 B.R. 87 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2,
    2006) ..................................................................................................................80, 86

*Kuroda v. SPJS Holdings, L.L.C.*,
    971 A.2d 872 (Del. Ch. 2009) ...........................................................................120

*In re Le Café Crème, Ltd.*,
    244 B.R. 221 (Bankr. S.D.N.Y. 2000) ..............................................................148

*In re Liberty Brands, LLC*,
    2014 WL 4792053 (Bankr. D. Del. Sept. 25, 2014) ..................................... *passim*

*In re Liberty Brands, LLC*,
    No. 07-10645 (MFW), D.I. 226 .........................................................................138

*In re Lifschultz Fast Freight*,
    132 F.3d 339 (7th Cir. 1997) ....................................................................141, 142

*Lyondell Chem. Co. v. Ryan*,
    970 A.2d 235 (Del. 2009) ..........................................................................101, 104

*MacDonald v. Hayner*,
    43 Wash. App. 81 (Ct. App. 1986) ...................................................................116

*Manzo v. Rite Aid Corp.*,
    2002 WL 31926606 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003) .................102

*In re Marriage of Cloney*,
    91 Cal. App. 4th 429 (1st Dist. 2001) .................................................................66

*McKenna v. Singer*,
    2017 WL 3500241 (Del. Ch. July 31, 2017).....................................................123

*McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*,
    339 F.3d 1087 (9th Cir. 2003) .............................................................................60

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
    945 F.2d 635 (3d Cir. 1991)................................................................................80

*In re Mervyn's Holdings, LLC*,
    426 B.R. 488 (Bankr. D. Del. 2010) ........................................................82, 84, 85

*In re Moll Indus., Inc.*,
    454 B.R. 574 (Bankr. D. Del. 2011) ..................................................................136

*Moses v. Harward*,
    2014 WL 12577167 (N.D. Cal. May 27, 2014)........................................117, 121

*In re Murphy*,
    331 B.R. 107 (Bankr. S.D.N.Y. 2005) ...................................................................74

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
    930 A.2d 92 (Del. 2007) .........................................................................................114

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) ..............................................................................117, 121

*In re Network Access Sols., Corp.*,
    330 B.R. 67 (Bankr. D. Del. 2005) ....................................................................88, 113

*In re New Life Adult Med. Day Care Ctr., Inc.*,
    2014 WL 6851258 (Bankr. D.N.J. Dec. 3, 2014) ........................................70, 71, 75

*Norris v. R & T Mfg.*,
    265 Or. App. 672 (Ct. App. 2014) .........................................................................73

*In re Nutri/Sys. of Fla. Assocs.*,
    178 B.R. 645 (E.D. Pa. 1995) .................................................................................142

*In re Octagon Roofing*,
    157 B.R. 852 (N.D. Ill. 1993) .................................................................................142

*of Ilshar Capital LLC v. Renco Grp., Inc.*,
    2013 WL 5863010 (Del. Ch. Oct. 31, 2013) ...............................................116, 120

*Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l*
    *Amusements Inc. (In re Midway Games Inc.)*,
    428 B.R. 303 (Bankr. D. Del. 2010) .......................................................................148

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley &*
    *Co., Inc. (In re Sunbeam Corp.)*,
    284 B.R. 355 (Bankr. S.D.N.Y. 2002) .............................................................98, 144

*In re Optim Energy, LLC*,
    2014 WL 1924908 (Bankr. D. Del. May 13, 2014), *aff'd*, 527 B.R. 169 (D.
    Del. 2015) .................................................................................125, 142, 143, 149

*In re Opus E., LLC*,
    528 B.R. 30 (Bankr. D. Del. 2015) .......................................................72, 104, 121

*Opus East*,
    528 B.R. at 103–04 (Bankr. D. Del. 2015) ...........................................................118

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005) ....................................................................... *passim*

*Pa. Emp. Benefit Tr. Fund v. Zeneca, Inc.*,
   710 F. Supp. 2d 458 (D. Del. 2010) ...................................................................117

*Quadrant Structured Prod. Co. v. Vertin*,
   102 A.3d 155 (Del. Ch. 2014) .............................................................................93

*In re R.M.L., Inc.*,
   92 F.3d 139 (3d Cir. 1996) ...................................................................................80

*In re Radnor Holdings Corp.*,
   353 B.R. 820 (Bankr. D. Del. 2006) ...........................................................132, 141

*In re Regency Holdings (Cayman), Inc.*,
   216 B.R. 371 (Bankr. S.D.N.Y. 1998) ...........................................................61, 76

*Matter of Rego Crescent Corp.*,
   23 B.R. 958 (Bankr. E.D.N.Y. 1982) .................................................................144

*Reis v. Hazelett Strip-Casting Corp.*,
   28 A.3d 442 (Del. Ch. 2011) .........................................................................90, 91

*Ross Holding & Mgmt. Co. v. Advance Realty Grp., LLC*,
   No. CIV.A. 4113-VCN, 2014 WL 4374261 (Del. Ch. Sept. 4, 2014) ....................92

*In re Rural Metro Corp. S'holders Litig.*,
   102 A.3d 205 (Del. Ch. 2014) .......................................................................95, 96

*Sears, Roebuck & Co. v. Sears plc*,
   744 F. Supp. 1297 (D. Del. 1990) ..........................................................60, 70, 85

*Shandler v. DLJ Merch. Banking, Inc.*,
   2010 WL 2929654 (Del. Ch. July 26, 2010) ...................................................92, 95

*In re ShendaTech, Inc.*,
   519 B.R. 292 (D. Nev. 2014) ................................................................................73

*In re Shubh Hotels Pittsburgh, LLC*,
   476 B.R. 181 (Bankr. W.D. Pa. 2012) ................................................................128

*Sinclair Oil Corp. v. Levien*,
   280 A.2d 717 (Del. 1971) ..............................................................................90, 91

*Sinclair v. Barr (In re Mid-Town Produce Terminal, Inc.)*
   599 F.2d 389 (10th Cir. 1979) ...........................................................................143

*Sixty-01 Ass'n of Apartment Owners v. Parsons*,
   314 P.3d 1121 (Wash. 2013) ...............................................................................65

KE 50077321.25

*Slappey Drive Indus. Park v. United States*,
    561 F.2d 572 (5th Cir. 1977) ..............................................................................128

*Solomon v. Armstrong*,
    747 A.2d 1098 (Del. Ch. 1999)............................................................................91

*Stewart v. BF Bolthouse Holdco, LLC*,
    2013 WL 5210220 (Del. Ch. Aug. 30, 2013) ...............................................97, 101

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ......................................................................92, 94, 99

*Stop & Go of Am., Inc. v. Stop & Go Shops, Inc.*,
    49 B.R. 743 (Bankr. D. Mass. 1985) ....................................................................62

*Strong v. Beydoun*,
    166 Cal. App. 4th 1398 (Ct. App. 2008)...........................................117, 118, 123

*In re SubMicron Sys. Corp.*,
    432 F.3d 448 (3d Cir. 2006)....................................................................... *passim*

*In re Synthes Inc. S'holder Litig.*,
    50 A.3d 1022 (Del. Ch. 2012)...............................................................91, 97, 101

*In re The Heritage Org.*,
    413 B.R. 438 (Bankr. N.D. Tex. 2009)..................................................................94

*In re Tower Air, Inc.*,
    416 F.3d 229 (3d Cir. 2005).................................................................................91

*In re Trans World Airlines, Inc.*,
    163 B.R. 964 (Bankr. D. Del. 1994) .....................................................................71

*Trenwick Am. Litig. Tr. v. Ernst & Young, LLP*,
    906 A.2d 168 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v.*
    *Billett*, 931 A.2d 438 (Del. 2007) .......................................................90, 94, 98, 100

*United States v. State St. Bank & Tr. Co.*,
    520 B.R. 29 (Bankr. D. Del. 2014) ....................................................125, 131, 148

*In re USDigital, Inc.*,
    443 B.R. 22 (Bankr. D. Del. 2011) .....................................................................125

*Vichi v. Koninklijke Philips Elecs. N.V.*,
    62 A.3d 26 (Del. Ch. 2012)...................................................................60, 70, 117

*In re Vision Metals, Inc.*,
    327 B.R. 719 (Bankr. D. Del. 2005) ...................................................................113

xiv

*Wang Elec., Inc. v. Smoke Tree Resort, LLC*,
    230 Ariz. 314 (Ct. App. 2012) ........................................................................117

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) ...............................................................................95

*Whiteford Plastics Co. v. Chase Nat'l Bank of New York City*,
    179 F.2d 582 (2d Cir. 1950) ............................................................................71

*In re Winstar Commc'ns, Inc.*,
    554 F.3d 382 (3d Cir. 2009)..........................................................................141

**Statutes**

6 Del. C. § 18-1002....................................................................................................114

6 Del. C. § 18-1101(b) ..............................................................................................115

6 Del. C. § 18-1101(e) ................................................................................................92

11 U.S.C. § 365 ........................................................................................................113

11 U.S.C. § 544 ..........................................................................................................71

11 U.S.C. § 548.................................................................................................... *passim*

Ariz. Rev. Stat. § 33-416 ............................................................................................66

Bankruptcy Code Section 510(c) ......................................................................140, 141

Bankruptcy Code sections 544, 547 and 548....................................................71, 75

California's Uniform Fraudulent Transfer Act ............................................................73

Delaware General Corporation Law Section 327, 8 Del. C. §327................................114

Delaware Limited Liability Company Act ................................................................114

Nev. Rev. Stat. § 111.315 ...........................................................................................66

Nevada's Uniform Fraudulent Transfer Act ..............................................................73

Or. Rev. Stat. § 93.643................................................................................................66

Oregon Uniform Fraudulent Transfers Act................................................................73

Uniform Fraudulent Transfer Act ..............................................................................73

**Rules**

Fed. R. Civ. P. 26(a)(1)(A)(iii) ......................................................................................102

**Other Authorities**

66 Am. Jur. 2d Restitution and Implied Contracts § 22........................................................116, 118

66 Am. Jur. 2d Restitution and Implied Contracts § 87........................................................118, 123

Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011)...............................117, 120

Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011).......................................117

KE 50077321.25

Defendants[2] hereby submit the following Proposed Findings of Fact and Conclusions of Law.

## **INTRODUCTION**

There is no real dispute in this case that Haggen's effort to capitalize on the Albertson's-Safeway opportunity failed.  The evidence at trial showed that hundreds of people—and all seven Defendants—poured their hearts into making the effort a success.  No one that heard the testimony of the Defendants could argue that the success or failure of the OpCo business was an afterthought.  And no one who saw John Clougher on the stand could plausibly suggest that the ultimate failure of this business effort did not take an emotional toll.

But business failure happens in a capitalist society.  Every day, businesses fail.  What has been radical about this case is the aggressive litigation tactics of the Committee without any actual evidence of wrongdoing by the Defendants.  The Committee has spent millions of dollars of the Estate's money pursuing unprecedented and revolutionary remedies ill-suited to this case.  If successful, they will transform Delaware law—and not in a good way.  And the Committee's ever-shifting theories of liability undergird an unspoken sentiment that Haggen's business failure <u>must</u> occasion a reckoning—and that the Defendants should pay.  So confident is the Committee in the notion that the Defendants should be punished for Haggen's demise that they did not bring <u>even one single creditor</u> to the trial.  In this story, the creditors are an after-thought.

---

[2]  The Defendants in this adversary proceeding are:  Comvest Group Holdings, LLC; Comvest Investment Partners III, L.P.; Comvest Investment Partners IV, L.P.; Defendant Comvest Haggen Holdings III, LLC; Defendant Comvest Haggen Holdings IV, LLC; Comvest Advisors, LLC (collectively, "Comvest"); Haggen Property Holdings, LLC ("Property Holdings"); Haggen Property South, LLC ("PropCo South"); Haggen Property North, LLC ("PropCo North"); Haggen Property Holdings II, LLC ("Property Holdings II"); Haggen SLB, LLC ("Haggen SLB"); John Caple; Cecilio Rodriguez; Michael Niegsch; John Clougher; Blake Barnett; William Shaner; and Derrick Anderson.

For all its aspersions against the Defendants, it is the Committee who has been all too willing to casually make, and then discard, allegations. In its Complaint, the Committee's theory was that "above-market rents" lay at the heart of Comvest's scheme to favor PropCo over OpCo. The Complaint made this allegation no fewer than 20 times. But when pressed for actual evidence to support its charges, the Committee faltered. Indeed, at trial, the Committee was forced to <u>stipulate</u> that it would <u>not</u> provide evidence that OpCo to PropCo rents were above market.

With its rent case relegated to an afterthought during discovery, the Committee evolved. Its new theory was that because the venture had failed quickly, *a priori*, it must have been undercapitalized. But the "under-capitalization" case did not hold up at trial either. That case hinged on the argument that Comvest and Haggen had developed unreasonable or "ridiculous" same-store sales growth projections. At trial, the facts bore out that A.T. Kearney, not Comvest, "devised" the same-store sales growth projections for OpCo; that A.T. Kearney did so based on years of experience in the industry and based on copious data; and that entity after entity after entity, including deal counterparties, lenders, creditors, and a federal governmental agency, reviewed and approved OpCo's financial projections. The only witness to testify that OpCo was undercapitalized at its inception was the Committee's paid expert (who possesses neither grocery expertise nor experience developing same-store sales growth projections in grocery), and his testimony was based on the incorrect belief (contradicted by five men who do have extensive grocery experience) that Haggen did not do much to convert the acquired stores to Haggen stores (i.e. to "Haggen-ize" the stores). The Business Judgment Rule exists exactly to protect businessmen from the results driven hindsight analysis that comprises the Committee's "undercapitalization" case.

With the rent case and the under-capitalization case gone, there is nothing left except to vaguely challenge the OpCo/PropCo structure.  In other words, the Committee has had to go back on its word and, at the end of the day, concede that this case is about OpCo/PropCo structures— per se.  Hence the Committee's statement in opening that the organizational chart of Haggen is "on trial."  And yet this theory too ran aground—on the words of the Committee's own counsel and witnesses.  Carol Flaton, a respected banker with decades of experience, testified that OpCo/PropCo structures are commonly used.  The Haggen family used an OpCo/PropCo structure at the time of Comvest's initial investment.  Indeed, *Albertson's* used an OpCo/PropCo structure with respect to many of the real estate assets sold to Haggen.

So the final frontier for the Committee is to wave its hands, ask the Court to ignore the trees (i.e. legal requirements) for the forest (i.e. the Committee's view of what's fair) and suggest that there simply must be something wrong here because, should Defendants prevail, equity will achieve some recovery while the unsecured creditors will be left "holding the bag."

But this approach is equally unavailing.  First, to be clear, the *equity at OpCo* will not recover anything in this case.  The absolute priority rule is being honored here.  Second, this is a court of law wherein the plaintiff bears the burden of establishing the elements of its claims with actual evidence—not simply by saying they wish things were otherwise.  The Committee in this case has repeatedly glossed over (or ignored) critical elements of its claims:  it did not put on any evidence of creditor reliance for substantive consolidation, it did not establish an intent case for actual fraudulent transfer, and it did not even offer a damages case on breach of fiduciary duty. Those are merely the spectacular examples—the Committee failed to meet its burden on each and every cause of action.

Perhaps most telling are the causes of action that the Committee did *not* bring in this proceeding.  The Committee did not bring a claim for common-law fraud.  After listening to five days of testimony and going through dozens of deposition designations, the Court will find that there is not a single allegation of a misrepresentation by any of the Defendants.  Nor is there any claim for any fraudulent omission committed by any of the Defendants.  Instead of fraud claims, the Committee brings a hodgepodge of mismatched causes of action—actual and constructive fraudulent transfer, breach of fiduciary duty, substantive consolidation, unjust enrichment, equitable subordination, and recharacterization—each a square peg in a round hole trying to approximate a recovery for fraud claims that the Committee couldn't allege.

The Defendants simply didn't do anything wrong here.  There was no fraud, no breach of fiduciary duty, no dereliction of the OpCos.  The Defendants ran a good process, took on an attractive opportunity to grow their successful grocery chain into a regional power, and ultimately failed.  When the struggles began, the Defendants focused their attention not on Comvest, but on OpCo, developing new business plans before ultimately providing a rescue loan.  Despite the Defendants' best efforts, Haggen went into bankruptcy.  Taking on risky opportunities in the pursuit of success is not only allowed in the United States, it is encouraged.

## FINDINGS OF FACT

I.    **PARTIES:  DEFENDANTS & DEBTORS**

    A.    **Comvest Partners**

1.    Comvest Partners is a private investment firm providing equity and debt capital to companies across North America.  Comvest is operationally focused and looks to invest in established businesses where it can add value and improve operations.  *See* 10/18/17 Tr. at 128:6–19 (Mr. Rodriguez).

4

2.      Defendant John Caple joined Comvest as a Managing Director in 2010 and later became a partner.  10/16/17 Tr. at 191:20–25 (Mr. Caple).   Prior to joining Comvest, Mr. Caple had substantial experience investing in and consulting with grocery store chains.  10/16/17 Tr. at 191:7–19 (Mr. Caple).  While at the firm Bain & Company, one of his biggest consulting clients was the grocery store chain Winn Dixie.  *Id*.  At HIG Capital, Mr. Caple directly oversaw multiple investments into grocery stores.  *Id*.  Once Mr. Caple joined Comvest, he was in charge of the Haggen deal team and later became a Manager at Holdings and a Director at Haggen, Inc.  D.I. 142 at 8–9 (Agreed Facts at ¶ 24).

3.      Defendant Michael Niegsch joined Comvest in 2010.  10/17/17 Tr. 5:13–16 (Mr. Niegsch).  Mr. Niegsch was part of the deal team involved in the original 2011 investment by Comvest in Haggen, and after the investment, he continued to work with management on converting stores and improving operations.  *Id*. at 68:8–18 (Mr. Niegsch).  He also served as a Manager of Holdings in 2015.  D.I. 142 at 9 (Agreed Facts at ¶ 26).

4.      Defendant Cecilio Rodriguez joined Comvest in 2004 and served as the Chief Financial Officer.  10/18/17 Tr. at 125:6–126:11 (Mr. Rodriguez).  In this role, he is not involved in deals on a day-to-day basis.  *Id*.  Mr. Rodriguez serves on the Investment Committee at Comvest in his CFO role.  10/18/17 Tr. at 126:12–127:15 (Mr. Rodriguez).  In terms of Haggen, he served as the Secretary and CFO of Holdings until January 2015, and he also served as a Manager of Holdings.  D.I. 142 at 9 (Agreed Facts at ¶ 25).

5.      The Committee is also suing the following companies and partnerships affiliated with the Comvest Partners private equity firm:   Defendant Comvest Group Holdings, LLC ("CGH") is a Delaware limited liability company;   Defendant Comvest Investment Partners III, L.P. is a Delaware limited partnership that is owned and/or controlled, directly or indirectly, by

CGH; Defendant Comvest Investment Partners IV, L.P. is a Delaware limited partnership that is owned and/or controlled, directly or indirectly, by CGH; Defendant Comvest Haggen Holdings III, LLC ("CHH III") is a Delaware limited liability company that is owned and/or controlled, directly or indirectly, by CGH; and Defendant Comvest Haggen Holdings IV, LLC ("CHH IV") is a Delaware limited liability company that is owned and/or controlled, directly or indirectly, by CGH; and Defendant Comvest Advisors, LLC is a Delaware limited liability company that is owned and/or controlled, directly or indirectly, by CGH.  CHH III and CHH IV own Class A Units in Holdings.  D.I. 142 at 7 (Agreed Facts at ¶¶ 11–18).

       B.    **Haggen (Corporate Entities)**

6.      Debtor Haggen, Inc. is a Washington corporation that was incorporated in 1962. DX0638-0031.  Until 2011, it served as the corporate vehicle for the Haggen family to operate their Northwest grocery store chain.  G. Hall Dep. at 21:14–22:15.

7.      In 2011, Comvest acquired an 80% interest in Haggen, Inc. and in doing so created a new ownership structure for the company.  G. Hall Dep. at 24:3–12.  Debtor Haggen Acquisition, LLC ("Acquisition") is a Delaware limited liability company that was formed in 2011.  D.I. 142 at 6 (Agreed Facts at ¶ 9); DX0639.  From 2011 forward, Haggen, Inc. was owned and managed by Acquisition. D.I. 142 at 6 (Agreed Facts at ¶ 10).

8.      Debtor Haggen Holdings, LLC ("Holdings") is a Delaware limited liability company that was also formed in 2011 as part of Comvest's investment in Haggen, Inc.  D.I. 142 at 5 (Agreed Facts at ¶ 5); DX0640.

9.      Over three years later in early December 2014 in preparation for the possibility of the Albertson's Acquisition, the following limited liability companies were created (all of which are either Debtors or Defendants):

- Defendant Haggen Property Holdings, LLC ("Property Holdings") is a Delaware limited liability company that was owned and managed by its sole member, Holdings. D.I. 142 at 7 (Agreed Facts at ¶ 19); DX0647.

- Defendant Haggen Property South, LLC ("PropCo South") is a Delaware limited liability company that was owned and managed by its sole member, Defendant Property Holdings. D.I. 142 at 8 (Agreed Facts at ¶ 20); DX0646.

- Defendant Haggen Property North, LLC ("PropCo North") is a Delaware limited liability company that was owned and managed by its sole member, Defendant Property Holdings. D.I. 142 at 8 (Agreed Facts at ¶ 21); DX0656.

- Defendant Haggen Property Holdings II, LLC ("Property Holdings II") is a Delaware limited liability company that was owned and managed by its sole member, Debtor Holdings. D.I. 142 at 8 (Agreed Facts at ¶ 22).

- Defendant Haggen SLB, LLC ("Haggen SLB") is a Delaware limited liability company that was owned and managed by its sole member, Debtor Acquisition. D.I. 142 at 8 (Agreed Facts at ¶ 23); DX0652.

- Debtor Haggen Operations Holdings, LLC ("Operations") is a Delaware limited liability company that was owned and managed by its sole member, Holdings. D.I. 142 at 5–6 (Agreed Facts at ¶ 6); DX0658.

- Debtor Haggen OpCo South, LLC ("OpCo South") is a Delaware limited liability company that was owned and managed by its sole member, Operations. D.I. 142 at 6 (Agreed Facts at ¶ 7); DX0650.

- Debtor Haggen OpCo North, LLC ("OpCo North") is a Delaware limited liability company that was owned and managed by its sole member, Operations. D.I. 142 at 6 (Agreed Facts at ¶ 8); DX0644.

10.    Because all of these companies were newly formed in December 2014, none of them had assets or liabilities prior to the Albertson's Acquisition. *Id*.

C.    **Haggen (Individual Defendants)**

11.    Defendant John Clougher joined Haggen as its Chief Executive Officer in September 2014. 10/19/17 Tr. at 145:8–146:1, 149:23–150:1 (Mr. Clougher). Prior to Haggen, Mr. Clougher had been working in the grocery industry since high school (over 30 years) and developed extensive grocery store management experience. *Id*. at 146:2–148:17. In particular, Mr. Clougher rose up to store manager at Purity Supreme Markets in Boston before switching to

7

Fresh Fields and eventually to Whole Foods with stops along the way. *Id.* At Whole Foods, Mr. Clougher was the Division President of Pacific Northwest for Whole Foods, overseeing more than $1 billion in revenue. 10/19/17 Tr. at 146:2–148:17 (Mr. Clougher). In his role at Haggen, Mr. Clougher served as the CEO of Holdings, Acquisition, Haggen, Inc., Operations, OpCo North, Haggen SLB, Property Holdings, and PropCo North. D.I. 142 at 9–10 (Agreed Facts at ¶ 27). He also served as President of OpCo North and Haggen, Inc. and as a Manager of Holdings. *Id.*

12.    Defendant Blake Barnett served as the Interim Chief Financial Officer for Haggen in 2011 and rejoined the company in that role in March 2014. 10/17/17 Tr. at 154:11–19 (Mr. Barnett). In late 2014, Mr. Barnett transitioned from Interim CFO to CFO. *Id.* at 154:11–155:1; DX0072-0020. Prior to joining Haggen, Mr. Barnett worked as the CFO for the California division of Albertson's. 10/17/17 Tr at. 229:13–230:6 (Mr. Barnett). There he oversaw 500 stores with over $9 billion in revenue, including many of the stores that were later acquired by Haggen. *Id.* In his role at Haggen, Mr. Barnett served as CFO for various companies, including Holdings, Acquisition, Operations, OpCo North, Property Holdings, Property Holdings II, Haggen SLB, OpCo South, PropCo South, and PropCo North. D.I. 142 at 10 (Agreed Facts at ¶ 28).

13.    Defendant William Shaner joined Haggen in January 2015 as the Chief Executive Officer of the stores in California, Arizona, and Nevada. 10/19/17 Tr. at 47:15–23 (Mr. Shaner). Prior to Haggen, Mr. Shaner had twenty-five years of experience in the grocery industry, including management positions at Kroger and SuperValu. 10/19/17 Tr. at 48:18–50:6 (served as region president for SuperValu overseeing one-fourth of its total footprint), 62:12–23 (Mr. Shaner). From 1999 through 2011, Mr. Shaner also served as COO and then CEO of Save-A-Lot, the nation's largest discount grocery chain. *Id.* at 50:7–9. Within his role at Haggen, Mr. Shaner was the President and Chief Executive Officer of OpCo South. He was also President of Operations,

Acquisition and Holdings (where he was also a Manager).  D.I. 142 at 10–11 (Agreed Facts at ¶ 29).  The Committee's solvency expert, David McGreevey, agrees that Mr. Shaner is an expert in grocery.  10/18/17 Tr. at 50:2–4 (Mr. MacGreevey).

14.     Derrick Anderson joined Haggen as his first job right after college in 1992 and remained at the company for over 25 years growing into a senior role in human resources.  10/17/17 Tr. at 267:1–269:5 (Mr. Anderson).  He worked there both before and after Comvest's investment. *Id*. at 270:21–271:1 (Mr. Anderson).  In his role at Haggen, Mr. Anderson served as the Secretary of Holdings, Acquisition, Haggen, Inc., Operations, OpCo South, OpCo North, Haggen SLB, Property Holdings, Property Holdings II, PropCo North, and PropCo South.  D.I. 142 at 11 (Agreed Facts at ¶ 30).

## II.     IN 2011, COMVEST INVESTED IN A STRUGGLING HAGGEN GROCERY STORE CHAIN, IMPROVED ITS PERFORMANCE, AND CREATED A PROFITABLE PARTNERSHIP.

15.     Dorothy and Bennett Haggen opened their first grocery store in the midst of the Great Depression in 1933.  Over the next 75 years, the business slowly grew, ultimately giving rise to a 30-store chain in Washington and Oregon.  DX0072-0005; D.I. 142 at 11 (Agreed Facts at ¶ 31).

16.     The Haggen Family owned their grocery stores in an OpCo/PropCo structure, with Haggen, Inc. (OpCo) owning the operations and Briar Development (PropCo) owning the real estate.  G. Hall Dep. at 71:10–16; 10/16/17 Tr. at 194:15–195:4 (Mr. Caple); 10/17/17 Tr. at 71:3–19 (Mr. Niegsch).  Accordingly, Haggen, Inc. had a lease with Briar Development and paid rents that were either "market rent" or "above market rent."  10/17/17 Tr. at 270:10–16 (Mr. Anderson).

17.     By 2010, the Haggen business was on the verge of bankruptcy.  The Haggen stores were "struggling," they "weren't earning any money," they had a "very low EBITDA," and the "cash flow was anemic."  G. Hall Dep. at 59:6–9, 70:15–22.  Haggen, Inc. was in such "financial

difficulty" that they "needed to determine whether or not we were going to sell Haggen or potentially bankrupt it if we didn't." G. Hall Dep. at 22:24–23:5; *see also id*. at 71:5–8 ("Q. Were you considering bankruptcy as a potential option in 2009 or 2010? A. We had discussions about that as an option.").

18.     Meanwhile, in 2010, Mr. Caple was searching for a potential investment in grocery—an industry where he had considerable experience. 10/16/17 Tr. at 192:1–194:14 (Mr. Caple). According to Mr. Caple, Comvest "called every grocery store chain in the U.S. with between, I think, 20 and 200 stores" to "find potential opportunities." *Id*. at 192:15–24 (Mr. Caple). Mr. Caple found Haggen to be a particularly interesting investment because the chain had a "great brand" but it was in need of renovations and updating. *Id*. at 193:2–19 (Mr. Caple). The investment thesis was to "turn around" the negative stores and renovate Haggen from a "grocery circa 1990 to grocery circa 2010." *Id*. at 195:10–19 (Mr. Caple).

19.     In 2010 and 2011, Comvest and the Haggen Family negotiated a deal, and Comvest ultimately acquired an 80 percent interest in Haggen in March 2011 for approximately $33 million. P-627.010; G. Hall Dep. at 24:3–12. To facilitate the transaction, Comvest created Haggen Holdings, LLC ("Holdings") and Haggen Acquisition, LLC ("Acquisition"), with Holdings owning 100 percent of Acquisition, and Acquisition owning 100 percent of Haggen, Inc. DX0639; DX0640; D.I. 142 at 15–16.

20.     Comvest did not acquire an interest in Briar Development, the Haggen Family's PropCo company. Even though the Haggen Family was willing to sell the real estate, Comvest was only interested in the grocery store operations. 10/16/17 Tr. at 194:15–195:4 (Mr. Caple). Accordingly, both before and after the investment, all of the original Haggen stores had leases and paid rent. 10/16/17 Tr. at 198:12–14 (Mr. Caple); 10/17/17 Tr. at 71:3–19 (Mr. Niegsch).

21.     Many of the 30 Haggen stores acquired by Comvest were actually operated under the "TOP" (tough on prices) banner.  *See* 10/16/17 Tr. at 195:20–197:5 (Mr. Caple); *see also* DX0211-0007.  After the acquisition, several underperforming TOP stores were closed, and five to seven of the "TOP" stores were converted to Haggen. 10/16/17 Tr. at 195:20–197:5 (Mr. Caple). Each of these conversions from "TOP" to "Haggen" took about 40 hours and involved rebranding the entire store.  *Id*. at 196:5–197:5 (Mr. Caple).  The renovation involved new fixtures, new displays, new organization, and new colors to refocus on the product and the community.  *Id*. at 196:5–197:5, 197:20–198:7 (Mr. Caple).  The former "TOP" stores had "same-store sales growth" in the "mid-to-high single digits" after the conversion to Haggen.  10/16/17 Tr. at 197:2–198:7 (Mr. Caple); *see also* 10/17/17 Tr. at 80:11–20 (Mr. Niegsch); DX0072-0007 (Woodinville conversion "resulted in a topline improvement of 7.5%.").  These changes occurred even though the "TOP" stores maintained the "same product" at "the exact same price." 10/16/17 Tr. at 197:20– 198:7 (Mr. Caple).

22.     In addition to converting the TOP stores, Haggen also invested $10 million to rebrand all their stores to "Haggen – Northwest Fresh."  DX0211-0010; DX0072-0007.  These rebranding efforts included "store remodels, remerchandising, [and] signage" to take advantage of Haggen's "brand recognition and to refocus the stores on its key competitive advantages." DX0211-0007–10.

23.     The renovations and strategic closures were a success.  According to surveys in 2014, Haggen had the best customer feedback of any of its competitors in the Pacific Northwest. DX0072-0013; 10/16/17 Tr. at 228:14–229:24 (Mr. Caple).

24.     By 2014, the remaining 18 stores were turning a profit.  Their EBITDA increased from $12 million to "well over $20 million."  10/16/17 Tr. at 197:6–12 (Mr. Caple).  Third quarter

financial information for 2014 showed that the stores had 5% same store sales growth.  10/17/17 Tr. at 79:1–8 (Mr. Niegsch).  This trajectory continued with the hiring of Mr. Clougher in September 2014 to take over as CEO.  After hiring Mr. Clougher, EBITDA continued to rise month after month until it reached $25 million in 2015. 10/17/17 Tr. at 82:2–20 (Mr. Niegsch).

25.    With Comvest's assistance, the Haggen stores went from the verge of bankruptcy to a profitable, regional grocery store chain.

## III.    THE ALBERTSON'S/SAFEWAY MERGER PRESENTS AN EXCITING OPPORTUNITY TO GROW THE SUCCESSFUL HAGGEN BRAND.

26.    In early 2014, Albertson's and Safeway, two of the largest grocery chains in the West, announced a merger whereby Albertson's would acquire all the shares of Safeway for approximately $9.2 billion.  DX0199 at ¶ 8.

27.    The merger drew the attention of the Federal Trade Commission ("FTC"), which was concerned that such a large combination would be anticompetitive in local markets throughout the West.  DX0199.  The state attorney generals in Arizona, California, Nevada, Oregon, and Washington were also concerned about the anticompetitive effects of such a large merger. 10/16/17 Tr. at 215:15–20; 247:19–248:3 (Mr. Caple).  The FTC filed a complaint to stop the merger due to those concerns, and to settle that complaint, Albertson's and Safeway agreed to divest 168 stores as a condition to closing the merger.  *See* DX0199; DX0512; DX0513; DX0854.

28.    Because it was a forced divestiture, both the real estate and the operations of those 168 stores would be sold at "pennies on the dollar versus what market value would have been." J. Ewing Dep. at 34:18–21. Albertson's—and its private equity owner, Cerberus Capital Management ("Cerberus")—were highly incentivized to sell these stores.  If the merger fell apart, Albertson's and Cerberus were on the hook for a $400 million break fee.  *See* DX0014-0003 ("A reverse termination fee of $400,000,000 may be payable by Albertsons to Safeway upon

termination of the Merger Agreement under certain circumstances, including if Albertsons is unable to obtain antitrust approval before the Initial End Date (or, if extended, the Final End Date) . . . .").

29.    Haggen was uniquely positioned to capitalize on this forced divestiture opportunity. On the one hand, Haggen had a small enough footprint not to raise anticompetitive concerns, as larger potential purchasers were already located in the areas where the stores were being divested and therefore would not address the FTC's competition concerns.  10/16/17 Tr. at 200:18–201:12 (Mr. Caple).  On the other hand, Haggen had the infrastructure and resources to effectively operate the stores (unlike small, unestablished grocery chains).  *Id.*

30.    Originally Comvest and Haggen were looking to purchase some of the stores in Washington and Oregon.  10/16/17 Tr. at 104:25–105:8, 106:2–5 (Mr. Caple).  Comvest put together a deal team (the "Comvest Deal Team") led by Caple that also included Niegsch and Lucas Scholl.  *Id.* at 200:15–17.  Niegsch, then a Vice President at Comvest, had already been working with Haggen, and stepped into the role of "deal quarterback."  *Id.* at 103:6–13; 10/17/17 Tr. at 68:8–18 (Mr. Niegsch).  Scholl was an associate and spent many hours analyzing and modeling the deal under the direction of Niegsch and Caple.  10/16/17 Tr. at 103:14–18 (Mr. Caple); 10/17/17 Tr. at 78:2–25 (Mr. Niegsch).

31.    At first, the Comvest Deal Team analyzed the possibility of buying approximately 45 stores in Washington and Oregon.  10/17/17 Tr. at 68:23–69:1 (Mr. Niegsch).  The Comvest Deal Team concluded that Mr. Clougher, who had been hired as CEO of Haggen, Inc. in September 2014, would stay on as CEO of the larger Haggen operation.  10/19/17 Tr. at 145:8–9 (Mr. Clougher); DX0072-0020.  The Comvest Deal Team vetted the potential acquisition, and presented its preliminary findings to Comvest's Investment Committee.  *See* DX0017.

13

32.    The Investment Committee is a group of senior investment professionals and managers that scrutinizes all of Comvest's prospective deals. 10/18/17 Tr. at 126:12–128:5 (Mr. Rodriguez). The Investment Committee acts as a fiduciary on behalf of Comvest's limited partners. *Id.* at 126:12–19. At the time that Comvest was contemplating the Albertson's Acquisition, the Investment Committee was made up of Michael Falk, Robert Priddy, Pete Kight, John Caple, Roger Marrero, Tom Clark, and Cecilio Rodriguez. *Id.* at 126:24–127:5. The investment and business acumen on among the members of the Investment Committee is extremely high. *Id.* at 127:6–128:5. The Comvest Investment Committee tends to ask many questions, probe deals carefully, and is far from a "rubber stamp." *Id.* at 131:8–23.

## IV.    COMVEST AND HAGGEN HIRE MULTIPLE CONSULTANTS TO SCRUTINIZE AND STRUCTURE THE POTENTIAL ACQUISITION.

33.    Over time, the number of stores that Albertson's wanted to sell to Haggen grew, as Albertson's wanted to find one buyer for as many of the stores as possible. *See* DX0030 ("Their message to us is that they really want us to bid on the whole thing and we will likely have to do that to be competitive if this other bid comes in."). The number of stores grew from approximately 43 stores to, ultimately 146 stores. *Compare* DX0017-0002 *with* DX0153-0003; 10/17/17 Tr. at 68:23–69:7 (Mr. Niegsch). The geographic scope of the stores also expanded from the Pacific Northwest, first into California, and ultimately into Arizona and Nevada as well. *See id.*

34.    Comvest and Haggen knew that any acquisition would have risks and challenges associated with it. 10/16/17 Tr. at 202:4–14 (Mr. Caple). As a result, Comvest and Haggen conducted a detailed and careful process for vetting the potential acquisition. 10/17/17 Tr. at 72:10–73:10 (Mr. Niegsch); 10/16/17 Tr. at 214:2–3 (Mr. Caple) ("We knew this was a huge endeavor and we asked for a lot of help.") Comvest and Haggen also hired multiple consultants to scrutinize and structure a potential deal, including, but not limited to, the following:

- <u>A.T. Kearney ("ATK")</u>:  ATK provided retail and grocery expertise, including expertise in grocery store conversions and assessing Haggen's likelihood of attracting and maintaining customers and sales in the to-be-acquired stores.  *See* 10/16/17 Tr. at 213:5–10 (Mr. Caple); 10/17/17 Tr. at 74:7–15 (Mr. Niegsch); 10/20/17 Tr. at 95:25–97:9, 103:8–18 (Mr. Hooper).  Todd Hooper led a large ATK team that assisted Haggen with its model, stores projections, and presentation to regulators.  *See id.*; *see also* 10/20/17 Tr. at 97:12–20 (Mr. Hooper).

- <u>Holliday Fenoglio Fowler ("HFF")</u>:  HFF provided real estate expertise, including analysis regarding potential sale-leaseback transactions and assistance in determining market rents to be applied at the acquired stores.  *See* 10/16/17 Tr. at 213:11–15 (Mr. Caple); 10/17/17 Tr. at 75:1–5 (Mr. Niegsch).

- <u>OAG Consulting ("OAG")</u>:  OAG was utilized to provide operational expertise.  *See* 10/17/17 Tr. at 74:16–20 (Mr. Niegsch).  In particular, Ira Genser at OAG worked closely with the Haggen Management Team throughout the whole conversion process.  *See id.*; I. Genser Dep. at 21:3–16; 23:14–24.  In that role, he helped structure the schedule or "cadence" for how to close, remodel, and quickly reopen 146 stores in under 5 months.  *Id.*

- <u>Willard Bishop</u>:  Comvest and Haggen understood pricing would be important as they opened new stores and, to that end, hired Willard Bishop for its expertise in that area.  DX0170; DX0174; 10/16/17 Tr. at 213:16–21 (Mr. Caple); 10/20/17 Tr. at 102:24–103:7 (Mr. Hooper).

- <u>Akerman LLP ("Akerman")</u>:  Comvest and Haggen utilized the Akerman law firm to provide legal assistance regarding the transaction.  *See* 10/16/17 Tr. at 213:22–23 (Mr. Caple); 10/17/17 Tr. at 74:21–25 (Mr. Niegsch).

- <u>Sagent Advisors ("Sagent")</u>:  An investment bank hired to explore various potential transactions related to the Albertson's Acquisition and advise on the Albertson's Acquisition itself.  *See* DX0092; 10/16/17 Tr. at 213:24–214:1 (Mr. Caple).

35.     Each time additional stores were added, the Comvest Deal Team, along with its myriad consultants and advisors, reassessed the risks and opportunities.  *See, e.g.*, DX0017; DX0079; DX0133.  Comvest and Haggen also ran "hundreds of models," which changed as the number of stores changed and other inputs were altered.  10/17/17 Tr. at 138:19 (Mr. Niegsch); *see, e.g.*, DX0124; DX0125; DX0135; DX0155; DX0240.

36.     To manage the expanded store base, Haggen brought in additional management help.  Mr. Shaner, who Comvest and Haggen had brought in as a consultant to help vet the potential acquisition, agreed to become the CEO of OpCo South, which would consist of the stores located

in California, Arizona, and Nevada.  10/19/17 Tr. at 43:4–44:20, 47:15–23 (Mr. Shaner); DX0072-0020.  Mr. Clougher, who was already serving as CEO of Haggen, Inc. (the 18 legacy Haggen stores in Washington and Oregon), agreed to also be the CEO of OpCo North, which would consist of the to-be acquired stores in Washington and Oregon.  10/19/17 Tr. at 145:8–9 (Mr. Clougher); DX0072-0020.  Mr. Barnett, who had been serving as interim CFO of Haggen, Inc, agreed to become the permanent CFO of OpCo South, OpCo North, and Haggen, Inc.  10/17/17 Tr. at 154:11–155:1 (Mr. Barnett); DX0072-0020.

37.    An important aspect of Comvest and Haggen's diligence was putting together a reasonable estimate of what to expect in terms of retaining customers and boosting sales at each store that would be converted to a Haggen.  *See, e.g.*, 10/17/17 Tr. at 78:2–15 (Mr. Niegsch); 10/20/17 Tr. at 98:22–99:3 (Mr. Hooper).  ATK brought specific expertise to this topic and analyzed the question from a number of angles.  10/20/17 Tr. at 105:1–17 (Mr. Hooper).

38.    ATK studied Haggen's "Net Promoter Score." This is a statistical measure of a customer's willingness to recommend a company's products or services to others and is frequently used in the retail industry.  10/20/17 Tr. at 107:12–108:11, 110:21–111:2. (Mr. Hooper); DX0072-0013. ATK found that Haggen had the highest Net Promoter Score in the Pacific Northwest, whereas Albertson's and Safeway had much lower Net Promoter Scores.  *See* DX0072-0013 (showing Haggen with a net promoter score of 47 percent, Safeway with a net promoter score of 14 percent, and Albertson's with a net promoter score of *negative* 4 percent).  Based on this survey, ATK and Haggen believed that Haggen would be able to convert Albertson's and Safeway customers into Haggen customers by delivering a better shopping experience.  *See, e.g.*, 10/16/17 Tr. at 228:10–24 (Mr. Caple); 10/20/17 Tr. at 108:4–8; 109:22–110:8 (Mr. Hooper).  Given its

high Net Promoter Score, ATK and Haggen also believed that Haggen's brand would travel well into California, Arizona, and Nevada. *See, e.g.*, 10/20/17 Tr. at 110:11–20 (Mr. Hooper).

39.    ATK also conducted "word cloud" surveys to see what concepts customers associated with Albertson's, Safeway, and Haggen. 10/20/17 Tr. at 111:3–112:18 (Mr. Hooper); DX0072-0015. These "word cloud" surveys are frequently used in the retail industry and are considered a reliable measure of customer's preferences. *Id.* Based on a statistically valid sampling of customers, these surveys demonstrated that Albertson's and Safeway customers focused on "location," "pricing," and "convenience." DX0072-0015. Haggen customers also cared about those issues, but also valued "quality," "local sourcing," "freshness," and "variety." *Id.* Based on these word cloud surveys, ATK and Haggen believed that they could retain a significant portion of the Albertson's and Safeway customers because the location, convenience, and pricing would not change. 10/16/17 Tr. at 235:9–236:15 (Mr. Caple); 10/20/17 Tr. at 111:16–112:8 (Mr. Hooper).

40.    Haggen also believed it could bring in new customers by remodeling the stores during the conversions to "Haggenize" them with greater variety and quality. *Id.* ATK also looked at the impact that the location and the planned remodeling of the news stores would have on sales. *See, e.g.*, DX0041; DX0080-0022–27. ATK understood that the plan was to "Haggenize" the stores and thus felt it appropriate to consider those renovations in its same store sales projections. 10/20/17 Tr. at 119:8–24 (Mr. Hooper). ATK also looked at pricing strategy, and how that would impact Haggen's ability to retain existing Albertson's and Safeway customers and develop new Haggen customers in the to-be converted stores. *See, e.g.*, DX0101-0003–4, 0012–13.

41.    Another important aspect of the due diligence was identifying an IT and back office solution for operating the 146 new stores. 10/17/17 Tr. at 187:4–7 (Mr. Barnett); DX0079-0005

("Conversion of stores, especially IT conversions, are a daunting task.").  Haggen recognized during due diligence that the Albertson's Acquisition would require the development of a "highly integrated infrastructure platform in a very short time period."  DX0072-0026.  Haggen therefore sought "to de-risk the transition" by partnering with a proven "Business Process Outsource" ("BPO") provider "with strong transition capabilities."  *Id.*

42.    To deal with this issue, Comvest and Haggen partnered with SuperValu, who would ultimately become Haggen's BPO provider for all 146 stores acquired from Albertson's.  DX0072-0027.  SuperValu had "extensive experience supporting store transitions for larger retailers"—and its IT infrastructure was already supporting the Albertson's stores, which represented over 70 percent of the stores being acquired by Haggen.  *Id.* Part of the IT infrastructure was SuperValu's price maintenance software, PM2, which Albertson's utilized in all of its stores.  10/19/17 Tr. at 84:24–85:12 (Mr. Shaner).  Haggen viewed its decision to retain SuperValu as its BPO provider as one that "dramatically de-risk[s] the transition" of the 146 to-be-acquired stores.  *Id.*  SuperValu would ultimately present on the Albertson's Acquisition to the FTC alongside Haggen. 10/16/17 Tr. at 224:3–18 (Mr. Caple).

43.    On November 3, 2014, the Comvest Deal Team and Haggen Management Team made another presentation to the Investment Committee about the potential Albertson's Acquisition.  *See* DX0079.  During that presentation, the Comvest Deal Team and Haggen Management Team presented the risks of the transaction, and actions that were being taken to mitigate those risks.  *See* DX0079–0005.

44.    Comvest and Haggen also invited ATK to present their due diligence findings directly to the Investment Committee.  10/18/17 Tr. at 130:15–131:14 (C. Rodriguez); 10/20/17 Tr. at 123:20–124:7 (T. Hooper).  It is very rare for the Investment Committee to hear directly

from a third-party consultant regarding the consultant's due diligence findings.  10/18/17 Tr. at

130:21–131:7 (C. Rodriguez).  Given the size and importance of the potential acquisition, Comvest

felt that the Investment Committee needed to hear from ATK directly.  *Id.*

## V.    HAGGEN'S BUSINESS PLAN AND FINANCIAL PROJECTIONS WERE VALIDATED BY NUMEROUS THIRD-PARTIES WHO HAD TO APPROVE THE ALBERTSON'S ACQUISITION OR WHO AGREED TO PARTNER WITH HAGGEN.

45.    Armed  with  the  expertise  of  its  consultants,  a  new  management  team,  and

relationships  with  key  suppliers  and  partners,  Haggen  was  well  positioned  to  seize  on  the

opportunity to acquire 146 new stores.  Before it could do so, Haggen had to convince a number

of third-parties to partner with Haggen and/or approve the acquisition.  *See* 10/16/17 Tr. at 214:7–

11, 215:21–22 (Mr. Caple).

46.    First  was  the  Comvest  Investment  Committee.    Without  the  Investment

Committee's approval, the bid on the Albertson's stores could not go forward.  10/16/17 Tr. at

104:14–24 (Mr. Caple).  On December 3, 2014, the Comvest Deal Team and Haggen Management

Team made their final presentation to the Investment Committee.  *See* DX0133; 10/16/17 Tr. at

187:7–9 (Mr. Caple).  The presentation included an analysis of the risks of acquiring the 146 stores,

and the steps that Comvest and Haggen would take to mitigate those risks.  *See* DX0133-0005;

10/16/17 Tr. at 202:15–203:2 (Mr. Caple). During the presentation, the Investment Committee

members  asked  questions  about  the  projections  that  were  presented  and  there  was  a  "robust

discussion" about the potential transaction.  10/18/17 Tr. at 132:9–133:15 (C. Rodriguez).  The

Investment Committee approved the transaction.  *Id.* at 132:7–10 (C. Rodriguez); 10/17/17 Tr. at

98:19–21 (M. Niegsch).

47.    Second was Albertson's/Cerberus and Safeway.  It was critical for Albertson's (and

its owner Cerberus) that any proposed deal be viable and eventually close.  Otherwise, their merger

with Safeway would be in jeopardy, and Cerberus was on the hook for a $400 million "break fee" should that merger fail to close. *See* 10/16/17 Tr. at 214:25–215:7 (Mr. Caple); DX0014-0003. Safeway similarly had an interest in successfully completing the merger. Albertson's/Cerberus and Safeway reviewed Haggen's presentations to the FTC—which contained Haggen's financial projections and business plan—and ultimately agreed to sell the 146 stores to Haggen. *See* 10/16/17 Tr. at 219:5–17 (Mr. Caple); DX0072; DX0101.

48.    Next Haggen had to convince Spirit Realty Capital and Garrison Investment Group ("GIG") that it had a viable business plan. *See* 10/16/17 Tr. at 214:20–24, 218:4–8 (Mr. Caple). Spirit and GIG were going to be the leaseback counterparties (which is described in more detail later), and they needed to know that the Haggen business would perform because these operating stores would be the source of their rental income. Both Spirit and GIG analyzed Haggen's financial projections and business plan, and both decided to participate in the transaction. *See* DX0118; DX0133; DX0507; DX0051; Rosenberg Dep. at 26:18–27:8.

49.    Next was PNC Bank ("PNC") and the "Bank Group."[3] *See* 10/16/17 Tr. at 214:20–24 (Mr. Caple). The new Haggen stores would need a revolving line of credit to operate, and Comvest and Haggen entered into discussions with PNC to be that lender. *See, e.g.*, P-365. As the prospective first lien lender to the OpCo Entities, PNC and the Bank Group reviewed Haggen's sales projections and EBITDA at the operating stores, as well as Haggen's business plan. *See* 10/16/17 Tr. at 217:12–218:3 (Mr. Caple); DX0129; DX0210; DX0211. After reviewing that information, PNC and the Bank Group agreed to participate. *See* DX0225; DX0236.

---

[3]    The "Bank Group"—who each made "commitments" in varying amounts in support of the revolving line of credit—are as follows:  PNC Bank, National Association; JP Morgan Chase Bank, N.A.; KeyBank, N.A.; U.S. Bank National Association; CIT Finance LLC; and Signature Bank. *See* DX0225-0250 (listing the members of the Bank Group and their respective commitment amounts).

50.     Haggen also had to convince key suppliers—particularly SuperValu and Unified

Grocers—that it had a viable business plan.  *See* 10/16/17 Tr. at 215:8–14, 221:6–25 (Mr. Caple).

In addition to providing the BPO services for the to-be-acquired stores, SuperValu was also

Haggen's primary distributor for the stores in Oregon and Washington.   *See* DX0072-0030.

Unified Grocers was the primary distributor for the stores in California, Arizona, and Nevada, as

well as the secondary distributor for the stores in Oregon and Washington.  *See id.*   Both parties

reviewed Haggen's financial projections and business plan—SuperValu was involved in

developing Haggen's business plan—and made the decision to partner with Haggen.  *See* 10/16/17

Tr. at 221:6–25 (Mr. Caple); M. Speiser Dep. at 47:10–13, 85:12–15, 174:24–175:3; DX0072-

0030; DX0142; DX0156; DX0184; DX0186.

51.     Finally, Haggen had to demonstrate the business plan's viability to the FTC.[4]  *See*

10/16/17 Tr. at 215:15–20 (Mr. Caple).  The FTC wanted to make sure that the new operators

would be well-positioned to succeed as a competitive counterweight to the combined Albertson's-

Safeway entity.  10/18/17 Tr. at 174:7–20 (Ms. Flaton); P. Frangie Dep. at 168:4–174:3, 181:3–

182:25.  In particular, the FTC cared to see that all stores would remain open and that the new

owners would be viable.  *Id.*  The FTC takes its job of vetting forced-divestiture transactions

seriously, and engaged in a rigorous process to ensure that Haggen's acquisition of the 146 stores

would be a success.  *Id.*

52.     Mr. Caple and the Haggen Management Team met with the FTC in mid-November

2014.  *See* 10/16/17 Tr. at 224:3–18 (Mr. Caple); P. Frangie Dep. at 51:23–55:18; DX0072.  They

---

[4]     In addition to the FTC, the state attorneys general in Arizona, California, Nevada, Oregon, and Washington were
        concerned about the anticompetitive consequences of the Albertson's/Safeway merger, and had an interest in
        seeing the to-be-divested stores sold to buyers that would succeed as a competitive counterweight.  *See* 10/16/17
        Tr. at 215:15–20; 247:19–248:3 (Mr. Caple).  As such, those parties vetted Haggen's financial projections and
        business plan, and ultimately approved the Albertson's Acquisition.  *Id.*

were accompanied by representatives from SuperValu and Akerman.  *Id.*  During that meeting, they presented Haggen's business plan and financial projections.  DX0072.  The presentation identified the risks associated with acquiring 146 stores in five states, and the steps that Haggen would take to mitigate those risks.  *See* DX0072-0047.  The presentation also disclosed Haggen's plan to finance the Albertson's Acquisition through sale-lease back transactions and to utilize an OpCo/PropCo corporate structure to house the operating and real estate assets separately.  *See* DX0072-0046, 0050, 0058–61; 10/16/17 Tr. at 244:17–245:14 (Mr. Caple).  The FTC and state attorneys general—who attended the presentation remotely—asked questions and explored the merits of the transaction.  *See* 10/16/17 Tr. at 224:23–225:4, 233:1–3, 247:19–248:3 (Mr. Caple).

53.    The FTC did not approve the transaction on the spot.  10/16/17 Tr. at 247:12–16 (Mr. Caple).  Over the next several weeks, the FTC asked Haggen and its lawyers additional questions.  *See* P. Frangie Dep. at 195:2–196:21.  For example, the FTC was concerned about several underperforming stores that Haggen was acquiring, and wanted to know what Haggen's plan was for those stores.  *See* DX0111; DX0112.  Comvest and Haggen put together another presentation on that issue, and gave it to the FTC.  *Id.*  The FTC also reached out the Lawrence Silverman, Haggen's FTC attorney, and asked questions regarding the sale-leaseback transactions and how the rental obligations associated with those transactions were calculated.  DX0439; P. Frangie Dep. at 195:15–196:6.  Mr. Silverman provided a detailed response to those questions. *See* DX0439.

54.    After months of diligence, hundreds of hours of analysis, and the creation of hundreds of models, Haggen and Comvest submitted a bid to Albertson's to buy the 146 stores. They won.  On December 10, 2014, Albertson's and Holdings entered into an Asset Purchase

Agreement (the "APA"), wherein Holdings agreed to buy 146 of the to-be-divested stores from Albertson's. *See* DX0517.

55.    The Albertson's Acquisition would not go forward, however, without approval from the FTC. *See* P. Frangie Dep. at 173:5–174:3. After reviewing Haggen's proposal for several weeks, the FTC gave the parties the final go-ahead on January 27, 2015. *See See* DX0199; DX0512; DX0513; DX0854. In describing its approval of the transaction, the FTC wrote that Haggen was a "highly suitable" purchaser and "well positioned to enter the relevant geographic markets." DX0854-0005. In responding to public comment on the transaction, the FTC stated that it had "evaluated the business plan and finances of Haggen and found that Haggen is a sound candidate for the purchase of the divested stores." DX0406-0003.

56.    The Investment Committee, Albertson's, Cerberus, Safeway, PNC, the Bank Group, Spirit, GIG, Unified Grocers, SuperValu, the state attorneys general, and the FTC all reviewed Haggen's business plan and financial projections, and either approved the transaction or agreed to partner with Haggen. None suggested that the business plan or financial projections were unreasonable. *See* 10/16/17 Tr. at 218:9–25, 219:18–220:1, 223:4–24, 233:4–9 (Mr. Caple); 10/17/17 Tr. at 89:21–90:7, 98:22–99:4, 99:20–100:15 (Mr. Niegsch); 10/18/17 Tr. at 133:16–134:1 (Mr. Rodriguez). None suggested that the proposed same-store sales growth projections were unreasonable. *See id.* None suggested that the OpCo Entities were undercapitalized. *See id.*

## VI.    TO FACILITATE THE ALBERTSON'S ACQUISITION, HOLDINGS CHOSE AN OPCO/PROPCO CORPORATE STRUCTURE FOR BUSINESS AND FINANCING REASONS.

57.    Holdings decided to use an OpCo/PropCo corporate form when structuring the possible acquisition of assets from Albertson's. 10/17/17 Tr. at 90:8–90:17 (Mr. Niegsch).

58.    This was the same form used by the Haggen Family. G. Hall Dep. at 71:10–16. It is also the same corporate structure that Alberton's used to hold their operational and real estate

assets prior to selling them to Haggen.  B. Beckstrom Dep. at 17:19–19:18.  Specifically, Albertson's held the real estate in various state specific "special-purpose entities," and these special-purpose entities would be the landlords under a "unitary lease" with an entity called Albertson's LLC.  *Id.* at 19:3–18; *see also* DX0519–521, 523–524, 526–532, 534–537, 539–543, 545–558, 561–563, 566–67, 569–572, 574–579, 581–582, 585 (identifying the various special-purpose entities as the sellers of the real estate as part of the Albertson's Acquisition).  Albertson's LLC, on the other hand, was the "store operator" and the tenant on the real estate pursuant to the leases with the special-purpose entities.  B. Beckstrom Dep. at 18:14–17.

59.    OpCo/PropCo corporate structures are "typical" in the grocery industry.  10/17/17 Tr. at 90:8–90:17 (Mr. Niegsch); 10/18/17 Tr. at 184:14–19 (Ms. Flaton) (calling "OpCo/PropCo structures" "fairly common" in the "business world").

60.    Comvest and Holdings chose to use an OpCo/PropCo structure because they "had different plans for the operating assets and liabilities, relative to the real estate assets and liabilities." 10/17/17 Tr. at 90:8–91:25 (Mr. Niegsch); 10/17/17 Tr. 161:1–25 (Mr. Barnett) ("there was different investment strategy for the real estate versus the operating assets"—"those business models are very different"); 10/17/17 Tr. at 47:2–6 (Mr. Niegsch) (agreeing that "one of the reasons the OpCo/PropCo structure was formed was because Comvest had different time horizons with respect to the operating assets versus the real estate assets"); 10/16/17 Tr. at 189:20–190:17 (Mr. Caple).  Comvest and Holding planned to "sell" the real estate "in the near term" so they "could focus on the core operating business."  10/17/17 Tr. at 90:8–91:25 (Mr. Niegsch).

61.    In addition, the OpCo/PropCo structure allowed Haggen to "optimize financing." 10/17/17 Tr. at 91:10–91:25 (Mr. Niegsch).  Certain ABL lenders do not like to lend on real estate, and certain real estate lenders do not work with operating assets.  *Id.*  The OpCo/PropCo structure

created an "optimal way to finance these businesses" therefore maximizing the value of the assets. *Id*.

62.    The OpCo/PropCo structure also allowed the real estate to be sold without disrupting the operating business.  The PropCo and OpCo Entities entered into leases because the OpCo Entities needed the right to use real estate to operate the stores.  These leases meant that the real estate could be sold with "literally no disruption" because the OpCo Entities' obligations "under those leases stay exactly the same" even though the property would be owned by new companies.  10/17/17 Tr. at 94:4–20 (Mr. Niegsch).  The OpCo Entities' expenses and projected expenses would remain the same no matter who owned the real estate.  *Id.*

63.    The decision to use an OpCo/PropCo structure was reflected in Haggen's financial projections, including those that went to the Federal Trade Commission.  *See* DX0072-0058; 10/16/17 Tr. at 224:17–225:14 (Mr. Caple); P. Frangie Dep. at 160:8–20.

## VII.    THE ALBERTSON'S ACQUISITION INVOLVED SEVERAL STEPS.

64.    On December 10, 2014, Holdings entered into an Asset Purchase Agreement ("APA") with Albertson's.  DX0143.  Through the APA, Holdings received the right to acquire 146 grocery stores (including all operating assets) as well as real estate assets for sixty-seven of the stores.  D.I. 142 at 13; DX0143-0021–23.  But the stores were not immediately transferred. Holdings agreed to acquire each of the 146 stores on a rolling basis throughout 2015 with Holdings paying the purchase price for each store on each store's "Closing Date."  *See* DX0143-0020.  The total purchase price for all the stores (excluding inventory) was approximately $309 million. DX0143-0027.

65.    Haggen and Comvest took several steps—both leading up to the APA signing date and afterwards—to facilitate the acquisition of these assets and finance the purchase price.

25

A.     **Holdings Created A New Corporate Structure.**

66.     Prior to signing the APA, Haggen created several new entities—including the "OpCo Entities" (Operations, OpCo South, OpCo North, and Acquisition), the "PropCo Entities" (Property Holdings, PropCo South, and PropCo North), and the "SLB Entities" (Haggen SLB and Property Holdings II).  Both the OpCo Entities and PropCo Entities would be wholly-owned by Haggen Holdings, LLC ("Holdings.").  D.I. 142 at 16–17.

67.     At the time of signing the APA, the Haggen corporate structure had the following form (D.I. 142 at 17):



B.     **Holdings Transferred to Its Subsidiaries the Right to Acquire Assets from Albertson's.**

1.     <u>Holdings Transfers the Operating Assets to the OpCo Entities.</u>

68.     Prior to the first Closing Date, Holdings transferred to OpCo North and OpCo South the right to acquire all of the operating assets associated with the 146 stores at each Closing Date.[5] DX0601.  The operating assets included 79 leases with third parties to operate the stores at those locations.  *See* D.I 142 at 13.  As a result, on each Closing Date, OpCo North and OpCo South acquired from Albertson's all of the operating assets associated with each store.  DX0601.

2.     Holdings Transferred the Real Estate Assets to the PropCo Entities and SLB Entities.

69.     Of the 146 stores, 67 of them were located on real estate that Albertson's or Safeway owned prior to the Albertson's Acquisition (the "Real Property Stores").  *See* D.I. 142 at 13; *see also* 10/17/17 Tr. at 92:8–94:3 (Mr. Niegsch).   Fifty-three of these 67 stores were located on real estate that Albertson's or Safeway had owned in fee simple.  *Id.*  Fourteen of these stores were located on real estate that was subject to a long-term ground lease.  *Id.*

70.     The other 79 stores were all paying rents to third-party landlords prior to the Albertson's Acquisition.  D.I 142 at 13 (Agreed Fact at ¶¶ 38–39).

71.     Prior to the Closing Date, Holdings transferred the right to acquire the real estate for 39 of the Real Property Stores to the SLB Entities.  D.I. 142 at 18.  As described below, this real estate was immediately sold to third parties as part of a sale-leaseback to finance that entire acquisition.  *Id.*

72.     In addition, prior to the Closing Date, Holdings transferred the right to acquire the real estate for 28 of the Real Property Stores—14 fee simple and 14 ground leases ("Retained Properties")—to PropCo North and PropCo South.  D.I. 142 at 20.  The right to acquire these

---

[5]     If the store was located in Washington or Oregon, then the non-real-property assets were transferred to OpCo North.  If the store was located in California, Nevada, or Arizona, then the non-real-property assets were transferred to OpCo South.  DX0601-0001.

assets was transferred from Holdings to the PropCo Entities pursuant to written Contribution Agreements. *See* DX0506, DX0586–DX0601.

73.     As a result of these agreements, on the Closing Date of each store with real estate assets, the real estate was transferred from Albertson's to an SLB Entity or PropCo Entity.  All of these real estate transfers were disclosed in publicly recorded deeds.  *See* DX0505; *see also* DX0477–DX0492.

C.     **Haggen Financed The Acquisition Through A Sale-Leaseback With Spirit and GIG.**

74.     The SLB Entities received the right to acquire the real estate for 39 locations.  This real estate was designed to be part of a sale-leaseback transaction.  D.I. 142 at 18–20.

75.     Upon the Closing Date, the SLB Entities sold the real estate for the 39 stores to an affiliate of Garrison Investment Group ("GIG") or an affiliate of Spirit Realty Capital ("Spirit"). DX0845–DX0850 (Spirit); DX0629–DX0636 (GIG).  In total, GIG and Spirit paid $358.8 million for the real estate.  D.I. 142 at 20.

76.     The 39 stores that were subject to the sale-leaseback were the "better stores." 10/17/17 Tr. at 93:11–23 (Mr. Niegsch).

77.     The proceeds of the sale-leaseback were able to fund the acquisition of all 146 stores (as well as the 67 pieces of real estate).  Indeed, because the purchase price for all 146 stores was $309 million, and Spirit and GIG paid $359 million for the real estate, there was approximately $50 million of proceeds leftover from the sale-leaseback transactions.  This money was transferred to the OpCo Entities to fund the operations.  10/17/17 Tr. at 95:6–8 ("We directed the 50 million of excess sale leaseback proceeds into the OpCos.") (Mr. Niegsch); *see also* 10/17/17 Tr. at 216:15–20 (Mr. Barnett).

D.	**The OpCo Entities Entered Leases With the PropCo Entities and Spirit and GIG.**

78.	Due to the OpCo/PropCo structure, the OpCo Entities needed leases to use the property for the 67 Real Property Stores. Accordingly, the OpCo Entities entered in leases with Spirit and GIG to use the real estate to operate their stores. *See* DX0507, DX0602–DX0628 ("GIG Leases") & DX0511, DX0827–DX0844 ("Spirit Leases"). Similarly, the OpCo Entities entered leases with the PropCo Entities to use their property to operate stores. *See* DX0506, DX0586–DX0601 ("PropCo Leases").

79.	In this litigation, the Committee seeks to avoid the PropCo Leases but does not challenge the proprietary of the GIG Leases or the Spirit Leases.

E.	**PNC Entered Into a $210 Million Asset-Based Lending Agreement With the OpCo Entities.**

80.	On February 12, 2015, OpCo North, OpCo South, and Haggen, Inc. entered a Revolving Credit and Security Agreement ("ABL") with PNC. DX0699; DX0704; D.I. 142 at 15. PNC agreed to lend up to $210 million based on the value of eligible inventory, pharmacy scripts, and accounts receivable at the "OpCo Borrowers." DX0704-0002 (Maximum Revolving Advance Amount is "$210,000,000"); *see also* DX0699-0052–53 (borrowing base is receivables and inventory). The ABL added substantial liquidity to the OpCo Entities. *See* 10/17/17 Tr. at 220:6–13 (Mr. Barnett).

F.    **Comvest Invested $50 Million in Equity as Well as Its Haggen, Inc. Portfolio Company Into OpCo.**

81.    As part of the Albertson's Acquisition, Comvest invested $50 million in equity into the OpCo Entities. D.I. 142 at 15.[6] This money went to provide additional liquidity at the OpCo Entities. 10/17/17 Tr. at 95:3–10 (Mr. Niegsch).

82.    In addition, Comvest and Holdings made the decision to place Haggen, Inc. on the OpCo side of the corporate structure. 10/17/17 Tr. at 95:3–10 (Mr. Niegsch). Nothing prevented them from placing the valuable Haggen, Inc. stores on the PropCo side of the structure. 10/16/17 Tr. at 199:9–200:6 (Mr. Caple).

83.    The parties differ on the value of Haggen, Inc. The Committee points to a Comvest letter to limited partners that that implies an enterprise value of $94.6 million and an equity value of $36.7 million. P-636.021. Mr. Caple testified that Haggen, Inc. at the time of the APA had an enterprise value of nearly $140 million with approximately $43 million in debt. 10/16/17 Tr. at 198:15–22 (Mr. Caple). While the parties generally agree that Haggen, Inc. was generating around $20 million per year in EBITDA in late 2014, they disagree on the appropriate EBITDA multiple for calculating enterprise value. 10/17/17 Tr. at 95:4–6 (Mr. Niegsch); P-636.021. A 4.7x multiple yields an enterprise value of $94 million, and a 7.0x multiple yields a $140 million valuation.

84.    This case does not ultimately turn on the precise valuation of Haggen, Inc. and the Court finds that the salient fact is that Comvest contributed a valuable asset to the OpCo side of the structure. Whether the value of that contribution is $100 million or $30 million is irrelevant,

---

[6]    Technically, Comvest invested $51.5 million into Holdings because it required a 3% "transaction fee" for this type of investment; Holdings immediately returned $1.5 million to Comvest netting an investment of $50 million. D.I. 142 at 15; 10/17/17 Tr. at 47:24–48:6 (Mr. Niegsch).

it is the decision to place the valuable Haggen, Inc. portfolio company generating $20 million in

EBITDA on the OpCo side of the corporate structure that is the key fact.

## VIII.  THE OPCO ENTITIES RECEIVED SUBSTANTIAL ASSETS AND LIQUIDITY AS A RESULT OF THE ALBERTSON'S ACQUISITION AND RELATED TRANSACTIONS.

85.    Prior to the Albertson's Acquisition, the OpCo Entities had no assets, no liabilities,

and no creditors because they were newly formed corporate entities.  As a result of the Albertson's

Acquisition and related transactions, the OpCo Entities received substantial assets, including:

- 79 grocery stores (including all operating assets) exactly as they were owned at Albertson's including the third-party leases;

- All operating assets for the other 67 stores, including FF&E, inventory, and pharmacy scripts;

- $50 million in equity from Comvest;

- Approximately $50 million from the excess proceeds from the sale-leaseback; and

- The original Haggen, Inc. stores, which were generating $20 million in EBITDA.

10/17/17 Tr. at 92:8–93:3, 94:21–95:10 (Mr. Niegsch); 10/17/17 Tr. at 220:6–13 (Mr. Barnett);

DX0601, *see also, e.g.*, DX0519–DX0585 (Settlement statements for closings).

86.    Using the new operating assets as collateral, the OpCo Entities obtained $210

million of liquidity from the PNC ABL.  DX0699; DX0704; *see also* 10/17/17 Tr. at 220:6–13

(Mr. Barnett).

87.    Based on these assets, Mr. Barnett estimated that OpCo started with "close to $300-

million-dollars of available liquidity."  10/17/17 Tr. at 219:24–220:13 (Mr. Barnett).

## IX.  THE RENTAL OBLIGATIONS ASSOCIATED WITH THE PROPCO LEASES AND THE SLB LEASES WERE SET AT MARKET RATES.

88.    As part of structuring the Albertson's Acquisition, the OpCo Entities agreed to pay

monthly rent to the PropCo Entities in exchange for the right to operate stores at the 28 locations

where the PropCo Entities owned the real estate.  *See* DX0506, DX0586–DX0601 ("PropCo Leases").  The OpCo Entities also agreed to pay monthly rent to GIG and Spirit in exchange for the right to operate stores at the 39 locations where Spirit and GIG owned the real estate.  *See* DX0507, DX0602–DX0628 ("GIG Leases"); DX0511, DX0827–DX0844 ("Spirit Leases").

A.     **The Rents on the PropCo Leases Were Market.**

89.     The goal was to set the rent on the PropCo Leases at market rates based on Cushman & Wakefield appraisals of the locations provided by Albertson's.  10/17/17 Tr. at 64:16–65:12, 95:23–96:8 (Mr. Niegsch); *see also* 10/16/17 Tr. at 140:17–21 (Mr. Caple).  Beyond rent, Mr. Niegsch instructed the attorneys to make the terms "favorable to OpCo."  10/17/17 Tr. at 64:16–23 (Mr. Niegsch).

90.     The Committee stipulated that the rents paid from the OpCo Entities to the PropCo Entities under the PropCo Leases were at (or below) market.  *See* D.I. 142 at 21 ("Plaintiff will not offer any evidence that the rents paid by Operations and the OpCo Entities to the PropCo Entities were above-market.").  It is therefore undisputed that the rents under the PropCo Leases were market rates.

91.     Because the parties agree that the PropCo Leases were set at market rates, the OpCo Entities received reasonably equivalent value by entering into the PropCo Leases.

B.     **The Rents on the SLB Leases Were Market.**

92.     Testimony by third parties and contemporaneous documents confirm that both sides to the Spirit and GIG Leases believed that they were set at market rents.  Spirit's corporate representative testified that Spirit believes that the leases were market.  *See* D. Rosenberg (Spirit) Dep. at 131:2–4 ("[W]e believed that the rents were in line with market or within the range of market.").  At the time of the transaction, Spirit hired Duff & Phelps to evaluate the lease, and Duff & Phelps concluded: "we have analyzed individual market rents for each of the subject

32

properties and believe that the master lease is reflective of market rent levels."  DX0222-0023.

GIG wrote that it viewed its "Rent to Sales Ratio" as "low compared to national averages" and

lower than Spirit's.  DX0131-0013.  In other words, GIG believed that it had negotiated a better

rental rate than Spirit.  HFF—Comvest and Haggen's real estate consultant—testified with respect

to the Spirit and GIG Leases that "we tried to set them all at market or below market."  M. West

(HFF) Dep. at 173:7–11, 173:17–18.  In addition, in December 2014, Akerman (legal counsel for

Haggen) represented to the FTC that the buyers (Spirit and GIG) "want to make sure the rent is

appropriate relative to other grocery / big box real estate in the same market (comps)"  because if

they need to sell a "new buyer is not going to pay for an above market rent."  DX0439-0001.

93.     The Committee's expert, Mr. Howard, offered an opinion contrasting the rents

under the Spirit and GIG Leases with what he viewed as "comparable" leases "over the life of the

rental agreements, either 20 or 25 years."  10/19/17 Tr. at 227:22–229:15 (Mr. Howard).

Defendants' expert, Mr. Satter, testified that Mr. Howard should have assumed some increase in

market rent over that period of time, and that an escalator of even 1% would reverse the

conclusions reached by Mr. Howard.  *See* 10/20/17 Tr. at 264:16–266:3 (Mr. Satter).

94.     The Court finds that the SLB Leases were set at market rents.

## X.    HAGGEN SUCCESSFULLY CONVERTED AND "HAGGENIZED" 146 STORES IN UNDER 150 DAYS.

95.     As part of the settlement of its complaint against Albertson's/Safeway merger, the

FTC mandated a 150-day timeframe for Haggen to convert the 146 acquired Albertson's and

Safeway stores into Haggen stores.  10/16/17 Tr. at 248:25–249:8 (Mr. Caple).  Comvest and

Haggen budgeted $105 million for capital expenditures on the new stores during these conversions.

*Id.* at 238:8–239:2; DX0072-0033; 10/20/17 Tr. at 180:10–24 (Mr. Montague); *Id*. at 119:25–

120:18 (Mr. Hooper).  Approximately $59.4 million of this capital expenditure budget was

33

allocated to conversion construction.  DX0072-0033; 10/20/17 Tr. at 120:19–21 (Mr. Hooper).  In addition to those conversions construction costs, several other categories of budgeted costs went to "Haggenizing" the stores.  10/20/17 Tr. at 121:1–18 (Mr. Hooper); 10/16/17 Tr. at 239:6–13 (Mr. Caple).

96.    Comvest and Haggen had previously learned from their experience converting TOPs stores into Haggen stores in 2011 and had a sense for how to best allocate expense to have the most positive impact on the customer.  10/16/17 Tr. at 249:14–250:12 (Mr. Caple).  Mr. Clougher and Mr. Shaner also had experience in converting grocery stores from one banner to another.  10/19/17 Tr. at 68:24–70:19 (Mr. Shaner); Id. at 160:4–7, 160:18–161:5 (Mr. Clougher).  And the $105 million was budgeted specifically to Haggenize the stores—to add new furniture and fixtures, to modernize the stores, to add new produce areas and display cases, and to make the stores look and feel like Haggen stores.  10/16/17 Tr. at 238:13–239:2 (Mr. Caple).

97.    In order to prepare for 146 conversions in under 150 days, Comvest and Haggen worked to devise a schedule or "cadence" for those closures.  DX0072-0039; 10/16/17 Tr. at 241:25–242:3 (Mr. Caple).  Multiple factors went into the cadence including geography (the plan was to start with conversions in the North and maintain geographical continuity to maximize efficiency), which stores to convert (Haggen decided to start with more Albertson's conversions due to an easier associated IT conversion), and starting with sale-leaseback stores.  10/16/17 Tr. at 242:4–24 (Mr. Caple).

98.    The conversions were a major undertaking involving multiple conversion crews and thousands of workstreams.  Id.; 10/19/17 Tr. at 165:14–166:17 (Mr. Clougher).  The conversions were done in between 40 and 56 hours per store.  10/19/17 Tr. at 168:14–16 (Mr. Clougher).  In the Pacific Southwest, the conversions would begin at midnight, and a large crew

34

of 50 to 100 people would come into the store to accomplish the renovations.  10/19/17 Tr. at 68:24–70:19 (Mr. Shaner).  Cranes, forklifts and other machinery came into the stores to perform renovations.  *Id*.  Dozens of people also went through the stores retagging all of the various SKUs. *Id*.  Similar conversions occurred in the Pacific Northwest, involving up to 200 people converting and renovating the stores.  *Id*. at 166:22–167:6, 171:12–172:2 (Mr. Clougher).

99.    Most of the renovations were done on the perimeter of the store where management felt the Haggen brand could make the biggest impact on customers.  *Id*. at 71:24–73:3 (Mr. Shaner). Haggen planned to leave the center of the stores largely unchanged (except for retagging all items) to allow customers to continue to find the items they expected in the center store.  *Id*. at 73:25– 74:20 (Mr. Shaner).

100.    Mr. Shaner described the conversions as "amazing" and creating a "wow factor." *Id*. at 68:24–69:4, 74:21–75:1 (Mr. Shaner).  Mr. Anderson, who had been with Haggen since it opened its fourth store, believed the renovations "turned out fabulous" and testified that he was "in awe of what you could do in 36 hours."  10/17/17 Tr. at 272:16–20 (Mr. Anderson).  Mr. Clougher also described the conversions as amazing and felt the goals associated with the conversions, in particular improving the stores so the customers could see Haggen's value proposition, were met.  10/19/17 Tr. at 163:6–19, 172:3–7 (Mr. Clougher); *see also* 10/17/17 Tr. at 183:5–16 (Mr. Barnett); DX0360.

101.    Mr. Clougher, Mr. Anderson, Mr. Caple, and Mr. Shaner all described the conversions as including renovations to the existing stores.  10/19/17 Tr. at 160:8–20 (Mr. Clougher); *Id*. at 13:7–11, 61:21–62:11, 64:9–65:2 (Mr. Shaner); 10/17/17 Tr. at 272:16–20 (Mr. Anderson); 10/16/17 Tr. at 239:3–5 (Mr. Caple).  This was consistent with A.T. Kearney's understanding that the stores were going to be revamped and "Haggenized" to recreate the

experience in the new stores that was already available in Haggen's existing stores.  10/20/17 Tr. at 119:11–19 (Mr. Hooper).  The HR aspects of the conversion were also successful.  10/17/17 Tr. at 271:18–25 (Mr. Anderson); *Id*. at 241:3–21 (Mr. Barnett).

102.    The Court finds that significant renovations were done in an effort to convert or "Haggenize" the stores.

## XI.    HAGGEN AND COMVEST RELIED ON REASONABLE SAME STORE SALES GROWTH PROJECTIONS IN CAPITALIZING THE OPCO BUSINESS.

103.    The Committee has alleged that OpCo was insolvent at the time of the signing of the APA (December 10, 2014).  In support of this allegation, the Committee relied solely on expert testimony.  DX0453-0012-0013 (Interrog. Resp. Nos. 11 and 12).  The Committee's only expert to opine on OpCo's solvency or insolvency was David McGreevey.  Mr. MacGreevey did not provide any opinion on the solvency or insolvency of any of the PropCo Entities.  And Mr. MacGreevey did not provide any opinion on the solvency or insolvency of Holdings.  10/17/17 Tr. at 40:20–22 (Mr. MacGreevey).

104.    To arrive at his opinion that OpCo was insolvent as of the APA signing date, Mr. MacGreevey took the Comvest and Haggen base case model (the "Management Base Case" or "Comvest Base Case") and made four "corrections" or "adjustments."  *Id*. at 42:3–19 (Mr. MacGreevey).  After first making two "corrections," Mr. MacGreevey arrived at his "Corrected Comvest Base Case" model.  *Id.*  Then, after making two "adjustments," Mr. MacGreevey arrived at his "Adjusted Comvest Base Case" model.  *Id*.  Mr. MacGreevey then ran three solvency tests after his "corrections" and adjustments: the Cash Flow Test, the Capital Adequacy Test, and the Balance Sheet Test.  *Id*. at 41:2–9.

105.    Mr. MacGreevey admits that OpCo passes the Balance Sheet Test under the Management Base Case, the Corrected Comvest Base Case, or the Adjusted Comvest Base Case.

*Id*. at 43:25–44:5.   Mr. MacGreevey admits that OpCo passes the Cash Flow Test under the Management Base Case and the Corrected Comvest Base Case.  *Id*. at 44:6–12.[7]  Mr. MacGreevey was not able to offer an opinion one way or the other as to whether OpCo passes the Capital Adequacy Test under either the Management Base Case or Corrected Comvest Base Case.  *Id.* at 44:25–45:4, 46:3–6.   Mr. MacGreevey conducted no solvency tests for any date other than the APA signing date.  *Id*. at 41:20–23.

106.    Mr. MacGreevey admits that, even in his Adjusted Comvest Base Case, OpCo never reaches a negative liquidity position.  *Id*. at 46:13–19.  Mr. MacGreevey also admits that, even in his Adjusted Comvest Base Case, he projects over $50 million in EBITDA for OpCo for all years projected after 2015.  *Id*. at 46:20–47:1.   Mr. MacGreevey admits that he made no effort to determine whether OpCo would have had access to the capital markets to address a near term liquidity event despite the fact that his own projections show the business becoming profitable in 2016 and every year thereafter without ever dipping into a negative liquidity position.  *Id*. at 83:5–17.

107.    The largest "adjustment" Mr. MacGreevey made was an adjustment to OpCo's projected same store sales growth as of the APA signing date.  *Id*. at 48:4–9.  Mr. MacGreevey assumed that a negative 8.6 same store sales growth number (in other words an 8.6 percent same store sales decline) was more appropriate than ATK's 4.9% same store sales growth projection utilized in OpCo's business projections.  *Id*. at 47:19–23.

108.    The ATK team developed the 4.9% same store sales growth projection.  *Id*. at 47:24–48:3.  That team was led by Todd Hooper, who had developed same store sales projections

---

[7]    Mr. MacGreevey also admits that OpCo would pass the Cash Flow test even at projected same stores sales growth of 0 percent.  10/17/17 Tr. at 44:10–16.

dozens of times prior to the Haggen engagement, including over half a dozen times specifically in the grocery industry.  10/20/17 Tr. at 105:4–9 (Mr. Hooper).  The ATK team also had 2 other partners and a principal— all of whom had individually developed same stores sales growth projections dozens of times prior to the Haggen engagement, including at least half a dozen times specifically in grocery.  *Id*. at 105:10–17.  Mr. MacGreevey admits that he has no grocery expertise.  10/17/17 Tr. at 50:25–51:5 (Mr. MacGreevey).  Mr. MacGreevey admits that he had never developed same stores sales growth projections for a grocery store prior to this case.  *Id.* at 52:3–6.  And Mr. MacGreevey had never worked on a matter involving banner conversions from one grocery store chain to another prior t to this matter.  *Id*. at 53:7–21.  Mr. MacGreevey also admits that A.T. Kearney has expertise in projecting same store sales for grocery stores after conversions.  *Id*. 49:10–13.

109.    Multiple parties reviewed OpCo's financials including the same store sales growth projections developed by ATK.  These parties included the Comvest Deal Team, the Haggen management team, the Comvest Investment Committee, multiple lenders, the Sale Leaseback Counterparties, SuperValu, the Federal Trade Commission, and Unified Grocers.  None of these parties ever asserted that ATK's same store sales growth projections for OpCo were unreasonable.  *See* 10/16/17 Tr. at 218:9–25, 219:18–220:1, 223:4–24, 233:4–9 (Mr. Caple); 10/17/17 Tr. at 89:21–90:7, 98:22–99:4, 99:20–100:15 (Mr. Niegsch); 10/18/17 Tr. at 133:16–134:1 (Mr. Rodriguez).  Only Mr. MacGreevey testified that these projections were unreasonable.

110.    The basis for Mr. MacGreevey's assertion that Haggen should have projected negative 8.6 percent same store sales growth as opposed to positive 4.9 percent same store sales growth is that Mr. MacGreevey believes that Haggen should have applied ATK's "pre-renovation" projection numbers rather than "post-renovation" projection numbers.  10/17/17 Tr. at 56:19–

57:10 (Mr. MacGreevey). Mr. MacGreevey did not develop his own numbers, rather he chose

from a table in an ATK spreadsheet that had pre-renovation and post-renovation projections. *Id*.

at 49:14–22. ATK used the post-renovation numbers rather than the pre-renovation numbers in

developing their same store sales projections. *Id*. at 57:21–58:5. Mr. Hooper testified that, based

on his conversations with Haggen and Comvest as well as his review of the capital expenditure

budget, it was appropriate to project the post-renovation benefit for OpCo. 10/20/17 Tr. at 119:6–

24.

111.    Mr. Hooper also testified as to multiple other reasons it was reasonable to project

positive same store sales growth for OpCo. These reasons included, among others:

- Net Promoter Score: ATK performed a consumer survey of over 1,000 people to determine Haggen's net promoter score. 10/20/17 Tr. at 109:20–21; 110:21–111:2 (Mr. Hooper); DX0072-0013. Haggen's high net promoter score in comparison to the net promoter score for Albertson's and Safeway gave ATK confidence that the brand could and would be successful. 10/20/17 Tr. at 109:22–110:8 (Mr. Hooper);

- Word Cloud Surveys: ATK also performed a "word cloud" survey on over 1,000 people to see what words they associated with shopping at Haggen, Albertson's and Safeway. *Id*. at 112:16–18. The word cloud survey supported the thesis that Haggen could keep the Albertson's and Safeway customers who cared primarily about price and location while also attracting the Haggen customers who also cared about freshness, local products, organic products, and other key words. *Id*. at 111:16–112:15.

- Case Studies: ATK also analyzed prior grocery store conversions in the form of case studies to support their projection that OpCo would experience positive same store sales growth. *Id*. at 112:19–113:17. Based on a review of the case studies, ATK placed Haggen on the top half of its two-by-two grids signifying ATK's view that renovations were being performed prior to the banner conversion. *Id*. at 119:6–24.

112.    Mr. MacGreevey relied in significant part on a series of capital expenditure ranges

contained in a chart provided in an A.T. Kearney presentation indicating a certain capital

expenditure range associated with a refresh, a minor remodel, and a major remodel. 10/18/17 Tr.

at 21:18–23:13, 63:24–64:10 (Mr. MacGreevey); DX0041-0002. Those ranges, however, were

not produced by A.T. Kearney. Mr. Hooper testified that instead those ranges were provided by

"the storyteller"—i.e. the people that ATK interview—from Winn Dixie who observed the store conversions in that case study. 10/20/17 Tr. at 113:18–115:10 (Mr. Hooper); DX041-0002. And the Winn Dixie case study qualified as a "store reset/remodel" according to ATK's own analysis. DX0041-0009.

113. ATK does not use a particular range of capital expenditures to determine whether something qualifies as a remodel, renovation or reset. 10/20/17 Tr. at 116:4–15 (Mr. Hooper). Instead, ATK focuses on whether the conversion will involve altering the store such that the customer will perceive a difference from the old store to the new store. 10/20/17 Tr. at 116:4–15, 117:21–118:3 (Mr. Hooper). Mr. Hooper testified that the plans to "Haggenize" the stores would fit within his view of a renovation. *Id.* at 119:6–24 (Mr. Hooper). Thus, Mr. Hooper disagreed with Mr. MacGreevey and believed that post-renovation rather than pre-renovation numbers should be used in projecting same store sales growth. *Id.*

114. The Court finds that it was reasonable for Haggen and Comvest to rely on the same store sales projections developed by A.T. Kearney. The overwhelming weight of the evidence indicates that Haggen intended to and did perform renovations at the acquired stores prior to reopening those stores under the Haggen banner.

115. Mr. MacGreevey also made an adjustment to "fix" certain operating costs rather than leave those costs variable as in the Management Base Case. 10/18/17 Tr. at 75:14–78:4 (Mr. MacGreevey). If Mr. MacGreevey's adjustment to projected same store sales growth is rejected, then Mr. MacGreevey admits there is no impact to his adjustment to "fix" certain costs. *Id.* at 75:14–76:23 (Mr. MacGreevey). One of the costs Mr. MacGreevey determined should be 100 percent fixed was labor costs. *Id.* at 76:24–78:4 (Mr. MacGreevey). Mr. Shaner, Mr. Clougher and Mr. Hooper, all of whom (unlike Mr. MacGreevey) have extensive grocery experience, each

testified that labor costs are not fixed in the grocery industry.  10/19/17 Tr. at 93:2–14 (Mr. Shaner), 188:5–189:12 (Mr. Clougher); 10/20/17 Tr. at 103:19–104:11 (Mr. Hooper) ("Q.  In grocery is labor a fixed cost or a variable cost?  A.  Labor is commonly understood to be very variable.").

116.    Mr. MacGreevey also "corrected" the Management Base Case by adjusting the store cadence to match the actual cadence and by implementing a $10 million minimum cash requirement in his liquidity calculation.  10/18/17 Tr. at 78:5–16 (Mr. MacGreevey).  The PNC Credit Agreement does not require a $10 million minimum cash requirement when calculating liquidity and evaluating whether a springing event had occurred.  *Id.* at 78:25–79:23 (Mr. MacGreevey).  And the actual store cadence would not have been known or knowable as of the signing date of the APA.  *Id.* at 79:24–80:17 (Mr. MacGreevey). The Court finds Mr. MacGreevey's "corrections" and "adjustments" to the Management Base Case unpersuasive.

117.    Defendants elicited expert testimony from Kevin Montague in rebuttal to Mr. MacGreevey's testimony on solvency.  Mr. Montague disagreed with the conclusions of Mr. MacGreevey and found Mr. MacGreevey's solvency analysis to be unreliable.  10/20/17 Tr. at 204:18–22 (Mr. Montague).  Mr. Montague testified that, under the management's base case assumptions, OpCo would pass all three solvency tests:  the Cash Flow Test, the Capital Adequacy Test, and the Balance Sheet Test.  *Id.* at 191:15–17, 193:18–20, 194:11–195:2 (Mr. Montague).

118.    The Court finds that OpCo was not insolvent as of the signing of the APA.

## XII.   DESPITE SUBSTANTIAL PLANNING, POST-CONVERSION ISSUES AT THE NEW STORES PROVED DISASTROUS.

119.    While the physical conversions (including renovations and grocery resets) were successful, almost nothing else went according to plan.  There were unexpected and unforeseeable problems with pricing, supply chain, and unfair competition.

A.    **Pricing Problems**

120.    Haggen understood that it was inheriting customers from Albertson's and Safeway that valued the low prices provided by those stores. *See, e.g.*, DX0072-0015; 10/19/17 Tr. at 84:22–23 (Mr. Shaner). Haggen also understood that if customers developed a negative price perception of a grocery store brand then it would be very difficult to change it. 10/16/17 Tr. at 254:6–15 (Mr. Caple). Accordingly, Haggen had a straightforward pricing strategy—keep the prices on like-for-like items the same. *See id.* at 250:24–251:20 (Mr. Caple); 10/19/17 Tr. at 84:12–23 (Mr. Shaner); 10/19/17 Tr. at 180:14–16 (Mr. Clougher) ("Q: So how important was it, on the like items, to keep those prices the same? A: It was critical.").

121.    Haggen developed a three-part approach for ensuring that prices on like-for-like items would remain the same. First, Haggen sought and received from Albertson's the pricing files for each store. 10/16/17 Tr. at 251:21–252:2 (Mr. Caple); 10/19/17 Tr. 86:6–87:20 (Mr. Shaner).

122.    Second, Haggen hired Willard Bishop. *See* 10/16/17 Tr. at 250:24–251:11 (Mr. Caple); 10/19/17 Tr. at 85:13–23 (Mr. Shaner). Willard Bishop is a retailing consulting firm that specializes in, among other things, pricing. *See* DX0170; 10/20/17 Tr. at 102:24–103:7 (Mr. Hooper). Willard Bishop's primary responsibility was to help Haggen set initial prices for the merchandise in the newly-acquired stores and to ensure that those prices were in line with Haggen's pricing strategy. *See* DX0170; 10/16/17 Tr. at 251:21–252:2 (Mr. Caple). As part of that process, Willard Bishop was to validate the prices in the Albertson's pricing files and make corrections to any information in those files that were misleading or inaccurate. *See id.*

123.    Third, Haggen relied on SuperValu, its BPO provider. 10/19/17 Tr. at 84:24–85:12 (Mr. Shaner). One of the IT solutions that SuperValu would provide to Haggen was its price maintenance software, PM2. *Id.* Haggen was comforted by the fact that PM2 had served

Albertson's well in many of the very same stores that Haggen was acquiring, and that SuperValu would ensure a smooth transition. *Id.*

124.    In short, Haggen believed that it had pricing covered, because it had hired a pricing consultant (Willard Bishop) to ensure that prices were set correctly and had retained the Albertson's BPO provider (SuperValu) to ensure that the correct prices made it to the shelves. *See* 10/19/17 Tr. at 180:25–181:10 (Mr. Clougher).

125.    Pricing was a problem from the outset, however, and it was hard to get a handle on the scope of the problem. *See, e.g.*, DX0273; 10/19/17 Tr. at 183:9–18 (Mr. Clougher). Pricing was "[e]asily the most difficult challenge" Haggen faced, and a "very large contributor" to Haggen's sales challenges. DX0351-0002; 10/16/17 Tr. at 253:11–14 (Mr. Caple)

126.    One issue was that the Albertson's pricing file had many items labeled as "temporary price reductions" or "TPRs," which suggested that those items were on short term sales. *See* 10/16/17 Tr. at 253:15–254:5 (Mr. Caple); 10/19/17 Tr. at 85:24–87:20 (Mr. Shaner); DX0292-0003. It turned out that the TPRs used by Albertson's were not actually temporary. *Id.* Albertson's frequently kept TPRs in place for months or years—rather than a few days—such that the reductions reflected the customer's expected price. *Id.* When Haggen used the standard price rather than the "temporary" price, it was effectively raising prices on their customers. *Id.*

127.    The Albertson's pricing files were full of other types of pricing errors as well, including on "known value items." *See, e.g.*, 10/19/17 Tr. at 124:6–125:25 (Mr. Clougher); DX0301. Willard Bishop was "ineffective" and failed to identify and correct those errors before they were uploaded into the PM2 system. DX0351-0002; 10/19/17 Tr. at 152:16–22, 179:16–180:25 (Mr. Clougher). As a result, prices were too high on "thousands of products" when each store opened after the conversion. *See* DX0301; DX0351-0002; 10/19/17 Tr. at 88:18–89:10 (Mr.

43

Shaner).  This included some "insult prices" where the system priced items dozens or hundreds of multiples higher than they should have been.  *See* DX0301.

128.    These problems could not be easily corrected either, as Haggen offered hundreds of thousands of SKUs and there were thousands of pricing errors.  *See, e.g.*, 10/19/17 Tr. at 34:24–35:4 (Mr. Shaner).  Moreover, SuperValu's PM2 system was more inflexible than expected, and required several days, and sometimes weeks, to make price changes.  *See* DX0351-0002 ("[T]he PM2 pricing system . . . has proven to be extraordinarily complex and 'clunky' . . . .").  With each new store opening, prior pricing problems would be fixed but new ones would arise.  *See, e.g.*, 10/19/17 Tr. at 33:10–12 (Mr. Shaner), 183:9–184:10 (Mr. Clougher).

129.    Haggen immediately went to work in an attempt to correct these pricing issues.  *See, e.g.*, 10/19/17 Tr. at 88:15–89:5 (Mr. Shaner); DX0301; DX0351-0002.  Haggen leaned on Willard Bishop.  *See, e.g.*, DX0292.  Haggen hired additional staff with PM2 pricing experience to work in PM2.  *See* DX0351-0002.  Haggen elevated the issues with SuperValu and leveraged SuperValu to fix the pricing errors in PM2.  10/19/17 Tr. at 121:5–10 (Mr. Clougher); DX0279; DX0301.  On multiple occasions, SuperValu and Willard Bishop assured Haggen that the pricing errors were resolved, but store after store opened with incorrect pricing.  *See, e.g.*, *id.* at 89:6–89:14 (Mr. Shaner), 183:9–184:10 (Mr. Clougher).

130.    Ultimately, Haggen severed ties with Willard Bishop in March 2015 and Haggen's merchandising team began fixing the pricing files themselves.  *See, e.g.*, DX0351-0002; DX0349-0003 ("The company no longer relies upon Willard Bishop and has made material corrections to the retail price file.").  Haggen also took a one-week break from converting stores so that its personnel could focus on the pricing issue, but even then problems persisted.  *See, e.g.*, DX0351-0002 ("During the 4/12 conversion 'off' week, operations and merchandising teams blitzed all San

Diego stores focusing on fine-tuning pricing, signage, and merchandising and [o]n reconnecting with store associates.").

131.    The pricing errors—and the negative price perception that they caused—devastated the newly-acquired stores and undermined the Haggen brand in new markets.  10/19/17 Tr. at 88:11–14 (Mr. Shaner), 184:11–25 (Mr. Clougher).

### B.    Supply Chain Issues

132.    Haggen also faced serious supply chain issues, which caused numerous product shortages and "out of stock" in its stores.  *See, e.g.*, 10/19/17 Tr. at 185:1–186:18 (Mr. Clougher). These issues were particularly acute in Washington and Oregon, where SuperValu served as Haggen's primary wholesaler and distributor.  *Id.*  At times, 25 percent or more of the items in the store would be out of stock.  *Id.*  As a result of these problems, new stores frequently had popular items out of stock.  Customers were upset by large gaps on the shelves.  *See* DX0301 ("Almost 35% [of surveyed customers] reported items not in stock.").

### C.    Unfair Competition

133.    Haggen also faced competition from Albertson's, Safeway, and others that were beyond expectation.  Haggen had negotiated for specific provisions in the APA that would prohibit Albertson's and Safeway from competing against Haggen in certain ways.  *See* DX0517-0065–69. For example, Haggen negotiated for Section 21.2 of the APA, which forbade Albertson's from using "all confidential or proprietary information" for its commercial benefit.  DX0517-0066–67. There was evidence to suggest, however, that Albertson's and Safeway nonetheless engaged in these unfair competitive practices.

134.    Prior to its merger with Albertson's, Safeway had a loyalty program called "just for U."  *See* 10/16/17 Tr. at 256:10–258:11 (Mr. Caple); DX0517-0068.  The loyalty program allowed Safeway to collect extensive data about its customers, including names, addresses, and e-mail

addresses.  *Id.*  It also allowed Safeway to track its customers' purchase history and shopping preferences, which in turn allowed Safeway to engage in targeted, customer-specific marketing campaigns.  *Id.*

135.    Haggen identified this as a potential problem while it was negotiating the terms of the APA.  As a result, Haggen negotiated Section 21.6 of the APA, which prohibited Albertson's from using "any customer purchase history data to create any specially-targeted offers or special incentives for customers of the Safeway 'just for U' loyalty program."  DX0517-0068.

136.    Haggen believed, however, that Albertson's and Safeway used this customer information as part of an aggressive couponing campaign in an attempt to drive Haggen out of business.  *See* 10/16/17 Tr. at 256:10–258:11 (Mr. Caple).  Soon after the conversions, sales at the Albertson's stores had shallow single digit declines, but sales at Safeway stores were down by 20 to 50 percent.  *Id.* at 260:8–20.  Comvest and Haggen could not understand this divergence and originally thought it must be an accounting problem with the Safeway stores.  *Id.* at 260:18–261:2.

137.    The evidence suggested that Albertson's and Safeway also used Haggen's confidential information in this aggressive couponing campaign.  *See* 10/16/17 Tr. at 256:10–258:11 (Mr. Caple); 10/17/17 Tr. at 244:3–13 (Mr. Barnett); 10/19/17 Tr. at 89:15–90:24 (Mr. Shaner), 186:19–187:1 (Mr. Clougher); DX0349-0003; DX0351-0003; DX0401-0003–4.  In order for Haggen to take ownership of the 146 Albertson's and Safeway stores on a rolling basis, Haggen had to share its cadence with Albertson's.  *Id.*  Albertson's would then conduct aggressive, targeted coupon campaigns in areas where Haggen was converting and opening a new Haggen location.  *Id.*

138.    These couponing campaigns had a cascading effect on Haggen's other grocery competitors.  *See* 10/16/17 Tr. at 256:10–258:11 (Mr. Caple); 10/17/17 Tr. at 244:3–13 (Mr.

Barnett); 10/19/17 Tr. at 89:15–90:24 (Mr. Shaner), 186:19–187:1 (Mr. Clougher); DX0349-0003;

DX0351-0003.    Competitors like Ralph's and Trader Joe's would see the flood of Albertson's

coupons entering the market, and institute their own promotional deals in that market to counter

Albertson's.  *Id.*  Once Haggen was finished converting one store, this pattern would repeat at the

next store.  *Id.*

139.    Haggen alleged that Albertson's and Safeway violated the APA in other ways as

well:

- Haggen discovered evidence that Albertson's and Safeway would purchase inventory at a to-be-divested store, and then have the inventory diverted to another location that was not being divested.  DX0401-0001–2.

- Haggen discovered evidence that Albertson's and Safeway were deliberately overstocking and understocking inventory at to-be-divested stores right before the closing.  DX0401-0002–3.  Overstocking caused Haggen to incur substantial write-offs on perishable items that could not be sold.  *Id.*  Understocking caused large gaps on the shelves that could not be remedied during the brief conversion period.  *Id.*

- Haggen learned that Albertson's and Safeway did not continue to advertise for the to-be-divested stores in the ordinary course of business.  DX0401-0003.  Specifically, Haggen discovered that Albertson's and Safeway sought to provide those impacted customers with a different version of the ad and route them to their next closest non-divested store.  *Id.*

140.    Haggen sent a demand letter to Albertson's in June 2015 chronicling these and other

violations of the APA.  *See* DX0401.

141.    Haggen later filed a $1 billion lawsuit against Albertson's for violating the APA in

the ways described above.  *See* DX0430.

## XIII.  THE PROPCO ENTITIES MADE A $25 MILLION RESCUE LOAN IN AUGUST 2015 TO THE OPCO ENTITIES.

142.    Haggen began to convert the Albertson's stores first, starting on February 12, 2015.

*See* 10/16/17 Tr. at 259:17–18 (Mr. Caple).  As the stores converted, both Haggen and Comvest

tracked daily sales on a store-by-store basis.  *Id.*  When the Albertson's stores initially opened,

they experienced a slight uptick in sales, but soon thereafter sales began to drop, falling by single

digits in the Pacific Northwest. *See id.* at 259:17–260:3. Comvest and Haggen initially attributed those sales drops to product supply issues. *See id.* at 260:2–5.

143. In April 2015, the Safeway stores began to convert to Haggen, and, after an initial bump, Comvest saw the Safeway stores sales dropped significantly. *Id.* at 260:12–25. While sales at the Albertson's stores had slipped single digits, sales at the Safeway stores were down 20 to 50 percent. *Id*. at 260:8–20.

144. By June 2015, Haggen had completed nearly all of the store conversions. *Id.* at 262:10–12. On average, Haggen was seeing same store sales drop by as much as 20 percent, but the Safeway stores continued to experience even greater same store sales declines. *Id*. at 262:12–20.

145. In June 2015, Comvest's Investment Committee realized that the OpCo Entities would need additional funds to address their liquidity needs. *See* T. Clark Dep. at 45:16–46:7. Comvest refused to make any new contributions in the form of equity. *See* T. Clark Dep. at 46:6–12; 10/16/17 Tr. at 268:7–16 (Mr. Caple). But Comvest was willing to consider options for a rescue loan to the OpCo Entities to help it through its liquidity shortfall. T. Clark Dep. at 46:6–12.

146. At this same time, Mr. Niegsch was speaking with the Haggen Management Team every day to address the situation. *See* 10/17/17 Tr. at 103:4–20 (Mr. Niegsch). At Comvest's direction, Mr. Barnett, Mr. Clougher, and Mr. Shaner were in the field with the stores, working on the various pricing issues and trying to get labor and gross margins in line with where they needed to be in light of the level of store sales. *See id*. at 104:20–105:3.

147. Meanwhile, Mr. Niegsch was himself taking several steps to line up additional liquidity for the OpCo Entities. Mr. Niegsch tried to arrange for the sale of certain OpCo stores in

an effort to reduce the OpCo Entities' cash burn and with the hope of getting the OpCo Entities through their then-current liquidity situation. *See id*. at 103:4–20. In late June, Mr. Niegsch reached out to UBS in an effort to obtain a loan for the OpCo Entities, using the PropCo Entities' real estate as collateral for the loan. *Id*. at 102:1–3. Comvest had originally been speaking with UBS earlier in 2015 about using the the PropCo Entities' real estate as collateral for a loan that would pay a dividend to Comvest. *Id*. at 18:7–10. However, as the OpCo Entities' business continued to deteriorate, Mr. Niegsch changed the focus of the discussions with UBS from using the loan proceeds to pay a dividend to Comvest to instead using the UBS loan proceeds to help the OpCo Entities continue to operate. *Id*. at 104:2–9.

148.    The size of the potential UBS loan varied from $55 million to $65 million. *Id*. at 101:18–23. Comvest hoped that by adjusting gross margin targets, adjusting labor targets, and utilizing the liquidity from the UBS loan, the OpCo Entities would be able to manage through their liquidity crisis. *Id*. at 104:10–19. Comvest believed that even if same store sales remained down 25 percent, that the OpCo Entities would still be salvageable. 10/16/17 Tr. at 267:20–268:3 (Mr. Caple).

149.    During the negotiations with UBS in late July 2015, UBS requested that Mr. Niegsch and Comvest make a representation that the OpCo Entities—who were tenants on the various properties owned by the PropCo Entities—had not contemplated bankruptcy. 10/17/17 Tr. at 105:4–21 (Mr. Niegsch). When Comvest could not make that representation, UBS refused to make the loan and walked away. *Id*. UBS's refusal to make the loan caught Comvest and Haggen by surprise, as HFF had been telling Comvest that they felt that UBS would make the loan. *Id*. at 106:1–6.

150.    During Comvest's negotiations with UBS, the OpCo Entities' liquidity situation had deteriorated further.  *Id*. at 106:7–11.  When UBS walked away, Comvest immediately requested that Alvarez and Marsal reach out to as many as four or five other potential lenders to see if they would be interested in making a loan, but Alvarez and Marsal could not locate one that could do it fast enough to meet the OpCo Entities' needs.  10/16/17 Tr. at 290:14–25, 291:22–292:2 (Mr. Caple).

151.    On July 27, 2015, PNC notified the OpCo Entities that they were in default under the ABL Agreement.  After UBS refused to go through with the loan to the PropCo Entities, Mr. Niegsch reached out to PNC to obtain an over-advance on the ABL loan.  10/17/17 Tr. at 26:3–9 (Mr. Niegsch).  PNC refused to provide the over-advance.  *Id*

152.    By now, it was early August.  Haggen needed funds to meet the OpCo Entities' operational needs, including to make payroll.  *Id*. at 117:6–16.  Comvest knew that if the OpCo Entities missed payroll, then employees would stop coming to work and the enterprise would have deteriorated even further and much more rapidly.  *Id*.

153.    Mr. Niegsch believed that the OpCo Entities had more than enough assets to support the balance owed to PNC under the ABL plus easily another $25 million loan.  *Id*. at 129:4–130:17.  However, Mr. Niegsch and Comvest also understood that it would take an outside lender significant time to perform the necessary due diligence on the OpCo Entities to reach the same conclusion.  *Id.* at 25:3–8.  Plus, an outside lender would have to negotiate with PNC to allow that new lender to take a second lien on the OpCo Entities' assets.  *Id.*  Given the OpCo Entities' immediate need for cash, introducing a third-party lender into the mix to loan money directly to the OpCo Entities simply was not feasible.

154.    Mr. Niegsch also understood that it would take an outside lender significant time to conduct due diligence on the real property owned by the PropCo Entities before such lender would make a loan using those properties as collateral.  *Id.*   Given the time constraints, that was not a feasible option either.  As a result, Comvest turned to Citibank, with whom Comvest already had a line of credit.  *Id.* at 27:5–13.

155.    As a result of their conversations with Citibank, Mr. Niegsch and Mr. Caple proposed to Comvest's Investment Committee that it allow a newly-formed entity—Haggen Property Lender—to become a "Qualified Borrower" under Comvest's line of credit with Citibank. *Id.* at 29:21–31:1; DX0419.  Citibank would then loan $25 million to Haggen Property Lender which, in turn, would loan $25 million to the PropCo Entities.  *Id.*; DX0423.  In exchange for its $25 million loan to the PropCo Entities, Haggen Property Lender would be granted a lien on the PropCo Entities' real estate.  10/17/17 Tr. at 29:21–31:1 (Mr. Niegsch); DX0423.  The PropCo Entities would then loan $25 million to the OpCo Entities.  10/17/17 Tr. at 29:21–31:1 (Mr. Niegsch); DX0416.  In exchange for that loan, the PropCo Entities would be granted a second lien on OpCo Entities' assets.  *Id.*  The Investment Committee approved the plan.  *Id*.

156.    At the same time, Mr. Niegsch and Mr. Caple were negotiating a Forbearance Agreement and Intercreditor Agreements with PNC.  10/17/17 Tr. at 31:2–25, 107:17–24 (Mr. Niegsch); DX0425; DX0426; DX0427.

157.    As part of these negotiations, PNC wanted a lien superior to Haggen Property Lender's lien on the PropCo Entities' real estate. 10/17/17 Tr. at 107:17–108:11 (Mr. Niegsch). In exchange, PNC would agree to the forbearance on the current default and also agree to provide an over-advance of $20 million to the OpCo Entities.  *Id.* at 111:14–112:2.  Haggen Property Lender and the PropCo Entities agreed to these terms.  DX0425; DX0426; DX0427.

158.    Thereafter, Haggen Property Lender loaned $25 million to the PropCo Entities, secured by a second lien position on the PropCo Entities' real estate. 10/17/17 Tr. at 112:3–9 (Mr. Niegsch); DX0423. The PropCo Entities then loaned $25 million to OpCo North, OpCo South and Haggen, Inc., secured by a second lien on their assets. 10/17/17 Tr. at 112:23–113:6 (Mr. Niegsch); DX0416. PNC entered into a Forbearance Agreement with the OpCo Entities, and received a $10 million first lien and a $15 million third lien on the PropCos' real estate. 10/17/17 Tr. at 111:14–112:2 (Mr. Niegsch); DX0425; DX0426; DX0427. Both Haggen Property Lender's loan to the PropCo Entities and the PropCo Entities' loan to the OpCo Entities (the "PropCo Loan") were evidenced by extensive documentation and UCC Financing Statements. 10/17/17 Tr. at 112:3–113:6 (Mr. Niegsch); DX0416; DX0423; DX0752–DX0777.

159.    In an effort to ensure that the PropCo Loan was fair, the parties utilized the same documents and terms from what would have been the UBS loan. 10/17/17 Tr. at 113:21–114:21 (Mr. Niegsch).

160.    Both the OpCo Entities and PropCo Entities intended the PropCo Loan to be an extension of secured debt. *See, e.g.*, 10/16/17 Tr. at 268:7–24 (Mr. Caple); 10/19/17 Tr. at 112:12–14 (Mr. Clougher). Even the Committee's expert witness, Ms. Flaton, admits that the OpCo and PropCo Entities intended the PropCo Loan to be a debt instrument. 10/18/17 Tr. at 194:13–195:4 (Ms. Flaton). Ms. Flaton also admits that the PropCo Loan had real economic significance with $25 million moving from the PropCo Entities to the OpCo Entities. *Id.* at 197:10–20 (Ms. Flaton). Ms. Flaton also admits that the PropCo Loan was "good for OpCo's creditors" and that she would have advised the OpCo Entities to accept the money. *Id.* at 197:24–198:17.

161.    The entire $45 million in liquidity—$25 million from the PropCo Loan and $20 from the PNC over-advance—was first used to meet payroll. 10/17/17 Tr. at 115:5–15 (Mr.

Niegsch).  Because the OpCo Entities needed to make payroll before PNC and the Bank Group had time to sign off on the Forbearance Agreement, $7.5 million of the PropCo Loan was distributed to the OpCo Entities on August 12, 2015, approximately 9 days before the PropCo Entities' liens on the OpCo Entities' assets had been perfected (but after the liens had been *attached*).  *Id*. at 34:25–35:4; DX0421.  The UCC Financing Statements were filed and the liens perfected on August 21, 2015.  10/17/17 Tr. at 34:25–35:4 (Mr. Niegsch); DX0772–DX0774.

162.    The additional $45 million of liquidity was used to make payroll and to pay the OpCo Entities' vendors and to continue to operate the business.  10/17/17 Tr. at 108:12–20 (Mr. Niegsch).  Comvest also hoped that the additional liquidity would provide runway to that Comvest would have more time to sell other assets to obtain more liquidity and slow the cash burn.  *Id*.  Thus, if the OpCo Entities were able to stop the sharp decline in same stores sales, the additional liquidity would have enabled them to buy additional time to try and keep the enterprise going.  *Id*.  If that plan was unsuccessful, then the additional liquidity would allow the OpCo Entities to pay vendors and to prepare for an orderly bankruptcy filing.  *Id.* at 108:21–109:2 (Mr. Niegsch).  The alternative to the PropCo Loan was missing payroll and likely a freefall bankruptcy.  10/17/17 Tr. at 117:1–16 (Mr. Niegsch).  Ms. Flaton testified that "freefall bankruptcies can be destructive of value" and could cause the debtors' creditor to suffer more than if the freefall bankruptcy is avoided.  10/18/17 Tr. at 221:8–19 (Ms. Flaton).

163.    If the PropCo Entities had not made the $25 million rescue loan, then many more people would have lost their jobs.  10/16/17 Tr. at 304:12–20 (Mr. Caple).  Comvest and Haggen were advised that the best thing it could do for the OpCo Entities—and in particular for the OpCo Entities' creditors—was to have a good bankruptcy plan, an orderly transition into bankruptcy, and try to save as many jobs as possible.  *Id*.  The $25 million loan enabled the OpCo Entities to

53

operate for another three more weeks and to pay their employees and vendors millions of dollars more than the OpCo Entities could have paid absent that loan.  Ultimately, approximately 2500 employees lost their jobs, but many more would have lost their jobs without the PropCo Loan. 10/16/17 Tr. at 304:21–305:2 (Mr. Caple); 10/17/17 Tr. at 281:1–10 (Mr. Barnett).

## XIV.   DEBTORS FILED FOR BANKRUPTCY.

164.    On September 8, 2015, the Debtors—Holdings, Operations, OpCo North, OpCo South, Acquisition, and Haggen, Inc.—filed for bankruptcy.  Case No. 15-11874, D.I. 1.

165.    During the bankruptcy, Debtors assumed several of the unexpired PropCo Leases because they are in the best interest of the estates.  *In re HH Liquidation, LLC, et al,* Case No. 15-11874, D.I. 843 (Store # 2233), D.I. 910 (Store # 2194), D.I. 1005 (Store # 2084, 2118, 2119, 2228, 2231), D.I. 1716 & 2185 (Store # 2075, 2089, 2102).

166.    During the bankruptcy, Debtors assumed several of the unexpired Spirit Leases and GIG Leases because they are in the best interest of the estates.  *In re HH Liquidation, LLC, et al,* Case No. 15-11874, D.I. 718 (Store # 2138, 2133) , 719 (Store # 2135, 2137), D.I. 861 (Store # 2141, 2148), D.I. 862 (Store # 2125, 2093, 2096, 2142, 2139, 2081, 2134, 2147, 2074, 2080, 2130, 2132), D.I. 847 (Store # 2143, 2160), D.I. 964 (Store # 2099, 2072, 2077, 2136, 2095, 2176), D.I. 2080 (Store # 2094), D.I. 1550 (Store #2144), and D.I. 1775 (Store # 2126).

167.    On September 7, 2016, the Committee filed this adversary proceeding against Defendants.  D.I. 1.

168.    The Committee did not include several parties to the Albertson's Acquisition as defendants in this action, including Albertson's, Safeway, Spirit, or GIG.

169.    Even though Holdings is a debtor, the Committee has offered no evidence that demonstrates that Holdings is—or ever was—insolvent.  The undisputed evidence is that Holdings is currently solvent.  10/20/17 Tr. at 175:10–16 (Mr. Montague).  Indeed, Defendants served an

54

interrogatory on the Committee asking, "For each Debtor, identify the date on which You contend the Debtor became insolvent, and why you contend that the Debtor became insolvent on that Date." DX0453 at Interrog. No 11. In response, the Committee objected on the ground that the interrogatory was "premature because it seeks expert opinion," and promised to "provide expert disclosures" that would be responsive to the interrogatory and "that will be deemed incorporated by reference herein." *Id.* at Resp. to Interrog. No. 11. But the Committee did not offer an expert opinion that Holdings is insolvent now or was insolvent at any time. 10/18/17 Tr. at 40:20–22 (Mr. MacGreevey), 171:4–14 (Ms. Flaton); 10/19/17 Tr. at 232:24–233:10 (Mr. Howard).

## XV. THERE IS NO EVIDENCE THAT ANY CREDITOR RELIED ON THE ALLEGED CORPORATE UNITY OF THE DEBTORS AND DEFENDANTS WHEN EXTENDING CREDIT.

170. The Committee has presented no evidence that any creditor actually or reasonably relied on the supposed unity of the Debtors and Defendants when extending credit, and the evidence that does exist shows the opposite.

### A. Spirit & GIG

171. Spirit Capital Realty ("Spirit") is a private real estate investment trust in the business of sale-leaseback and acquisition of real estate. D. Rosenberg Dep. at 13:23–14:3. Garrison Investment Group ("GIG") is a private hedge fund with substantial experience in sale-leaseback transactions. E. Rosenthal Dep. at 154:15–155:8.

172. Spirit and GIG were both aware that the OpCo Entities did not own the real property at the acquired grocery stores, and were also aware that the OpCo Entities, PropCo Entities, and Holdings were separate legal entities. D. Rosenberg Dep. at 52:4–22; E. Rosenthal Dep. at 186:19–23 In order to protect their investment, both Spirit and GIG sought, and obtained, a guarantee from Holdings that guaranteed the OpCo Entities' rent payments. D. Rosenberg Dep. at 52:18–53:6; *see also* D. Rosenberg Dep. at 113:20–114:2; E. Rosenthal Dep. at 186:24–187:9.

173.    If the OpCo Entities, PropCo Entities, and Holdings are substantively consolidated, Spirit and GIG's recoveries will drop from 100 percent to between 21 and 45 percent. 10/20/17 Tr. at 178:6–13 (Mr. Montague).

B.    **Unified Grocers**

174.    The creditor who has asserted the largest unsecured claim against any Debtor is Unified Grocers. On December 18, 2014, Haggen, Inc., OpCo North, and OpCo South entered into a Supply Agreement with Unified Grocers, Inc. wherein Haggen, Inc., OpCo North, and OpCo South agreed to buy approximately $13 million to $14 million in product and services a week from Unified Grocers. DX0156; DX0157-0002–4; M. Speiser Dep. at 51:6–11. Unified Grocers was aware of the OpCo/PropCo structure at Haggen before it began extending credit. In January 2015, Unified Grocers met with Haggen representatives and requested that "PropCo" guarantee the Unified Grocers Agreement, but Haggen representatives refused the request. M. Speiser Dep. at 99:3–100:10. Despite not receiving the guarantee, Unified Grocers extended credit to Haggen, Inc., OpCo North, and OpCo South uninterrupted from February 2015 to August 2015. M. Speiser Dep. at 168:11–15. Unified Grocers is a Committee Member.

C.    **Pepsi**

175.    Pepsi is also a large creditor of the OpCo Entities and a Committee Member. ███

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████

176.   ███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████

177.     Whether the OpCo Entities owned real property did not matter to Pepsi in its decision to extend credit to the OpCo Entities following the Albertson's Acquisition.  *Id.*

178.     After shipping product and receiving payment over several months, Pepsi became concerned in the summer of 2015 over the OpCo Entities' financial performance and, in July 2015, sought additional information from the Debtors about their structure and assets. In late July 2015, after learning about the Debtor's corporate structure, Pepsi requested a guarantee from Holdings.  *Id.*

179.     Pepsi did not receive the requested guarantee, but continued to extend credit and ship product to the OpCo Entities up through the Petition Date.  *Id.*

D.     **MoneyGram, TopCo, and Starbucks**

180.     MoneyGram, TopCo, and Starbucks are all creditors of the OpCo Entities.  P-620.  Each of them requested and received a copy of the OpCo Entities' pro forma financial statement in January and February 2015.  *See* DX0217–DX0218 (Starbucks received OpCo pro forma); DX0177–DX0178 (TopCo received OpCo pro forma); DX0204–DX0205 (MoneyGram received OpCo pro forma). The OpCo Entities' pro forma financial statement does not identify any real property and has a substantial line item for "rent expense."  *Id.*

E.     **Vendors**

181.     Haggen was in regular contact with vendors answering their questions. After signing the APA, Haggen held a large "vendor summit" in Bellevue, Washington with over 500 vendors attending.  The Haggen Management Team answered questions from the vendors.  There

were no questions about the corporate structure or whether the new stores would own the real estate under the stores.  10/19/17 Tr. at 172:8–173:7, 174:10–25 (Mr. Clougher).

182.    Haggen also held a "big tent meeting" for vendors in Southern California with 500 or 600 people attending.  10/19/17 Tr. at 80:10–81:17 (Mr. Shaner).  Haggen took questions from vendors but none asked whether the stores paid rent or whether the vendors could take a lien on the real estate under the stores.  *Id*.

183.    Haggen also held "Vendor Wednesday" where every Wednesday they would schedule regular appointments with vendors.  10/19/17 Tr. at 173:8–174:9 (Mr. Clougher).  There is no evidence that any vendor asked whether the stores were paying rent or whether the operating stores owned the real estate during these meetings.  *Id*.

184.    Many of the creditors in this bankruptcy were vendors of Haggen.  Vendors of Haggen had regular opportunities to ask questions about the grocery chain, its real estate holdings, and its business structure to the extent it would impact their decisions to offer credit.

F.    **No Evidence of Creditor Reliance**

185.    No evidence has been presented that any creditor ever claimed they were confused by the Debtors' corporate structure.

186.     No evidence has been presented that any creditor ever claimed they believed the OpCo Entities and the PropCo Entities were the same entities.

187.    No evidence has been presented that any creditor ever claimed that they believed the OpCo Entities owned the real property associated with the acquired grocery stores.

188.    No evidence has been presented that any creditor claims to have relied on a misapprehension of Haggen's OpCo/PropCo structure.

189.    No evidence has been presented that any creditor claims to have relied on a misapprehension that the OpCo Entities owned real estate when they extended credit to the OpCo Entities.

## XVI.    THE COMMITTEE FAILED TO OFFER ANY EVIDENCE PROVING OR QUANTIFYING DAMAGES

190.    No evidence has been presented proving or quantifying the damages caused by any breach of fiduciary duty.

191.    No evidence has been presented proving or quantifying the amount that any Defendant was unjustly enriched

192.    No evidence has been presented establishing the amount of harm suffered by any creditor.

## CONCLUSIONS OF LAW

## I.    THE COMMITTEE HAS FAILED TO PROVE ACTUAL FRAUD.

The most important claim in this case is the one that the Committee did not bring.  The Committee has failed to prove—and failed to even allege—that any Defendant committed fraud on any OpCo creditor.  The reason that the Committee could not bring this claim is because it is undisputed that there were never any misrepresentations.  Therefore, there was no intent by the Defendants to actively mislead the OpCo creditors, there was no justifiable reliance by the OpCo creditors on the misrepresentation, and there was no damages to the OpCo creditors directly caused by the misrepresentation.  The Committee cannot meet any element of common law fraud.  *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003).

The problem for the Committee is that its theory is based on fraud.  But without any actual misrepresentations, the Committee is left asserting a host of legal remedies that do not fit the facts of this case.  They seek to "avoid" transfers from Holdings to PropCo, but avoiding those transfers

will not result in any additional money going to the OpCo creditors. The Committee alleges a breach of fiduciary duty claim, but the duties and the allegations do not match, especially when Holdings has always been solvent. The Committee seeks to inappropriately add substantive consolidation (as a makeshift alter ego theory) on other claims to rearrange the corporate structure to fit a square peg in a round hole. The Committee's theory is ultimately a broken fraud case.

Put simply, the Defendants did not lie to the OpCo creditors. The OpCo creditors did as much diligence as they thought appropriate before extending credit, and they took the risk (just like every creditor) that the borrower would go bankrupt. It is unfortunate when a company fails. But it does not allow the Committee to backdoor a fraud case out of inappropriate legal remedies, and a broad request for "equity." From a legal perspective, nothing appears to fit correctly because at its core the Committee is bringing the wrong claim. Accordingly, there is no legal remedy applicable to the OpCo creditors beyond dividing up OpCo's remaining assets.

## II.    THERE IS NO BASIS TO PIERCE THE CORPORATE VEIL OR DISREGARD THE DEBTORS' CORPORATE FORM.

Delaware and its judiciary have a special role in American capitalism. The overwhelming majority of corporations and other business entities are formed in Delaware, and its courts are extremely sophisticated and well-versed in corporate law. Every Defendant company being challenged by the Committee was formed in Delaware. DX0646, DX0647, DX0652, DX0655, DX0657.

One of the principal advantages that investors rely on in choosing to incorporate in Delaware is its well-established respect for the corporate form. As the Delaware Supreme Court recently explained, "Delaware courts take the corporate form and corporate formalities very seriously," because it would "upset the contractual expectations" of the parties to conflate separate entities. *Culverhouse v. Paulson & Co.*, 133 A.3d 195, 199–200 (Del. 2016). "It is only the

60

exceptional case where a court will disregard the corporate form." *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990); *see also Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 48–49 (Del. Ch. 2012) ("Delaware courts take the corporate form and corporate formalities very seriously . . . [and] will disregard the corporate form only in the exceptional case."). Other courts recognize the policy decision made by Delaware's legislature and judiciary, and faithfully adhere to these principles when applying Delaware law. *McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1095 (9th Cir. 2003) (noting the "very limited circumstances in which Delaware law countenances veil piercing"); *see also ALT Hotel, LLC v. Diamondrock Allerton Owner, LLC*, 479 B.R. 781, 802 (Bankr. N.D. Ill. 2012) ("Delaware has an exceptionally strong policy of respecting the corporate form."); *Wallace ex rel. Cencom Cable Income Partners II, Inc., LP v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task.").

This certainty and emphasis on freedom of contract allow businesses to determine which risks, and how much risk, they wish to take in new ventures. This is why commercial contracts frequently select Delaware laws and courts as the governing forum. Yet the Committee seeks to undermine these fundamental tenets of Delaware law, asking this Court to disregard Holdings' separate existence and distribute its assets to creditors of its subsidiaries, OpCo. This runs counter to the well-established rule that "parent and subsidiary corporations are separate entities, having separate assets and liabilities. . . . [H]ence, the parent's creditors have no claim to the subsidiary's assets, and *vice versa.*" *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998).

Worse, the Committee seeks this extraordinary relief without even attempting to satisfy the stringent requirements Delaware courts require for veil piercing and without even pleading it in its

complaint.  If granted, this unprecedented disregard for the corporate form would be inconsistent with the expectations that businesses manifest in selecting Delaware.

## III.    THE COURT SHOULD REJECT THE COMMITTEE'S CLAIM FOR SUBSTANTIVE CONSOLIDATION (COUNT 72) BECAUSE THE COMMITTEE CANNOT MEET ITS BURDEN AS TO ANY ELEMENT OF THE *OWENS CORNING* TEST.

The Court should reject the Committee's claim to substantively consolidate the PropCo Entities with Holdings and the OpCo Entities.  To be entitled to substantive consolidation, the Committee has the burden of showing that the Debtors and the PropCo Entities disregarded their corporate separateness "*so significantly*" that "their ***creditors relied*** on the breakdown of entity borders and treated them as one legal entity."  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (emphasis added).  The Committee, however, has offered ***no evidence*** that the OpCo Entities' creditors "actually or reasonably" relied on any breakdown of the entities' corporate separateness.  *Id.* at 212.  And even if the Committee could meet its burden, an opponent of substantive consolidation can still preclude application of the remedy by showing that other creditors "***actually relied*** on debtors' separate existence," and would be "***adversely affected***" by substantively consolidating the various entities.  *Id.*  Here, it is undisputed that some of Holdings' creditors did actually rely on the Debtors' corporate separateness and would be adversely affected by substantive consolidation.  Accordingly, substantive consolidation is inappropriate given the facts in this case.

### A.    Legal Standard for Substantive Consolidation

Substantive consolidation in the Third Circuit is governed by *Owens Corning*.  In that case, the Third Circuit analyzed the approaches to substantive consolidation utilized by other circuits, and then adopted a straightforward approach that differs meaningfully from the approaches in

those circuits.[8]  *See Owens Corning*, 419 F.3d at 205–211.  For this reason, the Court should reject any attempt by the Committee to rely on non-Third-Circuit case law that does not apply the *Owens Corning* test.[9]

In crafting the Third Circuit test, the *Owens Corning* court identified several important principles.  One "fundamental ground rule" is that courts must limit "the cross-creep of liability by respective entity separateness" because "the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances."  *Id.* at 211.  Another important principle is that substantive consolidation is "***extreme***" and "***imprecise***," and that this "rough justice remedy should be ***rare***" and "one of ***last resort*** after considering and rejecting other remedies."  *Id*. (emphasis added).  Based on these principles, the court concluded that substantive consolidation is available when "***prepetition*** [the debtors] disregarded separateness ***so significantly*** their creditors ***relied*** on the breakdown of entity borders and treated them as one legal entity."[10]  *Id.*

---

[8]   For example, the court explicitly rejected the "*Auto-Train*" approach, which it described as "fail[ing] to capture completely the ***few times*** that substantive consolidation may be considered and then, when it does hit one chord, it allows a threshold ***not sufficiently egregious*** and ***too imprecise*** for easy measure." *Id.* at 210 (citing *In re Auto–Train Corp.*, 810 F.2d 270, 276 (D.C. Cir. 1987)) (emphasis added).  The court also rejected the "checklist" approach—utilized, for example, in the Second Circuit—because it "often results in rote following of a form containing factors where courts tally up and spit out a score without an eye on the principles that give the rationale for substantive consolidation (and why, as a result, it should ***so seldom be in play***.)" *Id.* (emphasis added); *see also In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992) (providing a list of factors that courts in the Second Circuit consider when analyzing a substantive consolidation claim).

[9]   In its Trial Brief, for example, the Committee relies on *Stop & Go of Am., Inc. v. Stop & Go Shops, Inc.*, a case out of the District of Massachusetts.  49 B.R. 743 (Bankr. D. Mass. 1985).  The test adopted by the Third Circuit in *Owens Corning* is exactly the opposite of the the test used in *Stop & Go*.  The *Owens Corning* court announced a hard and fast rule that substantive consolidation was never allowed where creditors were aware of and relied on the debtors' corporate separateness.  419 F.3d at 212 (Substantive consolidation is not available where creditors can prove "they are adversely affected and actually relied on debtors' separate existence.").  The *Stop & Go* court, on the other hand, applied a very different standard, in which substantive consolidation was ***favored*** where the creditors understood the separate corporate nature of the debtors.  49 B.R. at 750 ("[T]he Court cannot find that the defendants were ignorant of the relationship of the companies.").  These conflicting standards cannot be reconciled, and this Court is bound to follow the Third Circuit.

[10]   The *Owens Corning* court also stated that substantive consolidation is available when "postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  *Owens Corning*, 419

The Third Circuit went on to break down the elements of a substantive consolidation claim. *First*, the plaintiff must prove that the "parties' prepetition dealings" revealed "corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity." *Id.* at 212. *Second*, a proponent of substantive consolidation must prove that "in their prepetition course of dealing, they *actually and reasonably* relied on debtors' supposed unity." *Id.* (emphasis added). This prong has dual requirements: the creditor must not only prove actual reliance, but also that such reliance was "reasonable." *Id.* Simple ignorance of the debtors' corporate structure does not satisfy this test. *Id.* *Third*, if the first two prongs are met, an opponent of substantive consolidation can still preclude application of the remedy by showing that other creditors "actually relied on debtors' separate existence," and would be "adversely affected" by substantively consolidating the various entities. *Owens Corning*, 419 F.3d at 212.

Finally, there is a split of authority regarding whether substantive consolidation is an appropriate remedy at all where, as here, the Committee seeks the consolidation of debtors and non-debtors. To that end, Defendants incorporate by reference their arguments that the substantive consolidation of debtors and non-debtors should never be allowed. See D.I. 103 at 18 n.11; D.I. 125 at 3–5. What is clear, however, is that the burden on the Committee in establishing a right to this "extreme" and "rare" remedy is ratcheted up even further when seeking consolidation of a non-debtor entity. *See In re Howland*, 674 F. App'x 482, 488 (6th Cir. 2017) ("Substantive consolidation is an 'extreme' measure, only to be used 'sparingly,' especially when consolidating a non-debtor entity.") (citing *Owens Corning*, 419 F.3d at 208–09, 211).

---

F.3d at 211. The Committee, however, has stated that its alleged entitlement to substantive consolidation flows from the Debtors and Defendants supposed prepetition disregard for corporate separateness. *See* D.I. 111 at 19 ("Ultimately, for the PropCo Entities to be consolidated, the Committee must show that, prepetition, they disregarded corporate separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity."). And the Committee has not offered any evidence to support a finding that the assets and liabilities are so scrambled that separating them would hurt all creditors.

B.     **The Committee Failed to Prove Any Actual or Reasonable Creditor Reliance on the Debtors' Supposed Unity With the PropCo and SLB Entities.**

It is important to consider the burden of proof for substantive consolidation, because the Committee gets this point backwards.  "Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation." *Owens Corning*, 419 F.3d at 212.  As the proponent of substantive consolidation, the Committee has the burden of proving that creditors "actually and reasonably" relied on a belief that the OpCo, PropCo, and SLB Entities were the same entity.  *Id.* ("Proponents who are creditors must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity."); *see also Howland*, 674 F. App'x at 489 (holding that "the trustee's proposed amended complaint is devoid of any factual allegations that any creditor relied on the debtors' disregard of corporate formalities in making a business decision in connection with either entity" and dismissing the trustee's substantive consolidation claim).[11]  The Committee does not even attempt to meet this burden.  Instead, they argue that there "was no public disclosure of the PropCo/OpCo structure" and that in the absence of public disclosure, the OpCo creditors' "lack of knowledge was a foregone conclusion." 10/16/17 Tr. at 11:12–18; 11:22–24 (Mr. Morris).  This argument changes the standard from "reasonable reliance" to mere ignorance, improperly shifts the burden of proof from the Committee to Defendants, and is wrong as a matter of fact.

There is a difference between mere ignorance of the debtors' corporate structure and "actual and reasonable reliance" on the debtors' supposed unity.  The Third Circuit in *Owens Corning* did not rule that substantive consolidation is appropriate whenever debtors fail to

---

[11]    In *Howland*, the trustee sought to consolidate a non-debtor corporate entity owned by Chapter 7 debtors.  *See* 674 F. App'x at 483–84.  The bankruptcy court dismissed the trustee's amended complaint, and the Sixth Circuit affirmed.  *See id.* at 484.  Applying the *Owens Corning* test, the Sixth Circuit reasoned that the amended complaint failed "to allege any reliance by creditors, a necessary component to a substantive consolidation claim based on prepetition conduct."  *Id.* at 489.

publicize their corporate structure, and such a rule would be absurd. Privately held companies rarely, if ever, issue public announcements about their corporate legal structure; and the Committee's argument would change substantive consolidation from a "rare" and "extreme" remedy to one that would be available in nearly every bankruptcy. *Owens Corning*, 419 F.3d at 211. Instead, the *Owens Corning* court set a standard of actual and ***reasonable*** reliance. *See id.* at 212. This requires a creditor to engage in some minimal level of inquiry, such as asking whether the OpCo Entities owned any real property. They also had the option of checking the publicly-available real property records to see who owned the real property upon which the stores sat. Had the OpCo Entities' creditors checked the real property records, they would have discovered recorded deeds showing that Albertson's conveyed the real property at issue to Spirit, GIG, and the PropCo Entities, not the OpCo Entities.[12] *See, e.g.* DX0219; DX0232; DX0250; DX0251; DX0268. They also would have discovered the publicly recorded Memoranda of Lease disclosing that the OpCo Entities were tenants, and that they did not own the real property. *See, e.g.*, DX0265; DX0323. Publicly recorded deeds constitute constructive notice. *See, e.g., Sixty-01 Ass'n of Apartment Owners v. Parsons*, 314 P.3d 1121, 1125 (Wash. 2013) ("A recorded deed constitutes constructive notice of the interest acquired.").[13]

---

[12] As Defendants' counsel explained during oral argument on their Motion for Partial Summary Judgment, real property records can be accessed online. It took Defendants' counsel five minutes to find out that Albertson's sold the real estate associated with Haggen's Snohomish, Washington location to PropCo North in 2015. *See* 9/26/17 Hr'g Tr. at 42:23–43:15 (Mr. French).

[13] *See also* Ariz. Rev. Stat. § 33-416 ("The record of a grant, deed or instrument in writing authorized or required to be recorded, which has been duly acknowledged and recorded in the proper county, shall be notice to all persons of the existence of such grant, deed or instrument . . . ."); *In re Marriage of Cloney*, 91 Cal. App. 4th 429, 437 (1st Dist. 2001) ("Every duly recorded conveyance of real property, . . . , is constructive notice of the contents thereof to subsequent purchasers and mortgagees from the time of recordation."); Nev. Rev. Stat. § 111.315 ("Every conveyance of real property, and every instrument of writing setting forth an agreement to convey any real property, . . . , to operate as notice to third persons, shall be recorded in the office of the recorder of the county in which the real property is situated . . . ."); Or. Rev. Stat. § 93.643 ("To give constructive notice of an interest in real property, a person must have documentation of the interest recorded in the indices maintained under ORS

In addition, as the Committee's own expert testified, creditors "understand that corporate structure is important to credit analysis." 10/18/17 Tr. at 189:8–11 (Ms. Flaton). The Committee also admits that OpCo/PropCo corporate structures are fairly common in the business world. *See* 10/18/17 Tr. at 184:14–19 (Ms. Flaton). And it was not as though Holdings used vague or deceptive names for the OpCo Entities. To the contrary, creditors were extending credit to entities called Haggen *Operations* Holdings, LLC, Haggen *OpCo* South, LLC, and Haggen *OpCo* North, LLC. Creditors who stuck their heads in the sand and preserved their ignorance over the debtors' corporate structure cannot show any "reasonable" reliance, and they are not entitled to substantive consolidation. This is especially true since the real property and operating assets had been separately held in the same OpCo/PropCo structure when the stores were owned by Albertson's. *See* B. Beckstrom Dep. at 17:19–19:18.

The Committee is trying to shift the burden of proof because it failed to prove any actual or reasonable creditor reliance. The Committee is arguing that Defendants must prove that not one of the OpCo Entities' thousands of unsecured creditors relied on the mistaken belief that the OpCo Entities owned the real property. Not only is this logistically impossible, it is inconsistent with the actual *Owens Corning* test, which puts the burden of proving actual and reasonable creditor reliance squarely on the Committee's shoulders. *See* 419 F.3d at 212. The Committee has not even attempted to meet this burden, and this precludes substantive consolidation. *See id.*

Even though it was not their burden, Defendants did introduce evidence regarding four of the OpCo Entities' largest creditors—indeed, this was the only evidence regarding creditor reliance

---

205.130 in the county where the property is located. Such recordation, and no other record, constitutes constructive notice to any person of the existence of the interest.").

that was admitted at trial. This evidence shows that ***none*** of these creditors actually or reasonably relied on the Debtors' supposed unity with the PropCo and SLB Entities. Spirit, GIG, and Unified Grocers all knew that the OpCo Entities were separate companies that did not own any real property. Pepsi's corporate representative testified that they conducted no investigation and ***did not care*** whether or not the OpCo Entities owned any real property. *See* 10/19/17 Tr. at 82:8–83:10 (Pepsi Stipulation). This is consistent with the experience of the Haggen management team, who all testified (a) that trade creditors never ask whether a grocery store owns real estate before extending credit, and (b) that a trade creditor has never refused to extend credit to a grocery store on the basis that the grocery store does not own any real estate. *See* 10/17/17 Tr. at 230:7–18 (Mr. Barnett); 10/19/17 Tr. at 50:10–24, 80:8–81:17 (Mr. Shaner); 10/19/17 Tr. at 148:18–149:7, 172:8–174:9 (Mr. Clougher). Unified Grocers—who ultimately did $13-14 million of business per week with the OpCo Entities—actively sought a guarantee from the PropCo Entities on its extension of credit to the OpCo Entities, was denied, and made the business decision to extend credit to the OpCo Entities anyway.[14] Substantive consolidation is not a second chance for creditors to obtain access to collateral after liquidation that they failed to get in arms-length negotiation before liquidation. It should not be granted here.

In this Court's summary judgment ruling, it explained that "[t]he Committee will have the opportunity at trial to prove what creditors did not know and relied upon," and that "[a]fter trial, the Court will be in a better position to determine the creditors' recovery rights." D.I. 136 at 8. The trial has come and gone. Every single creditor that testified said that they either knew of or

---

[14] In addition, some creditors—such as Starbucks, MoneyGram, and TopCo—extended credit after receiving a copy of the OpCo Entities' pro forma financial statements. *See* DX0217–DX0218 (Starbucks received OpCo pro forma); DX0177– DX0178 (TopCo received OpCo pro forma); DX0204–DX0205 (MoneyGram received OpCo pro forma). The *pro forma* financial statements do not identify any real property and have a substantial line item for "rent expense." As such, these creditors had in their possession financial statements from the OpCo Entities showing that "OpCo" did not own the real property upon which the stores operated.

did not care about the Debtors' corporate structure.  Not one creditor testified that they actually and reasonably relied on the Debtors' supposed unity with the PropCo and SLB Entities.  That should be the end of the matter.

### C.    Holdings' Creditors Would Be Harmed by Substantive Consolidation.

In addition to failing the first prong of the *Owens Corning* test, substantive consolidation is unavailable here because the record is clear that ***Holdings' creditors*** "actually relied on debtors' separate existence" and would be "adversely affected" by substantive consolidation.  *Owens Corning*, 419 F.3d at 212.

Spirit and GIG entered into leases with the OpCo Entities whereby the OpCo Entities agreed to pay rent to Spirit and GIG for use of the grocery stores.  *See* DX0226; DX0235.  Both Spirit and GIG negotiated for and received a guarantee on these rental payments from Holdings. *See* DX0242; DX0396.  In doing so, Spirit and GIG understood the separate corporate existence between the OpCo Entities and Holdings, recognized that there was value in having an otherwise separate entity be liable for the rental payments, and understood that through the guarantees they would have access to assets that they (and other creditors of the OpCo Entities) would otherwise not have access to.  In other words, through these guarantees, Spirit and GIG (creditors of Holdings) "actually relied on the debtors' separate existence."  As Spirit's corporate representative explained, having these guarantees provided a "feature that mitigates our risk in doing the transaction."  D. Rosenberg Dep. at 52.18–53:6.

Substantive consolidation would be devastating on Holdings' creditors.  These creditors would see their recovery drop from 100% to as little as 21%.  *See* 10/20/17 Tr. at 177:13–17; 178:6–13 (Mr. Montague). And the OpCo Entities' creditors would receive a windfall, as their recoveries would increase from 0% to over 20%.  *See* 10/20/17 Tr. at 223:22–25 (Mr. Montague). Unsurprisingly, at the hearing on Defendants' Motion for Partial Summary Judgment, the attorney

for Spirit—a creditor at Holdings that would be harmed by substantive consolidation—objected to the Committee's claim in the adversary proceeding: "Spirit is not in favor of substantive consolidation at this stage." *See* 9/26/17 Hr'g Tr. at 48:4–5 (Mr. Ganz).

At that same hearing, the Committee's counsel argued that the prejudice to Holdings' creditors should be ignored because it was an "intercreditor" issue that could be addressed by a consensual plan. The Committee's counsel went so far as to promise such a consensual plan in a matter of days. *See* 9/26/17 Hr'g Tr. at 19:9–10 ("I hope to file the plan today, but I think it's just a matter of days . . . .") (Mr. Feinstein). It has been nearly three months, and no such plan has been filed. And even if the Committee does come forward with such a plan, it is simply too late. To be clear, discovery is over, trial is over, and the Committee's time is up. At best, the Committee is seeking an improper advisory opinion based on hypothetical evidence. *See Coffin v. Malvern Fed. Sav. Bank*, 90 F.3d 851, 853 (3d Cir. 1996). The Third Circuit has made it clear that "the possibility of later giving priority to [certain creditors]" cannot "cure" an inadequate substantive consolidation claim. *Owens Corning*, 419 F.3d at 215. The Committee's claim for substantive consolidation must be rejected as it fails every facet of the *Owens Corning* test.

## IV.    THE COURT SHOULD REJECT THE HOLDINGS FRAUDULENT TRANSFER CLAIMS (COUNTS 1–19, 39–65).

Fraudulent transfer is a statutory remedy that allows creditors to avoid transfers and return property to a debtor that originally owned it. 11 U.S.C. § 548. Here, the Committee is seeking to avoid transfers from Holdings to PropCo and Holdings to Comvest. If successful, the result of these claims will be that the transferred property is returned to the Holdings estate. *Id.*

But Holdings' creditors are already being paid in full. The Committee's ultimate goal is to take Holdings' property, and distribute it to OpCo creditors who have never been Holdings creditors. In essence, the Committee is seeking some sort of veil piercing remedy, but has not

70

even attempted to satisfy the stringent requirements under Delaware law to pierce the corporate veil. *Sears,* 744 F. Supp. at 1305 ("It is only the exceptional case where a court will disregard the corporate form."). The Committee has argued that these legal defects in their fraudulent transfer claims can be overlooked because they "presuppose" the validity of the of the Debtor's corporate structure, but this ignores the fact that "Delaware courts take the corporate form and corporate formalities very seriously," and that this Court is bound to do the same in applying Delaware law. *Vichi,* 62 A.3d at 48–49.

This is simply not a case of fraudulent transfer. Holdings, the only Debtor that has ever held the property at issue, is solvent, and is paying its creditors in full. The Committee is trying to seize property that never belonged to OpCo, and distribute it to OpCo creditors that have never had a claim against Holdings. But the OpCo's creditors lack standing to sue on behalf of Holdings for fraudulent transfer, and any recovery would not benefit Holdings' creditors, as they are already being repaid in full. *See Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80, 94 (S.D.N.Y. 2008) ("*Adelphia*"); *see also In re New Life Adult Med. Day Care Ctr., Inc.*, 2014 WL 6851258, at *6 (Bankr. D.N.J. Dec. 3, 2014) ("*New Life*").

A.    **Legal Standard for Fraudulent Transfer**

Fraudulent transfer is a legal, not an equitable, remedy. *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1508 (1st Cir. 1987). Whether alleged under state law, under 11 U.S.C. § 544, or under 11 U.S.C. § 548, the claim arises under statute, and each of the statutory elements must be met to impose liability. *See* 11 U.S.C. § 548; *see also* 11 U.S.C. § 544. The remedies available are limited to those enumerated by statute. *Id.*

To allege a claim for fraudulent transfer under state law, the plaintiff must be a creditor of the transferor. *See, e.g. Fidelity Nat'l Title Ins. Co. v. Schroeder*, 179 Cal. App. 4th 834, 841, (App. 5th 2009). Likewise, "the Bankruptcy Code's avoidance provisions can only be asserted to

benefit a creditor of the debtor in question." *Adelphia*, 390 B.R. at 94. "An obligation or transfer cannot be avoided as a fraudulent transfer or preference under sections 544, 547 and 548 of the Bankruptcy Code when doing so would not benefit any creditor of the particular debtor that incurred the obligation or made the transfer." *Id*. at 93.

Fraudulent transfer claims may not be brought where they offer no benefit to creditors of the transferor's estate. *Adelphia*, 390 B.R. at 95 ("Under the principles of federal jurisdiction, a party does not have standing to sue where the party is not able to allege an injury that is likely to be redressed by the relief sought."). No recovery is allowed if it would not provide any benefit to actual creditors of the transferor. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 969 (Bankr. D. Del. 1994); *Whiteford Plastics Co. v. Chase Nat'l Bank of New York City*, 179 F.2d 582, 584 (2d Cir. 1950) ("'It would be mockery of justice to [avoid a transaction] in the right of non-existing creditors."). This rule precludes recovery actions when the transferor is solvent and the transferor's creditors are all being paid in full. *See New Life*, 2014 WL 6851258, at *6.

Both the Bankruptcy Code and analogous state laws distinguish between claims for "actual" fraudulent transfer and "constructive" fraudulent transfer. *Compare* 11 U.S.C. § 548(a)(1)(A) *with* 11 U.S.C. § 548(a)(1)(B). To prove actual fraud, the plaintiff must show that the transfer was made with "actual intent to hinder, delay or defraud" the transferor's creditors. 11 U.S.C. § 548(a)(1)(A). Constructive fraud, on the other hand, occurs when an insolvent transferor makes a transfer for less than reasonably equivalent value. *See* 11 U.S.C. § 548(a)(1)(B). The plaintiff has the burden of proof under either theory of recovery. No claim for actual fraudulent transfer can succeed where the plaintiff fails to prove actual intent to hinder, delay or defraud the transferor's creditors. *See, e.g.*, *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009). And no claim for constructive fraudulent transfer can succeed where the plaintiff fails to

prove both (i) insolvency at the time of transfer, and (ii) failure of the transferor to receive reasonably equivalent value. *See, e.g.*, *In re Opus E., LLC*, 528 B.R. 30, 51 (Bankr. D. Del. 2015) ("The plaintiff bears the burden of proving insolvency by a preponderance of the evidence."); *id* at 83 ("The burden of proof is on the Trustee to establish that less than reasonably equivalent value was received by the Debtor for the allegedly fraudulent transfers.").

B.    **All of the Committee's Fraudulent Transfer Claims (Both Actual and Constructive) Involving Transfers By Holdings Fail Because Holdings' Creditors Are Being Paid in Full.**

As a matter of law, the Committee is precluded from prosecuting a claim for fraudulent transfer against Holdings on behalf of persons who ***are not creditors of Holdings***. *Adelphia*, 390 B.R. at 95.  At bottom, the Committee is seeking to recover assets transferred from Holdings to the PropCo Entities, and use those assets to pay OpCo creditors.  This violates well-established rules of law.  This is a complete bar to all of the fraudulent transfer claims directed at Holdings, including (i) the contribution to the PropCos, and (ii) the payment of the $1.5 million management fee from Holdings to Comvest.

Under state fraudulent transfer law, the Committee lacks standing to seek recovery on behalf of persons who are not creditors of Holdings.  *In re Global Grounds Greenery, LLC*, 405 B.R. 659, 662 (Bankr. D. Ariz. 2009) (stating "[t]here is no dispute that the Uniform Fraudulent Transfer Act, as adopted in Arizona and elsewhere, only creates causes of action for creditors of the transferor"); *In re ShendaTech, Inc.*, 519 B.R. 292, 303–04 (D. Nev. 2014) (holding that, under Nevada's Uniform Fraudulent Transfer Act, a creditor is the only party with standing to bring a claim); *Fidelity Nat'l Title*, 179 Cal. App. 4th at 841 (holding that, under California's Uniform Fraudulent Transfer Act, a fraudulent transfer may only be attacked by the creditor injured from the transfer); *Douglas v. Hill*, 148 Wash. App. 760, 765 (Ct. App. 2009) (holding that "under the definitions provided in the UFTA, a creditor need only have a right to collect a payment to void a

73

fraudulent transfer"); *Norris v. R & T Mfg.*, 265 Or. App. 672, 676 (Ct. App. 2014) (holding that, to establish a claim under the Oregon Uniform Fraudulent Transfers Act, a plaintiff must prove that it "has a claim as a creditor that arose before or after the transfer was made"); *Fisher v. Kelly*, 30 Or. 1, 12 (1896) ("[B]efore a person can attack a transfer of personal property, either actual or constructive, he must show himself to be a creditor . . . ."). This rule acts as an absolute bar to all of the Committee's state law claims alleging fraudulent transfer by Holdings.

The fact that Holdings already has enough assets to pay all of its creditors in full is also a bar to fraudulent transfer claims under the Bankruptcy Code. *Adelphia*, 390 B.R. at 94 ("[T]he Bankruptcy Code's avoidance provisions can only be asserted to benefit a creditor of the debtor in question."). This case is highly analogous to *Adelphia*. The debtors in *Adelphia* included the parent company Adelphia Communications Corporation ("Adelphia") and several of its subsidiaries (the "Obligor Debtors"). *See id.* at 83–85. The creditors' committee alleged fraudulent transfer claims for transfers made by the Obligor Debtors in an attempt to increase the recovery for creditors of Adelphia, the corporate parent. *See id.* at 91. Like in this case, the creditors' committee[15] asserted these fraudulent transfer claims after the bankruptcy court granted procedural standing to assert claims in an adversary proceeding. *See id.* at 88–89. Like Holdings' creditors in this case, all of the creditors of the Obligor Debtors were to receive full payment of all of their claims. *Id.* at 91. And like in this case—where the Committee alleges fraudulent transfers by Holdings in an attempt to increase recoveries for the creditors of the separate OpCo Entities— the complaint in *Adelphia* alleged fraudulent transfer claims for transfers made by the Obligor Debtors in an attempt to increase the recovery for Adelphia's creditors.

---

[15] After commencement of the adversary proceeding, the *Adelphia* creditors' committee's claims were transferred to the Adelphia Recovery Trust, who became the plaintiff in the adversary proceeding. *See id*. at 83.

In a detailed and thoughtful opinion, Judge McKenna explained that in order to show Article III standing, fraudulent transfer claims could only proceed where they would generate a recovery for creditors of the specific transferor entities; it was not enough that the claims sought a recovery for creditors of a separate corporate affiliate. *See id.* at 94–95. "Given that the creditors of the Obligor Debtors have received full payment with interest under the Plans, it follows that these creditors do not stand to benefit from recovery on the Bankruptcy Claims at issue here, and the [Adelphia Recovery Trust] does not have standing to bring these claims on their behalf." *Id.* at 95. The court held that bankruptcy courts must look to the actual transferor entity, and determine whether any of the transferor's creditors have unpaid claims. *See id.* The court further concluded that where all transferor creditors are being paid in full, no party has standing to sue for fraudulent transfer, whether under state law or 11 U.S.C. § 548. *See id.* at 92–97; *see also In re Murphy*, 331 B.R. 107, 126 (Bankr. S.D.N.Y. 2005) ("Given the important principle that bankruptcy courts should recognize state law to the extent that it does not conflict with federal interests and Section 548's limited purpose as a fraudulent conveyance law, the trustee in this case has the right to avoid the transfer of the Property as fraudulent but only to the extent necessary to satisfy allowed prepetition and administrative creditor claims, *i.e.,* those *legally* harmed by the transfer.").

In *Adelphia*, as here, the Adelphia Recovery Trust sought to cure its lack of standing by arguing that the bankruptcy court had previously granted the creditors' committee procedural standing to commence its adversary proceeding, and by invoking its rights as a hypothetical lien creditor. *See id.* at 88–89, 96. The court rejected this argument, explaining that the bankruptcy court's order allowing the creditors' committee to pursue claims did not resolve "the question of whether the Creditors' Committee had standing to prosecute specific claims." *Id.* at 88–89. Further, the court noted that the rights of the creditors' committee as a hypothetical lien creditor

75

were limited to asserting claims that would actually lead to an additional recovery for the creditors of the transferor entity. *Id.* at 93 ("[A]n obligation or transfer cannot be avoided as a fraudulent transfer or preference under sections 544, 547 and 548 of the Bankruptcy Code when doing so would not benefit any creditor of the particular debtor that incurred the obligation or made the transfer.").

Many courts have held that fraudulent transfer claims are improper where, as here, the creditors of the transferor are being paid in full. *See New Life*, 2014 WL 6851258, at *6 ("[E]ven applying the broadest application of the 'benefit to the estate' requirement, there is no conceivable benefit to the estate, either directly or indirectly. The Plan provided for full payment of all creditor claims. . . ."). Likewise, in *Adelphia*, the plaintiff argued that recovery would benefit creditors of the parent Adelphia. The court explained that this was insufficient, because there was no benefit to the creditors of the actual transferors:

> [N]o creditors of the Obligor Debtors, the specific debtors whose transfers and obligations the ART seeks to avoid, would benefit from recovery on these claims, as all creditors have been paid in full with interest under the Plans, and no creditors have been issued shares of the ART. It is therefore impossible to see how any recovery by the ART could result in any benefit, direct or indirect, to the creditors of the Obligor Debtors.

*Adelphia*, 390 B.R. at 97. If anything, the *Adelphia* creditors had a stronger argument regarding lack of benefit than the Committee does in this case, as the *Adelphia* creditors arguably could have benefitted if Adelphia's solvent subsidiaries recouped transferred assets, thereby further strengthening their financial position. *Id.* at 95 (entertaining and then rejecting the debtor's argument "that an indirect benefit to the creditors by way of a more financially sound estate could suffice to provide the necessary benefit"). Here, the solvent debtor is the *parent company* (Holdings), meaning that even if the Committee is successful in transferring property from the PropCo Entities to Holdings, it still would not benefit the creditors at Holdings' subsidiaries (the

OpCo Entities) because the Committee has not sued to pierce the corporate veil. *See In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) (*"As a rule, parent and subsidiary corporations are separate entities, having separate assets and liabilities. . . . Hence, the parent's creditors have no claim to the subsidiary's assets, and *vice versa.*"*) (Internal citations omitted).

The Committee has argued that its lack of standing and lack of benefit to the estate can be ignored because this "presupposes" the validity of the Debtors' corporate structure, but this ignores that piercing the corporate veil is not a recognized remedy for fraudulent transfer. *See* 11 U.S.C. § 548 (limiting remedies to "avoidance" of the transfer). To allow the OpCo Entities' creditors to recover from Holdings after avoiding transfers from Holdings to the PropCo Entities, the Committee would have needed to have separately pled a claim for veil piercing in the Complaint, which it has failed to do. The Committee has pled a claim for substantive consolidation but, as discussed *supra*, this claim fails because the Committee fails the *Owens Corning* test.

C.    **The Committee Has Failed to Prove that Holdings Intended to Delay, Hinder, or Defraud Its Creditors.**

The claims alleging actual fraudulent transfer by Holdings also fail because the Committee has failed to prove that Holdings actually intended to defraud any of its creditors. To the contrary, the record shows that Holdings kept all of the Haggen-related assets in wholly-owned subsidiaries and Holdings' creditors are estimated to recover 100 percent of their claims. If there was an attempt to defraud Holdings' creditors, it was a rather unsuccessful one.

The Committee tries to move the goalpost by arguing that Holdings intended to defraud the OpCo Entities' creditors. *See* D.I. 111 at 2 ("Comvest structured the transactions in a manner intended to hinder, delay or defraud the OpCo Entities' unsecured creditors."). This argument fails as a matter of fact and law.

77

There is an abundance of evidence that Defendants did not intend to hinder, delay, or defraud anyone. The OpCo Entities were well capitalized, and the testimony was that Comvest and its directors did everything they could to work for OpCo Entities' success. In addition, almost none of the badges of fraud are present here. The transfers of the right to acquire real property to the PropCo Entities was not concealed in any way; to the contrary, the deeds conveying the property from Albertson's property-holding companies to the PropCo Entities, Spirit, and GIG were publicly recorded. *See, e.g.* DX0219; DX0232; DX0250; DX0251; DX0268. Holdings was not under threat of suit when the transfers were made. The transfers were not for substantially all of Holdings' assets, as it continued to own the valuable membership interests of its wholly-owned subsidiaries. Holdings did not "abscond"—indeed, it is willing and able to pay all of its creditors. Holdings received equivalent value for the transfers because the property was placed in its wholly-owned subsidiaries. And finally, Holdings has at all times been solvent. Simply put, there is no evidence of an intent to defraud; there is only evidence of intent to build and grow a business.

Nor did the Committee prove that the use of the OpCo/PropCo legal structure was intended to defraud creditors. The Committee has stated that the OpCo/PropCo structure "is what's on trial" here, but admitted that these OpCo/PropCo corporate structures are not themselves improper. 10/16/17 Tr. 8:9–10 ("This chart, Your Honor, is what's on trial.") (Mr. Morris); 9/26/17 Hr'g Tr. 50:6–7 ("There is nothing, *per se*, wrong about the PropCo and OpCo structure.") (Mr. Feinstein). Witnesses provided extensive testimony about the business and financial reasons for using this type of structure. *See* 10/17/17 Tr. at 90:8–91:25 (Mr. Niegsch); *id.* at 161:1–25 (Mr. Barnett); *see also* 10/18/17 Tr. at 184:14–19 (Ms. Flaton) (calling "OpCo/PropCo structures" "fairly common" in the "business world"). In any event, the Committee fails to take into account that Comvest was not the first party to utilize an OpCo/PropCo structure with regard to the assets

acquired from Albertson's—the operating and real estate assets had been held in an OpCo/PropCo structure when those assets were owned by Albertson's and before they were transferred to the OpCo Entities and the PropCo Entities, respectively.  B. Beckstrom Dep. at 17:19–19:18.[16]  The Committee has not cited a single case in which maintaining a preexisting OpCo/PropCo structure amounted to a fraudulent transfer, and there are none.

But even if there was an actual attempt to defraud the OpCo Entities' creditors, that would still not provide the basis for a claim alleging fraudulent transfer by Holdings to the PropCo Entities.  The statutory text is clear:  11 U.S.C. § 548 only allows courts to avoid transfers made with an intent to defraud the ***transferor's*** creditors—here, Holdings.  The Court may avoid a transfer if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity ***to which the debtor was or became***, on or after the date that such transfer was made or such obligation was incurred, ***indebted***."  11 U.S.C. § 548(a)(1)(A) (emphasis added).  The law could not be clearer:  Section 548 limits claims for fraudulent transfer to transfers that harm the transferor's creditors, not the creditors of some other entity.

The Committee's case theory is ultimately that Comvest undercapitalized the OpCo Entities.  The evidence at trial demonstrated that that was not the case.  But even if it had been proven, it would not have given rise to a claim for fraudulent transfer.  Intentional undercapitalization has a number of remedies at law and equity, but a legal claim for fraudulent transfer is not one of them.  Section 548 requires a "transfer"—there is no such thing as a claim for fraudulent non-transfer.

---

[16]    Indeed, the Haggen Family utilized an OpCo/PropCo structure before it sold the original chain to Comvest.  *See* 10/16/17 Tr. at 194:15–195:4 (Mr. Caple); G. Hall Dep. at 71:10–16.  Comvest only bought the operating assets (Haggen, Inc.) from the Haggen Family; the real estate was held in an entity called Briar Development, which the Haggen Family still owns.  *See id.*; G. Hall Dep. at 58:9–19.

D.    **The Constructive Fraudulent Transfer Claims Against Holdings Fail Because Holdings Was Solvent at the Time of the Transfer.**

It is the Committee's burden to prove that Holdings was insolvent at the time it made the transfer. *See In re EBC I, Inc.*, 380 B.R. 348, 354 (Bankr. D. Del. 2008). Here, there is no evidence that Holdings was insolvent. And the Committee cannot seriously contend that Holdings is insolvent now, as its whole theory of the case is premised on recovering value from Holdings' equity and using it to pay the OpCo Entities' creditors. Instead, in its Opposition Brief to Defendants' Motion for Partial Summary Judgment, the Committee argues that *if* the Court grants the separate relief of substantive consolidation, *then* Holdings would be rendered insolvent and its claims for constructive fraudulent transfer could proceed. *See* D.I. 111 at 28. This fails for three reasons.

First, substantive consolidation "eliminates constructively fraudulent transfer avoidance claims" among the consolidated entities. *In re Bauman*, 535 B.R. 289, 301 (Bankr. C.D. Ill. 2015) (This is because "the consolidated estate is augmented and diminished in equal amounts . . . ."). If the Court grants substantive consolidation, then the claims for constructive fraudulent transfer all fail. *Id.*

Second, for purposes of constructive fraudulent transfer, solvency is measured at the time of the *transfer*. *See In re R.M.L., Inc.*, 92 F.3d 139, 154 (3d Cir. 1996) (holding that "solvency is measured at the time the debtor transferred value, not at some later or earlier time"). Even if Holdings is rendered insolvent by some future ruling, that does not retroactively make Holdings insolvent at the time of transfer. *Id.*

Third, the Committee has not put forth any evidence that establishes that if the Court consolidated all of the entities together, then Holdings was insolvent at the time of the transfers in question. The Committee's expert has testified that the ***OpCo Entities*** may have been insolvent

80

from the moment that the APA was signed, but the Committee's expert did not testify that if you consolidated the OpCo and PropCo Entities' assets and liabilities, then that hypothetical consolidated entity was insolvent when the new stores were acquired.

E.    **The Constructive Fraudulent Transfer Claims Against Holdings Fail Because Holdings Received Reasonably Equivalent Value.**

The Committee also has the burden of establishing that Holdings did not receive reasonably equivalent value when it transferred the right to acquire the real property from Albertson's to the PropCo Entities. *See In re Key3Media Grp., Inc.*, 336 B.R. 87, 94 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006) (citing *Mellon Bank, N.A. v. Metro Commc'ns, Inc.,* 945 F.2d 635, 646 (3d Cir. 1991)).  The Committee failed to meet this burden because it is undisputed that the PropCo Entities are—and at all times were—solvent, wholly-owned subsidiaries of Holdings.

Courts recognize that a transfer to a solvent, wholly-owned subsidiary does not amount to a fraudulent transfer.  *In re DVI, Inc.*, 326 B.R. 301, 306 (Bankr. D. Del. 2005) (Where a debtor "made a contribution to a solvent wholly-owned entity, the Committee would not be able to state a fraudulent transfer claim.").  The reasoning behind this rule is sound.  It is not fraudulent to allocate property to a solvent, wholly-owned subsidiary because the transferor receives value equal to the transferred asset. *See Branch v. F.D.I.C.*, 825 F. Supp. 384, 399–400 (D. Mass. 1993) ("The Court is aware of no case in which transfers to a solvent subsidiary have been determined to be for less than equivalent value.").  That is exactly what happened in this case, the transfer was to downstream, wholly-owned subsidiaries.



It is undisputed that the non-debtor PropCo Entities are solvent, meaning that the value of the transferred property is ultimately available to satisfy any claims made by Holdings' creditors. *See also In re First City Bancorporation of Tex., Inc.*, 1995 WL 710912, at *18 n.9 (Bankr. N.D. Tex. May 15, 1995) ("[A] transfer to a wholly-owned solvent subsidiary is often for reasonably equivalent value, because the value of the parent's stock interest in the subsidiary may be correspondingly increased . . . .").

F.    **This Case Is Highly Distinguishable from *Mervyn's*.**

Throughout these proceedings, the Committee has argued that this case is analogous to *Mervyn's*, but this theory has not been borne out on trial.  Mervyn's was a longstanding department store chain owned by the Dayton Hudson Corporation.  *See In re Mervyn's Holdings, LLC,* 426 B.R. 488, 492 (Bankr. D. Del. 2010).  In 2003, in order to devote more resources and attention to its Target line of stores, Dayton Hudson Corporation spun off the entire Mervyn's business in an ***equity*** transaction, transferring the membership interest in Mervyn's LLC to Mervyn's Holdings LLC.  *See id*. at 493.  The private equity sponsors that owned Mervyn's Holdings thus acquired Mervyn's LLC as an ongoing enterprise with many ***preexisting*** creditors and liabilities.  *Id.*

82

For decades, Mervyn's LLC and its predecessor corporation had owned both operating assets and valuable real property. *Id.* As part of the 2003 sale, the real property was "stripped"— *i.e.,* transferred from Mervyn's LLC to "bankruptcy remote" entities **outside of the Mervyn's ownership** structure for "virtually no consideration." *Id.* at 500. The "MDS Companies" that received the real property were ultimately owned by the same private equity sponsors, but were not subsidiaries of Mervyn's Holdings. *Id.* at 498. The effect of this transaction was that the real estate assets were taken from the company and transferred to an entity outside the reach of Mervyn's LLC's creditors in a transaction that allegedly rendered Mervyn's LLC insolvent. *Id*. Mervyn's LLC's creditors went from holding claims against a solvent company with substantial real estate assets to holding claims against an insolvent shell company.

The central holding of *Mervyn's* was that it is improper to acquire an entity that has held real property and operating assets together for years, and then transfer the real property to a separate entity (PropCo) in a transaction that renders the predecessor entity (OpCo) insolvent and prejudices the predecessor entity's longstanding, preexisting creditors. That is not what happened here, because:

1. Albertson's held the real property and operating assets in an OpCo/PropCo structure prior to the Albertson's Acquisition;

2. the Albertson's Acquisition was an asset sale—not a stock sale—which means that Holdings did not acquire a preexisting entity with preexisting creditors;

3. the OpCo Entities themselves had no preexisting creditors, and at no time did they ever own any real estate;

4. Holdings transferred the real property downstream to wholly-owned subsidiaries;

5. there is no evidence that Holdings is, or ever was, insolvent;

6. the Committee is not seeking to collapse the entire transaction; and

83

7. the Court now has the benefit of the evidence presented at trial, whereas the Court in *Mervyn's* was bound to "accept as true all factual allegations" on what was a pending motion dismiss.

The first day of trial, the Committee promised that it would prove that Albertson's had not used an OpCo/PropCo structure. 10/16/17 Tr. 14:1–7 ("[w]hen [Albertson's] owned them owned them . . . they didn't have this OpCo/PropCo structure, right?  That's what the evidence will show.") (Mr. Morris).  But this claim was not borne out.  Instead, the unrebutted evidence is that Albertson's used the same OpCo/PropCo structure used by Holdings to hold the assets.  *See* B. Beckstrom Dep. at 17:19–19:18; DX0519– DX0585.  Likewise, the unrebutted testimony was that the legacy Haggen stores were held in the same manner before Comvest ever came into the picture. *See* G. Hall Dep. at 71:10–16.  There can be no prejudice to any creditor at the OpCo Entities when Defendants utilized the same OpCo/PropCo structure that Albertson's utilized when those creditors did business with Albertson's.

The Albertson's Acquisition was also an asset sale—not a stock sale—which means that Holdings did not acquire a preexisting entity with preexisting creditors.  In *Mervyn's*, the private equity sponsors bought an ongoing entity—with preexisting creditors—that had held the real property and operating assets together for years.  Here, the OpCo Entities' creditors extended credit to an entirely new entity that had never done business before the Albertson's Acquisition and that never owned real property.

In *Mervyn's*, the Court noted that the transfer of the real property from Mervyn's LLC to the MDS Companies had a "devastating" effect on Mervyn's LLC, the transferor.  *Id.* at 498.  Here, there was no devastating effect on the transferor, because Holdings—not the OpCo Entities—was the transferor and Holdings transferred the real property ***downstream*** to wholly-owned subsidiaries (the PropCo Entities).  This means that the property was not transferred outside the reach of any Holdings creditor because the value of the real property sat at Holdings' wholly-owned

subsidiaries. The property likewise was not transferred outside the reach of the OpCo Entities' creditors, because it was never available to them in the first place. And, as discussed above, the Committee has not and cannot show that Holdings was insolvent at any point in time.

This case is also distinguishable from *Mervyn's* because that case collapsed the entire transaction and unwound the payments made to Target, the former owner of Mervyn's. *See Mervyn's*, 426 B.R. at 497. Here, unlike *Mervyn's*, the Committee is conspicuously not seeking to unwind all of the transfers. There is no claim asserting that any of the payments to Albertson's were fraudulent, and there is likewise no claim seeking to unwind rent payments to Spirit or GIG. The Committee alleges that the OpCo Entities paid above market rent to both Spirit and GIG, but has failed to actually sue them or avoid these transfers.

The relief that the Committee seeks is thus simultaneously too broad and too narrow. It seeks to "unwind" transfers that never occurred and to recover property for the OpCo Entities' estates that they never owned in the first place. But the Committee is also seeking to unwind only half of the transaction, collapsing and unwinding internal transfers to wholly-owned subsidiaries, while leaving the related payments and transfers to Albertson's, Spirit, and GIG in place. This has no support in the law and is unlike anything that took place in *Mervyn's*.

In *Mervyn's*, the Court ruled that it was appropriate to "collapse" the transaction, so that Target could be treated as a transferee even though the transfer of the real property took place after target sold Mervyn's Holdings. *Mervyn's,* 426 B.R. at 497 ("Instead of focusing on one of several transactions, a court should consider the overall financial consequences these transactions have on the creditors."). Because the Committee is not asserting any claims against Albertson's, such collapse is not needed here. *Id.* But, importantly, even if the Court does collapse the transfers in this case, that does not mean that any of the claims for fraudulent transfer survive.

Collapsing a transaction is not the same thing as a finding of fraudulent transfer; it is merely a tool to allow the Court to view the overall economic effect of a transfer. *Id.* After a court collapses a transaction, it still needs to apply traditional fraudulent transfer rules to see if there was any fraudulent transfer. *Id* If the transactions here are collapsed, the result is a simple transfer of real property from Albertson's (the original transferor) to PropCo (the ultimate transferee). Collapsing the transactions does not save the Committee's claims because at no intermediate step of any of the transactions did OpCo ever have any interest in the real property. That is a clear difference from Mervyn's, in which Mervyn's LLC had owned the real property for years.

In addition, the Court may only collapse the "transaction," the collapse doctrine does not allow the court to collapse separate entities, or pierce the corporate veil, or disregard the corporate form. *Id*. To collapse "entities" under Delaware law, a plaintiff must satisfy the stringent veil piercing elements, something the Committee has not even attempted to do here. *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990)

This case is also different from *Mervyn's* because in *Mervyn's* the unpaid creditors were creditors of the transferor (Mervyn's LLC) and had standing to sue, and because avoiding the transfer and returning the property to the transferor would actually benefit the transferor's creditors. As discussed above, the transferor in this case is Holdings—the OpCo Entities' creditors do not have standing to sue on behalf of Holdings and avoiding the transfers in question would provide no benefit to Holdings' creditors.

Finally, the procedural posture of this case is different from the procedural posture in *Mervyn's*. *Mervyn's* resolved a motion to dismiss filed by Target, the former owner of Mervyn's

86

LLC. Here, the Court has the benefit of the evidence presented at trial. And the evidence presented at trial shows that this case is not like *Mervyn's* at all.[17]

## V.    THE COURT SHOULD REJECT THE OPCO ENTITIES' FRAUDULENT TRANSFER CLAIMS (COUNTS 20–38).

The only fraudulent transfer claims for transfers made by the OpCo Entities are for rent payments made by OpCo North and South to the PropCo Entities to lease the 28 Retained Properties. D.I. 1 at Counts 20–38.[18]  OpCo North and South did not own any real property, and therefore these leases were necessary for the operation of OpCo North and South's grocery stores. Moreover, the Committee has stipulated that the rental payments and obligations were market. Accordingly, the Committee has failed to show that these rental obligations under the PropCo Leases were constructively or actually fraudulent. In addition, the Committee has failed to provide any cognizable evidence of damages.

### A.    The Constructive Fraudulent Transfer Claims Fail Because The PropCo Leases Were For Reasonably Equivalent Value.

The Committee cannot meet this burden to prove a constructive fraudulent transfer because the OpCo Entities' rental obligations under their leases with the PropCo Entities were at market rates. Under Section 548(a)(1)(B) and its state law analogues, it is an essential element of a constructive fraudulent transfer claim that the transfer is not for reasonably equivalent value. 11 U.S.C. § 548(a)(1)(B). The Committee bears the burden of establishing this element. *See In re*

---

[17]    In Count 78 of the Complaint, the Committee objects to the allowance of claims due to pending avoidance actions. D.I. 1 at ¶¶ 759–61. The Committee makes this objection based on Counts 1–65 of the Complaint. *Id.* at ¶ 760. For reasons set forth in Parts IV and V of these Conclusions of Law, the Court should reject Counts 1–65 of the Complaint. Under such circumstances, Count 78 would fall away as well.

[18]    In Count 76 of the Complaint, the Committee asserts that "if any of the PropCo Leases are avoided, the PropCo Entities' Lease Claims must be disallowed." D.I. 1 at ¶ 750. This claim is just an extension of the Committee's fraudulent transfer claims related to the leases with the PropCo Entities (Counts 20–38). When those claims fail, this claim disappears. However, even if the Committee successfully avoids any lease, the PropCo Entities may still have non-contractual claims related to the Debtors' occupancy and use of the premises.

*Key3Media Grp.*, 336 B.R at 94.  Throughout its Complaint, the Committee alleged that these rent payments were "above-market," but discovery has not borne this theory out.  D.I. 1, ¶¶ 57, 60, 127; *see also*, *e.g.*, D.I. 1, ¶¶ 316, 331, 338 ("OpCo North received less than reasonably equivalent value from PropCo North.").  After several pointed discovery requests on this issue, the Committee has now stipulated in the Pretrial Order that "Plaintiff will not offer any evidence that the rents paid by Operations and the OpCo Entities to the PropCo Entities were above-market."  D.I. 142 at 21.  Paying fair market rent for access to real property that the OpCo Entities needed to operate their business is a textbook example of reasonably equivalent value.  That should be the end of the inquiry for the constructive fraudulent transfer claims.

In light of these facts, the Committee now argues that, while the rents were market, the OpCo Entities "did not receive reasonably equivalent value for their incurrence of long-term lease obligations as they were incapable of sustaining ordinary course business operations in the leased locations beyond a few months."  D.I. 111 at 38.[19]  As an initial matter, while the Committee refers to "obligations" vaguely, the PropCo Leases were simple:  the OpCo Entities paid monthly rent— admittedly fair market rent—for use of the real property.  *See, e.g.,* DX0791-0008 ("Tenant shall pay to landlord, the Base Monthly Rent . . . on or before the first day of each month").  Undeterred, the Committee analogizes its argument to offering a dying patient a 10-year car lease.  *See* 9/26/17 Hr'g. Tr. at 61:22–62:6.  But this analogy shows the defect in the Committee's argument.  The leasehold estate given to the OpCo Entities had value, just as the right to use a car has value.  And the Committee has stipulated that the monthly rent due under the lease was reasonably equivalent to that value.  Even if the OpCo Entities were undercapitalized (or terminally ill), nothing would

---

[19]    *See also* D.I. 111 at 39 ("The ability to use the lease location for just a period of months until the lack of liquidity forced a shutdown is not reasonably equivalent value for the OpCo Entities' incurrence of long term lease obligations to the PropCo Entities regardless of whether the rents fixed thereunder were at or above market.").

prevent them from monetizing that value by assigning the lease, either before or during bankruptcy.

Further, the OpCo Entities **assumed** many of the PropCo Leases in the larger bankruptcy because the leases were in the best interest of the debtors' estate.  This assumption bars the Committee's fraudulent transfer claims with respect to these leases as a matter of law.  *See In re Network Access Sols., Corp.*, 330 B.R. 67, 76 (Bankr. D. Del. 2005).   In order to approve this assumption, the Court found that the assumption of these leases was "in the best interest of the Debtors," and this finding is now the law of the case.  *See, e.g.*, Order Authorizing The Debtors To Assume Certain Unexpired Leases, Case 15-11874, D.I. 1716 at 1 ("[T]he relief requested in the Motion and provided for herein is in the best interest of the Debtors.").  It would not have been a "sound exercise of [debtors'] business judgment to assume the [leases] if it was not receiving equivalent value for the payments it was making under the agreements."  *Network Access Solutions*, 330 B.R. at 76.  And even if the Committee's claim is limited to the rejected leases, the Committee has still failed to offer a shred of evidence as to what the value of those leases was, and whether or not it was reasonably equivalent to the rent due under those leases.  This evidentiary failure by itself is sufficient to resolve these claims in Defendants favor. [20]

Finally, the Committee conflates its available remedies.  The Committee is seeking to recoup the monthly rents actually paid by the OpCo Entities.  D.I. 142 at 52 (Committee seeks to

---

[20]    To prove constructive fraudulent transfer claims, the Committee must also prove that the transferor is insolvent or will be rendered insolvent by the transfer.  11 U.S.C. § 548(a)(1)(B) (ii).  The Committee presented evidence through its expert, Mr. MacGreevey, that the OpCo Entities were insolvent as of December 10, 2014.  But that approach is fundamentally flawed.  If this Court refuses to credit Mr. MacGreevey's solvency analysis as of December 10, 2014, the Committee has no additional evidence of insolvency.  Accordingly, if this Court does not credit Mr. MacGreevey's solvency analysis, then there is no evidence (and no later solvency analyses) in the record to support the Committee's view that the OpCo Entities were insolvent at the time that they entered the PropCo Leases.

"recover all amounts paid under the PropCo Leases.").[21]  But this cannot be the case, because in exchange for these payments the OpCo Entities actually received the right to operate, and did operate, on the real property.  At most, the Committee's available remedy would be to avoid the *future* rent payments for the rejected leases.  The future rent payments already form the basis of the PropCo Entities' lease rejection claim, which the Committee already seeks to disallow in this case.  *See* D.I. 1 at Count 76.

B. **The Actual Fraudulent Transfer Claims Fail Because the PropCo Entities Did Not Intentionally Defraud the OpCo Entities' Creditors Through the Payment of Market Rent.**

To support a claim of actual fraudulent transfer, the Committee must prove that the PropCo Entities signed the PropCo Leases with an "actual intent to hinder, delay, or defraud" the OpCo Entities' creditors.  11 U.S.C. § 548.  To be clear, the OpCo Entities did not own real estate so the PropCo Leases were necessary to operate their business for those 28 stores, and the Committee has stipulated that the the PropCo Leases were at (or below) market.  The OpCo Entities' creditors were not defrauded by the OpCo Entities' decision to enter a lease that it needed at a fair market price.  To the extent that the Committee tries to challenge these leases under the framework of their challenge to the OpCo/PropCo structure generally, it fails here for the same reasons described earlier in the previous fraudulent transfer section.  *See infra* Part IV, Section B–C.  In sum, the Committee has failed to prove their constructive or actual fraudulent transfer claims based on rent payments owed under the PropCo Leases.

---

[21] Notably, the Committee has not set forth any calculation of the "amounts paid under the PropCo leases" meaning that the Court has no ability to assign damages.  Because the Committee's damages would be limited to the PropCo Leases that were not assumed in the bankruptcy, and the stores opened on a rolling basis over the course of months, it is not a simple calculation to determine the amount of rent.  The trial is now finished, and the Committee has presented no calculation of prepetition rent paid by the OpCo Entities to support its damages theory.

## VI.    THE COURT SHOULD REJECT THE COMMITTEE'S BREACH OF FIDUCIARY DUTY CLAIMS AT HOLDINGS (COUNTS 66 & 68).

Counts 66 and 68 allege that Comvest (as the controlling shareholder) breached its fiduciary duty to Holdings and that Holdings' Managers breached their fiduciary duty to Holdings. D.I. 1 at ¶¶ 669, 689–693.  These are legally and factually unsupported.  First, Holdings was solvent and therefore all the fiduciary duties were to act in the interest of Holdings' equity—not, as the Committee claims, its creditors and subsidiaries.  Second, the majority of the improper conduct alleged by the Committee was part of arms-length transactions with third parties, and it is a foundational tenet of Delaware law that this conduct is protected by the Business Judgment Rule. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971).  Finally, the Committee is seeking damages sufficient to make every single creditor at every level of the Haggen corporate structure whole, yet it made no effort to present any evidence of what this hypothetical amount would be. The Committee did not disclose any evidence of damages in discovery, it did not present any such evidence at trial, and now there is nothing in the record to support its potentially enormous damages request.

### A.    Legal Standard for Breach of Fiduciary Duty

Delaware courts recognize that a parent company does not owe fiduciary duties to its direct or indirect subsidiaries.  *See Trenwick Am. Litig. Tr. v. Ernst & Young, LLP*, 906 A.2d 168, 173–74 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett,* 931 A.2d 438 (Del. 2007). Similarly, directors of a parent corporation do not owe fiduciary duties to subsidiary corporations. *Id*.

When analyzing breach of fiduciary duty claims, Delaware courts apply one of three standards of review:  (a) the business judgment rule; (b) enhanced scrutiny; or (c) entire fairness. *Reis v. Hazelett Strip-Casting Corp.,* 28 A.3d 442, 457 (Del. Ch. 2011).  "The business judgment

91

rule is the default standard of review." *Id.* The business judgment rule provides a "powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'" *Cede & Co. v. Technicolor, Inc.*., 634 A.2d 345, 361 (Del. 1993) (quoting *Sinclair Oil*, 280 A.2d at 720).

The burden is on the plaintiff to show that the business judgment rule should not be applied. *See Solomon v. Armstrong,* 747 A.2d 1098, 1111–12 (Del. Ch. 1999) ("Under the business judgment rule, the burden of pleading and proof is on the party challenging the decision to allege facts to rebut the presumption."). The plaintiff faces "an uphill battle" to carry this burden of proof. *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *9 (Del. Ch. 2014); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumption of the business judgment rule on the merits is a near-Herculean task.").

One circumstance that can trigger entire fairness review is when a controlling shareholder engages in a "conflicted transaction." *Crimson Expl.,* 2014 WL 5449419 at *12. The mere presence of a controlling shareholder, however, will not trigger the "entire fairness" review. *Id.* Instead, the plaintiff much show the controlling shareholder either: (a) stood on both sides of the transaction at issue; or (b) "compete[d] with the common [shareholder]" by obtaining a personal benefit that the other shareholders did not receive. *Id.*; *see also id.* at *14 ("In sum, triggering entire fairness review requires the controller or control group to engage in a conflicted transaction. That conflict transaction could involve standing on both sides of the transaction . . . or receiving different consideration than other stockholders."); *In re Synthes Inc. S'holder Litig.*, 50 A.3d 1022, 1034 (Del. Ch. 2012) (recognizing that in order to trigger the "entire fairness standard," the

plaintiff must prove that the controller derived a personal, financial benefit "to the exclusion of, and detriment to, the minority stockholders").

Courts recognize contractual agreements where the fiduciary duties have been limited.  *See Ross Holding & Mgmt. Co. v. Advance Realty Grp., LLC*, 2014 WL 4374261, at *12 (Del. Ch. Sept. 4, 2014) ("Nonetheless, where such default rules have been clearly supplanted or modified, those contractual choices will be respected.").  For example, Delaware law permits the members of a limited liability company to adopt provisions in their operating agreement that limit "any and all liabilities for breach of contract and breach of duties (including fiduciary duties)" with the exception of "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."  6 Del. C. § 18-1101(e).  These "exculpatory clauses" immunize managers from claims for breach of the duty of care, but not claims for an act of bad faith or breach of loyalty.  *Stone v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006).   In addition, when an exculpatory clause immunizes the managers of a limited liability corporation from breach of fiduciary duty claims, a controlling equity holder is likewise immunized.  *See Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *16 (Del. Ch. July 26, 2010) (recognizing, in dismissing a claim for breach of the duty of care based upon the exculpatory clause that mentioned only directors, that "a controlling stockholder cannot be held liable for a breach of the duty of care when the directors are exculpated.").

Finally, a breach of fiduciary duty is a derivative claim, and damages will go to the corporation and not to the creditors.  *See Americas Mining Corp. v. Theriault,* 51 A.3d 1213, 1264–65 (Del. 2012).  It is well settled that a plaintiff alleging a breach of fiduciary duty claim must prove its damages by a preponderance of the evidence.  *See Beard Research,* 8 A.3d at 613.  The Court cannot award damages that are based on mere speculation or conjecture where a plaintiff

has failed to adequately prove damages.  *See id*; *see also Cline v. Grelock*, 2010 WL 761142, at

*2 (Del. Ch. Mar. 2, 2010) (holding that despite the fact that the defendant had breached its

fiduciary duty the plaintiff recovered nothing because it had failed to prove any damages).

B.     **The Committee Wrongly Asserts That A Solvent Holdings Should Act In The Interest Of Holdings' Subsidiaries Or Creditors.**

The Committee tells this Court that "Holdings' Managers owed the **Debtors** fiduciary

obligations"—implying that they owed duties to Holdings' subsidiaries such as the OpCo Entities.

D. I. 1 ¶ 693 (emphasis added).  This is contrary to established law.  "Under settled principles of

Delaware law, a parent corporation does not owe fiduciary duties to its wholly-owned subsidiaries

or their creditors."  *Trenwick*, 906 A.2d at 191.[22]  And, because Holdings does not owe any

fiduciary duties to its subsidiaries, that means that "directors of a corporate parent" do not owe

fiduciary duties to a subsidiary.  *Id*. at 191–92.

Separately, the Committee asserts that their breach of fiduciary duty claim is that Holdings'

Managers and Comvest (as a controlling shareholder) acted "for Comvest's benefit" "at the

expense of the Debtors' **unsecured creditors**."  D.I. 1 at ¶ 695 (emphasis added).  But Holdings is

currently solvent and was solvent at the time of Albertson's Acquisition and the Challenged

Transactions.  The Committee has presented no evidence or expert testimony to the contrary.  This

fact is crucial because it means that the controlling Managers at Holdings were "obligated only to

manage    the    affairs    of    the    subsidiary    in    the    best    interests    of    the    parent    and    its

---

[22]   "Delaware law does not blithely ignore corporate formalities and the [plaintiff] has not explained how the [parent's] directors, as opposed to [the parent], can be deemed to be a 'controlling stockholder' group that owes fiduciary duties to a subsidiary." *Trenwick*, 906 A.2d at 194, *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).  Further, when dealing with multiple layers of parents and subsidiaries, the corporate veil likely must be pierced at each level. *See, e.g., In re The Heritage Org.,* 413 B.R. 438, 514 (Bankr. N.D. Tex. 2009) (interpreting Delaware corporate law and holding that the veil piercing test must be applied to and satisfied at each level of ownership).  In this matter, the Committee did not assert a claim to pierce the corporate veil of any entity.

shareholders." *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988); *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 184 (Del. Ch. 2014) ("The fiduciary duties of the directors and officers require that the subsidiary be managed for the benefit of the controller [equity-holders], and the fiduciary duties imposed on the controller self-referentially require the same thing."). Solvent companies are not obligated to act for the benefit of creditors. When the Committee tells this Court that its breach of fiduciary claim is based on Holdings' obligations to "unsecured creditors" or Holdings' subsidiaries—rather than the equity—it is pointing the obligations in the wrong direction. Accordingly to prove a breach of fiduciary duty to a solvent Holdings, the Committee must prove that Defendants acted contrary to the interests of Holdings' equity, and Comvest owns nearly all the equity in Holdings.[23]

### C.     The Committee's Duty of Care Claim Fails Due to an Enforceable Exculpatory Clause.

The Holdings' Operating Agreement contains an exculpatory provision. It states as follows: "Any fiduciary duties (including duties of care, disclosure or loyalty) that a Manager might otherwise have to the Company or Members of the Company are hereby eliminated, except to the extent as otherwise provided by law." *See* DX0641 at ¶ 12.11. (hereinafter the "Exculpatory Clause"). The Exculpatory Clause immunizes Holdings' Managers from any claim for a breach of the duty of care. *See Stone*, 911 A.2d at 369–70. Additionally, because Holdings' Managers are immune any claim for a breach of the duty of care, Comvest (as the controlling equity member) is also immune from liability for breach of the duty of care. *See Shandler*, 2010 WL 2929654, at

---

[23]     The Committee's Complaint is clear that it is alleging a breach because Holdings should have been acting in the for the benefit of Holdings' creditors and its subsidiaries' creditors. D.I. 1 at ¶¶ 693, 695. Even though Holdings was owned by both Comvest (80%) and HHI, Corp. (20%), this does not change the analysis. The alleged benefits to Comvest were also benefits to HHI both had an indirect interest in the PropCo Entities. In addition, there was no dilution of HHI's shares in Holdings. *See* G. Hall Dep. at 36:20–23. Simply put, the Committee did not allege nor did it even attempt to prove a minority shareholder dilution claim.

*16.  As a result, the Court need only examine, under the business judgment rule, whether Comvest and Holdings' Managers breached their duty of loyalty or acted in bad faith with regards to the Albertson's Acquisition.

D.    **The Committee Failed to Prove that Comvest and Holdings' Managers Breached Their Fiduciary Duties to Holdings (Counts 66 and 68).**

The Committee has made a habit throughout this case of playing fast and loose with the various parties and entities in this case.  The Committee's breach of fiduciary duty claims are no different.  The Committee tends to lump all the Debtor entities together (i.e., "owed the Debtors fiduciary obligations") and lump Defendants together (i.e., "Holdings' Managers" or "Officers and Directors") when describing the fiduciary duties that each Defendant allegedly breached.  However, Delaware courts are clear that a breach of fiduciary duty analysis must occur on a company-by-company and director-by-director basis.  *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983); *In re Rural Metro Corp. S'holders Litig.,* 102 A.3d 205, 252 (Del. Ch. 2014) ("Liability is assessed on a director-by-director basis.").  Once the Court separates out the specific parties, the specific duties, and the specific breaches, it is clear that the Committee's claims fall apart.

1.    The Committee Failed to Prove That Comvest Was On Both Sides of the Transaction.

The Committee broadly alleges that both the "Albertson's Acquisition" and the "Challenged Transactions" violated Comvest's and Holdings' Managers' duties for essentially the same reasons.  D.I. 1 ¶¶ 670, 695–96.  This imprecise pleading conflates substantially different conduct.  The Albertson's Acquisition claims allege, in essence, that the company's business plan was unrealistic and that the business decision to acquire the new stores was grossly negligent.  The Challenged Transaction claims on the other hand, assert that the use of an OpCo/PropCo structure deprived OpCo and its creditors of needed capital.  *Id.*  Both theories fail: (i) it is undisputed that

the "Albertson's Acquisition" was on arms-length transaction negotiated with Albertson's protected by the business judgment rule, and (ii) the "Challenged Transactions" did not cause any party any harm.

There is no evidence that Comvest stood on both sides of the Albertson's Acquisition. The plain language of the APA shows the agreement was between Albertson's—actually Albertson's LLC and Albertson's Holdings LLC—and Holdings. *See* DX0517. There is no evidence that Comvest had any financial interest in Albertson's such that Comvest could be accused of owning an interest in the entity that was on the other side of the transaction. The evidence shows that Cerberus—another private equity firm—owned Albertson's, and that Cerberus made several demands on Comvest in order to complete the deal, including requiring Comvest to make a $50 million infusion into Holdings. 10/17/17 Tr. at 48:17–49:3 (Mr. Niegsch). Likewise, there is no evidence that Comvest (or any other party) stood on both sides of the leases between the OpCo Entities and Spirit/GIG. Spirit and GIG are both sophisticated third parties, the negotiations of rent payments with them are classic examples of conduct protected by the business judgment rule.

There is also no evidence that Comvest derived a personal or financial benefit from the Albertson's Acquisition to the exclusion or detriment of the other shareholder, HHI. Prior to the Albertson's Acquisition, Comvest and HHI owned 80 percent and 20 percent of Holdings respectively. *See* D.I. 1 at ¶ 77; D.I. 142 at ¶ 55. Despite the fact that Comvest invested $50 million of equity into Holdings as part of the Albertson's Acquisition, HHI's interest in Holdings was not diminished at all. *See* D.I. 1 at ¶ 82; D.I. 142 at ¶ 58. HHI's representative confirmed that HHI was never asked to invest any additional funds into Holdings and yet its equity interest in Holdings never changed. *See* G. Hall Dep. at 36:20–23. Because Comvest was not on both sides of the Albertson's Acquisition and did not receive a benefit that HHI did not receive, the

Committee has failed to prove that Comvest was conflicted with regard to the Albertson's Acquisition.

As for the claims relating to the Challenged Transactions, these are essentially a rehash of the Committee's theory that the use of an OpCo/PropCo structure amounted to fraudulent transfer. The Committee argues that "Comvest" stood on both sides of (i) the contribution agreements to PropCo and (ii) the OpCo PropCo leases. D.I. 1 at ¶¶ 670, 695–96. But this is simply not true. It was Holdings and its wholly-owned subsidiaries that were parties to the contribution agreements and the OpCo/PropCo leases. The transfers among Holdings and its subsidiaries benefited Haggen's other shareholders, the Haggen family, to the exact same extent they benefitted Comvest. Because all of Haggen's shareholders, both Comvest and HHI, received the exact same treatment under all of the Challenged Transactions, there is no basis for applying the entire fairness and all of the Challenged Transactions are protected by the business judgment rule. *Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *10 (Del. Ch. Aug. 30, 2013); *In re Synthes Inc. S'holder Litig.*, 50 A.3d 1022, 1034 (Del. Ch. 2012).

Even if the Court applies the complete fairness standard, these transactions do not amount to breaches of any fiduciary duty because the Committee admits there is nothing wrong with an OpCo/PropCo structure. 9/26/17 Hr'g Tr. 50:6–7 (Mr. Feinstein). The contribution of the real property from Holdings to PropCo did not harm any party. It had no effect on any Holdings shareholder or creditor, because the property simply went from being held by Holdings to its wholly-owned subsidiary. Holdings received value that was exactly equivalent to the transferred property. *DVI,* 326 B.R. at 306. This transaction likewise caused no prejudice to OpCo because it never owned the real property in the first place. Likewise, none of the rent payments by OpCo amount to a breach of fiduciary duty. While the Committee initially alleged that the rent payments

from OpCo to PropCo were above market, they later stipulated that the rental payments and obligations were market.

The Committee is ultimately arguing that the failure to capitalize OpCo harmed the OpCo **creditors**, but not only did Comvest have no duty to capitalize OpCo with the real property, it had no fiduciary duties to the OpCo creditors whatsoever. *Trenwick*, 906 A.2d at 191. None of the Challenged Transactions can thus form the basis of any claim for breach of fiduciary duty. *Id.*

2.    <u>The Committee Failed to Prove that the Comvest Managers Were Not Independent and Disinterested.</u>

Caple, Niegsch, and Rodriguez—whom the Committee refers to as the "Comvest Managers"—were three of the five members of Holdings' Board of Managers. *See* D.I. 142 at ¶¶ 24–29). The Committee contends the Comvest Mangers lacked independence and were not disinterested board members because they were infected with Comvest's alleged conflict. *See* D. I. 144 at 34–35. As a result of this lack of independence and disinterestedness by a majority of Holdings' Board, the Committee contends that Holdings' Board was not independent and therefore their actions are subject to the entire fairness review.

The Committee, however, has failed to prove that the Comvest Managers lacked independence or disinterestedness. With regard to disinterestedness, the Committee presented no evidence that any of the Comvest Managers appeared on both sides of the Albertson's Acquisition nor could it. The Committee likewise presented no evidence that any Comvest Manager derived any personal benefit from any of those transactions. Simply put, the Committee failed to prove that any of the Comvest Managers lacked disinterestedness.

With regard to independence, the Committee's only evidence is that the Comvest Managers worked for Comvest. *See* D.I. 144 at 34–35. However, the fact that the Comvest Managers worked for Comvest is not relevant to the issue of whether the Comvest Managers were independent. *See*

99

*Crimson Expl.*, 2014 WL 5449419 at *21 (recognizing the fact that board members worked for and had been appointed by the alleged controlling shareholder was irrelevant in independence analysis of members because controller itself was not conflicted). This is especially so since Comvest itself was not conflicted. The Committee presented no other evidence of how the Comvest Managers lacked independence.

The Committee failed to show that the Comvest Managers actually lacked independence or disinterestedness. In turn, this means that the Committee failed to prove that Holdings' Board lacked independence or disinterestedness. Accordingly, entire fairness review should not apply in this case, and the Court should utilize the default rule—the business judgment rule—when reviewing Defendants' actions.

### 3. Comvest and Holdings' Managers Did Not Breach the Duty of Loyalty or Act in Bad Faith.

The Committee alleged that Comvest and Holdings' Managers acted in bad faith in relation to their duties owed to Holdings in consummating the Albertson's Acquisition and in setting up the corporate structure. *See* D.I. 1 at ¶¶ 672–674, 694–698. With regard to participating in the Albertson's Acquisition, the evidence showed that Comvest and Holdings' Managers acted reasonably, intending to advance Holdings' best interest. *See Stone*, 911 A.2d at 369. As Holdings' Managers all testified, Comvest spent hundreds of hours running different financial models and scenarios to determine whether Holdings could succeed with the Albertson's Acquisition. Comvest spent millions of dollars on experts to address potential risks associated with the acquisition in an effort to make sure it succeeded. Likewise, the evidence showed that the OpCo/PropCo structure was instituted for sound business purposes that fall squarely within the scope of the business judgment rule. The Committee failed to present any evidence that Comvest and Holdings' Managers intentionally acted with any purpose other than Holdings' best interest.

100

The evidence showed that the Defendants expended their best efforts and did all they could to work for Haggen's success.  When the stores experienced pricing issues or supply issues, Comvest gathered its Deal Team and Management Team together to address those issues.  It was "all hands on deck."  10/17/17 Tr. at 242:4–243:1 (Mr. Barnett).  They spent extensive time with Supervalu and Willard Bishop—who had been hired to prevent these very pricing issues from happening—to come up with a plan to address the problems, all in an effort to enable Holdings' OpCo subsidiaries to succeed.  *Id.*  Clougher and Shaner both testified that they thought the pricing issues had been addressed, only to find new pricing issues pop up at the next store.

When faced with sufficient evidence of improper conduct by Albertson's, Comvest and Holdings' Managers took steps to remedy the situation—first by withholding more than $40 million in payments owed to Albertson's and then by filing a lawsuit against Albertson's for $1 billion.  While in hindsight, different actions might have been done that could have resulted in different outcomes, Delaware law will not "impose retroactive fiduciary obligation simply because [the fiduciary's] chosen business strategy did not pan out."  *Trenwick,* 906 A.2d at 173.  Under the review of the business judgment rule, Comvest actions were reasonable and realistic.

The evidence also proved that the OpCo/PropCo structure was utilized for sound business purposes protected by the business judgment rule.  In the Albertson's Acquisition, Comvest saw two distinct businesses—a grocery store operation and a real estate business—with two distinct time horizons that had two distinct business plans.  Indeed, the corporate structure was set up in a way that Comvest and Holdings' Managers believed would maximize the effectiveness of both OpCo and PropCo, all for the benefit of Holdings. 10/17/20 Tr. at 90:8–92:7 (Mr. Niegsch).  When carrying out their fiduciary duties, Comvest's actions needed "only be reasonable, not perfect," a standard that is easily met here. *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 243 (Del. 2009).

101

And to be clear, there is no evidence that Comvest received anything more or different than what other Haggen shareholders received by virtue of the Albertson's Acquisition or the OpCo/PropCo corporate structure. And Holdings' Managers did not receive any personal benefits from the Albertson's Acquisition or the corporate structure either. There was no self-dealing by Comvest or Holdings' Managers either. In the absence of any disparate treatment of any other shareholder, there can be no claim for breach of the duty of loyalty or good faith to Holdings. *Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *10 (Del. Ch. Aug. 30, 2013); *In re Synthes Inc. S'holder Litig.*, 50 A.3d 1022, 1034 (Del. Ch. 2012).

E.    **The Committee Has Failed to Prove Any Damages.**

Even if this Court were to find that Comvest or Holdings' Manager breached their duties, the Committee has failed to present any evidence of damages to Holdings. The Committee promised in its Complaint to prove damages "in an amount to be determined *at trial*." D.I. 1 ¶ 677 (emphasis added). According to the Pre-Trial Order, for each of the breach of the fiduciary claims, the Committee seeks "damages in an amount equal to the OpCo Entities' unsatisfied liabilities." D.I. 142 at 52. As a starting point, the Committee is suing the Managers and shareholders of Holdings for *all* "unsatisfied liabilities" at subsidiaries two corporate levels lower. In addition, the Committee does not have an expert on the "unsatisfied liabilities" or a witness from the Debtors who can testify to this. At the close of the Committee's case, there was only one piece of evidence in the record regarding the amount of unsatisfied liabilities—the Claims Register, P-620—and the Committee stipulated to the Court that "[w]e are not using the claims register to establish our damages claim." 10/20/17 Tr. at 37:13–18 (; *see also id*. at 31:3–16 ("we're not offering it for the truth of the matter asserted."), 40:1–16, 42:8–14 (Mr. Morris).

The request for all of OpCo's "unsatisfied liabilities" is speculative, unproven, and in flux. Presumably the Committee would like to Defendants to hand over a check for the entire cost of

the bankruptcy three years from now after after they have sorted everything out, but that is not how it works.  The Committee had an obligation under the laws of Delaware and the Federal Rules of Procedure as incorporated into this adversary proceeding to present concrete evidence ***at trial***— just as the Committee promised in its Complaint—such that the Court can fashion a damages number.  All evidence of damages had to be disclosed in discovery so it could be tested by Defendants at trial.  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii) (in initial disclosures, parties must provide a "computation of each category of damages claimed" and "make available for inspection and copying as under Rule 34 the documents or other evidentiary material . . . on which each computation is based.").  The Committee's damages theory "amounts to speculation founded upon uncertainty" and should be rejected by this Court.  *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003); *Cline*, 2010 WL 761142, at *2 (holding that the plaintiff was entitled to no damages, despite the defendant's breach of fiduciary duty, where the plaintiff failed to present any evidence of damages).

## VII.    THE OFFICERS AND DIRECTORS DID NOT BREACH THEIR FIDUCIARY DUTIES (COUNT 67).

The Committee cannot maintain its claim against the Debtors' officers and directors because they worked tirelessly to try to make Haggen succeed.  As it had done with Comvest and the Holdings' Managers, the Committee lumps together all of the individual defendants into the category of "Officers and Directors."  D.I. 1 at ¶¶678–87.  It is necessary to address the individual Defendant's alleged breach of fiduciary duty vis-à-vis each Debtor.  Unlike the earlier counts, the Committee brings these claims against the Directors and Officers at every Debtor, not just Holdings.  The legal standard for breach of fiduciary duty does not change for this claim.

At the outset one thing is clear, each of these directors tried extraordinarily hard to make Haggen succeed, none of them experienced any benefit from the downfall of Haggen, and all of

them have suffered grave personal loss due to the failure of the Haggen businesses. *See, e.g.* 10/19/17 Tr. at 93:18–94:14 (Mr. Shaner).

A.    **John Caple Did Not Breach Any of His Fiduciary Duties to Any of the Debtors.**

In addition to being a manager of Holdings, Mr. Caple was also an officer of Holdings. *See* D.I. 142 at ¶ 24.  Because the claim is limited to Mr. Caple's actions at the Holdings level it fails many of the same reasons that the nearly identical claim against Mr. Caple in his role as a Manager of Holdings failed.   The Exculpatory Provision limited Mr. Caple's fiduciary duties as a manager of Holdings to the duty of loyalty and a lack of bad faith.  At trial, the Committee failed to distinguish Mr. Caple's actions as a manager of Holdings from any action he took as an officer of Holdings.   In such a scenario, Delaware law allows the officer/manager to invoke the exculpatory clause that otherwise mentions only a manager. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994) (where plaintiff failed to distinguish the defendants' acts as officers from their actions as directors, the exculpatory clause precluded all claims for breach of duty of care for those directors/officers); *Continuing Creditors' Comm of Star Telecomms. Inc. v. Edgecomb*, 385 F.Supp. 2d 449, 464 (D. Del. 2004) (an exculpatory clause that applied to directors also applied to claims asserted against an officer who was also a director).  As such, in his capacity as an officer of Holdings, Mr. Caple can only be liable for a breach of the duty of loyalty and for acts in bad faith.

The Committee presented no evidence that Mr. Caple was on both sides of the Albertson's Acquisition or that he personally benefitted from the transaction.  Thus, there is no evidence that he breached his fiduciary duty of loyalty to Holdings.  Nor is there any evidence that Mr. Caple acted in bad faith at any point as an officer of Holdings.  Mr. Caple, like everyone at Comvest and Haggen, relied on the subject matter expertise of the numerous advisors they hired, including and especially ATK.  Moreover, the rationale for the OpCo/PropCo structure was explained at trial—

104

namely, there were two different businesses with two different business plans and two different time horizons.  When Holdings' subsidiary (the OpCo Entities) experienced the pricing and supply problems and unfair competition from Albertson's, Mr. Caple took steps—along with Mr. Niegsch and the entire management team—to try and address those issues.  When the OpCo Entities were in desperate need of funds, Mr. Caple, Mr. Rodriguez and Mr. Niegsch—in their capacity as officers and managers of Holdings—arranged for other Holdings subsidiaries (the Propcos Entities) to put up their collateral and loan the OpCo Entities $25 million in an effort to sure up the OpCo Entities and make the entire Holdings enterprise successful.  Thus, the evidence showed that Mr. Caple did not intentionally abandon any of his duties to Holdings.  To the contrary. Mr. Caple spent enormous time and effort trying to make Holdings successful.  While in the end it did not prove successful, to fulfill his fiduciary duties, Mr. Caple needed only to act reasonably, not perfectly.

Mr. Caple was also a director of Haggen, Inc.  *See* D.I. 142 at ¶ 24.  Haggen, Inc.'s Restated Articles of Incorporation contain an exculpatory provision in Article 8, which states as follows: "A director of this corporation shall not be liable to this corporation or its shareholders for monetary damages for conduct as a Director."  *See* DX0638.  This provision limited Mr. Caple's fiduciary duties to the duty of loyalty and an absence of bad faith.  The Committee failed to present any evidence that as a director of Haggen, Inc., Mr. Caple received any personal benefit from the Albertson's Acquisition or from the creation of the OpCo/PropCo structure while a director of Haggen, Inc.  As such, the Committee failed to prove Mr. Caple breached his duty of loyalty to Haggen, Inc.  Nor did Mr. Caple act with an intentional purpose other than advancing the best interest of Haggen, Inc.  As part of the process, Mr. Caple, Mr. Niegsch and Mr. Rodriguez decided that Haggen, Inc. would not remain a separate entity, but instead would be placed on the OpCo

side of Holdings' corporate structure in an effort to make Haggen, Inc. and the entire OpCo side of Holdings' successful.  As explained above, when Haggen, Inc. and the other OpCo Entities (OpCo North and OpCo South) experienced problems, Mr. Caple did not abandon his duties.  He, Mr. Niegsch and the entire management team had "all hands on deck" meetings in an effort to help Haggen, Inc. survive.  In the end, they were unsuccessful.  But this does not mean that Mr. Caple acted in bad faith at any point.

B.    **Cecilio Rodriguez Did Not Breach Any of His Fiduciary Duties to Any of the Debtors.**

Mr. Rodriguez occupied nearly all of the same positions as Mr. Caple.   In addition to being a manager of Holdings, Mr. Rodriguez was also an officer of Holdings.  *See* D.I. 142 at ¶ 25.  The Committee failed to present any evidence at trial that distinguished Mr. Rodriguez's actions as a manager of Holdings from his actions as an officer of Holdings.  The Exculpatory Clause therefore applies to Mr. Rodriguez's actions as an officer of Holdings.  As such, in his capacity as an officer of Holdings, Mr. Rodriguez can only be liable for a breach of the duty of loyalty and for acts in bad faith.  Yet, the Committee presented no evidence that Mr. Rodriguez was on both sides of the Albertson's Acquisition or that he personally benefitted from the transaction.  Nor is there any evidence that he acted in bad faith.  Indeed, when the OpCo Entities need money to meet payroll, Mr. Rodriguez was instrumental in allowing the PropCo Entities to loan $25 million to the OpCo Entities in an effort to make the entire Holdings' enterprise successful.  Thus, Mr. Rodriguez did not breach his duty of loyalty or act in bad faith.

Mr. Rodriguez was also a director of Haggen, Inc.  *See* D.I. 142 at ¶ 25.  He is therefore covered by the exculpatory provision in Article 8 of Haggen, Inc.'s Restated Articles of Incorporation. *See* DX0638.   This provision limited Mr. Rodriguez's fiduciary duties to a duty of loyalty and an absence of bad faith conduct toward Haggen, Inc.  The Committee failed to present

106

any evidence that as a director of Haggen, Inc., Mr. Rodriguez received any personal benefit from the Albertson's Acquisition or from the creation of the corporate structure while a director of Haggen, Inc.  Nor did Mr. Rodriguez act with an intentional purpose other than advancing the best interest of Haggen, Inc.  Thus, Mr. Rodriguez did not breach his duty of loyalty or act in bad faith toward Haggen, Inc.

C.     **John Clougher Did Not Breach Any of His Fiduciary Duties to Any of the Debtors.**

Like Mr. Caple and Mr. Rodriguez, Mr. Clougher was both a manager and an officer of Holdings.  *See* D.I. 142 at ¶ 27.  The Exculpatory Clause therefore applies to Mr. Clougher's actions as an officer of Holdings.  As such, in his capacity as an officer of Holdings, Mr. Clougher can only be liable for a breach of the duty of loyalty and for bad faith acts.  Yet, the Committee presented no evidence that Mr. Clougher was on both sides of either the Albertson's Acquisition or the Challenged Transactions or that he personally benefitted from either.  Thus, there is no evidence he breached his fiduciary duty of loyalty to Holdings.

Nor is there any evidence he acted in bad faith. The Committee presented no evidence that Mr. Clougher intentionally acted at any time with the purpose of anything other than advancing the best interest of the Holdings enterprise.  Nor did the Committee present any evidence that Mr. Clougher acted in conscious disregard of his duties to Holdings.  Mr. Clougher testified he spent hundreds of hours in the weeks leading up to the Albertson's Acquisition meeting, planning and testing various models and business plans to ensure that Holdings could be successful.  After signing the APA, Mr. Clougher spent countless hours preparing for and then executing the store conversions.  He also worked very hard trying to make the Holdings enterprise succeed.

Under the business judgment rule, the officer's actions need only be reasonable and realistic, not perfect. *See Lyondell,* 970 A.2d  at 243.  Mr. Clougher is only liable for a breach of

the duty of due care if the Committee proves he acted with gross negligence, and the Committee can only satisfy this burden if it proves that Mr. Clougher deliberately failed to fully inform himself of the information reasonably available. *Opus East,* 528 B.R. at 56 (Bankr. D. Del. 2015). None of these requirements are met.

The evidence at trial showed that Mr. Clougher availed himself of expert counsel and was extremely diligent in considering all available information. For example, Mr. Clougher relied on A.T. Kearney's projections for same store sales. 10/19/17 Tr. at 154:13–18 (Mr. Clougher) Mr. Clougher testified that he believed that the projections were reasonable, just like A.T. Kearney, PNC Bank, Spirit, GIG and the FTC all believed the projections were reasonable. Mr. Clougher's belief that the projections were reasonable was based upon the time and effort he spent on the business plan in the months leading up to the APA Signing Date and the presentations to the FTC. *Id.* PNC Bank had also provided an untapped $210 million ABL facility to the OpCo Entities to operate their business. Moreover, the OpCo Entities would have access to a $50 million equity infusion from Comvest. Further, the OpCo Entities were expected to receive—and ultimately did receive—approximately $50 million in excess proceeds from the sale-leaseback transactions.

The record showed extensive evidence that Mr. Clougher did all that he could to work for Haggen's success both before and after the acquisition of the new stores. He retained an experienced management that worked tirelessly on the conversions. Mr. Clougher testified that after the FTC awarded Haggen the stores, he and the rest of the Haggen Management Team spent extensive time and energy preparing to "Haggenize" each store to hire the necessary staff. Mr. Clougher, Mr. Shaner, Mr. Barnett and Mr. Anderson all testified that the conversions of the stores had the effect that they hoped—they looked and felt like the legacy Haggen stores.

Mr. Clougher also retained both SuperValu and Willard Bishop to make sure that the new Haggen stores properly priced the products. And the evidence showed that once pricing problems arose Mr. Clougher, Mr. Shaner, and other Haggen management worked hard to solve the pricing problems that arose and that they received assurances from SuperValu and Willard Bishop that those issues were resolved.

In sum, the trial proved that Mr. Clougher relied on reasonable projections from industry experts to ensure that OpCo was adequately capitalized. He worked with both experienced Haggen management and outside experts and had sound reasons for concluding that the OpCo companies would succeed. The Committee presented no evidence that Mr. Clougher was grossly negligent in reaching that conclusion. All the Committee has done is point to the ultimate failure of OpCo and argue *post hoc* that there must have been some improper conduct, but this is the exact sort of Monday morning quarterbacking that the business judgment rule prohibits. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)

D.    **William Shaner Did Not Breach Any of His Fiduciary Duties to Any of the Debtors.**

Like Mr. Caple, Mr. Rodriguez and Mr. Clougher, Mr. Shaner was both a manager and an officer of Holdings. *See* D.I. 142 at ¶ 29. The Exculpatory Clause therefore applies to Mr. Shaner's actions as an officer of Holdings.[24] As such, in his capacity as an officer of Holdings, Mr. Shaner can only be liable for a breach of the duty of loyalty and for bad faith acts. The Committee presented no evidence that Mr. Shaner was on both sides of the Albertson's Acquisition or the Challenged Transactions, or that he personally benefitted from either. Thus, there is no evidence he breached his fiduciary duty of loyalty to Holdings.

---

[24] Mr. Shaner was also a director of Haggen, Inc., and so is entitled to the protection of the exculpatory provisions contained in Haggen, Inc.'s Articles of Incorporation.

Nor is there any evidence he acted in bad faith. The Committee presented no evidence that Mr. Shaner intentionally acted at any time with the purpose of anything other than advancing the best interest of the Holdings enterprise. Nor did the Committee present any evidence that Mr. Shaner acted in conscious disregard of his duties to Holdings. Mr. Shaner testified that he spent hundreds of hours in the weeks leading up to submitted the bid for the Albertson's Acquisition meeting, planning, and testing various models and business plans to ensure that Holdings would be successful. After the APA Signing Date, Mr. Shaner spent countless hours preparing for and then executing the store conversions. He also worked very hard trying to make the Holdings enterprise successful. Mr. Shaner further sold his house in Missouri, abandoned other lucrative business opportunities, and moved out to California to make the enterprise successful.

Like Mr. Clougher, the evidence is that Mr. Shaner sought expert advice, and personally worked hard with Haggen management to make the company a success. Mr. Shaner was aware of A.T. Kearney's projections for same store sales growth and believed that they were reasonable. Mr. Shaner testified that he believed that OpCo South did not need to own the real estate to be successful. Mr. Shaner described the tremendous efforts spent converting the stores. OpCo South personnel took over the stores at 12:01 a.m. on the day each store closed and then quickly launched a tsunami of workers to convert the Albertson's stores into a Haggen store. Mr. Shaner testified that he felt they had accomplished the task with all of the stores, accomplishing that "wow" factor they had hoped to get. 10/19/17 Tr. at 65:3–66:16 (Mr. Shaner). All of these actions are squarely protected by the business judgment rule, and none of them show any bad faith or breach of fiduciary duty. *Cede & Co. v. Technicolor, Inc..*, 634 A.2d 345, 361 (Del. 1993)

     E.     **Blake Barnett Did Not Breach Any of His Fiduciary Duties to Any of the Debtors.**

Mr. Barnett was an officer of Holdings, Haggen, Inc., and OpCo North.  *See* D.I. 142 at ¶ 28.  Like the other officers, directors and managers, Mr. Barnett participated in all of the discussions and planning leading up to the APA Signing Date and the meeting with the FTC.  Like the other officers, directors, managers, PNC, Spirit, GIG and the FTC, Mr. Barnett believed that A.T. Kearney's same-store sales projections were reasonable.  The Committee offered no evidence to show that Mr. Barnett's reliance on these projections, even if flawed, was unreasonable.  The Committee presented no evidence that Mr. Barnett received any personal benefit from the Albertson's Acquisition or that he stood on both sides of the transaction.  The Committee presented no evidence that Mr. Barnett believed that OpCo North or Haggen, Inc. needed access to the real estate or the liquidity therefrom in order to make the operations a success.  And the Committee offered no evidence that Mr. Barnett put the interests of any entity ahead of Holdings, Haggen, Inc., or OpCo North.  Summarily, the Committee offered no evidence to rebut the presumption that Mr. Barnett's actions were reasonable and in the best interest of the companies of which he was an officer.

F.    **Derrick Anderson Did Not Breach Any of His Fiduciary Duties to Any of the Debtors.**

Derrick Anderson was an officer of Holdings, OpCo North, OpCo South and Haggen, Inc.  *See* D.I. 142 at ¶ 30.  The Committee presented no evidence that Mr. Anderson received any personal benefit from the Albertson's Acquisition or for the creation of the corporate structure.  The Committee likewise presented no evidence that Mr. Anderson intentionally abandoned any of this duties or took any action that put another entity ahead of the interests of the companies of which he was an officer.  The undisputed evidence at trial showed just the opposite.  Mr. Anderson had been a long-standing Haggen employee who visited various stores as they were converted and made an effort to ensure that the conversion process—including the onboarding of new labor

unions—occurred efficiently and effectively.  In an effort to ensure the effective implementation of the conversion process, Mr. Anderson had agreed to make himself available to sign the necessary paperwork that the company's lawyers advised him to sign, as well as to effectuate the various licensing paperwork that sometimes required him to be fingerprinted at different points throughout the process.

There was no dispute that the various Debtor and non-debtor entities needed to execute numerous documents in order to effectively convert the Albertson's stores to Haggen stores.  Mr. Anderson testified that there were literally hundreds of documents to sign, and that often he was the only person consistently available to ensure the necessary legal documents were signed.  There is likewise no dispute that he only signed the papers that had first been reviewed and approved by Haggen's lawyers.  The Committee did not present any evidence that Mr. Anderson signed any document that had not been fully vetted by Haggen's lawyers.  And the law recognizes that the Contribution Agreements that Mr. Anderson signed were entirely appropriate transactions.  As set forth above, Delaware law has recognized that a party's transfer of interest to a solvent, wholly-owned subsidiary does not constitute a fraudulent transfer.  *DVI,* 326 B.R. at 306 (Where a debtor "made a contribution to a solvent wholly-owned entity, the Committee would not be able to state a fraudulent transfer claim.").  Therefore, there was nothing illegal, inappropriate or unreasonable about Mr. Anderson executing documents that (a) had been first vetted by counsel and (b) transferred Holdings' right to acquire the Real Property to the PropCo and SLB Entities.

When the transaction is reviewed under the business judgment rule, the Committee failed to present evidence to overcome the presumption that the actions taken by Comvest, Holdings' Managers, and each of the Officers and Directors was reasonable and in the best interest of the

individual companies.  As a result, Defendants respectfully request the Court enter judgment in favor of Defendants favor on Counts 66–68 of the Complaint.

>    G.    **The Committee Is Estopped From Challenging The Decision To Enter The PropCo Leases or Spirit/GIG Leases If They Were Assumed In The Bankruptcy.**

The Committee alleges, in part, that Comvest and Holdings' Managers breached their fiduciary duty to Holdings by choosing "to enter into the PropCo Leases and pay rent thereunder." D.I. 1 ¶¶ 676, 698.  The Committee also challenges the decision to enter the GIG and Spirit Leases, which are defined as part of the vague term "Challenged Transactions." *Id*. ¶ 149.  The Committee's decision to challenge these leases wholesale is particularly troubling because the Debtors in this bankruptcy has assumed close to half of the PropCo Leases and Spirit/GIG leases.[25]  By assuming this leases, this Court found at the Debtors request that the leases were "in the best interest of the Debtors." *See, e.g.*, Order Authorizing The Debtors To Assume Certain Unexpired Leases, Case 15-1874, D.I. 1716 at 1 ("the relief requested in the Motion and provided herein is in the best interest of the Debtors.").

Because assuming a contract under 11 U.S.C. § 365 requires a finding that the contract "was in the best interests" of the debtor, this finding judicially estops a claim breach of fiduciary duty claim related to the contract.  *In re Network Access Solutions Corp.*, 330 B.R. 67 (Bankr. D. Del. 2005) ("[J]udicial estoppel prevents the Committee from supporting the assumption of the agreements as a sound exercise of NAS's business judgment and then attempting to recover all authorized, contractual payments as fraudulent transfers or breaches of fiduciary duties."); *see also In re Vision Metals, Inc.*, 327 B.R. 719, 723 (Bankr. D. Del. 2005) (applying judicial estoppel to

---

[25]    *See, e.g.*, *In re HH Liquidation, LLC, et al,* Case No. 15-11874, D.I. 843, 910, 1005, 718 , 719, 861, 862, 847, 964, 2080, 1550, 1775.

challenges against an assumed contract).  To the extent that the Committee aims to salvage this contention by focusing only on the rejected leases, there is no evidence to distinguish why certain leases would be a breach of fiduciary duty and other nearly identical leases would be in the best interest of the debtors.  This fundamental inconsistency—which highlights the overbroad allegations logged by the Committee—dooms any fiduciary breach claim that relates to the PropCo Leases or the Spirit/GIG Leases.

> H.      **The Committee Failed To Prove Damages.**

The Committee similarly seeks "damages in an amount equal to the OpCo Entities' unsatisfied liabilities" for this claim.  D.I. 142 at 52.   These damages are just as inappropriate and unproven here as they were for Counts 66 and 68 explained earlier.

## VIII.  THE COMMITTEE LACKS STANDING TO PURSUE BREACH OF FIDUCIARY DUTY CLAIMS AGAINST LIMITED LIABILITY COMPANIES.

Separately and independently from the merits of the fiduciary duty claims, the Committee does not have standing to pursue the breach of fiduciary duty claims on behalf of any debtor that is a limited liability company: Haggen Holdings, LLC, Haggen Operations Holdings, LLC, Haggen OpCo North, LLC, Haggen OpCo South, LLC, and Haggen Acquisition, LLC (hereinafter the "LLC Debtors").   The Court should therefore enter judgment in Defendants' favor on the Committee's breach of fiduciary duty claims relating to the LLC Debtors.[26]

Delaware law recognizes that creditors of an insolvent *corporation* have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary

---

[26] Standing implicates subject matter jurisdiction, and such objections can be raised at any time during a proceeding by either the parties or the court. *See In re Harold*, 296 B.R. 868, 872 (Bankr. M.D. Fla. 2003) (collecting numerous cases holding that standing is not waivable and may be raised at any time).  A standing order does not act a bar to raising the standing issue. *See Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 92 (S.D.N.Y. 2008), *aff'd*, 379 Fed.App'x. 10 (2d Cir. 2010).  Indeed, Defendants explicitly reserved "all defenses" in the Committee's Standing Order. D.I. 1858-1 at 4; *see also* D.I. 24 at 185 (Defendants asserted "standing" as an affirmative defense).

duties. *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del.

2007)(emphasis added).    This is based on the language of Section 327 of the Delaware General

Corporation Law, 8 Del. C. §327, which provides a non-exclusive limitation on derivative

standing. *CMV V., LLC v. Bax*, 6 A.3d 238, 242 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011).

In contrast, the Delaware Limited Liability Company Act ("LLC Act") is clear and unambiguous

about who can bring a derivative action: the plaintiff "must be a member or an assignee."  6 Del.

C. § 18-1002; *Bax* 6 A.3d at 241.  "'[A] statute, clear and unambiguous on its face, need not and

cannot be interpreted by a court . . . .'" *Id.* at 241.  The Committee is neither a member nor an

assignee.  Under the plain language of the statute, the Committee has no standing to bring a breach

of fiduciary duty claim.[27]

Defendants anticipate the Committee will claim that such a ruling will be inequitable. The

Delaware Chancery Court in *Bax* addressed these concerns and disagreed that the holding

"generates an absurd distinction between insolvent corporations, where creditors can sue

derivatively, and insolvent LLCs, where they cannot . . . [because] there is nothing absurd about

different legal principles applying to corporations and LLCs." *Id.* at 249.  The underpinnings of

Delaware's corporate law and the law of limited liability companies are different.  *Id.* at 249–50.

Barring a creditor from derivative standing does not conflict with the purpose of the LLC Act

because the LLC Act itself gives "maximum effect to the principle of freedom of contract and to

the enforceability of limited liability company agreements." *Id.* at 250 (citing 6 Del. C. § 18-

1101(b)). Further, there is no inequity or prejudice to creditors because they "are presumed to be

---

[27]    This Court's ruling in *In re Golden Guernsey Dairy, LLC*, is not to the contrary.  548 B.R. 410, 413 (Bankr. D. Del. 2015).  Unlike a Chapter 7 trustee, which is empowered by statute to act as "the sole representative of the estate with the authority to sue and be sued," the creditors committee is no more than a collection of unsecured creditors. *Id.*  Their rights to assert derivative claims are limited to the derivative standing of their members, none of whom have standing as creditors of a Delaware LLC to assert derivative claims of breach of fiduciary duty on behalf of the company.  *CMV V., LLC v. Bax*, 6 A.3d 238, 242 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011).

'capable of protecting themselves through the contractual agreements that govern their relationships with firms.'" *Id.* (internal citation omitted). Limiting a creditors' right to sue derivatively, therefore, comports with the parties' bargained-for rights and the principles of freedom of contract that are legislated in the LLC Act. *Id.* In sum, Defendants respectfully contend the Committee has no standing to pursue the LLC Debtors' breach of fiduciary duty claims.

## IX. THE COURT SHOULD REJECT THE COMMITTEE'S UNJUST ENRICHMENT CLAIMS (COUNTS 73–75).

The Committee's claims for unjust enrichment are not supported by the facts. While the Committee challenges several transactions—including the contribution of real estate assets from Holdings' to the PropCo and SLB Entities and the PropCo Leases—each is governed by express, written contracts precluding an unjust enrichment claim. Moreover, even if the transactions were not governed by written contracts, the Committee has failed to prove the necessary elements of unjust enrichment, and has failed to carry its burden for proving damages.

### A. Choice of Law

Unjust enrichment is a state-law claim. Choice of law principles point to six different states governing the different transactions being challenged by the Committee as unjust enrichments: Arizona, California, Delaware, Nevada, Oregon, and Washington.[28] Fortunately these states have similar elements and legal requirements for unjust enrichment allowing the Court to focus on the legal principles common to these states rather than engaging in state-by-state choice of law analyses.

---

[28] "[B]oth Delaware and federal choice of law principles apply the 'most significant relationship test' found in section 188 of the Restatement Second of Conflict of Laws to determine which jurisdiction's laws will apply to a written or unwritten contract claim." *In re Fleming Cos., Inc.*, 347 B.R. 163, 168 (Bankr. D. Del. 2006) (applying California law to an unjust enrichment claim because the "place of performance" and the alleged "overpayments" occurred in California—even though California was not the Debtor's principal place of business nor its place of incorporation). In this case, the state with the "most significant relationship" is likely depends on the allegation—*i.e.* where the specific services were performed or where the real estate exists.

B.    **Legal Standard for Unjust Enrichment**

As a threshold matter, "an action for unjust enrichment cannot lie in the face of an express contract." 66 Am. Jur. 2d Restitution and Implied Contracts § 22.  This statement is true for all of the various states that could govern the Committee's unjust enrichment claims.  *See, e.g.*, *MacDonald v. Hayner*, 43 Wash. App. 81, 86 (Ct. App. 1986) ("The courts will not allow a claim for unjust enrichment in contravention of a provision in a valid express contract."); *see also In re Direct Response Media, Inc.*, 466 B.R. 626, 661 (Bankr. D. Del. 2012) ("exercise of [the defendant's] contractual rights" is "not an impoverishment to the Debtor or any creditor or an unjust enrichment" and therefore "the unjust enrichment count is dismissed.").  Moreover, a written contract defeats a claim for unjust enrichment even if the defendant is not a signatory to the contract. *See AM Gen. Holdings LLC on behalf of Ilshar Capital LLC v. Renco Grp., Inc.*, 2013 WL 5863010, at *15 (Del. Ch. Oct. 31, 2013) (dismissing unjust enrichment claim against a parent of a co-defendant signatory and reasoning it is "irrelevant that [the defendant] is not a signatory" because "the alleged unjust enrichment arises from a relationship governed by contract").

Assuming there is no contract governing the action, unjust enrichment requires proof of five elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010); *see also Wang Elec., Inc. v. Smoke Tree Resort, LLC*, 230 Ariz. 314, 318 (Ct. App. 2012) (same).[29]  Unjust enrichment seeks to "restore[] [the plaintiff] to a previous position" by "by restoring the very property that the claimant

---

[29]    The Committee adopted this five element test for unjust enrichment in its Trial Brief.  *See* D.I. 144 at 36 (citing *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).

117

gave up" or "a money equivalent."  Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011).

Courts limit the the types of "enrichments" that are subject to the claim of unjust enrichment.  Unjust enrichment cannot be sustained where a person conferred a benefit—that is, "some understanding or expectation of both parties that compensation therefor was to be made." *Moses v. Harward*, 2014 WL 12577167, at *10 (N.D. Cal. May 27, 2014) (citation omitted)); Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011) ("There is no liability in restitution for an unrequested benefit voluntarily conferred.").[30]  Similarly, the fact that a "recipient has obtained a benefit without paying for it does not of itself establish that the recipient has been unjustly enriched."  Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011).

A claim of unjust enrichment also requires a "direct relationship" between the alleged enrichment and impoverishment.  *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 61 (Del. Ch. 2012) (granting summary judgment to dismiss unjust enrichment because plaintiff "failed to adduce sufficient evidence" to prove a "direct relationship"); *Pa. Emp. Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 485 (D. Del. 2010) ("[U]njust enrichment" requires plaintiff "to establish the requisite causal nexus between the alleged wrongful conduct. . . and the injuries suffered.").  Because unjust enrichment focuses on a direct exchange of value, it cannot create an ongoing obligation (even where the parties are corporate affiliates):  "[t]here is no obligation of a parent [*corporation*] to stand by for the life of its 'child' to be sure it is always profitable."  *Opus East*, 528 B.R. at 103–04 (Bankr. D. Del. 2015) (entering judgment in favor of defendant on unjust enrichment claim).

---

[30]   *See also Strong v. Beydoun*, 166 Cal. App. 4th 1398, 1404 (Ct. App. 2008) (unjust enrichment requires the plaintiff "to show" that the enrichment was "rendered at the request of the person to be charged.").

Even though unjust enrichment is an equitable remedy, the plaintiff still has the "burden" to "show the value of his or her services." *Strong v. Beydoun*, 166 Cal. App. 4th 1398, 1404, (Ct. App. 2008); 66 Am. Jur. 2d Restitution and Implied Contracts § 87 (The plaintiff "has the burden" of "proving the amount and value" of "services or materials in question.").

C.   **All of the Committee's Unjust Enrichment Claims Fail Because There Are Express, Written Contracts Governing the Transactions.**

The Committee's unjust enrichment claims fail because each alleged enrichment is governed by an express written contract. 66 Am. Jur. 2d Restitution and Implied Contracts § 22 ("[A]n action for unjust enrichment cannot lie in the face of an express contract."). This is to be expected because the Committee is largely challenging the Albertson's Acquisition, which is the result of hundreds of individual contracts.

1.   Allegations Against the PropCo Entities Are Governed By Written Contracts (Count 75).

In Count 75, the Committee alleges unjust enrichment because "[t]he Debtors conferred benefits on the PropCo Entities by entering into the Contribution Agreements and the PropCo Leases." D. I. 1 ¶ 743. Count 75 represents two separate allegations: (1) Holdings contributed real estate assets to the PropCo Entities via the Contribution Agreements, and (2) the OpCo Entities paid rent via the PropCo Leases. The first is governed by express, written Contribution Agreements. *See* DX0506, DX0586–DX0601.[31] The second is governed by express, written PropCo Leases. DX0783–DX0809.[32] Simply put, Count 75 fails because the claims cannot lie in the face of the express Contribution Agreements and PropCo Leases.

---

[31] *See, e.g.*, DX0586-0001 ("Holdings hereby contributes . . . the right to acquire the Real Property Assets related to Store Property #00404AS located in Port Angeles, WA.").

[32] *See, e.g.*, DX0783-0008 ("Subtenant [*OpCo North*] shall pay to Sublandlord [*PropCo North*] . . . the Base Monthly Rental then in effect for each such month, in advance, on or before the first day of each month of the Term of this Sublease.").

 2. <u>Allegations Against the SLB Entities Are Governed By Written Contracts</u>
<u>(Count 74).</u>

In Count 74, the Committee alleges unjust enrichment because "[t]he OpCo Entities
conferred a benefit on the SLB Entities by entering into above-market leases in connection with
the Sale Leaseback Transactions thereby artificially increasing the price that the SLB Entities
received for the sale of the SLB Properties." D.I. 1 ¶ 743. Count 74 also has two steps: (1) the
OpCo Entities enter leases with Spirit and GIG, and (2) the SLB Entities sold real estate to
Spirit/GIG. The first step is governed by the Spirit and GIG Leases, which are express, written
contracts. *See* DX0507, DX0602–DX0628 (GIG Leases) & DX0511, DX0827–DX0844 (Spirit
Leases).[33] In addition, the sale of real estate from the SLB Entities to Spirit/GIG were all governed
by written contracts. DX0845–DX0850 (Spirit); DX0629–DX0636 (GIG).[34] Count 74 similarly
fails due to the existence of written contracts.

 3. <u>Allegations Against Comvest Are Governed By Written Contracts</u>
<u>(Count 73).</u>

In Count 73, the Committee alleges unjust enrichment because "[t]he Debtors conferred
benefits on Comvest by entering into the Challenged Transactions, including but not limited to the
Contribution Agreements and the PropCo Leases." D.I. 1 ¶ 731. The allegations related to the
"Contribution Agreement" and the "PropCo Leases" fail for the reasons stated above. *See also*

---

[33]    *See, e.g.*, DX0626-0007 ("Tenant [*OpCo North and OpCo South*] shall pay to Landlord [*GIG*] Base Rent, in
advance, without demand therefor, on or before the first day of each and every calendar month . . . .").

[34]    *See, e.g.*, DX0845-0011 ("The aggregate purchase price to be paid by Purchaser [*Holdings*] to Seller [*Spirit*] for
the Properties is . . . $202,496,792.00.").

DX0517 (Asset Purchase Agreement between Albertson's and Holdings).[35]  The existence of

express contracts defeats Count 73.[36]

> ### D.    Separately, the Committee Cannot Satisfy the Elements of Unjust Enrichment.

The Committee in its Trial Brief promised to prove that Comvest was unjustly enriched by

its "scheme to establish the PropCo/OpCo structure and impose the intercompany PropCo Leases

on the OpCo Entities."  D.I. at 144 at 37.  Even setting aside the fatal flaw that this entire "scheme"

was governed by written, express contracts, the Committee still failed to prove the necessary

elements of unjust enrichment for a myriad of reasons.

*First*, the OpCo Entities suffered no "impoverishment" by Holdings' decision to place the

real estate assets in the PropCo Entities through an OpCo/PropCo structure.  Unjust enrichment is

meant to "restore" a party to "to a previous position" by "restoring the very property that the

claimant gave up" or "a money equivalent."  Restatement (Third) of Restitution and Unjust

Enrichment § 1 (2011).  Because the OpCo Entities never possessed the real estate assets, the

Committee cannot ask the Court to "restore" the OpCo Entities to a position where they owned the

real estate.  In addition, because the OpCo Entities never owned the real estate, they had no

reasonable expectation of "compensation" by Holdings' decision to place certain assets in the

PropCo Entities rather than in the OpCo Entities.  *See Moses*, 2014 WL 12577167, at *10.

---

[35]  It does not matter that Comvest was not a signatory to the Contribution Agreements or the PropCo Leases because the purported enrichments were governed by those contracts. *See AM Gen. Holdings*, 2013 WL 5863010, at *15 (holding that it is "irrelevant that [the defendant] is not a signatory" because "the alleged unjust enrichment arises from a relationship governed by contract"); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891–92 (Del. Ch. 2009) (The plaintiffs "cannot use a claim for unjust enrichment to extend the obligations of a contract to [defendants] who are not parties to the contract."). The Committee is effectively arguing that there was a benefit to the PropCo Entities that would increase the equity owned by Holdings which would increase the share of the equity owned by Comvest.

[36]  The Committee has also alleged that Comvest "will unjustly benefit from [the] PropCo Entities' claim relating to the PropCo Advance [i.e. PropCo Loan]." D.I. 144 at 37.  This loan and the resulting claims in the bankruptcy were governed by the PropCo Loan Agreement (DX0416), an express, written contract.

*Second*, the decision to use a PropCo/OpCo corporate structure is a common business practice, and therefore it is not unjust or unfair to the OpCo Entities.  More generally, unjust enrichment cannot be used—as the Committee seeks to do here— to create an "obligation of a parent" corporation "to stand by for the life of its 'child' to be sure it is always profitable."  *Opus East*, 528 B.R. at 103.

*Third*, the OpCo Entities' agreement to pay fair market rent under the PropCo Leases does not create an unjust enrichment.  After substantial discovery, the Committee has stipulated that "Plaintiff will not offer any evidence that the rents paid by Operations or the OpCo Entities to the PropCo Entities were above-market."  D.I. 142 at 21.  In other words, the OpCo Entities paid fair market rent under the PropCo Leases for access to land they needed to operate the stores.  That is the definition of a fair market transaction with no enrichment or impoverishment—let alone an unjust enrichment.  *See Nemec*, 991 A.2d at 1130.

*Fourth*, the Committee's assertion that the OpCo Entities' leases with Spirit and GIG resulted in a benefit to the SLB Entities does not meet the elements of unjust enrichment.  As an initial matter, the contemporaneous documents and parties to the transaction agree that the Spirit/GIG Leases were arms' length negotiations that resulted in market rent.[37]  Accordingly, they are market agreements just like the PropCo Leases.  Even if the OpCo Entities paid slightly above

---

[37]    Both Spirit's corporate representative and HFF (who represented the OpCo Entities' in the negotiation of the leases) testified that the leases were market rent: *See* D. Rosenberg (Spirit) Dep. at 131:2–4 ("[W]e believed that the rents were in line with market or within the range of market."); M. West (HFF) Dep. at 173:7–11, 173:17–18 ("[W]e tried to set them all at market or below market.").  Spirit hired an appraiser (Duff & Phelps) who wrote in their appraisal report: "we have analyzed individual market rents for each of the subject properties and believe that, the master lease is reflective of market rent levels."  DX-222-0023.  GIG wrote that it viewed its "Rent to Sales Ratio" as "low compared to national averages" and lower than Spirit's.  DX-131-0013.  Akerman wrote to the FTC that in December 2014 that Spirit and GIG "want to make sure the rent is appropriate relative to other grocery / big box real estate in the same market (comps)"  because a "new buyer is not going to pay for an above market rent."  DX-439-0001.  Also, from a common-sense perspective, there is no reason for Haggen to seek above-market leases for the benefit of Spirit/GIG while ensuring that the PropCo Leases were set at fair market value.

market rent to Spirit and GIG, the Committee is not suing those entities.  At best, the Committee's legal theory is that the OpCo Entities may have provided some benefit to GIG and Spirit.[38]  But the Committee is not suing GIG and Spirit.

*Finally*, from a global perspective, the Committee's assertion that Comvest was unjustly enriched through the Albertson's Acquisition is unfounded because Comvest lost money on that transaction.  Comvest invested $50 million in equity, it placed its valuable portfolio company (Haggen, Inc.) within reach of the OpCo Entities' creditors, and it contributed the $49 million in excess proceeds from the sale-leaseback transactions to the OpCo Entities.  There cannot be a claim for unjust enrichment when the defendant lost money in the transaction.  In sum, the Committee has not proven the elements of unjust enrichment.

> **E.  The Committee Has Not Provided Sufficient Evidence to "Value" the Alleged Enrichment.**

The Committee's alleged damages for unjust enrichment are unsupported and bear no connection to the unjust enrichment theories it posits.  According to the Pre-Trial Order, the Committee is seeking "the net equity value of Holdings (after the payment of all claims other than to equity holders) (Count 73)" and "the value of the assets currently owned by each of the PropCo Entities and the SLB Entities (Counts 74 and 75)."  D.I. 142 at 52.[39]  In other words, the Committee is claiming that the entire value of PropCo is somehow an unjust benefit that was bestowed upon it by the OpCo Entities.

---

[38]  HFF testified that Haggen had to be "conservative" in selling the real estate to Spirit and GIG because they "did not have the luxury of time."  M. West Dep. at 158:16–160:2; *see also* DX0131-0004 (GIG estimated that it could sell the real estate it received from Haggen for a profit of $32 million over the course of nine months).

[39]  Notably, while the Committee hired an expert (Mr. Howard) to calculate the rents paid by the OpCo Entities to Spirit and GIG, the Committee made the choice to not to use that expert or his calculations as a theory for damages.  While Mr. Howard's calculations are unreasonable (10/20/17 Tr. at 252:17–266:3) (Mr. Satter), they are also apparently irrelevant to the damages being sought by the Committee.

To recover under unjust enrichment, the plaintiff has the "burden" to "show the value of his or her services." *Strong*, 166 Cal. App. 4th at 1404; 66 Am. Jur. 2d Restitution and Implied Contracts § 87 ("In an action for quantum meruit or unjust enrichment," plaintiff "has the burden" of "proving the amount and value" of "services or materials in question."). In *McKenna v. Singer*, the plaintiff sought unjust enrichment for services rendered to GEC Holdings, and at trial "put forth damages evidence related to the value of GEC Holdings." 2017 WL 3500241, at *21 (Del. Ch. July 31, 2017). The court held that the plaintiff failed to carry its "burden of establishing an unjust enrichment" because "the proper calculation of damages" is not the value of the entity to which it provided services but "the fair market value of the [plaintiff's] services minus the [amount] they were paid." *Id*. The Committee's theory has the same flaw. Rather than seeking the precise value of the benefit (i.e. assets or services) provided by OpCo, the Committee is simply seeking the full value of the PropCo Entities (or the net value minus Holdings' creditors). Accordingly, with respect to the Committee's evidence of damages, they have not "carried their burden." *Id*.

## X.    THE COMMITTEE'S RECHARACTERIZATION CLAIM (COUNT 71) IS NOT SUPPORTED BY THE FACTS.

The Court should reject the Committee's claim to recharacterize the $25 million PropCo Loan into equity. Both the Committee's expert and Defendants agree that the parties to the PropCo Loan intended it to be an instrument of debt, not equity. Under the Third Circuit case law, that alone is sufficient to reject the claim because "the intent of the parties" is the "determinative inquiry." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006). Even if this Court were to consider the various multi-factor tests as a proxy for divining intent, the evidence is overwhelming that the parties intended the PropCo Loan to be secured debt as shown by the written agreements and their treatment of the loan. Moreover, the PropCo Loan served a rescue financing

to the OpCo Borrowers and even the Committee's expert admits that the loan was a benefit to the OpCo creditors.

A.    **Legal Standard for Recharacterization**

The Third Circuit held that in evaluating a claim to recharacterize a purported debt into equity, the "determinative inquiry" "is the intent of the parties as it existed at the time of the transaction." *SubMicron*, 432 F.3d at 457.  The court's role is to determine whether "the party infusing funds [did] so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)." *Id.* at 456.  Given this inquiry, recharacterization is an unusual remedy where an advance is secured; indeed, Defendants have been unable to identify a single case in the Third Circuit where a secured advance was formally recharacterized into equity.

While the recharacterization inquiry can be broad, the goal is to look at the evidence to determine "what the parties actually intended." *Id.*  Accordingly, unlike equitable subordination, "[r]echaracterization has nothing to do with inequitable conduct." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 554 (Bankr. D. Del. 2009).  One way to evaluate intent is to look at whether the parties accounted for the advance as a loan or equity. *SubMicron*, 432 F.3d at 457 (holding that "numerous facts to support a debt characterization" including "1999 notes were recorded as secured debt on SubMicron's 10Q SEC filing.").  In addition, courts have identified related agreements, such as forbearance agreements between creditors, to be strong evidence of intent. *See, e.g.*, *In re Optim Energy, LLC*, 2014 WL 1924908, at *9 (Bankr. D. Del. May 13, 2014), *aff'd*, 527 B.R. 169 (D. Del. 2015) ("[T]he fact that the parties entered into the Forbearance Agreement lends support to the existence of a true creditor relationship.").

Where there is ambiguity regarding the parties' intent regarding an advance, courts in this Third Circuit have at times turned to various multi-factor tests to aid their analysis.  One such test is the 11-factor *AutoStyle* test developed by the Sixth Circuit.  *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 749–50 (6th Cir. 2001).   The Third Circuit warned that these factors are not a "mechanistic scorecard" to be tallied.  *SubMicron*, 432 F.3d at 456.  Indeed, many Delaware courts have turned away from the *AutoStyle* factors into a more streamlined seven-factor test that focuses more on recharacterization in the context of insolvency—with factors that focus on whether "voting rights" exist and "certainty of payment."  *Id*. at 455 n.8.[40]  While these various factors are potentially "pertinent," the "overarching inquiry" is to determine "what the parties actually intended."  *Id.* at 455–56 ("[I]n the end, [the form of the advance] is no more than an indicator of what the parties actually intended and acted on.").

If recharacterization of an investment from debt to equity is warranted, the characterization occurs "ab initio"—from the beginning of the investment.  *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 74 (Bankr. D. Del. 2014) (citing *AutoStyle*, 269 F.3d at 747–48).  Accordingly, the advance does not disappear; instead it becomes equity in the borrowing parties with all the rights and privileges associated with equity.

B.      **The Parties To the PropCo Loan Intended It To Be Secured Debt—Not An Equity Contribution.**

The Committee's claim for recharacterization of the PropCo Loan from debt into equity fails because the "determinative inquiry" on this issue "is the intent of the parties as it

---

[40]    *See also In re Color Tile, Inc.*, 2000 WL 152129, at *4 (D. Del. Feb. 9, 2000) (considering the Delaware seven-factor analysis); *In re Liberty Brands, LLC*, 2014 WL 4792053, at *3 (Bankr. D. Del. Sept. 25, 2014) (considering the Delaware seven factors); *In re USDigital, Inc.*, 443 B.R. 22, 52 (Bankr. D. Del. 2011) ("Courts in the Third Circuit have applied a seven-factor test" for recharacterization).

existed at the time of the transaction," and here the parties intended it to be a loan.  *SubMicron,*

432 F.3d at 457 (emphasis added).

The intent for the PropCo Loan to be debt is manifest.  The PropCo Loan is 107 pages

laying out in detail the terms and conditions of lending arrangement.  *See* DX0416.  It has an

interest rate, borrowing conditions, and it explicitly refers to the investment as a "loan."[41]  The

loan was secured by all the assets of the OpCo Borrowers.  *See* DX0416-00029 ("[E]ach Borrower

hereby pledges and grants to Agent . . . a continuing security interest in and to and Lien on all of

its Collateral.").[42]  The PropCo Entities entered an Intercreditor Agreement with PNC—the asset-

backed lender for the OpCo Entities—to delineate and formalize the terms between the two

creditor classes.  *See* DX0425 (Intercreditor Agreement: referring to PropCo Entities as

"Subordinated Lenders").  The OpCo Borrowers entered a Forbearance Agreement with PNC

where both sides formally recognized the the loan from PropCo. *See* DX0427 (Forbearance

Agreement).[43]  Together there are hundreds of pages of legal documents signed by PropCo

Lenders, by OpCo Borrowers, and by PNC clearly announcing the PropCo Loan as debt.  The

Committee concedes that both sides accounted for the investment as a loan on their books.

10/18/17 Tr. at 197:18–23 (Ms. Flaton).  To be clear, at no point in time has the PropCo Entities

ever owned any equity in OpCo North, OpCo South, or Haggen, Inc.  10/18/17 Tr. at 217:10–20

(Ms. Flaton).  Indeed, the relationship between these entities was that of landlord (PropCo) and

---

[41]  DX0416-0004 (titled "Term Loan and Security Agreement), DX0416-0004 (defines OpCo North, OpCo South, and Haggen, Inc. as "Borrowers" and defines PropCo North and PropCo South as "lenders"), DX0416-0024 & 0028 (interest equals "Term Loan Rate" of "8%" with a "Default Rate" of 12%), DX0416-0054–59 (listing "Events of Default" and remedies after default).

[42]  *See* P-245 at P-245.002 & P-245.005 ("This Note is a Note referred to in the Credit Agreement and is secured, inter alia, by the Liens granted pursuant to the Credit Agreement and Other Documents.").

[43]  The Forbearance Agreement defines PropCo North and PropCo South as the "PropCo Lenders" and the PropCo Loan as the "PropCo Loan Documents."  DX0427-0004.

tenant (OpCo).   The circumstances of the PropCo Loan demonstrate that the parties to the instrument intended it as debt.

While the facts support the Defendants' view that the PropCo Loan is debt, the Court need not evaluate the circumstances in detail because there is no real disagreement regarding intent. Consistent with the testimony of witnesses at trial, Defendants posit that the intent of the PropCo Loan was to be debt.  *See, e.g.*, 10/16/17 Tr. at 268:7–24 (Mr. Caple); 10/19/17 Tr. at 112:12–14 (Mr. Clougher).   On the other side, the Committee put forward a recharacterization expert, Ms. Flaton, who reviewed the evidence surrounding the loan and came to the same conclusion—that the parties to the PropCo Loan intended it to be a loan:

> Q.  And you agree that based on your review of the evidence, you believe that the PropCo lenders intended that the PropCo to OpCo loan was an extension of credit. Isn't that correct?
>
> A.  Yes, I do believe that.
>
> Q.  And similarly from the perspective of the OpCo borrowers, you agree that a representative of each OpCo borrower signed an agreement that said they were taking an extension of credit. Isn't that correct?
>
> A.  Yes.
>
> Q.  And you agree that the PropCo/OpCo loan document taken as a whole is an instrument evidencing indebtedness.  Isn't that correct?
>
> A.  I think I testified before it's not a normal agreement, but it's intended to be.
>
> Q.  An instrument evidencing indebtedness.
>
> A.  Yes.

10/18/17 Tr. at 194:13–195:4 (Ms. Flaton).  Ms. Flaton further placed here conclusion on intent in context.  She recognized that the PropCo Loan had real economic significance with $25 million moving from the PropCo Entities to the OpCo Entities.  *Id*. at 197:10–20.  It was a condition precedent to the OpCo Entities' forbearance agreement.  *Id*. at 209:21–210:25.  Despite her wealth of experience, she could recall a single case where a court recharacterized a secured loan to equity,

or one with a 70 page loan document, or one with an Intercreditor Agreement. *Id*. at 170:3–22. On these facts alone, there is no dispute over the intent of the PropCo Lenders or the OpCo Borrowers as to the nature of the investment.

In light of this evidence, the Committee has asked this Court to set aside the intent of the parties because the "recharacterization factors"—i.e. the *AutoStyle* factors, which the Committee favors over the other sets of factors—"apply with full force here." D.I. 144 at 28.  In other words, the Committee is asking this Court to apply a "scoreboard" approach to recharacterization even though there is no dispute of "what the parties actually intended."  This is contrary to the Third Circuit precedent where "intent" is the "determinative inquiry."  *SubMicron*, 432 F.3d at 457.[44]  In sum, the PropCo Loan was intended to be debt by the OpCo Borrowers and the PropCo Lenders (as admitted by the Committee's own expert), and therefore it must be characterized as debt.

### C.    Even If The Court Evaluates The Intent Through The Various Multi-Factor Tests, The Evidence Is Clear That The PropCo Loan Is Debt.

Both the PropCo Lenders and the OpCo Borrowers intended the PropCo Loan to be debt. Even if this Court aims to review the evidence through the rubric of the multi-factor tests, the outcome is the same.  The Committee and its recharacterization expert, Ms. Flaton, focuses exclusively on the eleven *AutoStyle* factors ignoring the other "pertinent" factors identified by courts in the Third Circuit.  In an effort to be thorough and fully respond to the assertions by the Committee, Defendants will address each of these *AutoStyle* factors in turn followed by additional

---

[44]    In its Trial Brief, the Committee propounds the argument that "subjective intent is irrelevant" based a single case from the Fifth Circuit from forty years ago.  D.I. 144 at 28 (citing *Slappey Drive Indus. Park v. United States*, 561 F.2d 572, 583 (5th Cir. 1977)).  Simply put, that case is not the law of the Third Circuit.  Presenting evidence of recharacterization is merely a way to divine "what the parties actually intended" when there is ambiguity or disagreement. *SubMicron*, 432 F.3d at 455–56); *see also See also In re Shubh Hotels Pittsburgh, LLC*, 476 B.R. 181, 189 (Bankr. W.D. Pa. 2012) ("Allowing the Shubh Hotels' hindsight characterization of the Advances to prevail over its confessed intent at the time the Advances were made, would run contrary to this well established precedent.").

factors identified by Delaware courts.  In the end, the *AutoStyle* factors overwhelming favor treating the PropCo Loan as debt—especially when placed in the proper legal and factual context. The same is true of the additional factors identified by Delaware courts.

> 1.    The Eleven *AutoStyle* Factors Weigh in Favor of Treating the PropCo Loan as Debt.

Factor 1 - The names given to instruments, if any, evidencing the indebtedness:  The PropCo Entities signed a 107-page written agreement titled "Term Loan and Security Agreement" (the "Loan Agreement") with the OpCo Entities.  DX0416.  The instrument's name clearly evidences a secured loan.  Even the Committee agrees that this evidences debt.  10/18/17 Tr. at 155:2–15, 211:1–8 (Ms. Flaton).

Factor 2 - The presence or absence of a fixed maturity date and schedule of payments:  The PropCo Loan provides that the loan's maturity date is "April __, 2016."  DX0416-0060.  The Committee is asking the Court to take the blank in the Agreement (*i.e.,* whether it is April 1 or April 30) and conclude that there is no maturity date at all.  That is unreasonable.  Courts regularly interpret imperfect contracts and resolve such minor ambiguities through commonsense and extrinsic evidence.  *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (When a contract is "susceptible of different interpretations" there is "ambiguity," and the court "must look beyond the language" to "ascertain the parties' intentions.").  Indeed, treating the PropCo Loan as if it had no maturity date would render several of the Loan Agreement's provisions meaningless as they rely on the defined term Maturity Date.  *See* DX0416 at §§ 2.6, 3.1, 13.1, and 16.2(b)(iii).  Courts do not require perfect documentation to evidence intent to create a debt.  *See SubMicron*, 432 F.3d at 458 (characterizing an advance as a debt despite "numerous mistakes and errors when generating notes"); *In re Liberty Brands, LLC*, 2014 WL 4792053, at *5 (Bankr. D. Del. Sept. 25, 2014) (holding that the parties intended the "Miller Loan" to be debt even though it

"was not documented" at all for six months). A written contract with a formal "Maturity Date" and obligations related to such a date weigh in favor of the parties' intending to create a debt instrument.

Factor 3 - The presence or absence of a fixed rate of interest and interest payments: The absence of "a fixed rate of interest and interest payments" is "a strong indication that the investment was a capital contribution." *See In re Broadstripe, LLC*, 444 B.R. 51, 95–96 (Bankr. D. Del. 2010). The PropCo Loan provides that the interest shall accrue at 8% per annum (Term Loan Rate) and that all accrued and unpaid interest is due in full on the Maturity Date. DX0416-0024 & 0028. In the event of a default, the interest rate increases to 12%. DX0416-0024 & 0028, DX0416-0054–59 (listing "Events of Default" and remedies after default). According to the Intercreditor Agreement, the interest payable to the PropCo Lenders would accrue, but no interest could be paid until the PNC Revolving Agreement was paid in full. But "deferral of interest payments does not by itself mean that the parties converted a debt transaction to equity since the defendants still expected to be repaid." *AutoStyle*, 269 F.3d at 751; *Broadstripe,* 444 B.R. at 96 ("presence of PIK interest is not decisive" of the recharacterization analysis "especially in a distressed investment context.").[45] Overall, this factor favors the treatment of the PropCo Loan as debt because there was a fixed rate of interest accruing over time.

---

[45] *See also State St. Bank*, 520 B.R. at 79 ("The Junior PIK Notes reflect all indicia of indebtedness, including the issuance of notes with payment at a fixed interest rate (although payment of interest was deferred).").

Factor 4 - The source of repayments (whether repayment is dependent on success): Under this factor, "[i]f the expectation of repayment depends *solely* on the success of the borrower's business, the transaction has the appearance of a capital contribution." *In re Friedman's Inc.*, 452 B.R. 512, 521 (Bankr. D. Del. 2011) (emphasis added) (internal citation omitted); *State St. Bank*, 520 B.R. at 76 ("all extensions of credit depend on a company's success, and that risk alone—without more—does not indicate that they are capital contributions."). The PropCo Loan and the Intercompany Note provide that the PropCo Entities have an absolute right to payment—*i.e.*, repayment is not contingent on success of the business. DX0416 at §§ 2.3, 2.6; Intercompany Note at 1. Moreover, the PropCo Loan was secured by the assets of the OpCo Borrowers. The evidence is clear that the OpCo Borrowers had sufficient unencumbered collateral to pay the PropCo Loan even in the event of a liquidation. 10/17/17 Tr. at 113:21–115:4, 128:23–129:9 (Mr. Niegsch).

Ms. Flaton asserts that because the PropCo Loan is "underneath the ABL" "it will require success of the business in order to get repaid." 10/18/17 Tr. at 160:23–161:2 (Ms. Flaton). While Ms. Flaton's statement could be true if the PNC Loan was undersecured, that was not the case. Ms. Flaton agreed that "where a secured lender has adequate collateral, they are not dependent on the success of the business for repayment because they have the collateral." 10/18/17 Tr. at 215:7–20 (Ms. Flaton). The testimony by the fact witnesses (plus the outcome of the bankruptcy sales and even the fact of this lawsuit) shows that there was adequate collateral for repayment of the secured PropCo Loan. Notably, Ms. Flaton "never attempted to value the collateral at the OpCo." *Id.* Accordingly, the PropCo Loan did not depend on the success of the OpCo Borrowers because there was sufficient unencumbered collateral to repay the loan, even in a liquidation scenario.

Factor 5 - The adequacy or inadequacy of capitalization:  Defendants acknowledge that the OpCo Borrowers were not adequately capitalized in August 2015.  Narrowly evaluated, this factor would weigh in favor of characterizing the PropCo Loan as equity.

This factor, however, has limited weight where an "existing lender . . . extend[s] additional credit to a distressed borrower as a means to protect its existing loans."  *In re Radnor Holdings Corp.*, 353 B.R. 820, 839 (Bankr. D. Del. 2006); *see also SubMicron*, 432 F.3d at 457 (When existing lenders make loans to a distressed company, "traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company.").  Admittedly, the PropCo Lenders were not preexisting lenders to the OpCo Borrowers.  But the PropCo Lenders did have a preexisting contractual relationship with OpCo North and OpCo South:  they were parties to long-term lease agreements—with the PropCo Lenders as landlord and OpCo North and South as tenant.  DX0783–DX0809.  The PropCo Lenders did not want the value of those leases to evaporate due to quickly deteriorating problems at with the tenants.  Accordingly, the logic for limiting the weight of the capitalization factor for an "existing lender" applies with equal force to the PropCo Lenders because they had a preexisting interest in their long-term leases with the OpCo Entities to protect.  *See Radnor Holdings Corp.*, 353 B.R. at 839.

Factor 6 - The identity of interest between the creditor and the stockholder:  Under this factor, "[i]f stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated."  *See Broadstripe,* 444 B.R. at 97 (internal citations omitted); *see also In re Exide Techs., Inc.*, 299 B.R. 732, 741 (Bankr. D. Del. 2003) (holding that this factor favored debt because "the advances were made not by stockholders, and not in proportion to respective stock ownership.").  The PropCo Entities owned no equity in OpCo North, OpCo South,

or Haggen, Inc. at the time of the PropCo Loan (or any time thereafter). Therefore, the PropCo

Entities could not "make advances in proportion to their respective stock ownership" because they

owned no equity. But the OpCo Entities and the PropCo Entities had common indirect ownership

by Holdings and Comvest. Accordingly, this factor is mixed: a narrow interpretation of the factor

favors debt (since PropCo Entities owned no stock in the OpCo Entities), but a broader

interpretation could potentially favor a characterization of equity (due to common, indirect

ownership).

Factor 7 - The security, if any, for the advances:   The OpCo Borrowers pledged all of their

assets as security pursuant to the Loan Agreement. DX0416. at § 4.1. The Promissory Notes also

evidence that they were "secured." P-245 at P-245.002 & P-245.005. Both the Loan Agreement

and the Promissory Notes are dated August 7, 2015.

Contrary to the documentation, Ms. Flaton testified that she understood that the PropCo

Loan was "unsecured" until the Intercreditor Agreement was signed with PNC on August 21, 2015.

10/18/17 Tr. at 163:3–14 (Ms. Flaton). Her belief is that a default on the PNC ABL Agreement

made it such that "there was no ability for [the OpCo Borrowers] to actually sign a security

agreement." *Id.* Ms. Flaton, however, is not a lawyer, and she misapprehends the legal agreements

and the nature of the security interests. It is true that the OpCo Borrowers' pledge of their assets

to the PropCo Lenders on August 7, 2015 without PNC's approval constituted an "Event of

Default" under the PNC Revolving Loan Agreement. DX0699-0042–43 (Permitted

Encumbrances), 699-0110-114 (Negative Covenants). But the PNC Revolving Loan Agreement

did not prevent the OpCo Borrowers from pledging their collateral to the PropCo Lenders. This

is clear from the Forbearance Agreement where PNC agreed to forebear the "Event of Default"

but there was no change to the security status of the PropCo Loan. DX0427-0005–6 (allowing the

"Liens" under the "PropCo Special Advance" and "Initial Provisional Funding" to no longer be an "Event of Default").[46]  From the signing of the PropCo Loan Agreement on August 7, 2015, the money advanced to OpCo was secured.

Some of the confusion appears to stem from the fact that the security interest was created on August 7, 2015 with the first advance, but that security interest was not perfected (through the filing of a Financing Statement) until August 21, 2015.  DX0772–DX0774 (UCC Financing Statements).  Regardless, the legal documents are clear:  the PropCo Loan was secured from its onset and fully perfected prior to the bankruptcy filing.

Factor 8 - The corporation's ability to obtain financing from outside lending institutions: Where "no reasonable creditor would have acted in the same manner" it is "evidence that the advances were capital contributions rather than loans." *AutoStyle*, 269 F.3d at 752.  Admittedly, the PropCo Lenders were not "outside lending institutions" and, given the time constraints, the OpCo Entities were not able to find an outside lender.  Ms. Flaton testified that this factor favors equity because the record does not contain evidence that any outside lender was offering to lend to the OpCo Entities at the time.  10/18/17 Tr. at 164:9–165:11 (Ms. Flaton).

The issue with Ms. Flaton's approach is that it ignores the fact that the PropCo Loan was fully secured.  Mr. Niegsch testified that in August 2015 he believed that the OpCo Borrowers had "asset value" that "exceeded the ABL by more than $25 million."  10/17/17 Tr. at 128:23–129:9 (Mr. Niegsch).  Indeed, he was proven right by the eventual sale of the assets where the sale

---

[46]    The Committee is likely to respond that it is unreasonable to provide a loan to borrowers that are in default.  But this occurs often enough in distressed situations that there is case law on point.  *See, e.g.*, *Fedders*, 405 B.R. at 554 ("Simply alleging, , , that the Lenders knew the 'loans' they provided to Fedders would be in default at the time the agreements providing for the loans were executed is not enough to state a claim for recharacterization.").  Moreover, at the time of the PropCo Loan, the PropCo Entities had been in negotiation with PNC knowing that they would consent to the Forbearance Agreement eliminating the default.  On August 12, 2015, for example, Mr. Niegsch referred to the "forbearance agreement term sheet" as "final" but the various banks would need "until next Wednesday" to "go to their credit committees for final sign off."  P-42.002.

exceeded the PNC ABL plus the PropCo Loan amount. 10/17/17 Tr. at 113:21–115:4 (Mr. Niegsch).[47] The choice to not pursue outside lenders was due to "the speed that it needed to get a loan." 10/16/17 Tr. 185:4–186:25 (Mr. Caple).[48] Ms. Flaton did not perform any analysis of whether a reasonable outside lender would have made a loan directly to OpCo—especially if OpCo had had more time. *See* 10/18/17 Tr. 218:3–13 (Ms. Flaton). Accordingly, Ms. Flaton's opinion is little more than a recitation of the factual record. The OpCo Entities did not have time to pursue new outside lenders and educate them regarding the value of the OpCo Entities' unencumbered collateral. Defendants will admit that it is unlikely that a lender would have loaned unsecured money to the OpCo Entities in August 2015. But it is reasonable to believe that a lender would have offered, like the PropCo Lenders, a secured loan where the unencumbered assets were more than sufficient to cover the amount of the loan.

Moreover, no matter how this Court views this fact, it has limited weight where the lender has a preexisting interest in the borrower to protect; as described earlier the PropCo Lenders had a preexisting interest in the long-term leases with OpCo, which is analogous to a preexisting lender relationship. *See In re Moll Indus., Inc.*, 454 B.R. 574, 584 (Bankr. D. Del. 2011).

Factor 9 - The extent to which the advances were subordinated to the claims of outside creditors: This factor only supports the Committee if there was "subordination of advances to claims of **all other creditors**." *AutoStyle*, 269 F.3d at 751 (emphasis added). While the PropCo Loan was subordinated to the PNC ABL, it was superior to all other creditors. 10/18/17 Tr. at

---

[47]  *See* 10/17/17 Tr. 115:1–4 (Mr. Niegsch) ("[W]e sold the legacy Haggen business to Albertson's, plus -- plus the sale of the non-core stores in the auction for a number that, you know, exceeded the ABL, plus, you know, the second lien loan.").

[48]  Mr. Caple testified that "I didn't believe that anybody was going to make a lien to OpCo, given its current state." 10/16/17 Tr. at 172:5-8 (Mr. Caple). But he clarified that this was due to "the speed that it needed to get a loan." *Id*. at 185:4–186:25.

218:19–219:4 (Ms. Flaton agreed that assuming no recharacterization the PropCo Loan "will be paid ahead of the general unsecured creditors."). Ms. Flaton misinterprets this factor in her testimony at trial. She testified that "ultimately if [the PropCo Loan is] down toward the bottom of the stack, it's looking more like equity than anything else." 10/18/17 Tr. at 165:22–24 (Ms. Flaton). But the factor does not look at whether the PropCo Loan is subordinated to the senior, secured creditor. It looks at whether the PropCo Loan is subordinated to "all other creditors." *See Broadstripe*, 444 B.R. at 101 ("Subordination of advances to claims of all other creditors indicates that the advances were capital contributions, not loans."). Accordingly, this factor favors a characterization of debt.

Factor 10 - The extent to which the advances were used to acquire capital assets: "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *AutoStyle*, 269 F.3d at 752. The record evidence is consistent that the PropCo Loan was used for working capital—not to acquire capital assets. 10/18/17 Tr. at 166:5–8 (Ms. Flaton) ("This in fact was used for working capital and paying payroll."). Even the Committee agrees that this factor favors the Defendants' view that the PropCo Loan is debt. *See* 10/18/17 Tr. at 219:10–19 (Ms. Flaton).

Factor 11 - The presence or absence of a sinking fund to provide repayments: Courts have recognized that, where a loan is "secured with liens," the "need for any sinking fund" is "obviated" and this factor will not weigh in favor of recharacterization. *AutoStyle*, 269 F.3d at 753. Here, the PropCo Loan is secured, obviating any need for a sinking fund and rendering this factor irrelevant.

The Third Circuit cautions that the *AutoStyle* factors (or any set of factors) are not "scorecard" to be tallied. *SubMicron*, 432 F.3d at 456. But taken together, and evaluated in

context, these factors overwhelmingly favor the view that the parties to the PropCo Loan intended it to be debt.

      2.    <u>The Additional Factors Identified by Delaware Courts Support the Treatment of the PropCo Loan as Debt.</u>

In addition to the *AutoStyle* factors, Delaware courts have considered several other factors in evaluating a recharacterization inquiry. For example, several courts in the Third Circuit have adopted a more streamlined seven-factor test rather than using the longer *AutoStyle* test. Among other factors, these courts evaluate the "certainty of payment in the event of the corporation's insolvency or liquidation." *SubMicron*, 432 F.3d at 456 n.8; *Liberty Brands,* 2014 WL 4792053, at *5. The "certainty of payment" factor cuts straight to what a lender cares about when making a loan, especially in a distressed situation. In the seven-factor test, this "certainty of payment" factor effectively replaces the more amorphous *AutoStyle* factors of capitalization, whether outside lenders would have lent, and source of repayments. Given the unencumbered collateral at the OpCo Borrowers available to the PropCo Lenders, the "certainty of payment" factor would weigh heavily in favor of treating the PropCo Loan as debt.

Another factor is the "presence or absence of voting rights" because equity is frequently associated with voting rights in the company. *SubMicron*, 432 F.3d at 456 n.8 (3d Cir. 2006); *Liberty Brands,* 2014 WL 4792053, at *5. Here, the PropCo Loan does not offer the PropCo Entities any voting rights in the OpCo Borrowers. Accordingly the lack of voting rights suggests that the PropCo Loan is debt.

Another factor frequently cited by courts to evaluate intent is how the parties accounted for the advance on their financial statements and accounting records. *SubMicron*, 432 F.3d at 457 ("numerous facts to support a debt characterization" including "1999 notes were recorded as secured debt on SubMicron's 10Q SEC filing and UCC-1 financing statements."); *see also Liberty*

*Brands*, 2014 WL 4792053, at *4 ("Sunflower loan was at all times denominated as 'Loan Payable

to Sunflower' on the Debtor's books."). It is undisputed that PropCo and OpCo accounted for the

PropCo Loan as a loan. 10/18/17 Tr. 197:21–23 (Ms. Flaton) ("Q. And both sides to the loan

accounted for it as a loan on their books. Isn't that correct? A. I believe that's correct. Yes.").

Overall, even focusing on the various factors, the PropCo Loan has characteristics more

similar to debt than other loans before this Court. In *Liberty Brands*, this Court evaluated the

"Sunflower Loan" where there was "no (i) written documentation of the Sunflower loan, (ii)

maturity date, (iii) schedule of payments, or (iv) fixed rate of interest" and the "loan depended on

the Debtor's success." *Liberty Brands,* 2014 WL 4792053, at *3–4. The Sunflower Loan was "not

secured." *See* Findings of Fact and Conclusions of Law, *In re Liberty Brands, LLC*, No. 07-10645

(MFW), D.I. 226 at ¶ 111. Even with these factors favoring equity, the Court found that the parties

intended it to be a loan because it was "denominated as 'Loan Payable to Sunflower' on the

Debtor's books," key witnesses "considered" it to be a loan, and the lender did not acquire voting

rights. *See Liberty Brands*, 2014 WL 4792053 at *3–4. If the "Sunflower Loan" is treated by debt

in this Court, then there can be no doubt that the PropCo Loan is a true loan. *See Id*. In sum, even

if this Court utilizes that various multi-factor tests to divine the intent of the parties, the PropCo

Loan should be treated as debt.[49]

### D.    The PropCo Loan Was Rescue Financing That Benefited OpCo's Creditors.

Recharacterization is designed to treat an investment consistent with the "the intent of the

parties." *SubMicron*, 432 F.3d at 456. At its core, the PropCo Loan is the type of rescue financing

---

[49]    If this Court determines that the PropCo Loan should be recharacterized as equity, the Committee has presented
no evidence regarding the supposed terms and conditions of the purported capital contribution. It is not clear how
much equity the PropCo Entities would own in OpCo North, OpCo South, and Haggen, Inc.—or how much this
would dilute the equity interests of other debtors.

that courts aim to preserve.  The PropCo Loan fits the characteristics of a rescue financing as described by Ms. Flaton:  the PropCo Loan was "made by non-traditional lenders," it was "secured by collateral," and it "is subordinate to the existing debt on the structure."  10/18/17 Tr. at 199:4–24 (Ms. Flaton) (describing characteristics of a typical rescue loan).  Moreover, Ms. Flaton testified that based on her experience the PropCo Loan was "good for OpCo's creditors" and that she would have advised them to accept the money:

> Q.  And you agree that the additional $25 million in capital into this failing situation was a good fact for OpCo's creditors.  Isn't that correct?
>
> A.  Yes. Any cash coming in would be a good fact for OpCo's creditors.
>
> Q.  In fact, if you had been advising the OpCos in August of 2015, you would not have advised them to reject a term loan from the OpCos.  Isn't that correct?
>
> A.  I would not have advised them to reject cash coming in.

10/18/17 Tr. at 197:24–198:17 (Ms. Flaton).  The alternative to the PropCo Loan was missing payroll—"Employees don't show up"—and likely a freefall bankruptcy.  10/17/17 Tr. at 117:1–16 (Mr. Niegsch); *see also* 10/16/17 Tr. at 304:12–305:2 (Mr. Caple).  As Ms. Flaton testified, "freefall bankruptcies can be destructive of value" and such a freefall could cause the debtors' creditors to suffer. 10/18/17 Tr. at 221:8–19 (Ms. Flaton).  From a practical standpoint, the PropCo Loan provided much needed liquidity that was used in part to pay OpCo's creditors while ultimately allowing for an organized descent in bankruptcy.

Courts have frequently worried that an overly aggressive recharacterization regime could deter good-faith rescue financing for struggling companies.  *In re: Dornier Aviation (N. Am.), Inc*., 453 F.3d 225, 234 (4th Cir. 2006) ("In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans."); *In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1152 (10th Cir. 2015) ("[P]lacing too heavy an emphasis on undercapitalization in our recharacterization analysis would create an

'unhealthy deterrent effect,' causing business owners to fear that, should their 'rescue efforts' fail, a court will . . . 'too quickly refuse to treat their cash infusions as loans.'").  An overly aggressive recharacterization regime could eliminate efficient, good-faith rescue financing to the detriment of creditors.  In addition, going forward, it could nudge corporations into specific jurisdictions to avoid recharacterization risk.  Regardless, it would be an "unhealthy deterrent" to punish the PropCo Lenders for stepping in and protecting value at the OpCo Borrowers—to the benefit of OpCo's creditors—through rescue financing.

## XI.   THE COURT SHOULD REJECT THE COMMITTEE'S EQUITABLE SUBORDINATION CLAIMS (COUNTS 69, 70, AND 77).

The Court should also reject the Committee's claims to equitably subordinate the $25 million PropCo Loan or any proofs of claim filed (or to be filed) by the PropCo Entities (the "PropCo Proofs of Claim") to the claims of the unsecured creditors (Counts 69 and 77).[50]  These claims—which are against the PropCo Entities—fail because the Committee has not shown that there was any inequitable conduct on the part of the PropCo Entities or that the OpCo Entities' creditors were harmed.

### A.    Legal Standard for Equitable Subordination

The doctrine of equitable subordination, codified in section 510(c) of the Bankruptcy Code, authorizes a bankruptcy court to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."  11 U.S.C. § 510(c).  The Third Circuit requires a

---

[50]   The Committee also asserts that the "liens" on the Intercompany Notes should be transferred to the Debtors' estate (Count 70).  Section 510(c) of the Bankruptcy Code allows a court, "after notice and a hearing," to "order that any lien securing such a subordinated claim be transferred to the estate."  11 U.S.C. § 510(c); Collier on Bankruptcy § 510.05 (16th ed. 2017) ("In essence, the subordinated claim becomes unsecured and the property securing such claim becomes part of the debtor's estate.").  This claim is little more than the statutory mechanism to enforce equitable subordination; it rises or falls in combination with Count 69.  The Committee admitted as much in its Pretrial Brief.  *See* D.I. 144 at 28 n.41 (noting that the "Equitable Subordination" section addresses Counts 69, 70, and 77 of the Complaint).

movant to establish three elements before a court may subordinate a creditor's claim: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir. 2009) (quotations and brackets omitted) (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699–700 (5th Cir. 1977)). Equitable subordination is "an extraordinary remedy which is applied sparingly."[51] *See, e.g., In re Epic Capital Corp.*, 307 B.R. 767, 773 (D. Del. 2004); *see also Radnor Holdings,* 353 B.R. at 840 (describing equitable subordination as a "drastic" and "unusual" remedy).

"Courts recognize three general categories of behavior that *may* constitute inequitable conduct: 1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or alter ego." *Epic Capital,* 290 B.R. at 524, *aff'd*, 307 B.R. 767 (D. Del. 2004) (emphasis added). While the burden of proof on the movant "is less demanding when the respondent is an insider," it is axiomatic that "[i]nsider status alone . . . is insufficient to warrant subordination." *Id.*; *In re Nutri/Sys. of Fla. Assocs.*, 178 B.R. 645, 657 (E.D. Pa. 1995). In addition, obtaining a security interest—without more—is not inequitable conduct. *See Optim Energy,* 527 B.R. at 177. Neither is undercapitalization "without evidence of deception about the debtors' financial condition or other misconduct." *Lifschultz*, 132 F.3d at 349; *AutoStyle*, 269 F.3d at 747 ("Undercapitalization *alone* is insufficient to justify the subordination of insider claims."); *Alternate Fuels*, 789 F.3d at 1155 (reasoning that "undercapitalization is not

---

[51]  Indeed, "[w]rongful or unpredictable subordination spawns legal uncertainty of a particular type: the risk that a court may refuse to honor an otherwise binding agreement on amorphous grounds of equity." *In re Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997).

in itself inequitable conduct"). This makes sense, as "[a]ny other analysis would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a floundering company." *AutoStyle*, 269 F.3d at 747 (citing *In re Octagon Roofing*, 157 B.R. 852, 858 (N.D. Ill. 1993)).

Finally, equitable subordination and recharacterization are distinct claims that "address distinct concerns." *SubMicron*, 432 F.3d at 454. While the recharacterization inquiry focuses on "the proper characterization" of an advance "in the first instance," equitable subordination "is apt when equity demands that the payment priority of claims of an otherwise legitimate creditor be changed to fall behind those of other claimants." *Id.* The Third Circuit has described the equitable subordination doctrine as "remedial, not penal, and should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the *inequitable conduct*." *Id.* at 462 (emphasis added). "The critical inquiry," therefore, when evaluating an equitable subordination claim "is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated." *In re Hedged-Invs. Assocs., Inc.*, 380 F.3d 1292, 1300 (10th Cir. 2004).

### B.    The PropCo Entities Did Not Act Inequitably In Making a Secured Loan to the OpCo Entities.

The Committee's claims to equitably subordinate the PropCo Loan fail because the Committee has not shown that the PropCo Entities engaged in any inequitable conduct. In its Complaint, the Committee alleges two types of misconduct:

1. The PropCo Entities took "security interests" in the OpCo Entities in exchange for the PropCo Loan "at a time when the Debtors were insolvent, unable to pay their debts as they became due, and left with unreasonably small capital"; and

2. Comvest "engaged in a pattern of misconduct and inequitable conduct at the expense of the Debtors, . . . including by engineering and executing the Challenged Transactions."

143

D.I. 1 at ¶¶ 703, 704, 710.  The first allegation does not warrant the subordination of the PropCo Loan; the second allegation asserts misconduct by the wrong party (Comvest) and is not supported by the evidence.

As for the first allegation, neither that the PropCo Entities took security interests in the OpCo Entities nor that the Debtors were in dire financial straits when the PropCo Loan was executed constitute conduct sufficient to support equitable subordination.  Taking a security interest does not constitute inequitable conduct.  *See Optim Energy,* 527 B.R. at 177 ("It is not inequitable for a lender, even an insider lender, to obtain a lien on the borrower's assets in order to secure its position above creditors in the event of the borrower's default.").  This is especially so where, as here, the security interest was taken in conjunction with a loan that generated $45 million in additional liquidity at the OpCo Entities.  *See* 10/18/17 Tr. at 153:8–154:8 (Ms. Flaton); 10/17/17 Tr. at 107:25–108:11 (Mr. Niegsch).  The fact that the OpCo Entities were in financial distress when the PropCo Loan was made does not change the analysis.  Courts consistently hold that insider loans to distressed companies will not *ipso facto* be subordinated.  *AutoStyle,* 269 F.3d at 747; *Sinclair v. Barr (In re Mid-Town Produce Terminal, Inc.)* 599 F.2d 389, 392 (10th Cir. 1979) ("To hold the debt may be subordinated [solely on the basis of the insider nature of the transaction] would discourage owners from trying to salvage a business, and require all contributions [from insiders] to be made in the form of equity capital.").  This is sound policy, as "[t]he penalty for attempting to save the corporation should not be subordination." *Matter of Rego Crescent Corp.*, 23 B.R. 958, 964 (Bankr. E.D.N.Y. 1982).

As for the second allegation, the Committee has not demonstrated that the *PropCo Entities* engaged in any inequitable conduct.  Indeed, the Committee does not even allege that the PropCo Entities engaged in any inequitable conduct; rather it claims that *Comvest* engaged in inequitable

144

conduct, and that conduct should be imputed to the PropCo Entities. *See* D.I. 1 at ¶¶ 704, 705. Comvest's alleged conduct should not be imputed to the PropCo Entities. *See*, *e.g.*, *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 369 (Bankr. S.D.N.Y. 2002) (holding that the committee's allegations regarding the control exercised by a corporate parent that advised the debtor on corporate acquisitions over the decision by a corporate affiliate to finance such acquisitions were insufficient to hold the corporate affiliate liable for the parent's alleged misconduct, and thus to equitably subordinate affiliate's claim on that basis); *Comm. of Unsecured Creditors of Champion Enter., Inc. v. Credit Suisse (In re Champion Enter., Inc.)*, 2010 WL 3522132, at *10 (Bankr. D. Del. Sept. 1, 2010) (dismissing complaint because "courts commonly hold that equitable subordination must be based on the claimant's own acts" and plaintiff failed to allege inequitable conduct on the part of the claimants themselves).

Even if Comvest's conduct could be imputed to the PropCo Entities, the allegation that Comvest engaged in inequitable conduct is not borne out by the evidence. The Committee alleges that the "Challenged Transactions" constituted inequitable conduct.[52] None of the Challenged Transactions were inequitable. First, the Committee admitted repeatedly in this case that there is nothing wrong with creating an OpCo/PropCo corporate structure. *See, e.g.*, 9/26/17 Hr'g Tr. 50:6–7 (Mr. Feinstein) ("There is nothing, *per se*, wrong about the PropCo and OpCo structure."). Second, as described above, there is nothing fraudulent or inequitable about a corporation contributing value to its wholly-owned subsidiaries. *See infra* Part IV, Section E. Third, the

---

[52]    The Committee defined the "Challenged Transactions" as (1) the creation of the OpCo/PropCo corporate structure; (2) the downstream contributions of the right to acquire real property from Holdings to the wholly-owned PropCo and SLB Entities; (3) the sale-leaseback transactions with Spirit and GIG; and (4) the imposition of above-market leases on the OpCo Entities.

evidence shows that the sale-leaseback transactions were the product of arm's length negotiations, and that the resulting leases were not above market. *See* D. Rosenberg (Spirit) Dep. at 131:2–4; M. West (HFF) Dep. at 173:7–11, 173:17–18; DX0222-0023; DX0131-0013; DX0439-0001. Fourth, the Committee concedes that the leases between the PropCo and OpCo Entities were not above market. *See* D.I. 142 at 21 ("Plaintiff will not offer any evidence that the rents paid by Operations and the OpCo Entities to the PropCo Entities were above-market.").

The Committee also has not shown that either the PropCo Entities or Comvest engaged in any of the "three general categories of behavior that may constitute inequitable conduct." *Epic Capital*, 290 B.R. at 524. The Committee has not demonstrated, for example, that Defendants engaged in any conduct that would constitute fraud, illegality, or breach of fiduciary duty. *See infra* Parts I, III–VII. The evidence adduced at trial shows that the OpCo Entities were *not* undercapitalized at the outset of the Albertson's Acquisition. *See infra* Findings of Fact, Part XII. The case law is also clear that undercapitalization of the debtor at the time it entered into a secured loan with a lender does not constitute inequitable conduct, absent something more. *See, e.g.*, *In re Filtercorp, Inc.*, 163 F.3d 570, 583 (9th Cir. 1998) (holding that the insolvency of the debtor at the time it entered into secured loan transactions with claimants, standing alone, is insufficient to require subordination of claimants' claims). And the Committee has not shown, much less alleged, that the OpCo Entities were mere instrumentalities or alter egos of either the PropCo Entities or Comvest.

Ultimately, just as with so many of its other claims, the Committee's complaint is that "[f]rom the outset this transaction was set up in such a way that it was going to benefit Comvest whether, you know, heads I win tails you lose." 10/20/17 Tr. at 88:7–10 (Mr. Feinstein). But that myth has been debunked at every turn. The evidence clearly shows that the PropCo Entities did

not engage in any inequitable conduct.  As a result, the Committee cannot make out a prima facie

case for equitable subordination.

### C.    The PropCo Loan Did Not Harm the OpCo Entities' Unsecured Creditors.

The Committee also has the burden to show that the PropCo Loan harmed the unsecured

creditors at the OpCo Entities or bestowed an unfair advantage on the PropCo Entities.   The

Committee's position as to this element is two-fold:  if the PropCo Loan "is allowed as a secured

claim," then (a) the OpCo Entities' creditors will be harmed "because there will be $25 million

(plus interest) less to satisfy their claims"; and (b) it "will confer an unfair advantage to the PropCo

Entities by ratifying Comvest's decision to use the Debtors' assets under dire circumstances to try

to protect its own equity investment."   D.I. 144 at 31.   The evidence does not support either

position.

The unsecured creditors were not injured by the PropCo Loan.  Indeed, the evidence shows

that they were the primary beneficiary of it.  The PropCo Loan directly resulted in the infusion of

$25 million in the OpCo Entities in August 2015.  *See* DX0416; 10/18/17 Tr. at 197:18–20 (Ms.

Flaton).  That money was used to make payroll and to pay then-existing obligations to the very

same unsecured creditors that the Committee represents.  *See* 10/18/17 Tr. at 166:5–8 (Ms. Flaton)

("This in fact was used for working capital and paying payroll.").   The PropCo Loan was also a

condition precedent for unlocking $20 million of additional liquidity:  as part of the Forbearance

and Intercreditor Agreements, PNC provided an additional $20 million of availability under the

PNC Revolver.  *See* 10/18/17 Tr. at 198:15–19 (Ms. Flaton).  These funds—$45 million in total—

reduced the OpCo Entities' debt and were designed to give the OpCo Entities time to execute a

turnaround plan.  *See* 10/17/17 Tr. at 108:5–109:2 (Mr. Niegsch).  The evidence also shows that,

absent the PropCo Loan, the OpCo Entities would have descended into a freefall bankruptcy,

which would have destroyed value and left the unsecured creditors worse off.  *See* 10/17/17 Tr. at

117:6–16 (Mr. Niegsch); 10/18/17 Tr. at 220:23–221:25 (Ms. Flaton). As a result, the unsecured

creditors *benefited* from this additional working capital; they were not harmed.

The Committee's own expert agrees that the unsecured creditors were better off because

of the PropCo Loan than they otherwise would have been. During cross-examination, Ms. Flaton

admitted that, from the perspective of the OpCo Entities' creditors, it was a good thing for the

OpCo Entities to receive the proceeds of the PropCo Loan. *See* 10/18/17 Tr. at 197:24–198:3 (Ms.

Flaton). She further admitted that had she been advising the OpCo Entities, she would not have

advised them to turn down the PropCo Loan. *See* 10/18/17 Tr. at 198:4–7 (Ms. Flaton). Ms. Flaton

also testified that, in her view, the PropCo Loan was better than market, as nobody else would

have made a loan to the OpCo Entities on as good of terms as the PropCo Loan. *See* 10/18/17 Tr.

at 217:21–218:2 (Ms. Flaton). In other words, not only did the OpCo Entities' creditors benefit

from the additional liquidity in the short run, they did so on terms that were favorable to them over

the long run.

The PropCo Loan also did not confer an "unfair advantage" on the PropCo Entities vis-à-

vis the OpCo Entities. The PropCo Loan was an attempt to rescue the OpCo Entities. *See infra*

Part X, Section D. Had that attempt been successful, the OpCo Entities' creditors would have

benefitted tremendously from a healthy grocery brand that would have been able to pay its

creditors. Comvest would also have been a beneficiary of that success, but to say that Comvest's

attempt to "protect its own equity investment" constitutes an "unfair advantage" is to ignore the

benefits that the unsecured creditors would have reaped. The Committee's argument also ignores

the short term benefits that the unsecured creditors reaped as a direct result of the PropCo Loan.

And as discussed above, there are important policy reasons to encourage loans from insiders to

companies in dire straits, as insiders are often a company's last best chance to avoid a bankruptcy

148

filing. *See AutoStyle,* 269 F.3d at 747; *In re Mid-Town Produce*, 599 F.2d at 392.

Importantly, this is not a case where the PropCo Entities improved their priority position vis-à-vis other creditors on an existing debt on the eve of bankruptcy. Courts often equitably subordinate attempts by insiders to improve their recovery on existing debts through the last minute taking of a security interest. For example, in *State Street Bank*, the court found inequitable conduct and harm to creditors when an insider-noteholder implemented a plan in conjunction with a debtor's management to convert its preexisting debt to secured status and obtain priority over other creditors. 520 B.R. at 82; *see also In re Le Café Crème, Ltd.*, 244 B.R. 221, 236 (Bankr. S.D.N.Y. 2000) (finding evidence of inequitable conduct and creditor harm when insider-shareholders used the debtor to repay themselves first on preexisting debt, and then extended additional credit on a secured basis to exchange their equity interest).

Here, the PropCo Entities took a security interest at the OpCo Entities in conjunction with a loan of $25 million. Prior to that loan, the PropCo Entities had not extended any debt to the OpCo Entities. The simple fact that the unsecured creditors were subordinate to the PropCo Loan does not, in and of itself, establish that they were harmed. *See, e.g.*, *Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc. (In re Midway Games Inc.)*, 428 B.R. 303, 319 (Bankr. D. Del. 2010) (dismissing equitable subordination claim and reasoning that although the challenged transactions may have "buried the creditor beneath more debt than would have been the case had the Debtor filed for bankruptcy beforehand, the Committee did not allege that the Debtor suffered harm"). After all, "[a]ttaining a higher priority of repayment is a major motivation behind secured lending." *Optim Energy,* 527 B.R. at 177.

The PropCo Loan was a real economic transaction that provided real benefits to the OpCo Entities and its creditors. It is not the kind of transaction that should lead to equitable

subordination.

D.      **The PropCo Proofs of Claim Should Not Be Equitably Subordinated Either.**

Finally, the Committee has not established that the PropCo Proofs of Claim should be equitably subordinated because there is no evidence that the PropCo Entities acted inequitably or that the OpCo Entities were harmed.  As discussed above, the Committee has not established that the PropCo Entities acted inequitably in any way—and to the extent that the Court determines that Comvest's conduct should be imputed to the PropCo Entities, the Committee has not established that Comvest acted inequitably either.  In addition, the PropCo Proofs of Claim stem directly from the leases that the PropCo and OpCo Entities entered into so that the OpCo Entities could operate the stores.  The Committee has already stipulated that the rent that the PropCo Entities charged to the OpCo Entities were not above-market.  *See* D.I. 142 at 21 ("Plaintiff will not offer any evidence that the rents paid by Operations and the OpCo Entities to the PropCo Entities were above-market.").  Accordingly, the Committee cannot show that the PropCo Entities acted inequitably with regard to those leases or that the OpCo Entities were harmed by inflated rental rates.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, Defendants respectfully request that this Court deny all relief requested in the Committee's Complaint.

*Signature block on next page*

150

Dated:  November 15, 2017          **KIRKLAND & ELLIS LLP**
Stephen C. Hackney, P.C. (admitted *pro hac vice*)
Richard U.S. Howell (admitted *pro hac vice*)
Jeffery J. Lula (admitted *pro hac vice*)
300 N. LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-7092
E-mail:  stephen.hackney@kirkland.com
E-mail:  richard.howell@kirkland.com
E-mail:  jeffery.lula@kirkland.com

-and-

**WOMBLE BOND DICKINSON (US) LLP**


*/s/ Kevin J. Mangan*
Kevin Mangan (DE Bar No. 3810)
222 Delaware Avenue
Suite 1501
Wilmington, DE 19801
Telephone:  (302) 252-4361
E-mail:  kmangan@wcsr.com

-and-

Philip J. Mohr, Esq.
300 North Greene Street, Suite 1900
Greensboro, NC 27401
Telephone:  (336) 721-3577
E-mail:  pmohr@wcsr.com

*Counsel to Defendants Comvest Group Holdings, LLC,*
*Comvest Investment Partners III, L.P., Comvest Investment*
*Partners IV, L.P., Comvest Haggen Holdings III, LLC,*
*Comvest Haggen Holdings IV, LLC, Comvest Advisors,*
*LLC Haggen Property Holdings, LLC, Haggen Property*
*South LLC, Haggen Property North, LLC, Haggen*
*Property Holdings II, LLC, and Haggen SLB, LLC, and*
*John Caple, Cecilio Rodriguez, Michael Niegsch, John*
*Clougher, Blake Barnett, William Shaner, and Derrick*
*Anderson*