## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HH LIQUIDATION, LLC, *et al.*[1], | ) | Case No. 15-11874 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS OF HH LIQUIDATION, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 16-51204 (KG) |
| | ) | |
| - against - | ) | |
| | ) | |
| COMVEST GROUP HOLDINGS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PACHULSKI STANG ZIEHL & JONES LLP
Bradford J. Sandler (DE Bar No. 4142)
Robert J. Feinstein (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705

*Counsel to the Official Committee of Unsecured Creditors*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) (7558); HH Operations, LLC (f/k/a Haggen Operations Holdings, LLC) (6341), HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC) (7257), HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC) (5028), HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC) (7687), and HH Legacy, Inc. (f/k/a Haggen, Inc.) (4583).  The mailing address for each of the Debtors is 2211 Rimland Drive, Bellingham, WA  98226.

# TABLE OF CONTENTS

**Page**

PROPOSED FINDINGS OF FACT ................................................................................. 1

I.     Jurisdiction ........................................................................................................ 1

II.    The Parties ......................................................................................................... 1

       A.    The Debtors ............................................................................................. 1

       B.    The Non-Debtor Affiliate and Corporate Defendants ........................... 2

       C.    The Individual Defendants ...................................................................... 4

III.   Procedural History ............................................................................................. 8

IV.    Comvest Acquires a Controlling Interest in Haggen .................................... 10

V.     The Albertson's Opportunity and Comvest's Real Estate Play .................... 11

       A.    Comvest learns of the Albertson's opportunity .................................. 11

       B.    Comvest's "Investment Thesis" and Focus is on the Real Estate ...... 13

       C.    Comvest's Contention that it "does not invest in real estate" is not
             Credible ................................................................................................. 14

VI.    Substantial Execution Risks That Later Materialized ................................... 15

       A.    Numerous Risks are Identified Pre-Closing ........................................ 15

       B.    Pricing Risks were Specifically Identified and were Foreseeable ...... 18

VII.   The Role of Certain Third-Parties in Regards to Comvest's Projections ...... 22

       A.    FTC ........................................................................................................ 22

       B.    PNC ....................................................................................................... 24

       C.    Garrison ................................................................................................. 27

       D.    Albertson's ............................................................................................ 29

VIII.  Comvest's new Corporate Structure Advanced its own Interests to the Detriment
       of the OpCo Entities and Their Creditors ..................................................... 30

IX.    The Transactions were Interrelated and Dependent ...................................... 34

       A.    Holdings' Right to Acquire Real Estate were Gratuitously Transferred to
             PropCo Entities and SLB Entities Through the Contribution Agreements ........ 34

       B.    The SLB Transactions ........................................................................... 35

             a.    The SLB Transactions with Spirit ............................................. 36
             b.    The SLB Transactions with Garrison ....................................... 36
             c.    The SLB Leases Were Above Market ....................................... 38

       C.    The PropCo Leases/Rents ..................................................................... 40

D.   The Subleases (Ground Leases) .......................................................... 41

E.   Comvest's Domination of the Transactions and Terms ...................................... 41

X.   Comvest and Haggen Fail to Disclose the new Corporate Structure and Asset Transfers ............................................................................................................. 42

XI.   Comvest's "Investment" in Haggen was a Fraction of what Comvest Claimed ............ 44

A.   The Value of Comvest's Interest in the Legacy Stores was $26.5 million .......... 44

B.   Comvest Never Intended to Make an "Equity Investment" ................................ 45

XII.   Haggen Suffers an Immediate Meltdown Post-Closing .................................. 48

XIII.   Comvest Tries to Find a Third-Party Lender ................................................... 52

A.   UBS is "Spooked" by Financial Performance and the Risk that the OpCo Entities Would File for Bankruptcy ..................................................................... 53

B.   A&M is Retained, but Cannot Identify a Lender Due to Price and Time Constraints ............................................................................................................. 54

C.   Comvest and Priddy Decline to Make a Loan due to "Equitable Subordination" Concerns ....................................................................................... 55

D.   PNC Refused to Provide an Overadvance .......................................................... 56

XIV.   The PropCo Advance ........................................................................................ 57

A.   Citibank Refuses to Lend Against PropCo's Real Property ............................... 57

B.   The Multi-Step Process Employed to Fund the PropCo Advance ..................... 59

C.   The OpCo Entities Paid Wages in Excess of $25 million Between August 14, 2015 and the Petition Date ............................................................................... 66

D.   Flaton's Recharacterization Analysis was Credible and Unrebutted .................. 68

XV.   Comvest's IC Expected the Real Estate to be Unencumbered and Available for Comvest's Benefit in a "Disaster Scenario" ............................................................. 74

A.   Rodriguez's failure to recall is not credible ....................................................... 78

XVI.   Defendants Blame Everyone but Themselves ................................................. 79

A.   Defendants Blame Willard Bishop for Pricing Problems, but they did Nothing Other Than Fire Them ........................................................................... 81

B.   Defendants Blame SuperValu for Pricing and Supply Problems, but they Gave SuperValu a General Release and got Nothing in Return ......................... 81

C.   Defendants Conjured up their Allegations Against Albertson's Because Haggen Could not Pay the $40 million due in July ............................................. 82

XVII.   Comvest's Unreasonable Projections were a Proximate Cause of Haggen's Demise ........................................................................................................................ 86

A.   Comvest's Projections were Unreasonable ....................................................... 86

B.     The Court Accepts as Credible MacGreevey's Opinion that the OpCo Entities were Insolvent and Undercapitalized...................................................... 97

C.     Montague's Criticisms of MacGreevey's Opinions are Without Merit............. 103

PROPOSED CONCLUSIONS OF LAW ..................................................................... 104

I.     Burden of Proof................................................................................................. 104

II.     Actual Fraudulent Transfer Claims (Counts 1, 3, 6, 9, 11, 14, 17, 20, 22, 25, 28, 30, 33, 36, 39, 41, 44, 47, 50, 53, 56, 58, 61, 64) .......................................................... 105

A.     Collapsing and Substantive Consolidation as a Remedy ................................. 105

III.     Plaintiff Established all of the Elements of Actual Fraudulent Transfer Claims Related to the Owned Properties.................................................................................. 114

A.     Counts Under Federal Law (11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 550) ..................................................................................................................... 114

a.     Holdings' Interest in the Owned Properties.............................. 115
b.     The Transfer of Holdings' Interest in the Owned Properties Within Two Years of the Petition Date............................................... 115
c.     Holdings' Intent to Hinder, Delay or Defraud ....................... 116

B.     Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law ......... 119

IV.     Actual Fraudulent Transfer Claims Related to the SLB Properties ............................. 121

A.     Counts Under Federal Law (11 U.S.C. § 548(a)(1)(A) ..................................... 122

a.     Holdings' Interest in the SLB Properties.................................. 122
b.     The Transfer of Holdings' Interest in the SLB Properties Within Two Years of the Petition Date................................................. 122
c.     Holdings' Intent to Hinder, Delay or Defraud ....................... 123

B.     Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law)........ 124

C.     Transferee Liability Related to the SLB Properties (11 U.S.C. § 550) ............. 125

V.     Actual Fraudulent Transfer Claims Related to the PropCo Leases ............................. 125

a.     Actual Fraudulent Transfer Counts Under Federal Law (11 U.S.C. § 548(a)(1)(A) ...................................................................... 125
b.     The OpCo Entities' Obligations under the PropCo Leases ................... 126
c.     Within Two Years of the Petition Date................................................ 126
d.     The OpCo Entities' Intent to Hinder, Delay or Defraud....................... 126

A.     Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law)........ 127

B.     Transferee Liability Related to the PropCo Leases (11 U.S.C. § 550). ............. 128

VI.     Actual Fraudulent Transfer Claims Related to the Comvest Payments....................... 129

A.     Count 64 Federal Law (11 U.S.C. § 548(a)(1)(A) and State Law (11 U.S.C. § 548(a)(1)(A) and Applicable State Law) ....................................................................... 129

a.     Haggen's Interest in the Comvest Payments ......................... 129

|  |  | b. | The Transfer of Haggen's Interest in the Comvest Payments Within two years of the Petition Date | 129 |
|  |  | c. | Haggen's Intent to Hinder, Delay or Defraud | 129 |
| B. | | | Transferee Liability Related to the Comvest Payments (11 U.S.C. § 550) | 130 |
| VII. | | | Constructive Fraudulent Transfer Claims Related to the Owned Properties | 131 |
|  | A. | | Counts Under Federal Law (11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 550) | 131 |
|  |  | a. | Holdings' Interest in the Owned Properties | 131 |
|  |  | b. | The Transfer of Holdings' Interest in the Owned Properties Within Two Years of the Petition Date | 132 |
|  |  | d. | Financial Conditions | 133 |
|  | B. | | Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law) | 135 |
|  | C. | | Transferee Liability Related to the Owned Properties (11 U.S.C. § 550(a)) | 139 |
| VIII. | | | Constructive Fraudulent Transfer Claims Related to the SLB Properties | 139 |
|  | A. | | Counts Under Federal Law (11 U.S.C. § 548(a)(1)(B)) | 139 |
|  |  | a. | Holdings' Interest in the SLB Properties | 140 |
|  |  | b. | The Transfer of Holdings' Interest in the SLB Properties Within two years of the Petition Date | 140 |
|  |  | c. | Reasonably Equivalent Value | 140 |
|  |  | d. | Financial Conditions | 141 |
|  | B. | | Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law) | 142 |
|  | C. | | Transferee Liability Related to the SLB Properties (11 U.S.C. § 550) | 143 |
| IX. | | | Constructively Fraudulent Transfer Claims Related to the PropCo Leases | 143 |
|  | A. | | Counts Under Federal Law (11 U.S.C. § 548(a)(1)(B) | 143 |
|  |  | a. | The OpCo Entities' Obligations under the PropCo Leases | 144 |
|  |  | b. | The OpCo Entities' Payment of the PropCo Rent Payments | 144 |
|  |  | c. | Reasonably Equivalent Value | 144 |
|  |  | d. | Financial Conditions | 146 |
|  | B. | | Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law) | 147 |
|  | C. | | Transferee Liability Related to the PropCo Leases (11 U.S.C. § 550). | 148 |
| XVIII. | | | Substantive Consolidation (Count 72) | 148 |
| X. | | | Breach of Duty | 158 |
|  | A. | | Elements of Cause of Action | 158 |
|  | B. | | Standard of Conduct | 159 |
|  | C. | | The "Business Judgment Rule" Does Not Apply to Insider Transactions | 162 |
|  | D. | | Breach of Fiduciary Duty by Comvest, as Controlling Equity Owner (Count 66) | 166 |

E. Breach of Duties of Good Faith and Care by the Officers and Directors (Count 67) ................................................................................ 169

XI. The PropCo Advance ................................................................................ 171

 A. Recharacterization of the PropCo Advance (Count 71) ..................................... 171

  a. Applicable Standard ................................................................ 171
  b. Relevant Factors ..................................................................... 177
   i. Name of Instruments .................................................. 177
   ii. Fixed Maturity Date and Schedule of Payments ...................... 177
   iii. Fixed Rate of Interest and Interest Payments .......................... 177
   iv. Payment Dependent on the OpCo Entities' Business ................ 178
   v. Inadequacy of the OpCo Entities' Capitalization ..................... 179
   vi. Identity of Interests ..................................................... 180
   vii. Security for the PropCo Advance ................................... 183
   viii. Inability to Obtain Third-Party Financing ......................... 184
   ix. Subordination of the PropCo Advance to Other Debt .............. 184
   x. Advance Used to Acquire Capital Assets ........................... 185
   xi. Presence of Sinking Fund ............................................ 185
   xii. Presence or Absence of Voting Rights .............................. 185
   xiii. Policy Considerations ................................................ 186
   xiv. Equitable Subordination of the PropCo Advance (Count 69) ................................................................... 191
   xv. Transfer of Liens Securing PropCo Advance (Section 510(c)) (Count 70) ..................................................... 198

XII. Unjust Enrichment ..................................................................................... 198

 A. Elements of Cause of Action ................................................................. 198

 B. Comvest (Count 73) ........................................................................... 199

 C. SLB Entities (Count 74) ...................................................................... 199

 D. PropCo Entities (Count 75) ................................................................... 199

XIII. Disallowance of PropCo Entities' Lease Claims – 11 U.S.C. § 502(b) ....................... 200

XIV. Equitable Subordination of PropCo Entities' Lease Claims ................................... 200

XV. Judgment .................................................................................................. 201

 A. Actual Fraudulent Transfer Claims ......................................................... 201

 B. Constructive Fraudulent Transfer Claims .................................................. 203

 C. Avoidance Claims Relating to the PropCo Leases ........................................ 204

 D. Breach of Fiduciary Duty Counts (Counts 66, 67, 68) .................................. 204

 E. Equitable Subordination: PropCo Advance (Count 69) ................................... 208

 F. Transfer of Liens Securing the OpCo Entities' Obligations under PropCo Advance (Count 70) ........................................................................... 208

 G. Recharacterization: PropCo Advance (Count 71) ......................................... 208

H.      Unjust Enrichment (Counts 73, 74 and 75) ........................................................ 208

I.      Disallowance of the PropCo Entities' Lease Claims (Count 76)....................... 209

J.      Equitable Subordination of the PropCo Entities' Lease Claims (Count 77) ..... 209

K.      Disallowing Claims of Avoidance Defendants (Count 78) ............................... 209

# TABLE OF AUTHORITIES

## CASES

*2009 Caiola Family Trust v. PWA, LLC*,
  2014 Del. Ch. LEXIS 261 (Del. Ch. 2014) ........................................................... 167

*80 Nassau Assoc. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assoc.)*,
  169 B.R. 832 (Bankr. S.D.N.Y. 1994) .................................................................. 195

*Acierno v. Goldstein*,
  2005 Del. Ch. LEXIS 176 (Del. Ch. Nov. 16, 2005) .............................................. 207

*Aéropostale* ..................................................................................................... 197

*Agostino v Hicks*,
  845 A.2d 1110 (Del. Ch. 2004) ........................................................................... 158

*Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp.)*,
  353 B.R. 324 (Bankr. D.C. 2006) ........................................................................ 205

*Alexander v. Compton (In re Bonham)*,
  229 F.3d 750 (9th Cir. 2000) ............................................................................. 157

*Allen v. Dameron*, 389 P.3d 487 (Wash. 2017) ...................................................... 186

*Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76 (Bankr. D. Del. 2010) ....... 133

*Aquino v. Black (In re AtlanticRancher, Inc.)*,
  279 B.R. 411 (Bankr. D. Mass. 2002) ................................................................. 181

*August v. August* ............................................................................................... 201

*August v. August*,
  2009 Del. Ch. LEXIS 21 (Del. Ch. Feb. 20, 2009), *aff'd*, 65 A.3d 616 (2013) .......... 106

*Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*,
  473 B.R. 525 (Bankr. D. Del. 2012) ............................................................. passim

*Backus v. U3 Advisors, Inc.*,
  2017 U.S. Dist. LEXIS 132829 (S.D.N.Y. Aug. 18, 2017) ................................ 159, 160

*BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*,
  2009 Del. Ch. LEXIS 17 (Del. Ch. Feb. 3, 2009) ................................................. 199

*Bakerman v. Sidney Frank Imp. Co.*,
  2006 Del. Ch. LEXIS 180 (Del. Ch. Oct. 16, 2006) .............................................. 199

*Bayer Corp. v. MasoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
  269 F.3d 726 (6th Cir. 2001) ..................................................................... passim

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*,
  396 B.R. 810 (Bankr. S.D.N.Y. 2008) .......................................................... 116, 118

*Begier v. IRS*,
  496 U.S. 53 (1990 ........................................................................................... 115

*Benjamin v. Diamond (In re Mobile Steele,*
    563 F.2d at 699-700 (5th Cir. 1977) ............................................................ 194

*Boles v. Filipowski (In re Enivid, Inc.),*
    345 B.R. 426 (Bankr. D. Mass. 2006) ........................................................... 206

*Bomarko, Inc. v. International Telecharge, Inc.,*
    794 A.2d 1161 (Del. Ch. 1999) ..................................................................... 207

*Boucher v. Shaw,*
    572 F.3d 1087 (9th Cir. 2009) ...................................................................... 187

*Boyer v. Crown Stock Distribution, Inc.,*
    587 F.3d 787 (7th Cir. 2009) ........................................................................ 110

*Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.),*
    906 A.2d 27 (Del. 2006) ................................................................................ 161

*Brown v. General Electric Capital Corp. (In re Foxmeyer Corp.),*
    286 B.R. 546 (Bankr. D. Del. 2002) ............................................................. 104

*Brown v. Third Nat'l Bank (In re Sherman),*
    67 F.3d 1348 (8th Cir. 1995) ........................................................................ 116

*Burtch v. Opus, LLC (In re Opus East, LLC),*
    528 B.R. 30 (Bankr. D. Del. 2015) ........................................................ passim

*Cede & Co. v. Technicolor, Inc.,*
    634 A.2d 345 (Del. 1993) .......................................................... 160, 162, 207

*Christian Bros. High School Endowment v. Bayou No Leverage Fund LLC (In re Bayou Group, LLC),*
    439 B.R. 284 (S.D.N.Y. 2010) ..................................................................... 116

*Cinerama v. Technicolor Plenary,*
    663 A.2d 1156 (Del. 1995) ........................................................................... 162

*CMS Inv. Holdings, LLC v. Castle,*
    2015 Del. Ch. LEXIS 169 (Del. Ch. June 23, 2015) ..................................... 158

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.),*
    432 F.3d 448 (3d Cir. 2006) ................................................................. 105, 172

*Cohen v. S.A.C. Trading Corp.,* 711 F.3d 353 (2d Cir. 2013) .................................. 156

*Collins & Aikman Corp. v. Stockman,*
    2009 U.S. Dist. LEXIS 93806 (D. Del. Sept. 30, 2009) ............................... 205

*Committee v. Foss (In re Felt Mfg. Co., Inc.),*
    Bankr. 05-13724-JMD, Mem. Op., (Bankr. D. Del. July 27, 2007) ............... 206

*Concord Agency, Inc. v. New Castle Ins. Agency, Ltd.,*
    2015 Del. C.P. LEXIS 81 (Del. C.P. Aug. 31, 2015) .................................... 105

*DDRA Capital, Inc. v. Baldwin,*
    2017 U.S. App. LEXIS 17184 (3d Cir. Sept. 6, 2017) ................................... 156

*Dobin v. Hill (In re Hill),*
   342 B.R. 183 (Bankr. D.N.J. 2006) ............................................................................. 117

*Donovan v. Agnew*, 712 F.2d 1509 (1st Cir. 1983) ......................................................... 187

*Donovan v. Grim Hotel Co.,*
   747 F.2d 966 (5th Cir. 1984) ..................................................................................... 187

*Doukas v. La Babola Bakery & Rest., LLC,*
   2007 Del. Super. LEXIS 228 (Del. Super. July 2007).................................................. 105

*Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.),*
   810 F.2d 270 (D.C. Cir. 1987)..................................................................................... 158

*Duffield Assocs. v. Lockwood Bros.*, LLC,
   2017 Del. Ch. LEXIS 121 (Del. Ch. July 11, 2017) ..................................................... 106

*Edgewater Med. Ctr. v. Edgewater Prop. Co. (In re Edgewater Med. Ctr.),*
   373 B.R. 845 (Bankr. N.D. Ill. 2007) ................................................................... 126, 144

*Ellerman v. Centerpoint Prepress, Inc.,*
   143 Wash. 2d 514, 22 P.3d 795 (2001) ....................................................................... 186

*Emmons Coal Mining Corp. v. Sir R. Ropner & Co.,*
   31 F.2d 948 (3d Cir. 1929) ......................................................................................... 109

*Enron Corp. v. Avenue Sp. Sit. Fund II (In re Enron Corp.),*
   333 B.R. 205 (Bankr. S.D.N.Y. 2005)......................................................................... 195

*Estes v. N & D Prop., Inc. (In re N & D Prop., Inc.),*
   799 F.2d 726 (11th Cir. 1986) .............................................................................. 193, 194

*Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.),*
   926 F.2d 1458 (5th Cir. 1991) .............................................................................. 193, 194

*Failla v. FixtureOne Corp.,*
   336 P.3d 1112 (Wash. 2014), *modified*, 2014 Wash. LEXIS 1070 (Wash. Nov. 25, 2014), *cert. denied*, 135 S. Ct. 1904 (2015) ..................................................................................... 187

*Fairchild Dornier GmbH v. Off'l Comm. (In re Dornier Aviation (N. Am.), Inc.),*
   453 F.3d 225 (4th Cir. 2006) ................................................................................ passim

*Fin Hay Realty Co. v. United States,*
   398 F.2d 694 (3d Cir. 1968) ....................................................................................... 181

*Fischer v. United States,*
   441 F. Supp. 32 (E.D. Pa. 1977) ................................................................................ 179

*Fleet Corp. v. Topps Chewing Gum,*
   539 A.2d 1060 (Del. 1988) .......................................................................................... 199

*Frederick Hsu Living Trust v. ODN Holding Corp.,*
   2017 Del. Ch. LEXIS 67 (Del. Ch. Apr. 14, 2017) ............................................... passim

*Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.),*
   452 B.R. 512 (Bankr. D. Del. 2011) ..................................................................... passim

*Gatz Props., LLC v. Auriga Capital Corp.*,
   59 A.3d 1206 (Del. 2012) ................................................. 164

*Gatz v. Ponsoldt*,
   925 A.2d 1265 (Del. 2007) ............................................... 167

*Gesoff v. IIC Indus., Inc.*,
   902 A.2d 1130 (Del. Ch. 2006) ........................................ 164

*Gray v. O'Neill Props. Group (In re Dehon, Inc.)*,
   2004 Bankr. LEXIS 1470 (Bankr. D. Mass. Sep. 24, 2004) ................. 158

*Grochocinski v. Schlossberg (In re Eckert)*,
   388 B.R. 813 (Bankr. N.D. Ill. 2008) ............................... 117

*Guiliano v. Schnabel*,
   2017 Bankr. LEXIS 2023 ................................................. 117

*Hecht Co. v. Bowles*,
   321 U.S. 321, 64 S. Ct. 587, 88 L. Ed. 754 (1944) ..................... 201

*Heller v. Kiernan*,
   2002 Del. Ch. LEXIS 17 (Del. Ch. Feb. 27, 2002) ..................... 105

*Hooper v. Ebenezer Sr. Servs. & Rehab. Ctr.*,
   386 S.C. 108, 687 S.E.2d 29 (S.C. 2009) .............................. 202

*In Bay Ctr. Apts. Owner, LLC v. Emery Bay PKI, LLC*,
   2009 Del. Ch. LEXIS 54 (Del. Ch. Apr. 20, 2009) ..................... 167

*In re ADPT DFW Holdings, LLC*,
   2017 Bankr. LEXIS 3326 (Bankr. N.D. Tex. Sept. 29, 2017) ............. 105

*In re Aéropostale, Inc.*,
   555 B.R. 369 (Bankr. S.D.N.Y. 2016) ................................. 196

*In re Affiliated Foods, Inc.*,
   249 B.R. 770 (Bankr. W.D. Mo. 2000) ................................. 105

*In re American Lumber Co.*,
   7 B.R. 519 (Bankr. D. Minn. 1979) .................................... 194

*In re Cold Harbor Assocs.*,
   204 B.R. 904 (Bankr. E.D. Va. 1997) ...................... 172, 175, 181

*In re Diwan, L.L.C.*,
   2013 Bankr. LEXIS 5630 (Bankr. D. Iowa July 16, 2013) ............... 105

*In re Ezcorp Consulting Agreement Deriv. Litig.*,
   2016 Del. Ch. LEXIS 14 (Del. Ch. Jan. 25, 2016) ..................... 165

*In re French Quarter, Inc.*,
   2012 U.S. Dist. LEXIS 44476 (D. Nev. March 30, 2012) ................. 105

*In re Fruehauf Trailer Corp.*,
   444 F.3d at 212 ................................................ 132, 144

*In re GM Shareholders Lit.*,
734 A.2d 611 (Del. Ch. 1999) ........................................................................... 163

*In re HealthSouth Corp. S'holders Litig.*,
845 A.2d 1096 (Del. Ch. 2003) ......................................................................... 199

*In re Introgen Therapeutics*,
429 B.R. 570 (Bankr. W.D. Tex. 2010).............................................................. 105

In re Lane,
742 F.2d 1311 (11th Cir. 1984) ......................................................................... 174

*In re Lehman Bros. Holdings*,
541 B.R. 551 (S.D.N.Y. 2015)........................................................................... 197

*In re LightSquared*,
511 B.R. 253 (Bankr. S.D.N.Y. 2014)............................................................... 195

*In re MAXXAM, Inc.,*\
659 A.2d 760 (Del. Ch. 1995) ........................................................................... 166

*In re Mid-American Waste Sys.*,
284 B.R. 53 (Bankr. D. Del. 2002) ....................................................... 192, 193, 194

*In re Nortel Networks, Inc.*,
532 B.R. 494 (Bankr. D. Del. 2015)................................................................... 149

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005) ........................................................................ passim

*In re Primedia Inc. Derivative Litig.*,
910 A.2d 248 (Del. Ch. 2006) ........................................................................... 167

*In re Reading Co.*,
711 F.2d 509 (3d Cir.1983) ............................................................................... 166

*In re Trados II*,
73 A.3d 17 (Del. Ch. 2013) ............................................................................... 164

*In re Tribune Co*,
464 B.R. 126 (Bankr. D. Del. 2011) .................................................................. 110

*In re Tureaud*,
59 B.R. 973 (N.D. Okla. 1986) ......................................................................... 158

*In re USACafes, L.P. Litigation*,
600 A.2d 43 (Del. Ch. 1991) ............................................................................. 167

*In re W. T. Grant*,
699 F.2d 599 (2d Cir. 1983) .............................................................................. 194

*In re Walt Disney Co. Derivative Litig.*,
907 A.2d 693 (Del. Ch. 2005) ........................................................... 105, 161, 163

*International Telecharge, Inc. v. Bomarko, Inc.*
766 A.2d 437 (Del. 2000) ................................................................................. 205

*Jahn v. Bacon (In re East Tech Co.),*
    528 B.R. 743 (Bankr. E.D. Tenn. 2015) ................................................ 105

*JPMCC 2007-CIBC 19 East Greenway LLC v. Bataa/Kierland, LLC (In re Bataa/Kierland, LLC),*
    517 B.R. 155 (D. Ariz. 2014) ................................................ 105

*Jumamil v. Lakeside Casino, LLC,*
    319 P.3d 868 (Wash. App. 2014 ................................................ 187

*Kahn v. Tremont Corp.,*
    1996 Del. Ch. LEXIS 40 (Del. Ch. Mar. 21, 1996), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997) ................................................ 166

*Kaler v. Slominski (In re Keeley & Grabanski Land P'ship),*
    2012 Bankr. LEXIS 921 (Bankr. D.N.D. Mar. 7, 2012), *rev'd on other grounds*, *Kaler v. Slominski (In re Keeley & Grabanski Land P'ship, 531 B.R. 771 (B.A.P. 8th Cir. 2015)* .... 126, 144

*Kipperman v. Onex Corp.,*
    411 B.R. 805 (N.D. Ga. 2009) ................................................ 110

*Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.),*
    2017 Bankr. LEXIS 1150 (Bankr. D. Del. Apr. 27, 2017) ................................................ 171

*Liquidating Tr. of the Amcast Unsecured Creditor Liquidating Tr. v. Baker (In re Amcast Indus. Corp.),*
    365 B.R. 91 (Bankr. S.D. Ohio 2007) ................................................ 206

*Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.),*
    327 B.R. 537 (D. Del. 2005), *aff'd*, 278 F. App'x. 125 (3d Cir. 2008) ................................................ 110, 117

*LMI Legacy Holdings,*
    2017 Bankr. LEXIS 1150 ................................................ passim

*Logistics Info. Sys. v. Braunstein (In re Logistics Info. Sys.),*
    432 B.R. (D. Mass. 2010) ................................................ 158

*Lyondell Chem. v. Ryan,*
    970 A.2d 235 (Del. 2009) ................................................ 163

*McMullin v. Beran,*
    765 A.2d 910 (Del. 2000) ................................................ 162

*Mervyn's, LLC v. Lubert-Alder Group IV, LLC (In re Mervyn's Holdings, LLC),*
    426 B.R. 488 (Bankr. D. Del. 2010) ("*Mervyn's*") ................................................ 108, 111, 202

*Mervyn's* ................................................ 110

*MetCap Sec. LLC v. Pearl Senior Care, Inc.,*
    2009 Del. Ch. LEXIS 28 (Del. Ch. Feb. 27, 2009) ................................................ 199

*Milbank, Tweed, Hadley & McCloy v. Boon,*
    13 F.3d 537 (2d. Cir. 1994) ................................................ 207

*Miller v. Dow (In re Lexington Oil & Gas Ltd.)*,
  423 B.R. 353 (Bankr. E.D. Okla. 2010)..........................................................................passim

*Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.)*,
  471 B.R. 354 (Bankr. D. Del. 2012) ................................................................................ 105

*Miller v. McCown De Leeuw & Co. (In re Brown School)*,
  386 B.R. 37 (Bankr. D. Del. 2008) .......................................................................... 205, 206

*Mizel v. Connolly*,
  1999 Del. Ch. LEXIS 157 (Del. Ch. July 22, 1999) ....................................................... 165

*Monroe Park v. Metro. Life Ins. Co.*,
  457 A.2d 734 (Del. 1983) ............................................................................................... 167

*Morris v. Nance*,
  132 Or. App. 216888 P.2d 571 (1994) ............................................................................ 105

*Mukamel v. Bakes*,
  378 F. App'x 890 (11th Cir. 2010) .................................................................. 160, 166, 193

*Murphy v. Stop & Go Shops, Inc. (In re Stop & Go of Am., Inc.)*,
  49 B.R. 743 (Bankr. D. Mass. 1985) .............................................................................. 153

*NCP Litigation Trust v. KPMG*,
  945 A.2d 132 (N.J. Sup. 2007) ....................................................................................... 106

*Nemec v. Shrader*,
  991 A.2d 1120 (Del. 2010 ....................................................................................... 198, 199

*Oberly v. Kirby*,
  592 A.2d 445 (Del. 1991) ............................................................................................... 160

*Off'l Comm. of Unsec Credits. v. CIT Group/Business Credit, Inc. (In re Jevic Holding Corp.)*,
  2011 Bankr. LEXIS 3553 (Bankr. D. Del. Sept. 15, 2011) .................................................. 110

*Off'l Comm. of Unsec. Credits v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)*,
  274 B.R. 71 (D. Del. 2002) ............................................................................................. 109

*Off'l Comm. of Unsec. Credits. of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*,
  405 B.R. 527 (Bankr. D. Del. 2009) ....................................................................... 117, 161

*Off'l Comm. v. Highland Capital Mgmt., L.P. (In re Moll Indus.)*,
  454 B.R. 574 (Bankr. D. Del. 2011) ...................................................................... 171, 173, 188

*Off'l Unsec. Creds. Comm. v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*,
  444 B.R. 51 (Bankr. D. Del. 2010) ........................................................................ 178, 180

*Official Comm. of Unsecured Creditors v. Hendricks (In re Dwight's Piano Co.)*,
  424 B.R. 260 (S.D. Ohio 2009) ...................................................................................... 207

*Official Committee of Former Partners v. Brennan (In re Labrum & Doak, LLP)*,
  227 B.R. 383 (Bankr. E.D. Pa. 1998) ............................................................................. 134

*Orr v. Kinderhill Corp.*,
  991 F.2d 31 (2d Cir. 1993) .................................................................................... 109, 110

*PCS Nitrogen, Inc. v. Ross Dev. Corp.*,
  126 F.Supp.3d 611 (D.S.C. 2015) ..................................................... 201

*Peltz v. Hatten*,
  279 B.R. 710 (D. Del. 2002) ............................................ 133, 134, 146

*Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp.*
  *Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*,
  444 F.3d 203 (3d Cir. 2006) ............................................................. 104

*Pepper v. Litton*,
  308 U.S. 295 (1939) ........................................................................... 192

*Pogostin v. Rice*,
  480 A.2d 619 (Del. 1984) ................................................................. 162

*Radnor Holdings v. Tennenbaum Capital Ptnrs. (In re Radnor Holdings)*,
  353 B.R. 820 (Bankr. D. Del. 2006) ................................................ 188

*Reserves Development LLC v. Severn Sav. Bank FSB*,
  2007 Del. Ch. LEXIS 156 (Del. Ch. Nov. 9, 2007) .......................... 199

*RG Garcia Corp. v. Bitetti*,
  2014 Cal. App. Unpub. LEXIS 6478 (Ct. App. Cal. Sept. 15, 2014) .................... 187

*Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*,
  447 B.R. (Bankr. D. Mass. 2011) ..................................................... 193

*RJR Nabisco*,
  1989 Del. Ch. LEXIS 9 (Del. Feb. 14, 1989) ................................... 164

*Rosener v. Majestic Management, Inc. (In re OODC, LLC)*,
  321 B.R. 128 (Bankr. D. Del. 2005) ................................................. 110

*S. Pac. Co. v. Bogert*,
  250 U.S. 483 (1919) ........................................................................... 167

*Sampsell v. Imperial Paper & Color Corp.*,
  313 U.S. 215 (1941) ........................................................................... 201

*Sandys v. Pincus*,
  152 A.3d 124 (Del. 2016) ................................................................. 165

*Schock v. Nash*,
  732 A.2d 217 (Del. 1999) ................................................................. 199

*Schroeder v. Pinterest*, 133 A.D.3d 12, 17 N.Y.S.3d 678 (App. Div. 2015) ........................... 158

*Schubert v. Lucent Tech., Inc. (In re Winstar Communs.)*,
  554 F.3d 382 (3d Cir. 2009) ............................................................. 192

*Scriptomatic, Inc. v. U.S.*,
  397 F. Supp. 753 (E.D. Pa. 1975) .................................................... 178

*Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*,
  532 A.2d 1324 (Del. Ch. 1987) ........................................................ 163

*SEC v. Antar,*
120 F. Supp. 2d 431 (D. N.J. 2000) ........................................................ 201

*Seitz v. Detweiler, Hershey and Associates, P.C. (In re CitX Corp.),*
448 F.3d 672 (3d Cir. 2006) .................................................................... 206

*Sender v. Bronze Group, Ltd. (In re Hedged-Invs. Assocs., Inc.),*
380 F.3d 1292 (10th Cir. 2004) .............................................................. 192

*Simon v. New Ctr. Hospital (In re Matter of New Ctr. Hospital),*
187 B.R. 560 (E.D. Mich. 1995) .............................................................. 158

*Slappey Drive Industrial Park v. United States,*
561 F.2d 572 (5th Cir. 1977) .................................................................. 173

*Stanziale v. Nachtomi,*
330 B.R. 56 (D. Del. 2004) ...................................................................... 161

*Sterling v. Mayflower Hotel Corp.,*
33 Del. Ch. 293, 93 A.2d 107 (Del. 1952) ................................................ 167

*Stone v. Ritter,*
911 A.2d 362 (Del. 2006) ........................................................................ 161

*Stop & Go of America, Inc. v. Stop & Go Shops, Inc. (In re Stop & Go of America, Inc.),*
49 B.R. 743 (Bankr. D. Mass. 1985) ........................................................ 158

*Thabault v. Chait,*
541 F.3d 512 (3d Cir. 2008) ................................................ 106, 201, 205

*Thorpe by Castleman v. CERBCO,*
676 A.2d 436 (Del. 1996 ........................................................................ 207

*Trados Inc. Shareholder Lit.,*
2009 Del. Ch. LEXIS 128 ........................................................................ 163

*Trans World Airlines, Inc. v. Travellers International AG, (In re Trans World Airlines, Inc.),*
180 B.R. 389 (Bankr. D. Del. 1994) ........................................................ 134

*Triton Constr. Co. v. Eastern Shore Elec. Servs., Inc.,*
2009 Del. Ch. LEXIS 88 (Del. Ch. May 18, 2009) ................................. 105

*U.S. Securities and Exchange Comm. v. Bocchino (In re Bocchino),*
794 F.3d 376 (3d Cir. 2015) .................................................................. 117

*United States v. State St. Bank & Trust,*
520 B.R. 29 (Bankr. D. Del. 2014) ................................................... passim

*United States v. Tabor Court Realty Corp.,*
803 F.2d 1288 (3d Cir. 1986) ................................................................ 109

*Van de Walle v. Unimation, Inc.,*
1991 Del. Ch. LEXIS 27 (Del. Ch. Mar. 6, 1991) ................................. 164

*Virtus Capital L.P. v. Eastman Chem. Co.,*
2015 Del. Ch. LEXIS 34 (Del. Ch. Feb. 11, 2015) ................................. 167

*Viscount Air Servs., Inc. v. Cole (In re Viscount Air Servs., Inc.)*,
    232 B.R. 416 (Bankr. D. Ariz. 1998); Cal. Civ. Code § 3439.04(c) ...................................... 105

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*,
    919 F.2d 206 (3d Cir. 1990) ............................................................................................... 109

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) .................................................................................. 163, 164, 165

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
    544 B.R. 75 (Bankr. S.D.N.Y. 2016) ................................................................................. 178

*William Penn Partnership v Saliba*,
    13 A.3d 749 (Del. 2011) ..................................................................................................... 158

*York Lingings v. Roach*,
    1999 Del. Ch. LEXIS 160 (Del. Ch. July 28, 1999) ........................................................... 158

## STATUTES

11 U.S.C. § 101(28)(B) .......................................................................................................... 193

11 U.S.C. § 101(54)(D) .......................................................................................................... 115

11 U.S.C. § 105(a) .................................................................................................................. 106

11 U.S.C. § 544(b) ............................................................................................................. passim

11 U.S.C. § 544(b)(1) ............................................................................................................. 120

11 U.S.C. § 548(a)(1)(A) ................................................................................... 114, 122, 125, 129

11 U.S.C. § 548(a)(1)(B) ....................................................................................... 131, 139, 143

11 U.S.C. § 548(a)(1)(B)(ii) .................................................................................................. 133

11 U.S.C. § 548(d)(1) ............................................................................................................. 115

11 U.S.C. §547(b)(4)(B) ........................................................................................................ 193

11 U.S.C. §548(d)(2)(A) ........................................................................................................ 132

11 USCS § 101 (34) ............................................................................................................... 134

29 U.S.C. §203(d) .................................................................................................................. 187

Ariz. Rev. Stat. § 44-1004(A)(1) ................................................................... 120, 124, 128, 130

Ariz. Rev. Stat. § 44-1004(A)(2) ................................................................... 135, 137, 142, 147

Ariz. Rev. Stat. § 44-1005 ............................................................................... 135, 137, 142

Cal Civ Code § 3439.13 ......................................................................................................... 135

Cal. Civ. Code § 3439.04(a)(1) .................................................................... 121, 124, 130

Cal. Civ. Code § 3439.04(a)(2) .................................................................... 135, 138, 142, 147

Cal. Civ. Code § 3439.05 ............................................................................... 135, 139, 142

Cal. Lab. Code § 204 ............................................................................................................. 187

Del. Code Ann. tit. 6, § 18-1101(e) ....................................................................... 159

Del. Code Ann. tit. 6, § Del. 18-1104 ................................................................... 158

Nev. Rev. Stat. § 112.180(1)(a) ................................................. 121, 124, 128, 130

Nev. Rev. Stat. § 112.180(1)(b) ................................................. 135, 138, 142, 147

Nev. Rev. Stat. § 112.190 ................................................................................. 135, 142

Nev. Rev. Stat. § 112.190 (1).................................................................................. 138

Nev. Rev. Stat. Ann. § 112.250 ............................................................................... 135

Or. Rev. Stat. § 95.230(1)(b) ......................................................... 135, 142, 147

Or. Rev. Stat. § 95.230(a)(1) ......................................................... 124, 127, 130

Or. Rev. Stat. § 95.240(1) ............................................................. 135, 137, 142

Or. Rev. Stat. §95.230(a)(1) ................................................................................... 120

ORS § 95.300 ............................................................................................................ 135

Rev. Code Wash. §49.52.050................................................................................... 186

Wash. Rev. Code § 19.40.041(1)(a) ............................................. 120, 124, 127, 130

Wash. Rev. Code § 19.40.041(1)(b) ............................................. 135, 136, 142, 147

Wash. Rev. Code § 19.40.041(3) ............................................................................ 104

Wash. Rev. Code § 19.40.051(1 ............................................................................ 136

Wash. Rev. Code § 19.40.051(1) ............................................................................ 135

Wash. Rev. Code § 19.40.051(a ) ........................................................................... 142

Wash. Rev. Code § 19.40.903................................................................................. 135

*Williams v. Freedomcard, Inc.*,
   123 Cal. App. 4th 609 (2004) ....................................................................... 187

## OTHER AUTHORITIES

12B *Fletcher, Cyclopedia Corporations*
   §5811 at 156-57 (1984).................................................................................. 193

5-547 *Collier on Bankruptcy* ¶ 547.03[6] (16th ed. 2017) ...................................... 193

Berle, *"Control" in Corporate Law*,
   58 Colum. L. Rev. 1212 (1958) ...................................................................... 193

## RULES

Fed. R. Bankr. P. 3001(f)........................................................................................ 206

Fed. R. Evid. 201 ............................................................................................... 67, 80

*Seitz v. Detweiler, Hershey and Associates, P.C. (In re CitX Corp.)*,
   448 F.3d 672 (3d Cir. 2006) ......................................................................... 206

# TREATISES

*Acierno v. Goldstein*,
   2005 Del. Ch. LEXIS 176 (Del. Ch. Nov. 16, 2005) ............................................................. 207

Restatement Second of Torts § 912 ......................................................................................... 207

## GLOSSARY OF DEFINED TERMS

All capitalized terms not defined in the text shall be defined in accordance with these definitions.

| Term | Definition |
| --- | --- |
| A&M | Alvarez & Marsal, an advisor retained by Haggen in 2015 |
| ABL | The Revolving Credit and Security Agreement dated February 12, 2015 among PNC Bank, National Association, as Agent, PNC Bank and other party thereto, as Lenders and Haggen, Inc., OpCo North and OpCo South, as Borrowers |
| Acquisition | HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC) |
| Akerman | Akerman, LLP, counsel to Comvest and Haggen in connection with the Albertson's Acquisition |
| Albertson's | Albertson's LLC and Albertson's Holdings LLC |
| Albertson's Acquisition | The December 2014 transaction whereby Holdings agreed to acquire 146 grocery stores and related real estate assets from Albertson's |
| Anderson | Derrick Anderson, Defendant and at relevant times corporate secretary of various Haggen entities |
| APA | The Asset Purchase Agreement dated as of December 10, 2014, between Albertson's LLC and Albertson's Holdings LLC, as sellers, and Holdings, as buyer |
| ATK | ATKearney |
| Bankruptcy Code | Title 11 of the United States Code |
| Barnett | Blake Barnett, Defendant and at relevant times CFO of various Haggen entities |
| BofA | Bank of America |
| Caple | John Caple, Defendant and at relevant times Partner of Comvest, member of Comvest's IC and Deal Team |
| Cerberus | Cerberus Capital Management, L.P., the owner of Albertson's |
| CGH | Comvest Group Holdings, LLC |
| CHH III | Comvest Haggen Holdings III, LLC |
| CHH IV | Comvest Haggen Holdings IV, LLC |
| CIP III | Comvest Investment Partners III, L.P. |
| CIP IV | Comvest Investment Partners IV, L.P. |
| Citibank | Citibank, National Association, and party to, inter alia, that certain $25,000,000 Qualified Borrower Note among Citibank, Property Lender, CIP IV, and Comvest Investment Partners IV-A, L.P. dated August 12, 2015 |
| Clark | Thomas Clark, Partner of Comvest Partners and member of Comvest's IC |
| Clougher | John Clougher, Defendant and at relevant times CEO of various Haggen entities |
| Committee | Official Committee of Unsecured Creditors |
| Comvest | Comvest Advisors, CGH, CIP III, CIP IV, CHH III, and CHH IV |
| Comvest Advisors | Comvest Advisors, LLC |

| | |
|---|---|
| Contribution Agreement | An agreement pursuant to which Holdings transferred, directly or indirectly, rights to Real Property to one of the PropCo Entities or one of the SLB Entities |
| Deal Team | Caple, Niegsch and Scholl |
| Debtors | HH Liquidation, LLC (f/k/a Haggen Holdings, LLC), HH Operations, LLC (f/k/a Haggen Operations Holdings, LLC), HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC), HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC), HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC), and HH Legacy, Inc. (f/k/a Haggen, Inc.) |
| Defendants | The Individual Defendants, Comvest, the PropCo Entities, and the SLB Entities |
| Falk | Michael Falk, CEO, Managing Partner and Co-Founder of Comvest Partners, and Member of Comvest's IC |
| Forbearance Agreement | The Forbearance Agreement, Second Amendment to Revolving Credit and Security Agreement and First Amendment to Guarantor Security Agreement dated as of August 21, 2015, among Haggen, Inc., OpCo North, and OpCo South, as borrowers, Operations and Acquisition, as guarantors, JPMorgan Chase Bank, N.A. and Keybank, N.A. as co-syndication agents, and PNC, as agent for the lenders |
| FTC | Federal Trade Commission |
| Garrison | GIG TCG Wave Holdings, LLC and its affiliates |
| Garrison Lease | That certain Master Land and Building Lease dated February 17, 2015, between Garrison, as landlord, and OpCo South and OpCo North, as tenants, and any amendments thereto |
| Garrison SLB Agreement | The Purchase and Sale Agreement and Joint Escrow Instructions dated December 4, 2014, between Holdings and Garrison, and any amendments thereto |
| Garrison SLB Properties | Those nineteen (19) parcels of real estate (and improvements) located in Arizona, California, Nevada, Oregon, and Washington that the SLB Entities sold pursuant to the Garrison SLB Agreement |
| Genser | Ira Genser, at relevant times partner at Operating Advisory Group, LLC, consultants to Haggen |
| Haggen | The entire Haggen enterprise as it may have existed at the referenced time period, including all subsidiaries and affiliates, and without regard to whether any entity was a debtor at the referenced time period |
| Haggen SLB | Haggen SLB, LLC, an SLB Entity managed by its sole member, Acquisition |
| Haggen, Inc. | HH Legacy, Inc. (f/k/a Haggen, Inc.) |
| HHI | HHI, Corp. |
| Holdings | HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) |
| IC | Comvest's Investment Committee, comprising voting members Falk, Marrero, Rodriguez, Clark and Caple, and observer Louis |

|  | Colosimo |
|---|---|
| Intercreditor Agreement | The Intercreditor Agreement dated as of August 21, 2015, among PNC, as agent for itself and the other lenders, PropCo North and PropCo South, as subordinated lenders, and Haggen, Inc., OpCo North, and OpCo South, as obligors |
| Individual Defendants | Defendants Anderson, Barnett, Caple, Clougher, Niegsch, Rodriguez, and Shaner |
| Marrero | Roger Marrero, Managing Partner of Comvest Partners, and member of Comvest's IC |
| Monitor | FTC-appointed monitor, Richard King |
| Niegsch | Michael Niegsch, at relevant times Vice President of Comvest and member of Comvest's Deal Team |
| OpCo Entities | OpCo North and OpCo South |
| OpCo North | HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC), an OpCo Entity solely owned by Operations |
| OpCo South | HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC), an OpCo Entity solely owned by Operations |
| Operations | HH Operations, LLC (f/k/a Haggen Operations Holding, LLC), the holding company for the OpCo Entities, whose membership interests are solely owned by Holdings |
| Owned Properties | The twenty-eight (28) parcels of real property (fee owned or ground leases), that Holdings contributed, directly or indirectly, to the PropCo Entities pursuant to the Contribution Agreements |
| Petition Date | September 8, 2015, the date the Debtors filed voluntary petitions for relief under the Bankruptcy Code |
| Plaintiff | The Official Committee of Unsecured Creditors |
| PNC | PNC Bank, National Association, Haggen's ABL lender |
| PropCo Advance | The $25 million advance provided by the PropCo Entities to the OpCo Entities pursuant to the PropCo Agreement |
| PropCo Agreement | That certain Term Loan and Security Agreement dated as of August 7, 2015, between the OpCo Entities and the PropCo Entities, and any amendments thereto |
| PropCo Entities | PropCo North, PropCo South and Property Holdings |
| PropCo Leases | The leases and subleases entered into between an OpCo Entity and a PropCo Entity, and any amendments thereto |
| PropCo North | Haggen Property North, LLC, a PropCo Entity managed by its sole member, Property Holdings |
| PropCo Notes | The promissory notes that the OpCo Entities issued in favor of PropCo North and PropCo South, respectively, on August 7, 2015 |
| PropCo South | Haggen Property South, LLC, a PropCo Entity managed by its sole member, Property Holdings |
| Property Holdings | Haggen Property Holdings, LLC, a PropCo Entity managed by its sole member, Holdings |
| Property Holdings II | Haggen Property Holdings II, LLC, an SLB Entity managed by its sole member, Holdings |

| | |
|---|---|
| Property Holdings III | Haggen Property Holdings III, LLC |
| Property Lender | Haggen Property Lender, LLC |
| PTO | Final Pretrial Order, entered on October 6, 2017, at Docket No. 142 |
| Rodriguez | Cecilio Rodriguez, Defendant and CFO of Comvest, and member of Comvest's IC |
| Safeway | Safeway, Inc. |
| Sale Leaseback Transaction | The transactions whereby certain of the real property subject to Contribution Agreements was first transferred to an SLB Entity and then immediately resold to third parties |
| Scholl | Lucas Scholl, at all relevant times, an Associate with Comvest Partners and member of the Deal Team |
| Shaner | William Shaner, Defendant and at relevant times CEO of OpCo South |
| SLB Entities | Property Holdings II and Haggen SLB |
| SLB Properties | The Real Property that was subject to the Contribution Agreements and that was first transferred to an SLB Entity and then immediately resold to third parties |
| Spirit | Spirit Master Funding IV, LLC and its affiliates. |
| Spirit Lease | The Master Lease Agreement, together with any amendments thereto, and any related documents pursuant to which Spirit leased certain of the Spirit SLB Properties to Operations |
| Spirit SLB Agreement | The Purchase and Sale Agreement and Joint Escrow Instructions signed on November 24, 2014, by Holdings and Spirit, and any amendments thereto |
| Spirit SLB Properties | Those twenty (20) parcels of real estate (and improvements) located in Arizona, California, Nevada, Oregon, and Washington that the SLB Entities sold pursuant to the Spirit SLB Agreement |
| Supervalu | Supervalu, Inc. |

## PROPOSED FINDINGS OF FACT

### I.    Jurisdiction

1.    This is an action for avoidance of fraudulent transfers, monetary damages for breach of fiduciary duty and for unjust enrichment, equitable subordination, the transfer of liens and security interests, recharacterization, substantive consolidation, and the disallowance of claims.  PTO ¶ A.

2.    The jurisdiction of the Court over this action is not disputed.  The bases for jurisdiction over this action are 28 U.S.C. §§ 157(a) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This action is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  PTO ¶¶ B-C.

### II.    The Parties

#### A.    The Debtors

3.    Holdings, one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed under the laws of the state of Delaware.  Prior to the Petition Date, certain Comvest entities owned an interest in Holdings.  Holdings directly or indirectly owned and operated approximately 18 supermarkets and one pharmacy in Oregon and Washington before contracting to purchase 146 stores from Albertson's.  PTO ¶ 5.

4.    Operations, one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed under the laws of the state of Delaware.  HH Operations, LLC was formed prior to the Albertson's Acquisition.  Prior to the Petition Date, Operations was owned and managed by its sole member, Holdings.  PTO ¶ 6.

5.    OpCo South, one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed under the laws of the state of Delaware.

OpCo South was formed prior to the Albertson's Acquisition.  Prior to the Petition Date, OpCo South was owned and managed by its sole member, Operations.  PTO ¶ 7.

6.      OpCo North, one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed under the laws of Delaware.  OpCo North was formed prior to the Albertson's Acquisition.  Prior to the Petition Date, OpCo North was owned and managed by its sole member, Operations.  PTO ¶ 8.

7.      Acquisition, one of the Debtors on whose behalf Plaintiff brings these causes of action, is a limited liability company formed under the laws of the state of Delaware. Acquisition was formed prior to the Albertson's Acquisition.  Prior to the Petition Date, Acquisition was owned and managed by its sole member, Operations.  PTO ¶ 9.

8.      Haggen, Inc., one of the Debtors on whose behalf Plaintiff brings these causes of action, is a corporation formed under the laws of the State of Washington.  From 2011 through the Petition Date, Haggen, Inc. was owned by Acquisition.  PTO ¶ 10.

**B.      The Non-Debtor Affiliate and Corporate Defendants**

9.      Defendant CGH is a limited liability company formed under the laws of the state of Delaware.  PTO ¶ 11.

10.     Defendant CIP III is a limited partnership formed under the laws of the state of Delaware, and is owned and/or controlled, directly or indirectly, by CGH.  PTO ¶ 12.

11.     Defendant CIP IV is a limited partnership formed under the laws of the state of Delaware, and is owned and/or controlled, directly or indirectly, by CGH.  PTO ¶ 13.

12.     Defendant CHH III is a limited liability company formed under the laws of the state of Delaware, and is owned and/or controlled, directly or indirectly, by CGH.  CHH III holds 458,489 Class A Units in Holdings.  PTO ¶ ¶ 14-15.

13.   Defendant CHH IV is a limited liability company formed under the laws of the state of Delaware, and is owned and/or controlled, directly or indirectly, by CGH.  CHH IV holds 1,724,792 Class A Units of Holdings.  PTO ¶ ¶ 16-17.

14.   Defendant Comvest Advisors is a limited liability company formed under the laws of the state of Delaware, and is owned and/or controlled, directly or indirectly, by CGH. PTO ¶ 18.

15.   Defendant Property Holdings is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware.  At all relevant times prior to the Petition Date, Property Holdings was owned and managed by its sole member, Debtor Holdings.  PTO ¶ 19.

16.   Defendant PropCo South is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware.  At all relevant times prior to the Petition Date, PropCo South was owned and managed by its sole member, non-Debtor Defendant Property Holdings.  PTO ¶ 20.

17.   Defendant PropCo North is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware.  At all relevant times prior to the Petition Date, PropCo North was owned and managed by its sole member, non-Debtor Defendant Property Holdings.  PTO ¶ 21.

18.   From the time of their formation in December 2014 through the Petition Date, PropCo South and PropCo North were managed by their sole member, Property Holdings, and did not create or maintain any board minutes, did not utilize or maintain their own business forms or domain name, and maintained their businesses addresses, books and record and email servers at the Debtors' location.  PTO ¶ 60-61.

19.    Defendant Property Holdings II is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware.  At all relevant times prior to the Petition Date, Property Holdings II was owned and managed by its sole member, Debtor Holdings.  PTO ¶ 22.

20.    Defendant Haggen SLB is a limited liability company formed at the time of the Albertson's transaction under the laws of the state of Delaware.  At all relevant times prior to the Petition Date, Haggen SLB was owned and managed by its sole member, Debtor Acquisition.  PTO ¶ 23.

21.    From the time of their formation through the Petition Date, the SLB Entities had no creditors, did not create or maintain any board minutes, did not utilize or maintain their own business forms or domain name, and maintained their business addresses, books and record and email servers at the Debtors' location.  PTO ¶ 63.

C.    **The Individual Defendants**

22.    **John Caple.**  Caple is an individual residing in the state of Florida.  Caple was a Partner at Comvest Partners until January 31, 2016.  In addition, Mr. Caple served as (a) a Manager of Holdings since at least January 1, 2014 through at least the Petition Date, as well as President and Chief Executive Officer for the period beginning no later than January 1, 2014 through January 30, 2015, and (b) a Director of Haggen, Inc. since at least January 1, 2014 through at least the Petition Date.  PTO ¶ 24.

23.    Caple joined Comvest in 2010, as a managing director and later became a partner.  Caple was responsible for managing Comvest's investment in Haggen, and was the leader of the Deal Team; he was asked to leave the firm less than six months after Haggen filed for bankruptcy relief.  Trial Tr. (10/16) at 101:22-102:6, 103:1-18, 183:7-21.

24.    **Michael Niegsch.**  Niegsch is an individual residing in the state of Florida. At all relevant times, Niegsch was a Vice President of Comvest Partners.  In addition, Niegsch has served as a Manager of Holdings since January 30, 2015.  PTO ¶ 26.

25.    Niegsch joined Comvest in 2010, with modest experience:  he graduated from the University of Michigan just four years earlier, spent about seven months at UBS, two years at Morgan Joseph, and one year as an independent consultant before joining Comvest. Trial Tr. (10/17) at 5:13-6:16.  In the summer of 2014, Niegsch was designated the "quarterback" of the Deal Team.  As such, Niegsch was responsible for overseeing third party due diligence streams, managing third party experts, interfacing with Caple and the IC, working with financing counterparties to arrange financing for the transaction, and interfacing with management concerning the store conversions.  Niegsch participated in the negotiation of the APA, the ABL, and the Sale Leaseback Transactions, and was also responsible for negotiating with UBS about a possible loan against the PropCo Entities' real property (initially for the purpose of paying Comvest a dividend, and later, in the summer of 2015, for the purpose of using the proceeds to support the OpCo Entities), and ultimately with Citibank in August 2015 concerning the PropCo Advance.  Trial Tr. (10/17) at 6:17-8:10.

26.    **Cecilio Rodriguez.**  Rodriguez is an individual residing in the state of Florida.  At all relevant times, Rodriguez was the Chief Financial Officer of Comvest Partners. In addition, Rodriguez has served as (a) Secretary and Chief Financial Officer of Holdings for the period November 24, 2014 through January 30, 2015, as well as a Manager of Holdings since November 24, 2014, and (b) a Director of Haggen, Inc. for the period beginning no later than September 1, 2014 through December 6, 2014.  PTO ¶ 25.

27.     **John Clougher.**  Clougher is an individual residing in the state of

Washington.  Clougher served as Chief Executive Officer of (a) Holdings since January 30, 2015

through at least the Petition Date, as well as a Manager of Holdings during that time, (b)

Acquisition since December 6, 2014 through at least the Petition Date, (c) Haggen, Inc. since

September 8, 2014 through at least the Petition Date, as well as President during that time,

Treasurer for the period September 8, 2014 through January 1, 2015, and Director since

December 6, 2014 through at least the Petition Date, (d) Operations since December 22, 2014

through at least the Petition Date, (e) OpCo North since December 2, 2014 through at least the

Petition Date, as well as President during that time, (f) Haggen SLB since December 2, 2014

through at least the Petition Date, as well as President during that time, (g) Property Holdings for

the period December 2, 2014 through October 8, 2015, (h) Property Holdings II for the period

December 2, 2014 through October 8, 2015, (i) Haggen Property Holdings III, LLC for the

period December 2, 2014 through October 8, 2015, and (j) PropCo North for the period

December 2, 2014 through October 8, 2015.  PTO ¶ 27.

28.     **William Shaner.**  Shaner is an individual residing in the state of

Washington.  Shaner served as (a) a Manager and President of Holdings from January 30, 2015

to September 2, 2015; (b) President of Acquisition from January 30, 2015 to September 2, 2015;

(c) President of Operations from December 22, 2014 to September 2, 2015; and (d) President and

Chief Executive Officer of OpCo South from December 2, 2014 to September 2, 2015.  PTO

¶ 29.

29.     **Blake Barnett.**  Barnett is an individual residing in the state of

Washington.  Mr. Barnett has served as the Chief Financial Officer of (a) Holdings since January

30, 2015 through at least the Petition Date, (b) Acquisition since January 30, 2015 through at

least the Petition Date, (c) Haggen, Inc. since January 1, 2015 through at least the Petition Date, (d) Operations since December 22, 2014  through at least the Petition Date, (e) OpCo North since December 2, 2015 through at least the Petition Date, (f) Property Holdings from December 2, 2014 through October 8, 2015, (g) Property Holdings II from December 2, 2014 through October 8, 2015, (h) Property Holdings III from December 2, 2014 through October 8, 2015, (i) Haggen SLB since December 2, 2015 through at least the Petition Date, (j) OpCo South since December 2, 2014 through at least the Petition Date (as well as Vice President since October 29, 2015 through at least the Petition Date), (k) PropCo South from December 2, 2014 through October 8, 2015, and (l) PropCo North from December 2, 2014 through October 8, 2015.  PTO ¶ 28.

30.    **Derrick Anderson.**  Anderson is an individual residing in the state of Washington.  Anderson served as the Secretary of (a) Holdings since January 30, 2015 through at least the Petition Date, (b) Acquisition since December 6, 2014 through at least the Petition Date, (c) Haggen, Inc. since September 8, 2014 through at least the Petition Date, (d) Operations since December 22, 2014 through at least the Petition Date, (e) OpCo South since December 2, 2014 through at least the Petition Date (as well as Vice President since October 29, 2015 through at least the Petition Date), (f) OpCo North since December 2, 2014 through at least the Petition Date, (g) Haggen SLB since December 2, 2014 through at least the Petition Date, (h) Property Holdings from December 2, 2014 through October 8, 2015, (i) Property Holdings II from December 2, 2014 through October 8, 2015, (j) Property Holdings III from December 2, 2014 through October 8, 2015, (k) PropCo North from December 2, 2014 through October 8, 2015, (l) PropCo South from December 2, 2014 through October 8, 2015.  PTO ¶ 30.

31.    The evidence shows that Anderson was unprepared to carry out the duties of corporate secretary and was ill-suited to execute other tasks that Comvest thrust upon him.  As

of December 2, 2014, Anderson was the Secretary of each of the Haggen entities.  Trial Tr.

(10/17) at 225:4-7.  Yet, (a) nobody explained to Anderson why he was appointed (and he never

asked), (b) Anderson could not recall ever receiving an explanation as to what the duties of

corporate secretary entailed, (c) Anderson did nothing to prepare himself for the responsibilities

of corporate secretary, and (d) Anderson never discussed his duties as corporate secretary with

anyone at Comvest.  Trial Tr. (10/17) at 255:21-257:3.

32.    Indeed, despite holding the title of "corporate secretary," Anderson never

participated in a board meeting for any of the Haggen entities; never drafted board minutes or

corporate resolutions for any of the Haggen entities; and did not maintain the books and records

of any of the Haggen entities.  Trial Tr. (10/17) at 257:4-258:20.  As discussed below, it appears

that the only tasks Anderson handled as "Corporate Secretary" were to blindly execute the

Contribution Agreements (on behalf of all of the transferors and transferees) and the PropCo

Leases (on behalf of all of the "landlords" and all of the "tenants").

### III.    <u>Procedural History</u>

33.    On the Petition Date, the Debtors filed with this Court voluntary petitions

for relief under the Bankruptcy Code.  These cases are being jointly administered for procedural

purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  No trustee or

examiner has been appointed in the Debtors' cases.  PTO ¶ 1.

34.    On September 21, 2015, the United States Trustee for Region 3 appointed

the Committee to represent the interests of all general unsecured creditors in these cases pursuant

to section 1102 of the Bankruptcy Code.  PTO ¶ 2.

35.    On January 14, 2016, Plaintiff, the Debtors, Comvest, the PropCo Entities,

and Property Holdings II executed and filed that certain *Stipulation and Order (1) Granting*

*Derivative Standing to the Official Committee of Unsecured Creditors to Commence Litigation*

*Against Haggen Property Holdings, LLC, Haggen Property South, LLC, Haggen Property North, LLC, Haggen Property Holdings II, LLC, Haggen Property Holdings III, LLC, Comvest Partners and/or Directors and Officers Thereof; and (2) Providing for a Litigation Standstill*, at Docket No. 1216 (the "Initial Standing Stipulation"). On January 15, 2016, the Court approved the Initial Standing Stipulation. PTO ¶ 3.

36.    On April 29, 2016, Plaintiff and the Debtors executed and filed that certain *Stipulation and Order Granting Derivative Standing to the Official Committee of Unsecured Creditors to Commence Litigation Against Haggen SLB, LLC and/or its Past and/or Present Directors and Officers*, at Docket No. 1858 (the "Second Standing Stipulation" and together with the Initial Stipulation, the "Standing Stipulations"). On May 2, 2016, the Court approved the Second Standing Stipulation. PTO ¶ 4.

37.    On September 7, 2016, Plaintiff filed its *Complaint and Objection to Claims* at Docket No. 1 (the "Complaint").

38.    On December 9, 2016, Defendants filed their *Answer* to the Complaint at Docket No. 16 (the "Answer").

39.    On August 25, 2017, Defendants filed their (a) *Motion in Limine to Exclude the Expert Report and Testimony of Carol Flaton* [Docket No. 101] (the "Motion in Limine"), and (b) *Motion for Partial Summary Judgment* [Docket No. 102] (the "PSJ Motion").

40.    On September 26, 2017, the Court entered an order denying the Motion in Limine. [Docket No. 133].

41.    On October 4, 2017, the Court issued a memorandum opinion and separate order denying the PSJ Motion [Docket Nos. 136 and 137, respectively].

42.    The Court conducted a trial on five consecutive days from October 16-20, 2017, during which it heard live testimony from each of the seven individual Defendants, Todd Hooper (a representative of ATK), and the following expert witnesses: David MacGreevey, Carol Flaton, and James Howard on behalf of the Plaintiff; and Kevin Montague and John Satter on behalf of the Defendants. The Court also admitted into evidence numerous exhibits and deposition designations of 26 witnesses as well as the videotaped deposition of Thomas Clark, a non-defendant managing director of Comvest who sat on the IC during the relevant time.

## IV.    Comvest Acquires a Controlling Interest in Haggen

43.    Haggen was founded in 1933 as a single grocery store. In the ensuing decades, the Haggen family operated the company and opened additional stores. In 1962, the Haggen family concentrated all of their business activities in a single corporate entity, Haggen, Inc. By 2011, Haggen, Inc. operated a 30-store chain of grocery stores in the states of Washington and Oregon. PTO ¶ 31.[2]

44.    In 2011, the Haggen family sold an 80% equity interest in Haggen, Inc. to Comvest. Specifically, defendant CGH, a Comvest entity, purchased its majority stake in Haggen, Inc. through two newly-formed limited liability companies, Holdings and Acquisition, that it formed for that purpose. Thus, in January 2011, CGH formed Holdings, and acquired

---

[2] Defendants contend -- without any documentary evidence -- that Haggen employed a "PropCo/OpCo" structure prior to the time Comvest invested in Haggen in 2011. *See, e.g.,* Trial Tr. (10/17) at 269:17-270:2. While this contention is irrelevant, the evidence does not support it. Although it appears that the Haggen family owned a grocery (or "operational") business known as Haggen, and a "PropCo type entity called Briar Development," (a) the Haggen family "operated them very separately," and (b) the real estate was never part of the grocery business. Indeed, there is no evidence that Haggen, Inc. ever transferred real estate to Briar Development or (as here) that it did so in anticipation of a broader corporate transaction. Trial Tr. (10/17) at 281:24-282:10. In any event, as set forth below, Plaintiff does not contend, and the Court does not hold, that "PropCo/OpCo" corporate structures are inherently improper. Based on the limited testimonial evidence offered at trial, however, the Court cannot conclude that Haggen utilized a "PropCo/OpCo" structure prior to the Albertson's Acquisition. But even if it did, that fact would be irrelevant to the present case because there is no evidence (as there is in this case) that the Haggen family adopted the structure on the eve of embarking on a large, risky transaction with the intent of "siloing" away assets beyond the reach of the operating entities' creditors of an undercapitalized "OpCo" so as to protect itself in a "disaster scenario." Trial Tr. (10/17) at 134:9-136:16.

80% of the membership interests of that entity with the Haggen family obtaining the balance of

the membership interests, and at about the same time, CGH also formed Acquisition.  Holdings

solely owned the membership interests in Acquisition, and Acquisition owned all of the stock of

Haggen, Inc.  PTO ¶ 32.[3]

45.    After becoming the majority owner, Comvest controlled Haggen to the

exclusion of the Haggen family.[4]  The Haggen family played no role in Haggen's operations, had

no visibility into Haggen's financial performance, and was otherwise uninvolved with the "new"

Haggen entity.  HHI (Hall) Tr. at 23:17-24, 31:25-32:18, 41:14-25, 45:13-47:20.  Over the next

four years, under Comvest's direction, Haggen closed a number of unprofitable stores and, as of

the end of 2014, operated 18 grocery stores and one pharmacy on a profitable basis.  PTO ¶ 33.

46.    While Comvest contends that it engineered a turnaround at Haggen, Inc.

prior to the execution of the APA, the evidence shows that a "big part" of the turnaround resulted

simply from the closing of underperforming stores.  Defendants' assertions notwithstanding,

there is no evidence in the record that establishes that Haggen's ongoing operations were

meaningfully altered or improved or that same store sales or same store profits increased under

Comvest's leadership.  Trial Tr. (10/17) at 136:17-23.  Indeed, same store sales for the Haggen

legacy stores contracted 1.2% in 2013, and grew by a modest 0.5% in 2014.  PX 19.017.

V.    **The Albertson's Opportunity and Comvest's Real Estate Play**

A.    **Comvest learns of the Albertson's opportunity**

47.    In the summer of 2014, Caple learned that the FTC required Albertson's

and Safeway to divest a substantial number of stores as a condition to the closing of their

---

[3]  While Comvest owned 80% of the membership interests of Holdings, it also obtained a "call option" pursuant to which Comvest could purchase the Haggen family's 20% interest at any time for $5 million.  Trial Tr. (10/16) at 195:5-9.

[4]  Comvest controlled (at least) a majority of the Managers of Haggen's Board from the inception (naming Caple, Rodriguez, and Adam Bentkover the Managers on the Board).  PX 713.018.

proposed merger and identified this as an opportunity for Comvest.  On August 13, 2014, Comvest submitted its initial indication of interest to acquire 22 stores in Washington and Oregon.  Trial Tr. (10/16) at 104:25-105:18; PX 4; PTO ¶¶ 34, 46.  Comvest originally focused on Washington and Oregon because those were the only states in which Haggen operated.

48.    From the beginning, Comvest focused on the valuable real estate and devised strategies intended to "monetize the real estate/minimize risk/maximizing overall value between the operating business and the real estate."  PX 616.002.  According to ATK, one of Comvest's consultants, Comvest expressly stated in August 2014 that Comvest's "investment thesis [was] driven primarily by the value of the real estate," a thesis that, to ATK's knowledge, never changed.  Trial Tr. (10/20) at 143:17-144:22; PX 192.004.

49.    On September 15, 2014, the Deal Team informed the IC that the number of stores being considered had increased from 22 to approximately 43, and all were located in Washington and Oregon.  *Compare* PX 4.004 *with* PX 8.002.  The IC was also informed that the appraised value of the real estate associated with those 43 stores exceeded the proposed purchase price by $56 million.  The Deal Team described the proposed transaction as "transformational" but noted that it also "provide[d] integration execution risk (i.e., Haggen's current infrastructure will need to absorb 43 additional stores)."  Trial Tr. (10/16) at 106:2-8; 106:25-112:17; PX 8.

50.    Several weeks later, Comvest was informed by Albertson's representatives that Comvest would also have to bid on stores located in California to remain competitive.  The Deal Team informed the IC of this development and noted that, although the execution risk would increase as Haggen entered new markets, they believed the proposed transaction was "too juicy" to pass up, in part, because of the value of the owned real estate associated with the stores.  Trial Tr. (10/16) at 117:7-119:21; PX 6; PX 7.

B.      **Comvest's "Investment Thesis" and Focus is on the Real Estate**

51.      On November 3, 2014, the Deal Team informed the IC that, among other

things, "Albertson's has asked us to take 16 additional stores in Nevada and Arizona," nine of

which were situated on fee-owned real estate and two of which were subject to ground leases.

The IC was also told that Albertson's was "adding these stores to our deal for no additional

purchase price because it makes their lives easier," and that the appraised value of the real estate

associated with the stores in Nevada and Arizona was $56 million, well in excess of the expected

$12 million cost to convert these stores.  PX 220.012.

52.      The Deal Team also included certain projections described as "downside

scenarios."  Within hours of the November 3, 2015 meeting, Clark and Marrero focused their

attention on the value of the real estate.  In particular, both Clark and Marrero sought assurances

from Caple about the value of the "underlying real estate (in downside scenarios)" because,

according to Marrero, "*that affects decision tree more than anything*."  Trial Tr. (10/16) at

119:22-123:6, 296:9-298:6; Clark Tr. at 116:20-117:10, 117:20-119:2; DX 79; PX 9 (emphasis

added).  Indeed, Clark acknowledged that the "potential to acquire real estate with underlying

value" was one of the "key components" to Comvest's deal thesis.  Clark Tr. at 109:25-111:14;

PX 26.005.[5]

53.      A month after Clark and Marrero sought assurances as to the value of the

real estate, the Deal Team requested authority from the IC to submit Haggen's final bid, and

submitted a "deck" in advance of the meeting.  Trial Tr. (10/16) at 123:12-15; PX 30.  In the

deck, and at the meeting, the IC was told that the "all-in purchase price of $430M" would be

funded with the proceeds from the SLB Transactions and the ABL, and would yield, among

_____

[5]  As in a leveraged buyout, Comvest planned to, and did, leverage some of the real estate through the SLB
Transactions to fund the entire purchase price, and retain real estate appraised at $118 million for itself by
transferring it to the PropCo Entities.

other things, residual real estate with an appraised value of $118 million, all of which would be

transferred to the PropCo Entities for Comvest's benefit.  Trial Tr. (10/16) at 123:16-126:19;

PX 19.004.  Thus, while the Deal Team also informed the IC that the acquisition presented

certain risks, the consensus was that the real estate "was a general mitigant to the overall

transaction."  Trial Tr. (10/17) at 56:19-58:17; PX 30.006.

       54.     Several weeks later, before Haggen closed on the first store, Falk and

Niegsch conferred on, among other things, the economic benefits that Comvest expected to reap

from the real property.  Specifically, and consistent with the representations set forth in the

December deck, Niegsch confirmed for Falk that the PropCo Entities would have (a)

unencumbered real estate appraised at $117 million, and (b) annual rental income of $13 million

from the OpCo Entities (pursuant to the PropCo Leases), all for Comvest's ultimate benefit.

Trial Tr. (10/17) at 49:4-51:17; PX 33.[6]

### C.    Comvest's Contention that it "does not invest in real estate" is not Credible

       55.     Comvest contends -- and specifically told the FTC -- that it "is not a real

estate owner" and that it created the PropCo/OpCo structure, in part, because it did not intend to

hold the real estate assets for the long term, and wanted to monetize the real estate assets as

quickly as it reasonably could.  Trial Tr. (10/16) at 138:3-10; DX 72.0046.[7]  Comvest offers this

rationale in a vain effort to rebut Plaintiff's claim that Comvest intended to retain $118 million of

---

[6] Niegsch testified that the difference between the $118 million valuation referred to in the December 3, 2014 deck (PX 19.004), and the $117 million valuation that Falk and Niegsch referred to several weeks later (PX 33) was likely attributable to changes in the store mix because they were "changing a little bit over time."  Based on Niegsch's testimony, the Court finds that although the numbers may have changed slightly, they both relate to the "same pool of assets."  Trial Tr. (10/17) at 49:11-51:2.

[7] Barnett claimed that the "PropCo/OpCo" structure was adopted because Comvest had a "different investment strategy for the real estate versus the operating assets" and that it was therefore "reasonable to separate the two sets of assets."  Trial Tr. (10/17) at 160:3-161:17.  *See also Id.* at 168:4-169:5 (asserting that Comvest adopted the "PropCo/OpCo" structure because the "real estate business . . . is very, very different than your operating business.").

real estate for itself by placing it in the PropCo Entities beyond the reach of the OpCo Entities'

creditors.  Comvest's contention is belied by the following facts: (a) Comvest did not sell any of

the real property assets held by the PropCo Entities prior to the Petition Date, and offered no

evidence that it ever attempted to do so; (b) Comvest eschewed the option of simply selling the

real estate assets and transferring the proceeds to the operating business, choosing instead to

create ten corporate entities within the new PropCo/OpCo structure; (c) Comvest utilized the

Contribution Agreements pursuant to which the rights to acquire the fee-owned properties were

transferred from Holdings to the PropCo Entities; (d) Comvest immediately imposed long-term

leases and subleases between the PropCo Entities and the OpCo Entities, giving the PropCo

Entities its exclusive source of revenue; (e) before the APA was consummated, Comvest was

negotiating with UBS to leverage the real property for the purpose of paying a large dividend to

Comvest; and (f) the Deal Team presented the IC with five-year projections for the PropCo

Entities.  Trial Tr. (10/16) at 138:3-143:1, 286:16-288:7; PX 19.028-040.

56.     Every one of these facts contradicts or undermines Comvest's contention

that this was not a "real estate play" and that it did not intend to invest in, and hold, the fee-

owned real estate long-term for its own benefit.

## VI.     Substantial Execution Risks That Later Materialized

### A.     Numerous Risks are Identified Pre-Closing

57.     Prior to the closing of the Albertson's Acquisition, Comvest, the

Individual Defendants, and Comvest's advisors identified numerous and substantial transaction

and execution risks as they planned to transform a relatively small, regional grocer into a large-

scale supermarket chain spread out over five states.  Haggen had only a few months to prepare,

and only 120-150 days to complete the acquisition and conversion of 146 supermarkets.

58.     Comvest knew in September that the initial proposal to acquire just 43 stores in Washington and Oregon states where it was already operating presented significant integration risks because Haggen was going to need to integrate the Albertson's and Safeway stores "into our chain and rebrand them.  So there was an awful lot to do to get that done.  And that presented risk," including the need to build "infrastructure."  According to Caple, "infrastructure," included employees, software and IT systems, union and vendor relationships, purchasing and distribution processes, and back office operations.  Trial Tr. (10/16) at 112:18-114:4; PX 8.003.  Caple knew that these integration risks would increase as stores continued to be added.  *Id.* at 119:10-17.

59.     When the Deal Team later told the IC that Comvest would have to bid on the California stores as well, it also told the IC that the execution risk would increase, not just because of the much larger number of stores being acquired, but also because of the entry into new geographic markets.  Haggen had a different customer profile than Albertson's, and Comvest knew early on that there was uncertainty as to how its stores would perform with the new model (Albertson's catered to a more price-sensitive consumer).  Trial Tr. (10/16) at 114:14-115:15; PX 8.003.[8]  Nonetheless, the Deal Team told the IC that the proposed transaction was just "too juicy" to pass up, in significant part because of the valuable owned real estate associated with the stores.  Trial Tr. (10/16) at 119:10-21; PX 7.

60.     Less than six weeks before the signing of the APA, certain of the Individual Defendants and Comvest's advisors identified substantial transaction risks and potential downside scenarios, including:

---

[8] Lawrence Silverman, an attorney at Akerman who represented the interests of Comvest and Haggen at the FTC, testified that the FTC was told that Haggen was a more "upscale" grocery store as compared to Albertson's and Safeway.  Akerman (Silverman) Tr. at 23:6-24:23.

- "sales growth/banner conversion -- would have no benefit at all"
- "no labor savings at all, ever"
- "store expenses are up some %, 5%, 10% from base case"
- While the Haggen brand may bring positives, it "isn't going to overwhelm the customer at first."
- "We are fighting headwinds like eliminating the Von's card and fuel programs; not small takeaways."
- "We are eliminating banners that have a presence for years, and while somewhat tarnished, still maintain a loyal customer base."

PX 157.

61.     Other risks were identified.  For example, when the Deal Team sought

authorization from the IC to make the final bid, the Deal Team identified the following risks:

- "Large size relative to typical CV deals magnifies loss impact of underperformance"
- "The current Haggen management team currently operates an 18 store chain"
- "Uncertainty as to how [California] consumers will react to a new brand in the market"
- "Conversion of stores, especially, IT conversions, are a daunting task"

PX 19.006.[9]

62.     Separately, in December, SuperValu raised concerns to Comvest and

Haggen about "logistics/slotting," the process whereby decisions are made concerning the

assortment of products that would be put on the shelves.  SuperValu advised them that

"[a]ssortment decisions must be made by Haggen immediately" or there would be "[r]isk to

customer experience and out of stocks."  PX 273.004.  In other words, SuperValu expressly

warned Haggen that Haggen's inability to quickly make assortment decisions could result in

inventory shortages – one of the very supply issues Defendants now contend was not foreseeable

– and that is exactly what happened.  SuperValu (Collison) Tr. at 108:23-110:20.

63.     The Court also notes that Comvest and Haggen increased certain risks

through their own decisions.  For example, Comvest and Haggen apparently decided not to seek

---

[9]  According to Niegsch, the real estate that Comvest caused to be transferred to the PropCo Entities, beyond the reach of the OpCo Entities' creditors, mitigated virtually every risk identified.  Trial Tr. (10/17) at 56:19-58:17.

any adjustments in timing even as the scope of the acquisition increased in just ten weeks from

22 stores in two states (where Haggen had a long-standing presence) to 146 stores spread out

across most of the western United States.  Haggen never sought to extend or adjust the 120-day

cadence period at any point in the negotiations even though dozens of stores in additional states

were added and had to be converted during the same abbreviated time period.  Albertson's

(Ewing) Tr. at 74:20-76:10, 76:16-77:18, 178:19-179:2.[10]

## B.    Pricing Risks were Specifically Identified and were Foreseeable

64.    The pricing risks were among the most significant risks that were

identified to the Defendants and that were never adequately addressed.  The facts bely their

assertions that their consultants, Willard Bishop and SuperValu, failed to execute Haggen's

pricing strategy, and that their failure caused Haggen's demise and was not foreseeable.  As set

forth below, the evidence conclusively establishes that Defendants were specifically advised –

prior to the execution of the APA – that if Haggen failed to execute its pricing strategy, it would

likely suffer a loss of customers.

65.    On October 6, 2014, shortly after ATK was hired, Caple told Hooper that

there "seems to be a huge capability gap around pricing at Haggen."  Inexplicably, Caple did not

ask ATK, the industry expert, for advice on how to fill the gap.  Trial Tr. (10/20) at 149:12-21;

PX 206.

66.    Nevertheless, on October 15, 2014, after having been alerted to the issue,

ATK identified "pricing" as one of the "Key Decisions/Issues To Be Addressed" and advised

Comvest and Haggen to "maintain" existing prices in the short-term in order to "minimize

changes for [the] consumer."  PX 211.010.  As Hooper knew, and as he advised Haggen, the risk

---

[10] Comvest, Haggen, and the Individual Defendants were not alone in identifying risks.  As discussed below, PNC, Garrison and others also identified numerous and substantial risks.

was that if Haggen did not maintain existing prices, particularly for "like items," Haggen was likely to lose customers. Trial Tr. (10/20) at 146:22-147:17. While ATK was not asked to provide any specific services with respect to pricing, ATK emphasized that Haggen had "development needs" and "reinforced the need to build capability." *Id*. at 150:25-151:6. Despite all of this advice, ATK never learned who provided services to address the "huge capability" gap that Caple had identified. *Id*. at 152:2-6.

67.     ATK was terminated by early December. In an effort to remain engaged in some capacity, Hooper called Caple and memorialized that discussion in an e-mail to his colleagues later that day. According to Hooper, Caple informed him that he did not want to pay ATK $500,000 per month for services. Trial Tr. (10/20) at 152:10-153-10. In response, Hooper told his colleagues that:

> 1) I think they are under-estimating the decisions and analysis required (e.g., pricing, promotion, assortment), 2) over-estimating his team's capabilities, and 3) ignoring the 'insurance' we represent. On balance, they are taking on a lot of risk.

Trial Tr. (10/20) at 153:11-25; PX 226.

68.     As Hooper admitted, as of December 6, 2014, "there was a lot of work to be done there." He also admitted that when he told Caple that he was "over-estimating his team's capabilities," he meant that this was another level of risk that could have been mitigated by keeping ATK on, but Comvest did not do so. Hooper reiterated that, in his view, Comvest and Haggen were "taking on a lot of risk." Trial Tr. (10/20) at 157:7-22; PX 226.

69.     Comvest and Haggen apparently thought they could simply "outsource" the pricing logistics to SuperValu. As Shaner testified, SuperValu's pricing platform "worked for Albertson's" so Haggen assumed it would work for them. Trial Tr. (10/19) Tr. at 35:16-25; PX 72-0027. This assumption proved problematic because, among other reasons, (a) SuperValu

had no prior relationship with Safeway, and (b) Comvest and Haggen decided to keep the legacy stores running on its own independent platform thereby preventing the integration of all three parts of the newly-formed enterprise.  SuperValu (Collison) Tr. at 40:9-13, 41:21-42:6.

70.    The logistics of training everyone on the various information systems created additional risks.  SuperValu, for example, had to train all of the Safeway employees as well as approximately 130 merchants (the corporate-level managers that make "item and price and promotion decisions and assortment decisions.").  *Id*. at 43:7-44:25.  SuperValu knew "early on" that it would take "months" to fully train everyone, a point that it asserts was conveyed to Haggen but nevertheless caused considerable concern due to the closing cadence schedule.  *Id*. at 47:24-49:19.

71.    According to SuperValu, there were a lot of "items to set up, the right prices, the right vendors, the right costs in order to support a store opening.  We didn't believe there was enough time to do that properly."  SuperValu prepared "a document that we shared with them outlining risks and concerns," but the response of Clougher, Barnett, and Genser was that they "needed to open the stores on the date that they had signed the agreement on."  *Id*. at 49:20-51:8; PX 273.

72.    SuperValu's risk analysis should have caused great concern at Comvest and Haggen.  SuperValu had learned that Haggen was planning a "very aggressive first store opening, and under the [Transition Services Agreement between Haggen and SuperValu] we did not believe we could do the proper work, nor did we believe Haggen could do the proper work in order to have a successful first store opening."  As it concerned pricing and merchandising, SuperValu asserted that "for systems like the PM2 pricing system, there's setup and configuration on the SUPERVALU side that had to occur before the business users on the

Haggen side could do their work.  And finally, we did not believe that there was adequate time

for Haggen to make all the merchandising decisions that they needed to make in order to have

the right prices, the right assortment in their stores."  SuperValu (Collison) Tr. at 91:18-93:12;

PX 273.003 (identifying the impact and associated risks for pricing and merchandising issues

caused by the accelerated conversion commencement date).

73.    Haggen was dismissive of the risks that had been identified, with Clougher

telling Barnett and Genser that "[t]here is a large level of b…s…" in SuperValu's risk analysis.

PX 273.001.  But SuperValu's warnings were prescient.  When the very first store opened, there

were considerable pricing problems that resulted in multiple "shelf tags" for the same items; this

created a laborious, complex set of issues that required determinations to be made as to which

tag was the correct one, and then match that tag with the "point of sale system."  *Id*. at 51:9-

54:11.  The consequences were severe: "There were out of stocks in the store because they put

the wrong shelf tag up and when they went to reorder, they couldn't reorder because it was the

wrong vendor.  The vendor wouldn't ship there.  Every week when shelf labels came to the store,

the store would get a big pile of shelf labels and it became overwhelming for them."  This caused

inventory shortages and a loss of customers, just as SuperValu had warned back in December.

*Id*. at 111:3-112:2; PX 273.

74.    Despite the complexity of the pricing problems, Haggen proceeded with

more store closings without delay knowing that the problems had not been solved.  In response

to these issues, SuperValu told Clougher, Barnett, and Genser that SuperValu did not believe that

Haggen had "enough merchants to do the work that was required," but was told, in essence, to

mind their business.  *Id*. at 204:14-205:14.

## VII.    The Role of Certain Third-Parties in Regards to Comvest's Projections

75.    Defendants contend that their proposal to acquire 146 stores from Albertson's was "vetted by multiple third parties who were incentivized to rigorously inspect the deal" and all "believed it would work." *See e.g.,* Def. Trial Br. at 4-5, 15, 32-33. [11]  Defendants also contend that these third parties validated Haggen's corporate structure, and found Comvest's projections to be reasonable.  Trial Tr. (10/16) at 47:3-10; 66:24-25, 69:7-12. The Court finds, based on the evidence, that Defendants' contentions are vastly overstated and in some cases simply false.  With the exception of the state attorneys general (for whom there is no specific evidence concerning these particular contentions), each of these third parties was served with a subpoena and gave sworn testimony, yet Defendants offer *no* evidence that any of them (a) validated Haggen's new "PropCo/OpCo" structure, or Haggen's decision to transfer the fee-owned real property to the PropCo Entities, ostensibly beyond the reach of the OpCo Entities' creditors; or (b) determined that Comvest's projections were reasonable.

76.    Indeed, as discussed below, the evidence establishes that each of these third parties validated only the transaction that it was entering into as it pertained to their parochial interests, and that some of them identified very substantial risks, but had their own unique mitigants and reasons for proceeding notwithstanding those substantial risks.

### A.    FTC

77.    The FTC is a governmental agency that ordered Albertson's and Safeway to divest certain stores as a condition to approving the Albertson's/Safeway merger, and that approved Haggen as a qualified bidder of 146 of those stores.  PTO ¶¶ 46, 48.  The parties

---

[11] References to "Def. Trial Br. __" are to Defendants' Trial Brief dated October 6, 2017, and filed at Docket No. __.

dispute what the FTC was told and actually approved,[12] but based on the evidence, including the depositions of Paul Frangie, the FTC's representative, and Lawrence Silverman, the Court can easily resolve those disputes.

78.     The evidence shows that Haggen and Comvest (a) provided the FTC with a business plan and a set of projections (that did not include a "downside case" let alone the "real bad downside case" that Niegsch described as showing Haggen with barely any liquidity), and (b) participated in one in-person meeting with the FTC that lasted two to three hours.  Trial Tr. (10/16) at 224:3-22; DX 72, PX 318.  Other than a handful of sporadic phone calls or e-mails, the FTC apparently relied on these materials and meeting in approving Haggen as a qualified bidder.

79.     Based on the evidence, the Court finds that:

- The FTC (a) was never informed that Haggen was creating ten new corporate entities in connection with the Albertson's Acquisition, and (b) never saw, discussed, or approved "any aspect of Haggen's corporate organizational structure at any time," nor did the FTC even understand what a "PropCo" entity was at the time it issued its proposed order approving the Albertson's/Safeway merger on January 27, 2015.  FTC (Frangie) Tr. at 42:9-20, 135:15-21, 155:17-163:12; Trial Tr. (10/16) at 288:8-289:15; Trial Tr. (10/19) at 207:25-208:24, 209:6-10; Akerman (Silverman) Tr. 33:6-20, 35:8-13.

- The FTC did not see, discuss, or approve of any Contribution Agreement that was to be used by Haggen and Comvest, nor did Haggen or Comvest ever disclose to the FTC their plan to transfer real property assets to the PropCo Entities immediately after the closing.  FTC (Frangie) Tr. at 35:7-24, 36:21-37:6, 38:4-39:4, 39:21-40:11, 43:21-25, 136:14-20; Trial Tr. (10/16) at 288:8-289:15; Akerman (Silverman) Tr. 35:14-23.

- The FTC did not see, discuss, or approve of any PropCo Lease or sublease, nor was it aware that Haggen intended to enter into intercompany leases following the closing. FTC (Frangie) Tr. at 41:5-42:11, 43:10-20, 44:2-45:9, 95:17-23, 95:24-96:6, 135:22-136:13; Akerman (Silverman) Tr. 35:24-36:22.

---

[12] *Compare* Defendants' contentions (Trial Tr. (10/16) at 61:5-63:13; Def. Trial Br. at 11-13) *with* Plaintiffs' contentions (Pl. Trial Br. at 15-17).

80.     Defendants contend that the FTC approved and validated Comvest's projections as "reasonable."  There is no evidence to support this contention.  Defendants failed to offer any documentary or testimonial evidence to show that Comvest's projections were considered by the FTC or that the projections were the subject of any substantive communications or approvals, formal or otherwise.  Indeed, the Defendants took the FTC's deposition and failed to elicit any testimony to support their contention that the FTC specifically reviewed, considered or in any way validated Comvest's projections, or that the FTC relied on those projections in approving Haggen as a qualified bidder.  In the absence of any corroborating evidence, there is no basis to equate the FTC's decision to approve Haggen as a qualified bidder with the FTC's approval or validation of any particular aspect of Haggen's business plan or projections.

**B.     PNC**

81.     Defendants also contend that by agreeing to the terms of the ABL, PNC implicitly or explicitly validated or approved Haggen's new corporate structure, including the transfer of assets to bankruptcy remote entities, Comvest's projections, and the Albertson's Acquisition generally.  *See e.g.,* Trial Tr. (10/16) at 60:15-21; Answer ¶ 82; Def. Trial Br. at 4, 11.  The evidence contradicts Defendants' contentions concerning PNC.

82.     Comvest and PNC had a long-standing relationship that preceded the Albertson's Acquisition, with PNC already having extended credit to "five or six" of Comvest's portfolio companies.  PNC (Goldstein) Tr. at 39:11-22, 40:19-24; PX 369.003 (listing the entities PNC has provided financing to, including specific Comvest funds, companies to which Comvest provided debt financing, and Comvest portfolio companies).  On August 30, 2014, Niegsch wrote to PNC about Haggen's potential acquisition of stores from Albertson's and Safeway and emphasized that "[g]iven the dynamics, were are going to be able to pick up the stores and some

valuable real estate for a very attractive price." Niegsch expressed interest in "upsizing our current ABL facility and putting some leverage on the real estate." PX 366.004.

83.    By October, the Albertson's deal had expanded to include certain California stores and PNC was asked to lead a $150 million underwriting for a revolving, asset-based loan. PNC was advised that Comvest planned to take out a $61 million term loan against the fee-owned real estate, with $50 million of the proceeds used to finance a "Comvest Dividend payable at closing." PX 367.

84.    On December 1, 2014, PNC sought approval from its Credit Risk Management Committee and Executive Credit Risk Management Committee for a proposed $180 million revolving line of credit to Haggen. PNC (Goldstein) Tr. at 74:3-77:3; PX 369. These Committees approved the proposed transaction and provided six "business justifications" for the loan including the profitable nature of the deal to PNC, PNC's "extensive history with Comvest," and the fact that the loan was to be a "fully-secured, fully-monitored, revolver-only facility." PX 369.004. PNC's analysis does not appear to refer to, or rely upon, the merits of the new "PropCo/OpCo" corporate structure, the reasonableness of Comvest's projections or the viability of the overall enterprise.[13]

85.    Although PNC ultimately approved the loan, PNC's underwriters considered Haggen's proposed $180 million ABL very risky and assigned it a "risk rating" of

---

[13] Indeed, the loan documentation contradicts Defendants' contention that PNC validated Comvest's projections. The Borrowers were required to represent and warrant to PNC that their projections were "based on underlying assumptions which provide a reasonable basis for the projections contained therein and reflect Borrower's judgment based on present circumstances of the most likely set of conditions and course of action for the projected period." 106:9-108:17; PX 370.092. This was one of 33 separate representations and warranties (not including sub-parts) the Borrowers were required to make spanning more than eleven single-spaced pages. PX 370.092-103. There is no evidence that PNC made any effort to validate, test, or analyze Comvest's projections (or any of the facts or assertions underlying any of the other 32 representations and warranties), and the Court will not equate PNC's acceptance of the representation and warranty concerning the "Borrower's judgment" with a declaration or determination by PNC that the projections were reasonable. Indeed, such a determination would render Section 10.2 of the ABL obsolete (Section 10.2 provides for an Event of Default if a representation or warranty "shall prove to have been incorrect or misleading in any material respect" when rendered). PX 370.124.

12B.  According to PNC, the numerical part of the risk rating is an assessment of the probability

of the prospective borrower's default with "1" being the least likely and "14" being the most

likely to default.  The alphabetical part of the risk rating is an assessment of PNC's loss in the

event of default or, stated another way, PNC's perception of the quality of collateral, with "A"

being the most secure (*i.e.*, cash collateral) and "G" being the least secure (*i.e.*, unsecured).  PNC

(Goldstein) Tr. at 80:11-84:11, 85:11-20; PX 369.003.[14]  Thus, in assigning a risk rating of 12B

to the proposed ABL, PNC determined that there was a very substantial risk of default, but

concluded that the risk was mitigated by the strength of the collateral securing the ABL.  PNC

also identified other specific risks:

- The proposal will expand Haggen's footprint to "regions likely unaware of the Haggen brand"
- "Many key aspects of the acquisition, rebranding and go-forward integration/operations remain TBD (such as a firm Transition Services plan . . .)"
- The projected "cash burn" showed a peak of $115M through May 2015 (although Comvest and management were "confident" that a cash burn of only $105M was an "accurate assumption")
- "Comvest intends to take up to a $15MM dividend once the conversion process is complete, which would leave the firm with no equity in the business (Comvest currently only has $11MM of remaining equity)."

PX 369.005-006.

86.    On February 12, 2015, Haggen, Inc., OpCo South, and OpCo North

entered into the ABL.  PNC (Goldstein) Tr. at 100:7-101:9; PX 370.  The ABL was projected to

be, and initially was, for a Maximum Revolving Advance Amount of $180 million.  *Id.* at

101:10-13, 104:20-23; PX 370.038.

87.    Based on the foregoing, the Court concludes, as factual matters, that

(a) PNC approved of the terms of the ABL, and nothing more; (b) PNC identified substantial

---

[14]  PNC's Rule 30(b)(6) witness, Scott Goldstein, never saw PNC underwrite a loan with a risk rating of 14.  PNC (Goldstein) at 85:11-20.

risks, including a high risk of Haggen's default, but justified extending the loan based on the

quality of the collateral, the nature of the loan, and its long-standing relationship with Comvest;

and (c) while PNC accepted Haggen's representations concerning the projections, there is no

evidence that PNC validated them or any other aspect of Comvest's business plan including, but

not limited to, the "PropCo/OpCo" corporate structure and "siloing" of assets.

### C.    Garrison

88.    Garrison is a sale leaseback counterparty.  Defendants contend that by

entering into the Sale Leaseback Transactions, Garrison validated Haggen's new corporate

structure, Comvest's projections, and the Albertson's Acquisition generally.  Trial Tr. (10/16) at

60:22-61:4; Def. Trial Br. at 4, 12.  The evidence is to the contrary.

89.    Prior to entering into the Sale Leaseback Transaction, a team at Garrison

prepared a "Confidential Information Memorandum" ("CIM").  The CIM was presented to

Garrison's Management Committee, the body charged with the responsibility of approving the

transaction on behalf of Garrison.  Garrison (Rosenthal) Tr. at 41:5-44:21; PX 178.  The CIM

detailed, among other things, the many risks identified by Garrison as well as Garrison's overall

strategy.  PX 178.

90.    The CIM, and Garrison's testimony, establishes that Garrison entered into

the Sale Leaseback Transactions because it believed it was acquiring real estate at a substantial

discount to market, and that its business strategy would allow it to avoid the substantial

transactional risks that it identified -- including, but not limited to, the risk that "Haggen runs out

of liquidity."

91.    Prior to entering into the transaction, Garrison and its industry consultant,

Food Partners, identified numerous and substantial risks presented by the proposed Albertson's

Acquisition.  Garrison (Rosenthal) Tr. at 38:16-39:6, 74:17-25; PX 178.016.  Among the risks

identified by Garrison were:

- Haggen was deemed to be a "non-investment grade credit"
- Comvest planned to contribute insignificant new equity
- Haggen was taking on higher than average risk with this "complicated endeavor" due to the "size of the transaction; the amount of stores that were being acquired."
- Garrison was concerned that Haggen lacked the capability to successfully convert all the stores
- Haggen lacked brand recognition in the new markets it was entering
- Albertson's and Safeway were to remain direct competitors
- Short term liquidity risk due to the possibility that corporate cash flows could be impaired
- Possible delays in the conversion schedule; higher than expected costs; higher CAPEX; sales declines

Garrison (Rosenthal) Tr. at 75:2-76:11, 80:24-90:23; PX 178.016.

92.     Garrison's consultant, Food Partners, prepared its own independent risk

assessment that was presented to Garrison's Management Committee as part of the CIM.

Among the risks Food Partners identified were:

- "This type of transaction [*i.e.,* the size and scale] has never been done before"
- "Haggen brand and format is not portable for other markets."
- "Leveraged acquisition with Comvest not investing equity"
- Albertson's and Safeway "will be direct competitors and will know the markets (and customers) better than Haggen"
- "Closing and conversion schedule highly risky, especially licenses and permits and executing SLB."
- "Management team has not operated a traditional format in these markets"
- "Transaction complexity and size may overwhelm Haggen"
- "Haggen runs out of liquidity"

Garrison (Rosenthal)Tr. at 92:18-104:5; PX 178.093.

93.     Despite these long lists of substantial risks, the Court finds that Garrison

proceeded with the sale leaseback transaction for two very simple reasons:  (a) it believed it was

purchasing real estate at a $33 million discount to market (*i.e.,* a "purchase price of $130.4

million" versus a "gross exit value of $162.9 million"), and (b) most significantly, Garrison

intended to "employ a 'wholesale-to-retail' strategy, by acquiring and divesting of the properties with a nine-month investment period."  Garrison (Rosenthal) Tr. at 47:3-47:23, 48:14-49:5, 60:20-61:11; PX 178.004.

94.    The Court also finds that the opportunity to purchase the real property at such a substantial discount to market provided Garrison with the financial incentive to proceed, and the strategy of selling the real property individually over a nine-month period mitigated substantially all of the risks identified.

95.    In sum, the evidence shows that Garrison entered into the sale leaseback transaction based on its own self interest and the belief that its intended strategy of purchasing the real estate at a discount and promptly "flipping" the real property would ameliorate all of the risks.  There is no evidence supporting Defendants' contention that by entering into the SLB transaction, Garrison validated Haggen's business plan, corporate structure, or Comvest's projections.

### D.    **Albertson's**

96.    Defendants also suggest that Albertson's and Safeway, the sellers, also validated Haggen's business plans and projections, and that they were motivated to do so because Albertson's sponsor, Cerberus, would have been "on the hook for a $400 million 'break fee'" if the merger failed.  Trial Tr. (10/16) at 59:22-60-14; Def. Trial Br. at 11.

97.    Defendants offered no evidence to support their contention that Cerberus would have been obligated to pay a $400 million "break fee" if the Albertson's/Safeway merger had failed, and, of course, do not even allege that the "break fee" was conditioned on Haggen being approved as a buyer.  The Court cannot simply presume that Cerberus risked a $400 million "break fee" on the quality and credibility of Haggen's business plan or Comvest's projections or on Haggen's adoption of a "PropCo/OpCo" structure.

98.    Nor is there any evidence that Albertson's actually "validated" Comvest's projections or Haggen's business plans.  Indeed, it seems incongruous that Haggen would ever ask a competitor to "validate" any aspect of its business.  In any event, the evidence in the record shows only that shows that Albertson's signed the APA on December 10, 2014, and agreed to sell certain assets (including fee-owed real estate, ground leases, and inventory) for money that was to be paid as the stores were transferred pursuant to the cadence.  PX 263 ¶¶ 2.1, 3.1, 3.2, 6.2, and 7.1.  The sale was not conditioned in any way on the quality of Comvest's projections or Haggen's business plans or the adoption of a "PropCo/OpCo" structure.

## VIII.    Comvest's new Corporate Structure Advanced its own Interests to the Detriment of the OpCo Entities and Their Creditors

99.    Plaintiff contends -- and the Court finds -- that all of the claims at issue arise, in the first instance, from Comvest's decision to create a "PropCo/OpCo" structure in connection with the Albertson's Acquisition.  To be clear, as a general matter, there is nothing inherently illegal, improper or unfair about the utilization of a PropCo/OpCo structure, and the Court's findings and conclusions in this case should not be construed as condemning the use of "PropCo/OpCo" structures in other contexts and circumstances.

100.    But the evidence discussed below conclusively shows, Comvest's adoption of the PropCo/OpCo structure in this case was problematic for at least the following reasons:  (a) the structure was adopted on the eve of, and in connection with, a "transformative" transaction; (b) the transaction involved an eight-fold increase in the number of Haggen's stores, including Haggen's expansion into three new states where Haggen had no prior name recognition, customer affinity, or reputation, (c) as Haggen and Comvest knew, the transaction was fraught with substantial execution risks, (d) the OpCo Entities were inadequately capitalized from the outset and remained so, and (e) most importantly, Comvest devised the PropCo/OpCo

structure with the specific intent of securing the economic benefits of the real estate for itself, whether the transaction succeeded (by leveraging the real estate to pay dividends to Comvest, and creating $13 million in annual cash flow from the rent due under the PropCo Leases and subleases), or failed (by placing the real estate beyond the reach of the OpCo Entities' creditors, Comvest intended to provide itself with "downside protection" in the event of a "disaster" or "liquidation" scenario).

101.    The parties agree on certain basic facts.  From the time of Comvest's investment in Haggen in 2011 through December 1, 2014, the equity owners of the enterprise (*i.e.*, Comvest and members of the Haggen family, through HHI) owned the membership interests in Holdings, which owned all of the membership interests in Acquisition, which owned all of the common stock in Haggen, Inc. as follows:



PTO ¶ 55.

102.    On the eve of the Albertson's Acquisition, however, Comvest caused Haggen to create ten new entities within a new "PropCo/OpCo" structure:



PTO ¶¶ 56-58.

103.    The evidence establishes that Comvest created this structure with the intent of keeping the assets and liabilities of the PropCo Entities separate from the assets and liabilities of the OpCo Entities.  Trial Tr. (10/16) at 147:19-148:6.  In fact, Caple expressly admitted the intent and effect of the PropCo/OpCo structure was to prevent the PropCo Entities' assets (*i.e.*, the real estate) from being used to satisfy claims made against the OpCo Entities. Trial Tr. (10/16) at 292:17-294:4.  Clark expressed the same view, testifying that he knew the real estate assets would be transferred to the PropCo Entities and would be unencumbered, and that there would be "no link directly between" the PropCo Entities and the OpCo Entities.  Clark Tr. at 122:10-123:14, 125:11-126:6, 127:2-128:21.[15]

104.    Comvest's conduct is consistent with the specific intent identified by Caple and Clark.  For example, Comvest resisted using a more conventional corporate structure and financing methodology precisely because it would have put the acquired real estate assets at

---

[15] Despite being the President and Chief Executive Officer of OpCo South, and later a Manager and President of Holdings (PTO ¶ 29), Shaner had no involvement in the creation of Haggen's new corporate structure.  Moreover, while Shaner was aware that real estate assets were to be transferred to the PropCo Entities, he did not know whether those assets were placed beyond the reach of the OpCo Entities' creditors, whether the OpCo Entities' creditors could look to the real estate assets to satisfy their debts, or how Haggen's new corporate structure impacted the OpCo Entities' creditors.  Consequently, Shaner could not, and did not, explain to creditors how they might be affected by the new corporate structure.  Trial Tr. (10/19) at 7:22-9:22.

risk if the OpCo Entities failed to meet their obligations as they became due.  In late November

2014, Albertson's and Cerberus advised that they wanted Comvest to arrange for an ABL as well

as a traditional real estate loan from BofA, rather than the ABL and SLB transactions that

Comvest planned to utilize.  Comvest resisted the Albertson's/Cerberus alternative precisely

because it would have "cross-collateralized" the operating assets and the real property assets,

thereby giving BofA the ability to foreclose on all assets in the event of default.  Trial Tr. (10/17)

at 40:19-44:6; PX 29.  Comvest was intent on placing as much of the real estate as possible into

an entity or entities that operational creditors could not reach.  (It turns out they were

overzealous in this regard and put too much value into the PropCo Entities and insufficient

capital into the OpCo Entities.)

105.    This topic came up on November 20, 2014, when Barnett, who needed to

know the names of the entities for purposes of executing various contracts, asked Niegsch about

the status of the "legal entity structure."  Trial Tr. (10/17) at 163:16-24; PX 29.  Niegsch told

Barnett that he was unsure, but if "we have to take the [BofA deal advocated by

Albertson's/Cerberus], we could probably keep this structure, but it would mean nothing from a

silo-'ing' of assets and liabilities perspective."  PX 29.

106.    At trial, Niegsch admitted that (a) the "structure" he was referring to was

the PropCo/OpCo structure, (b) his reference to the "siloing" of assets and liabilities "was to the

structure that [Comvest] was pursuing that would have separated the operating assets and

liabilities from the real estate assets and liabilities," (c) if Comvest took the BofA deal it

"wouldn't have a structure where the operating company had the operating assets and liabilities,

and the real estate company had the real estate assets and liabilities," and (d) the effect of the

PropCo/OpCo structure was that "the property assets couldn't be used to satisfy the OpCo

liabilities and the OpCo assets couldn't be used to satisfy the PropCo liabilities." Trial Tr. (10/17) at 44:7-46:2, 164:19-165:11 (cross-collateralization would permit the lender to foreclose on all assets in the event of default); PX 29.

107. By knowingly shielding the real property from the claims of the OpCo Entities' creditors, the new corporate structure was intended to enable Comvest to monetize the real estate assets for its own benefit by executing its two-pronged real estate strategy: (1) some of the fee-owned property would be used to finance the acquisition through the SLB Transactions (with the SLB Leases imposed on the OpCo Entities), and (2) the balance of the fee-owned properties would be transferred to the PropCo Entities for Comvest's ultimate benefit. Trial Tr. (10/16) at 134:6-136:20, 148:7-11; PX 726, PX 727.[16]

108. Based on the foregoing, the Court finds and determines that Comvest adopted the "PropCo/OpCo" structure on the eve of the Albertson's Acquisition with the specific intent of advancing its own interests. By adopting this structure, Comvest positioned itself to reap the benefits of the real estate regardless of whether the transaction succeeded or failed.

IX. **The Transactions were Interrelated and Dependent**

    A. **Holdings' Rights to Acquire Real Estate were Gratuitously Transferred to PropCo Entities and SLB Entities Through the Contribution Agreements**

109. With the corporate structure in place, Comvest executed on its strategy of transferring the real estate assets from Holdings to the PropCo Entities and the SLB Entities through the use of the Contribution Agreements. Trial Tr. (10/17) at 62:20-63:8; PTO ¶ 65.

110. Holdings was the sole Haggen party to the APA and had the exclusive right to acquire, among other things, the real property assets, including fee-owned property and

---

[16] The Deal Team's projections showed that the PropCo Entities, holders of the real estate, were expected to perform as well in the "downside case" as in the "base case" when measured by EBITDA, balance sheets, and cash flow. Trial Tr. (10/16) at 143:2-144:18; compare PX 19.028-030 with PX 19.038-040.

ground leases.  PX 263.  Haggen acquired the stores on a rolling basis.  As the stores were

acquired, Anderson signed Contribution Agreements whereby Holdings transferred its right to

acquire specified stores to a PropCo Entity (if it was a fee owned property that was not included

in an SLB transaction) or to an SLB Entity (if it was a fee owned property that was included in

an SLB transaction).  Trial Tr. (10/17) at 258:21-260:4; PTO ¶¶ 64-65; PX 263; PX 89-PX 103.

111.    The Contribution Agreements were insider transactions engineered by

Comvest for its own benefit.  Comvest dictated the terms of the Contribution Agreements and

directed their lawyers to prepare them.  Trial Tr. (10/17) at 63:22-64:9.  Anderson signed each

form Contribution Agreement on behalf of each of the transferors and transferees even though he

had no personal experience with real estate, had never negotiated an intercompany transfer of

assets, had never previously seen an agreement pursuant to which assets were transferred, and

had never personally participated in the transfer of assets between corporate affiliates.  Trial Tr.

(10/17) at 253:14-16, 253:21-254:5.

112.    Most importantly, Holdings apparently received nothing in exchange for

the transfers of its right to acquire the real property assets to the PropCo Entities and the SLB

Entities.  Trial Tr. (10/16) at 126:20-127:25; Trial Tr. (10/17) at 260:16-20; 261:6-8.

**B.    The SLB Transactions**

113.    Haggen financed the Albertson's Acquisition by using a substantial

portion of the acquired real estate in two unusual sale leaseback transactions pursuant to which

(a) Holdings transferred its right to acquire certain fee owned properties to one of the SLB

Entities pursuant to the Contribution Agreements; (b) the SLB Entities then sold those fee-owned

properties to the SLB counterparties (*i.e.,* Garrison and Spirit); (c) the sales proceeds were

initially paid to the SLB Entities and most was then used to pay Albertson's purchase price; and

(d) the financial obligations under the SLB Leases were not assumed by the SLB Entities that

received the money, but were thrust upon the OpCo Entities. The Court finds it odd that one group of Haggen affiliates (the SLB Entities) received the proceeds from the SLB transactions, but another group (the OpCo Entities) was forced to assume the obligations in the form of the SLB Leases.[17]

### a.    The SLB Transactions with Spirit

114.    Holdings signed the "Purchase and Sale Agreement and Joint Escrow Instructions" with Spirit Master Funding IV, LLC (collectively, with that entity's affiliates, "Spirit"), dated as of November 24, 2014 (together with any amendments thereto, the "Spirit SLB Agreement"). PTO ¶ 70.

115.    Pursuant to the Spirit SLB Agreement, the SLB Entities sold twenty (20) parcels of real estate (and improvements) to Spirit located in Arizona, California, Nevada, Oregon, and Washington (the "Spirit SLB Properties") for approximately $224.4 million. PTO ¶¶ 71-74.

116.    An affiliate of Spirit, Spirit SPE HG 2015-1, LLC, as landlord, entered into a Master Lease Agreement with Operations, as Tenant, as of February 12, 2015, with respect to certain of the other Spirit SLB Properties (together with any amendments thereto, and the Spirit Lease, the "Spirit Master Leases"). PTO ¶ 86.

### b.    The SLB Transactions with Garrison

117.    Haggen also entered into a Sale Leaseback Transaction with Garrison.[18] Garrison understood that Comvest was the majority equity owner of Haggen and negotiated the Sale Leaseback Transaction with Niegsch. Garrison (Rosenthal) Tr. at 13:3-11. Garrison also

---

[17] Barnett admitted that he had never seen a sale leaseback transaction where the fee owner received the proceeds from the sale but the lease obligations were assumed by a different entity. Trial Tr. (10/17) at 19-23.

[18] As a technical matter, Garrison formed a joint venture with another firm, Cogent, and their joint venture was named "GIG TCG Wave Holdings, LLC." Garrison (Rosenthal) Tr. 18:20-19:6. For convenience purposes only, the Court refers to this joint venture as "Garrison."

understood that completion of the Sale Leaseback Transaction was dependent on Haggen's closing on the APA with Albertson's.  Garrison (Rosenthal) Tr. at 23:11-25:5.

118.    On December 4, 2014, Holdings and Garrison executed a "Purchase and Sale Agreement and Joint Escrow Instructions" (together with any amendments thereto, the "Garrison SLB Agreement").  PTO ¶ 75; Garrison (Rosenthal) Tr. at 25:6-18; PX 481.  The Garrison SLB Agreement governed the "sale" part of the SLB transaction.  Garrison (Rosenthal) Tr. at 108:22-109:3.

119.    Pursuant to the Garrison SLB Agreement, the SLB Entities sold nineteen (19) parcels of real estate (and improvements) located in Arizona, California, Nevada, Oregon, and Washington (the "Garrison SLB Properties") for approximately $134.4 million.  PTO ¶¶ 76-79.  According to Garrison, Haggen determined which specific properties were included in the set.  Garrison (Rosenthal) Tr. at 36:21-37:8.

120.    On February 17, 2015, Garrison, as landlord, and OpCo South and OpCo North, as tenants, entered into the Garrison Lease, as amended.  The Garrison Lease set forth the terms by which the OpCo Entities leased each of the Garrison SLB Properties following Garrison's acquisition of them from the SLB Entities.  PTO ¶¶ 82-84; Garrison (Rosenthal) Tr. at 107:13-109:3, PX 482.

121.    The SLB Transactions yielded $358.8 million.  As intended, the proceeds were used to pay Albertson's (which included payment for all of the fee owned properties subject to the SLB Transactions as well as the twenty-eight remaining fee owned properties that were transferred free and clear to the PropCo Entities), with the residual proceeds of $50 million going to the OpCo Entities.  PTO ¶¶ 66-67, 87.

122.    In exchange for the $50 million in SLB proceeds, the OpCo Entities were forced to assume all of the massive long-term obligations under the SLB Leases at above market rates, and yet were insufficiently capitalized from the outset.  PTO ¶ 68.

### c.    The SLB Leases Were Above Market

123.    James Howard offered expert testimony on Plaintiff's behalf concerning whether the SLB Leases were above market.  Howard's testimony is relevant to certain of Plaintiff's constructive fraudulent transfer claims, as well as its claims for breach of fiduciary duty, equitable subordination, substantive consolidation, and unjust enrichment.[19]

124.    Howard's ultimate conclusion was that the lease rates in the SLB Leases were above market.  Trial Tr. (10/19) at 218:25-220:12.  For the reasons set forth below, the Court finds that Howard was a credible witness, his methodology is generally accepted, and the bases for his opinions were reasonable.  The Court therefore credits Howard's opinions as set forth herein and finds that the SLB Leases were above market.

125.    Howard is well-qualified to offer expert opinions concerning commercial real estate leases, particularly those concerning supermarkets.  Howard has over 35 years of relevant experience, including 27 years working on behalf of lenders in the real estate and special assets/workouts fields.  As the market manager for Wachovia Bank's West Florida lending division, Howard oversaw loans of over $500 million to retail developers related to grocery stores.  Since 2008, Howard has been advising retail developers as a Senior Managing Director of GlassRatner Advisory & Capital Group LLC.  Based on his knowledge and experience, the Court concludes that Howard is qualified to offer his expert opinions concerning fair market rent. Trial Tr. (10/19) at 215:6-17, 216:9-217:1; PX 166.080-089.

---

[19]    *See* Counts 40-55, 57-63, 66-69, and 72-75 of the Complaint.

126.    Howard was first retained in April 2017 and was asked to examine the master leases related to the SLB Transactions and compare them to what he "would expect to see in the market at the time that the transaction transpired."  Trial Tr. (10/19) at 214:19-24, 217:16-19.  Howard assembled a team to assist him, and together they gathered and reviewed documents in connection with the preparation of a written report.  *Id.* at 217:20-218:18.

127.    Howard's methodology was a classic "comparable transaction" analysis.  After reviewing the Garrison CIM and Spirit confidential memorandum, Howard and his team used various databases to establish a "market rent" in each relevant geographic market.  Howard and his team also visited each of the properties that was subject to the SLB Transactions and conducted physical inspections to assess particular characteristics.  Trial Tr. (10/19) at 220:13-221:13.

128.    Howard compiled various schedules that included his "comparable transactions."  The primary sources for Howard's comparable transactions were Duff & Phelps (commissioned by Spirit), Garrison, and CoStar.  Howard focused on supermarkets (excluding all non-grocer tenants), eliminated smaller stores, and broke his "comps" down by geographical area.  Trial Tr. (10/19) at 221:17-227:3.

129.    Howard's ultimate conclusions are that the SLB Leases were, in the aggregate, (a) $3.55 million above market on an annual basis, and (b) $17 million above market over the life of the leases.  Trial Tr. (10/19) at 227:4-229:15; PX 166 (tables 11 and 11(a)).

130.    Defendants offered the expert testimony of John Satter to rebut Howard's conclusions.  Satter's principal criticism was that Howard did not provide for an annual rent escalation clause.  This is a significant point because all of the SLB Leases were subject to annual rent increases.  On cross-examination, however, Satter was forced to admit that Howard

had reviewed each of the 79 third-party leases that Albertson's assigned to Haggen as part of the Albertson's Acquisition, and not a single one contained an annual rent escalation clause.  Trial Tr. (10/20) at 266:14-268:1.

131.    In light of the sound methodology employed, and the reasonableness of Howard's decision not to include an annual rent escalation clause, the Court finds that Howard's opinions are credible, and the SLB Leases were above market to the extent determined by Howard.

### C.    The PropCo Leases/Rents

132.    Simultaneous with the transfer of the fee-owned real estate to the PropCo Entities pursuant to the Contribution Agreements, Comvest caused the PropCo Leases to be executed pursuant to which the OpCo Entities were required to pay rent to their corporate cousins, the PropCo Entities.  Notably, when the stores subject to the PropCo Leases were owned by Albertson's, they paid "nominal rent" of about $100 per store per year – a peppercorn – "[j]ust enough so that we have some consideration."  Albertson's (Beckstrom) Tr. at 16:8-18:22, 22:23-23:7.

133.    The Court finds, as a matter of fact, that the PropCo Leases did not result from arms' length negotiations.  Comvest unilaterally decided the terms of the PropCo Leases and directed Akerman to prepare them, and Anderson signed all of the PropCo Leases on behalf of both the "landlords" and the "tenants."  Trial Tr. (10/17) at 63:9-21, 261:13-24; PX 692-703. The Court finds that Anderson was not prepared for this task and had no ability to fulfill his fiduciary duties under the circumstances.  Anderson had never negotiated a commercial lease and had no experience assessing fair market rental rents.  Most importantly, Anderson admitted that he signed the PropCo Leases without having made any effort to determine fair market rental

rates and without knowing if the rent was fair and reasonable or whether anyone was responsible for making that assessment.  Trial Tr. (10/17) at 253:14-20, 254:14-21, 262:22-264:1.

134.    Consequently, the Court finds that the PropCo Leases were "insider" transactions undertaken for Comvest's sole benefit.

**D.**      **The Subleases (Ground Leases)**

135.    As with the Contribution Agreements and the PropCo Leases, Comvest also dictated the terms of the subleases between the PropCo Entities and the OpCo Entities pertaining to the ground leases, and Comvest's decision in this regard is a good illustration of how Comvest improperly elevated its own interests as a controlling shareholder to the detriment of the operating companies.

136.    According to Niegsch, at the time of the Albertson's Acquisition, Albertson's had a number of third-party ground leases.  Instead of simply transferring those ground leases to the operating companies, Comvest transferred the ground leases to the PropCo Entities and caused the OpCo Entities to enter into "subleases" at "market rates" with the PropCo Entities, pocketing the difference between the actual rent due under the ground leases and what Comvest determined the market rent to be.  Trial Tr. (10/17) at 64:10-65:12.  In other words, each of the stores subject to a ground lease was forced to take a rent increase for Comvest's ultimate benefit.[20]  The only plausible explanation for the subleases is that Comvest advanced its own interests at the OpCo Entities' expense.

**E.**      **Comvest's Domination of the Transactions and Terms**

137.    Caple admitted that Comvest: (a) controlled the Haggen enterprise, (b) structured the Albertson's Acquisition, (c) determined to pursue the SLB transactions,

---

[20] Prior to the Albertson's Acquisition, the stores subject to the ground leases did not pay any additional "rent" to any Albertson's affiliate.  Albertson's (Beckstrom) Tr. at 25:4-22, 27:7-31:25.

(d) made the decision to enter into each applicable agreement, (e) authorized Caple, as Manager, to enter into the APA, (f) approved the PropCo Advance in August 2015, (g) approved the commencement of these bankruptcy cases, and (h) decided which Haggen entities would file for bankruptcy and which would not.  Trial Tr. (10/16) at 146:3-147:18.

X.   **Comvest and Haggen Fail to Disclose the new Corporate Structure and Asset Transfers**

138.   The evidence adduced at trial shows that while a few parties involved in the financing and execution of the Albertson's Acquisition knew in advance that Haggen was adopting a "PropCo/OpCo" corporate structure (*e.g.*, Spirit and Garrison (the sale leaseback counterparties), PNC (the ABL lender), and Albertson's (the seller)), only a select few of the OpCo Entities' largest creditors found out that Haggen was doing so.  Trial Tr. (10/16) at 282:9-293:22.  And that was no accident:  Comvest and Haggen did not publicly disclose anything to the OpCo Entities' vendors, employees, landlords, and service providers concerning the adoption of a new corporate structure or the transfer of real estate valued at over $100 million to bankruptcy remote entities.

139.   For example, Clougher, the CEO of OpCo North, admitted that he never informed any of the OpCo Entities' creditors that (a) Haggen had adopted a new "PropCo/OpCo" corporate structure as part of the Albertson's Acquisition; (b) all of the fee owned real property acquired from Albertson's was being transferred to the PropCo Entities (and was intended to be beyond the reach of the OpCo Entities' creditors); or (c) Haggen was running out of liquidity in the spring and summer of 2015.  Trial Tr. (10/19) at 110:23-111:7; 111:19-23.  Indeed, Clougher stood in front of certain of the OpCo Entities' suppliers at a "vendor summit" and failed to tell anyone that Haggen was adopting a PropCo/OpCo structure or disclose the implications of the new structure (*i.e.*, that real estate valued at over $100 million would not be used to capitalize the

OpCo Entities and would be beyond the reach of the OpCo Entities' creditors). Trial Tr. (10/19) at 211:15-17.

140. For his part, Shaner, the CEO of OpCo South, did not even understand how the corporate structure impacted the OpCo Entities' unsecured creditors or whether the real estate assets were placed beyond the reach of those creditors, so he did not – and could not – explain these issues to anyone, nor did he ever tell any employees that Haggen had adopted an "PropCo/OpCo" structure. Trial Tr. (10/19) at 7:8-10:11, 105:1-3. Moreover, Shaner was unaware of anyone ever explaining to the OpCo Entities' creditors that the real property being acquired from Albertson's was being transferred to the PropCo Entities and would be unavailable to satisfy those creditors' claims. Trial Tr. (10/19) at 40:11-41:9.

141. Barnett, Haggen's Chief Financial Officer, never told any of the OpCo Entities' creditors that the real estate assets had been separated from the operating assets or that the real estate assets would be unavailable to satisfy claims against the OpCo Entities. Trial Tr. (10/17) at 169:23-170:16, 170:21-171:12, 201:23-202:4.[21] Moreover, Barnett admitted that he was unaware of any statements made to the OpCo Entities' creditors that would have caused them to inquire about the adoption of the new corporate structure or the transfer of assets. Trial Tr. (10/17) at 247:23-248:13.

142. Similarly, Caple did not instruct anyone to disclose to the OpCo Entities' suppliers and others it did business with that Haggen was adopting a new corporate structure; nobody ever told Caple that they made such a disclosure, or that they disclosed that the real property was being transferred to the PropCo Entities, or that they disclosed that intercompany

---

[21] Haggen and Comvest made certain limited exceptions to their general rule of silence regarding the adoption of the PropCo/OpCo structure and the "siloing" of assets. While Barnett claimed that "CFOs [generally] don't have balance sheet structure discussions with vendors," exceptions were made for Unified Grocers ("because they were going to be our biggest supplier in the South") and SuperValu ("because SuperValu was such an important part of what we were doing"). Trial Tr. (10/17) at 171:2-172:1

leases were being executed between the OpCo Entities and the PropCo Entities.  Trial Tr. (10/16) at 280:16-282:11, 283:23-284:6.

## XI.    Comvest's "Investment" in Haggen was a Fraction of what Comvest Claimed

143.    Defendants have repeatedly asserted that Comvest contributed nearly $200 million into the Albertson's Acquisition, comprised of the legacy stores with an alleged value of $100-140 million and an "equity investment" of $50 million.  *See, e.g.*, Hearing Tr. (9/26/17) at 26:24-27:2; Def. Trial Br. at 1, 2, 4, 29-30.  Defendants made these representations in an apparent attempt to persuade the Court that Comvest would not have adopted the "PropCo/OpCo" structure, created unreasonable projections, left the OpCo Entities undercapitalized, or breached their fiduciary duties in connection with the Albertson's Acquisition, with so much at stake.  Defendants' assertions in this regard are not credible.  The evidence conclusively establishes that Comvest had no more than $26.5 million at risk -- while intending to capture $118 million in appraised real estate "for free."

144.    These facts placed Comvest squarely in a "moral hazard."  As the evidence shows, because Comvest believed that the real estate was "money good" in a "disaster" or "liquidation" scenario, Comvest was able to ignore or minimize the obvious transaction and execution risks and flaws in their projections that jeopardized the OpCo Entities and their constituencies, but not Comvest.

### A.    The Value of Comvest's Interest in the Legacy Stores was $26.5 million

145.    As part of the Albertson's Acquisition, Comvest "contributed" the legacy stores by placing Haggen, Inc. on the "OpCo" side of the new corporate structure.  Defendants contend that the value of the legacy stores was $100 million.  Trial Tr. (10/16) at 50:21-51:7, 96:20-97:2; Def. Trial Br. at 1, 4, 29.  At trial, Caple went even further, asserting that the Haggen legacy stores were worth between $100 to $140 million.  Trial Tr. (10/16) at 269:17-21.  None of

these assertions are supported by any evidence and none of them are credible.  For example,

Caple's "valuation" constituted of nothing more than his own personal view, a view that was

never reduced to writing and that was, in any event, an "enterprise valuation," not an equity

valuation.  Trial Tr. (10/16) at 269:17-270:13.

146.    Contradicting Defendants' assertions of much higher values, the best

evidence of the value of Comvest's equity interest in the legacy stores is Comvest's

contemporaneous communications to its investors.  As Caple was forced to admit, Comvest

reported to its investors that as of December 31, 2014 (the time of the Albertson's Acquisition)

Comvest's equity interest in Haggen was only worth $26.5 million.  Trial Tr. (10/16) at 274:20-

276:7; PX 636.

147.    Based on the foregoing, the Court finds that Comvest's equity interest in

the legacy stores was, at most, $26.5 million as of December 31, 2014, the last month before the

closing of the Albertson's Acquisition.

**B.    <u>Comvest Never Intended to Make an "Equity Investment"</u>**

148.    Comvest also contends that it made an "equity contribution" of $50

million in the OpCo Entities in connection with the Albertson's Acquisition.[22]  Trial Tr. (10/16)

at 67:9-10; Def. Trial Br. at 1, 29.  While Comvest certainly "invested" (and lost) $50 million,

the evidence conclusively establishes that Comvest did not intend to make an "equity

investment" of any kind; rather, Comvest believed it was really making a short-term "bridge

loan" at the insistence of the sellers, and had various plans and schemes to recover the entire cash

"investment" within months.

---

[22]  Comvest "invested" $51.5 million, not $50 million, so that it could -- and did -- pay itself a "management fee" of 3%, or $1.5 million.  Trial Tr. (10/17) at 47:24-48:6.  Plaintiff seeks to recover this $1.5 million "management fee" under Counts 64 and 65 of the Complaint.

149.    The evidence shows that, based on its own overly optimistic projections, Comvest did not believe that Haggen needed a $50 million "equity investment" to capitalize the OpCo Entities; rather, Albertson's and Cerberus insisted that Comvest put the money in and keep it there until Albertson's was paid in full, which Comvest expected to occur within 30 days after the closing of the last store in June.  Trial Tr. (10/16) at 128:21-129:14, 131:6-12.  There is substantial, uncontroverted evidence that Comvest planned to leverage the real estate to finance the entire transaction (and a dividend to boot) and did not intend to have its $50 million "investment" remain in the business for very long.  In fact, before the APA was even signed, Comvest was already devising plans to recover its entire "investment," and withdraw a whole lot more, at the earliest opportunity.

150.    On December 3, 2014, when seeking approval of the Haggen bid, the Deal Team told the IC that even though Comvest was putting in $50 million, it would "have no risk outside its basis" because (a) half the money would be used to pay back an existing Haggen loan that Comvest had guaranteed (thereby eliminating a potential $25 million obligation), (b) the balance was expected to be repaid to Comvest in the form of a tax distribution later in the SLB and conversion processes, and (c) Comvest was also contemplating making dividend distributions equal to its "investment" by selling ground leases and leveraging the PropCo Entities' real estate.  Trial Tr. (10/16) at 129:15-133:13, Trial Tr. (10/17) at 142:10-18; PX 19.004, 19.012 (setting forth Comvest's "Real Estate Strategy Between Sign and Close/Comvest Dividend").[23]

---

[23]  At trial, Caple admitted that $20 million from the proceeds of Haggen's pre-existing loan was used to pay Comvest a dividend.  Trial Tr. (10/16) at 129:15-130:25; PX 19.004.  In other words, half of Comvest's $50 million "equity investment" was used to pay off a $25 million loan previously taken out by Haggen, Inc. that was guaranteed by Comvest, and where most of the proceeds ($20 million) was previously used to pay Comvest a dividend.  These facts render Comvest's claim that it made an "equity investment" particularly troublesome.

151.    Indeed, at that time, Comvest was already negotiating with UBS over a potential loan to the PropCo Entities, the proceeds of which would be used to pay Comvest a dividend.  Trial Tr. (10/16) at 170:2-15; Trial Tr. (10/17) at 18:4-10; PX 30.012.

152.    On January 27, 2015, before Haggen closed on the first Albertson's store, Falk sought confirmation that its "investment" would be risk-free and quickly recovered. Niegsch assured Falk that Haggen did not need Comvest's $50 million "to fund this transaction," but the Deal Team agreed to it because Cerberus required it.  Trial Tr. (10/17) at 46:3-13 PX 33.001.  Comvest characterized the so-called "equity investment" as a "bridge loan" because -- as the Deal Team told the IC in December -- Comvest intended to quickly recover the $50 million as soon as it could.  Trial Tr. (10/17) at 47:18-23; 48:7-49:3; PX 33.

153.    In addition to the methods outlined by the Deal Team on December 3, 2014, Comvest devised other methods by which it planned to quickly recover its "investment." For example, in the ABL that Comvest negotiated with PNC, Comvest succeeded in including a provision enabling it to use up to $50 million of the OpCo Entities' ABL credit line for purposes of paying Comvest dividends.  Thus, the ABL provided that a $50 million dividend could be paid to Comvest (a) after Haggen received at least $300 million of SLB transaction proceeds (which Haggen was already under contract to receive), (b) after the store conversion process was complete, (c) as long as Haggen was not in default, and (d) as long as Haggen would still have 15% of the maximum availability after paying the dividend.  Thus, Comvest planned to use the ABL facility to recoup its investment by mid-June 2015, when the conversion process was scheduled to be completed.  PNC (Goldstein) Tr. at 126:21-130:12; PX 370.070.[24]  *See also* Trial Tr. (10/17) at 204:4-206:21.

---

[24]  Comvest held fast to its belief that it could quickly recover the "equity investment."  Even in June, as Haggen faced a liquidity shortfall, the Deal Team was still telling the IC that the ABL could be used to fund a $50 million

154.    Based on the foregoing, the Court finds, as matter of fact, that Comvest never intended to capitalize the OpCo Entities with a $50 million "equity investment" and that Comvest had devised myriad schemes to extract that money, and more, as soon as it possibly could.  These findings are significant because they (a) establish that Comvest did not believe it had more than its equity stake in Haggen, Inc. at risk (which it told its investors was worth $26.5 million), (b) show the degree to which Comvest was focused on extracting as much value as possible out of Haggen without any apparent regard for how these dividends and distributions would affect the OpCo Entities' capital structure, and (c) call into serious question Defendants' credibility.

## XII.    Haggen Suffers an Immediate Meltdown Post-Closing

155.    On December 10, 2014, Albertson's LLC and Albertson's Holdings LLC, as sellers, and Holdings, as the buyer, entered into the APA.  PTO ¶¶ 35-36, 47.  On January 27, 2015, the FTC issued an order directing Albertson's and Safeway to, among other things, divest the 146 stores to Holdings. PX 314.006.  Thereafter, Haggen closed on the stores on a rolling basis starting in February of 2015.  Haggen's demise was swift, began immediately, and continued unabated for seven months, ending in its September 2015 bankruptcy filing and complete liquidation.

156.    Comvest and Haggen's management were fully aware of the risks that materialized from the beginning -- many of which they and their advisors identified as "transactional and execution risks" prior to the signing of the APA -- but they were ill-prepared to address the problems because, among other things, the OpCo Entities were inadequately capitalized to weather the foreseeable storm.

---

dividend to Comvest as a return of the "equity investment," subject to sufficient liquidity.  Trial Tr. (10/16) at 160:13-161:10; PX 16.015.

157.    Among the more significant issues that Haggen confronted was the pricing of their products.  ATK and others had identified pricing issues as substantial risks, but other than delegating the responsibility for addressing these risks, neither Haggen nor Comvest did anything to prepare.

158.    Apparently, Haggen's pricing strategy was to be pretty simple:  don't change any prices.  Trial Tr. (10/19) at 30:13-17.  Somehow, Haggen failed to execute this basic strategy.  According to Barnett, "very early on in the process we became aware that our pricing was not where we wanted it to be" because the prices were too high.  Trial Tr. (10/17) at 198:1-8.  Shaner also knew that pricing problems emerged with the opening of OpCo South's very first store and believed they would be catastrophic if not corrected.  Thus, Shaner called for a "SKU by SKU analysis and action plan . . . ASAP before we go well down the [acquisition and conversion path].  We can't have some 12 week systemic program to fix.  Needs urgent attention now."  PX 159.

159.    Shaner conceded that the pricing problems were "very serious," they could cause customers to "get angry" and never return, and Haggen would "never get a second chance to make a first impression."  Nevertheless, Haggen continued to open stores knowing that these pricing problems had not been corrected:

> Q:   So my question is, sir, you continued to open stores knowing
>       that there were pricing problems, correct?
>
> A:   Yes.
>
> Q:   And you had not fixed those pricing problems when you
>       continued to open stores?
>
> A:   We fixed some problems, others emerged.
>
> Q:   You had not fixed all the pricing problems when you
>       continued to open stores, correct?

A:  Correct.

Q:  How many stores did you open up when you still had pricing
problems that you knew about, sir?

A:  We continued to experience various pricing problems in
various degrees throughout the entire conversion process.

Q:  So you botched pricing, didn't you?

A:  We had pricing issues during the whole entire time.

Q:  Yeah.  And those pricing problems led to a loss of customers
which led to the terrible results that you obtained, correct?

A:  Pricing was a huge factor into the issues we were
experiencing, yes.

Trial Tr. (10/19) at 33:7-34:1.  *See also Id*. at 30:18-32:15, 36:21-25.[25]

160.    Shaner was not alone.  Clougher, the CEO of OpCo South, also knew
about incorrect pricing issues on the very first day and admitted that Haggen continued to
acquire, convert, and open stores knowing that the pricing issues – including over 4,000 pricing
errors -- had not been solved.  Trial Tr. (10/19) at 118:20-22, 119:7-9, 120:7-121:15, 124:6-8.
*See also* Trial Tr. (10/16) at 298:25-300:3 (Comvest knew of the pricing issues "early on" but
never raised the issue with the Monitor and had no knowledge that anyone had done so on
Haggen's behalf).[26]

161.    But Comvest clearly made a bad situation worse.  Even though the initial
plan was to maintain prices, after learning of the pricing issues that were antagonizing its

---

[25]  Barnett corroborated Shaner's testimony that Haggen continued with the cadence and opened stores with
knowledge that the pricing problems were unresolved.  Trial Tr. (10/17) at 198:9-199:1.

[26]  Shaner claimed that Haggen hired SuperValu as the pricing manager because Albertson's was using their system
and they assumed it would "work effectively" for Haggen.  Shaner was forced to admit that Haggen and Comvest
were "totally and completely wrong" about their assessment of SuperValu's capabilities.  Trial Tr. (10/19) at 35:16-
36:2.

customers, Caple directed Haggen to raise its prices – a strategy with which Shaner disagreed. Trial Tr. (10/19) at 37:21-38:15; PX 159.[27]

162.    Haggen's "partner," SuperValu, saw other mistakes and deficiencies that it believed contributed to Haggen's demise.  For example, SuperValu did not believe that Haggen's marketing and merchandising capabilities were sufficient to handle the enormous expansion that was contemplated, asserting that Haggen "did not have the – both the talent nor the numbers of people in merchandising to adequately negotiate, make decisions, set up pricing, and manage a large chain," assertions that SuperValu contends were repeatedly conveyed to Haggen. SuperValu (Collison) Tr. at 166:12-167:12.[28]

163.    The consequences of these decisions and deficiencies were immediate and catastrophic.  By April, just a few weeks after closing on the first store, Haggen was already falling well short of projections across all converted stores.  Trial Tr. (10/16) at 151:25-152:3; PX 11.003.  By June, the IC was informed that same store sales were "down 20-25% since Haggen took ownership of the stores."  Trial Tr. (10/16) at 155:8-11; PX 16.004.

164.    On June 16, 2015, the Deal Team presented a "deck" to the IC in which it disclosed that while 10% of the stores had yet to be acquired and converted, and Haggen was facing a liquidity shortfall in July.  Trial Tr. (10/16) at 154:2-155:7; PX 16.004.

165.    As of July 13, 2015, Haggen had only $25 million of liquidity, but owed approximately $10 million to contractors and was "disputing the $43M in inventory payments to Albertson's."  Trial Tr. (10/16) at 161:25-162:22; PX 18.003.

---

[27] While Comvest contends that the customer feedback concerning the first store was "pretty good," the Court finds that "customer feedback" is best understood by Haggen's immediate loss of sales, a fact Caple could not credibly contest.  Trial Tr. (10/16) at 298:8-24.

[28] SuperValu specifically identified Haggen's "go-to market strategy," customer analytics and mobile and digital technologies as being appropriate for a smaller company, but not for a 164-store supermarket chain operating in five states.  SuperValu (Collison) Tr. at 167:23-169:7.

166.    On July 28, 2015, PNC declared a default and a "springing event" under the ABL.  PNC (Goldstein) Tr. at 150:16, 182:2-10; PX 375.  A "springing event" occurs when a borrower's availability falls below a specified threshold; from PNC's perspective it could be an indication that the borrower is in distress.  PNC (Goldstein) Tr. at 189:2-15.  The declaration of a "springing event" had substantial consequences for Haggen including the imposition of a fixed charge coverage ratio and the ability of PNC to take control of Haggen's accounts.  *Id.* at 187:16-188:3, 192:7-193:3; PX 375.  Haggen failed to maintain the mandated fixed charge coverage ratio and that, among other things, led to an event of default under the ABL shortly thereafter. *Id.* at 190:2-10; PX 254.

167.    Caple cavalierly testified that he did not believe PNC's notice of default to be "really terribly relevant."  According to Caple, the event of default "wasn't as big an issue as the liquidity issues that we needed to work through" such that he could not even recall whether Haggen or Comvest ever disputed PNC's declarations of default (as established in the Forbearance Agreement (PX 254.002), Haggen acknowledged that six separate events of default had occurred as of August 21, 2015, and were continuing).  Trial Tr. (10/16) at 167:1-168:20. The Court finds that Caple's dismissiveness of the event of default demonstrates a recklessly cavalier attitude.

## XIII.   Comvest Tries to Find a Third-Party Lender

168.    Beginning in June and continuing through early August of 2015, as the OpCo Entities faced plummeting sales and a liquidity shortfall, Comvest tried without success to arrange for third party financing.  Notably, however, neither Comvest nor Haggen ever sought to obtain a loan from a third party to be extended directly to the OpCo Entities.  Trial Tr. (10/17) at 22:24-23:11, 132:11-16.  As Caple candidly admitted at trial, he "didn't believe that anybody was going to make a loan to OpCo, given its current state."  Trial Tr. (10/16) at 171:20-172:8.

169.    Indeed, Comvest consciously determined not to bother even testing whether the OpCo Entities could obtain a loan from a third party by offering a second lien on their assets because Comvest believed there was insufficient time to educate potential lenders "on the situation of OpCo," and because the third-party lenders would have faced the hurdle of seeking and obtaining PNC's consent before gaining a second lien on the OpCo Entities' assets. Trial Tr. (10/17) at 24:24-25:17; 25:23-26:2.[29] Thus, not surprisingly, Caple could not identify a single person or entity who was asked to make a loan to OpCo in the summer of 2015 -- besides the PropCo Entities. Trial Tr. (10/16) at 290:14-292:2. *See also* Trial Tr. (10/17) at 208:8-18 (Barnett, Haggen's Chief Financial Officer, admitted that he was unaware of any person or entity other than Comvest and the PropCo Entities that was prepared to make a $25 million loan to the OpCo Entities in August 2015).

170.    Rather than seeking a loan on behalf of the OpCo Entities, Comvest spent at least two months desperately pursuing a loan on behalf of the PropCo Entities, secured by a lien on their unencumbered real estate, with the expectation that Comvest would then engineer the "PropCo Advance" to the OpCo Entities -- but even that effort ended in failure.

A.    **UBS is "Spooked" by Financial Performance and the
Risk that the OpCo Entities Would File for Bankruptcy**

171.    By June, with the OpCo Entities facing a liquidity shortfall, the situation was urgent and Niegsch's negotiations with UBS shifted from obtaining a loan to pay Comvest a dividend to obtaining a loan for the purpose of supporting the OpCo Entities. Trial Tr. (10/16) at 170:2-15; Trial Tr. (10/17) at 15:22-18:6; PX 36.[30]

---

[29] Niegsch told Citibank that Comvest was not pursuing a loan on behalf of the OpCo Entities because it had no unencumbered assets and its financial performance struggled making a subordinated loan a "fairly risky loan." Trial Tr. (10/17) at 27:5-29:20; PX 113.

[30] Niegsch never asked UBS to make a loan directly to the OpCo Entities. Trial Tr. (10/16) at 170:16-21.

172.    On June 16, 2015, the Deal Team provided an update to the IC and proposed the following solution to Haggen's liquidity shortfall:  (a) a $55 million loan would be taken from UBS against the PropCo Entities' real estate; (b) the PropCo Entities would sell four ground leases for $16.4 million; (c) the resulting $71.4 million would be upstreamed to Holdings; and (d) Comvest would cause Holdings to distribute to the OpCo Entities amounts sufficient to address the liquidity shortfall, and the balance would be paid as a dividend to Comvest.  Trial Tr. (10/16) at 157:22-160:10; PX 16.015.

173.    During the course of the negotiations, Niegsch told UBS that the OpCo Entities were "underperforming."  Because the PropCo Entities' cash flow was dependent on the rental stream flowing from the OpCo Entities, UBS demanded that Haggen represent and warrant that the OpCo Entities were not considering a bankruptcy filing.  After Caple and Niegsch specifically discussed bankruptcy as being a potential option for the OpCo Entities, Comvest refused to give UBS the requested representation and warranty.  Trial Tr. (10/16) at 174:24-175:5; Trial Tr. (10/17) at 18:11-22:3.  Consequently, UBS got "spooked" and refused to make a loan to the PropCo Entities secured by a lien on the PropCo Entities' unencumbered real estate.  Trial Tr. (10/16) at 170:22-25, 174:13-23.

**B.**    **A&M is Retained, but Cannot Identify a Lender**
       **Due to Price and Time Constraints**

174.    At the suggestion of an IC member, Haggen retained A&M on July 20, 2015, to assist in the evaluation of strategic alternatives, including a bankruptcy filing.  Trial Tr. (10/16) at 168:24-170:1; PX 730.

175.    After being retained, A&M reached out to potential investors to try to find a lender to the PropCo Entities; there is no evidence that A&M ever attempted to obtain a potential loan directly to the OpCo Entities.  Trial Tr. (10/17) at 22:4-23.

176.    Comvest directed A&M to stop speaking with potential lenders because Comvest determined that the fees and terms being discussed were "too expensive" and "also the urgency.  We didn't have a lot of time.  We were trying to sell stores to generate liquidity for the OpCo's.  And so we were working in a very tight timeframe."  Trial Tr. (10/17) at 23:12-24:15.

### C.    Comvest and Priddy Decline to Make a Loan due to "Equitable Subordination" Concerns

177.    On July 17, 2015, Caple reached out to Robert Priddy (a former Comvest partner) to gauge his interest in making a loan to the PropCo Entities secured by a first lien on the real estate.  Trial Tr. (10/16) at 171:1-19; PX 1.

178.    In his e-mail, Caple informed Priddy that:  (1) the OpCo Entities were facing a liquidity shortfall; (2) Haggen had "lost all of the price focused customers" but had not "yet had the time to attract quality focused customers;" (3) Haggen's sales were down 20-30%; (4) Haggen was expected to close stores; and (5) UBS got "spooked," terminated negotiations, and left Haggen and Comvest "at the altar."  Trial Tr. (10/16) at 172:9-174:12; PX 1.

179.    Remarkably, Caple also told Priddy that Comvest decided not to make a loan directly to the OpCo Entities because it had "concerns about equitable subordination given that [Comvest was] equity."  PX 1.  *See also* Clark Tr. at 44:21-45:14 (asked whether he discussed issues of "equitable subordination" in the context of the contemplated PropCo Advance, Clark testified:  "If I may answer your [question] in a different way.  I think the discussion was more, how do we do this such that it is a loan that we're making?  So I know that might be semantics but that was the spirit of the discussion.").

180.    Caple described the "equitable subordination" issue and related internal discussions at Comvest as follows:

> Q:  Can you explain to the judge what concerns you had about equitable subordination for Comvest.

> A:  Yeah, I'm not a lawyer, but my understanding is any time you
> make a loan into a business where you also own equity, there's
> a chance -- albeit, my understanding is it's a very small one --
> but there's a chance that you can become equitably
> subordinated.  At the time here, my partners were not at all
> happy about how this deal was going, to say the least, and
> putting additional money in with additional risk was a big
> issue and, you know, any issue was something that they were
> concerned about, even a very small percentage-type issue.
>
> Q:  And you discussed that precise topic with your colleagues at
> Comvest, right?
>
> A:  Yes.
>
> Q:  In fact, you specifically discussed the risks associated with
> equitable subordination, right?
>
> A:  And I don't remember the exact conversation, but I remember
> them having concerns.
>
> Q:  And you -- while you don't have a specific recollection, you
> believe you discussed the issue of equitable subordination at
> the investment committee to try to understand the risk,
> correct?
>
> A:  Yeah, I certainly remember them having real concerns about
> anything that might, you know --

Trial Tr. (10/16) at 175:6-176:14; PX 1.

181.    Due to his prior association with Comvest, Priddy expressed concerns that

he might also be implicated by issues of "equitable subordination if he chose to act as a lender."

Mr. Priddy nevertheless proposed onerous terms for a loan; there is no evidence that Comvest

ever responded or otherwise pursued a loan with Mr. Priddy.  *See* PX 1.

### D.    PNC Refused to Provide an Overadvance

182.    After UBS got "spooked" and terminated negotiations, Comvest asked

PNC to provide an overadvance to the OpCo Entities.[31]  But PNC knew at the time that the

---

[31]  The OpCo Entities asked PNC to provide an overadvance to bridge cash flow.  If PNC had approved of the overadvance, PNC would have loaned more money than the formula amount calculated by the borrowing base

OpCo Entities had no unencumbered assets, were running out of liquidity, losing money, and had laid off hundreds of employees.  PNC also knew that Haggen was looking to sell assets to generate liquidity and avoid running out of cash, and that sales were off by well more than 20% relative to projections, and that Haggen had fared poorly on other financial metrics.  PNC (Goldstein) Tr. at 166:7-169:5; PX 377.

183.    Consequently, PNC concluded that Haggen's request for an overadvance "didn't make sense from a lender's perspective" and PNC decided not to even bring the request to the syndicate lenders for consideration.  Instead, PNC simply rejected the proposal:  "After careful consideration, PNC does not support providing an overadvance to bridge cash flow.  We feel PNC and the other lenders have enough at risk given the level of cash burn that has occurred."  Trial Tr. (10/17) at 26:3-23; PNC (Goldstein) Tr. at 171:16-20, 173:17-174:18, 175:9-176:13; PX 39.002.[32]

## XIV.    The PropCo Advance

### A.    Citibank Refuses to Lend Against PropCo's Real Property

184.    In early August 2015, after exhausting all other options, Comvest asked Citibank to provide a loan that would ultimately become the source of the funds used for the PropCo Advance.  PX 113.009.

185.    Citibank and a Comvest entity, CIP IV, had a pre-existing banking relationship dating back to at least 2010 when they first entered into a revolving credit line facility.  On August 2, 2012, Citibank and CIP IV amended that credit facility and Citibank

---

[32] collateral would have otherwise allowed, but not, apparently, more than the limits under the ABL.  PNC (Goldstein) Tr. at 170:4-25; PX 378.

[32] On August 3, 2015, PNC imposed a $2.5 million "availability block" thereby restricting that portion of the borrowing base from being available to Haggen.  PNC asserted a right to restrict availability under the circumstances and did so because it perceived Haggen to be in distress and sought to mitigate its own risks.  PNC (Goldstein) Tr. at 179:2-183:25; PX 379.

increased the line to $100 million (the "<u>Fund IV Revolver</u>").[33]  The Fund IV Revolver has been

available to CIP IV on a continuous basis since 2010.  Citibank (Raeburn) Tr. at 16:8-21, 17:5-

18:14, 19:6-20:14; PX 431. [34]

186.    On August 5, 2015 (at 3:37 a.m.), Rodriguez asked Citibank to provide a

loan to PropCo Entities, noting that there was an "extremely short fuse on this."  Citibank

(Raeburn) Tr. at 71:10-23, 93:21-95:2; PX 113.  Niegsch then proposed specifically that Citibank

make a loan to the PropCo Entities secured by the real estate, the same type of loan UBS refused

to make.  Citibank (Raeburn) Tr. at 52:22-53:5, 66:14-67:17, 68:2-4; PX 113.  Citibank also

refused.  Citibank (Raeburn) Tr. at 68:12-70:22; PX 113.005.

187.    In the end, the only loan Citibank would agree to make was a "qualified

borrower loan" under the Fund IV Revolver to a to-be-formed, wholly-owned Comvest entity for

which Comvest would provide a full guaranty.  Trial Tr. (10/17) at 29:21-30:20; Citibank

(Raeburn) Tr. at 76:21-77:25; PX 113.001-003.  According to Citibank, the parties would "create

a qualified borrower loan whereby Comvest designates an entity in which it has ownership as a

qualified borrower.  That loan would be guaranteed by Comvest . . . [T]o the extent that Comvest

has to repay the facility under the terms of the guarantee, it can in turn seek repayment from the

qualified borrower that it guaranteed the facility for."  Citibank (Raeburn) at 75:20-76:7; PX 113.

---

[33]  More precisely, the borrowers under the Fund IV Revolver were CIP IV and Comvest Investment Partners IV- A, L.P. PX 431.

[34]  Fund IV used the Fund IV Revolver to support its portfolio companies through the use of "qualified borrower loans."  According to Citibank, a "qualified borrower" is an entity that is partially or wholly owned and controlled by a fund borrower.  Citibank (Raeburn) Tr. at 26:8-18.  In 2012, Haggen, Inc. became a "qualified borrower" under the Fund IV Revolver, and in 2013, Haggen, Inc. sought to increase the amount it could borrow to $25 million.  *Id.* at 25:4-26:7, 27:13-28:21; PX [Citibank Dep. Ex. 5], PX 433, 434.  This is the $25 million loan that was largely used to pay Comvest a dividend, that was guaranteed by Comvest, and that was paid off on February 12, 2015, with the proceeds of Comvest's "equity investment."  Citibank (Raeburn) Tr. at 34:4-35:11, 42:17-25, 43:2-13; PX 433, PX 434, PX 437.

### B.    The Multi-Step Process Employed to Fund the PropCo Advance

188.    Like the Albertson's Acquisition itself, the funding of the PropCo Advance required a fair amount of financial engineering by Comvest and the creation of another new corporate entity.[35]

189.    Certain evidence was presented in summary fashion in an apparent effort to simplify what is otherwise a fairly complex series of steps taken to fund the PropCo Advance. *See, e.g.*, Trial Tr. (10/17) at 30:22-31:1; PX 42.002; PX 118 at 17.  In its simplest form, the PropCo Advance was funded as follows: (1) Citibank advanced $25 million to a newly-formed "qualified borrower" formed and owned by Comvest, Property Lender, and the loan was guaranteed by Comvest; (2) Property Lender then advanced $25 million to the PropCo Entities, secured by a lien on the PropCo Entities' real estate; and (3) the PropCo Entities in turn advanced $25 million to the OpCo Entities, purportedly secured by a second lien on the OpCo Entities' assets behind PNC (and ahead of the OpCo Entities' unsecured creditors).[36]

190.    On August 7, 2015, the PropCo Entities, as lenders, and the OpCo Entities, as borrowers, entered into the PropCo Agreement pursuant to which the PropCo Entities agreed to advance up to $25 million to the OpCo Entities.  PX 244.  Comvest caused the PropCo Agreement to be signed knowing that it did not have: (a) an agreement with Citibank with respect to a funding source for the PropCo Advance (the agreement with Citibank was not signed until August 12, 2015), or (b) as discussed in more detail below, PNC's consent to a

---

[35]  Of course, as Niegsch acknowledged, a prerequisite to the PropCo Advance was the existence of the PropCo/OpCo corporate structure that Comvest created.  Trial Tr. (10/17) at 122:19-22.

[36]  This summary of the steps taken to fund the PropCo Advance should not be interpreted as having resulted from a series of carefully choreographed steps.  Rather, while all of the steps were related, and all were ultimately necessary to fund the PropCo Advance, the evidence described below shows that the steps occurred in increments over a fourteen day period with each step undertaken without the knowledge that the next was certain to occur (or when it might occur).  This uncertainty is relevant to Plaintiff's claim for recharacterization of the PropCo Advance because the Court must analyze the PropCo Advance based on the facts and circumstances that existed at the time the obligations were incurred and the advances were made.

subordinated lien on the OpCo Entities' assets (the Intercreditor Agreement was not signed until August 21, 2015).

192. The PropCo Agreement was an "insider transaction" that was not the product of arms' length negotiations. Instead, the evidence shows that Caple and Niegsch decided on the terms of the PropCo Agreement; nobody negotiated the terms on behalf of the putative borrowers and lenders. Trial Tr. (10/17) at 133:7-13.[37]  In fact, Shaner, the CEO of OpCo South, one of the putative borrowers under the PropCo Advance, was not personally involved in Comvest's attempts to obtain a loan in August 2015. Indeed, Shaner testified that although he "knew that Comvest was attempting to secure different financial opportunities," he was uncertain as to "whether it was a loan, equity or otherwise" and could not rule out the possibility that Comvest made an equity investment. Trial Tr. (10/19) at 10:12-11:18. As further confirmation that the PropCo Advance was an "insider" loan and not the product of arms' length negotiations, the evidence also shows that Barnett signed the PropCo Agreement on behalf of each of the "borrowers" and each of the "lenders." PX 244.

192. The PropCo Agreement provides further proof as to the unusual nature of the PropCo Advance. The PropCo Agreement was missing critical information; for example, it provided, among other things, that interest on the PropCo Advance was to begin on "_____, ____, 2015" and the loan would mature on "April ___, 2016." PX 244 §§3.1, 13.1 [sic]. The PropCo Agreement also purported to grant to the PropCo Entities "a continuing security interest in and to and Lien on all of its Collateral, whether now owned or existing or

---

[37] Defendants offer no evidence to show that the PropCo Advance was the product of customary corporate review and authorization. For example, Comvest appears to have exercised unilateral control -- to the exclusion of Haggen's senior management (*i.e.*, Clougher, Shaner and Barnett) -- over the efforts to find and negotiate a loan for the ultimate benefit of the OpCo Entities. Defendants offered no evidence that Holdings or the OpCo Entities held a Board meeting at any time to discuss the PropCo Advance and no corporate resolutions or consents approving the PropCo Advance were offered into evidence.

hereafter created, acquired or arising and wheresoever located." PX 244 §4.1. "Collateral" was defined to include, among other things, "all" of the OpCo Entities' Receivables, equipment and fixtures, general intangibles, Inventory, contract rights, and the proceeds thereof. PX 244.007 (definition of "Collateral").

193.    The Court finds, as a matter of fact, that Comvest, which controlled both the borrowers and the lenders, acted to protect its own interests by structuring the PropCo Advance as a secured loan. As Niegsch was forced to admit, (a) if the PropCo Advance enabled Haggen to avoid bankruptcy, Comvest's equity interest in the OpCo Entities would be enhanced, but (b) if the OpCo Entities failed (as they did), Comvest would avoid any loss because the security interest it granted to itself would (as Defendants now contend) put itself ahead of the OpCo Entities' unsecured creditors. Trial Tr. (10/17) at 127:15-128:16.

194.    Notably, the PropCo Agreement does not reference: (a) PNC or any of the OpCo Entities' senior lenders; (b) the OpCo Entities' indebtedness under the ABL (which at that time exceeded $170 million); (c) the OpCo Entities' prior grant of a security interest in the Collateral to PNC, as agent for the ABL lenders; or (d) PNC's July 28, 2015 declaration of default under the ABL. Nor does the PropCo Agreement state that the OpCo Entities sought or obtained PNC's consent to grant the security interest described therein. The Defendants failed to offer any evidence -- other than their subjective beliefs -- to prove that the PropCo Advance was "secured" under these circumstances or why any of the Defendants could have reasonably believed that to be the case. *See* Trial Tr. (10/18) at 162:15-164:8.

195.    On August 7, 2015, even though no funds had actually been advanced and the OpCo Entities had received no benefit, the OpCo Entities issued the PropCo Notes, one in favor of PropCo North in the amount of $12,640,750, and one in favor of PropCo South in the

amount of $12,359,250.  Blake Barnett signed each of the PropCo Notes on behalf of each of the OpCo Entities.  PX 245.

196.    Comvest created "Haggen Property Lender, LLC" as a wholly-owned affiliate to serve as the "qualified borrower" under the Fund IV Revolver, so that it could act as the conduit between Citibank and the PropCo Entities.  Citibank (Raeburn) Tr. at 79:4-18; 99:12-100:9, 100:18-101:3; PX 113, PX 438.  On August 12, 2015, consistent with the negotiations, Citibank, Comvest, and its newly-formed entity, Property Lender, completed the "Qualified Borrower" loan (pursuant to which Citibank agreed to advance $25 million to Property Lender, guaranteed by Comvest) by executing the following documents: (a) the "Qualified Borrower's Representation Letter" (pursuant to which Property Lender made certain representations and warranties to Citibank and otherwise agreed to borrow up to $25 million from Citibank, subject to the terms of the "Credit Agreement"); (b) the "Qualified Borrower Promissory Note" (pursuant to which Property Lender and Comvest promised to pay $25 million to Citibank in accordance with the terms set forth therein); and (c) the "Notice of Advance" (pursuant to which Property Lender and Comvest asked Citibank to advance $3,792,225.01 to PropCo North, and $3,707,774.99 to PropCo South (or, $7.5 million in the aggregate), on August 12, 2015).  Citibank (Raeburn) Tr. at 109:11-110:23, 112:13-20; 117:15-119:7; PX 439; PX 248; PX 247.

197.    Also on August 12, 2015, Property Lender, as lender, and the PropCo Entities, as borrowers, entered into a "Loan Agreement" pursuant to which, among other things, Property Lender agreed to advance $25 million to the PropCo Entities on the Closing Date (*i.e.*, August 12, 2015).  PX 251.  Even though only $7.5 million was being advanced that day, the PropCo Entities also tendered a "Promissory Note" to Property Lender in the face amount of $25

million, purportedly secured by "the Security Instrument and the other Loan Documents."[38]  PX 252.

198.    On August 17, 2015, Property Lender filed UCC-1 Financing Statements against the PropCo Entities.  DX 752-771; DX 775-777.

199.    The economic reality is that Comvest borrowed the funds from Citibank, and by circuitous and deliberate means funneled the cash into the OpCo Entities and called it a secured loan by the PropCo Entities.  According to Citibank, it would likely have declined to make a $25 million loan on the timetable Comvest needed without both (a) a pre-existing relationship with Comvest, and (b) the existence of availability under the Fund IV Revolver guaranteed by Comvest.  Citibank (Raeburn) Tr. at 89:17-90:10, 91:4-92:4.

200.    At the time it obtained the initial $7.5 million advance on August 12, 2015, Comvest knew that the OpCo Entities did not have PNC's consent to grant a second lien on the OpCo Entities' assets, but the IC nevertheless approved of the request for an initial advance of $7.5 million because the situation was desperate and Comvest needed to "ensure OpCo ha[d] the liquidity to meet its obligations [the following day] and cover payroll later" in the week.  Trial Tr. (10/17) at 31:2-34:18; PX 41.001 (Niegsch told the IC that "the PropCo loan to OpCo will not have a 2nd lien in OpCo until the forbearance agreement with the entire bank group is agreed on and executed," something that did not occur until August 21, 2015).

201.    On August 21, 2015, the applicable parties executed the Forbearance Agreement and the Intercreditor Agreement.  PX 254; PX 255.

202.    As Comvest knew, the OpCo Entities could not grant a second lien on their assets without PNC's consent.  Trial Tr. (10/17) at 32:7-34:17 ("We would not have the

---

[38]  Curiously, unlike the PropCo Agreement, the Loan Agreement evincing the Property Lender loan to the PropCo Entities does not appear to include any provisions for a security interest; indeed, "collateral" is not a defined term. *See* generally PX 251.

liens filed until the forbearance agreement was executed.").  By amending the definitions of "Permitted Encumbrances" and "Permitted Indebtedness," PNC provided the requisite consent in the Forbearance Agreement on August 21, 2015.  PX 254.005-006.

203.    Comvest authorized Haggen to sign the Forbearance Agreement knowing that the Debtors were required to, among other things, acknowledge six existing events of default, and the indebtedness under the ABL in excess of $173 million.  Trial Tr. (10/17) at 34:19-36:22; PX 254.  The Forbearance Agreement also provided, among other things, that:

- the Borrowers (as defined) had to pay all of PNC's out-of-pocket expenses (including attorneys' and advisor fees) (Section 1(c));

- the Credit Agreement was amended to include Haggen's alleged claims against Albertson's in the definition of "Commercial Tort Claims" so that those claims would be included in PNC's collateral (Section 2 (c));

- PNC reduced substantially the Maximum Revolving Advance Amount and the Maximum Swing Loan Advance Amount (Section 2 (e)-(f));

- a more restrictive formula for calculating Revolving Advances was adopted (Section 2(j)); and

- the Borrowers had to adhere to a 13-week cash flow forecast and comply with other reporting obligations (Section 2 (o), (q)).

PX 254.

204.    The PropCo Entities, the OpCo Entities, and PNC also entered into an Intercreditor Agreement as of August 21, 2015.  PX 255.  At Comvest's direction, Barnett signed the Intercreditor Agreement on behalf of both the PropCo Entities and the OpCo Entities, and even though he played no meaningful role in negotiating this Agreement.  Trial Tr. (10/17) at 206:24-208:3.  Pursuant to the Intercreditor Agreement, the PropCo Advance was "subordinated to the prior payment in full in cash" of all amounts owed under the ABL, and the PropCo Entities' liens against the OpCo Entities' assets were subordinated to PNC's liens against those

assets.  Trial Tr. (10/17) at 37:4-38:4; PX 255.004-.005.[39]  In other words, as conditions to the

PropCo Advance, the PropCo Entities were forced to agree that they could not recover the

principal and interest under the PropCo Advance on "April __, 2016" [sic], until PNC was first

fully repaid $173 million (plus interest), in cash, something the OpCo Entities would be unable

to do.

205.    Critically, Comvest had no plan or model showing how the OpCo Entities

would be able to pay PNC $173 million "in full in cash" while also having sufficient funds to

pay the PropCo Advance by "April __, 2016" [sic].  Trial Tr. (10/17) at 38:8-39:22; Trial Tr.

(10/19) at 113:4-6, 113:16-13, 114:4-9.  The Court therefore concludes, as a matter of fact, that

the PropCo Entities made the PropCo Advance with the knowledge that they would not be repaid

other than, potentially, through the liquidation of collateral in a total meltdown.[40]

206.    Also on August 21, 2015, (a) the PropCo Entities filed UCC-1 Financing

Statements against the OpCo Entities, taking a "blanket lien" against OpCo Entities' assets

(although the PropCo Entities' liens were subordinated to PNC's liens pursuant to the

Intercreditor Agreement), and (b) Property Lender and Comvest tendered two "Notices of

Advance" to Citibank in the aggregate amount of $17.5 million (the balance of the $25 million

advance); the funds bypassed Property Lender and were sent by Citibank directly to the PropCo

Entities.  Citibank (Raeburn) Tr. at 120:10-121:4, 122:4-14, 122:23-123:21; DX 772-774;

PX 440-441; PX 254; PX 255.

---

[39]  Notably, PNC refused to recognize the PropCo Agreement as having been entered into as of August 7, 2015, as defendants purportedly intended; instead, that agreement is referred to in the Intercreditor Agreement as having been entered into on "even date herewith" (*i.e.*, August 21, 2015).  PX 254; PX 255.

[40]  PNC had obvious concerns as to whether the value of their blanket lien was sufficient because it took the opportunity to add to its collateral pool all of Haggen's commercial tort claims against Albertson's.  PX 254.003.

207.    Based on the foregoing, the Court concludes, as factual matters, that (a) the PropCo Advance was not the subject of arms' length negotiations but was an "insider" transaction resulting from Comvest's unilateral control of both the "borrowers" and the "lenders," (b) was in effect funded by Comvest borrowing funds from Citibank and putting them into the OpCo Entities by circuitous means, (c) regardless of the Defendants' subjective intent or the form of the documentation, the PropCo Advance was effectively unsecured when the commitment was made on August 7, 2015, (d) the $7.5 million advance made on August 12, 2015 was unsecured, (e) the PropCo Entities could not have obtained a validly perfected, subordinated security interest in the OpCo Entities' assets prior to August 21, 2015, less than three weeks before the Petition Date, and (f) the PropCo Entities could not have reasonably believed that the OpCo Entities would have been able to satisfy its obligations to PNC before April 2016, let alone have sufficient cash remaining to pay all principal and interest under the PropCo Advance.

## C.    The OpCo Entities Paid Wages in Excess of $25 million Between August 14, 2015 and the Petition Date

208.    As described above, the PropCo Advance was disbursed in two parts, with $7.5 million being advanced on August 12, 2015,[41] and $17.5 million being advanced on August 21, 2015.  The record shows that the OpCo Entities paid employee wages of approximately $25 million from August 14, 2015, through the Petition Date, some of which was already in arrears when the advances were made.[42]

---

[41]  As Niegsch told the IC on August 12, 2015, the $7.5 million advance was needed to ensure that the OpCo Entities could meet their obligations and payroll that week.  The OpCo Entities paid wages of approximately $7.6 million two days later, on August 12.

[42]  Defendants contend that the OpCo Entities used the proceeds of the PropCo Advance to, among other things, pay creditors.  While money is fungible, Defendants offered no documentary evidence to support their contention. Based on the Debtors' Wage Motion (defined below), and Barnett's declaration, Defendants cannot dispute that the

209.    The Court takes judicial notice of the Wage Motion.[43]  Fed. R. Evid. 201.

The Wage Motion states that "historically, the Debtors' combined gross aggregate payroll

liability is approximately $26.4 million per month."  Wage Motion at ¶ 9.  Haggen Inc.

employees were paid approximately $2.1 million bi-weekly, Haggen OpCo North employees

were paid approximately $1.9 million weekly, and Haggen OpCo South employees were paid

approximately $3.6 million weekly.

210.    The Wage Motion also stated that the most recent payroll before the

Petition Date was made (i) to employees of Haggen OpCo North and Haggen OpCo South on

September 4, 2015, for the period ending on August 29, 2015, and (ii) to employees of Haggen

Inc. on August 28, 2015, for the period ending August 22, 2015.  *Id.* ¶ 10.  Based on the

foregoing, the Court finds, as a matter of fact, that the OpCo Entities paid wages as follows:

|  | PropCo South | PropCo North | Haggen, Inc. |
|---|---|---|---|
| August 14 | $3.6 | $1.9 | $2.1 |
| August 21 | $3.6 | $1.9 | |
| August 28 | $3.6 | $1.9 | $2.1 |
| September 4 | $3.6 | $1.9 | |
| **TOTAL** | **$14.4** | **$6.6** | **$4.2** |

211.    Based on the foregoing, the Court concludes that the OpCo Entities used

the proceeds of the PropCo Advance to pay wages in arrears of approximately $25 million

between August 14, 2015, and the Petition Date.

---

OpCo Entities paid wages in excess of the PropCo Advance during the period August 14, 2015, through the Petition Date.

[43]  The "Wage Motion" refers to *Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (IV) Payment of Workers' Compensation Obligations; (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions; and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*, dated September 9, 2015, and filed at Docket No. 8 (main case).  Barnett filed a Declaration in support of the First Day Motions (as defined), including the Wage Motion.  *See* Barnett Decl. (defined below) at ¶¶ 3, 32-36.  Barnett declared that he reviewed each of the First Day Motions and believed the information contained in those motions was accurate and correct.  *See id*. at ¶ 22.

### D.   <u>Flaton's Recharacterization Analysis was Credible and Unrebutted</u>

212.    Carol Flaton offered expert testimony on behalf of Plaintiff with respect to its claim to recharacterize the PropCo Advance as an equity contribution (Count 71 of the Complaint); Defendants did not offer a rebuttal witness.  For the reasons set forth below, the Court finds Flaton to be a highly credible witness and credits her opinions at set forth herein.

213.    Plaintiff asked Flaton to assess the facts and circumstances surrounding the PropCo Advance and evaluate whether the transaction "looked more like a debt transaction or an equity transaction" and whether it was "inappropriately disguised as a loan and instead should be recharacterized and treated as an equity contribution."  Trial Tr. (10/18) at 144:8-12; PX 118 at 5.

214.    Flaton has been a managing director at Zolfo Cooper, the Committee's financial advisor, for four years.  During her time at Zolfo, Flaton has provided financial advisory and management services to debtors, creditors, and committees.  Prior to joining Zolfo Cooper, Flaton spent approximately six years at Lazard Freres, where she served as a managing director advising public and private companies, creditors, and equity holders in complex restructurings.  Before that, Flaton spent, collectively, approximately thirteen years at Credit Suisse/Credit Suisse First Boston (1995-2006) and Citibank (2006-2008) working in lending, finance, and risk management.  In sum, Flaton has spent over thirty years in the fields of banking and finance, including positions in leveraged finance, lending, capital markets, and risk management, with a specialization in financial restructuring.  Trial Tr. (10/18) at143:23-145:21, 149:15-21; PX 118 at 39 (Appendix A).

215.    Based on the foregoing, the Court finds that Flaton is qualified to offer expert testimony on the questions presented to her.

216.    Flaton's ultimate conclusion is that the PropCo Advance "looked more like an equity transaction than a debt transaction."  More particularly, Flaton stated that, in her opinion, based on her extensive experience in analyzing loans, debt exchanges, debt refinances, distressed company situations and equity/capital raises:

> despite how the PropCo Loan was documented and recorded in OpCo's financial statements, I believe the facts and circumstances that existed at the time the PropCo Loan was made, including OpCo's financial condition, strongly indicate that an independent third party lender would not have provided additional financing to OpCo on the same or similar terms to the PropCo Loan such that the PropCo Loan was more representative of a equity contribution than a loan.

Trial Tr. (10/18) at 145:22-146:2; PX 118 at 10.

217.    In reaching her conclusions, Flaton utilized the eleven-factor *Roth Steel* test and evaluated the facts and circumstances that existed at the time the PropCo Advance was made "from the perspective of a restructuring, finance and investment banking professional." Trial Tr. (10/18) at 146:3-8; PX 118 at 5.

218.    The Court is persuaded that Flaton and her team -- and not, as Defendants previously suggested, Plaintiff's counsel[44] -- identified and decided on the correct methodology and the documents that Flaton considered in rendering her report and formulating her conclusions.  Trial Tr. (10/18) at 146:9-149:14, 149:22-25; PX 115 at 5 and Exhibit B (Documents Considered).

219.    In order to analyze the PropCo Advance in context, Flaton reviewed certain documents and events, including: (a) "very early… internal memos and e-mails saying that there was a liquidity problem;" (b) the refusal by third parties, including UBS and PNC, to

---

[44]  *See, e.g.*, *Defendant's Motion in Limine to Exclude the Expert Report and Testimony of Carol Flaton*, filed on August 25, 2015 (Docket No. 101), at 11 (asserting that Flaton conducted a "perfunctory analysis of lawyer-selected facts").

extend credit (UBS refused to lend against the PropCo real estate, and PNC refused to provide an

"overadvance"); (c) PNC's July 28, 2015, declaration of a default under the ABL; and

(d) Comvest's refusal to lend directly to the OpCo Entities due to concerns about "equitable

subordination."  Trial Tr. (10/18) at 150:1-151:24; PX 118 at 16.  Flaton explained how these

events related to her opinions:

> A:   Well, again, I was asked to look at a transaction which
> occurred in August.  And the question really was, is this a
> transaction that a third party independent lender, would they
> make a loan, a piece of debt into this type of a situation.  So
> it's important to understand the condition of the company
> that's being lent into and some of the facts around it and the
> trajectory.  And it's all besides being, you know, not great,
> sales were down and I think they were substantially off their
> budget from EBITDA to the tune of I think $80 million in this
> July timeframe.  It was all happening very quickly.  So, you
> know, you've had an acquisition of stores, but it literally did
> not transpire from day one the way it was meant to.

Trial Tr. (10/18) at 151:25-152:15.

220.    Flaton also analyzed the series of steps required to get the $25 million

from Citibank to the OpCo Entities:  (a) Citibank agreed to advance $25 million to a newly-

formed entity, Property Lender (wholly-owned by Comvest, at Citibank's insistence), secured by

a guaranty from Comvest; (b) Haggen Property Lender then agreed to advance $25 million to the

PropCo Entities, taking a lien on the PropCo Entities' real estate; and (c) Comvest then caused

the PropCo Entities to agree to advance $25 million to the OpCo Entities, taking a second lien on

the OpCo Entities' assets in return.  Trial Tr. (10/18) at 152:16-154:8; PX 118 at 17.

221.    With that background, Flaton analyzed the PropCo Advance in the context

of the eleven *Roth Steel* factors.

222.    <u>Name of instruments evidencing indebtedness</u>:  Flaton conceded that,

while there were omissions (*e.g.*, a specific maturity date) and ambiguities (*e.g.*, the interest

payment schedule was unclear), the documentation was in the form of debt, not equity.  Trial Tr.
(10/18) at 154:13-155:15; PX 118 at 22.

223.    <u>Fixed maturity date and schedule of payments</u>:  Flaton observed that the
PropCo Advance did not have a specific maturity date and opined that "[n]o institution would
really close a loan without properly indicating many of the things in the documents."
Consequently, Flaton concluded that this factor weighed in favor of equity.  Trial Tr. (10/18) at
155:16-156:5; PX 118 at 23.

224.    <u>Fixed rate of interest and interest payments</u>:  Flaton observed that although
the loan documentation provided for the earning of interest, the Intercreditor Agreement that was
subsequently signed prohibited the OpCo Entities from making any payments of principal or
interest until the ABL was paid in full.  In Flaton's opinion, "that is not a normal course.  If you
extend a piece of debt, you would expect to be receiving payments on a regular basis."  Trial Tr.
(10/18) at 156:6-20, 158:7-11; PX 118 at 24.[45]

225.    <u>Source of repayments</u>:  Flaton opined that this factor weighed in favor of
equity because "in this case besides the fact that the ABL has to be paid off, it does depend on
the success of the business because it's an enterprise type loan.  It's underneath the ABL and it
will require success of the business in order to get repaid."  Trial Tr. (10/18) at 160:16-161:2;
PX 118 at 25.

226.    <u>Adequacy of capitalization</u>:  Flaton testified that the OpCo Entities had
inadequate capital at the time of the PropCo Advance in August 2015 because (a) internal

---

[45]  Flaton testified that the Intercreditor Agreement's "complete block" on all payments to the PropCo Entities "until
the senior indebtedness is fully repaid" was a condition that no third party would likely have accepted.  Flaton also
testified that she never saw a plan or projections showing that Comvest had a plan or strategy enabling the OpCo
Entities to pay PNC in full, in cash, before "April __, 2016."  Comvest's failure to have a plan or strategy to get
repaid was, in Flaton's opinion, contrary to customary lending practices:  "A prospective lender always takes steps
to understand how it's going to get repaid.  That's what you have to report to a… credit committee to get approval."
Trial Tr. (10/18) at 156:21-157:15, 158:12-159:9; PX 255.004.

communications showed that the OpCo Entities were expected to run out of cash imminently (a fact conclusively established at trial), (b) the OpCo Entities had no unencumbered assets, (c) the OpCo Entities were "really at the precipice of unravelling," and (d) PNC had concluded that, as of August 1, 2015, the OpCo Entities had failed to "generate sufficient EBITDA to support the business." For these reasons, Flaton concluded that this factor weighed in favor of equity. Trial Tr. (10/18) at 161:3-16; PX 118 at 26.

227.    <u>Identity of interest between creditor and stockholder</u>: Flaton testified that this factor also weighed in favor of equity because Comvest was the indirect controlling shareholder of the borrowers and the lenders, and the transaction "did not look like an independent transaction." Trial Tr. (10/18) at 159:10-160:15, 161:23-162:15; PX 118 at 27. The Court also notes that Comvest, as the party controlling both the lenders and the borrowers, unilaterally determined the terms of the PropCo Advance; there was no negotiation. Trial Tr. (10/16) at 147:1-3; Trial Tr. (10/17) at 133:7-13. This fact is critical because Comvest, and Comvest alone, decided to style the advance as a "secured loan."

228.    <u>Security for the advance</u>: Flaton testified that although the PropCo Advance was documented as a secured loan as of August 7, 2015, the "security interest" was not valid or enforceable at that time because the OpCo Entities (a) were in default under the ABL, and (b) did not obtain the consent of the senior lenders (*i.e.*, PNC) until August 21, 2015. Flaton did not "believe that any third party would have ever made an advance that's unsecured that ultimately becomes secured, a bank would just not lend money that way." Consequently, Flaton concluded that this factor weighed in favor of equity. Trial Tr. (10/18) at 162:15-164:8; PX 118 at 28. The Court notes that the PropCo Entities' security interest was not perfected until August 21, 2015.

229.    <u>Financing from outside lenders</u>:  In Flaton's opinion, this is the "most important" *Roth Steel* factor because it provides a "very strong indication" that the PropCo Advance is more akin to equity then debt.  Flaton's opinion was based on Comvest's unsuccessful "market test" and well-documented failure to identify a lender ready, willing, and able to make a loan to the OpCo Entities, let alone one on the same terms as the PropCo Advance.  According to Flaton, "while no one factor generally controls, in [her] opinion substantial consideration should be given to the fact that no disinterested third-party would have made a loan on the same or similar terms to the PropCo Loan because (a) of the circumstances that existed at the time, and (b) Haggen tried and failed to obtain such financing."  Trial Tr. (10/18) at 164:9-165:11; PX 118 at 29, 34.

230.    <u>Subordinated to claims of outside creditors</u>:  Flaton concluded that this fact weighs in favor of equity because the PropCo Advance was subordinated to the OpCo Entities' obligations under the ABL (more than $173 million), and was also effectively subordinated to vendor claims because the OpCo Entities "were continually drawing on the ABL to pay vendor invoices."  Trial Tr. (10/18) at 165:12-24; PX 118 at 30.

231.    <u>Advanced used to acquire capital assets</u>:  In Flaton's opinion, this factor weighs in favor of characterizing the PropCo Advance as debt because the proceeds were used to fund working capital and payroll, not to purchase capital assets.  Trial Tr. (10/18) at 165:25-166:8; PX 118 at 31.

232.    <u>Presence of a sinking fund</u>:  Flaton observed that the PropCo Advance "did not establish a sinking fund to provide repayment or include an amortization schedule" and therefore this factor weighs in favor of equity.  Trial Tr. (10/18) at 166:9-18; PX 118 at 32.

233.    Defendants' attempts to undermine Flaton's opinions and conclusions were unpersuasive.  For example, although Flaton admitted that the PropCo Advance was a "transaction with economic significance," and that the OpCo Entities benefitted from the transfer made to it (Trial Tr. (10/18) at 197:10-198:3), the Court finds that such facts are necessary components of every recharacterization claim:  if the putative borrower did not actually benefit from the receipt of money, there presumably would be nothing to recharacterize.

234.    The same conclusion holds with respect to Comvest's subjective intent.[46] Defendants suggest that the subjective intent of the "borrowers" and the "lenders" is determinative.  *See, e.g.,* Def. Trial Br. at 37-38.  The Court disagrees.  If the "borrowers" and the "lenders" did <u>not</u> intend the transfer to be a "loan," there would be no transaction to recharacterize.  The parties' subjective intent is, as Flaton observed, "sort of self-fulling."  Trial Tr. (10/18) at 194:1-194:4.[47]  This is particularly true where, as here, the same party controls both the putative lenders and the putative borrowers and could style the instrument however they pleased.

## XV.    Comvest's IC Expected the Real Estate to be Unencumbered and Available for Comvest's Benefit in a "Disaster Scenario"

235.    The IC members "were not happy about" having to use the PropCo Entities' real estate to fund the OpCo Entities' liquidity shortfall.  Trial Tr. (10/16) at 177:1-19. Comvest's approval of the PropCo Advance was the product of a broader internal debate that

---

[46]  Given that Comvest controlled the parties to, and the terms of, the PropCo Advance (Trial Tr. (10/16) at 147:1-3, Trial Tr. (10/17) at 133:7-13), the Court will view the issue of "intent" from Comvest's perspective.

[47]  Given that Flaton analyzed the PropCo Advance from the perspective of a banker, the Court understands why the parties' subjective intent was "irrelevant" to her.  From a legal perspective, however, the Court finds that *Roth Steel* implicitly takes the parties' specific intent into account by including several factors designed to discern the parties' intent such as the name of the instrument, and whether there was a fixed maturity date, rate of interest and schedule of repayment (factors 1-3).  But *Roth Steel* also requires an analysis of objective factors including, for example, the adequacy of the borrowers' capitalization, the identity of interest between the creditor and stockholder, and whether the "borrower" could have obtained a loan from a third party on the same or similar terms.  None of these inquiries would be needed if a putative lender could defeat a recharacterization claim merely by asserting -- as Defendants do here -- that he or she intended the transfer to be a loan.

sheds considerable light into Comvest's intent in creating the "PropCo/OpCo" structure, and transferring the real estate assets to the PropCo Entities beyond the reach of the OpCo Entities' creditors.  The evidence shows, and the Court concludes, that when approving the Albertson's Acquisition, the IC relied on, among other things, the Deal Team's assertions that the real estate assets would (a) be transferred to PropCo Entities and remain unencumbered; which (b) would, among other things, provide Comvest with substantial downside protection "even in complete disaster/liquidation scenarios."

236.    The Court's conclusions in this regard are based on PX 20, PX 45, PX 190 (collectively, the "Clark/Marrero E-mails"), and PX 189, as well as the videotaped deposition of Thomas Clark.  During the relevant time, Clark was a managing director at Comvest and a member of the IC.  Clark Tr. at 8:9-9:22.  Clark was not named as a defendant in this action and did not testify live.[48]  The Court has, however, admitted into evidence and reviewed Clark's videotaped deposition.  While discussed further below, the Court found Clark to be evasive and hypertechnical such that much of his testimony about his and others' contemporaneous written statements is simply not credible.  Consequently, the Court places substantial weight on Clark's plain and contemporaneous written words regarding Comvest's investment thesis as set forth in the Clark/Marrero E-mails.

237.    From the outset, Comvest focused on the valuable real estate available in a potential deal with Albertson's.[49]  In that regard, prior to approving Haggen's entry into the Albertson's Acquisition, the IC was expressly informed that, among other things: (a) Haggen

---

[48]  Combined with Rodriguez's memory failure (discussed below), the Court was deprived of the opportunity to hear live testimony concerning the substance of the Clark/Marrero E-mails.  The Court notes that Comvest flew Todd Hooper of ATK in from San Francisco to testify, but declined to subject Clark (currently a partner at Comvest) to questioning at trial despite the obvious import of his prior deposition testimony and written communications.

[49]  *See supra* Section V (The Albertson's Opportunity and Comvest's Real Estate Play).

was acquiring substantial real assets significantly below the appraised value;[50] (b) the real estate would mitigate the operational risks;[51] (c) by transferring the real estate to the PropCo Entities and shielding it from the operational risks, Comvest would be protected in a "downside scenario"[52]; and (d) Comvest would make "multiples of [its] money" even in downside scenarios.[53]

238.    By June, Haggen faced substantial challenges and the issues concerning the protection afforded by the real estate came to the fore.  On June 16, 2015, the Deal Team informed the IC that, among other things, even though the conversion process was not complete, same stores sales were down 20-25% and Haggen faced a liquidity shortfall.  At around that time, Clark believed that Haggen could fail.  Clark Tr. at 40:8-41:6.  To address Haggen's liquidity shortfall, the Deal Team proposed leveraging the PropCo Entities' real property to support the OpCo Entities.  Clark Tr. at 23:18-24:7, 25:18-26:9, 30:4-31:4; PX 16.004, 015.

239.    The Deal Team's proposal struck a nerve with the IC because it contradicted what they had been led to believe.  Caple recalled that "a number" of IC members specifically told him that "they were under the impression that Comvest could still get its money back in Haggen through the real estate, even in a disaster scenario" with the OpCo Entities.  Trial Tr. (10/16) at 177:20-24.  *See also* Trial Tr. (10/16) at 177:25-179:7 (Caple also recalled Clark telling him that he was "under the belief that the underlying real estate value was money good in a disaster scenario").  Caple's recollections in this regard are consistent with an e-mail that Clark sent to Marrero on July 14, 2015.  Clark's e-mail stated, among other things, that:

---

[50]  PX 23, PX 26, and PX 30.

[51]  Trial Tr. (10/17) at 56:19-58:19; PX 30.006.

[52]  PX 20.002.

[53]  PX 45.002, PX 190.001.

- PropCo/Downside
  - *Under the impression/belief that the underlying real estate value was money-good in a disaster scenario*
  - News to Michael and us that PropCo value seems encumbered
    - ABS payable
    - SLB guarantee
  - *Relied on this downside protection when approving the deal*

Clark Tr. at 97:24-98:15; PX 20 (emphases added).[54]

240.    A few weeks later, Clark and Marrero collaborated on a more expansive version of Clark's e-mail.  On Sunday, August 2, 2015, Clark and Marrero took turns wordsmithing a set of "observations" concerning Caple.  Clark Tr. 72:15-76:22, 77:25-79:10; PX 190.  Marrero then reorganized certain of the issues and presented the final document to Falk the following day.[55]  The issues set forth in these documents were the subject of numerous discussions among IC members.  Clark Tr. at 64:14-65:23, 67:8-68:4, 69:11-16, 69:19-71:6, 80:3-20.  The version that Marrero presented to Falk stated, among other things, that:

- We must avoid IC discussion from being a "sell job"
  - *IC relied on strong assertions that we would make multiples of our money on Haggen in even complete disaster/liquidation scenarios*
    . . .
- We must carefully lay out "likely case" as well as a "downside" case reflecting negative outcomes and the quantification of these financially
  - Guarantees and ABS Liabilities at Holdings not understood by the IC and/or Deal team.
  - We should not rely on Team's "best thinking" but rather show sensitivities with thoughtful assumptions on both upside and down.

PX 45 (emphasis added).[56]

---

[54]  Clark testified that his e-mail was the product of "emotion" and reflected "exaggerations" and that he did not actually believe much of what was written.  Clark Tr. at 98:16-108:5.  The Court rejects Clark's testimony in favor of Clark's plain, contemporaneous written words.

[55]  Clark admitted that there was no substantive difference between the version he and Marrero worked on and the version that Marrero tendered to Falk.  Clark Tr. 81:11-86:8.

[56]  Clark attempted to disavow or minimize the relevant points in Marrero's version of the document, contending that they were the product of "a lot of emotion" and contained some "exaggeration."  Clark Tr. at 86:17-97:23.  Again, the Court rejects as not credible Clark's attempt to avoid the plain and obvious meaning of the Clark/Marrero E-mails.

241.    Every member of the IC (save for the captain of the ship, Caple) agreed with the substance of these communications.  Nevertheless, after the Deal Team was unable to obtain a loan from unrelated third parties, Comvest's IC begrudgingly authorized the PropCo Entities to make the PropCo Advance, with certain IC members warning that they would not likely consent to the use of the PropCo Entities' assets again.  PX 42.

242.    Comvest's IC members clearly believed they were misled by Caple, particularly on the issue of Holdings' guaranties.  In fact, Clark was so distrustful of Caple that he went back and reviewed all of the information presented by the Deal Team and informed Marrero that "I couldn't find anything in the decks that said the [Sale Leaseback] guarantees would float up to Holdings.  And [the Deal Team] show[s] the inventory in current liabilities, not shown as a HoldCo liability or debt of OpCo."  In response, Marrero wrote: "Yup . . . given [Caple] is being so aggressive, we need to inform him that it was NOT any deck we were shown and no one remembers hearing it."  PX 189.  As noted above, Caple was forced out of Comvest shortly after Haggen filed for bankruptcy.

A.    **Rodriguez's failure to recall is not credible**

243.    At trial, Rodriguez was unable to recall participating in any discussions or communications concerning the Clark/Marrero E-mails.  The Court is highly skeptical that Rodriguez was able to recall details of conversations that preceded the Albertson's Acquisition, but was unable to remember any aspect of the critical (and more recent) discussions that took place in the summer of 2015 while Haggen was melting down and the IC was being asked to leverage the PropCo Entities' real estate to support the OpCo Entities.  Trial Tr. (10/18) at 114:5-120:23.

244.    Rodriguez's complete failure to recall anything about these discussions is particularly concerning because Clark testified that Rodriguez was directly involved in addressing the issues raised in the Clark/Marrero E-mails.  According to Clark:

- The Clark/Marrero e-mails were "prepared in conjunction" with Falk and Rodriguez for the purpose of giving Caple "feedback" (Comvest (Clark) Tr. at 61:16-62:7);

- Clark believed that Falk and Rodriguez met with Caple to discuss the observations on PX 45.  (*Id.* at 69:11-16);

- Rodriguez, Falk, Marrero, and Clark discussed the substance of PX 45 in various combinations and subsets of groups in August 2015 (*Id.* at 70:9-71:6); and

- Clark spoke with Rodriguez about the issues set forth in PX 190, and believed that "a version of this document was shared with [Rodriguez] as well."  (*Id.* at 80:3-20).

245.    Based on Clark's testimony, the Court finds that Rodriguez's failure to recall discussing any aspect of the Clark/Marrero E-mails was not credible.  Consequently, the Court will draw a negative inference with respect to all of Mr. Rodriguez's testimony.

## XVI.    Defendants Blame Everyone but Themselves

246.    The Defendants contend that Haggen failed for three reasons:  pricing issues, supply issues, and unfair competition.  Defendants also contend that there were three -- and only three – culprits: Willard Bishop, SuperValu, and Albertson's.  Trial Tr. (10/16) at 82:16-87:10; Trial Tr. (10/17) at 9:1-10; Def. Trial Br. at 21-25.

247.    The Court takes judicial notice of the *Declaration of Blake Barnett in Support of Chapter 11 Petitions and First Day Motions*, dated September 9, 2015, and filed at Docket No. 15 (main case) ("Barnett Dec.").  Fed. R. Evid. 201.  While Barnett described certain allegations against Albertson's, and disclosed the existence of the Albertson's Action (defined below) in his first-day declaration, he did not mention or refer to any wrongful conduct by Willard Bishop or SuperValu, nor did he mention or refer to any pricing or supply issues as causes for Haggen's abrupt failure.  Barnett Dec. ¶ 15.  These omissions strongly suggest that

these issues may have been contrived after the fact for this lawsuit.  Indeed, a review of the

record (including, among other things, the Barnett Dec., Defendants' Answer and Defendants'

Motion for Partial Summary Judgment) shows that, at least as it relates to Willard Bishop and

SuperValu, the issues of pricing and supply were apparently raised for the first time in

Defendants' Trial Brief on the eve of trial.

248.    The absence of evidence buttresses this suggestion.  Given Defendants'

(albeit, unsupported) contentions that Comvest had $150-200 million at risk, and that Haggen

collapsed due to the actions and inactions of Willard Bishop, SuperValu, and Albertson's, the

Court expected to receive evidence establishing the culpability of these third parties, yet the

court received little beyond the uncorroborated testimony of some of the Individual Defendants.

Given the stakes and Defendants' strong assertions, the Court also expected to receive evidence

establishing that Defendants tried to hold those firms accountable for their allegedly wrongful

conduct.  The evidence, however, shows just the opposite:  despite the alleged problems, and

despite Comvest's alleged investment of $150-200 million, Comvest and Haggen did virtually

nothing to hold anyone responsible for Haggen's demise.

249.    Based on the evidence, the Court concludes that while certain pricing,

supply, and competitive problems likely occurred during the conversion process, Defendants

failed to offer sufficient evidence to back up their allegations that these problems caused

Haggen's demise as opposed to their own reckless miscalculations.  This conclusion is further

supported by Barnett's failure to mention Willard Bishop or SuperValu, or pricing or supply

issues, in the Barnett Dec., and Defendants' collective failure to make any meaningful effort to

hold anyone accountable.

A. **Defendants Blame Willard Bishop for Pricing Problems,
but they did Nothing Other Than Fire Them**

250.    Defendants contend that Willard Bishop contributed to the pricing

problems that led to Haggen's demise.  Yet, neither Haggen nor Comvest took any steps to hold

Willard Bishop accountable for the damage it allegedly did with respect to pricing issues other

than to discontinue working with them.  Trial Tr. (10/17) at 9:11-13, 9:24-10:13; Trial Tr.

(10/19) at 193:19-20, 194:5-14, 195:13-17, 211:5-7.

B. **Defendants Blame SuperValu for Pricing and Supply Problems, but
they Gave SuperValu a General Release and got Nothing in Return**

251.    Defendants contend that SuperValu contributed to the pricing and supply

problems that led to Haggen's demise.  Yet, neither Haggen nor Comvest took any steps to hold

SuperValu accountable for the damage it allegedly did with respect to the pricing and supply

issues (other than to have "lots of discussions" with them).  Trial Tr. (10/17) at 10:14-11:13.

Indeed, as Barnett admitted, neither Haggen nor Comvest ever withheld payment from

SuperValu, negotiated a reduction in the amounts due to SuperValu, or commenced an action

against SuperValu.  Trial Tr. (10/17) at 195:6-16.  *See also* SuperValu (Collison) Tr. at 68:20-

69:7 (Haggen never paid late or failed to pay the amounts due to SuperValu), 78:18-79:12

(Haggen never attempted to terminate the Transition Services Agreement (the "<u>TSA</u>") (PX 271),

and never invoked the dispute resolution clause in Section 6.2(c) of the TSA).[57]

252.    In fact, Comvest knowingly and intentionally let SuperValu off the hook

for no consideration.  The Debtors, certain non-Debtor affiliates (including the PropCo Entities),

Comvest, and the Committee entered into a Settlement Agreement with Albertson's and

Cerberus that was filed at Docket No. 1312-2 in the main case on January 27, 2016 (the

---

[57] According to SuperValu, Haggen also never accused SuperValu of breaching the TSA (beyond an allegation that
SuperValu breached a confidentiality provision), or threatened to sue SuperValu for any reason.  SuperValu
(Collison) Tr. at 79:15-80:17.

"Settlement Agreement"). PX 117.   Pursuant to the Settlement Agreement, SuperValu was released from "any and all claims, demands, causes of action or sums owed, foreseeable or unforeseeable, which are based on conduct or inaction that occurred before" the closing of each store.  Neither Comvest nor the Debtors received any monetary compensation in exchange for their release of SuperValu.  *Id.* at .009-010.

253.   The Court finds, as a matter of fact, that Haggen and Comvest would not have provided SuperValu with a release, while receiving no monetary compensation in return, if there was any merit to Defendants' allegations against SuperValu.  Trial Tr. (10/17) at 15:3-21; PX 117.009-.010.

### C.   Defendants Conjured up their Allegations Against Albertson's Because Haggen Could not Pay the $40 million due in July

254.   Defendants contend that Albertson's engaged in unfair competition and contributed to the problems that led to Haggen's demise.  Trial Tr. (10/16) at 84:19-85:1, 86:6-87:10; Trial Tr. (10/17) at 9:19-22, 11:4-6; Def. Trial Br. at 3, 23-25.

255.   Based on the evidence described below that, among other things, (a) neither Haggen nor Comvest ever objected to Albertson's conduct in any meaningful way prior to June 29, 2015 (nor did they convey any complaints to the Monitor before mid-July); (b) on that date, Haggen owed Albertson's over $40 million for inventory that it could not pay for; (c) Haggen improperly resorted to "self-help" by withholding payment of that $40 million in contravention of the bargained-for dispute resolution mechanism contained in the APA; and (d) Haggen and Comvest ultimately agreed to settle their dispute with what was effectively a "walk away," the Court finds and determines that Defendants' attempts to blame Albertson's for Haggen's demise were conjured up in an attempt to shift blame away from themselves and are not credible.

256.    On June 29, 2015, Haggen sent Albertson's a letter identifying certain allegedly wrongful conduct, and informing Albertson's that Haggen was withholding $43 million in inventory payments (the "Demand Letter").  PX 266.  Prior to that time, Haggen had timely made all of the payments to Albertson's that it was required to make under the APA, but the OpCo Entities faced a liquidity shortfall at that time.  Trial Tr. (10/17) at 11:4-18; Albertson's (Ewing) Tr. at 164:25-165:14; PX 16.004; PX 18.003.[58]

257.    In the Demand Letter, Haggen asserted that Albertson's had breached the APA and identified four specific instances of allegedly wrongful conduct.  PX 266.[59]  Haggen also notified Albertson's for the first time that it would "not make further payments of the Inventory Purchase Price" under the APA until Haggen completed its investigation and the matters "have been satisfactorily resolved."  Trial Tr. (10/16) at 163:12-22; PX 266.006.  According to Albertson's, Haggen had therefore not raised any issues concerning the pricing of

---

[58]  Notably, as of June 16, the Deal Team had not decided to withhold payments to Albertson's and had not informed the IC of any allegedly wrongful conduct by Albertson's or that it was even considering withholding payment to Albertson's.  Trial Tr. (10/16) at 155:12-156:18, 156:24-157:5.

[59]  The relatively modest nature of Haggen's complaints lends further credence to the Court's conclusion that the Demand Letter was sent, and the dispute resolution mechanism in the APA were ignored, primarily because Haggen faced a liquidity shortfall and had no ability to pay Albertson's over $40 million that was about to become due.  Specifically, Haggen complained of (a) "Improper Transfer of Inventory out of Purchased Store(s)" (other than generalized allegations, the only specific facts asserted by Haggen related to the removal of inventory and equipment from one store); (b) "Overstocking and Understocking of Inventory" (Haggen identified one store, acquired on February 26, 2015, where the inventory was allegedly so low that Haggen was forced to purchase approximately $208,000 of inventory to "help refill the store," and another store where a bakery manager was allegedly instructed to "purchase and/or bake 2 times her normal inventory levels" thereby causing Haggen to purchase unneeded baked goods that that store, as well as other similar issues concerning inventory); (c) "Failure to Advertise in the Ordinary Course of Business" (describing as "intentional misconduct" discrete problems relating to advertising that lasted a week; ironically, according to the FTC, this was the *only* issue Haggen and Comvest ever raised with the Monitor prior to July 2015, and the Monitor "took a look into it and corrected it, and [] it was concluded as an oversight.").  (FTC (Frangie) Tr. at 142:3-23, 148:14-149:9); Albertson's (Cummins) Tr. at 38:21-39:14, 40:25-45:14); and (d) "Misuse of Confidential Information and Failure to Use Commercially Reasonable Efforts to Preserve Existing Relationships" (alleging that Albertson's "substantially increased their advertising and marketing in the stores being acquired, and that Albertson's did so "based upon their knowledge of the Store Closing cadence;" Caple admitted that he could not prove that Comvest or Haggen had previously complained to anyone about this topic (Trial Tr. (10/16) at 301:1-20)).  PX 266.

inventory, and had not availed itself of the dispute resolution procedures in Section 6 of the

APA, at any time prior to the date of the Demand Letter. Albertson's (Ewing) Tr. at 166:7-21.

258.    The Court concludes that Haggen's complaints as set forth in the Demand

Letter were a pretext designed to cover up its precarious financial condition and buy time.[60] The

uncontroverted evidence shows that, at the time the Demand Letter was sent, Haggen faced a

liquidity shortfall and knew that it would be unable to pay Albertson's approximately $43

million when it became due in July. Trial Tr. (10/16) at 161:25-163:4, 164:3-24; PX 18.003.

Indeed, the Deal Team virtually admitted that the Demand Letter was pretextual in their July

report to the IC, writing:

> Assuming the [Albertson's] inventory payments and conversion
> capex payables *can continue to be delayed*, the latest daily
> liquidity model shows Haggen getting very close to negative
> liquidity at the beginning of August and then going negative on
> August 21. If Haggen misses its plan targets or *needs to begin
> paying off its delayed one-time payables* it will hit negative
> liquidity sooner.

PX 18.03.

259.    The uncontroverted evidence also shows that (with the exception of the

issue concerning the advertising described above) no one from Haggen or Comvest complained

to the FTC or the Monitor about Albertson's allegedly anti-competitive conduct until mid-July,

and even those complaints came as a result of inquires placed by the FTC that were prompted by

news reports concerning employee layoffs at Haggen. Trial Tr. (10/17) at 12:20-13:18; Trial Tr.

(10/19) at 38:21-39-24, 127:20-23, 128:21-129:2, 198:16-199:23; FTC (Frangie) Tr. at 137:25-

---

[60] The Court notes that Albertson's asserts that, far from engaging in "anti-competitive" conduct, Albertson's extended considerable courtesies to Haggen and made best efforts to cooperate during the store conversion process, including participating in weekly (or more frequent) meetings. Albertson's (Crandall) Tr. at 109:15-112:15, 161:13-164:9, 60:17-62:12; Albertson's (Cummins) Tr. at 19:10-21:15, 45:25-47:20. The Court also notes that Albertson's met with the Monitor on a regular basis, and submitted "Compliance Reports" to the FTC, to report on the progress of the conversions and address all issues concerning Haggen. Albertson's (Williams) Tr. at 141:15-159:23, 136:4-16, 136:25-137:22, 160:6-176:12, 177:18:183:2; PX 598-610, inclusive.

146:12 (Haggen's counsel identified numerous reasons for Haggen's struggles (including that "the Haggen brand and format did not seem to be catching on in California"), only one of which was the "significant competitive response" from Albertson's).[61]

260.    On July 17, 2015, less than three weeks after receiving the Demand Letter, Albertson's sued Haggen Holdings, LLC in the Superior Court of the State of California, Case No. BC 588598 (the "Albertson's Action").  Trial Tr. (10/16) at 165:7-166:6; Trial Tr. (10/17) at 11:22-13:1; PX 306.  Albertson's asserted claims for breach of contract, anticipatory breach of contract (repudiation), fraud, and breach of the implied covenant of good faith and fair dealing, all in an effort to recover the $43 million that was then due or about to become due.  PX 306.

261.    On September 1, 2015, just six days before the Petition Date, Haggen filed a responsive action against Albertson's in which it sought $1 billion in damages ("Haggen's Action").  PX 613.

262.    Albertson's Action and Haggen's Action were resolved in the bankruptcy where the Court approved the Settlement Agreement.  PX 117.  The Settlement Agreement effectively embodied a "walk away."  Pursuant to its terms (a) Albertson's was obligated to pay $5.75 million into a creditor trust, (b) Albertson's was to receive an unsecured claim against Holdings in the amount of $8.25 million, and assign such claim to the creditor trust, and (c) the parties exchanged mutual general releases.  PX 117.004-009.  Comvest acknowledged its belief that this was a "fair and equitable resolution to the billion dollar lawsuit that was brought."  Trial Tr. (10/17) at 13:19-15:2.

263.    Based on the foregoing, the Court concludes that the pricing, supply and anti-competitive issues allegedly caused by Willard Bishop, SuperValu, and Albertson's were

---

[61] Ironically, Albertson's immediately informed the FTC of the Demand Letter in its Sixth Compliance Report dated July 1, 2015.  PX 611.007-008 (telling the FTC that Albertson's believed Haggen's claims were "without merit").

not the primary cause of Haggen's demise.  The Court bases this conclusion on the following

facts:  (a) Defendants failed to offer meaningful evidence to support their claims; (b) neither

Comvest nor Haggen raised any of these issues with the FTC or the Monitor before July 2015;

(c) neither Comvest nor Haggen sought to hold Willard Bishop or SuperValu accountable for the

their allegedly wrongful conduct (indeed, SuperValu was given a release in the Settlement

Agreement); (d) the issues identified in the Demand Letter were relatively modest when

measured against the $43 million that Haggen withheld; (e) Haggen was contractually obligated

to utilize the dispute mechanism in the APA rather than resorting to "self help" by withholding

payment;[62] (f) the Demand Letter was pretextual because, as Defendants admit, Haggen had no

ability to pay Albertson's at the time the $43 million became due; (g) the Albertson's Action was

commenced almost immediately, without discussion; and (h) Haggen's $1 billion lawsuit was

settled for a "walkaway," something that would not have occurred if Comvest believed the

claims against Albertson's had real merit.  Trial Tr. (10/17) at 13:19-15:2; PX 117.

## XVII.  **Comvest's Unreasonable Projections were a Proximate Cause of Haggen's Demise**

### A.     **Comvest's Projections were Unreasonable**

264.     Prior to the Albertson's Acquisition, Comvest prepared projections of

Haggen's future financial performance.  These projections formed the predicate for determining

the OpCo Entities' liquidity needs and capitalization.  In the final version of projections

---

[62] Section 6.4 of the APA contains a dispute resolution mechanism that relates to disagreements concerning the Inventory Purchase Price.  PX 263.031.  Section 6.4 provides that if the parties cannot agree on the Inventory Purchase Price within ten business days, "the items remaining for resolution" shall be submitted to an independent accounting firm, which shall issue a binding resolution within 20 days.  *Id.*  Thus, the agreed-upon process was limited to only those matters in dispute (the balance of the Inventory Purchase Price was to be paid), it was to be quick, and it did not provide for a unilateral withholding of payment under any circumstances.  Nathan Balint, an attorney at Akerman who represented the interests of Comvest and Haggen in connection with the negotiation of the APA, testified that Section 6.4 was not "boilerplate," but was a unique provision that was a product of negotiations, and was to apply whenever the parties were unable to agree on the Inventory Purchase Price.  Balint could not think of anything in Section 6.4 that would have given Haggen the right to withhold payment.  Akerman (Balint) Tr. at 54:10-56:16.

presented to the IC, Comvest's "base case" assumed that Haggen would enjoy same store sales growth of 4.9% in the first year leading to earnings of $78.2 million.  Based on these projections, Comvest vastly underestimated the OpCo Entities' liquidity needs.  For the reasons set forth below, the Court concludes that Comvest's "base case" was unreasonable and the overly optimistic assumptions caused the OpCo Entities to be undercapitalized from their inception in December 2014.

265.    Comvest's industry consultant, ATK, created the 4.9% same store sales growth rate that was incorporated into Comvest's "base case."  Trial Tr. (10/20) at 106:14-16. As discussed below, in the context of the Albertson's Acquisition, the methodology employed by ATK is subject to fair criticism.  But what renders ATK's methodology (and therefore its conclusion concerning the projected same stores sales growth rate) fundamentally flawed is what it *failed* to take into account:  the historical sales data, the unprecedented nature of the transaction, and the extensive and foreseeable transaction and execution risks that were specifically identified by ATK and Haggen's management prior to the execution of the APA.

266.    During his direct examination, Hooper testified that ATK's same store sales growth rate was based on certain objective data, "net promoter scores" and "word clouds," case studies, and the erroneous assumption that Haggen's supermarket "resets" would occur during or prior to store conversions.  Trial Tr. (10/20) at 106:14-113:17.  The data that ATK relied upon included factors such as industry growth, population growth, and inflation, and its own generalized belief "that the business could grow based on the strength of the brand and the strength of the proposition."  Trial Tr. (10/20) at 105:18-24, 106:23-107:3.

267.    ATK also relied on "net promoter scores" that showed Haggen's customers in Washington and Oregon had a positive view of the grocery chain.  According to

ATK, a "net promoter score" is a consumer survey designed to measure the strength of a brand because it shows "the loyalty and the connection of the relationship that the consumer has with the brand."  Trial Tr. (10/20) at 107:12-14, 108:4-8.  Here, however, reliance on "net promoter scores" was misplaced because ATK simply assumed that Haggen would immediately reap the benefits of its brand in new markets where Haggen had no prior presence or name recognition (*i.e.*, California, Nevada, and Arizona, where most of the stores being acquired were located), and could not have expected any customer "loyalty" to measure.  Trial Tr. (10/16) at 276:11-278:16; Trial Tr. (10/20) at 109:20-110:20, 132:16-133:20.

268.    Finally, Hooper testified that ATK's same store sales growth rate was also based, in part, on the assumption that Haggen's "resets" would occur during or prior to the conversions, an assumption that ATK specifically advised Haggen would have a significant impact on expected sales growth.  PX 107.024.  The Court heard considerable testimony about the meaning of "resets" and "conversions."  For the reasons set forth below, the Court need not determine the precise meaning of these terms because the evidence shows that Haggen did not, and never planned to, complete any "resets" prior to store conversions.[63]

269.    ATK analyzed certain case studies and advised Haggen that, depending on whether "resets" occurred before or after conversions, and whether the acquiring company was entering into new markets, sales might be impacted, positively or negatively, by as much as 15%.[64]  In fact, ATK presented case studies showing actual transactions where the acquiring

---

[63] Suffice it to say for these purposes that "resets," "conversions," and "remodels" all relate to some part of banner changes, store construction, and inventory overhauls that may occur in connection with the change in ownership of supermarkets.

[64] Hooper admitted that even these ranges were "highly dependent upon execution [risk] and consumer affinity for existing customer banner," and that Haggen had no "customer affinity" in California, Arizona, or Nevada because Haggen had no presence there.  Trial Tr. (10/20) at 138:18-140:15; PX 107.024.  In fact, the evidence shows that – at least in Shaner's view – Albertson's and Safeway were expected to maintain the customer affinity.  PX 157 ("while somewhat tarnished, [the Albertson's and Safeway banners] still maintain a loyal customer base.").

companies experienced sales decreases of 20-30% in the first year when "resets" followed conversions.[65]  Based on ATK's analysis, the Court finds that Comvest and the Individual Defendants knew or should have known that sales could erode by double-digit percentages in the first year if "resets" followed conversions, particularly in markets where the Haggen brand was previously unknown.  Further, based on the trial testimony, contemporaneous communications, and Haggen's store-by-store construction budgets, the Court concludes that Haggen did not, and never planned to, complete any "resets" prior to conversions.

270.    At trial, Caple admitted that total store resets were not supposed to occur as part of the conversion process because the stores came stocked with inventory that Haggen had to sell before it could do resets.  Trial Tr. (10/16) at 150:24-151:24.  Shaner also admitted that the "decision was made to not do the reset" until later in 2015, and observed that resets "are extraordinary, literally moving tens of thousands of products takes about a week and that is in consideration of doing nothing else in the store."  Trial Tr. (10/19) at 13:22-15:15.

271.    This testimony is consistent with Shaner's contemporaneous reports.  In April 2015, for example, Shaner emphasized that the parts and areas of the stores experiencing the greatest sales declines "have been the least impacted through the conversion process and *will be fully 'Haggen-ized' through subsequent total store resets once all stores have been converted*."  Trial Tr. (10/16) at 152:10-154:1; PX 11.003 (emphasis added).

272.    In June, Genser and another consultant hired by Comvest, Terry Peets, compared observations on a number of topics.  Both men made clear that (just days before Haggen was to acquire and convert the last stores) "resets" had yet to occur, with Peets stating: "I really liked what I heard in terms of doing several mini resets in order of sales impact and

---

[65] Notably, Haggen was one of ATK's case studies and it showed that Haggen's sales declined by 2.5% because the "resets" followed the conversions.  PX 107.025.

Haggen strength categories, as opposed to one major reset 6 months down the road … much less

customer disruption."  In response, Genser suggested that Haggen would conduct "test cases"

before deciding on a "mini reset" strategy.  PX 233.002 (item number 6).  At trial, Shaner

corroborated Genser's and Peets' conclusion that "there needed to be more resets done to

Haggenize the stores."  Trial Tr. (10/19) at 15:21-16:4, 17:13-18-10; PX 233.002 (Item No. 6).

273.    Comvest's store-by-store construction budget provides further support for

the Court's conclusion that "resets" were never expected to occur prior to conversions and that

Haggen should therefore have expected the negative same store sales growth predicted by ATK's

analysis.  First, one quarter of the acquired stores were allocated a construction budget of only

$75,000 per store -- an amount that Comvest's advisors described as putting "lipstick on the

pig."  Trial Tr. (10/18) at 19:13-21:14; DX 240; PX 339.  Second, even the amounts allocated to

more significant remodels are relatively modest compared to the amounts spent by the acquiring

supermarket chains analyzed in ATK's case studies.  Trial Tr. (10/18) at 21:16-23:13 PX

138.002.

274.    In a transparent effort to avoid the obvious implications of these

undisputed facts, Shaner and Hooper claimed that the terms "conversion" and "reset" were

"ambiguous."  Trial Tr. (10/19) at 13:12-19; Trial Tr. (10/20) at 115:13-116:3.[66]  The Court need

not decide the precise meaning of those terms, but concludes that this testimony is not credible

because (a) ATK should have resolved such ambiguities with Haggen prior to the Albertson's

Acquisition given the substantial financial impact the issues were expected to have; (b) Caple,

---

[66] On cross-examination, Hooper was forced to admit that he didn't actually know what store improvements Haggen planned to make.  *Compare* Trial Tr. (10/20) at 119:8-21 (initially claiming that ATK assumed resets would occur at or before the conversion, and therefore would be in the upper range of same store sales growth rates, based on communications with Comvest and Haggen) *with Id.* at 140:17-142:25 (conceding that whatever work would be done "would vary a lot by stores.").  If Haggen intended to follow ATK's advice and complete the "resets" prior to conversions, the Defendants should have offered evidence establishing that fact, but they failed to do so.

Shaner, Peets, and Genser all believed "resets" (whatever the precise meaning) were needed to

drive sales and would occur after the conversion process; and (c) putting "lipstick on the pig" is

inconsistent with achieving the heightened same store sales growth predicted when, according to

ATK, "resets" occur prior to "conversions."[67]

275.    In this context, ATK's reliance on inflation, net promoter scores, word

clouds, and the "reset/conversion" issues to project same store sales growth of 4.9% is highly

questionable.  The Court finds, as a matter of fact, that ATK's projected 4.9% same store sales

growth rate (and, therefore, Comvest's "base case") is unreasonable because ATK failed to

consider any of the fact-specific circumstances that Haggen confronted.  When asked to identify

the factors that went into ATK's 4.9% same store sales growth rate, Hooper *failed* to mention,

among other things, (a) the magnitude of the transaction; (b) the historical sales of the target and

legacy stores; and, most importantly in the Court's view, (c) the foreseeable and substantial

transaction and execution risks that he and Haggen's management and other consultants had

identified -- including the very pricing issues that Hooper was concerned about and that he did

not believe were addressed.  Trial Tr. (10/20) at 106:14-113:17; PX 226.  This is a fatal flaw.

276.    The evidence shows that the scope and timing of this transaction had no

precedent: an 18-store chain was expanding by eight times by acquiring 146 stores spread out

over five states (including three where Haggen had no prior market presence), and where

entrenched competition would remain.  The entire transaction (the scope of which changed over

time from an initial 22 stores in Washington and Oregon in late August to, ultimately, 146 stores

---

[67] While the Court was impressed with the accelerated video showing the conversion process at one store, the Court notes that (a) given the materially different construction budgets per store, the Court cannot infer that the process depicted in the video reflects what occurred in each of the other 145 stores, and (b) the defendants failed to offer *any* documentary evidence (e.g., conversion or reset plans, communications, store-by-store analyses, etc.) to prove what was done in each store as part of the "conversion" process, whether "resets" actually occurred as part of the "conversion" process, or what "Haggen-izing" the stores actually meant in practice.

in five states by November) was negotiated in less than four months; Haggen had just several

months to develop conversion plans, hire hundreds of workers and managers, and create the

"infrastructure" necessary to run a business of this magnitude; and Comvest and Haggen

willingly agreed to acquire and convert all of the stores in just 120 days (which the FTC

extended to 150).[68]

277.    This was unprecedented.  David MacGreevey, an expert who testified on

behalf of Plaintiff, presented a compelling analysis of "comparable" transactions showing that

the Albertson's Acquisition was far greater in size, and was to be completed in a substantially

shorter time frame, than any recent "comparable" transaction.  Trial Tr. (10/18) at 36:6-37:11;

PX 106.018.  Even Shaner admitted that he had never seen a transaction of this magnitude.  Trial

Tr. (10/19) at 39:25-40:6.  It does not take an expert or hindsight to appreciate that the risks

posed by a transaction of this nature would not be captured by net promoter scores or word

clouds.

278.    Based on Hooper's testimony, Comvest's projections failed to take into

account and were inconsistent with the actual pre-Albertson's Acquisition results of the Haggen

legacy stores and the stores being acquired from Albertson's and Safeway.  The evidence shows

that sales at the legacy stores contracted in each of the four years from 2010 through 2013,

before growing, but by only 0.5% in 2014 (when Comvest claims it engineered a turnaround at

---

[68] Defendants emphasized that they acted as "good fiduciaries" in hiring various experts.  The role of these experts must be put in context.  Haggen's TSA with SuperValu (one of the three entities that Defendants blame for Haggen's catastrophic failure) was not signed until December 6, 2014, about ten weeks before Haggen was scheduled to begin acquiring and converting 146 stores in five states.  PX 271.  Willard Bishop, another entity now accused of destroying the Haggen brand, was not hired until December 23, 2014, less than eight weeks before the cadence began.  PX 127; PX 145.003.  And ATK, Comvest's "industry expert," performed services for about two months before being terminated by Comvest prior to the execution of the APA.  Trial Tr. (10/20) at 100:1-3, 129:15-25.  Ominously, after being terminated, Hooper warned his colleagues that "I think they are underestimating the decisions and the analysis required, e.g., pricing, promotion, assortment."  Trial Tr. (10/19) at 152:10-153:25; PX 226.  Hiring (and firing) advisors under these circumstances is not necessarily consistent with being a "good fiduciary."

Haggen).  Sales for the targeted stores also contracted or rose modestly (less than 2%) until 2014.

PX 19.017; PX 26.008; PX 632.011.  Notably, these historical results were attained without *any*

of the risks that Haggen faced.  Trial Tr. (10/16) at 115:16-117:6; Trial Tr. (10/17) at 142:19-

145:24; DX 79.006; PX 8.004.  The Court is unable to reconcile the historical sales results,

achieved without any of the foreseeable transactional or execution risks that Haggen confronted,

with Comvest's projected base case 4.9% same store sales growth rate in the year immediately

after the closing.

      279.    Finally, Comvest and ATK appear to have ignored all of the transaction

and execution risks, as well as the considerable concerns expressed by Haggen's management

and advisors regarding ATK's projections.  For example, October 29, 2014, ATK circulated a set

of projections in which it claimed to have "dialed back the assumptions in our case; as a result,

EBITDA is forecast to grow modestly (+5%) in Year 1."  PX 231.003.  In response, Shaner

wrote to Barnett and said, among other things, that he was "digging through this deck and the

ATK assumptions and am developing `heartburn' around the concept of [Southern California]

being able to deliver positive sales and flat EBITDA through the year one transition" because he

expected the transition to create "turmoil" for Haggen's customers.  PX 231.  In Shaner's view,

that turmoil would be caused by expected changes in the customer experience, including the

elimination of popular programs.  Shaner acknowledged that it would "take time" for Haggen to

communicate its message and brand because Haggen was unlikely to "show the customer a

meaningfully amazing difference in the first 6 months" or engage in substantial price reductions.

As Shaner knew, all of these issues might lead to a loss of customers and sales.  Trial Tr. (10/19)

at 19:16-22:17.

280.    Two days later, on October 31, 2015, ATK circulated another set of projections, including an upside case, a base case, and a downside case; the assumptions in the "upside case" were modified to assume even stronger same store sales growth in the second and third years.  PX 157.005.  On cross-examination, Shaner initially testified that he no longer had "heartburn" after receiving ATK's revised projections, and that he couldn't recall whether he agreed with the concerns expressed by Genser.[69]  Shaner was forced to recant that testimony after seeing that he, and Genser, and Barnett all expressed considerable concerns about ATK's later set of projections:

- Genser stated, among other things, that he did not "believe the downside case [was] draconian enough" and that "year one could be worse that [sic] what is presented and it never bounces back."

- Barnett expressed the view that "the downside is not a good representation of just how far 'down' could be, and therefore does not accurately represent both the Branding risk (SoCal) and Executional risk (both).  My concern is that ATK presents, and therefore legitimizes the 'worst case,' which we know is not really the worst case."

- Shaner wrote: "I am strongly in Ira and Blake's camp.  There are so many moving parts, and so much turmoil to manage through, that I think it's only prudent to be keenly aware of the potential downside risk scenarios . . . [w]e are eliminating banners that have a presence for years, and while somewhat tarnished, still maintain a loyal customer base . . . I believe in the Haggen brand's ability over time, [but] the challenges to sales and ebitda in years 1-2 are significant."

Trial Tr. (10/19) at 24:22-29:5; PX 157.

281.    In essence, Shaner maintained the very same concerns that he told Barnett had caused "heartburn" just days before; he was forced to admit that (a) he believed Haggen faced "significant challenge[s]" to sales and EBITDA during the first two years, and (b) that

---

[69] Shaner asserted that "additional learnings" made him "more confident" in the projections, but he admitted that he never told the FTC or state regulators about the "heartburn" he developed over the 5% growth rate.  Trial Tr. (10/19) at 24:5-10.

what he "foresaw back in October [2014] was exactly what happened.  Sales and EBITDA in

year one were just a disaster."  Trial Tr. (10/19) at 29:6-12.

282.    In response to the concerns expressed by Genser, Shaner, and Barnett,

Niegsch claimed to have prepared a "real bad downside case" showing the operating companies

"barely" having any liquidity after "cutting down Capex and G&A and stretching payables for

more breathing room in that scenario."[70]  PX 157.003.  Niegsch's "real bad downside case" is

very significant because, as Niegsch admitted, it establishes as a matter of fact that it "was

foreseeable that there was a scenario where the operating companies might just barely have

liquidity."  Trial Tr. (10/17) at 138:8-17; PX 25.002.

283.    While the Court never saw Niegsch's "real bad downside case," the

evidence shows that Comvest's downside scenarios were just as unreasonable as its "base case"

insofar as none of them ever showed the OpCo Entities losing any money.  Trial Tr. (10/16) at

295:11-296:1.  Indeed, prior to the time it approved Haggen's bid, the IC was never presented

with a scenario that showed the OpCo Entities earning less than $40 million per year.  Trial Tr.

(10/17) at 62:7-12.  Thus, although the Deal Team's "downside" projections assumed same store

sales would decline by 5% in the first year (PX 19.026), the Deal Team changed other

assumptions that mitigated the impact of the projected loss of sales such that Haggen still

showed profits of almost $50 million in the first year.  The Court finds that the Deal Team's

assumption that Haggen's "management team would [be able to] react to the [projected] sales

decline" to be unreasonable for purposes of creating a "downside scenario."  Moreover, for the

reasons set forth below, the Court is skeptical that a 5% decrease in same store sales growth is

---

[70] Niegsch relied on the "real bad downside case" to dismiss the substantial concerns that ATK's "downside scenarios" did not sufficiently take into account the transaction and execution risks, yet Niegsch could not identify the "real bad downside case," and could not recall ever presenting it to, or discussing it with, the IC (or anyone else). Trial Tr. (10/17) at 136:24-139:24; Trial Tr. (10/19) at 101:13-18; PX 625.

reasonable for a "downside scenario," and notes that the assumption that Haggen could efficiently manage such a loss in sales defeats the very purpose of creating a "downside scenario" because it falsely suggests that there is little risk from a 5% decrease in sales. Trial Tr. (10/17) at 59:13-61:23, 62:7-12.

284.    But the most egregious omission was ATK's failure to take into account the deficiencies that ATK identified in Haggen's pricing capabilities. Caple told Hooper early on about the deficiencies in Haggen's pricing capabilities, and Hooper did not believe they had been corrected by the time ATK was terminated in early December. Yet, ATK never revised its projections to take the pricing risks into account, nor was it ever told to do so, even though those risks were foreseeable. Trial Tr. (10/20) at 147:18-25, 150:15-24, 154:1-12.

285.    In sum, the Court finds and determines that Comvest's base case projections were unreasonable, and caused the OpCo Entities to enter the Albertson's Acquisition undercapitalized, for the following reasons: (a) the projections incorporated ATK's flawed 4.9% same store sales growth rate for the first year; (b) putting aside the technical question of "resets" and conversions, ATK's case studies included four actual supermarket acquisitions where same store sales *contracted* by 10-30% following the transaction; (c) Niegsch's description of his "real bad downside case" showed that scenarios where Haggen faced "liquidity constraints" were foreseeable; and (d) while Comvest prepared a "downside case" case showing a contraction of sales by 5% in the first year, they made other adjustments to the assumptions to mitigate the impact such that Haggen still projected profits of nearly $50 million.

### B.  The Court Accepts as Credible MacGreevey's Opinion
###     that the OpCo Entities were Insolvent and Undercapitalized

286.    David MacGreevey offered expert testimony on Plaintiff's behalf concerning whether the OpCo Entities were insolvent and undercapitalized on the date of the APA (*i.e.,* December 10, 2014), and each day thereafter through the Petition Date.  Trial Tr. (10/18) at 5:14-19.  The OpCo Entities' solvency (and undercapitalization) is relevant to Plaintiffs' constructive fraudulent transfer claims,[71] as well as its claims for breach of fiduciary duty, equitable subordination, substantive consolidation, recharacterization, and unjust enrichment.[72]

287.    MacGreevey's ultimate conclusion is that the OpCo Entities were insolvent and undercapitalized as of the date of the APA and each day thereafter.  *Id.* at 7:19-8:2. For the reasons set forth below, the Court finds that MacGreevey was a credible witness; his methodologies are commonly accepted; and the bases for his opinions were sound.  The Court therefore credits his opinions as set forth herein and finds that the OpCo Entities were undercapitalized throughout the relevant time period.

288.    MacGreevey is well-qualified to offer his expert opinion on issues of insolvency.  He has spent more than fifteen years in the restructuring and finance arenas, including more than seven years in the restructuring group at Duff & Phelps (and its predecessor, Chanin Capital Partners), and two years in the Restructuring and Special Situations practice of Macquarie Capital, before joining Zolfo Cooper LLC ("Zolfo Cooper") in 2011.  MacGreevey has represented creditors and creditors' committees in a wide variety of cases and industries and

---

[71]  *See* Counts 21-27 and 29-38 of the Complaint.

[72]  *See* Counts 66-69 and 72-75.

has advised stakeholders on strategic transactions, including restructurings, mergers and

acquisitions, and capital raises.  Trial Tr. at (10/18) at 5:20-6:6; PX 106.064.

289.    Most pertinent here, MacGreevey testified that working with projections

and forecasts of future financial performance, including developing and critiquing projections,

business plans, and liquidity forecasts, is one of his and Zolfo Cooper's "key competencies."

MacGreevey has performed these services across a wide array of industries, including retail.

While MacGreevey has some experience in the grocery sector (in particular, as advisor to the

creditors' committee in A&P), he does not hold himself out as an expert in that industry.   Trial

Tr. (10/18) at 6:7-7:5.

290.    MacGreevey was asked to render his opinions in early 2017.  A team of

professionals at Zolfo Cooper assisted MacGreevey.  Together, they gathered and reviewed

information and spent "hundreds of hours" on the project.  Trial Tr. (10/18) at 10:23-12:8;

PX 106.067-71.  Ultimately, MacGreevey prepared a written report setting forth his opinions, the

methodologies utilized, and the bases for his opinions.  Trial Tr. (10/18) at 8:12-9:4; PX 106.

291.    MacGreevey utilized three common methodologies to perform his

insolvency analysis:  the cash flow test, the capital adequacy test, and the balance sheet test.

Trial Tr. (10/18) at 8:9-11.  As a starting point, MacGreevey used Comvest's final "base case"

projections and then made four adjustments described in his report and summarized below.  Trial

Tr. (10/18) at 12:9-13:4; PX 106.039.

292.    For the reasons set forth below, there can be no credible dispute that three

of MacGreevey's adjustments were appropriate.  The fourth – relating to projected same store

sales growth in the first year – was hotly contested.  As set forth above, Comvest's base case

incorporated ATK's 4.9% same store sales growth rate.  In contrast, MacGreevey's base case

assumed that same store sales would contract by 8.6% in the first year.  For the reasons set forth herein, the Court finds and determines that MacGreevey's assumption is far more credible under the circumstances and that as a result, the OpCo Entities were equitably insolvent and undercapitalized at all relevant times.

293.   <u>Store Acquisition Cadence</u>:  According to MacGreevey, Comvest's forecasts assumed that Haggen would begin acquiring stores during the first week of January 2015, even though Comvest knew as early as December 3, 2014, that the cadence would not begin until early to mid-February.  Consequently, MacGreevey made two adjustments to Comvest's base case concerning store cadence: (a) using the information available on December 3, 2014, MacGreevey assumed that the cadence would begin in mid-February, and (b) he used the actual sequence of store acquisitions on the basis that it reflected management's best thoughts as the way to sequence the stores.  According to MacGreevey, these adjustments impacted Comvest's forecasts because they appropriately deferred the time when Haggen could expect to begin benefitting from the expected store-by-store earnings.  Trial Tr. (10/18) at 13:6-14:16; PX 106.030.  By delaying the commencement of the cadence, store level EBITDA was reduced by $10 million.  Trial Tr. (10/18) at 16:19-17:3; PX 106.030.[73]  Based on the information available on December 3, 2014, and Montague's concession, the Court finds that MacGreevey's "store acquisition cadence" adjustment was appropriate.

294.   <u>Minimum Cash Balance</u>:  MacGreevey adjusted Comvest's model to take into account Haggen's minimum cash needs.  MacGreevey testified that "[w]e found that the Comvest model assumed that the business required zero operating cash on a daily basis and

---

[73] Montague agreed with the first part of MacGreevey's "store cadence" adjustment (pertaining to the change of the commencement of the cadence from early January to February based on the information available in December), but not the second (relating to MacGreevey's use of the actual store cadence).  Trial Tr. (10/18) at 28:9-29:22; PX 228.019-020.  MacGreevey quantified the difference between the point of agreement and the point of disagreement as between $2-3 million.  Trial Tr. (10/18) at 29:23-30:4.

that's just not possible, particularly in a retail industry.  We knew from prior experience that a

retail business would require a certain amount of cash on hand" and determined, based on his

review of certain materials, that $10 million was appropriate.  There is documentary support for

MacGreevey's opinions in this regard, and Caple admitted to the merits of this adjustment at

trial.  Trial Tr. (10/18) at 14:17-15:10, 30:5-19; Trial Tr. (10/16) at 166:9-24; PX 18.007.[74]

Based on the documentary and testimonial evidence, the Court finds that MacGreevey's

"minimum cash balance" adjustment was appropriate.

        295.   <u>Fixed Operating Expenses</u>:  According to MacGreevey, the Comvest

model improperly assumed that all store level operating expenses were variable; in

MacGreevey's opinion, this inflated Comvest's projections because it assumed that Haggen

could freely manage costs to meet fluctuations in sales and profits.[75]  Instead, based on

communications he reviewed between ATK and Comvest, MacGreevey concluded that 26% of

store-level expenses were fixed costs.  Trial Tr. (10/18) at 16:2-17; PX 106.035.  MacGreevey's

conclusion appears to be conservative, at least when measured against ATK's analysis.  PX

107.008 (ATK assumed that 30% of store operation expenses (including labor) would be fixed).

---

[74] Montague contends that MacGreevey's "minimum cash balance" adjustment is flawed because -- relying solely on the Debtors' First Day Affidavit -- it is allegedly "inconsistent with the Debtors' actual cash management system."  Trial Tr. (10/18) at 30:20-31:3; PX 228.021-022.  The Court rejects Montague's contention.  At trial, Caple expressly acknowledged the merit in MacGreevey's adjustment, testifying that a "business of this size just needs a certain amount of cash to operate, and so we needed about $10 million just to deal with, you know, what day payroll was paid versus this, that, and the other.  And so just -- and you'd have to have a ten-million-dollar minimum to get by," something that was as true in July (*see* PX 18.007) as it would have been in February.  Trial Tr. (10/16) at 166:7-24.

[75] In an apparent effort to contest MacGreevey's opinion in this regard, Hooper testified that labor is a variable expense because "many businesses will manage labor to a percent of sales."  Trial Tr. (10/20) at 103:19-104:16.  The Court suspects that in a perfect world, companies can manage their labor force in relation to the ebbs and flows of the business.  But projections viewed through the rose-colored glasses of a perfect world are, by definition, not reasonable.  In fact, the FTC was told that one of the reasons for Haggen's struggles was that "labor costs were out of whack."  FTC (Frangie) Tr. at 138:24-139:23, 145:12-146:2 (Haggen's "revenue as a percentage of store sales was what was out of whack, so they were seeking to reduce labor in order to get it into a more normal percentage of store sales.").  The Court concludes that it is unreasonable to assume that all labor costs are variable, and that companies can immediately "manage labor to a percent of sales."

Consequently, the Court concludes that MacGreevey's "fixed operating expense" adjustment to Comvest's projections was appropriate.

296.    <u>Same Store Sales Growth</u>:  According to MacGreevey, Comvest's model assumed same store sales growth of +4.9% in the first year; he adjusted it to -8.6%.  Trial Tr. (10/18) at 15:18-16:1; PX 106.033-034.  This is the issue of greatest dispute.

297.    MacGreevey's change to same store sales growth was largely based on his interpretation of ATK's analysis.  As set forth above, ATK provided advice to Comvest that same store sales growth would depend on the timing of conversions and "resets."  MacGreevey believed that ATK's advice "was fairly clear and that the period between banner conversion and when the company was able to complete its full resets, there would be an array of negative sales comps.  And once the full resets were complete, there would be a positive impact in sales and a positive bump there."  Based on his review of the available information, MacGreevey "observed that the company did not provide a sufficient budget or really any intention to complete full resets through the end of 2015" so he relied on ATK's "data that applied from the banner conversion through full reset for 2015."  Trial Tr. (10/18) at 17:10-18:6; PX 106.114

298.    Specifically, MacGreevey used ATK's "pre-renovation impact" based on his (a) conclusion that Haggen's store-level conversion budgets were insufficient to include the cost of resets, and (b) review of presentations, data, and case studies that ATK provided to Comvest.  Trial Tr. (10/18) at 18:9-19:11; PX 106.114.

299.    Haggen's store-level conversion budgets justified MacGreevey's use of ATK's "pre-renovation impact" same store sales growth of -8.6%.  As described by MacGreevey, the construction budgets ranged from $75,000-$628,000 per store, with $75,000 (Genser's "lipstick on the pig" budget) allocated to 25% of the stores Haggen was acquiring.

Trial Tr. (10/18) at 19:13-21:14; DX 240 (excerpt used at trial during MacGreevey's direct examination).

300.    MacGreevey relied on ATK's case studies and analyses to assess what those construction dollars would yield.  According to ATK's report, a store "refresh" constituted an overnight "clean up" that included "paint, minor fixture upgrades, new banner[s], [and] signage," and cost in the range of $500,000-$750,000.  As MacGreevey observed, a quarter of the stores to be acquired had construction budgets amounting to a small fraction of the "refresh" budget leading to MacGreevey to conclude that those stores could expect "minimal" renovation; MacGreevey also observed that even the highest budget (*i.e.,* $628,000) would only fall within the range of "refresh" and would not qualify as "minor remodels" under ATK's case studies. Trial Tr. (10/18) at 21:16-23:13; PX 138.002.

301.    MacGreevey's conclusion that Haggen planned to conduct resets after store conversions was further informed by other information in ATK's reports.  In particular, ATK provided an analysis that showed that the "time to reset" (measured in months) would be three to four months in the Northwest, and four to ten months for the Southern California locations, bolstering MacGreevey's conclusion that Haggen planned to conduct "resets" long after the store conversions were completed.  Trial Tr. (10/18) at 23:14-25:2; PX 107.027.

302.    Taking the four adjustments into account, MacGreevey concluded that the OpCo Entities "failed both the cash flow test, as well as the capital adequacy test."  Trial Tr. (10/18) at 33:14-34:14; PX 106.010.  The Court accepts and adopts this conclusion as reasonable and finds that the OpCo Entities were equitably insolvent and undercapitalized throughout the relevant time period. [76]

---

[76] The Court notes that, although MacGreevey assumed that sales would contract by 8.6% in his "base case," he also opined that (a) "downside scenarios" of -15% and -20% same store sales growth were reasonably foreseeable, and

C.    **Montague's Criticisms of MacGreevey's Opinions are Without Merit**

303.    Defendants' rebuttal expert, Kevin Montague, tried to attack MacGreevey for relying on ATK's "2x2" matrix relating to "resets" and store conversions.  *See* PX 107.024.  Specifically, Montague asserted that MacGreevey utilized "this matrix as the primary basis for his same store sales adjustments."  Trial Tr. (10/18) at 26:5-12; PX 228.011.  Montague's criticism in this regard is misplaced.  MacGreevey testified that the "2x2" matrix was an illustration created by ATK, but that he "didn't use" and "did not rely on this illustration."  Trial Tr. (10/18) at 23:14-24:16, 26:5-12.  Instead, MacGreevey "used the underlying data [set forth on PX 106.114] which is required to build the model properly."  *Id.* at 26:5-12.

304.    Montague also criticizes MacGreevey's analysis because it deviates from Comvest's projections, and he asserts those projections were "reviewed, analyzed, and relied upon" by certain third parties including the FTC, PNC, and the SLB counterparties.  Trial Tr. (10/18) at 26:13-27:24; PX 228.012, .025-030.[77]  Like the Defendants, Montague assumes too much.  As described above, in the absence of actual evidence (which could have been obtained during discovery), the Court will not equate a third party's decision to pursue a particular transaction for its own self-interest as its validation of Comvest's business plans or projections -- particularly where, as here, each of the parties entered into the transaction with their own

---

(b) the OpCo Entities would have been insolvent with just -2.2% same store sales growth.  Trial Tr. (10/18) at 33:21-36:4.  This "sensitivity analysis" bolsters the Court's conclusion that MacGreevey's analysis is reasonable because, based on the totality of the evidence, a same store sales growth rate of -2.2% is extremely conservative under the circumstances.  Moreover, measured against Haggen's actual results -- sales down 20-30% (as in two of ATK's case studies), and EBITDA off almost $100 relative to projections (PX 106.024) -- MacGreevey's forecast looks extremely conservative.

[77]  The Court notes that Montague seems to have "cherry picked" certain information from the relevant analyses prepared by the third-parties, and omitted completely the extensive risks they identified and the rationales provided from pursuing the transactions in spite of such risks (all of which are described below).  *Compare* PX 228.029 (Montague identifies four reasons for PNC's entry into the ABL) *with* PX 369.004 (PNC lists six justifications).

interests protected from the numerous risks that had been presented, including the risk that

"Haggen runs out of liquidity."[78]

## PROPOSED CONCLUSIONS OF LAW

### I.   **Burden of Proof**

305.   Plaintiff must prove each Count of the Complaint by a preponderance of

the evidence:

306.   Fraudulent transfers under Bankruptcy Code section 548(a)(1): *See*

*Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp.*

*Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 211 (3d Cir. 2006); *Brown v.*

*General Electric Capital Corp. (In re Foxmeyer Corp.)*, 286 B.R. 546, 572 (Bankr. D. Del.

2002).[79]

307.   Fraudulent transfers under Bankruptcy Code section 544(b) and the

Applicable State Statutes:  *See* Wash. Rev. Code § 19.40.041(3); *Morris v. Nance*, 132 Or. App.

216, 223, 888 P.2d 571, 576 (1994); *Viscount Air Servs., Inc. v. Cole (In re Viscount Air Servs.,*

*Inc.)*, 232 B.R. 416, 433 (Bankr. D. Ariz. 1998); Cal. Civ. Code § 3439.04(c).

308.   Recharacterization:  *See Cohen v. KB Mezzanine Fund II, LP (In re*

*SubMicron Sys. Corp.)*, 432 F.3d 448, 458 (3d Cir. 2006); *JPMCC 2007-CIBC 19 East*

*Greenway LLC v. Bataa/Kierland, LLC* (*In re Bataa/Kierland, LLC*), 517 B.R. 155, 159 (D.

Ariz. 2014).

---

[78]  Indeed, as MacGreevey points out, there is no evidence that the third-parties received any of the information he relied upon, or that any of them had an opportunity to consider alternative views like his.  Trial Tr. (10/18) at 26:16-27:24.

[79]  This Court declines to require the clear and convincing standard for causes of action brought pursuant to Bankruptcy Code section 548(a)(1)(A) based on *Grogan v. Garner*, 498 U.S. 279, 291 (1991) (applying the preponderance standard in an action to determine the non-dischargeability of a debt for fraud under Bankruptcy Code section 523(a)(2)).  For the reasons set forth by the Supreme Court in *Grogan*, this Court applies the preponderance of the evidence standard to the claims brought by Plaintiff under section 548(a)(1)(A).  *See also Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 587 n.11 (Bankr. N.D. Ill. 2005).

309.    <u>Equitable Subordination</u>: *See Burtch v. Opus, LLC (In re Opus East, LLC)*, 528 B.R. 30, 105 (Bankr. D. Del. 2015) ("<u>Opus East</u>"); *Jahn v. Bacon (In re East Tech Co.),* 528 B.R. 743, 756 (Bankr. E.D. Tenn. 2015); *In re Diwan, L.L.C.*, 2013 Bankr. LEXIS 5630, *19 (Bankr. D. Iowa July 16, 2013); *In re French Quarter, Inc.*, 2012 U.S. Dist. LEXIS 44476, *9 (D. Nev. March 30, 2012).

310.    <u>Substantive Consolidation</u>: *See In re Introgen Therapeutics*, 429 B.R. 570, 582 (Bankr. W.D. Tex. 2010); *In re Affiliated Foods, Inc.,* 249 B.R. 770, 775 & 790 n.5 (Bankr. W.D. Mo. 2000); *In re ADPT DFW Holdings, LLC*, 2017 Bankr. LEXIS 3326, *34 (Bankr. N.D. Tex. Sept. 29, 2017).

311.    <u>Unjust enrichment</u>: *See Triton Constr. Co. v. Eastern Shore Elec. Servs., Inc.*, 2009 Del. Ch. LEXIS 88, *84 (Del. Ch. May 18, 2009); *Concord Agency, Inc. v. New Castle Ins. Agency, Ltd.*, 2015 Del. C.P. LEXIS 81, *12 (Del. C.P. Aug. 31, 2015); *Doukas v. La Babola Bakery & Rest., LLC*, 2007 Del. Super. LEXIS 228, *9 (Del. Super. July 30, 2007).

312.    <u>Breach of fiduciary duty</u>: *See Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.)*, 471 B.R. 354, 375 (Bankr. D. Del. 2012); *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 756-57 (Del. Ch. 2005); *Heller v. Kiernan*, 2002 Del. Ch. LEXIS 17, *9 (Del. Ch. Feb. 27, 2002) .

## II.    <u>Actual Fraudulent Transfer Claims (Counts 1, 3, 6, 9, 11, 14, 17, 20, 22, 25, 28, 30, 33, 36, 39, 41, 44, 47, 50, 53, 56, 58, 61, 64)</u>

### A.    <u>Collapsing and Substantive Consolidation as a Remedy</u>

313.    "'Where there is harm, the law provides a remedy.'" *Thabault v. Chait*, 541 F.3d 512, 522 (3d Cir. 2008) (quoting *NCP Litigation Trust v. KPMG*, 945 A.2d 132, 144 (N.J. Sup. 2007). The bankruptcy court has wide latitude to fashion an appropriate and equitable remedy where property of the debtor has been fraudulently transferred. *Duffield Assocs. v.*

*Lockwood Bros.*, LLC, 2017 Del. Ch. LEXIS 121 (Del. Ch. July 11, 2017).  The overarching

goal in applying these remedies is "to put a creditor in the position she would have been in had

the fraudulent transfer not occurred. This principal stems from the concept that the recipient of a

fraudulent transfer holds the asset in constructive trust for creditors . . ." *August v. August*, 2009

Del. Ch. LEXIS 21, *33 (Del. Ch. Feb. 20, 2009), *aff'd*, 65 A.3d 616 (2013).

314.    As a preliminary matter, the Court will address "collapsing" because this

determination affects all of Plaintiff's causes of action for avoidance of fraudulent transfers made

with actual intent to hinder, delay or defraud as well as its claim for substantive consolidation,

addressed *infra*.  Whether by substantive consolidation or avoiding the component transactions

of the Albertson's transaction, the Committee's aim in this litigation is to reunite the acquired

assets into the Debtors' estates for the ultimate benefit of the Debtors' creditors before Holdings'

equity owners obtain any recovery.  This aim is entirely consistent with the goal and purpose of

Chapter 11.[80]

315.    Plaintiff alleged and at trial established by a preponderance of the

evidence that Comvest developed and implemented a scheme to balkanize the assets being

acquired from Albertson's.  The intent of this scheme was to transfer some of the acquired real

estate assets into newly-formed PropCo Entities for Comvest's benefit and use the rest to finance

the transaction by way of sale leaseback transactions.  As Comvest knew and intended, if the

venture succeeded, Comvest would reap the benefits in the form of dividends and cash flow.

---

[80]  Pursuant to its equitable powers, a bankruptcy court may, under certain circumstances, order the substantive
consolidation of debtor and non-debtor entities. Bankruptcy Code section 105(a) provides, "The court may issue any
order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of
this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua
sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders
or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

And if it failed, Comvest expected to retain over $100 million in real estate, because those assets would be beyond the reach of the OpCo Entities' creditors.

316.    Comvest's self-serving scheme left the OpCo Entities' undercapitalized and led to Haggen's cataclysmic failure.  Just months after the last store was acquired, Holdings and the OpCo Entities (but not the Comvest Entities which Comvest kept out of the bankruptcy filings) entered chapter 11 and thereafter underwent a complete, piecemeal liquidation.  The consequences were devastating, as Haggen's failure led to scores of supermarket closings, thousands of employees losing their jobs, and unsatisfied liabilities of more than $100 million owed to the OpCo Entities' creditors, including hundreds of small and large vendors, taxing authorities, employees, pension and benefit funds and others, left with no source of payment, while Comvest hopes to not only escape liability for all of this destruction but also to take home a $40 million dividend.

317.    The Court finds that this contrived effort engineered by Comvest to place over $100 million of unencumbered real estate into the PropCo Entities, beyond the reach of and to the detriment of the OpCo Entities' present and future creditors while undercapitalizing the OpCo Entities in reliance on unavoidable projections, constitutes an actual fraudulent transfer. The avoidance remedies this Court may impose under § 550 of the Code include avoiding the transfers, as well as disregarding the newly-formed PropCo and OpCo entities, substantively consolidating Holdings and all of its direct and indirect subsidiaries into a single entity, and holding Comvest liable to the estates as the entity for whose benefit these transfers were made equal to the value of all the transfers.

318.    Relying on this Court's decision in *Mervyn's, LLC v. Lubert-Alder Group IV, LLC (In re Mervyn's Holdings, LLC),* 426 B.R. 488 (Bankr. D. Del. 2010) ("*Mervyn's*"),

which the Court finds is factually similar to this case in many material respects, Plaintiff asks the

Court to disregard the artifices employed by Comvest in favor of the economic realities, and to

grant relief, *inter alia*, avoiding the transfers made by consolidating Holdings, the PropCo

Entities and the OpCo Entities into a single entity, Holdings.  Because, as discussed below,

Plaintiff has established the requisite elements of its claims for relief for actual fraudulent

transfer under section 548(a)(1) of the Bankruptcy Code, and section 544(b) of the Code and

state law analogs to section 548(a)(1), and considering the economic substance of the

transactions instead of their form, the Court concludes that consolidating these entities and

disregarding the many component elements of the transactions employed by Comvest in the

scheme is well within the Court's authority, and under the circumstances is warranted and

appropriate.

        319.    Comvest alone decided how much of the real estate to contribute to the

SLB's to fund payment of the purchase price to Albertson's and how much to secrete away in the

PropCo Entities for itself.  Comvest created the PropCo/OpCo structure for its own benefit and

devised unreasonable projections that left the OpCo Entities undercapitalized and masked their

true liquidity needs, leading to Haggen's catastrophic failure.  As a court of equity, the Court will

set aside and disregard the numerous transfers, Contribution Agreements, PropCo Leases and the

PropCo Advance and related agreements by consolidating all of Holdings' subsidiaries into

Holdings and thereby reunifying the assets and liabilities of Holdings into a single, integrated

entity.[81]  By granting this relief, the assets that Comvest sought to shield in the PropCo Entities

will be made available to unpaid creditors of the OpCo Entities, the only creditors facing

impairment, instead of being returned to Comvest via Holdings as a dividend.

---

[81]  This relief is consistent with the equitable maxim that equity considers that to have been done which should have been done.  *See generally Emmons Coal Mining Corp. v. Sir R. Ropner & Co.*, 31 F.2d 948, 950 (3d Cir. 1929).

320.    The Court holds that this remedy is well-grounded in fraudulent transfer law, which prioritizes substance over form.  The Third Circuit has recognized the propriety of analyzing highly complex transactions with multiple, interrelated component parts, as here, and treating them as one integrated transaction for the purpose of assessing a defendant's fraudulent transfer liability.  *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986); *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212-13 (3d Cir. 1990).  Where a series of transactions are all part of one integrated transaction, the Court may look "beyond the exchange of funds" in one transaction and consider the "aggregate transaction." *Tabor*, 803 F.2d at 1300, 1302.

321.    To determine whether a series of transactions should be "collapsed" and viewed as a single integrated transaction, courts focus on the substance rather than on the form of the individual transactions and the overall intent and impact of the transactions.  Even where the transactions are structurally independent and distinct, courts may apply collapsing by focusing their analysis "not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction."  *Off'l Comm. of Unsec. Credits v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)*, 274 B.R. 71, 91 (D. Del. 2002) (citations omitted); *see also Orr v. Kinderhill Corp.*, 991 F.2d 31, 35-36 (2d Cir. 1993); *Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In  re Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537, 546 (D. Del. 2005), *aff'd*, 278 F. App'x. 125 (3d Cir. 2008); *Rosener v. Majestic Management, Inc. (In re OODC, LLC)*, 321 B.R. 128, 138 (Bankr. D. Del. 2005).  ("In deciding whether to 'collapse' a series of transactions into one integrated transaction, the issue is not whether there was common ownership on both sides of the transaction or whether the transfer was a stock or an

asset sale, but rather whether there was an overall scheme to defraud the estate and its creditors by depleting all the assets through the use of a leveraged buyout.").

322.    The passage of time between the various transactions is not fatal if they are sufficiently related.  *See Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 795-96 (7th Cir. 2009); *Orr*, 991 F.2d at 35; *Kipperman v. Onex Corp*., 411 B.R. 805, 837 (N.D. Ga. 2009). "Neither time nor transactional formalities can shield a party involved in such a series of transactions." *Off'l Comm. of Unsec Credits. v. CIT Group/Business Credit, Inc. (In re Jevic Holding Corp.),* 2011 Bankr. LEXIS 3553, at *20-21 (Bankr. D. Del. Sept. 15, 2011).

323.    In considering whether to collapse multiple transactions, courts consider three factors:  (1) whether all of the parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own, and (3) whether each transaction was dependent or conditioned on the other transaction.  *Mervyn's,* 426 B.R. at 497; *In re Tribune Co,* 464 B.R. 126, 165 (Bankr. D. Del. 2011).  This is the so-called "Integrated Transactions Test."  Finally, the Court must also consider "the overall financial consequences the transactions have had on creditors."  *Mervyn's*, 426 B.R. at 497.

324.    The Committee has established each element of the Integrated Transactions Test by a preponderance of the evidence.  First, Plaintiff established that Comvest controlled Haggen, that Comvest and Haggen knew of and approved each of the Integrated Transactions, and that the transactions were managed by Mr. Caple and Mr. Niegsch.  (FOF 22-25, 43-45, 137).

325.    Second, Plaintiff established that none of the Integrated Transactions would have occurred on its own.  (FOF 109-136).

326.    Third, Plaintiff established that each of the Integrated Transactions was conditioned or dependent on one another:  (a) the corporate structure was created in anticipation of the Albertson's Acquisition; and (b) the transfers of the rights to acquire the real property and the PropCo Leases could not have been effectuated without, and were therefore dependent on, the creation of the corporate structure, the execution of the APA, and the Contribution Agreements.  (FOF 99-108, 109-136).

327.    Fourth, Plaintiff established that the transactions had a disastrous effect on creditors.  Haggen was a supermarket chain with hundreds of vendors and thousands of employees.  As a result of the Integrated Transactions devised by Comvest, Haggen's insider equity owners stand to recover almost $40 million while Haggen's outside creditors who are owed over $100 million face the prospect of recovering nothing.

328.    The Court notes that this case closely resembles *Mervyn's*, but that case settled before trial and the Court was not called upon to formulate appropriate remedies. Nonetheless, the parallels between this case and *Mervyn's* are striking.  In both cases, private equity firms acquired a large number of retail stores that pre-acquisition were conducted on real estate owned by the sellers, but in conjunction with the acquisition they separated the real estate and the operations into a PropCo/OpCo structure only to see the operating entities later fail and enter bankruptcy.  (In *Mervyn's*, the debtors sought bankruptcy protection almost four years after the transaction whereas here, Haggen filed for bankruptcy (a) ten months after the APA was signed; (b) three months after acquiring the last store; and (c) 18 days after the PropCo Advance was fully funded).

329.    In both cases, private equity firms used the debtors' real estate assets to fund their purchase of the company; in *Mervyn's* loans against the real estate were employed in a

more typical leveraged buyout structure whereas here, unusual sale-leasebacks of the acquired

real properties were used to fund the purchase price.  In both cases, the private equity firms

placed some of the acquired real estate into PropCo entities with the intention of putting those

assets beyond the reach of present and future operational creditors of the acquired retail stores.

In this case, Comvest did so but in reliance on its unreasonably optimistic projections, failed to

adequately capitalize the OpCo Entities.

       330.    Defendants' attempts to distinguish *Mervyn's* are unpersuasive.

Defendants argue that collapsing should not apply in this case because: (1) Holdings never

owned the real estate and the operating assets, (2) the Albertson's Acquisition left the OpCo

Entities "flush with working capital and assets," and (3) the real estate assets in PropCo Entities

are available to satisfy the obligations of Holdings' creditors.  None of these arguments have

merit.

       331.    Comvest's assertion that Holdings never owned the real estate assets and

the operational assets is misplaced.  Holdings was the lone signatory to the Albertson's APA of

and thus only entity with the right to acquire the real estate.  As part of its scheme and "real

estate play," Comvest caused Holdings to set up intermediary entities to take ownership of the

various assets by way of form Contribution Agreements in order to separate the operational

liabilities from the real estate assets, and place a substantial amount of the acquired real estate

into the PropCo Entities beyond the reach of creditors of the OpCo Entities, evidencing

Comvest's and Holdings' requisite intent.  As the court stated in *Guiliano v. Schnabel,* in which

it refused to dismiss a collapsing claim:

> The creation of an intermediary corporation does not insulate the
> defendants from liability for fraudulent transfers.  Additionally, the
> Third Circuit has held that a fraudulent transfer can occur when
> employees, customer base, and physical assets are subsumed by

> another entity. The circumstances surrounding the debtor's demise
> and the new entity's ascendance matter more than the classification
> of each transfer. "[I]f one acts with knowledge that creditors will
> be hindered or delayed by a transfer but then intentionally enters
> the transaction in disregard of this fact, he acts with actual intent to
> hinder and delay them.

2017 Bankr. LEXIS 2023, *35 (Bankr. D. Del. July 20, 2017).

332.    Under these circumstances, the Court concludes that it is appropriate to undo the effects of and avoiding the actual fraudulent transfers made by consolidating Holdings and all of its direct and indirect subsidiaries into a single entity,[82] as well as holding Comvest liable as an intended beneficiary of the various transfers.[83]  Further support for granting the relief of consolidating all of Holdings debtor and non-debtor subsidies into it is discussed below in the discussion of Plaintiff's separate claim for relief seeking substantive consolidation, which will be granted as well.

333.    Having determined to consolidate Holdings with all of its direct and indirect subsidiaries, the Court finds and concludes that Holdings on a consolidated basis Holdings is insolvent and therefore rejects the Defendants' argument that no avoidance claims can be brought on its behalf because there would be no benefit to creditors.

---

[82]  This is not the exclusive remedy as the estates have claims against Comvest to recover the value of fraudulent transfers made for its benefit which well exceed the residual value of the PropCo Entities' assets.

[83]  In this regard, the Court concludes that under section 550(a)(1) of the Bankruptcy Code, (a) the transfers of the PropCo Properties to the PropCo Entities were made for Comvest's benefit as it was Comvest's plan to upstream the value of the properties to itself as Holdings' owner, and (b) the transfers of the SLB Properties to the SLB Entities to be used in a sale leaseback transaction to fund the purchase price paid to Albertson's were made for Comvest's benefit, in much the same way that in a conventional leveraged buyout, the loans taken out against the target company's assets and the liens granted thereon are transfers made for the benefit of the LBO sponsors who would otherwise have to infuse capital to pay the purchase price.  Similar claims were made against the private equity sponsors of the leveraged transaction challenged in *Mervyn's*.  In either case, the party for whose benefit the transfer is made is liable regardless of the fact that it may not have actually received the transferred property.  *See Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 313 (Bankr.S.D.N.Y. 1999) (A benefit can occur "without the beneficiary ever holding the money or property . . . .").

**III.    Plaintiff Established all of the Elements of Actual Fraudulent Transfer Claims Related to the Owned Properties**

334.    Plaintiff has asserted a litany of actual fraudulent transfer claims under section 548(a)(1)(A) of the Code and section 544(b) of the Code and the laws of the applicable states where affected properties were located, and has established each of the requisite elements of those claims.

**A.    Counts Under Federal Law (11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 550)[84]**

335.    The transfers of the Owned Properties to the PropCo Entities are avoided pursuant to 11 U.S.C. § 548(a)(1)(A).

336.    Bankruptcy Code section 548(a)(1)(A) provides, in pertinent part, "(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily -- (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A).

337.    Accordingly, the Committee must establish, by a preponderance of the evidence that the following elements have been met: (a) Holdings had an interest in the Owned Properties; (b) Holdings transferred its interests in the Owned Properties within two years before the Petition Date, and (c) Holdings made the transfers with actual intent to hinder, delay, or defraud any present or future creditor.

---

[84]  These conclusions apply to Count 1 (Against PropCo North and Comvest) (Avoidance of Transfer of the PropCo North Owned Properties to PropCo North) and Count 9 (Against PropCo South and Comvest) (Avoidance of Transfer of the PCS Owned Properties to PropCo South).

338. The Committee has met its burden of proof as to each element as to Holdings' transfer of the Owned Properties to the PropCo Entities.

### a.    Holdings' Interest in the Owned Properties

339. Property subject to the fraudulent transfer provisions is best understood as property that would have been property of the Debtors' estates had it not been transferred before the commencement of the bankruptcy cases. *See Begier v. IRS*, 496 U.S. 53, 59 (1990) (applying definition in context of preferential transfer provisions).

340. Holdings acquired the fee simple interest in each of the Owned Properties pursuant to the APA executed on December 10, 2014. (FOF 110).

341. As owner of the fee simple interest in each of the Owned Properties, Holdings had an interest in each of the Owned Properties for the purpose of Bankruptcy Code section 548(a)(1)(A).

### b.    The Transfer of Holdings' Interest in the Owned Properties Within Two Years of the Petition Date

342. Bankruptcy Code section 101(54)(D) defines "transfer" as, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D).

343. A "transfer" is made when it becomes valid as against a subsequent bona fide purchaser under applicable nonbankruptcy law. 11 U.S.C. § 548(d)(1).

344. Holdings transferred the fee simple interest in each of the PropCo North Owned Properties to PropCo North pursuant to an applicable Contribution Agreement within two years of the Petition Date. Specifically, each of the PropCo North Owned Properties was transferred by Holdings to PropCo North between December 10, 2014 and the Petition Date. (FOF 110, 132).

345. Holdings transferred the fee simple interest in each of the PCS Owned Properties to PropCo South pursuant to an applicable Contribution Agreement within two years of the Petition Date. Specifically, each of the PCS Owned Properties was transferred by Holdings to PropCo South between December 10, 2014 and the Petition Date. (FOF 110, 132).

346. Accordingly, Holdings transferred its interests in each of the Owned Properties within two years of the Petition Date for the purpose of Bankruptcy Code section 548(a)(1)(A).

### c.    Holdings' Intent to Hinder, Delay or Defraud

347. With respect to whether Holdings transferred the Owned Properties to the PropCo Entities with the "actual intent to hinder, delay or defraud" the Debtors' creditors, the requirement is in the disjunctive. Any one of the three intents -- intent to hinder, intent to delay or intent to defraud -- is sufficient for liability. *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC),* 396 B.R. 810, 826 (Bankr. S.D.N.Y. 2008) ("The malicious intent sufficient to support a cause of action is set forth in the disjunctive-a plaintiff may avoid the transfer where it was made with intent 'to hinder, delay, or defraud,'") (citation omitted) *rev'd on other grounds*, *Christian Bros. High School Endowment v. Bayou No Leverage Fund LLC (In re Bayou Group, LLC)*, 439 B.R. 284 (S.D.N.Y. 2010). Plaintiff is not required to prove that Holdings intended to hinder, delay or defraud any particular creditor. *Id.* at 826. Neither is Plaintiff required to establish that creditors suffered actual harm (though they did in this case). Plaintiff must show only that Holdings acted with the intent to hinder, delay or defraud. *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 n.6 (8th Cir. 1995).

348. The Bankruptcy Code does not define "intent." In the absence of such definitions, courts may look to the Restatement (Second) of Torts for guidance. *U.S. Securities and Exchange Comm. v. Bocchino (In re Bocchino)*, 794 F.3d 376, 381 (3d Cir. 2015). The

Restatement (Second) of Torts states that the word "intent" is used "to denote that the actor

desires to cause the consequences of his act or that he believes that the consequences are

substantially certain to result from it." Restatement (Second) of Torts, § 8A (Am. Law Inst.

1975). If one acts with knowledge that creditors will be hindered or delayed by a transfer but

then intentionally enters the transaction in disregard of this fact, he acts with actual intent to

hinder and delay them. *Guiliano v. Schnabel,* 2017 Bankr. LEXIS 2023, *35.

349.   The Court may rely on circumstantial evidence to infer the requisite intent.

*In re Hechinger Inv. Co. of Del., Inc.*, 327 B.R. at 550. In doing so, courts look to whether a

collection of "badges of fraud" are present. *See Dobin v. Hill (In re Hill),* 342 B.R. 183, 198

(Bankr. D.N.J. 2006). These "badges of fraud" include, but are not limited to: (1) the

relationship between the debtor and the transferee; (2) consideration for the conveyance; (3)

insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred;

(5) reservation of benefits, control or dominion by the debtor over the property transferred; and

(6) secrecy or concealment of the transaction. *Off'l Comm. of Unsec. Credits. of Fedders N.*

*Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545

(Bankr. D. Del. 2009). While the insolvency of the transferor may be relevant as one badge of

fraud, section 548(a)(1)(A) does not require proof of the transferor's insolvency. *Grochocinski*

*v. Schlossberg (In re Eckert),* 388 B.R. 813, 830 (Bankr. N.D. Ill. 2008).

350.   The presence or absence of any single badge of fraud is not conclusive,

and a court may consider other factors relevant to the transaction. *In re Fedders N. Am., Inc.*,

405 B.R. at 545. Although the presence of a single factor may cast suspicion on the transferor's

intent, the confluence of several in one transaction may provide conclusive evidence of an actual

intent to hinder, delay or defraud. *In re Hill*, 342 B.R. at 198-99. It is sufficient for Plaintiff to

demonstrate that Holdings acted under circumstances that preclude any reasonable conclusion other than that the purpose of the transfer was fraudulent as to creditors.  *In re Bayou Grp.*, *LLC*, 396 B.R. at 827.

351.    As is set forth extensively through the Findings of Fact, Holdings (acting through Comvest) transferred each of the Owned Properties to the PropCo Entities with the intent to hinder the Debtors' creditors and with the intent to delay the Debtors' creditors.  The Court also finds that actual intent to hinder or delay can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest (FOF 22, 23-26, 29-32); Comvest dominated and controlled the parties to the applicable Contribution Agreements (FOF 44-45, 137); (b) the Owned Properties were transferred to the PropCo Entities, who are insiders by virtue of the fact that they are indirectly owned by Holdings (FOF 15-18); (c) Holdings retained control of the Owned Properties after the transfers (FOF 15-18); (d) the direct or indirect transfer of the Owned Properties from Holdings to the PropCo Entities was not publicly disclosed (FOF 79, 138-142); (e) the Contribution Agreements were not the subject of arms' length negotiations (FOF 31-32, 110-121); (f) the PropCo Entities provided no consideration to Holdings for the Owned Properties (FOF 112); (g) the same person, Derrick Anderson, signed each applicable Contribution Agreement on behalf of eight different parties even though not all of the eight parties had an interest in each transfer effectuated by each Contribution Agreement (FOF 111); (h) the Debtors, in particular the OpCo Entities were undercapitalized and insolvent or became insolvent shortly after Holdings transferred the Owned Properties to the PropCo Entities (FOF 286-304); and (i) Comvest created this structure with the intent of keeping the assets and liabilities of the PropCo Entities separate from the assets and liabilities of the OpCo Entities so that the PropCo

Entities would have (j)unencumbered real estate appraised at $117 million, and (k) annual cash flow of $13 million (pursuant to the PropCo Leases), all for the benefit of Holdings' equity holders.   (FOF 54, 99-108)

352.     Accordingly, Plaintiff has established, by a preponderance of the evidence, that: (a) Holdings had an interest in the Owned Properties; (b) Holdings transferred its interests in the Owned Properties within two years before the Petition Date; and (c) Holdings made the transfers with actual intent to hinder, delay or defraud creditors.

### B.     Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law[85]

353.     The transfers of the Owned Properties to the PropCo Entities are avoided pursuant to 11 U.S.C. § 544(b) and Wash. Rev. Code § 19.40.041(1)(a) (Count 3), Or. Rev. Stat. § 95.230(a)(1) (Count 6), Ariz. Rev. Stat. § 44-1004(A)(1) (Count 11), Nev. Rev. Stat. § 112.180(1)(a) (Count 14), and Cal. Civ. Code § 3439.04(a)(1) (Count 17).

354.     Bankruptcy Code section 544(b) provides, in pertinent part, that "[e]xcept as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."  11 U.S.C. § 544(b)(1).  The real properties transferred by Holdings were located in the states of Washington, Oregon, Arizona, Nevada, and

---

[85]   These conclusions apply to Count 3 (Against PropCo North and Comvest) (Avoidance of Transfer of the PropCo North Washington Properties to PropCo North), Count 6 (Against PropCo North and Comvest) (Avoidance of Transfer of the PropCo North Oregon Properties to PropCo North), Count 11 (Against PropCo South and Comvest) (Avoidance of Transfer of the PCS Arizona Properties to PropCo South), Count 14 (Against PropCo South and Comvest) (Avoidance of Transfer of the PCS Nevada Properties to PropCo South), and Count 17 (Against PropCo South and Comvest) (Avoidance of Transfer of the PCS California Properties to PropCo South).

California, each of which has an actual fraudulent transfer status, the requisites for which are substantially identical.

355.    Washington Revised Code section 19.40.041(1)(a) provides, in pertinent part:  "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay, or defraud any creditor of the debtor . . . ."  Wash. Rev. Code § 19.40.041(1)(a).

356.    Oregon Revised Statute section 95.230(a)(1) provides, in pertinent part: "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay, or defraud any creditor of the debtor . . . ."  Or. Rev. Stat. §95.230(a)(1).

357.    Arizona Revised Statutes section 44-1004(A)(1) provides, in pertinent part:  "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation under any of the following: (1) With actual intent to hinder, delay or defraud any creditor of the debtor. . . ."  Ariz. Rev. Stat. § 44-1004(A)(1).

358.    Nevada Revised Statutes section 112.180(1)(a) provides, in pertinent part: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation under any of the following: (1) With actual

intent to hinder, delay or defraud any creditor of the debtor. . . ."  Nev. Rev. Stat. § 112.180(1)(a).

359.    California Civil Code section 3439.04(a)(1) provides, in pertinent part: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: (1) With actual intent to hinder, delay or defraud any creditor of the debtor. . . ."  Cal. Civ. Code § 3439.04(a)(1).

360.    The applicable state fraudulent transfer laws are substantially similar not only to each other but also to section 548(a)(1)(A) of the Bankruptcy Code, and for the reasons set forth above, the Court concludes that Plaintiff has established, by a preponderance of the evidence that the following elements have been met: (a) Holdings had an interest in the Owned Properties; (b) Holdings transferred its interests in the Owned Properties within four years before the Petition Date; and (c) Holdings made the transfers with actual intent to hinder, delay, or defraud any present or future creditor.

## IV.    Actual Fraudulent Transfer Claims Related to the SLB Properties

361.    The transfers of the SLB Properties to the SLB Entities also gives rise to actual fraudulent transfer claims under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code.  While the Plaintiff does not seek recovery avoiding the SLB transactions, Plaintiff has established that the transfer of the SLP Properties was an avoidable transfer made for Comvest's benefit, thereby entitling the Plaintiff to a judgment against Comvest for the value of the SLB Properties transferred by Holdings for Comvest's benefit.

A.    **Counts Under Federal Law (11 U.S.C. § 548(a)(1)(A)**[86]

362.    As is set forth below, Plaintiff has established, by a preponderance of the

evidence, that the following elements required by 11 U.S.C. § 548(a)(1)(A) have been met: (a)

Holdings had an interest in the SLB Properties; (b) Holdings transferred its interests in the SLB

Properties within two years before the Petition Date; and (c) Holdings made the transfers with

actual intent to hinder, delay, or defraud any present or future creditor.

a.    **Holdings' Interest in the SLB Properties**

363.    Holdings acquired the fee simple interest in each of the SLB Properties

pursuant to the APA executed on December 10, 2014.  (FOF 110).

364.    As owner of the fee simple interest in each of the SLB Properties,

Holdings had an interest in each of the SLB Properties for the purpose of Bankruptcy Code

section 548(a)(1)(A).

b.    **The Transfer of Holdings' Interest in the SLB Properties**
       **Within Two Years of the Petition Date**

365.    Holdings transferred the fee simple interest in each of the SLB Properties

to the SLB Entities pursuant to an applicable Contribution Agreement within two years of the

Petition Date.  Specifically, each of the SLB Properties was transferred by Holdings to the SLB

Entities between December 10, 2014 and the Petition Date. (FOF 110, 132).

366.    Accordingly, Holdings transferred its interests in each of SLB Properties

within two years of the Petition Date for the purpose of Bankruptcy Code section 548(a)(1)(A).

---

[86]  These conclusions apply to Count 39 (Against Property Holdings II and Comvest) (Avoidance of Transfer of the
PHII Properties) and Count 56 ((Against Property Haggen SLB and Comvest) (Avoidance of Transfer of the Haggen
SLB Properties).

c.      **Holdings' Intent to Hinder, Delay or Defraud**

367.    As was set forth above, as part of its overall scheme, Comvest caused

Holdings to transfer each of the SLB Properties to the SLB Entities with the intent to hinder and

delay the Debtors' creditors.  The SLB transactions were an integral part of a scheme devised by

Comvest to acquire the 146 supermarkets and leveraging acquired real estate in substantial part

to pay the purchase price by means of unusual Sale-Leaseback Transactions that provided for the

funds to go to the SLB entities and Holdings but the lease obligations were imposed on the OpCo

Entities.

368.    As is set forth extensively through the Findings of Fact, the Court finds

that actual intent to hinder or delay can be inferred from at least the following "badges of fraud":

(a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest

(FOF 22, 23-26, 29-32); (b) Comvest dominated and controlled the parties to the applicable

Contribution Agreements (FOF 44-45, 137) (c) the SLB Properties were transferred to the SLB

Entities, insiders by virtue of the fact that they was indirectly owned by Holdings (FOF 15-18);

(d) Holdings directly or indirectly controlled the disposition of the proceeds of the sale of the

SLB Properties pursuant the applicable Sale Leaseback Transaction (FOF 15-18); (e) the direct

or indirect transfer of the SLB Properties from Holdings to the SLB Entities was not publicly

disclosed (FOF 138-142, 79); (f) the Contribution Agreements were not the subject of arms'

length negotiations (FOF 31-32, 110-111); (g) the SLB Entities provided no consideration to

Holdings for the SLB Properties (FOF 112); (h) the same person, Derrick Anderson, signed each

applicable Contribution Agreement on behalf of eight different parties even though not all of the

eight parties had an interest in each transfer effectuated by each Contribution Agreement (FOF

111); (i) the Debtors, and particularly the OpCo Entities, which were forced to take on the lease

obligations, were undercapitalized and insolvent or became insolvent shortly after Holdings

transferred the SLB Properties to the SLB Entities;(FOF 286-304); and (j) Comvest created this structure with the intent of keeping the assets and liabilities of the PropCo Entities and using the assets to fund payment of the purchase price. (FOF 99-108, 54).

369.    Accordingly, Plaintiff has established, by a preponderance of the evidence, that: (a) Holdings had an interest in the SLB Properties; (b) Holdings transferred its interests in the SLB Properties within two years before the Petition Date; and (c) Holdings made the transfers with actual intent to hinder, delay creditors.

## B.    Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law)[87]

370.    The transfers of the SLB Properties to the SLB Entities are avoided pursuant to 11 U.S.C. § 544(b) and Wash. Rev. Code § 19.40.041(1)(a) (Count 41 and 58), Or. Rev. Stat. § 95.230(a)(1) (Count 44), Ariz. Rev. Stat. § 44-1004(A)(1) (Count 47),  Nev. Rev. Stat. § 112.180(1)(a) (Count 50), and Cal. Civ. Code § 3439.04(a)(1) (Count 53 and 61).

371.    As stated above, the applicable state law actual fraudulent transfer statutes implicated in this case are substantially identical, and the Court concludes that Plaintiff has established, by a preponderance of the evidence, that the following elements required by 11 U.S.C. § 544(b) and Applicable State Law have been met: (a) Holdings had an interest in the SLB Properties; (b) Holdings transferred its interests in the SLB Properties within four years before the Petition Date; and (c) Holdings made the transfers with actual intent to hinder, delay, or defraud any present or future creditor.

---

[87] These conclusions apply to Count 41 (Against Property Holdings II and Comvest) (Avoidance of the Transfer of the PHII Washington Properties), Count 44 (Against Property Holdings II and Comvest)(Avoidance of the Transfer of the PHII Oregon Properties), Count 47 (Against Property Holdings II and Comvest) (Avoidance of the Transfer of the PHII Arizona Properties), Count 50 (Against Property Holdings II and Comvest) (Avoidance of the Transfer of the PHII Nevada Properties), Count 53 (Against Property Holdings II and Comvest) (Avoidance of the Transfer of the PHII California Properties), Count 58 (Against Haggen SLB and Comvest) (Avoidance of the Transfer of the Haggen SLB Washington Properties), and Count 61 (Against Haggen SLB and Comvest) (Avoidance of the Transfer of the Haggen SLB California Properties),

C.   **Transferee Liability Related to the SLB Properties (11 U.S.C. § 550)**

372.   The transfers of the SLB Properties from Holdings to the SLB Entities were made for Comvest's benefit. (FOF 54)

V.   **Actual Fraudulent Transfer Claims Related to the PropCo Leases**

373.   Plaintiff has asserted both actual and constructive fraudulent transfer claims to avoid the PropCo Leases, recover all rents paid on account of the PropCo Leases and to disallow all claims that may be asserted by the PropCo Entities based on the rejection of any PropCo Leases.

a.   **Actual Fraudulent Transfer Counts Under Federal Law (11 U.S.C. § 548(a)(1)(A)**[88]

374.   The PropCo Lease Obligations are avoided pursuant to 11 U.S.C. § 548(a)(1)(A).

375.   As is set forth below, Plaintiff has established, by a preponderance of the evidence, that the following elements required by 11 U.S.C. § 548(a)(1)(A) have been met: (a) OpCo North and OpCo South, respectively incurred long-term lease obligations (collectively, the "PropCo Lease Obligations") under the PropCo North and PropCo South Leases (collectively the "PropCo Leases") within two years of the Petition Date; (b) OpCo North and OpCo South, respectively, transferred property to PropCo North and OpCo South in the form of rent payments (the "PropCo Rent Payments") under the PropCo Leases, within two years of the Petition Date; (c) OpCo North and OpCo South incurred the PropCo Lease Obligations and made the transfers of the PropCo Rent Payments with actual intent to hinder, delay, or defraud their creditors.

---

[88] These conclusions apply to Count 20 (Against PropCo North and Comvest) (Avoidance of the PropCo North Lease Obligations) and Count 28 (Against PropCo South and Comvest) (Avoidance of the PCS Lease Obligations).

**b.**     <u>The OpCo Entities' Obligations under the PropCo Leases</u>

376.     The OpCo Entities incurred long-term obligations as the tenant under the PropCo Leases in connection with Albertsons' Acquisition  such as the obligation to pay rent. (FOF 131).

377.     A lease of real property is an "obligation" that may be avoided pursuant to Bankruptcy Code section 548(a)(1)(A). *Kaler v. Slominski (In re Keeley & Grabanski Land P'ship)*, 2012 Bankr. LEXIS 921, at *50-51 (Bankr. D.N.D. Mar. 7, 2012), *rev'd on other grounds*, *Kaler v. Slominski (In re Keeley & Grabanski Land P'ship,* 531 B.R. 771 (B.A.P. 8th Cir. 2015).

378.     The obligation to pay rent under a lease of real property is a "transfer" that is subject to the avoidance provisions of Bankruptcy Code section 548. *Edgewater Med. Ctr. v. Edgewater Prop. Co. (In re Edgewater Med. Ctr.)*, 373 B.R. 845, 855 (Bankr. N.D. Ill. 2007).

**c.**     <u>Within Two Years of the Petition Date</u>

379.     The OpCo Entities entered into the PropCo Leases between December 10, 2014 and the Petition Date. (FOF 132).

380.     Accordingly, the OpCo Entities incurred the obligations under the PropCo Leases within two years of the Petition Date.

**d.**     <u>The OpCo Entities' Intent to Hinder, Delay or Defraud</u>

381.     For the reasons set forth herein, the Court concludes that Plaintiff has established, by a preponderance of the evidence, that the OpCo Entities incurred the PropCo Lease Obligations and transferred the PropCo Rent Payments with the "actual intent to hinder, delay or defraud" the OpCo Entities' creditors.

382.     This Court finds that actual intent to hinder or delay can be inferred from at least the following "badges of fraud": (a) a majority of Holdings' Managers were

simultaneously employed or affiliated with Comvest (FOF 22, 23-26, 29-32); (b) Comvest

dominated and controlled the parties to the applicable PropCo Leases (FOF 44-45, 137); (c) the

PropCo Lease Obligations were made to the PropCo Entities, insiders by virtue of the fact that

they were indirectly owned by Holdings (FOF 15-18); (d) the PropCo Lease Obligations were

not publicly disclosed (FOF 138-142, 79); (e) the PropCo Leases (including the PropCo Rent

Payments payable thereunder) were not the subject of arms' length negotiations (FOF 133);

(f) the same person, Derrick Anderson, signed each applicable PropCo Lease on behalf of the

PropCo Entities  and the OpCo Entities (FOF 133); (g) the OpCo Entities were undercapitalized

and insolvent or became insolvent shortly after the PropCo Leases were executed (FOF 286-

304); and (h) Comvest created this structure with the intent of keeping the assets and liabilities of

the PropCo Entities and the SLB Entities separate from the assets and liabilities of the OpCo

Entities so that the PropCo Entities would have (1) unencumbered real estate appraised at $117

million, and (2) annual cash flow of $13 million (pursuant to the PropCo Leases), all for the

benefit of Holdings' equity holders.   (FOF 99-108, 54).

383.    Accordingly, Plaintiff has established, by a preponderance of the evidence,

that: (a) the OpCo Entities incurred the PropCo Lease Obligations within two years of the

Petition Date; (b) the OpCo Entities incurred the PropCo Lease Obligations with actual intent to

hinder, delay, or defraud the OpCo Entities' creditors.

A.    **Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law)[89]**

384.    The PropCo Lease Obligations are also avoided pursuant to 11 U.S.C. §

544(b) and Wash. Rev. Code § 19.40.041(1)(a) (Count 22), Or. Rev. Stat. § 95.230(a)(1) (Count

---

[89]   These conclusions apply to Count 22 (Against PropCo North and Comvest) (Avoidance of the PropCo North
Washington Lease Obligations), Count 25 (Against PropCo North and Comvest) (Avoidance of the PropCo North
Oregon Lease Obligations), Count 30 (Against PropCo South and Comvest) (Avoidance of the PCS Arizona Lease
Obligations), Count 33 (Against PropCo South and Comvest) (Avoidance of the PCS Nevada Lease Obligations),
and Count 36 (Against PropCo South and Comvest) (Avoidance of the PCS California Lease Obligations).

25),  Ariz. Rev. Stat. § 44-1004(A)(1) (Count 30),  Nev. Rev. Stat. § 112.180(1)(a) (Count 33),

and Cal. Civ. Code § 3439.04(a)(1) (Count 36).

385.    The applicable state fraudulent transfer laws are substantially similar not

only to each other but also to section 548(a)(1)(A) of the Bankruptcy Code, and for the reasons

set forth above, the Court concludes that Plaintiff has established, by a preponderance of the

evidence that the following elements have been met as required by Bankruptcy Code section

544(b) and applicable state law: (a) the OpCo Entities incurred obligations under the PropCo

Leases within four years of the Petition Date; (b) the OpCo Entities transferred property to the

PropCo Entities in the form of rent payments under the PropCo Leases within four years of the

Petition Date; (c) the OpCo Entities incurred the PropCo Lease Obligations and made the

transfers of the PropCo Rent Payments with actual intent to hinder, delay, or defraud the OpCo

Entities' creditors.

### B.        Transferee Liability Related to the PropCo Leases (11 U.S.C. § 550).

386.    As is set forth above, the PropCo Lease Obligations were incurred for

Comvest's benefit and the PropCo Rent Payments were made for Comvest's benefit. (FOF 54)

387.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover for the benefit

of the Debtors' estates the PropCo Rent Payments, or the value of such property, from the

PropCo Entities and Comvest.

388.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PropCo

Lease Obligations as fraudulently incurred obligations, (ii) recovering from the PropCo Entities

and Comvest the PropCo Rent Payments made thereunder or their value, and (iii) disallowing

any claim by the PropCo Entities against the Debtors for damages arising from the rejection of

the PropCo Leases.

VI.    **Actual Fraudulent Transfer Claims Related to the Comvest Payments**

A.    **Count 64 Federal Law (11 U.S.C. § 548(a)(1)(A) and State Law (11 U.S.C. § 548(a)(1)(A) and Applicable State Law)**[90]

389.    The transfers of the Comvest Payments are avoided pursuant to 11 U.S.C. § 548(a)(1)(A).

390.    As is set forth below, Plaintiff has established, by a preponderance of the evidence, that the following elements required by 11 U.S.C. § 548(a)(1)(A) have been met: (a) Haggen had an interest in the Comvest Payments; (b) Haggen transferred its interests in the Comvest Payments, to or for the benefit of Comvest, within two years before the Petition Date; and (c) Haggen made the transfers with actual intent to hinder, delay, or defraud any present or future creditor.

a.    **Haggen's Interest in the Comvest Payments**

391.    Haggen paid Comvest (a) fees and expenses pursuant to a Comvest Management Agreement (the "Comvest Fees") and a (b) a "transaction fee" of $1.5 million in connection with the Comvest Investment (together with the Comvest Fees, the "Comvest Payments").  (FOF 148).

b.    **The Transfer of Haggen's Interest in the Comvest Payments Within two years of the Petition Date**

392.    Holdings transferred the Comvest Payments to Comvest within two years of the Petition Date.

c.    **Haggen's Intent to Hinder, Delay or Defraud**

393.    Holdings transferred each of the Comvest Payments to Comvest with the intent to hinder the Debtors' creditors and with the intent to delay the Debtors' creditors.  In sum, this Court finds that actual intent to hinder or delay can be inferred from at least the following

---

[90]    These conclusions apply to Count 64 (Against Comvest) (Avoidance of Transfer of the Comvest Payments).

"badges of fraud: (a) a majority of Holdings' Managers were simultaneously employed or affiliated with Comvest (FOF 22, 23-26, 29-32); (b) Comvest dominated and controlled the parties who authorized the transfer of the Comvest Payments (FOF 44-45, 137); (c) the Comvest Payments were transferred to Comvest, an insider by virtue of the fact that it owned, directly or indirectly, the Debtors (FOF 3-8); (d) there is no evidence that Comvest disclosed the Comvest Payments from the Debtors publicly, that the Comvest Payment (and the underlying agreements, including the Management Agreement) were the subject of arms' length negotiations or that Comvest provided consideration to the Debtors for the Comvest Payment; and (e) the Debtors were insolvent or became insolvent shortly after they transferred the Comvest Payments to Comvest (FOF 286-304); (FOF 99-108, 54).

394.    Accordingly, Plaintiff has established, by a preponderance of the evidence, that: (a) Haggen had an interest in the Comvest Payments; (b) Haggen transferred its interests in the Comvest Payments to Comvest within two years before the Petition Date; and (c) Haggen made the transfers with actual intent to hinder or delay creditors.

395.    For the reasons set forth above, the transfers of the Comvest Payments to Comvest are also avoided pursuant to 11 U.S.C. § 544(b) and Wash. Rev. Code § 19.40.041(1)(a), Or. Rev. Stat. § 95.230(a)(1), Ariz. Rev. Stat. § 44-1004(A)(1), Nev. Rev. Stat. § 112.180(1)(a), and Cal. Civ. Code § 3439.04(a)(1).

**B.      Transferee Liability Related to the Comvest Payments (11 U.S.C. § 550)**

396.    The transfers of the Comvest Payments were made for Comvest's benefit.

## CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS

**(Counts 2, 4, 5, 7, 8, 10. 10. 12, 13, 15, 16, 18, 19, 21, 23, 26, 31, 34, 37, 40, 42, 43, 45, 46, 48, 49, 51, 52, 54, 55, 57, 59, 60, 62, 63)**

**VII.    Constructive Fraudulent Transfer Claims Related to the Owned Properties**

**A.    Counts Under Federal Law (11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 550)[91]**

397.    The transfers of the Owned Properties to the PropCo Entities are avoided pursuant to 11 U.S.C. § 548(a)(1)(B).

398.    Bankruptcy Code section 548(a)(1)(B) provides, in pertinent part, "(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--(B) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured . . . ."  11 U.S.C. § 548(a)(1)(B).  As is set forth below, the Committee has met its burden of proof as to each element.

### a.    Holdings' Interest in the Owned Properties

399.    Holdings acquired the fee simple interest in each of the Owned Properties pursuant to the APA executed on December 10, 2014.  (FOF 110)

---

[91]  These conclusions apply to Count 2 (Against PropCo North and Comvest) (Avoidance of Transfer of the PropCo North Owned Properties to PropCo North) and Count 10 (Against PropCo South and Comvest) (Avoidance of Transfer of the PCS Owned Properties to PropCo South).

400.    As owner of the fee simple interest in each of the Owned Properties, Holdings had an interest in each of the Owned Properties for the purpose of Bankruptcy Code section 548(a)(1)(A).

**b.    The Transfer of Holdings' Interest in the Owned Properties Within Two Years of the Petition Date**

401.    Holdings transferred the fee simple interest in each of the Owned Properties to the PropCo Entities between December 10, 2014 and the Petition Date. (FOF 110, 132).

**c.    Reasonably Equivalent Value**

402.    For a transaction to be avoided under section 548(a)(1)(B), the debtor must have "received less than a reasonably equivalent value in exchange for such transfer or obligation … ."  The answer to this question requires a two-step analysis: (1) What value did the Debtors receive in exchange for the transfer or obligation? (2) Was that value reasonably equivalent to what the Debtors transferred?  *See e.g., In re Fruehauf Trailer Corp.*, 444 F.3d at 212.

403.    Value.  The Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. §548(d)(2)(A).   It is undisputed that Holdings transferred the Owned Properties to the PropCo Entities for zero consideration. (FOF 112)

404.    Reasonable Equivalence.  If the Court determines that the debtor gained at least some value as a result of the transfer, what follows is a comparison: whether the debtor got roughly the value it gave.  *In re Fruehauf Trailer Corp.*, 444 F.3d at 212-213.  In conducting this factual analysis, the court looks to the totality of the circumstances, including (1) the fair market value of the benefit received as a result of the transfer, (2) the existence of an arm's-length

relationship between the debtor and the transferee, and (3) the transferee's good faith.  *Id.*;

*Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010).

405.    Holdings did not receive any value for the transfers of the Owned

Properties to the PropCo Entities.  The value Holdings transferred to the PropCo Entities, on the

other hand, was significant.  In connection with the Albertson's Acquisition pursuant to which

Holdings acquired the Owned Properties, Albertson's was paid a total of approximately $308.8

million, which included the value of the real estate assets.  (FOF 110, 121, PX 263, section 2.1).

The Owned Properties were then transferred to the PropCo Entities for no consideration.

Accordingly, Holdings did not receive reasonably equivalent value for the transfers.

### d.    Financial Conditions

406.    For a transaction to be avoided under section 548(a)(1)(B), the Plaintiff

must also establish the existence of one of the following three financial conditions: (a) that

Holdings was insolvent on the date of the transfers or obligations, or became insolvent as a result

of the transfers or obligations (the "Solvency Test"); (b) Holdings was engaged in business or a

transaction, or was about to engage in business or a transaction, for which any property

remaining with Holdings was an unreasonably small capital (the "Unreasonably Small Capital

Test"); or (c) Holdings intended to incur, or believed that the debtor would incur, debts that

would be beyond its ability to pay as such debts matured (the "Inability to Pay Test").  11 U.S.C.

§ 548(a)(1)(B)(ii); *Peltz v. Hatten*, 279 B.R. 710, 742 (D. Del. 2002).  The relevant test here is

the Solvency Test.

407.    Under the Bankruptcy Code "insolvent" means "financial condition such

that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation,

exclusive of--(i) property transferred, concealed, or removed with intent to hinder, delay, or

defraud such entity's creditors; and (ii) property that may be exempted from property of the

estate under section 522 of this title [11 USCS § 522]."  11 USCS § 101 (34). Courts use a

"balance sheet test for insolvency, comparing assets to debts."  *Official Committee of Former*

*Partners v. Brennan (In re Labrum & Doak, LLP)*, 227 B.R. 383, 387 (Bankr. E.D. Pa. 1998)

(quotations and citations omitted).  The court's insolvency analysis is not literally limited to or

constrained by the debtor's balance sheet, however.  It is "appropriate to adjust items on the

balance sheet that are shown at a higher or lower value than their going concern value and to

examine whether assets of a company that are not found on its balance sheet should be included

in its fair value." *Peltz v. Hatten*, 279 B.R. as 743; *Trans World Airlines, Inc. v. Travellers*

*International A.G., (In re Trans World Airlines, Inc.)*, 180 B.R. 389, 405 n.22 (Bankr. D. Del.

1994).

      408.    As is set forth above, this Court has determined that the Integrated

Transactions should be collapsed, such that the PropCo Entities' assets and the SLB Entities' are

subject to the Debtors' liabilities.  Once the Integrated Transactions are collapsed, Holdings is

insolvent for the purpose of section 548(a)(1)(B) under the Solvency Test.  Trial Tr. (10/20) at

222:23-223:35; PX 227 at PX 227.007-008.  Indeed, the Debtors' Most Recent Monthly

Operating Report makes clear that the Debtors' consolidated liabilities far exceed their assets.

See Debtors' Monthly Operating Report, dated November 3, 2017 at 12 [Main Docket No.

3269].

      409.    Accordingly, Plaintiff has established, by a preponderance of the evidence,

that: (a) Holdings had an interest in the Owned Properties; (b) Holdings transferred its interests

in the Owned Properties within two years before the Petition Date; (c) Holdings did not receive

reasonably equivalent value in exchange for the transfers; and (d) Holdings (i) was insolvent on

the date the transfers were made, or became insolvent as a result of the transfers; (ii) was

engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; and (iii) intended to incur, or believed that it would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

**B.**    **Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law)**[92]

410.    The transfers of the Owned Properties to the PropCo Entities are avoided pursuant to 11 U.S.C. § 544(b) and Wash. Rev. Code § 19.40.041(1)(b) (Count 4), Wash. Rev. Code § 19.40.051(1) (Count 5), Or. Rev. Stat. § 95.230(1)(b) (Count 7), Or. Rev. Stat. § 95.240(1) (Count 8), Ariz. Rev. Stat. § 44-1004(A)(2) (Count 12),  Ariz. Rev. Stat. § 44-1005 (Count 13), Nev. Rev. Stat. § 112.180(1)(b) (Count 15), Nev. Rev. Stat. § 112.190 (Count 16), and Cal. Civ. Code § 3439.04(a)(2) (Count 18), and Cal. Civ. Code § 3439.05 (Count 19) (collectively the "Applicable State CF Statutes").[93]

411.    Washington Statutes.  Washington Revised Code section 19.40.041(1)(b) provides, in pertinent part, "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:  (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:  (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of

---

[92]  These conclusions apply to Count 4 and 5 (Against PropCo North and Comvest) (Avoidance of Transfer of the PropCo North Washington Properties to PropCo North), Count 7 and 8 (Against PropCo North and Comvest) (Avoidance of Transfer of the PropCo North Oregon Properties to PropCo North), Count 12 and 13 (Against PropCo South and Comvest) (Avoidance of Transfer of the PCS Arizona Properties to PropCo South), Count 15 and 16 (Against PropCo South and Comvest) (Avoidance of Transfer of the PCS Nevada Properties to PropCo South), and Count 18 and 19 (Against PropCo South and Comvest) (Avoidance of Transfer of the PCS California Properties to PropCo South).

[93]  Unless otherwise highlighted in the COL, there are no material differences between the statute statutes that are applicable to the Plaintiff's constructive fraudulent transfer claims. The provisions of the UFTA and the UVTA are to be applied in a manner that implements the general purpose of making fraudulent transfer laws uniform across the states enacting them.  Wash. Rev. Code § 19.40.903; ORS § 95.300; Nev. Rev. Stat. Ann. § 112.250; Cal Civ Code § 3439.13.

the debtor were unreasonably small in relation to the business or transaction; or (ii) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.  Wash. Rev. Code § 19.40.041(1)(b).  Washington Revised Code section 19.40.051(1) provides, in pertinent part, "(1) A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."  Wash. Rev. Code § 19.40.051(1).

412.    Oregon Statutes.    Oregon Revised Statutes section 95.230(1)(b) provides, in pertinent part, "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:  (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:  (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.  Or. Rev. Stat. § 95.230(1)(b).  Oregon Revised Statutes section 95.240(1)  provides, in pertinent part, "(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor

was insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation."  Or. Rev. Stat. § 95.240(1).

413.   <u>Arizona Statutes</u>.  Arizona Revised Statutes section 44-1004(A)(2) provides, in pertinent part, "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation under any of the following:  (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:  (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or  (ii) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.  Ariz. Rev. Stat. § 44-1004(A)(2).  Arizona Revised Statutes section 44-1005 provides,  in pertinent part, "(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation."  Ariz. Rev. Stat. § 44-1005.

414.   <u>Nevada Statutes</u>.   Nevada Revised Statutes section 112.180(1)(b) provides, in pertinent part, "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:  (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) Was engaged or was about to engage in a business or a transaction for which the remaining

assets of the debtor were unreasonably small in relation to the business or transaction; or  (ii) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  Nev. Rev. Stat. § 112.180(1)(b). Nevada Revised Statutes section 112.190(1) provides, in pertinent part, "(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation."  Nev. Rev. Stat. § 112.190 (1).

   415. <u>California Statutes</u>.  California Civil Code section 3439.04(a)(2) provides, in pertinent part, "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:  (b) Without receiving reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:  (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (ii) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Cal. Civ. Code § 3439.04(a)(2). California Code section 3439.05 provides, in pertinent part, "(1) A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor

was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Cal. Civ. Code § 3439.05.

416.    The applicable state fraudulent transfer laws are substantially similar not only to each other but also to section 548(a)(1)(B) of the Bankruptcy Code, and for the reasons set forth above, the Court concludes that Plaintiff has established, by a preponderance of the evidence that the following elements have been met: (a) Holdings had an interest in the Owned Properties; (b) Holdings transferred its interests in the Owned Properties within four years before the Petition Date; (c) Holdings did not receive reasonably equivalent value in exchange for the transfers; and (d) Holdings (i) was insolvent on the date the transfers were made, or became insolvent as a result of the transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; and (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

## C.    Transferee Liability Related to the Owned Properties (11 U.S.C. § 550(a))

417.    The transfers of the Owned Properties from Holdings to the PropCo Entities were made for Comvest's benefit.  (FOF 54).

## VIII.    Constructive Fraudulent Transfer Claims Related to the SLB Properties

### A.    Counts Under Federal Law (11 U.S.C. § 548(a)(1)(B))[94]

418.    The transfers of the SLB Properties to the SLB Entities are avoided pursuant to 11 U.S.C. § 548(a)(1)(B).

419.    As is set forth below, Plaintiff has established, by a preponderance of the evidence, that the following elements required by 11 U.S.C. § 548(a)(1)(B) have been met: (a)

---

[94]   These conclusions apply to Count 40 (Against Property Holdings II and Comvest) (Avoidance of Transfer of the PHII Properties) and Count 57 (Against Haggen SLB and Comvest) (Avoidance of Transfer of the Haggen SLB Properties).

Holdings had an interest in the SLB Properties; (b) Holdings transferred its interests in the SLB Properties within two years before the Petition Date; (c) Holdings did not receive reasonably equivalent value in exchange for the transfers; and (d) Holdings (i) was insolvent on the date the transfers were made, or became insolvent as a result of the transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; and (iii) intended to incur, or believed that it would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

### a.     Holdings' Interest in the SLB Properties

420.    Holdings acquired the fee simple interest in each of the SLB Properties pursuant to the  APA executed on December 10, 2014.   (FOF 110).

421.    As owner of the fee simple interest in each of the SLB Properties, Holdings had an interest in each of the SLB Properties for the purpose of Bankruptcy Code section 548(a)(1)(B).

### b.     The Transfer of Holdings' Interest in the SLB Properties Within Two Years of the Petition Date

422.    Holdings transferred the fee simple interest in each of the SLB Properties to the SLB Entities pursuant to an applicable Contribution Agreement between December 10, 2014 and the Petition Date. (FOF 110, 132).

### c.     Reasonably Equivalent Value

423.    As was noted above, for a transaction to be avoided under section 548(a)(1)(B), the debtor must have "received less than a reasonably equivalent value in exchange for such transfer or obligation … ."

424.     Holdings did not receive any value for the transfers of the SLB Properties to the SLB Entities.  The value Holdings transferred to the SLB Entities, on the other hand, was significant.  Value was paid for the SLB Properties in connection with the Albertson's Acquisition and the Sale Leaseback Transactions. The SLB Properties were acquired from Albertsons, transferred to the SLB Entities for no consideration, and immediately sold to third party purchasers for a total of $358 million.  (FOF 121).  Accordingly, Holdings did not receive reasonably equivalent value for the transfers.

### d.     Financial Conditions

425.     As set forth above, Plaintiff has also met its burden with respect to the Solvency Test.

426.     Accordingly, Plaintiff has established, by a preponderance of the evidence, that: (a) Holdings had an interest in the SLB Properties; (b) Holdings transferred the SLB Properties to the SLB Entities within two years of the Petition Date; (c) Holdings did not receive reasonably equivalent value in exchange for the transfers; and (d) Holdings (i) was insolvent on the date the transfers were made, or became insolvent as a result of the transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; and (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

## B.    Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law)[95]

427.    The transfers of the SLB Properties to the SLB Entities are avoided pursuant to 11 U.S.C. § 544(b) and Wash. Rev. Code § 19.40.041(1)(b) (Counts 42, 59), Wash. Rev. Code § 19.40.051(a )(Counts 43, 60 ), Or. Rev. Stat. § 95.230(1)(b)) (Count  45),  Or. Rev. Stat. § 95.240(1) (Count 46), Ariz. Rev. Stat. § 44-1004(A)(2) (Count 48),  Ariz. Rev. Stat. § 44-1005 (Count 49),  Nev. Rev. Stat. § 112.180(1)(b) (Count 51), Nev. Rev. Stat. § 112.190 (Count 52), and Cal. Civ. Code § 3439.04(a)(2) (Counts 54, 62), and Cal. Civ. Code § 3439.05 (Count 55, 63).

428.    The applicable state constructive fraudulent transfer laws are substantially similar not only to each other but also to section 548(a)(1)(B) of the Bankruptcy Code, and for the reasons set forth above, the Court concludes that Plaintiff has established, by a preponderance of the evidence that the following elements that the following elements required by 11 U.S.C. § 544(b) and the Applicable State Statutes have been met: (a) Holdings had an interest in the SLB Properties; (b) Holdings transferred its interests in the SLB Properties within four years before the Petition Date; (c) Holdings did not receive reasonably equivalent value in exchange for the transfers; and (d) Holdings (i) was insolvent on the date the transfers were made, or became insolvent as a result of the transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; and (iii) intended to incur, or

---

[95]  These conclusions apply to Count 42 and 43 (Against Property Holdings II and Comvest) (Avoidance of Transfer of the PHII Washington Properties to Property Holdings II), Count 46 and 46 (Against Property Holdings II and Comvest) (Avoidance of Transfer of the PHII Oregon Properties to Property Holdings II), Count 48 and 49 (Against Property Holdings II and Comvest) (Avoidance of Transfer of the PHII Arizona Properties to Property Holdings II), Count 51 and 52 (Against Property Holdings II and Comvest) (Avoidance of Transfer of the PHII Nevada Properties to Property Holdings II), Count 54 and 55 (Against Property Holdings II and Comvest) (Avoidance of Transfer of the PHII California Properties to Property Holdings II), Count 59 and 60 (Against Haggen SLB and Comvest) (Avoidance of Transfer of the Haggen SLB Washington Properties to Haggen SLB), Count 62 and 63 (Against Haggen SLB and Comvest) (Avoidance of Transfer of the Haggen SLB California Properties to Haggen SLB

believed that it would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

### C.    Transferee Liability Related to the SLB Properties (11 U.S.C. § 550)

429.    The transfers of the SLB Properties from Holdings to the SLB Entities were made for Comvest's benefit. (FOF 54).

## IX.    Constructively Fraudulent Transfer Claims Related to the PropCo Leases

### A.    Counts Under Federal Law (11 U.S.C. § 548(a)(1)(B)[96]

430.    The PropCo Lease Obligations are avoided pursuant to 11 U.S.C. § 548(a)(1)(B).

431.    As is set forth below, Plaintiff has established, by a preponderance of the evidence, that the following elements required by 11 U.S.C. § 548(a)(1)(B) have been met: (a) the OpCo Entities incurred the PropCo Lease Obligations under the PropCo Leases within two years of the Petition Date; (b) the OpCo Entities transferred property to the PropCo Entities in the form of the PropCo Rent Payments within two years of the Petition Date; (c) the OpCo Entities did not receive reasonably equivalent value in exchange for the PropCo Lease Obligations; and (d) the OpCo Entities (i) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the OpCo Entities was an unreasonably small capital; and (ii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

---

[96] These conclusions apply to Count 21 (Against PropCo North and Comvest) (Avoidance of the PropCo North Lease Obligations) and Count 29 (Against PropCo South and Comvest) (Avoidance of the PCS Lease Obligations).

### a.    The OpCo Entities' Obligations under the PropCo Leases

432.    The OpCo Entities incurred long term obligations as the tenant under the PropCo Leases in connection with Albertson's Acquisition, such as the obligation to pay rent. (FOF 132)

433.    A lease of real property is an "obligation" that may be avoided pursuant to Bankruptcy Code section 548(a)(1).  *Kaler v. Slominski (In re Keeley & Grabanski Land P'ship)*, 2012 Bankr. LEXIS 921, at *50-51 (Bankr. D.N.D. Mar. 7, 2012).

### b.    The OpCo Entities' Payment of the PropCo Rent Payments

434.    The OpCo Entities incurred the obligation to pay rent to the PropCo Entities pursuant to the PropCo Leases between December 10, 2014 and the Petition Date. (FOF 132).

435.    The obligation to pay rent under a lease of real property is a "transfer" that is subject to the avoidance provisions of Bankruptcy Code section 548.  *Edgewater Med. Ctr. v. Edgewater Prop. Co. (In re Edgewater Med. Ctr.)*, 373 B.R. 845, 855 (Bankr. N.D. Ill. 2007).

436.    Accordingly, the OpCo Entities incurred the obligations under the PropCo Leases and made the transfers of the PropCo Rent Payments to the PropCo Entities within two years of the Petition Date.

### c.    Reasonably Equivalent Value

437.    As was noted above, for a transaction to be avoided under section 548(a)(1)(B), the debtor must have "received less than a reasonably equivalent value in exchange for such transfer or obligation . . ."  The answer to this question requires a two-step analysis: (1) What value did the Debtors receive in exchange for the transfer or obligation? (2) Was that value reasonably equivalent to what the Debtors transferred?  *See e.g., In re Fruehauf Trailer Corp.*, 444 F.3d at 212.

438.    Comvest set up the PropCo Leases on terms of its own design and, based on its highly-flawed assumptions as to the projected cash flows of the OpCo Entities that masked their realistic liquidity needs, established those entities on a deeply undercapitalized and insolvent basis from their inception, leading to their inevitable failure and liquidation only months after the transaction closed.  The OpCo Entities were doomed from the outset and did not receive reasonably equivalent value for their incurrence of long-term lease obligations as they were incapable of sustaining ordinary course business operations in the leased locations beyond a few months before they failed.  And all of this was at the hands and the design of Comvest, which as the as the beneficial owner of both the PropCo and OpCo Entities had a conflict of interest when it came to setting up those leases since it was on both sides of the transaction. (FOF 132-134)

439.    Given the corporate and financial structure imposed on the OpCo Entities by Comvest, in exchange for incurring long-term, multi-million dollar rental obligations that formed the predicate for rental payments made in the past and now form the basis for PropCo's massive lease rejection claims), at best the OpCo Entities received the use of these supermarket locations for the period of only the several months they were able to stay in business before failing.  The ability to use the lease location for just a period of months until the lack of liquidity forced a inevitably shutdown is not reasonably equivalent value for the OpCo's incurrence of long term lease obligations to the PropCo Entities regardless of whether the rents fixed thereunder were at or above market.  The OpCos were simply incapable of performing and thereby enjoying the benefits of the leases due to their inadequate capitalization that rendered them not viable on a sustained basis from the outset, as would become evident in the bankruptcy and full chain liquidation that ensued in a matter of only a few months.

440.    Accordingly the OpCo Entities did not receive reasonably equivalent value for the burdens they incurred in connection with the PropCo Leases.

### d.    Financial Conditions

441.    Plaintiff has also met its burden with respect to two of the three financial condition tests: (i) the Unreasonably Small Capital Test and (ii) the Inability to Pay Test.

442.    <u>Unreasonably Small Capital Test</u>.  As was noted above, the test for "unreasonably small capital" is "reasonable foreseeability."  That is, was it reasonably foreseeable on the date of the transfers that the Debtors would have unreasonably small capital to carry out their business?  As the District Court noted in *Peltz v. Hatten*, 279 B.R. 710 (D. Del. 2002), "Determining whether a firm has unreasonably small capital requires an objective assessment of the companies' financial projections—'critical question is whether the parties' projections are reasonable.'" *Id*. at 744.

443.    As is set forth above, the transfers of the PropCo Rent Payments and the incurrence of the PropCo Lease Obligations left the OpCo Entities with an unreasonably small capital. (FOF 264-285, FOF 286-304).

444.    <u>Inability to Pay</u>.  As was noted above, the Inability to Pay test is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.

445.    At the time the OpCo Entities transferred the PropCo Rent Payments to the PropCo Entities and incurred the PropCo Lease Obligations, the OpCo Entities intended to incur or believed that they would incur debts beyond their ability to pay as such debts matured. (FOF 285-303)

446.    Accordingly, Plaintiff has established, by a preponderance of the evidence, that: (a) the OpCo Entities incurred the PropCo Lease Obligations under the PropCo Leases

within two years of the Petition Date; (b) the OpCo Entities transferred property to the PropCo

Entities in the form of the PropCo Rent Payments within two years of the Petition Date; (c) the

OpCo Entities did not receive reasonably equivalent value in exchange for the PropCo Lease

Obligations; and (d) the OpCo Entities (i) were engaged in business or a transaction, or were

about to engage in business or a transaction, for which any property remaining with the OpCo

Entities was an unreasonably small capital; and (ii) intended to incur, or believed that they would

incur, debts that would be beyond their ability to pay as such debts matured.

**B.      Counts Under State Law (11 U.S.C. § 544(b) and Applicable State Law)[97]**

447.    The PropCo Lease Obligations are avoided pursuant to 11 U.S.C. § 544(b)

and Wash. Rev. Code § 19.40.041(1)(b) (Count 23), Or. Rev. Stat. § 95.230(1)(b) (Count 26),

Ariz. Rev. Stat. § 44-1004(A)(2) (Count 31),  Nev. Rev. Stat. § 112.180(1)(b) (Count 34), and

Cal. Civ. Code § 3439.04(a)(2) (Count 37).

448.    The applicable state fraudulent transfer laws are substantially similar not

only to each other but also to section 548(a)(1)(B) of the Bankruptcy Code, and for the reasons

set forth above, the Court concludes that Plaintiff has established, by a preponderance of the

evidence that the following elements have been met as required by Bankruptcy Code section

544(b) and applicable state law: (a) the OpCo Entities incurred obligations under the PropCo

Leases within four years of the Petition Date; (b) the OpCo Entities transferred property to the

PropCo Entities in the form of the OpCo Rent Payments within four years of the Petition Date;

(c) the OpCo Entities (i) were engaged in business or a transaction, or were about to engage in

business or a transaction, for which any property remaining with the OpCo Entities was an

---

[97]  These conclusions apply to Count 23 (Against PropCo North and Comvest) (Avoidance of the PropCo North Washington Lease Obligations), Count 26 (Against PropCo North and Comvest) (Avoidance of the PropCo North Oregon Lease Obligations); Cunt 31 (Against PropCo South and Comvest) (Avoidance of the PCS Arizona Lease Obligations), Count 34 (Against PropCo South and Comvest) (Avoidance of the PCS Nevada Lease Obligations), and Count 37 (Against PropCo South and Comvest) (Avoidance of the PCS California Lease Obligations).

unreasonably small capital; and (ii) intended to incur, or believed that they would incur, debts

that would be beyond their ability to pay as such debts matured.

### C.    Transferee Liability Related to the PropCo Leases (11 U.S.C. § 550).

449.    The PropCo Lease Obligations were incurred for Comvest's benefit. (FOF

54).

450.    Accordingly, Plaintiff is entitled to judgment (i) avoiding the PropCo

Lease Obligations as fraudulently incurred obligations, (ii) recovering from the PropCo Entities

and Comvest the PropCo Rent Payments made thereunder or their value, and (iii) disallowing

any claim by the PropCo Entities against the Debtors for damages arising from the rejection of

the PropCo Leases.

### XVIII.    Substantive Consolidation (Count 72)

451.    As stated above, separate from its avoidance claims, the Committee pled a

claim of substantive consolidation.[98]  For the following reasons, the Court orders the substantive

consolidation of the PropCo Entities and the SLB Entities with and into the Debtors' estates.

452.    Pursuant to section 105 of the Bankruptcy Code, bankruptcy courts may

order the substantive consolidation of the estates of separate debtor entities in appropriate cases.

*See e.g., In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).  Under *Owens Corning,* the

proponent of substantive consolidation must prove (absent consent) concerning the entities for

whom substantive consolidation is sought that pre-petition they disregarded separateness so

significantly their creditors relied on the breakdown of entity borders and treated them as one

legal entity.  *Id.* at 211.  This rationale is "meant to protect in bankruptcy the prepetition

---

[98]  As discussed above, the Court has determined to order substantive consolidation as an remedy on account of Plaintiff's actual fraudulent transfer claims, the gravaman of which is that by means of a series of interrelated transfers, the assets acquired from Albertson's were artificially fragmented into the PropCo, SLB and OpCo entities as part of the Defendants' scheme to place valuable assets beyond the reach of creditors with the intent to hinder, delay or defraud them.

expectations of those creditors. The usual scenario is that creditors have been misled by debtors'

actions (regardless of whether those actions were intentional or inadvertent) and thus perceived

incorrectly (and relied on this perception) that multiple entities were one." *Id*. at 211 n.19.

453.    The *Owens-Corning* court called this an  "intentionally open-ended,

equitable inquiry," and directed lower courts to be guided by the following principles that justify

that remedy:  (1) courts should respect corporate separateness unless compelling circumstances

exist, (2) the harms substantive consolidation addresses are nearly always caused by debtors and

entities they control (as opposed to creditors), (3) mere simplicity of administration is

insufficient to justify substantive consolidation, (4) substantive consolidation is a "rough justice"

remedy that should only be used after considering and rejecting other, more precise remedies in

the Bankruptcy Code, (5) substantive consolidation may be used defensively to remedy the

identifiable harms caused by entangled affairs, but may not be used offensively (*i.e.*, with the

primary purpose of disadvantaging a group of creditors in the plan process or altering creditor

rights).  *Owens Corning*, 419 F.3d at 210-11.  This analysis generally is accomplished with

reference to the following factors: (1) difficulty in segregating assets, (2) presence of

consolidated financial statements, (3) profitability of consolidation at a single location, (4)

commingling of assets and business functions, (5) unity of interests in ownership, (6) existence

of intercorporate loan guaranties, and (7) transfer of assets with observing corporate formalities.

*In re Nortel Networks, Inc.*, 532 B.R. 494, 556-57 (Bankr. D. Del. 2015).

454.    The two-pronged standard adopted by the Third Circuit in *Owens Corning*

should be considered in light of the particular circumstances that informed that Court's decision

on summary judgment, which differ substantially from universal facts at hand.  In *Owens*

*Corning*, the banks opposing substantive consolidation had done the "deal world" equivalent of

"Lending 101" by obtaining guaranties from subsidiaries on an unsecured loan provided to the

parent. *Owens Corning*, 419 F.3d at 212.  In doing so they had a direct claim against the

subsidiaries that other creditors of the parent did not have.  In addition, the request was made by

plan proponents who sought "deemed" consolidation under a plan, which if approved would

proceed as though the assets and liabilities were merged but in fact remained separate "with the

twist that the guarantees to the banks are eliminated." *Id.* at 199.  Based on such circumstances,

the court concluded that the plan proponents requested consolidation not to rectify harm but as "a

ploy to deprive one group of creditors of their rights while providing a windfall to other

creditors." *Id.* at 200.

455.    None of those circumstances exists here.  As Garrison noted when

weighing the risks of the proposed transaction, "[t]his type of transaction has never been done

before."  This case does not involve a creditor opposing substantive consolidation who "lawfully

bargained for unequal treatment;" c*f. id.* at 216, but rather a highly-complex scheme with little or

no precedent (other than *Mervyn's*).  This Court may use its equitable powers to remedy the

harm caused by the scheme contrived Comvest.  Absent substantive consolidation, thousands of

creditors who performed services for and provided goods to the OpCo Entities would receive

nothing on their more than $100 million of claims while Comvest proposes to walk away with a

$40 million dividend.  This situation, unlike in *Owens Corning*, is the "perfect storm" warranting

substantive consolidation.  *Id.* at 216.

456.    As this Court explained in its denial of the Defendants' request to dismiss

the substantive consolidation claim:

> The Defendants ignore a problem they created and which the Court
> wants to learn more about at a trial. Comvest created Holdings, the
> OpCo Entities and the PropCo Entities and formed them to hold
> separate assets. The OpCo Entities held operational assets and

> leased property from the PropCo Entities which held the real
> property. Then, in a matter of a few months the OpCo Entities
> were bankrupt and are unable to pay unsecured creditors anything
> while the PropCo Entities are flush with money. The Court and the
> OpCo Entities' creditors need to see evidence at trial of why and
> how this happened.

*Memorandum Opinion Denying Defendants' Motion for Partial Summary Judgment* [Docket No. 136] at 7-8.  Plaintiff addressed substantial evidence at trial as to how the transaction imploded so quickly, and Comvest and the Individual Defendants bear substantial blame for this catastrophe.

457.   As the Third Circuit emphasized, "substantive consolidation at its core is equity. Its exercise must lead to an equitable result." *Owens Corning*, 419 F.3d at 216.

458.   Under *Owens-Corning*, "*Creditor opponents* of consolidation can nonetheless defeat a prima facie showing under the [pre-petition test] if they can prove they are adversely affected by substantive consolidation and they actually relied on debtor's separate existence." *In re Owens Corning*, 419 F.3d at 212 (emphasis added).  Defendants are not creditors of Holdings or the PropCo Entities.  They cited no authority for the proposition that an equity holder of the parent company of the entity the Plaintiff seeks to consolidate may assert the rights of a creditor of that entity in order to block consolidation.  No other creditor has come forward to object.

459.   Even assuming Comvest can assert Spirit's potential defense to the substantive consolidation of the PropCo Entities and SLB Entities, disparity of treatment as between Holdings' creditors and the OpCo Entities' creditors is an intercreditor issue.  Creditors of all the Debtors will have notice and an opportunity to object to the substantive consolidation of all of the entities when the Committee files its proposed plan of liquidation.

460.    Consolidation is also warranted because Plaintiff has established that pre-petition the Debtors, the SLB Entities and the PropCo Entities disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity.

461.    At all relevant times, the SLB Entities and the PropCo Entities were solely owned (directly or indirectly) and controlled by Holdings. (FOF 22, 23-26, 29-32)

462.    The SLB Entities and the PropCo Entities, along with the OpCo Entities, were created in connection with the Albertson's Acquisition to facilitate the separation of the Real Property and related assets from the operating entities and their liabilities. (FOF 99-108)

463.    The SLB Entities and the PropCo Entities served no purpose other than to acquire and/or convey the Real Property and related assets, and collect rent, for Comvest's ultimate benefit.  (FOF 54)

464.    From the time of their formation in December 2014 through the Petition Date, the PropCo Entities (a) had no independent managers, but were managed solely by their corporate owner, Property Holdings (FOF 15-18), (b) did not create or maintain any board minutes (FOF 18), (c) did not utilize their own domain name (FOF 18), and (d) maintained their business addresses, their books and records and their e-mail server at the Debtors' location. (FOF 18)

465.    From the time of their formation in December 2014 through the Petition Date, the SLB Entities (a) had no independent managers, but were managed solely by their respective corporate owner (FOF 19-20), (b) had no creditors Defendants Answer at ¶ 84d., (c) did not create or maintain any board minutes (FOF 21), (d) did not utilize their own domain

name (FOF 21), and (e) maintained their business addresses, their books and records and their e-mail server at the Debtors' location.  (FOF 21).

466.    Accordingly, at all relevant times, the Debtors' finances were so intermingled and interdependent with the SLB Entities and the PropCo Entities that administration of the Debtors' estates by themselves would leave the Debtors' creditors without assets that, but for their use by the SLB Entities and the PropCo Entities, would have been available to satisfy debts owed to them.

467.    There is no evidence that, beyond a few suppliers and the sale leaseback landlords, any of the Debtors' suppliers, landlords, contractors or other creditors were made aware that in connection with the Albertson's Acquisition, the assets were going to be splintered apart with the lion's share of value placed at Comvest's direction into separate entities ostensibly beyond the reach of operational creditors. Nor was the FTC or the general public informed of Haggen's corporate reorganization or the implications of the PropCo/OpCo structure.

468.    With respect to "creditor reliance" on the entities' consolidated existence, *Murphy v. Stop & Go Shops, Inc. (In re Stop & Go of Am., Inc.),* 49 B.R. 743, 745 (Bankr. D. Mass. 1985), is particularly instructive.  There, the chapter 11 trustee of an "OpCo" company filed a complaint seeking legal title to certain franchise contracts and property rights listed in the name of "ShellCo" and to avoid the purported lien asserted on the assets. Pre-petition, three individuals (later shareholders and directors of both OpCo and ShellCo) negotiated to buy a transmission business from seller.  Seller proposed to set up two companies to accomplish the transaction. Buyers would "assign" all their right, title, and interest in the assets acquired to newly created ShellCo; (ii) ShellCo would grant to newly created OpCo the sole and exclusive license to use the assets and operate under franchise contracts, for no consideration; (iii) all

royalty payments from the contracts would be the property of OpCo; and (iv) the stock of both would be pledged to buyer as security for the promissory note as well as a security interest in the assets. A license agreement between the parties was to provide that ShellCo would not be liable for any of the debts of OpCo that all documents and FTC paperwork would provide that the two entities were to remain independent. This license agreement was never executed, however, and, as in this case, neither the public nor the FTC was made aware of the separate nature of the two entities, which did business exclusively (in relation to the general public) as OpCo. In other words, ShellCo had all the assets (the franchise agreements) and OpCo had all the liabilities and merely acted as ShellCo's licensee. In that case, the court ordered the substantive consolidation of ShellCo and OpCo in the context of an adversary proceeding. In doing so, the court noted:

> There was a single operation, namely [OpCo], and that was the
> face turned to the world, except for that little corner of the bush
> where the seller lay hidden. If that doesn't constitute fraud and the
> evidence of reliance is meager, it was a deliberate scheme to
> protect the seller's interest by insuring its status as sole creditor of
> the legal title holder of the franchise, namely, the shell, [ShellCo],
> in a manner likely to result in a fraud to creditors because of the
> concealment of any public awareness. The descriptions of
> [OpCo's] financial assets would lead one to conclude that [OpCo,
> not ShellCo], possessed the master franchise contract.

*Id.* at 748. The court rejected the defendants' argument that they would be impermissibly prejudiced by substantive consolidation because their debt would be combined with the other creditors of OpCo while, without consolidation, they would be the only creditor of ShellCo and be entitled to distribution of its one remaining asset -- the franchise contract. In doing so, the court stated:

> [T]he Court cannot find that the defendants were ignorant of the
> relationship of the companies. It was at their insistence that the two
> operating companies were formed. . . . The defendants are not as
> innocent as they would like the Court to believe. *While a seller can*
> *and should be expected to protect the purchase price, it cannot be*

> *allowed to do it in so devious a manner. Whether its scenario*
> *results in fraud or not, should not be only a matter of chance.*
> *Legal shrewdness is often but a neighbor to an unconscionable*
> *scheme.*  Accordingly, the substantive consolidation of [OpCo] and
> [ShellCo] is ordered.

*Id*. at 750-51 (emphasis added).

469.    In *Stop & Go* as in this case, if substantive consolidation were denied

based on explicit proof of creditor reliance, the creditors of the debtor would be denied the

opportunity to share in the only real asset available to them, which was owned by the non-debtor.

Notably, in *Stop & Go*, the court ruled:

> Further, although this Court has found no specific creditor reliance,
> at the very core of any business relationship is a natural
> assumption that a business is what it purports to be. Creditors
> derive their impressions of the enterprise from the manner in which
> it holds itself out to them. In the case at bar, creditors had no cause
> to question the assets and financial viability of [debtor] S & G of
> America.

*Id.* at 750.

470.    The *Stop & Go* Court's decision to substantively consolidate a debtor and

non-debtor absent creditor reliance echoes this Court's remarks at the hearing on the summary

judgment motion:

> MR. FRENCH: So let's turn to their statement that creditors were
> confused about whether Holdings or Opco owned the real property.
> … In the absence of that evidence it's not enough to say creditors
> were confused.
>
> THE COURT: Well, isn't a foregone conclusion? This is a
> question. So I'm not arguing the point. Is it a foregone conclusion
> that based upon the nature of the transaction and the creditors were
> doing business with Opco that they didn't understand the
> transaction? That they didn't know that the real estate was held by
> Propco?

Transcript of Hearing, September 26, 2017, at 74:6-18.

471.     Creditors in this case merely continued to do business with Haggen.  By and large, they had no reason to believe that the assets were going to be segregated into separate bankruptcy remote entities. (*See* FOF 138-142)  The information that was known publically about the Albertsons Acquisition was not, therefore, sufficient to put creditors on notice that they had a duty to investigate further before continuing to do business with what they thought was Haggen.  Like in the typical fraud case, if there are no facts raising a red flag, then there is no duty to investigate or inquire, and even if a duty of reasonable investigation were triggered, no reasonable inquiry would have readily revealed the PropCo/OpCo maneuvering.  *See, e.g., Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 362-63 (2d Cir. 2013) (ex-wife filed action against ex-husband for fraud, breach of fiduciary duty, and other claims; "We disagree with the district court that those circumstances put Patricia on inquiry notice in 1991 of Steven's alleged fraud with respect to his concealment of the Lurie payment . . . . Inquiry notice imposes an obligation of reasonable diligence . . . . While hindsight shows that the fraud *could* have been discovered, that fact does not support the conclusion that, on reasonable inquiry, the fraud *would* have been discovered.").  *See also DDRA Capital, Inc. v. Baldwin*, 2017 U.S. App. LEXIS 17184 at *6 (3d Cir. Sept. 6, 2017) ("If the recipient is aware of facts from which a reasonable person would be alerted to make further inquiry, then he or she has a duty to investigate further and is not justified in relying on' the statements.").

472.     The Defendants not surprisingly point to a handful of large, sophisticated creditors who either had direct knowledge of the OpCo/PropCo structure because they were involved in the transactions or asked for and did not obtain a guarantee.  No mention is made of the hundreds of smaller trade vendors who simply relied on what the business purported to be – a grocery store chain – not a complex web of corporate entities designed to secret valuable real

property into bankruptcy remote entities for the benefit of private equity.  Equity mandates that

Comvest not be rewarded for its clever financial engineering at those unsuspecting creditors'

expense.

473.    Given (a) the identity of the interests among the Debtors, the SLB Entities

and the PropCo Entities, including their common ownership, (b) the improper purpose for which

the SLB Entities and the PropCo Entities were created, and (c) Comvest's inequitable conduct in

attempting to sequester the Real Property and related assets for its benefit, and to the exclusion

of the Debtors' general unsecured creditors, it is necessary and appropriate that the business

affairs of the SLB Entities and the PropCo Entities be administered and resolved in conjunction

with the Debtors' affairs.

474.    Absent substantive consolidation, thousands of creditors who performed

services for and provided goods to the OpCo Entities would receive nothing on their more than

$100 million of claims while Comvest, which created Holdings, the OpCo Entities and the

PropCo Entities and formed them to hold separate assets, will walk away from the wreckage with

a $40 million windfall.  Substantive consolidation is necessary to insure the equitable treatment

of all creditors, in that the Debtors' unsecured creditors will unfairly and inequitably receive a

smaller share of assets if the SLB Entities and the PropCo Entities are not brought into these

proceedings.

475.    It is no bar to ordering substantive consolidation that the PropCo Entities

and the SLB Entities are non-debtors.  While the Third Circuit expressly left open the question of

the consolidation of debtors and non-debtors, *Owens Corning*, 419 F.3d at 208, n.13, the great

weight of authority authorizes substantive consolidation of debtors and non-debtors.  *See e.g.*,

*Alexander v. Compton (In re Bonham)*, 229 F.3d 750 (9th Cir. 2000); *Drabkin v. Midland-Ross*

*Corp. (In re Auto-Train Corp.)*, 810 F.2d 270, 276 (D.C. Cir. 1987); *Logistics Info. Sys. v.*

*Braunstein (In re Logistics Info. Sys.)*, 432 B.R. 1, 12 (D. Mass. 2010); *Simon v. New Ctr.*

*Hospital (In re Matter of New Ctr. Hospital)*, 187 B.R. 560 (E.D. Mich. 1995); *In re Tureaud*, 59

B.R. 973 (N.D. Okla. 1986); *Gray v. O'Neill Props. Group (In re Dehon, Inc.)*, 2004 Bankr.

LEXIS 1470 (Bankr. D. Mass. Sep. 24, 2004); *Stop & Go of America, Inc. v. Stop & Go Shops,*

*Inc. (In re Stop & Go of America, Inc.)*, 49 B.R. 743 (Bankr. D. Mass. 1985).  This is particularly

warranted in this case since the entities to be consolidated are wholly owned subsidiaries of a

chapter 11 debtor, Holdings.

## X.    Breach of Duty

### A.    Elements of Cause of Action

476.    The elements of a breach of fiduciary duty claim are:  (1) that a fiduciary

duty exists and (2) that the fiduciary breached that duty.  *See York Lingings v. Roach*, 1999 Del.

Ch. LEXIS 160, at \*5 (Del. Ch. July 28, 1999).

477.    It is axiomatic that an officer or director of a Delaware corporation owes

fiduciary duties to both the company and its shareholders.  *See Agostino v Hicks*, 845 A.2d 1110,

1122 n.54 (Del. Ch. 2004); *Gantler v. Stephens*, 965 A.2d 695, 708-09 & n.37 (Del. 2009)

(officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty).

Likewise, unless the operating agreement provides otherwise, managers and officers of a

Delaware limited liability company ("LLC") owe traditional fiduciary duties to both the LLC

and its members.  *See Opus East*, 528 B.R. at 66*; Schroeder v. Pinterest*, 133 A.D.3d 12, 14, 17

N.Y.S.3d 678, 687 (App. Div. 2015) (citing *William Penn Partnership v Saliba*, 13 A.3d 749,

756 (Del. 2011); *CMS Inv. Holdings, LLC v. Castle*, 2015 Del. Ch. LEXIS 169, \*\*64-65 (Del.

Ch. June 23, 2015)); Del. Code Ann. tit. 6, § Del. 18-1104 ("In any case not provided for in this

chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary

duties and the law merchant, shall govern.").

478.    LLCs may limit or eliminate "any and all liabilities for . . . breach of

duties (including fiduciary duties) of a member, manager or other person . . . ."  Del. Code Ann.

tit. 6, § 18-1101(e).  Here, Holdings' LLC agreement purports to eliminate fiduciary duties for

"Managers," but not for any other person, including Comvest as the controlling shareholder.  *See*

PX 713 § 12.11 ("Any fiduciary duties (including duties of care, disclosure or loyalty) that a

Manager might otherwise have to the Company or the Members of the Company are hereby

eliminated, except to the extent otherwise provided by law.").[99]

### B.    Standard of Conduct

479.    The two fiduciary duties to a corporation or limited liability company are:

(1) the duty of care and (2) the duty of loyalty.[100]  *See ODN Holding*, 2017 Del. Ch. LEXIS 67,

at *43-44; *Gantler*, 965 A.2d at 708-09 (Del. 2009) (officers owe same fiduciary duties as

directors); *Backus v. U3 Advisors, Inc.*, 2017 U.S. Dist. LEXIS 132829 (S.D.N.Y. Aug. 18,

2017) (upholding on motion to dismiss claims against officers for breach of fiduciary duties

under Delaware law where officers were alleged to have exploited their positions as officers to

further their private interests as members of a separate company);  *Opus East*, 528 B.R. at 57

(discussing fiduciary duties owed to a limited liability company).

---

[99] Holdings' LLC agreement contains only a limited exculpatory provision providing that "[n]o activity by [Comvest] or any Manager designated by it or any of their respective Affiliates described in [section 12.11] shall be a breach of fiduciary duty to the Company or any Other member."  The activities described in section 12.11 relate only to corporate opportunities and do not diminish or limit Comvest's liability for the breaches of fiduciary duty claimed by Plaintiff.

[100] Certain courts formulate the duties owed by fiduciaries as the "triad" of duty of care, duty of loyalty and duty of good faith, *see Opus East*, 528 B.R. at 56, while certain courts formulate them as two duties, with the duty of good faith subsumed as a subsidiary of the duty of loyalty, *see Frederick Hsu Living Trust v. ODN Holding Corp.*, 2017 Del. Ch. LEXIS 67, at *92 (Del. Ch. Apr. 14, 2017) ("*ODN Holding*").  The difference is without distinction.

480.    "'[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.'" *ODN Holding*, 2017 Del. Ch. LEXIS 67, at *43-44 (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)); *Opus East*, 528 B.R. at 56.  The Delaware Supreme Court has "consistently defined" the duty of loyalty in "broad and unyielding terms":

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests . . . A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.

*Backus v. U3 Advisors, Inc.*, 2017 U.S. Dist. LEXIS 132829, at *63-64 (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d at 361).

481.    A claim for breach of the duty of loyalty requires a showing that a fiduciary was on both sides of a transaction and that the transaction was not entirely fair to the company.  *See Opus East*, 528 B.R. at 56.  "A claim for the breach of the duty of loyalty under Delaware law exists where (1) the company is harmed or (2) a fiduciary personally profits from the corporate opportunity."  *See Mukamel v. Bakes*, 378 F. App'x 890, 899-900 (11th Cir. 2010) (citing *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991)).

482.    The duty of loyalty also includes a requirement to act in good faith, which is "'a subsidiary element, i.e., a condition, of the fundamental duty of loyalty.'"  *ODN Holding*,

2017 Del. Ch. LEXIS 67, at *44 (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).  The duty of good faith requires "'true faithfulness and devotion to the interests of the corporation and its shareholders'" and is breached when, among other things, a fiduciary acts with a purpose other than that of advancing the best interests of the corporation.  *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 67 (Del. 2006) ("*Walt Disney Co.*"); *In re Fedders North America, Inc.*, 405 B.R. at 540.  A claim for breach of the duty of good faith may be established in several ways.  The Delaware courts have identified three examples of such a breach:

> A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.

*Opus East*, 528 B.R. at 58 (quoting *Walt Disney Co.*, 906 A.2d at 67).

483.    A claim for breach of the duty of care requires a showing of gross negligence which generally "'requires directors and officers to fail to inform themselves fully and in a deliberate manner.'"  *Opus East*, 528 B.R. at 56 (quoting *In re Fedders North American, Inc.*, 405 B.R. at 527); *see also Walt Disney Co.*, 906 A.2d 27, 64; *Stanziale v. Nachtomi*, 330 B.R. 56, 64 (D. Del. 2004) ("Gross negligence also applies to the decision made by corporate officers."), *aff'd in part & rev'd on other ground*, 416 F.3d 229 (3d Cir. 2005).  A fiduciary's intent, *i.e.*, whether the fiduciary acted in bad faith, is irrelevant.  *See Opus East*, 528 B.R. at 56.  The gross negligence category includes the "failure to inform one's self of available material facts."  *Walt Disney Co.*, 906 A.2d at 64.

C.    **The "Business Judgment Rule" Does Not Apply to Insider Transactions**

484.    The duties described above relate to the standard of conduct owed by fiduciaries.  The standard of review is the test a court applies when evaluating whether fiduciaries have met that standard of conduct.  *See ODN Holding*, 2017 Del. Ch. LEXIS 67, at *42.  "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."  *Id.* at *59.

485.    The default standard is the business judgment rule, which presumes that a director acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.  *See id.*  The business judgment rule's presumption may be rebutted by showing that a director was interested and therefore cannot count towards the requisite majority necessary to make the relevant decision.  *See id.* at *61. The burden of proof is on the party challenging the decision to establish facts to rebut the presumption.  *See id.* at *62.

486.    The presumption can be rebutted by proving that the director received "a personal financial benefit from a transaction that is not equally shared by the stockholders."  *Id.* (quoting *Rales v. Blasband*, 634 A.2d 927, 936; *accord Cede*, 634 A.2d at 362 ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."); *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("Directorial interest exists whenever . . . a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders.").  "[A] subjective 'actual person' standard [is used] to determine whether a 'given' director was likely to be affected in the same or similar circumstances."  *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) (quoting *Cinerama v. Technicolor Plenary*, 663 A.2d 1156, 1167 (Del. 1995).  "[T]he benefit received by the director and not shared with stockholders

must be 'of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest.'" *Trados Inc. Shareholder Lit.*, 2009 Del. Ch. LEXIS 128, at *6 (quoting *In re GM Shareholders Lit.*, 734 A.2d 611, 617 (Del. Ch. 1999)).

487.    Another way to rebut the presumption of the business judgment rule is by proving that the director "was a dual fiduciary and owed a competing duty of loyalty to an entity that itself stood on the other side of the transaction or received a unique benefit . . . ." *ODN Holding*, 2017 Del. Ch. LEXIS 67, at *62, n.44 (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (holding that officers of parent corporation had a conflict of interest when acting as subsidiary directors regarding transaction with parent); *accord Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987) (same); *see also Trados I,* 2009 Del. Ch. LEXIS 128, 2009 WL 2225958, at *8 (treating directors as interested for pleading purposes in transaction that benefited preferred stockholders when "each had an ownership or employment relationship with an entity that owned Trados preferred stock")).

488.    A plaintiff may also rebut the presumption by proving a director's lack of good faith. *ODN Holding*, 2017 Del. Ch. LEXIS 67, at *63. Bad faith encompasses both "an intent to harm [and] also intentional dereliction of duty." *Id.* (quoting *Lyondell Chem. v. Ryan*, 970 A.2d 235, 240 (Del. 2009). "'A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation.'" *Id.* (quoting *Walt Disney Co.*, 906 A.2d at 67). "'It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation.'" *Id.* (quoting *Walt Disney Co.*, 907 A.2d at 754). "Bad faith can be the result of

'any emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation, including greed, hatred, lust, envy, revenge, . . . shame or pride.'" *Id.* (quoting *In re RJR Nabisco*, 1989 Del. Ch. LEXIS 9 (Del. Feb. 14, 1989)).

489.    If the plaintiff proves that the defendant was on both sides of the transaction, then the burden shifts to the defendant to prove that the transaction was entirely fair. The entire fairness test is Delaware's most onerous standard of review. *ODN Holding*, 2017 Del. Ch. LEXIS 67, at * 61. Under this test, the defendant must prove "'to the *court's* satisfaction that the transaction was the product of both fair dealing and fair price.'" *Id.* (quoting *Cinerama*, 663 A.2d at 1163); *accord Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1214 (Del. 2012). Fair dealing "'embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.'" *Auriga Capital Corp.*, 59 A.3d at 1214 (quoting *Weinberger*, 457 A.2d at 711). Fair price "'relates to the economic and financial considerations of the proposed' transaction." *Id.* (same). "'Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs.'" *ODN Holding*, 2017 Del. Ch. LEXIS 67, at *61 (quoting *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006)).

490.    The Delaware Supreme Court held in the landmark *Weinberger* decision that there is "no dilution" of the duty of loyalty when a director "holds dual or multiple" fiduciary obligations. 457 A.2d at 710; *accord ODN Holding*, 2017 Del. Ch. LEXIS 67, at *65. "If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict." *In re Trados II*, 73 A.3d 17, 46-47 (Del. Ch. 2013); *see Van de Walle v. Unimation, Inc.*, 1991 Del. Ch. LEXIS 27, at *47 (Del. Ch. Mar. 6, 1991). But if the interests of

the beneficiaries diverge, the fiduciary faces an inherent conflict of interest.  *See ODN Holding*, 2017 Del. Ch. LEXIS 67, at *65.  "There is no 'safe harbor' for such divided loyalties in Delaware."  *Weinberger*, 457 A.2d at 710; *accord ODN Holding*, 2017 Del. Ch. LEXIS 67, at *65.

491.    *ODN Holding* is instructive in this regard.  There, certain of the directors were also principals of the controlling shareholder, Oak Hill, and in such capacities they owed fiduciary duties to Oak Hill.  Thus, for purposes of evaluating the theory of the complaint that Oak Hill wanted the company to engage in a de facto liquidation to raise cash that Oak Hill could extract preferentially through its redemption right, the court concluded at the pleading stage that such individuals could not count as independent or disinterested directors "because each faced the dual fiduciary problem that the Supreme Court identified in *Weinberger*."  *ODN Holding*, 2017 Del. Ch. LEXIS 67, at *66.

492.    The *ODN Holding* court found similarly with respect to a director who was also the officer of a company controlled by Oak Hill.  "'Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of [the controlling shareholder].'"  *Id.* at *72 (quoting *In re Ezcorp Consulting Agreement Deriv. Litig.*, 2016 Del. Ch. LEXIS 14, at *116 (Del. Ch. Jan. 25, 2016) (collecting cases); *accord Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) ("Mattrick is Zynga's CEO. Zynga's controlling stockholder, Pincus, is interested in the transaction under attack, and therefore, Mattrick cannot be considered independent.").  The fact that officers derive their principal income from their employment "'powerfully strengthens the inference'" that they cannot act independently from the controlling stockholder.  *ODN Holding*, 2017 Del. Ch. LEXIS 67, at *72 (quoting *Mizel v. Connolly*, 1999 Del. Ch. LEXIS 157, at *9 (Del. Ch. July 22, 1999)).

493.    Even with respect to outside directors, the court found that it was "critical to remember that they acted in the shadow of a controlling stockholder, and that [such directors] had additional reasons to favor Oak Hill's interests." *ODN Holding*, 2017 Del. Ch. LEXIS 67, at *79.  A controlling stockholder transaction "'of course is the context in which the greatest risk of undetectable bias may be present.'" *Id.* at *79 (quoting *Kahn v. Tremont Corp.*, 1996 Del. Ch. LEXIS 40, at *23 (Del. Ch. Mar. 21, 1996), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997)). Based on the foregoing, the court concluded that the entire fairness standard applied because the company lacked a disinterested or independent board majority.

494.    As set forth above, all of the transactions at issue in this lawsuit – from the transfer of assets from Holdings to the PropCo Entities and the SLB Entities for no consideration; to the imposition of the PropCo Leases and subleases for no purpose other than to extract value; to the payment of Comvest's "management fee"; to the PropCo Advance where Comvest purported to give itself a security interest – are insider transactions because, as the evidence shows, Comvest controlled the parties and dictated the terms.

### D.    Breach of Fiduciary Duty by Comvest, as Controlling Equity Owner (Count 66)

495.    Delaware law recognizes that a majority or controlling shareholder also owes fiduciary duties to the corporation.  *Mukamel v. Bakes*, 383 B.R. 798, 822-23 (S.D. Fla. 2007) (citing *In re Reading Co.*, 711 F.2d 509, 517 (3d Cir.1983) (citations omitted); *In re MAXXAM, Inc.*, 659 A.2d 760, 771 (Del. Ch. 1995) ("A shareholder that owns a majority interest in a corporation, or exercises actual control over its business affairs, occupies the status of a fiduciary to the corporation and its minority shareholders.").

496.    "Breach of fiduciary duty is an equitable claim, and it is a maxim of equity that 'equity regards substance rather than form.'" *Virtus Capital L.P. v. Eastman Chem. Co.*,

2015 Del. Ch. LEXIS 34, at *47 (Del. Ch. Feb. 11, 2015) (quoting *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983)); *accord Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007) ("It is the very nature of equity to look beyond form to the substance of an arrangement.").

497.    It is well established under Delaware law that courts applying equitable principles have extended liability for breach of fiduciary duty "beyond the natural persons who served as directors to outsiders like majority stockholders who effectively controlled the corporation." *See Virtus Capital*, 2015 Del. Ch. LEXIS 34, at *47 (citing *S. Pac. Co. v. Bogert*, 250 U.S. 483, 488 (1919); *Sterling v. Mayflower Hotel Corp.*, 33 Del. Ch. 293, 298, 93 A.2d 107 (Del. 1952)). Delaware courts consistently have looked to who actually wields control and have imposed the risk of fiduciary liability on the actual controllers. *See id.*.[101]

498.    The actions of a controlling shareholder's representatives are attributable to the controlling shareholder. *See ODN Holding*, 2017 Del. Ch. LEXIS 67, at *103 (citing *Hospitalists of Del., LLC v. Lutz*, 2012 Del. Ch. LEXIS 207, at *17 (Del. Ch. Aug. 28, 2012)). Thus, the actions of Comvest's Deal Team (Caple, Niegsch and Scholl) and IC (Falk, Rodriguez, Clark and Marrero) all are attributable to Comvest.

499.    The Court finds that the entire fairness standard applies with respect to the Plaintiff's claims for breach of fiduciary duty against Comvest because Comvest was on both sides of the relevant transactions and Comvest received benefits not shared by the entities it

---

[101]  In addition, in the LLC context, fiduciary duties may extend to entities that control fiduciaries on a theory of liability under a line of cases beginning with *In re USACafes, L.P. Litigation*, 600 A.2d 43 (Del. Ch. 1991) (holding that those affiliates of a general partner who exercise control over the partnership's property may find themselves owing fiduciary duties to both the partnership and its limited partners); *accord In Bay Ctr. Apts. Owner, LLC v. Emery Bay PKI, LLC*, 2009 Del. Ch. LEXIS 54 (Del. Ch. Apr. 20, 2009) (extending doctrine to LLCs and denying motion to dismiss breach of fiduciary duty claims); *see also 2009 Caiola Family Trust v. PWA, LLC*, 2014 Del. Ch. LEXIS 261 (Del. Ch. 2014) (unpublished decision); *In re Primedia Inc. Derivative Litig.*, 910 A.2d 248 (Del. Ch. 2006).

controlled.  As a result, the burden shifts to Comvest to prove that such transactions were entirely fair.  Comvest has failed to satisfy this burden.

500.    Comvest engaged in actions that favored and advanced its own interests over the OpCo Entities' interests from the outset.  Comvest devised and implemented the PropCo/OpCo structure with the specific intent of keeping the PropCo Entities' assets and liabilities separate from those of the OpCo Entities for the purpose of preventing the PropCo Entities' real estate assets from being used to satisfy the OpCo Entities' liabilities thereby securing the economic benefits of the real estate for itself whether the OpCo Entities' operations succeeded or failed.

501.    Thereafter, Comvest executed this strategy by engaging in a constellation of actions whereby the fee-owned properties were transferred from Holdings to either the PropCo Entities or the SLB Entities for Comvest's sole benefit and without any consideration to Holdings.  Instead, Comvest used most of the proceeds from the sale of property to the SLB Entities to pay the Albertson's Acquisition purchase price and foisted subleases of the property transferred to the PropCo Entities, and the obligations thereunder, upon the OpCo Entities.

502.    Comvest unilaterally dictated the terms of the Contribution Agreements and PropCo Leases between the PropCo Entities and OpCo Entities for its own benefit and to the detriment of the operating companies.

503.    Comvest orchestrated and dictated the terms of the PropCo Advance on both the PropCo Entities' and OpCo Entities' sides for its own benefit and to the detriment of the operating companies.

504.    Based on the evidence above (FOF 45, 47-54, 99-137, 184-211, 264-285), the Court concludes that Comvest breached its fiduciary duties.

E.    **Breach of Duties of Good Faith and Care by the Officers**
      **and Directors (Count 67)**

505.    The Court concludes that Caple, Rodriguez, Barnett, Shaner, Clougher, and Anderson breached their duty of care in their capacities as officers.[102]

506.    Caple owed fiduciary duties to Holdings as an officer (President and CEO)[103] from January 1, 2014 through January 30, 2015, while Rodriguez owed fiduciary duties to Holdings as an officer (Secretary and CFO) from November 24, 2014 through January 30, 2015. Caple and Rodriguez were also principals of Comvest during those periods and in such capacities owed fiduciary duties to it. Thus, neither Caple nor Rodriguez were independent or disinterested because each faced the "dual fiduciary problem." *ODN Holdings*, at *66, 72.

507.    Barnett owed fiduciary duties to OpCo North and OpCo South as an officer (CFO) from December 2, 2014 through at least the Petition Date. Shaner owed fiduciary duties to OpCo South as an officer (President and CEO) from December 2, 2014 through at least the Petition Date. Clougher owed fiduciary duties to OpCo North as an officer (President and CEO) from December 2, 2014 through at least the Petition Date. Anderson owed fiduciary duties to OpCo South and OpCo North as an officer (Secretary) from December 2, 2014 through at least the Petition Date, and as Vice President of OpCo South from October 29, 2015 through at least the Petition Date. While Barnett, Shaner and Clougher were not principals of Comvest, the Court finds based on their testimony that they "acted in the shadow" of Comvest and accordingly were not independent or disinterested. *Id*. at *79.

---

[102] Niegsch is the sole Individual Defendant who was a manager and not an officer of any of the relevant Haggen entities. The Court concludes that Niegsch, as the Manager of Holdings, is exculpated for the breach of his duties of loyalty, good faith, and care pursuant to section 12.11 of Holdings' LLC agreement. PX 713. Accordingly, Count 67 for the breach of duties of good faith and care by Officers and Managers and Count 68 for the breach of duty of loyalty by Holdings' Managers are dismissed solely as against Niegsch.

[103] OpCo North and OpCo South were managed by Operations, which in turn was managed by Holdings.

508.    The Court thus concludes that the entire fairness standard applies to Caple, Rodriguez, Barnett, Shaner and Clougher.  Therefore the burden shifts to them to prove that the relevant transactions were entirely fair.  These individuals have failed to satisfy such burden.

509.    The Court concludes that Caple's and Rodriguez' conduct constitutes gross negligence because, as dual fiduciaries, they not only failed to fully inform themselves of the available material facts, but completely ignored the impact on the OpCo Entities of the transactions they engineered at the direction and for the benefit of Comvest, to whom they also owed fiduciary duties.

510.    Anderson's lack of relevant experience rendered him unprepared to satisfy his fiduciary duty of care.  He blindly signed the Contribution Agreements and PropCo Leases with no knowledge of the substance of their terms or their impact on the OpCo Entities to whom he owed this duty.  He failed to inform himself of available material facts related to such transactions.  Anderson was grossly negligent in his complete abdication of his responsibilities as an officer.

511.    Barnett failed to inform himself in a deliberate manner of the impact of the PropCo/OpCo structure and the PropCo Advance on the OpCo Entities and their creditors.  Anderson was grossly negligent in his complete abdication of his responsibilities as an officer.

512.    Shaner failed to inform himself in a deliberate manner of the impact of the PropCo/OpCo structure and the PropCo Advance on OpCo South and its creditors.  Shaner was grossly negligent in his complete abdication of his responsibilities as an officer.

513.    Clougher failed to inform himself in a deliberate manner of the impact of the PropCo/OpCo structure and the PropCo Advance on OpCo North and its creditors.  Clougher was grossly negligent in his complete abdication of his responsibilities as an officer.

514. Based on the evidence above (FOF 22, 26-30, 45, 47-54, 99-137, 184-211, and 264-285), the Court concludes that Caple, Rodriguez, Anderson, Barnett, Shaner, and Clougher breached their fiduciary duties.

## XI. The PropCo Advance

### A. Recharacterization of the PropCo Advance (Count 71)

#### a. Applicable Standard

515. The *Roth Steel* eleven-factor test has been used by courts in this district to determine whether a loan should be recharacterized as equity. *See Order Denying Defendants' Motion in Limine to Exclude the Expert Report and Testimony of Carol Flaton* [Docket No. 133] at 2 ("*Roth Steel* is an opinion which the court has cited after the *SubMicron* opinion . . . ."); *accord Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525 (Bankr. D. Del. 2012) ("*Autobacs*");[104] *Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.)*, 2017 Bankr. LEXIS 1150 (Bankr. D. Del. Apr. 27, 2017) ("*LMI Legacy Holdings*");[105] *Off'l Comm. v. Highland Capital Mgmt., L.P. (In re Moll Indus.)*, 454 B.R. 574 (Bankr. D. Del. 2011) ("*Moll Indus.*").

516. The eleven factors are as follows:

  (a)    names given to the instruments, if any, evidencing the indebtedness;

  (b)    presence or absence of a fixed maturity date and a schedule of payments;

  (c)    no fixed rate of interest and interest payments;

  (d)    whether repayment depended on success of the business;

  (e)    inadequacy of capitalization;

---

[104] In *Autobacs*, the court denied a motion to dismiss the recharacterization counts. The parties later settled the adversary proceeding requiring the defendant to pay plaintiff $8.5 million and disallowing defendant's claim.

[105] In *LMI Legacy Holdings*, the court denied the defendant's motion to dismiss recharacterization counts and the litigation is ongoing.

      (f)     identity of interests between creditor and stockholder;

      (g)    security, if any, for the advances;

      (h)    ability to obtain financing from outside lending institutions;

      (i)     extent to which the advances were subordinated to the claim of outside creditors;

      (j)     the extent to which the advances were used to acquire capital assets;

      (k)    presence or absence of a sinking fund;

      (l)     presence or absence of voting rights; and

      (m)   other considerations.

*LMI Legacy Holdings*, 2017 Bankr. LEXIS 1150, at * 38 (citing *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006) ("*SubMicron*")).  No one factor is dispositive.  *See Bayer Corp. v. MasoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 750 (6th Cir. 2001) ("*AutoStyle*") ("No one factor is controlling or decisive.").  Courts may find recharacterization appropriate even if fewer than all of the factors weigh in favor of a capital contribution.  *See Fairchild Dornier GmbH v. Off'l Comm. (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006) ("*Dornier*") (affirming the lower court's determination that "[w]hile some aspects of the transaction were consistent with a loan, the transaction on the whole was more consistent with a capital contribution" and therefore should be treated as such); *In re Cold Harbor Assocs.*, 204 B.R. 904, 916-19 (Bankr. E.D. Va. 1997) ("*Cold Harbor*") (concluding the advances should be treated as equity where five factors weighed in favor of equity and four factors weighed in favor of a loan); *LMI Legacy Holdings*, 2017 Bankr. LEXIS 1150, at *37 (denying motion to dismiss where trustee alleged and defendant did not dispute facts with respect to 7 of 11 factors weighing in favor of recharacterization).  In addition, certain factors (such as inadequate capitalization, identity of interest, the absence of security, and an inability to obtain third-party financing) are "strong" or "overwhelming" evidence of an equity

contribution. "These factors all speak to whether the transaction 'appears to reflect the characteristics of . . . an arm's length negotiation.'" *Dornier*, 453 F.3d at 234 (quoting *AutoStyle*, 269 F.3d at 750).

517.    In reviewing such factors, "courts must look to the facts on a case by case basis, focusing on the intent of the parties 'inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.'" *Moll Indus.*, 454 B.R. at 582 (quoting *SubMicron*, 432 F.3d at 456); *see also Autobacs*, 473 B.R. at 572 (quoting *Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 518 (Bankr. D. Del. 2011)) ("*Friedman's*").[106]

518.    In addition, contrary to the Defendants' assertions, the parties' subjective intent is irrelevant:

> Appellants place particular reliance on the intent of the parties. Here, appellants contend, the form in which the parties cast the transactions conclusively demonstrates their intent to create a debt relationship. In relying so heavily on this factor, however, appellants misconceive its import. The question is not whether the parties intended to call their transaction "debt" . . . . Instead, the relevant inquiry is the actual manner, not the form, in which the parties intended to structure their relationship. If the intended structuring accords with the type arrangement that qualifies . . . as debt, that intent supports a finding of debt.

*Slappey Drive Industrial Park v. United States*, 561 F.2d 572, 583 (5th Cir. 1977).

519.    The court agrees with the Bankruptcy Court for the Eastern District of Oklahoma that the Court should not rely on subjective intent or self-serving testimony of the parties. That court reasoned:

---

[106] In *Friedman's*, the court denied a motion to dismiss the recharacterization counts. The parties later settled, with the liquidating trust plaintiff dismissing the complaint and defendants receiving smaller general unsecured claims under a plan.

> At the time of an initial investment, investors hope to make money. Lots of it. By the time the business has entered into a downward spiral, the parties are in survival mode. Testimony offered in court is shaped by the passage of time and the change in expectations. Recollection is jaundiced by a desire to minimize losses. For this reason, courts look to the "objectively indicated intent" of the parties rather than the subjective recollections testified to at trial. to the text of the note "A court must look not simply at self-serving declarations of the parties, but instead must examine those circumstances surrounding the transaction."

*Miller v. Dow (In re Lexington Oil & Gas Ltd.)*, 423 B.R. 353, 367 (Bankr. E.D. Okla. 2010)

("*Lexington Oil*") (quoting In re Lane, 742 F.2d 1311, 1316 (11th Cir. 1984)).

520.    As in this case, the "lender" representatives in *Lexington Oil* testified that they believed their investments were loans and that they would not have invested their money in the company had they know it might be treated as equity.  The court rejected such testimony as "serv[ing] them well at trial as they attempt to retain the monies paid to them." *Id.*  Instead, the court found that there was "much more to be learned" from the conduct of the lenders at the time they provided the money to the company.  *Id.* at 368.  Such conduct included the failure to follow corporate formalities.   For example, the investors could not recall when they first reviewed their respective promissory notes.  Further, in some cases, money was transferred days or weeks before the effective date of the note.  *See id.*[107]

---

[107] The *Lexington Oil* court concluded that "when viewed as a whole, the transaction is an attempt to provide [the investors] all of the benefits of equity ownership without any of the attendant risks" because each obtained an ownership interests and all of its upside while preserving their investment in the event of a business failure.  423 B.R. at 371.  The court reasoned:

> Such a characterization is of little concern to anyone unless and until the business fails. If countenanced, the effect of this transaction will be to elevate the claims of Dow and Cox over those of all general unsecured creditors. The concept of owning equity in a corporation does not allow such a result, and the concept of equity in jurisprudence requires the same conclusion.

*Id.*

521.    As in *Lexington Oil*, the Defendants (and the OpCo Entities controlled by them) failed to follow numerous corporate formalities.[108]  For example, the PropCo Agreement omitted both the maturity date and the date interest was to begin to accrue.  In addition, at least $7.5 million was advanced on August 12, 2015, nine days before the Intercompany Notes were tendered.  Defendants did not offer into evidence any board minutes, resolutions, or consents authorizing the PropCo Advance.  And the OpCo Entities and Haggen, Inc. purported to grant a security interest to the PropCo Entities on August 7, 2015 – when the OpCo Entities were in default under the ABL and had not obtained the consent of the senior lenders to grant a security interest.[109]  The Defendants' failure to follow corporate formalities in these myriad ways further buttresses the Court's decision to recharacterize the PropCo Advance as equity.

522.    Before undertaking the *Roth Steel* analysis, it is important to review the facts and circumstances that existed on August 7, 2015, the day the PropCo Entities, the OpCo Entities and Haggen, Inc. executed the PropCo Agreement.  As of June 16, the IC was informed that Haggen faced a "liquidity shortfall," and the chances that Haggen would actually run out of cash increased over time.  The OpCo Entities' sales were down 20-30% against projections and EBITDA was off nearly $100 million relative to plan in the seven months since the OpCo Entities began to acquire and close on the stores.  In July, Haggen began terminating employees and retained A&M to "explore strategic alternatives."  Comvest knew that no independent third party would lend directly to the OpCo Entities, so Comvest aggressively pursued potential loans

---

[108] *Lexington Oil*, 423 B.R. at 370 ("[O]ne can ascertain the intent of the parties by looking at the circumstances surrounding the creation of the 'debt.'  By their nature, lenders are prudent.  I's are dotted, t's are crossed, and money is advanced by a lender only *after* everything appears to be in order.").

[109] The Court also relies on *Autobacs*, in which the court considered the additional factor of a lack of formalities that weighed in favor of recharacterization.  In that case, the debtor, ABST, alleged that the loan agreements were never approved or discussed in any board of director meetings, no minutes of any such meetings existed, and the two non-lender-related directors were purposefully excluded from any finance discussions, including those related to the loan.  *Autobacs*, 473 B.R. at 581; *accord Cold Harbor*, 204 B.R. at 916 (identity of interest coupled with "troubling" lack of formalities weighs in favor of equity).

to the PropCo Entities.  As part of that effort, Caple admitted to Priddy that Comvest would not make a direct loan to the OpCo Entities due to concerns about "equitable subordination."  Before that, Comvest had refused UBS's request for a representation and warranty that the OpCo Entities were not considering filing for bankruptcy.  In the end, Comvest could not find anyone to make a loan to the PropCo Entities, even though the PropCo Entities had tens of millions of dollars of unencumbered real estate available as collateral.

523.    Against this backdrop, on August 7, 2015, Comvest caused the PropCo Entities, the OpCo Entities and Haggen, Inc. to sign the PropCo Agreement even though (a) the PropCo Entities had not yet secured the "Qualified Borrower" loan from Citibank; (b) the OpCo Entities, who were in default under the ABL, did not have the consent of its senior lenders to grant a subordinated security interest in its assets; and (c) the PropCo Entities did not know the conditions that PNC would require before it would consent to a subordinated lien.

524.    These facts and circumstances strongly suggest that a $25 million "rescue loan" was never going to be sufficient to save Haggen.  Moreover, the uncontroverted evidence shows that no one – other than Haggen's equity owner or a potential DIP lender – would have ever made the PropCo Advance.

525.    The court has reviewed the record to ascertain the intent of the parties, from an objective standard, at the time of the transaction, "'determined not by applying any specific factor, but through a common sense evaluation of the facts and circumstances surrounding a transaction.'"  *Autobacs*, 473 B.R. at 572 (quoting *Friedman's*, 452 B.R. at 518). The Court accordingly assesses each factor below focusing on a common sense evaluation of the facts and circumstances surrounding the PropCo Advance.

### b.    Relevant Factors

### i.    Name of Instruments

526.    Given that the very issue is whether a transaction denominated as a loan should be recharacterized as equity, the Court "sees very little in a name." *Accord Lexington Oil*, 423 B.R. at 366.  As Flaton conceded, the PropCo Advance was described as a form of secured debt, albeit with certain omissions and ambiguities that the Court addresses below in connection with other relevant factors.  Trial Tr. (10/18) at 154:13-155:15; PX 118 at 22.  The Court assigns the "name" factor little weight, if any, however, because the PropCo Advance was not the product of an arm's length negotiation between two independent parties, but rather was dictated by the controlling equity holder, Comvest.  *See*, *e.g.*, *LMI Legacy Holdings*, 2017 Bankr. LEXIS 1150, at *37 ("Notably, the Trustee observes that four out of eleven factors that weight against recharacterization 'all relate to terms in the documents themselves, terms that the Complaint alleges were not negotiated, but dictated by the majority shareholder.'").

### ii.    Fixed Maturity Date and Schedule of Payments

527.    The PropCo Advance did not have a specific maturity date and the interest payment schedule was unclear.  See *Lexington Oil*, 423 B.R. at 370 ("By their nature, lenders are prudent. I's are dotted, t's are crossed, and money is advanced by a lender only after everything appears to be in order.").  The Court credits Flaton's opinion that "[n]o institution would really close a loan without properly indicating" such terms and concludes that this factor weighs in favor of equity.

### iii.    Fixed Rate of Interest and Interest Payments

528.    Although the PropCo Agreement provided for interest at 8%, the evidence shows that the PropCo Entities could not reasonably have expected to receive interest under the circumstances that existed on August 7, 2015.  Moreover, the Intercreditor Agreement ultimately

prohibited the PropCo Entities from receiving interest payments until the OpCo Entities satisfied

their $173 million obligation to PNC under the ABL.  In Flaton's opinion, "that is not a normal

course."  The Court agrees and therefore finds that this factor weighs in favor of equity.

### iv.    Payment Dependent on the OpCo Entities' Business

529.    Courts agree that "'if the expectation of repayment depends solely on the

success of the borrower's business, the transaction has the appearance of a capital contribution.'"

*Off'l Unsec. Creds. Comm. v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R.

51, 98 (Bankr. D. Del. 2010) (quoting *AutoStyle*, 269 F.3d at 751 (denying motion for summary

judgment on recharacterization count).  The applicable agreements are not required to explicitly

tie repayment to the success of a borrower's business.  *Autobacs*, 473 B.R. at 575.  Even when

repayment is not *solely* dependent on the success of the borrower's business, this factor may still

be "slightly in favor of equity."  *Id.*[110]

530.    Courts will examine the proposed source of repayment of interest and

principal to a lender:

> In general, there are four possible sources: (1) liquidation of the
> business' assets, (2) profits, (3) cash flow, and (4) refinancing with
> another lender. "If repayment of the advances can only be
> reasonably assured by the chance of profits or from the liquidation
> of the business, the money is at the risk of the venture."
> *Scriptomatic, Inc. v. U.S.*, 397 F. Supp. 753, 764 (E.D. Pa. 1975).

---

[110] *See also Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75 (Bankr. S.D.N.Y. 2016) (quoting *Lexington Oil*, 423 B.R. at 366) ("The Court believes this factor must be considered in conjunction with a borrower's overall capital structure. The question is whether the lender has any reasonable expectation of payment if the business fails."). Based on the *Lexington Oil* and *Roth Steel* decisions, the *Lyondell* court concluded:

> Those holdings suggest that when other creditors have lent on a secured basis
> and have a first claim on a company's assets, and the company is so
> overleveraged that there is little likelihood that those other creditors will be
> oversecured (thus generating a surplus for allocation to others), *repayment of
> more junior debt is dependent on success of the business because "future profits
> are the only hope* of repayment."

*Id.* (citing *Lexington Oil*, 423 B.R. at 366) (emphasis supplied).

> If, however, under the circumstances at the time of the advances, a
> prudent investor would have had a realistic and reasonable
> expectation of an adequate cash flow or the presence of outside
> financing which would enable repayment to be made under the
> terms of the advance, economic reality would dictate that a valid
> debt had been created.

*United States v. State St. Bank & Trust*, 520 B.R. 29, 78 (Bankr. D. Del. 2014) ("*State St. Bank*

*& Trust*") (quoting *Fischer v. United States*, 441 F. Supp. 32, 39 (E.D. Pa. 1977)).

531.    Here, the Court concludes that the PropCo Advance was unsecured at the

time the parties entered into the PropCo Agreement on August 7, 2015, notwithstanding the

purported security interest granted therein.  The Court reaches this conclusion because (a) PNC

had not consented to the filing of a security interest and (b) the PropCo Entities had not perfected

any purported security interest (the UCC-1 financing statements were not filed until August 21,

2015, after the Intercreditor Agreement was executed).  Consequently, at the time the parties

entered into the PropCo Agreement, the PropCo Entities were reliant on the success of the OpCo

Entities to recover their investment.

532.    Moreover, even though the PropCo Entities later perfected their security

interest, Defendants offered no valuations or appraisals or analyses of any kind that would have

supported their belief that the value of the OpCo Entities' assets was sufficient to satisfy the

obligations to PNC and have $25 million left over.

533.    The Court thus concludes that this factor weighs strongly in favor of

recharacterization.

### v.      **Inadequacy of the OpCo Entities' Capitalization**

534.    "'Thin or inadequate capitalization is *strong* evidence that the advances

are capital contributions  rather than loans.'"  *Friedman's*, 452 B.R. at 522-23 (quoting

*AutoStyle*, 269 F.3d at 750-51) (emphasis supplied).  "'[W]hen a corporation is undercapitalized,

a court is more skeptical of purported loans made to it because they may in reality be infusions of capital.'" *State St. Bank & Trust Co.*, 520 B.R. at 78 (quoting *SubMicron*, 432 F.3d at 457) (quoting *AutoStyle*, 269 F.3d at 746-47); *LMI Legacy Holdings*, 2017 Bankr. LEXIS 1150, at *37.

535.    There is compelling evidence that the OpCo Entities were undercapitalized at the time of the PropCo Advance.  Flaton testified that the OpCo Entities had inadequate capital at the time of the PropCo Advance in August 2015 because (a) internal communications showed that the OpCo Entities were expected to run out of cash imminently (a fact conclusively established at trial), (b) the OpCo Entities had no unencumbered assets, (c) the OpCo Entities were "really at the precipice of unravelling," and (d) PNC had concluded that, as of August 1, 2015, the OpCo Entities had failed to "generate sufficient EBITDA to support the business."  Trial Tr. (10/18) at 161:3-16; PX 118 at 26.  Indeed, on August 12, 2015, Niegsch sought the IC's approval for an immediate $7.5 million advance "to ensure OpCo has the liquidity to meet its obligations [the following day] and cover payroll" two days later.  PX 41.

536.    In addition, and significantly, Comvest had not run a model or set of projections showing how the OpCo Entities would generate sufficient cash flow to pay off the senior lender "in full in cash" just nine months later, and have $25 million left over to repay the PropCo Entities.  *See Broadstripe*, 444 B.R. at 96-97 (committee's evidence shows that Highland was aware that Broadstripe would be unable to repay the second lien investments prior to maturity out of operating cash flows).

537.    The Court concludes that the "inadequate capital" factor weighs strongly in favor of recharacterization of the PropCo Advance as equity.

### vi.    <u>Identity of Interests</u>

538.    It is well established that:

> "Where there is an exact correlation between the ownership
> interest of the equity holders and their proportionate share of the
> alleged loan, this Court believes this evidence standing alone is
> almost so overwhelming that the advance was in fact a capital
> contribution to equity and not a loan that coupling this with the
> complete lack of formality evidenced by the records of the
> transaction this Court is convinced that holding the advances to be
> equity is correct."

*Lexington Oil*, 423 B.R. at 366 (quoting *Cold Harbor,* 204 B.R. at 919), *cited with approval by*

*AutoStyle*, 269 F.3d at 751 ("the court considers this to be the most critical factor in its

determination due to the exact identity between the two groups"); *Roth Steel*, 800 F.2d at 630

("If advances are made by stockholders in proportion to their respective stock ownership, an

equity contribution is indicated."); *Friedman's*, 452 B.R. at 521.  "Identity of interest" also

occurs when, as in this case, the interests of the shareholder/lenders and the corporation are so

entwined that an arm's length relationship is unlikely.  *Cf. State St. Bank & Trust*, 520 B.R. at 77

(citing *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 698 (3d Cir. 1968)); *see also Aquino*

*v. Black (In re AtlanticRancher, Inc.)*, 279 B.R. 411, 435-36 (Bankr. D. Mass. 2002) (deciding a

transaction was equity when holder of convertible promissory note had "extraordinary ability to

direct the company's affairs" and "was extremely involved in the daily operations of the

Debtor");.

539.    Here, cutting through the complicated form of the transaction to its

substance, Comvest provided 100% of the PropCo Advance and indirectly owns 80% of Haggen.

But even the "80/20" purported split is misleading for this purpose.  As Caple acknowledged,

Comvest had a "call option" pursuant to which it could have acquired the Haggen family's 20%

interest at any time for $5 million.  Trial Tr. (10/16) at 195: 5-9.  *See also* PX 713.045 (fixing

HHI's capital contribution in Holdings at $5,000,000, or just 5.55% of the paid in capital).

Consequently, in the absence of further agreement, HHI had no incentive to make any additional

investment of any kind.  Not surprisingly, HHI was never asked to invest money as part of the

Albertson's Acquisition or at any time thereafter.  HHI (Hall) Tr. 35:24-36:13.[111]

540.    In this regard, *Autobacs* is directly on point.  There, ABST sought to

recharacterize an advance made to it by its parent company, AB7, which had advanced 100% of

the funds to ABST, its indirect wholly owned subsidiary.  AB7 argued that the "identity of

interests" factor was probative of intent only where there are numerous stockholders, but not in

the context of a wholly owned subsidiary. AB7 argued that because "a sole shareholder always

makes advances in proportion to its holdings, if this factor is given undue weight it could

improperly deter a corporation's 100 percent owner from extending financing to a subsidiary in

need." 473 B.R. at 578.  ABST argued that the identity of interest factor takes on particular

importance where a parent company makes a cash advance to a struggling subsidiary.  AB7

replied by arguing that a sole shareholder necessarily makes advances in proportion to their

equity ownership, and therefore reveals nothing about the parties' intent.  The court rejected

AB7's arguments on several grounds:

> In cases of wholly owned subsidiaries, there is only an exact
> correlation between the ownership interest of the sole equity holder
> and the proportionate share of the alleged loan where the equity
> holder is also the sole lender. There could be numerous lenders
> involved together in making a single advance. Therefore, AB7's
> statement is not necessarily true.
>
> Additionally, a parent of a wholly owned subsidiary often trades
> away control as additional shareholders or lenders join the fray.
> Where they choose to retain control (or whatever other benefits
> they see in sole equity ownership and sole lender status) they risk
> this factor weighing against them in a recharacterization claim.
>
> Moreover, AB7's policy argument fails because it is equally
> applicable to situations involving numerous shareholders.  For

---

[111] Defendants have proffered no evidence to indicate that Holdings' minority shareholder was given an opportunity
to participate in, or even notice of, Comvest's "equity investment," the PropCo Advance or any other "opportunity"
relating to Haggen after 2011, including the payment of dividends.

example, if this factor was applied to two equity shareholders who each own 50% of the company and contribute 50% of a $1 million loan ($500,000), they could argue that such a pro rata split made business sense, and that giving this factor undue weight in favor of recharacterization would deter a corporation's two fifty-percent owners from extending financing to a subsidiary in need.

ABST alleges an exact correlation between AB7's ownership interest and its proportionate share of the alleged loan,  and further alleges that AB7's cash advances were made to a struggling subsidiary. Therefore, the sixth factor favors ABST and weighs in favor of recharacterization.

*Autobacs*, 473 B.R. at 578.

541.    The Court concludes that the correlation between Comvest's ownership interests and the amount of the PropCo Advance, coupled with Comvest's exercise of complete control over the transaction as the indirect equity holder of both the borrowers and lenders, weighs strongly in favor of characterizing the PropCo Advance as equity.

### vii.    Security for the PropCo Advance

542.    The absence of security for an advance is a strong indication that the advance was a capital contribution.  *Friedman's*, 452 B.R. at 522 (citing *AutoStyle*, 269 F.3d at 752) (finding genuine factual issue regarding whether Second Lien Investments were undersecured or would even be out of the money).

543.    As a thresholder matter, Comvest, and Comvest alone, decided that the PropCo Advance would be secured.  Moreover, (a) the PropCo Entities had not perfected their security interest as of August 12, 2015, when they advanced $7.5 million, [112] and (b) even after August 21, their security interest was subordinated to PNC's.  On balance, this fact weighs in favor of equity.

---

[112] As Niegsch told the IC on August 12, 2015, "the Propco loan to Opco will not have a 2nd lien in Opco until the forbearance agreement is executed," something that did not occur until August 12, 2015.  PX 41.

### viii.    Inability to Obtain Third-Party Financing

544.    "'When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans.'" *Friedman's*, 452 B.R. at 523 (quoting *AutoStyle*, 452 F.3d at 752); *LMI Legacy Holdings*, 2017 Bankr. LEXIS 1150, at *37 (failure to try to obtain third-party financing).

545.    The evidence that there was no third party willing to loan money to the OpCo Entities is undisputed:  Caple plainly admitted that he "didn't believe that anybody was going to make a loan to OpCo, given its current state," and Comvest consciously decided not to bother even testing the market.  Trial Tr. (10/16) at 171:20-172:8; Trial Tr. (10/17) at 22:24-23:11, 24:24-25:17, 25:23-26:2, 132:11-16, 208:8-18.  Indeed, as detailed above, the evidence shows that despite considerable effort, Comvest was unable to convince anyone (including UBS, Citibank, Priddy, and those contacted by A&M) to loan money to the PropCo Entities in exchange for a lien on their unencumbered real property.

546.    Flaton gave this factor "substantial consideration" (PX 118 at 34) and the Court agrees; this factor strongly weighs in favor of recharacterization.

### ix.    Subordination of the PropCo Advance to Other Debt

547.    "'Subordination of advances to claims of all other creditors indicates that the advances were capital contributions, not loans.'" *Friedman's*, 452 B.R. at 523 (quoting *AutoStyle*, 269 F.2d at 752).

548.    Either direct evidence of a subordination agreement or even a "de facto" subordination arrangement may suffice.  *Dornier*, 453 F.3d at 236.  Here, as in *Dornier*, there is substantial evidence that Comvest would only recover from the OpCo Entities after they were profitable.  The PropCo Advance was effectively subordinated to payment of all other creditors.

This evidence, in conjunction with the relationship between Comvest and the OpCo Entities and Comvest's interest in the OpCo Entities' survival, establishes that repayment of the PropCo Advance would be made only after payments to all other creditors.

549.    The Court concludes that this factor strongly weighs in favor of recharacterization.

### x.    Advance Used to Acquire Capital Assets

550.    The Plaintiff concedes, and the Court concludes, that the PropCo Advance was not used to acquire capital assets and, accordingly, this factor weighs in favor of debt.  *See Friedman's*, 452 B.R. at 522 ("'Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness.'") (quoting *AutoStyle*, 269 F.3d at 752).

### xi.    Presence of Sinking Fund

551.    The PropCo Advance did not establish a sinking fund to provide repayment or include an amortization schedule.  The evidence also shows that repayment of the PropCo Advance effectively depended solely on the success of the OpCo Entities' business.  The Court thus concludes that this factor weighs in favor of equity.  *See id.* (citing *AutoStyle*, 269 F.3d at 753).

### xii.    Presence or Absence of Voting Rights

552.    The absence of voting rights generally weighs in favor of debt.  *See SubMicron*, 291 B.R. at 323.  None of the instruments or agreements relating to the PropCo Advance grants the PropCo Entities or Comvest voting rights.  As with certain other factors, the Court assigns this factor less weight under the circumstances of this insider transaction given the unilateral control already possessed by Comvest over both the PropCo Entities, on the one hand,

and the OpCo Entities on the other.  Comvest could not have obtained any additional or greater

rights or control than it already had at the time of the PropCo Advance.

**xiii.**    **Policy Considerations**

553.    The Court rejects Comvest's self-serving policy-based assertions

contending that the recharacterization of the PropCo Advance would chill future "rescue

financing" of troubled companies.  Defendants' policy argument perverts the term "rescue

financing" by ignoring the fact that Comvest created the disaster from which it now claims it

tried to rescue Haggen.  Comvest also ignores the fact that the PropCo Advance was made by an

existing equity holder for the principal purpose of protecting its investment, not by an existing

lender and perhaps to cover insiders' liability for unpaid wages.  The PropCo Advance was an

insider transaction whose terms were dictated by Comvest, as the controlling equity holder.  The

advance was used in substantial part to pay accrued and unpaid payroll for which the insiders

faced personal liability.[113]  The Court concludes that, under the particular facts and

---

[113] OpCo North conducted operations in Washington and Oregon.  OpCo South conducted operations in California, Arizona and Nevada.  At all relevant times, (a) Clougher was an officer of OpCo North, (b) Shaner was an officer of OpCo South, and (c) Barnett was an officer of OpCo North and OpCo South. The Court concludes that Comvest controlled OpCo North and OpCo South at all relevant times.

The Court concludes that Clougher, Barnett and Comvest faced civil and criminal liability under Washington law for unpaid wages of individuals employed in Washington.  *See* Rev. Code Wash. §49.52.050 ("[a]ny employer or officer, vice principal or agent of any employer, . . . who . . . (2) willfully and with intent to deprive the employee of any part of his or her wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract; … Shall be guilty of a misdemeanor"); *Id.* §49.52.070 ("Any employer and any officer, vice principal or agent of any employer who shall violate any of the provisions of RCW 49.52.050(1) and (2) shall be liable in a civil action by the aggrieved employee or his or her assignee to judgment for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees."); *Id.* §49.46.010(4) (made applicable to 49.52.050 through 49.48.082) ("Employer" includes "any individual . . .  or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee."); *Ellerman v. Centerpoint Prepress, Inc.*, 143 Wash. 2d 514, 22 P.3d 795 (2001) (definition of employer under Rev. Code Wash. §49.46.010(4) includes those who have power and/or authority to make decisions regarding wages or the payment or withholding of wages); *Morgan v. Kingen*, 210 P.3d 995 (Wash. 2009) (officers can be liable for withholding of wages under the Washington wage laws, even if the employer has gone bankrupt).  *See also Allen v. Dameron*, 389 P.3d 487, 495 (Wash. 2017) ("officers, vice principals, or agents" who have control over payment of wages may be held personally liable under the WRA, even if the payday date for those wages came after the employer filed for chapter 7 bankruptcy; an officer's participation in the decision to file the chapter 7 bankruptcy petition tends to show a willful withholding of wages; "The WRA imposes personal liability on an officer for such decisions because 'the officers control the choices over how the

circumstances here, it must use its "ability to recharacterize a claim that would have the effect of subverting the Code's critical priority system by allowing equity investors to jump the line and reduce the recovery to true creditors." *Dornier*, 453 F.3d at 231.

554.   In *State St. Bank & Trust*, the court addressed this concern, noting that "in *SubMicron* the Third Circuit decided that it was appropriate to review later advances by an existing lender in light of the ongoing relationship and recognizing that 'when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional

---

corporation's money is used.'") (quoting *Morgan*, 210 F.3d at 537); *Failla v. FixtureOne Corp.*, 336 P.3d 1112 (Wash. 2014), *modified*, 2014 Wash. LEXIS 1070 (Wash. Nov. 25, 2014), *cert. denied*, 135 S. Ct. 1904 (2015) (officer (CEO) was liable for nonpayment of wages because the officer controlled the corporation's finances, had the ability to pay the salesperson, and willfully failed to do so); *Jumamil v. Lakeside Casino, LLC*, 319 P.3d 868, 879 (Wash. App. 2014) ("Given the operating agreement and Coon's actions as the LLC's manager, it is clear he . . . had authority over the financial decisions of the Casino and the payment of wages.").

The Court also concludes that Shaner, Barnett and Comvest faced civil and criminal liability under California law for unpaid wages of individuals employed in California. *See, e.g.*, *Williams v. Freedomcard, Inc.*, 123 Cal. App. 4th 609, 612 (2004) (explaining that Labor Commissioner awarded employee unpaid wages, interest and penalties against company and its director/officer on a joint and several basis); *RG Garcia Corp. v. Bitetti*, 2014 Cal. App. Unpub. LEXIS 6478, **1-2 (Ct. App. Cal. Sept. 15, 2014) (explaining Labor Commissioner found indirect owner of employer liable for unpaid overtime, interest and penalties, where, among other factors, entity and formal employer both exercised control over the claimant's wages and working terms); *see generally* Cal. Lab. Code § 204 (requiring regular payment of wages); § 210 (providing for fines for failure to comply with 204); §215 ("Any person, or the agent, manager, superintendent or officer thereof, who violates any provision of Section [§204, among others] is guilty of a misdemeanor."); §216 ("In addition to any other penalty imposed by this article, any person, or an agent, manager, superintendent, or officer thereof is guilty of a misdemeanor, who: (a)  having the ability to pay, willfully refuses to pay wages due and payable after demand has been made."); §558 (provides for certain monetary penalties (based on whether initial or subsequent violations) in addition to the unpaid wages, as well as not precluding other possible civil penalties under other laws); §225.5 (civil penalties for violations of 216, among other provisions); §1194 (employee not receiving minimum wage or overtime is entitled to recover balance of minimum wage or overtime, including interest, attorneys' fees and costs)..

In addition, the Court concludes that Clougher, Shaner, Barnett and Comvest faced liability under federal law for unpaid wages of individuals employed in all of the states in which the OpCo Entities operated under the Fair Labor Standards Act, which applies to employers engaged in interstate commerce.  29 U.S.C. §203(d) (an "employer" is any person "acting directly or indirectly in the interest of an employer in relation to an employee"); *id.* §206(a); *id.* §216(b) (employer liable for unpaid minimum wages or unpaid overtime, plus an additional equal amount as liquidated damages (i.e., double damages)); *Lambert v. Ackerley*, 180 F.3d 997, 1011-12 (9th Cir. 1999) ("employer" definition is to be given "an expansive interpretation"; liability against CEO and COO where the officers had a "significant ownership interest with operational control of significant aspects of the corporation's day-to-day functions; the power to hire and fire employees; [the power to] determin[e][] salaries; [and the responsibility to] maintain [] employment records"); *Boucher v. Shaw*, 572 F.3d 1087 (9th Cir. 2009) (following *Lambert* with respect to FLSA liability for unpaid wages); *Donovan v. Grim Hotel Co.*, 747 F.2d 966 (5th Cir. 1984) ("'The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.'") (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983).

factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company.'" 520 B.R. at 80 (quoting *SubMicron*, 432 F.3d at 457). This rationale has been followed in subsequent recharacterization cases. *Moll Indus.*, 454 B.R. at 583-84 (citing *SubMicron*); *Radnor Holdings v. Tennenbaum Capital Ptnrs. (In re Radnor Holdings)*, 353 B.R. 820, 839 (Bankr. D. Del. 2006) ("*Radnor*") (same).  As a threshold matter, unlike in those cases, the PropCo Advance is not a continuance of indebtedness but instead an entirely new transaction whereby the controlling equity holder made a capital contribution dressed up as "debt." Thus, the rationale in *SubMicron* and its progeny that traditional recharacterization factors are limited in the case of lenders seeking to protect their existing loans does not apply here because neither Comvest nor the PropCo Entities were existing lenders.

555.    The facts and circumstances here differ markedly from those present in decisions by courts in this district that have denied claims for recharacterization and thus require a different result. *Cf.*, *e.g.*, *Moll Indus.*, 454 B.R. 574 (court agreed with the lenders that allegations were insufficient to state a claim for recharacterization because of the pre-existing lender relationship); *Radnor*, 353 B.R. 820 (dismissing recharacterization claim where parties that advanced funds were both pre-existing secured lenders and equity holders and lender/investor-designated board member abstained from voting on advances).  The pre-existing secured lender relationship is absent here.  Thus, the *SubMicron* rationale followed by the courts in *Radnor* and *Moll Indus.* does not apply and the Court accordingly does not believe that the impact of the usual recharacterization factors should be limited or discounted in any way.

556.    Instead, this Court relies on Judge Sontchi's reasoning in *Autobacs* in rejecting the Defendants' policy argument.  In *Autobacs*, the investor, AB7, argued that

undercapitalization is not determinative and that insolvency or potential insolvency is not a ground for recharacterization.  473 B.R. 525.

557.    The debtor, ABST, argued that inadequate capitalization was particularly relevant because – as in this case – advances came from an insider to a subsidiary with a history of unprofitability, where "'the substance of the relationship represented a capital contribution designed to prop up the struggling subsidiary.'"  *Id.* at 576 (quoting ABST papers).  The insider lender, AB7, replied that "'courts have cautioned that this factor is not determinative, even where the advances are made by an insider.'"  *Id.* at 576-77 (quoting AB7 papers).  Similarly, AB7 cautioned the court away from "excessive suspicion about loans made by owners and insiders of struggling enterprises" because "too heavy an emphasis on undercapitalization produces . . . an unhealthy deterrent effect."  *Id.* at 577 (same).

558.    The court rejected the insider lender's arguments and found:

AB7's caution regarding the unhealthy deterrent effect is misplaced. In *Hedged-Investments*, the Tenth Circuit noted that it had previously rejected "the . . . automatic subordination of insider loans [when the borrower corporation was badly undercapitalized] on the grounds that such a fixed rule would discourage owners' efforts to salvage a troubled business." That ruling explicitly addressed equitable subordination rather than recharacterization, and the mischaracterized citation provided by AB7 did not, in fact, suggest that the factor regarding inadequacy of capitalization needed to be viewed with caution.

In fact, the language comes from a footnote that described the shift from "automatic subordination of insider loans [to a badly undercapitalized borrower]," which had previously been the standard for both equitable subordination and recharacterization (under *In re Mid-Town Produce Terminal, Inc.*) of the note to a new, entirely separate inquiry.

The *Hedged-Investments* court shifted the recharacterization inquiry to a thirteen factor examination used in the Eleventh Circuit. It was the shift from using the former bright line equitable subordination rule to the new multi-factor recharacterization test that the Tenth Circuit noted served to assuage one of their main

> concerns — that excessive suspicion about loans made by insiders
> to struggling borrowers would "discourage legitimate efforts to
> keep a flagging business afloat." Thus, unlike AB7's
> characterization of the court's concern, where they argue that this
> factor needs to be cautiously regarded, in fact Hedged-Investments
> had moved to satisfy its cautious regard by switching from the
> equitable subordination bright line inquiry to the multi-factor test.

*Autobacs*, 473 B.R. at 577.  The court concluded that the undercapitalization factor weighed in

favor of recharacterization.

559.    The Court acknowledges that, "[i]n many cases, an insider will be the only

party willing to make a loan to a struggling business, and recharacterization should not be used

to discourage *good-faith* loans."  *Dornier*, 453 F.3d at 234 (emphasis added).  However, "when

other factors indicate that the transaction is not a loan at all, recharacterization is appropriate to

ensure the consistent application of the Bankruptcy Code."  *Id.*

560.    Given the overall context, the factual record here establishes that the

PropCo Advance is not the sort of "good-faith loan" that warrants protection.  Rather,

recharacterization is appropriate here to ensure consistent application of the Bankruptcy Code.

The evidence belies the Defendants' assertion that the PropCo Advance was "rescue financing"

to "gain some runway in an attempt to *avoid* a bankruptcy filing."  Def. Trial Br. at 39 (emphasis

added).  The likelihood of a bankruptcy filing was extremely high by the time of the PropCo

Advance, with the filing occurring less than three weeks after most of the funds were advanced.

Indeed, other potential lenders would not lend given the potential of a bankruptcy filing.

Significantly, substantially all of the funds were used to make payroll payments to avoid trust-

fund and related liability for the insiders, including Comvest's nominee managers.  This was not

Comvest's good-faith attempt to avoid bankruptcy for the OpCo Entities, but an attempt to

insulate its principals from liability relating to the nonpayment of wages and ensure that payment

of the PropCo Advance would come ahead of unsecured creditors once the OpCo Entities filed for bankruptcy.

561.    In sum, the Court finds that the evidence weighs strongly in favor of treating the PropCo Advance as equity.  While it has some characteristics of debt, the factors that favor that conclusion are weak and, in any event, relate to the terms of the documents, all of which were dictated by Comvest.  The factors that point to an equity contribution, on the other hand, are very strong and are objective evidence that the PropCo Advance was a capital contribution and not a loan.  Based on the evidence above (FOF 155-207, 212-234), the Court will recharacterize the PropCo Advance as an equity contribution.

### xiv.    Equitable Subordination of the PropCo Advance (Count 69)

562.    If the PropCo Advance had not been recharacterized, it would have been equitably subordinated to the claims of the OpCo Entities' general unsecured creditors, including suppliers, landlords, employees, pension and benefit funds and taxing authorities facing no recovery in these cases as a result of the actions undertaken by the PropCo Entities under Comvest's control.

563.    The Court may subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim under section 510(c) of the Bankruptcy Code.  *See* 11 U.S.C. § 510(b).  Equitable subordination is a remedial doctrine designed "'to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.'"  *State St. Bank & Trust Co.*, 520 B.R. at 81 (quoting S*chubert v. Lucent Tech., Inc. (In re Winstar Communs.)*, 554 F.3d 382,

411 (3d Cir. 2009)).[114]  As the Supreme Court stated, "[n]o matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it." *Pepper v. Litton*, 308 U.S. 295, 312 (1939).

564.    While recharacterization rests on the substance of the transaction giving rise to the claimant's demand, its equitable subordination decision rests on its assessment of the creditor's behavior.  *See Dornier*, 453 F.3d at 232.  When a claim is equitably subordinated, "[t]he funds in question are still considered outstanding corporate debt, but the courts seek to remedy some inequity or unfairness perpetrated against the bankrupt entity's other creditors or investors by postponing the subordinated creditor's right to repayment until others' claims have been satisfied." *Sender v. Bronze Group, Ltd. (In re Hedged-Invs. Assocs., Inc.)*, 380 F.3d 1292, 1297 (10th Cir. 2004).

565.    Equitable subordination of a claim is warranted if: (1) the claimant engaged in inequitable conduct; (2) the misconduct resulted in an injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is consistent with the provisions of the Bankruptcy Code.  *Winstar Communs.*, 554 F.3d at 411.  The Court concludes that each of these elements has been satisfied in this case.

566.    The first factor of the equitable subordination analysis requires a finding of inequitable conduct by the claimant.  The standard used to determine whether a claimant engaged in inequitable conduct depends upon whether such claimant is an insider or fiduciary. Notably, "conduct that may not rise to the level of a breach of fiduciary duty may still satisfy the

---

[114] When a party seeking equitable subordination of a claim meets the initial burden of coming forward with evidence to overcome the prima facie validity accorded to proofs of claim, the burden shifts to the claimant to demonstrate the fairness of its conduct, including the inherent fairness from the point of view of the debtor corporation and those with interests therein.  *In re Mid-American Waste Sys.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002).

element of 'inequitable conduct' required to maintain a claim for equitable subordination."

*Mukamel v. Bakes*, 383 B.R. at 828 (dismissing breach of fiduciary duty claims against directors,

officers and controlling shareholder but upholding equitable subordination and recharacterization

claims based on same conduct).  A party may be found to be an "insider" for purposes of

equitable subordination if the party either (i) meets the statutory definition of insider,[115] or (ii)

[is] in a close relationship with the debtor to such an extent as to suggest transactions were not

conducted at arm's length.  *Autobacs*, 473 B.R. at 582.

> 567.    The evidence shows that the PropCo Entities, and their ultimate

controlling shareholder, Comvest, are "insiders" for purposes of this analysis.

> 568.    Where, as here, the claimant is an insider, the standard for finding

inequitable conduct is much lower.  *See Mid-American Waste Sys.*, 284 B.R. at 70.  "'A claim

arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the

courts.'"  *Winstar Communs.*, 554 F.3d at 412 (quoting *Fabricators, Inc. v. Technical

Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991)).  When the

creditor is an insider, the proof . . . is not demanding.  In such cases, a bankruptcy trustee need

only show "material evidence" of unfair conduct.  *Id.*

---

[115] The Bankruptcy Code defines an insider as an officer, director, or "person in control of the debtor" corporation. *See* 11 U.S.C. § 101(28)(B).  A managing member of a limited liability company is in an analogous position to a director of a corporation under Delaware law.  *See Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 31 (Bankr. D. Mass. 2011).  A fiduciary, under general corporate theory, includes an officer, director, agent, majority shareholder, or a minority shareholder exercising actual control over the corporation.  *See Estes v. N & D Prop., Inc. (In re N & D Prop., Inc.)*, 799 F.2d 726, 731-32 (11th Cir. 1986) (citing 12B *Fletcher, Cyclopedia Corporations* §5811 at 156-57 (1984)).  A shareholder has control when he determines corporate policy, whether by personally assuming management responsibility or by selecting management personnel.  *See id.* (citing Berle, *"Control" in Corporate Law*, 58 Colum. L. Rev. 1212 (1958)).  A party may also be considered a "nonstatutory insider," even without actual control of the debtor, when there is a close relationship between debtor and creditor and when transactions between them were not conducted at arm's length.  *See Winstar Communs.*, 554 F.3d at 396-97 (citation omitted).  *See also* 5-547 *Collier on Bankruptcy* ¶ 547.03[6] (16th ed. 2017) ("The consideration of insider status focuses on two factors: (1) the closeness of the relationship between the parties; and (2) whether the transaction was negotiated at arm's length.") (discussing "insider" as used in 11 U.S.C. §547(b)(4)(B)); *LMI Legacy Holdings*, 2017 Bankr. LEXIS 1150, at *26.

569.    "Courts have generally recognized three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Mid-American Waste*, 284 B.R. at 70.  However, the inability to fit the parties' actions squarely within a specific heading does not make the misconduct any less inequitable.  *LMI Legacy Holding*, 2017 Bankr. LEXIS 1150, at *33.  "[I]nequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim."  *Benjamin v. Diamond (In re Mobile Steele*, 563 F.2d at 699-700 (5th Cir. 1977); *accord LMI Legacy Holding*, 2017 Bankr. LEXIS 1150, at *33.

570.    For example, the granting of a lien that disadvantages other creditors has been determined to be inequitable behavior (*see Fabricators*, 926 F.2d at 1467; *N & D Prop.*, 799 F.2d at 732 (finding misconduct based on an insider's actions to encumber the debtor's assets and obtain a priority in the impending bankruptcy proceedings was inequitable to consumer creditors); *State St. Bank & Trust*, 520 B.R. at 86 (finding that noteholders engaged in inequitable conduct in obtaining lien for prior debt that enabled them to gain an unfair advantage and priority over another creditor).  An insider's pursuit of personal gain at the expense of creditors, for example, justifies equitable subordination.  *See*, *e.g.*, *N&D Prop.*, 799 F.2d at 732 (citing *In re American Lumber Co.*, 7 B.R. 519 (Bankr. D. Minn. 1979); *In re W. T. Grant*, 699 F.2d 599, 610-11 (2d Cir. 1983)).

571.    Here, Comvest's inequitable conduct is plain.  The evidence shows, among other things, that Comvest engaged in actual fraudulent transfers and breach of its fiduciary duty as controlling shareholder in connection with the Albertson's Acquisition; never

disclosed to the OpCo Entities' creditors that a new corporate structure was being adopted or that the real estate assets were being transferred beyond the reach of creditors; imposed the PropCo Leases and subleases for the sole purpose of extracting value from the OpCo Entities for its own benefit; leveraged certain fee-owned properties in the SLB Transactions to pay the purchase price while saddling the OpCo Entities with the lease obligations; and dictated the terms of the PropCo Advance, on a secured basis, when most of the proceeds were used to pay wages and shield the Defendants from personal liability.

572.    The second factor of the equitable subordination analysis requires a finding that the inequitable conduct resulted in an injury to creditors or unfair advantage to the claimant. *Mid-American Waste*, 284 B.R. at 36. "If the misconduct harmed the entire creditor class, it is sufficient to show as harm that general creditors will be less likely to collect their debts as a result of the misconduct." *Liberty Mutual Ins. Co. v. Leroy Holding Co., Inc. (In re Fort Ann Express)*, 226 B.R. 746, 757 (N.D.N.Y. 1998).

573.    Here, the harm to OpCo Entities' creditors is manifest; they face a zero recovery on over $100 million of liabilities.

574.    Finally, equitable subordination requires the Court to determine whether subordination of a particular claim is consistent with the Bankruptcy Code. Codification of the doctrine in section 510(c) limits the attention given to this third factor. *See, e.g.*, *In re LightSquared*, 511 B.R. 253, 352 (Bankr. S.D.N.Y. 2014); *80 Nassau Assoc. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assoc.)*, 169 B.R. 832, 841 (Bankr. S.D.N.Y. 1994). This factor ensures that courts do not use this remedy to violate unambiguous statutory language of the Bankruptcy Code. *See Enron Corp. v. Avenue Sp. Sit. Fund II (In re Enron Corp.)*, 333 B.R. 205, 218-19 (Bankr. S.D.N.Y. 2005).

575.     Contrary to the Defendants' assertions, this case is distinguishable from the court's decision in *In re Aéropostale, Inc.*, 555 B.R. 369 (Bankr. S.D.N.Y. 2016), denying the debtors' request to equitably subordinate claims of the "Sycamore Parties," which had multiple roles: stockholder, lender and majority-owner of the debtors' largest supplier.  Prior to the bankruptcy filing, the Sycamore Parties had invested $54 million in equity and loaned the debtors $150 million secured by second liens in the debtors' assets.  The Sycamore Parties also had a majority stake in a supplier, MGF, with significant monetary exposure to Aéropostale under a sourcing agreement.  The debtors sought to equitably subordinate the Sycamore Parties' claims, arguing that certain of the Sycamore Parties had engaged in the following inequitable conduct: (1) MGF breached the sourcing agreement; (2) the Sycamore Parties used their various hats to further their secret plan to subvert the company, push it into bankruptcy and thus buy the company on the cheap; and (3) the Sycamore Parties improperly traded stock while in possession of Aéropostale's material non-public information.  The only relevant theory for purposes of this decision is the second.

576.     The *Aéropostale* court found:

> The Sycamore Parties' multiple roles in their relationship with
> Aéropostale is also an insufficient basis for relief in this case.
> Sycamore Partners started out as an equity holder, via Lemur, and
> subsequently expanded its role. But its role as lender and MGF's
> role as supplier were not forced upon the Debtors. They were
> agreements negotiated at arms-length with the Debtors, who
> concluded that they were the best available options. These
> agreements provided each of the parties with a variety of rights and
> the Sycamore Parties' rights included the ability to appoint
> Aéropostale board members. The Debtors cannot rely on the
> existence of these rights—agreed to by the Debtors in exchange for
> consideration, including a $150 million loan—as a basis for relief
> here.

555 B.R. at 408-09.

577.    The court also found that the communications relied upon by the debtors relating to discussions about the possibility of bankruptcy and related contingency planning failed to establish inequitable conduct on the part of the Sycamore Parties.  Such discussions were not impermissible.  *See id.* at 409 (citing  *In re Lehman Bros. Holdings*, 541 B.R. 551, 583 (S.D.N.Y. 2015) ("'[T]here is generally no objection to a creditor's using his bargaining position, including his ability to refuse to make further loans needed by the debtor, to improve the status of his existing claims.'") (quoting *In re W.T. Grant Co.*, 699 F.2d at 610).  The court correctly posed the relevant inquiry as follows:

> Rather, the question is whether a party planning to exercise its rights as a creditor takes actions that step over the line into impermissible conduct to further its interest in a way that damages a debtor or the bankruptcy estate. The Court does not find such conduct here. Instead, the totality of the credible evidence at trial demonstrates that the Sycamore Parties did not take actions beyond what was proper to protect their interests. *See In re Lehman Bros.*, 541 B.R. at 583 (a creditor can even "us[e] his bargaining position . . . to improve the status of his existing claims" without triggering a claim for equitable subordination) (citation omitted).

*Aéropostale*, 555 B.R. at 409.

578.    The court concluded that, given such facts, an equitable subordination claim could not succeed, particularly given that the Sycamore Parties were not insiders.

579.    The court's decision in *Aéropostale* has no bearing on this case for several reasons.  First, unlike the Sycamore Parties, Comvest was an insider, thus requiring a different standard with respect to what constitutes inequitable conduct.  Second, unlike the Sycamore Parties, Comvest was not an existing secured lender.  Accordingly, unlike the Sycamore Parties, Comvest was not using its bargaining power as a "creditor" to improve the status of its "existing claims" arising from secured loans.  Instead, it was using its position as the controlling equity

holder solely to preserve its equity position and to recover on the PropCo Advance ahead of the

OpCo Entities' unsecured creditors.

580.    Based on the evidence above (FOF 99-137, 155-234, 264-285), the Court

concludes that the PropCo Advance is equitably subordinated to the OpCo Entities' general

unsecured creditors.

### xv.    Transfer of Liens Securing PropCo Advance (Section 510(c)) (Count 70)

581.    Under section 510(c) of the Bankruptcy Code, the Court may order that

any lien securing a claim subordinated under section 510(b) of the Bankruptcy Code be

transferred to the estate.  11 U.S.C. § 510(c).  Based on the foregoing conclusion that the PropCo

Advance claim is equitably subordinated, the Court concludes that the lien securing such

advance be transferred to the estate.

## XII.    Unjust Enrichment

### A.    Elements of Cause of Action

582.    Unjust enrichment is a remedial doctrine intended to prevent injustice.

For example, as the Delaware Chancery Court found, if the benefits received by controlling

shareholders and officers result from breaches of fiduciary duties, and defendants who received

those benefits are not liable under a different theory, then unjust enrichment claims may serve as

a vehicle to recover such improperly received benefits.  *See*, *e.g.*, *ODN Holding*, 2017 Del. Ch.

LEXIS 67, at *110.  Unjust enrichment is defined under Delaware law as "'the unjust retention

of a benefit to the loss of another, or the retention of money or property of another against the

fundamental principles of justice or equity and good conscience.'"  *Nemec v. Shrader*, 991 A.2d

1120, 1130 (Del. 2010) (quoting *Fleet Corp. v. Topps Chewing Gum*, 539 A.2d 1060, 1062 (Del.

1988); *Reserves Development LLC v. Severn Sav. Bank FSB*, 2007 Del. Ch. LEXIS 156, at \*\*11-13 (Del. Ch. Nov. 9, 2007) (unpublished opinion) (granting unjust enrichment claims after trial).

583.     To prove an unjust enrichment claim, the Plaintiff must establish: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment,[116] (4) the absence of justification, and (5) the absence of a remedy provided by law.  *See*, *e.g.*, *Nemec*, 991 A.2d at 1130; *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 Del. Ch. LEXIS 17, at \*26 (Del. Ch. Feb. 3, 2009).  As a threshold matter, the court must determine that no contract already governs the parties' relationship.  *See*, *e.g.*, *Bakerman v. Sidney Frank Imp. Co.*, 2006 Del. Ch. LEXIS 180, at \*18 (Del. Ch. Oct. 16, 2006).[117]

### B.     Comvest (Count 73)

584.     Based on the evidence above (FOF 45, 47-54, 99-137, 184-211, 264-285), the Court grants Plaintiff's unjust enrichment claim against Comvest.

### C.     SLB Entities (Count 74)

585.     Based on the evidence above (FOF 109-131), the Court grants the Plaintiff's unjust enrichment claim against the SLB Entities.

### D.     PropCo Entities (Count 75)

586.     Based on the evidence above (FOF 109, 112, 132-136, 188-207), the Court grants Plaintiff's unjust enrichment claim against the PropCo Entities.

---

[116] "Impoverishment" does not require that the plaintiff seeking a restitutionary remedy suffer an actual financial loss, as distinguished from being deprived of the benefit unjustifiably conferred upon the defendant.  *See MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 Del. Ch. LEXIS 28, at \*18 n.26 (Del. Ch. Feb. 27, 2009) (stating that an "impoverishment" is not critical to an unjust enrichment claim because restitution may be awarded based solely on the benefit conferred upon the defendant, even in the absence of an impoverishment suffered by the plaintiff).

[117] Notably, restitution is permitted even when the defendant retaining the benefit is not a wrongdoer.  "'Restitution serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'"  *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1105 (Del. Ch. 2003) (quoting *Schock v. Nash*, 732 A.2d 217, 232-233 (Del. 1999).

### XIII.    Disallowance of PropCo Entities' Lease Claims – 11 U.S.C. § 502(b)

587.    Section 502(b) of the Bankruptcy Code requires the Court to disallow a claim if it is unenforceable against the debtor and property of the debtor under any agreement or applicable law.  *See* 11 U.S.C. § 502(b).

588.    The PropCo Entities have not yet filed proofs of claim against any of the Debtors.  The Plaintiff seeks to disallow any claims that may be filed by the PropCo Entities in the future for damages concerning any of the PropCo Leases, including, but not limited to, claims for rejection damages (collectively, the "PropCo Entities' Lease Claims").  The Court concludes that the PropCo Entities' Lease Claims are unenforceable against the OpCo Entities as a result of my conclusion that the PropCo Leases shall be avoided and that the PropCo Entities shall return to the OpCo Entities the rent amounts paid by the OpCo Entities to the PropCo Entities thereunder.  Given that the leases are avoided, any claims arising thereunder are unenforceable and, accordingly, disallowed pursuant to section 502(b) of the Bankruptcy Code.

### XIV.    Equitable Subordination of PropCo Entities' Lease Claims

589.    If the PropCo Entities' Lease Claims had not been disallowed, they would have been equitably subordinated to the claims of the OpCo Entities' general unsecured creditors.

590.    I conclude that equitable subordination of the PropCo Entities' Lease Claims is warranted because, based on the foregoing facts: (1) the PropCo Entities are insiders who engaged in inequitable conduct; (2) the misconduct resulted in an injury to the creditors of Haggen and conferred an unfair advantage on the PropCo Entities; and (3) equitable subordination of the PropCo Entities' Lease Claims is consistent with the provisions of the Bankruptcy Code.

XV.    **Judgment**

    A.    **Actual Fraudulent Transfer Claims**

        591.    "'Where there is harm, the law provides a remedy.'" *Thabault v. Chait*, 541 F.3d 512, 522 (3d Cir. 2008) (*quoting NCP Litigation Trust v. KPMG*, 945 A.2d 132, 144 (N.J. Sup. 2007)). In the case of fraudulent transfers, the bankruptcy court has wide latitude to fashion an appropriate equitable remedy. As the court noted in *Duffield Assocs. v. Lockwood Bros., LLC*, 2017 Del. Ch. LEXIS 121 (Del. Ch. July 11, 2017), "[t]he Delaware 'Supreme Court has recognized the 'broad latitude' a court in equity has to craft a remedy appropriate to the circumstances of a fraudulent transfer.' Under UFTA, the 'remedies are broad and leave considerable space for the exercise of equitable discretion.' The remedies are 'cumulative and non-exclusive.'" *Id.* at *9-*10 (internal citations omitted). The overarching goal in applying these remedies is "to put a creditor in the position she would have been in had the fraudulent transfer not occurred. This principal stems from the concept that the recipient of a fraudulent transfer holds the asset in constructive trust for creditors . . ." *August v. August*, 2009 Del. Ch. LEXIS 21, *33 (Del. Ch. February 20, 2009), *aff'd*, 65 A.3d 616 (2013); *In re Revco D.S. Inc.*, 118 B.R. 468, 477 (Bankr. N.D. Ohio 1990). *See also SEC v. Antar*, 120 F. Supp. 2d 431, 448 (D. N.J. 2000) (finding that UFTA explicitly provides for equitable remedies). A bankruptcy court's power to "adjudicate equities arising out of the relationship between the several creditors is complete." *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941). As the district court noted in *PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 126 F.Supp.3d 611, 642 (D.S.C. 2015):

        The fraudulent conveyance action is an equitable action. In equity, a federal court has the power to "mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30, 64 S. Ct. 587, 88 L. Ed. 754 (1944). "Flexibility

rather than rigidity" is the hallmark of equity, which allows "for nice adjustment" between competing private claims. *Id.* In the circumstances of this case, the court relies on the equity maxim that "equity will not suffer a wrong to be without a remedy." "The equitable power of a court is not bound by cast-iron rules but exists to do fairness and is flexible and adaptable to particular exigencies so that relief will be granted when, in view of all the circumstances, to deny it would permit one party to suffer a gross wrong at the hands of the other." *Hooper v. Ebenezer Sr. Servs. & Rehab. Ctr.*, 386 S.C. 108, 687 S.E.2d 29, 33 (S.C. 2009) (quotation and citation omitted).

*Id.* at 642.

592.    Unlike *Mervyn's* which settled before the action was tried, this Court must determine the appropriate remedies under section 550(a) of the Bankruptcy Code, which include avoiding the subject transfers and imposing a monetary judgment against any entity for whose benefit such transfer was made.

593.    On all of the claims for actual fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code (Counts 1, 9, 39, 56), and state fraudulent transfer statutes made applicable by section 544(b) of the Bankruptcy Code (Counts 3, 6, 11, 14, 17, 41, 44, 47, 50, 53, 58, 61), as well as the claim for substantive consolidation (Count 72), the Court awards judgment for Plaintiff against the Defendants as follows:

a.    The transfers between and among Holdings, the PropCo Entities, the SLB Entities, and the OpCo Entities are avoided as actual fraudulent transfers.

b.    To implement the avoidance of the challenged transfers, all of the assets and liabilities of Holdings, the PropCo Entities, the SLB Entities, and the OpCo Entities shall be and hereby are collapsed and consolidated into the estate of Holdings for all purposes, and the distribution of the assets of the estate of the consolidated entity shall be subject to further order of the Court in the Holdings case (including, without limitation, an order confirming a plan of

liquidation that addresses any intercreditor issues among the creditors of Holdings and the OpCo Entities).

    c.   Plaintiff is awarded judgment against Comvest, as the entity for whose benefit such transfers were made, for the value of the assets transferred by Holdings to the PropCo Entities and the SLB Entities in amounts equals to (a) $118 million (as the value of the property transferred to the PropCo Entities); and (b) $303 million (as the value of the property transferred to the SLB Entities, ($353 million), less the $50 million conveyed to the OpCo Entities).

**B.**    **Constructive Fraudulent Transfer Claims**

594.    On all of the claims for constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code (Counts 2, 10, 40, 57), and state fraudulent transfer statutes made applicable by section 544(b) of the Bankruptcy Code (Counts 4, 5, 7, 8, 12, 13, 15, 16, 18, 19, 42, 43, 45, 46, 48, 49, 51, 52, 54, 55, 59, 60, 62, 63), the Court awards judgment for Plaintiff against the Defendants as follows:

    a.   The transfers between and among Holdings, the PropCo Entities, the SLB Entities, and the OpCo Entities are avoided as constructive fraudulent transfers.

    b.   To implement the avoidance of the challenged transfers, all of the assets and liabilities of Holdings, the PropCo Entities, the SLB Entities, and the OpCo Entities shall be and hereby are collapsed and consolidated into the estate of Holdings for all purposes, and the distribution of the assets of the estate of the consolidated entity shall be subject to further order of the Court in the Holdings case (including, without limitation, an order confirming a plan of

liquidation that addresses any intercreditor issues among the creditors of Holdings and the OpCo Entities).

    c.   Plaintiff is awarded judgment against Comvest, as the entity for whose benefit such transfers were made, for the value of the assets transferred by Holdings to the PropCo Entities and the SLB Entities in amounts equals to (a) $118 million (as the value of the property transferred to the PropCo Entities); and (b) $303 million (as the value of the property transferred to the SLB Entities, ($353 million), less the $50 million conveyed to the OpCo Entities).

### C.    Avoidance Claims Relating to the PropCo Leases

595.    On the avoidance claims with respect to the PropCo Leases (Federal-actual (Counts 20, 28); Federal-constructive (Counts 21, 29); State-actual (Counts 22, 25, 30, 33, 36); State-constructive (Counts 23, 26, 31, 34, 37)), Plaintiff is awarded judgment as follows: (i) avoiding the PropCo Lease Obligations as fraudulently incurred obligations, (ii) recovering from the PropCo Entities (to the extent they have not been consolidated) the PropCo Rent Payments made thereunder, and (iii) disallowing any claim by and of the PropCo Entities against the Debtors for damages arising from the rejection of the PropCo Leases.

### D.    Breach of Fiduciary Duty Counts (Counts 66, 67, 68)

596.    As set forth above, the Committee proved by a preponderance of the evidence that Comvest, as the controlling shareholder of Holdings, and the Individual Defendants, in their capacities as officers of the Debtors, breached their fiduciary duties of care and loyalty to the Debtors.  As a direct and proximate result of their actions, the OpCo Entities incurred liabilities beyond their means to pay and quickly collapsed into liquidation.  As a result, the OpCo Entities have over $100 million in obligations that will go unpaid if the Court does not to grant any of the remedies sought by the Plaintiff in this adversary proceeding.

597.    The trial court has wide discretion in fashioning damages for breach of fiduciary duty claims under Delaware law. *International Telecharge, Inc. v. Bomarko, Inc*. 766 A.2d 437, 441 (Del. 2000) (affirming trial court's decision to award damages for breach of an officer's duty of loyalty in connection with a merger by determining what the stockholders' shares would have been worth at the time of the merger if the officer had not breached his fiduciary).  Any appropriate form of equitable and monetary relief may be awarded. *Id*. Where issues of loyalty are involved, potentially harsher rules come into play. *Id.* at 440.  Delaware law imposes strict penalties to discourage disloyalty. *Id.*

598.    Courts have held that "an increase in liabilities is a harm to the company and the law provides a remedy when a plaintiff proves a negligence cause of action." *Thabault v. Chait*, 541 F.3d at 520 (holding that under New Jersey law, "there is a remedy for traditional tort damages that flow from wrongful conduct that results in increased liabilities, decrease in fair asset value, and lost profits of a corporation).  Following *Thabault*, one Delaware district court noted that deepening insolvency can be measured by the "harm it encompasses" including increased liabilities. *Collins & Aikman Corp. v. Stockman*, 2009 U.S. Dist. LEXIS 93806, at *10 (D. Del. Sept. 30, 2009) (holding that pleading for damages under a deepening insolvency theory was sufficient). Thus, it is well-established in this and other jurisdictions that the increase in a debtor's liabilities is a valid theory of damages for breaches of fiduciary duty committed by a debtor's officers and directors. *Miller v. McCown De Leeuw & Co. (In re Brown School)*, 386 B.R. 37, 48 (Bankr. D. Del. 2008).  *See also Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp.)*, 353 B.R. 324, 336-38 (Bankr. D.C. 2006) (holding that deepening insolvency is a valid theory of damages for a breach of fiduciary duty claim); *Liquidating Tr. of the Amcast Unsecured Creditor Liquidating Tr. v. Baker (In re Amcast Indus. Corp.),* 365 B.R. 91, 119 n.19

(Bankr. S.D. Ohio 2007) ("While declining to recognize deepening insolvency as a valid cause of action, the court believes that the concept may be useful as a measure of damages for breach of fiduciary duty or commission of an actionable tort.").  Where courts have refused to recognize an independent cause of action for deepening insolvency, they have frequently done so because the remedy was already subsumed in the plaintiff's breach of fiduciary duty claims.  *Committee v. Foss (In re Felt Mfg. Co., Inc.)*, Bankr. 05-13724-JMD, Mem. Op., \*36 in ADV 06-1171-JMD (Bankr. D. Del. July 27, 2007) (declining to recognize a cause of action for deepening insolvency against officers and directors but for the very reason that the remedy for an independent tort of deepening insolvency was already subsumed in the Committee's breach of fiduciary duty claims); *Boles v. Filipowski (In re Enivid, Inc.)*, 345 B.R. 426, 453 (Bankr. D. Mass. 2006) (same).[118]

599.    The Claims Register reflects hundreds of claims filed against the Debtors which under Bankruptcy Code section 502 are presumptively allowed unless a party in interest objects.  11 U.S.C. § 502(a).  *See also* Fed. R. Bankr. P. 3001(f) ("[A] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.").  Both the Defendants' expert's testimony and the claims filed in accordance with Bankruptcy Code section 502 provide proof of the OpCo Entities' substantial pecuniary loss.

600.    It is no bar to recovery that at this juncture that the amount of unpaid liabilities cannot be stated with precision as many of the claims against the OpCo Entities may be

---

[118] *Seitz v. Detweiler, Hershey and Associates, P.C. (In re CitX Corp.)*, 448 F.3d 672, 677-78 (3d Cir. 2006) is not dispositive.  In that case, the Third Circuit held that deepening insolvency is not a viable theory of damages for an accounting malpractice claim. This Court agrees with the Bankruptcy Court in *In re The Brown Schools* that *In re CitX* "does not stand for the broad proposition that deepening insolvency cannot be a valid theory of damages for any independent cause of action" and that deepening insolvency is a valid theory of damages in this case for the Committee's cause of action for breach of fiduciary duty and self-dealing. *In re The Brown Schools*, 386 at 49.

disputed and remain to be reconciled.  Certainty in the award of damages is not required where a wrong has been proven and injury established.  *Bomarko, Inc. v. International Telecharge, Inc.,* 794 A.2d 1161, 1184 (Del. Ch. 1999).  *See* Restatement Second of Torts § 912 ("One to whom another has tortuously caused harm is entitled to compensatory damages for the harm if, but only if, he establishes by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit."). "It is desirable, also, that there be definiteness of proof of the amount of damage as far as is reasonably possible.  It is even more desirable, however, that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered.  Responsible estimates that lack mathematical certainty are permitted so long as the Court has a basis to make a responsible estimate of the damages."  Restatement Second of Torts § 912, cmt.

601.    Thus, while a court may not award damages based upon "speculation or conjecture" where the plaintiff has not met its burden of proving damages, *Acierno v. Goldstein*, 2005 Del. Ch. LEXIS 176 at *31-32 (Del. Ch. Nov. 16, 2005), a specific and quantified injury that has resulted from a breach of fiduciary duty need not be proven. *Cede & Co. v. Technicolor*, 634 A.2d at 369; *Official Comm. of Unsecured Creditors v. Hendricks (In re Dwight's Piano Co.*), 424 B.R. 260, 286-87 (S.D. Ohio 2009); *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d. Cir. 1994) ("[B]reaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages.").  Once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer.  *Thorpe by Castleman v. CERBCO*, 676 A.2d 436, 441 (Del. 1996).

602.    The Court thus rejects Defendants' contention that damages have not been proved or cannot be determined.  As noted above, in the context of breaches of fiduciary duty, mathematical precision is not required.  The Court is satisfied that the OpCo Entities' unpaid liabilities provide sufficient certainty given the circumstance of this case.

603.    Accordingly, the Court enters judgment for the Plaintiff and against Comvest and the Individual Defendants in an amount equal to the OpCo Entities' allowed and unpaid liabilities as fully and finally determined by the Court.

### E.    Equitable Subordination: PropCo Advance (Count 69)

604.    The Court enters judgment for Plaintiff against the PropCo Entities equitably subordinating the PropCo Advance to the claims of the OpCo Entities' general unsecured creditors.

### F.    Transfer of Liens Securing the OpCo Entities' Obligations under PropCo Advance (Count 70)

605.    The Court enters judgment for Plaintiff against the PropCo Entities transferring to Plaintiff any validly perfected liens securing the OpCo Entities' obligations under the PropCo Advance.

### G.    Recharacterization: PropCo Advance (Count 71)

606.    The Court enters judgment for Plaintiff against the PropCo Entities recharacterizing the PropCo Advance as equity.

### H.    Unjust Enrichment (Counts 73, 74 and 75)

607.    As an alternative to the damages awarded in (A)-(C) above, the Plaintiff would be entitled to a judgment against Comvest in an amount equal to: (a) Holdings' net equity value (*i.e.*, after all claims against Holdings are satisfied), with such amounts distributed to the

holders of allowed general unsecured claims against the OpCo Entities; and (b) the Comvest

Investment Fee (*i.e.*, $1.5 million).

### I.    Disallowance of the PropCo Entities' Lease Claims (Count 76)

608.    The Court enters judgment for Plaintiff against each of the PropCo

Entities disallowing each of the PropCo Entities' Lease Claims that has been or will be filed by

any of them pursuant to section 502(b) of the Bankruptcy Code.

### J.    Equitable Subordination of the PropCo Entities' Lease Claims (Count 77)

609.    The Court enters judgment for Plaintiff against the PropCo Entities

equitably subordinating the PropCo Entities' Proofs of Claim to general unsecured claims.

### K.    Disallowing Claims of Avoidance Defendants (Count 78)

610.    The Court enters judgment for the Plaintiff disallowing any proof of claim

that has been or will be filed by any of the Avoidance Defendants pursuant to section 502(d) of

the Bankruptcy Code.


Dated:   November 15, 2017          **PACHULSKI STANG ZIEHL & JONES LLP**


By:*/s/ Bradford J. Sandler*
    Bradford J. Sandler (DE Bar No. 4142)
    Robert J. Feinstein (admitted *pro hac vice*)
    John A. Morris (admitted *pro hac vice*)
    919 North Market Street, 17th Floor
    Wilmington, DE 19899-8705
    E-mail:    bsandler@pszjlaw.com
            rfeinstein@pszjlaw.com
            jmorris@pszjlaw.com


*Counsel to the Official Committee of Unsecured Creditors*