## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HH LIQUIDATION, LLC, *et al.*, | ) | Case No.: 15-11874 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS OF HH LIQUIDATION, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No. 16-51204 (KG) |
| | ) | |
| COMVEST GROUP HOLDINGS, LLC, COMVEST | ) | |
| INVESTMENT PARTNERS III, L.P., COMVEST | ) | |
| INVESTMENT PARTNERS IV, L.P., COMVEST | ) | |
| HAGGEN HOLDINGS III, LLC, COMVEST | ) | |
| HAGGEN HOLDINGS IV, LLC, COMVEST | ) | |
| ADVISORS, LLC, HAGGEN PROPERTY | ) | |
| HOLDINGS, LLC, HAGGEN PROPERTY SOUTH, | ) | |
| LLC, HAGGEN PROPERTY NORTH, LLC, HAGGEN | ) | |
| PROPERTY HOLDINGS II, LLC, HAGGEN SLB, | ) | |
| LLC, JOHN CAPLE, CECILIO RODRIGUEZ, | ) | |
| MICHAEL NIEGSCH, JOHN CLOUGHER, BLAKE | ) | |
| BARNETT, WILLIAM SHANER and | ) | |
| DERRICK ANDERSON, | ) | |
| | ) | |
| Defendants. | ) | **Re:  D.I. 142** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

## INTRODUCTION

On September 8, 2015, Haggen filed for bankruptcy under Chapter 11 of the

Bankruptcy Code, 11 U.S.C. § 101, *et seq.*  The filing took place a few months after

Haggen, an 18 grocery store operation, purchased 146 stores from Albertsons and

---

[1] These Findings of Fact and Conclusions of Law utilize many defined terms.  The Court will use the glossary which the Committee provided.  The glossary is at the rear of this document.

Safeway (the "Project"). The bankruptcy resulted in the loss of thousands of jobs and creditors losing tens of millions of dollars. The Committee filed an adversary proceeding with a 78 count Complaint alleging fraudulent transfers, breach of fiduciary duties, unjust enrichment and more.

The Court conducted a five day trial and received hundreds of exhibits, numerous deposition transcripts and over 300 pages of the parties' proposed findings of fact and conclusions of law. The parties involved in the adversary proceeding are: the Plaintiffs, which is the Committee acting on behalf of the Debtors; and the Defendants, Comvest Group Holdings, LLC; Comvest Investment Partners III, L.P; Comvest Haggen Holdings III, LLC; Comvest Haggen Holdings IV, LLC; Comvest Advisors, LLC; Haggen Property Holdings, LLC; Haggen Property South, LLC; Haggen Property North, LLC; Haggen Property Holdings, LLC; Haggen Property Holdings II, LLC; Haggen SLB, LLC; and individual defendants John Caple, Michael Niegsch, Cecilio Rodriquez, John Clougher, William Shaner, Blake Barnett and Derrick Anderson.

The Committee and the Defendants litigated the adversary proceeding earnestly and thoroughly, but civilly and courteously. Both sides were very well represented by their lawyers, whose advocacy was outstanding. The Court nonetheless must name the winner and the loser based upon the evidence presented and applicable law.

The Defendants argue that the Individual Defendants made every effort to make the Project a success and that the risk they took is what a capitalist society encourages and its legal system protects. The Defendants also argue that the Committee's legal theories shifted and that the Committee did not bring a single creditor to the trial to

support its case.

The Committee argues that there is nothing wrong with risk-taking but here the Defendants structured the Project to place all of the risk on the OpCo creditors while, at the same time, protecting their investment. The Defendants did so by structuring the Project using OpCo's and PropCo's. The OpCo's were the operating stores which filed for bankruptcy, and the PropCo's held the real estate assets and they did not file. As a result, the OpCo's sustained all of the injuries and their creditors will be unpaid, while the PropCo's were left largely unscathed.

The Committee formulated a strong case that (1) Haggen was unprepared for the Project, (2) the OpCo were undercapitalized, and (3) Comvest structured the Project to provide for all of the risk at OpCo, while PropCo would succeed regardless of the success of the Project.

The Project failed for a number of reasons which the Court discusses below. However, the Court does not share the Committee's view that the Defendants were so cavalier in planning and effecting the Project that they were grossly negligent or that there was anything inherently wrong with the OpCo-PropCo structure. Indeed, no creditor of the OpCo's appeared in court or gave deposition testimony complaining about the debacle. The Project failed but not because the Defendants did not care if it succeeded. Moreover, it is not uncommon for parties who are planning a transaction to make certain that they are protected in the event the transaction fails. Such protection from adverse results is one of the reasons for forming a corporation or other entity – to limit personal liability.

It is unnerving that the Project failed in a matter of months and certainly the Court had questions about how it happened.  It turns out that the people in charge, the Individual Defendants, to some degree were not prepared.  They were not, however, grossly negligent and they certainly meant for Haggen, Holdings and the OpCo to succeed.  The Committee made a strong case but, at the end of the day failed to establish gross negligence or self-dealing or the existence of any fraudulent transfers.  The Committee did establish that the leases between Spirit and GIG, and the OpCo's, were above the market rate, but there is no liability.  The Committee failed however, to establish the remaining counts of the Complaint.

A brilliant jurist once wrote:

> Thus, to allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect.

*Gagliardi v. TriFoods Int'l, Inc.*, 683 A. 2d 1049, 1052 (Del. Ch. 1996) (C.A. No. 14725).  The case involved allegations of mismanagement and, as the quoted material makes clear, the Court of Chancery, under the helm of Chancellor William T. Allen, dismissed the complaint.  *TriFoods* stands for the proposition that fiduciaries who enter into "foolish" transactions but who are acting in good faith are protected.  The facts in the Haggen's case illustrate managers and companies who in retrospect acted foolishly but who the Court finds are not liable.

**FINDINGS OF FACT**

I.    Jurisdiction And Venue

1.    This is an action for avoidance of fraudulent transfers, monetary damages for breach of fiduciary duty and for unjust enrichment, equitable subordination, the transfer of liens and security interests, recharacterization, substantive consolidation, and the disallowance of claims. PTO ¶ A.

2.    The jurisdiction of the Court over this action is not disputed. The bases for jurisdiction over this action are 28 U.S.C. §§ 157(a) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. This action is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). PTO ¶¶ B-C.

II.    The Parties

A.    The Debtors

3.    Holdings, one of the Debtors on whose behalf the Committee brings this proceeding, is a limited liability company formed under the laws of Delaware. Prior to the Petition Date, certain Comvest entities owned an interest in Holdings. Holdings directly or indirectly owned and operated approximately 18 supermarkets and one pharmacy in Oregon and Washington before contracting to purchase 146 stores from Albertson's. PTO ¶ 5.

4.    Operations, one of the Debtors on whose behalf the Committee brings these causes of action, is a limited liability company formed under the laws of Delaware. Operations was formed prior to the Albertson's Acquisition. Prior to the Petition Date,

Operations was owned and managed by its sole member, Holdings.  PTO ¶ 6.

5.      OpCo South, one of the Debtors on whose behalf the Committee brings these causes of action, is a limited liability company formed under the laws of Delaware.  OpCo South was formed prior to the Albertson's Acquisition.  Prior to the Petition Date, OpCo  South was owned and managed by its sole member, Operations. PTO ¶ 7.

6.      OpCo North, one of the Debtors on whose behalf the Committee brings these causes of action, is a limited liability company formed under the laws of Delaware. OpCo North  was formed prior to the Albertson's Acquisition.  Prior to the Petition Date, OpCo North was  owned and managed by its sole member, Operations.  PTO ¶ 8.

7.      Acquisition, one of the Debtors on whose behalf the Committee brings these causes of action, is a limited liability company formed under the laws of Delaware. Acquisition was formed prior to the Albertson's Acquisition.  Prior to the Petition Date, Acquisition was owned and managed by its sole member, Operations.  PTO ¶ 9.

8.      Haggen, Inc., one of the Debtors on whose behalf the Committee brings these causes of action, is a corporation formed under the laws of the State of Washington. From 2011  through the Petition Date, Haggen, Inc. was owned by Acquisition.  PTO ¶ 10.

B.      The Non-Debtor Affiliate and Corporate Defendants[2]

9.      Defendant CGH is a limited liability company.  PTO ¶ 11.  Defendant CIP III is a limited partnership and is owned and/or controlled, directly or indirectly, by CGH.

---

[2]  All of the entities were formed under the laws of Delaware.

PTO ¶ 12.  Defendant CIP IV is a limited partnership and is owned and/or controlled, directly or indirectly, by CGH.  PTO ¶ 13.  Defendant CHH III is a limited liability company and is owned and/or controlled, directly or indirectly, by CGH. CHH  III holds 458,489 Class A Units in Holdings.  PTO ¶ ¶ 14-15.  Defendant CHH IV is a limited liability company and is owned and/or controlled, directly or indirectly, by CGH. CHH  IV holds 1,724,792 Class A Units of Holdings.  PTO ¶ ¶ 16-17.  Defendant Comvest Advisors is a limited liability company and is owned and/or controlled, directly or indirectly, by CGH. PTO ¶ 18.  Defendant Property Holdings is a limited liability company formed at the time of the Albertson's transaction.  At all relevant times  prior to the Petition Date, Property Holdings was owned and managed by its sole member, Holdings.  PTO ¶ 19.  Defendant PropCo South is a limited liability company formed at the time  of the Albertson's transaction.  At all relevant times prior  to the Petition Date, PropCo South was owned and managed by its sole member, non-Debtor  Defendant Property Holdings.  PTO ¶ 20. Defendant PropCo North is a limited liability company formed at the time  of the Albertson's transaction.  At all relevant times prior  to the Petition Date, PropCo North was owned and managed by its sole member, non-Debtor Defendant Property Holdings. PTO ¶ 21.

10.    From the time of their formation in December 2014 through the Petition Date, PropCo South and PropCo North were managed by their sole member, Property Holdings.  PTO ¶ 60-61.  Defendant Property Holdings II, is a limited liability company formed at  the time of the Albertson's transaction.  At all relevant  times prior to the Petition Date, Property Holdings II was owned and managed by its sole  member, Debtor Holdings.  PTO ¶ 22.  Defendant Haggen SLB is a limited liability company formed at the

time of the Albertson's transaction.  At all relevant times prior  to the Petition Date, Haggen SLB was owned and managed by its sole member, Debtor  Acquisition.  PTO ¶ 23.  From the time of their formation through the Petition Date, the SLB  Entities had no creditors, did not create or maintain any board minutes, did not utilize or  maintain their own business forms or domain name, and maintained their business addresses,  books and record and email servers at the Debtors' location.  PTO ¶ 63.

       C.    <u>The Individual Defendants</u>

      11.    <u>John Caple</u>.  Caple is an individual residing in the state of Florida.  Caple was a Partner at Comvest Partners until January 31, 2016.  In addition, Caple served as (a) a  Manager of Holdings since at least January 1, 2014 through at least the Petition Date, as well as President and Chief Executive Officer for the period beginning no later than January 1, 2014  through January 30, 2015, and (b) a Director of Haggen, Inc. since at least January 1, 2014  through at least the Petition Date.  PTO ¶ 24.  Caple joined Comvest in 2010, as a managing director and later became a  partner.  Caple was responsible for managing Comvest's investment in Haggen, and was the  leader of the Deal Team; he was asked to leave the firm less than six months after Haggen filed  for bankruptcy relief.  Trial Tr. (10/16) at 101:22-102:6, 103:1-18, 183:7-21.

      <u>Michael Niegsch</u>.  Niegsch is an individual residing in the state of Florida.  At all relevant times, Niegsch was a Vice President of Comvest Partners.  In addition, Niegsch has served as a Manager of Holdings since January 30, 2015.  PTO ¶ 26.  Niegsch joined Comvest in 2010.  He graduated  from the University of Michigan four years earlier, spent about seven months at UBS, two  years at Morgan Joseph, and one year as an independent consultant before joining Comvest.  Trial Tr. (10/17) at 5:13-6:16.  In the summer of 2014,

Niegsch was designated the "quarterback" of the Deal Team. As such, Niegsch was responsible for overseeing third party due diligence streams, managing third party experts, interfacing with Caple and the IC, working with financing counterparties to arrange financing for the transaction, and interfacing with management concerning the store conversions. Niegsch participated in the negotiation of the APA, the ABL, and the Sale Leaseback Transactions, and was also responsible for negotiating with UBS about a possible loan against the PropCo Entities' real property, and ultimately with Citibank in August 2015 concerning the PropCo Advance. Trial Tr. (10/17) at 6:17-8:10.

Cecilio Rodriguez. Rodriguez is an individual residing in the state of Florida. At all relevant times, Rodriguez was the Chief Financial Officer of Comvest Partners. In addition, Rodriguez has served as (a) Secretary and Chief Financial Officer of Holdings for the period November 24, 2014 through January 30, 2015, as well as a Manager of Holdings since November 24, 2014, and (b) a Director of Haggen, Inc. for the period beginning no later than September 1, 2014 through December 6, 2014. PTO ¶ 25.

John Clougher. Clougher is an individual residing in the state of Washington. Clougher served as Chief Executive Officer of (a) Holdings since January 30, 2015 through at least the Petition Date, as well as a Manager of Holdings during that time, (b) Acquisition since December 6, 2014 through at least the Petition Date, (c) Haggen, Inc. since September 8, 2014 through at least the Petition Date, as well as President during that time, Treasurer for the period September 8, 2014 through January 1, 2015, and Director since December 6, 2014 through at least the Petition Date, (d) Operations since December 22, 2014 through at least the Petition Date, (e) OpCo North since December 2, 2014 through at least the Petition Date, as well as President during that time, (f) Haggen

SLB since December 2, 2014  through at least the Petition Date, as well as President during that time, (g) Property Holdings for  the period December 2, 2014 through October 8, 2015, (h) Property Holdings II for the period  December 2, 2014 through October 8, 2015, (i) Property Holdings III, for the  period December 2, 2014 through October 8, 2015, and (j) PropCo North for the period  December 2, 2014 through October 8, 2015.  PTO ¶ 27.

William Shaner.  Shaner is an individual residing in the state of Washington. Shaner served as (a) a Manager and President of Holdings from January 30, 2015  to September 2, 2015 (b) President of Acquisition from January 30, 2015 to September 2, 2015; President of Operations from December 22, 2014 to September 2, 2015, and (d) President and  Chief Executive Officer of OpCo South from December 2, 2014 to September 2, 2015. PTO ¶ 29.

Blake Barnett.  Barnett is an individual residing in the state of Washington.  Barnett has served as the Chief Financial Officer of (a) Holdings since January  30, 2015 through at least the Petition Date, (b) Acquisition since January 30, 2015 through at least the Petition Date, (c) Haggen, Inc. since January 1, 2015 through at least the Petition Date, Operations since December 22, 2014  through at least the Petition Date, (e) OpCo North since  December 2, 2015 through at least the Petition Date, (f) Property Holdings from December 2, 2014 through October 8, 2015, (g) Property Holdings II from December 2, 2014 through October  8, 2015, (h) Property Holdings III from December 2, 2014 through October 8, 2015, (i) Haggen SLB since December 2, 2015 through at least the Petition Date, (j) OpCo South since December  2, 2014 through at least the Petition Date (as well as Vice President since October 29, 2015   through at least the Petition Date), (k) PropCo South from December 2, 2014 through October 8,  2015, and (l) PropCo North from December 2,

2014 through October 8, 2015.  PTO ¶ 28.

    <u>Derrick Anderson</u>.  Anderson is an individual residing in the state of Washington. Anderson served as the Secretary of (a) Holdings since January 30, 2015 through at least the Petition Date, (b) Acquisition since December 6, 2014 through at least the Petition Date, (c) Haggen, Inc. since September 8, 2014 through at least the Petition Date, (d) Operations since December 22, 2014 through at least the Petition Date, (e) OpCo South since December 2, 2014 through at least the Petition Date (as well as Vice President since October 29, 2015 through at least the Petition Date), (f) OpCo North since December 2, 2014 through at least the Petition Date, (g) Haggen SLB since December 2, 2014 through at least the Petition Date, (h) Property Holdings from December 2, 2014 through October 8, 2015, (i) Property Holdings II from December 2, 2014 through October 8, 2015, (j) Property Holdings III from December 2, 2014 through October 8, 2015, (k) PropCo North from December 2, 2014 through October 8, 2015, and (l) PropCo South from December 2, 2014 through October 8, 2015.  PTO ¶ 30.

III.    <u>Relevant Procedural History</u>

    12.    On the Petition Date, the Debtors filed with the Court voluntary petitions for relief under the Bankruptcy Code. These cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. No trustee or examiner has been appointed in the Debtors' cases.  PTO ¶ 1. The United States Trustee for Region 3 appointed the Committee on September 21, 2015, to represent the interests of all general unsecured creditors in these cases pursuant to Section 1102 of the Bankruptcy Code.  PTO ¶ 2.

    13.    On January 14, 2016, the Committee, the Debtors, Comvest, the PropCo

Entities, and Property Holdings II executed and filed that certain Stipulation and Order (1) Granting Derivative Standing to the Official Committee of Unsecured Creditors to Commence Litigation Against Haggen Property Holdings, LLC, Haggen Property South, LLC, Haggen Property North, LLC, Haggen Property Holdings II, LLC, Haggen Property Holdings III, LLC, Comvest Partners and/or Directors and Officers Thereof; and (2) Providing for a Litigation Standstill, at Docket No. 1216 (the "Initial Standing Stipulation"). On January 15, 2016, the Court approved the Initial Standing Stipulation. PTO ¶ 3.

14.    On April 29, 2016, the Committee and the Debtors executed and filed that certain Stipulation and Order Granting Derivative Standing to the Official Committee of Unsecured Creditors to Commence Litigation Against Haggen SLB, and/or its Past and/or Present Directors and Officers, at Docket No. 1858 (the "Second Standing Stipulation" and together with the Initial Stipulation, the "Standing Stipulations"). On May 2, 2016, the Court approved the Second Standing Stipulation. PTO ¶ 4.

15.    On September 7, 2016, the Committee filed its Complaint and Objection to Claims at Docket No. 1 (the "Complaint").

16.    Defendants filed their Answer to the Complaint on December 9, 2016. Docket No. 16 (the "Answer").

17.    The Court conducted a trial on five consecutive days from October 16-20, 2017, during which it heard live testimony from each of the seven Individual Defendants, Todd Hooper (a representative of ATK), and the following expert witnesses: David MacGreevey, Carol Flaton, and James Howard on behalf of the Committee; and Kevin Montague and John Satter on behalf of the Defendants. The Court also admitted into

evidence numerous exhibits and deposition designations of 26 witnesses as well as the videotaped deposition of Thomas Clark, a non-defendant managing director of Comvest who sat on the IC during the relevant time.

## IV.    Comvest Acquires A Controlling Interest In Haggen

18.    Haggen was founded in 1933 as a single grocery store.  In the ensuing decades, the Haggen family operated the company and opened additional stores.  In 1962, the Haggen family concentrated all of their business activities in a single corporate entity, Haggen, Inc.  By 2011, Haggen, Inc. operated a 30-store chain of grocery stores in the states of Washington and Oregon.  PTO ¶ 31.[3]

19.    In 2011, the Haggen family sold an 80% equity interest in Haggen, Inc. to Comvest.  Specifically, defendant CGH, a Comvest entity, purchased its majority stake in Haggen, Inc. through two newly-formed limited liability companies, Holdings and Acquisition, which it formed for that purpose. Thus, in January 2011, CGH formed Holdings and acquired 80% of the membership interests of that entity with the Haggen family obtaining the balance of the membership interests, and at about the same time, CGH also formed Acquisition. Holdings solely owned the membership interests in Acquisition, and Acquisition owned all of the stock of Haggen, Inc.  PTO ¶ 32.

---

[3]  Defendants contend that Haggen employed a "PropCo/OpCo" structure prior to the time Comvest invested in Haggen in 2011. *See*, e.g., Trial Tr. (10/17) at 269:17-270:2. While this contention is irrelevant, the evidence does not support it. Although it appears that the Haggen family owned a grocery (or "operational") business known as Haggen, and a "PropCo type entity called Briar Development," (a) the Haggen family "operated them very separately," and (b) the real estate was never part of the grocery business. Indeed, there is no evidence that Haggen, Inc. ever transferred real estate to Briar Development or (as here) that it did so in anticipation of a broader corporate transaction. Trial Tr. (10/17) at 281:24-282:10.

20.    Over the next four years, under Comvest's direction, Haggen closed a number of unprofitable stores.  As of the end of 2014, Haggen operated 18 grocery stores and one pharmacy on a profitable basis.  PTO ¶ 33.

V.    The Albertson's Transaction – The Project

A.    Comvest Learns Of The Albertson's Opportunity

21.    In the summer of 2014, Caple learned that the FTC required Albertson's and Safeway to divest a substantial number of stores as a condition to the closing of their proposed merger and identified this as an opportunity for Comvest.  On August 13, 2014, Comvest submitted its initial indication of interest to acquire 22 stores in Washington and Oregon.  Trial Tr. (10/16) at 104:25-105:18; PX 4; PTO ¶¶ 34, 46. Comvest originally focused on Washington and Oregon because those were the states in which Haggen operated.

22.    On September 15, 2014, the Deal Team informed the IC that the number of stores being considered had increased from 22 to approximately 43, and all were located in Washington and Oregon.  *Compare* PX 4.004 *with* PX 8.002. The IC was also informed that the appraised value of the real estate associated with those 43 stores exceeded the proposed purchase price by $56 million. The Deal Team described the proposed transaction as "transformational" but noted that it also "provide[d] integration execution risk (i.e., Haggen's current infrastructure will need to absorb 43 additional stores)." Trial Tr. (10/16) at 106:2-8; 106:25-112:17; PX 8.

23.    Several weeks later, Comvest was informed by Albertson's representatives that Comvest would also have to bid on stores located in California to remain competitive.  The Deal Team informed the IC of this development and noted that,

although the execution risk would increase as Haggen entered new markets, they believed the proposed transaction was "too juicy" to pass up, in part, because of the value of the owned real estate associated with the stores. Trial Tr. (10/16) at 117:7-119:21; PX 6; PX 7.

B.    Comvest Focuses On The Real Estate.

24.    On November 3, 2014, the Deal Team informed the IC that, among other things, "Albertson's has asked us to take 16 additional stores in Nevada and Arizona," nine of which were situated on fee-owned real estate and two of which were subject to ground leases. The IC was also told that Albertson's was "adding these stores to our deal for no additional purchase price because it makes their lives easier," and that the appraised value of the real estate associated with the stores in Nevada and Arizona was $56 million.

25.    The Deal Team also included certain projections described as "downside scenarios." Clark and Marrero focused their attention on the value of the real estate.  In particular, both Clark and Marrero sought assurances from Caple about the value of the "underlying real estate (in downside scenarios)" because, according to Marrero, "that affects [the] decision tree more than anything." Trial Tr. (10/16) at 119:22-123:6, 296:9-298:6; Clark Tr. at 116:20-117:10, 117:20-119:2; DX 79; PX 9.  Indeed, Clark acknowledged that the "potential to acquire real estate with underlying value" was one of the "key components" to Comvest's deal thesis. Clark Tr. at 109:25-111:14; PX 26.005.

26.    A month after Clark and Marrero sought assurances as to the value of the real estate, the Deal Team requested authority from the IC to submit Haggen's final bid, and submitted a "deck" in advance of the meeting. Trial Tr. (10/16) at 123:12-15; PX 30.

In the deck, and at the meeting, the Deal Team told the IC that the "all-in purchase price of $430M" would be funded with the proceeds from the Sale Lease Back Transactions and the ABL, and would yield, among other things, residual real estate with an appraised value of $118 million, all of which would be transferred to the PropCo Entities. Trial Tr. (10/16) at 123:16-126:19; PX 19.004.

27.     Several weeks later, before Haggen closed on the first store, Falk and Niegsch conferred on, among other things, the economic benefits that Comvest expected to reap from the real property.  Specifically, and consistent with the representations set forth in the December deck, Niegsch confirmed for Falk that the PropCo Entities would have (a) unencumbered real estate appraised at $117 million, and (b) annual rental income of $13 million from the OpCo Entities (pursuant to the PropCo Leases), all for Comvest's ultimate benefit.  Trial Tr. (10/17) at 49:4-51:17; PX 33.

VI.    Execution Risks

    A.    Risks Are Identified Pre-Closing

28.     Comvest knew in September that the initial proposal to acquire just 43 stores in Washington and Oregon states where it was already operating presented significant integration risks because Haggen was going to need to integrate the Albertson's and Safeway stores "into our chain and rebrand them. So there was an awful lot to do to get that done."  According to Caple, "infrastructure," included employees, software and IT systems, union and vendor relationships, purchasing and distribution processes, and back office operations.  Trial Tr. (10/16) at 112:18- 114:4; PX 8.003.  Caple knew that these integration risks would increase as stores continued to be added. *Id.* at 119:10-17.

29.     Less than six weeks before the signing of the APA, certain of the Individual Defendants and Comvest's advisors identified substantial transaction risks and potential downside scenarios, including:

- "sales growth/banner conversion would have no benefit at all"
- "no labor savings at all, ever"
- "store expenses are up some, 5%, 10% from base case"
- While the Haggen brand may bring positives, it "isn't going to overwhelm the customer at first."
- "We are fighting headwinds like eliminating the Von's card and fuel programs; not small takeaways."
- "We are eliminating banners that have a presence for years, and while somewhat tarnished, still maintain a loyal customer base."

PX 157.

30.     Separately, in December, SuperValu raised concerns to Comvest and Haggen about "logistics/slotting," the process whereby decisions are made concerning the assortment of products that would be put on the shelves.  SuperValu advised them that "[a]ssortment decisions must be made by Haggen immediately" or there would be "[r]isk to customer experience and out of stocks." PX 273.004.

B.     <u>Pricing Risks Were Identified</u>

31.     The pricing risks were among the most significant risks that were identified to the Defendants.  The evidence establishes that Defendants were specifically advised prior to the execution of the APA that if Haggen failed to execute its pricing strategy, it would likely suffer a loss of customers.

32.     On October 6, 2014, shortly after ATK was hired, Caple told Hooper that there "seems to be a huge capability gap around pricing at Haggen."  Trial Tr. (10/20) at 149:12-21; PX 206.

33.    On October 15, 2014, after having been alerted to the issue, ATK identified "pricing" as one of the "Key Decisions/Issues To Be Addressed" and advised Comvest and Haggen to "maintain" existing prices in the short-term in order to "minimize changes for [the] consumer." PX 211.010. Hooper advised Haggen that if Haggen did not maintain existing prices, particularly for "like items," Haggen was likely to lose customers.  Trial Tr. (10/20) at 146:22-147:17.

34.    ATK was terminated by early December.  According to Hooper, Caple informed him that he did not want to pay ATK $500,000 per month for services.  Trial Tr. (10/20) at 152:10-153-10.

35.    Comvest and Haggen apparently thought they could "outsource" the pricing logistics to SuperValu.  Trial Tr. (10/19) Tr. at 35:16-25; PX 72-0027.  This assumption proved problematic because, among other reasons, (a) SuperValu had no prior relationship with Safeway, and (b) Comvest and Haggen decided to keep the legacy stores running on their own independent platform thereby preventing the integration of all three parts of the newly-formed enterprise.  SuperValu (Collison) Tr. at 40:9-13, 41:21-42:6.

36.    The logistics of training everyone on the various information systems created additional risks.  SuperValu, for example, had to train all of the Safeway employees as well as approximately 130 merchants (the corporate-level managers that make "item and price and promotion decisions and assortment decisions."). *Id.* at 43:7-44:25.  SuperValu knew "early on" that it would take "months" to fully train everyone, a point that it asserts was conveyed to Haggen but nevertheless caused considerable concern due to the closing cadence schedule. *Id.* at 47:24-49:19.

37.     Concerning pricing and merchandising, SuperValu asserted that "we did not believe that there was adequate time for Haggen to make all the merchandising decisions that they needed to make in order to have the right prices, the right assortment in their stores." SuperValu (Collison) Tr. at 91:18-93:12; PX 273.003 (identifying the impact and associated risks for pricing and merchandising issues caused by the accelerated conversion commencement date).

38.     Haggen was dismissive of the risks that had been identified, with Clougher telling Barnett and Genser that "[t]here is a large level of b…s…" in SuperValu's risk analysis. PX 273.001.  When the very first store opened, there were considerable pricing problems that resulted in multiple "shelf tags" for the same items; this created a laborious, complex set of issues that required determinations to be made as to which tag was the correct one, and then match that tag with the "point of sale system." *Id.* at 51:9-54:11.  As a consequence, there were inventory shortages and a loss of customers, just as SuperValu had warned back in December.  *Id.* at 111:3-112:2; PX 273.

Certain Third-Parties' Roles With Projections

39.     Defendants contend that their proposal to acquire 146 stores from Albertson's was "vetted by multiple third parties who were incentivized to rigorously inspect the  deal" and all "believed it would work." *See, e.g.,* Def. Trial Br. at 4-5, 15, 32-33. Defendants also contend that these third parties validated Haggen's corporate structure and found Comvest's  projections to be reasonable.  Trial Tr. (10/16) at 47:3-10; 66:24-25, 69:7-12. The evidence shows that Defendants' claims are somewhat overstated.

A.    <u>FTC</u>

40.    The FTC is a governmental agency that ordered Albertson's and Safeway to divest certain stores as a condition to approving the Albertson's/Safeway merger, and that approved Haggen as a qualified bidder of 146 of those stores. PTO ¶¶ 46, 48. The evidence shows that Haggen and Comvest (a) provided the FTC with a business plan and a set of projections (that did not include a "downside case" or a "real bad downside case" showing Haggen with barely any liquidity), and (b) participated in one in-person meeting with the FTC that lasted two to three hours. Trial Tr. (10/16) at 224:3-22; DX 72, PX 318. The FTC apparently relied on these materials and meeting in approving Haggen as a qualified bidder.

B.    <u>PNC</u>

41.    Defendants also contend that by agreeing to the terms of the ABL, PNC implicitly or explicitly validated or approved Haggen's new corporate structure, including the transfer of assets to bankruptcy remote entities, Comvest's projections, and the Albertson's Acquisition generally. *See, e.g.,* Trial Tr. (10/16) at 60:15-21; Answer ¶ 82; Def. Trial Br. at 4, 11. The evidence somewhat contradicts Defendants' contentions concerning PNC.

42.    Comvest and PNC had a long-standing relationship that preceded the Albertson's Acquisition, with PNC already having extended credit to "five or six" of Comvest's portfolio companies. PNC (Goldstein) Tr. at 39:11-22, 40:19-24; PX 369.003 (listing the entities PNC has provided financing to, including specific Comvest funds, companies to which Comvest provided debt financing, and Comvest portfolio companies). On August 30, 2014, Niegsch wrote to PNC about Haggen's potential

acquisition of stores from Albertson's and Safeway and emphasized that "[g]iven the dynamics, we are going to be able to pick up the stores and some valuable real estate for a very attractive price." Niegsch expressed interest in "upsizing our current ABL facility and putting some leverage on the real estate." PX 366.004.

43.     By October 2014, the Albertson's deal had expanded to include certain California stores and PNC was asked to lead a $150 million underwriting for a revolving, asset- based loan. PNC was advised that Comvest planned to take out a $61 million term loan against the fee-owned real estate, with $50 million of the proceeds used to finance a "Comvest Dividend payable at closing." PX 367.

44.     On December 1, 2014, PNC sought approval from its Credit Risk Management Committee and Executive Credit Risk Management Committee for a proposed $180 million revolving line of credit to Haggen. PNC (Goldstein) Tr. at 74:3- 77:3; PX 369. These Committees approved the proposed transaction and provided six "business justifications" for the loan including the profitable nature of the deal to PNC, PNC's "extensive history with Comvest," and the fact that the loan was to be a "fully-secured, fully-monitored, revolver-only facility." PX 369.004.

45.     Although PNC ultimately approved the loan, PNC's underwriters considered Haggen's proposed $180 million ABL risky and assigned it a "risk rating" of 12B. According to PNC, the numerical part of the risk rating is an assessment of the probability of the prospective borrower's default with "1" being the least likely and "14" being the most likely to default. The alphabetical part of the risk rating is an assessment of PNC's loss in the event of default or, stated another way, PNC's perception of the quality of collateral, with "A" being the most secure (*i.e.*, cash collateral) and "G" being

the least secure (*i.e.*, unsecured).  PNC  (Goldstein) Tr. at 80:11-84:11, 85:11-20; PX 369.003. Thus, in assigning a risk rating of 12B to the proposed ABL, PNC determined that there was a very substantial risk of default, but  concluded that the risk was mitigated by the strength of the collateral securing the ABL.  PX 369.005-006.

46.    On February 12, 2015, Haggen, Inc., OpCo South, and OpCo North entered into the ABL.  PNC (Goldstein) Tr. at 100:7-101:9; PX 370.  The ABL was projected to be, and initially was, for a maximum revolving advance amount of $180 million.  *Id.* at 101:10-13, 104:20-23; PX 370.038.

47.    Based on the foregoing, the Court concludes PNC identified risks, but justified extending the loan based on the  quality of the collateral, the nature of the loan, and its long-standing relationship with Comvest.

C.    <u>Garrison</u>

48.    Garrison is a sale leaseback counterparty.  Defendants contend that by entering into the Sale Leaseback Transactions, Garrison validated Haggen's new corporate   structure, Comvest's projections, and the Albertson's Acquisition generally. Trial Tr. (10/16) at  60:22-61:4; Def. Trial Br. at 4, 12.  The evidence is to the contrary.

49.    Prior to entering into the Sale Leaseback Transaction, a team at Garrison prepared a "Confidential Information Memorandum" ("CIM").  The CIM was presented to Garrison's Management Committee, the body charged with the responsibility of approving the  transaction on behalf of Garrison.  Garrison (Rosenthal) Tr. at 41:5-44:21; PX 178.  The CIM  detailed, among other things, the many risks identified by Garrison as well as Garrison's overall  strategy.  PX 178.

50.    The CIM and Garrison's testimony establish that Garrison entered into the Sale Leaseback Transactions because it believed it was acquiring real estate at a substantial discount to market, and that its business strategy would allow it to avoid the substantial transactional risks that it identified including, but not limited to, the risk that Haggen would run out of liquidity.

51.    Prior to entering into the transaction, Garrison and its industry consultant, Food Partners, identified numerous and substantial risks presented by the proposed Albertson's Acquisition.  Garrison (Rosenthal) Tr. at 38:16-39:6, 74:17-25; PX 178.016. Among the risks identified by Garrison were:

    a.    Haggen was deemed to be a "non-investment grade credit"
    b.    Comvest planned to contribute insignificant new equity
    c.    Haggen was taking on higher than average risk with this "complicated endeavor" due to the "size of the transaction; the amount of stores that were being acquired."
    d.    Garrison was concerned that Haggen lacked the capability to successfully convert all the stores
    e.    Haggen lacked brand recognition in the new markets it was entering
    f.    Albertson's and Safeway were to remain direct competitors
    g.    Short term liquidity risk due to the possibility that corporate cash flows could be impaired
    h.    Possible delays in the conversion schedule; higher than expected costs; higher CAPEX; sales declines

Garrison (Rosenthal) Tr. at 75:2-76:11, 80:24-90:23; PX 178.016.

52.    Food Partners also prepared its own independent risk assessment that was presented to Garrison's Management Committee as part of the CIM.  Among the risks Food Partners identified were:

    a.    "This type of transaction [*i.e.,* the size and scale] has never been done before"
    b.    "Haggen brand and format is not portable for other markets."
    c.    "Leveraged acquisition with Comvest not investing equity"

    d.      Albertson's and Safeway "will be direct competitors and will know the markets (and customers) better than Haggen"

    e.      "Closing and conversion schedule highly risky, especially licenses and permits and executing SLB"

    f.      "Management team has not operated a traditional format in these markets"

    g.      "Transaction complexity and size may overwhelm Haggen"

    h.      "Haggen runs out of liquidity"

Garrison (Rosenthal) Tr. at 92:18-104:5; PX 178.093.

53.      The opportunity to purchase the real property at such a substantial discount to market provided Garrison with the financial incentive to proceed, and the strategy of selling the real property individually over a nine-month period mitigated substantially all of the risks identified.

VII.   <u>Comvest's New Corporate Structure</u>

54.      The Committee contends that all of the claims at issue arise, in the first instance, from Comvest's decision to create a "PropCo/OpCo" structure in connection with the Albertson's Acquisition. To be clear, there is nothing illegal, improper or unfair about the utilization of a PropCo/OpCo structure.

55.      The Committee contends that Comvest's adoption of the PropCo/OpCo structure in this case was problematic for at least the following reasons: (a) the structure was adopted on the eve of, and in connection with, a "transformative" transaction (b) the transaction involved an eight-fold increase in the number of Haggen's stores, including Haggen's expansion into three new states where Haggen had no prior name recognition, customer affinity, or reputation, (c) the transaction was fraught with substantial execution risks, (d) the OpCo Entities were inadequately capitalized from the outset and remained so, and (e) Comvest devised the PropCo/OpCo structure with the specific

intent of securing the economic benefits of the real estate for itself,  whether the transaction succeeded (by leveraging the real estate to pay dividends to Comvest,  and creating $13 million in annual cash flow from the rent due under the PropCo Leases and subleases), or failed (by placing the real estate beyond the reach of the OpCo Entities' creditors,  Comvest intended to provide itself with "downside protection" in the event of a "disaster" or "liquidation" scenario).

56.    The parties agree on certain basic facts.  From the time of Comvest's investment in Haggen in 2011 through December 1, 2014, the equity owners of the enterprise  (*i.e.*, Comvest and members of the Haggen family, through HHI) owned the membership  interests in Holdings, which owned all of the membership interests in Acquisition, which owned  all of the common stock in Haggen, Inc. as follows:



PTO ¶ 55.

57.    On the eve of the Albertson's Acquisition, Comvest caused Haggen to create ten new entities within a new "PropCo/OpCo" structure:



58.    The evidence establishes that Comvest created this structure with the intent of keeping the assets and liabilities of the PropCo Entities separate from the assets and liabilities of the OpCo Entities. Trial Tr. (10/16) at 147:19-148:6. Caple admitted that the effect of the PropCo/OpCo structure was to prevent the PropCo Entities' assets (*i.e.*, the real estate) from being used to satisfy claims made against the OpCo Entities. Trial Tr. (10/16) at 292:17-294:4. Clark expressed the same view, testifying that he knew the real estate assets would be transferred to the PropCo Entities and would be unencumbered, and that there would be "no link directly between" the PropCo Entities and the OpCo Entities. Clark Tr. at 122:10-123:14, 125:11-126:6, 127:2-128:21.

59.    Comvest was intent on placing as much of the real estate as possible into an entity or entities that creditors of the operations could not reach. This topic came up on November 20, 2014, when Barnett, who needed to know the names of the entities for

purposes of executing various contracts, asked Niegsch about  the status of the "legal

entity structure."  Trial Tr. (10/17) at 163:16-24; PX 29.  Niegsch told  Barnett that he was

unsure, but if "we have to take the [BofA deal advocated by  Albertson's/Cerberus], we

could probably keep this structure, but it would mean nothing from a  silo-'ing' of assets

and liabilities perspective."  PX 29.

60.    At trial, Niegsch admitted that (a) the "structure" he was referring to was

the PropCo/OpCo structure, (b) his reference to the "siloing" of assets and liabilities

"was to the  structure that [Comvest] was pursuing that would have separated the

operating assets and  liabilities from the real estate assets and liabilities," (c) if Comvest

took the BofA deal it  "wouldn't have a structure where the operating company had the

operating assets and liabilities,  and the real estate company had the real estate assets

and liabilities," and (d) the effect of the  PropCo/OpCo structure was that "the property

assets couldn't be used to satisfy the OpCo liabilities and the OpCo assets couldn't be

used to satisfy the PropCo liabilities."  Trial Tr.  (10/17) at 44:7-46:2, 164:19-165:11 (cross-

collateralization would permit the lender to foreclose on all assets in the event of default);

PX 29.

VIII.    The Transactions Were Interrelated And Dependent

A.    Holdings' Rights to Acquire Real Estate Were Transferred to
PropCo Entities and SLB Entities Through the Contribution Agreements

61.    With the corporate structure in place, Comvest executed on its strategy of

the transfer of real estate assets from Holdings to the PropCo Entities and the SLB Entities

through the use of the Contribution Agreements.  Trial Tr. (10/17) at 62:20-63:8; PTO ¶

65.

62.    Holdings was the sole Haggen party to the APA and had the exclusive right to acquire, among other things, the real property assets, including fee-owned property and ground leases. PX 263. Haggen acquired the stores on a rolling basis. As the stores were acquired, Anderson signed Contribution Agreements whereby Holdings transferred its right to acquire specified stores to a PropCo Entity (if it was a fee owned property that was not included in an SLB transaction) or to an SLB Entity (if it was a fee owned property that was included in an SLB transaction). Trial Tr. (10/17) at 258:21-260:4; PTO ¶¶ 64-65; PX 263; PX 89-PX 103.

63.    Holdings received nothing in exchange for the transfers of its right to acquire the real property assets to the PropCo Entities and the SLB Entities. Trial Tr. (10/16) at 126:20-127:25; Trial Tr. (10/17) at 260:16-20; 261:6-8.

B.    The SLB Transactions

64.    Haggen financed the Albertson's Acquisition by using a substantial portion of the acquired real estate in two sale leaseback transactions pursuant to which (a) Holdings transferred its right to acquire certain fee owned properties to one of the SLB Entities pursuant to the Contribution Agreements (b) the SLB Entities then sold those fee-owned properties to the SLB counterparties (*i.e.*, Garrison and Spirit) and (c) the sales proceeds were initially paid to the SLB Entities and most was then used to pay Albertson's purchase price; and the financial obligations under the SLB Leases were not assumed by the SLB Entities that received the money, but were placed on the OpCo Entities. Thus Haggen affiliates (the SLB Entities) received the proceeds from the SLB transactions. Another group (the OpCo Entities) assumed the obligations in the form of the SLB Leases.

1.  The SLB Transactions with Spirit

65.     Holdings signed the "Purchase and Sale Agreement and Joint Escrow Instructions" with Spirit, dated as of November 24, 2014 (together with any amendments thereto, the "Spirit SLB Agreement").  PTO ¶ 70.

66.     Pursuant to the Spirit SLB Agreement, the SLB Entities sold 20 parcels of real estate (and improvements) to Spirit located in Arizona, California, Nevada,  Oregon, and Washington (the "Spirit SLB Properties") for approximately $224.4 million. PTO ¶¶ 71-74.

67.     An affiliate of Spirit, Spirit SPE HG 2015-1, LLC, as landlord, entered into a Master Lease Agreement with Operations, as tenant, as of February 12, 2015, with respect to certain of the other Spirit SLB Properties (together with any amendments thereto, and the Spirit Lease, the "Spirit Master Leases").  PTO ¶ 86.

2.  The SLB Transactions with Garrison

68.     Haggen also entered into a Sale Leaseback Transaction with Garrison.[4] Garrison understood that Comvest was the majority equity owner of Haggen and negotiated the  Sale Leaseback Transaction with Niegsch. Garrison (Rosenthal) Tr. at 13:3-11.  Garrison also understood that completion of the Sale Leaseback Transaction was dependent on Haggen's closing on the APA with Albertson's.  Garrison (Rosenthal) Tr. at 23:11-25:5.

---

[4] As a technical matter, Garrison formed a joint venture with another firm, Cogent, and their joint venture was named "GIG TCG Wave Holdings, LLC," Garrison (Rosenthal) Tr. 18:20-19:6.  For convenience purposes only, the Court refers to this joint venture as "Garrison."

69.    On December 4, 2014, Holdings and Garrison executed a "Purchase and Sale Agreement and Joint Escrow Instructions" (together with any amendments thereto, the "Garrison SLB Agreement"). PTO ¶ 75; Garrison (Rosenthal) Tr. at 25:6-18; PX 481. The Garrison SLB Agreement governed the "sale" part of the SLB transaction. Garrison (Rosenthal) Tr. at 108:22-109:3.

70.    Pursuant to the Garrison SLB Agreement, the SLB Entities sold 19 parcels of real estate (and improvements) located in Arizona, California, Nevada, Oregon, and Washington (the "Garrison SLB Properties") for approximately $134.4 million. PTO ¶¶ 76. According to Garrison, Haggen determined which specific properties were included in the set. Garrison (Rosenthal) Tr. at 36:21-37:8.

71.    On February 17, 2015, Garrison, as landlord, and OpCo South and OpCo North, as tenants, entered into the Garrison Lease, as amended. The Garrison Lease set forth the terms by which the OpCo Entities leased each of the Garrison SLB Properties following Garrison's acquisition of them from the SLB Entities. PTO ¶¶ 82-84; Garrison (Rosenthal) Tr. at 107:13-109:3, PX 482.

72.    The SLB Transactions yielded $358.8 million. As intended, the proceeds were used to pay Albertson's (which included payment for all of the fee owned properties subject to the SLB Transactions as well as the twenty-eight remaining fee owned properties that were transferred free and clear to the PropCo Entities), with the residual proceeds of $50 million going to the OpCo Entities. PTO ¶¶ 66-67, 87.

73.    In exchange for the $50 million in SLB proceeds, the OpCo Entities assumed all of the massive long-term obligations under the SLB Leases. PTO ¶ 68.

### 3. The SLB Leases Were Above Market

74.     James Howard offered expert testimony on the Committee's behalf concerning whether the SLB Leases were above market.  Howard's ultimate conclusion was that the lease rates in the SLB Leases were above market.  Trial Tr. (10/19) at 218:25-220:12.  For the reasons set forth below, the  Court finds that Howard was a credible witness, his methodology is generally accepted, and the  bases for his opinions were reasonable.  The Court therefore credits Howard's opinions as set  forth herein and finds that the SLB Leases were above market.

75.     Howard is well-qualified to offer expert opinions concerning commercial real estate leases, particularly those concerning supermarkets.  Howard has over 35 years of  relevant experience, including 27 years working on behalf of lenders in the real estate and special  assets/workouts fields.  As the market manager for Wachovia Bank's West Florida lending  division, Howard oversaw loans of over $500 million to retail developers related to grocery  stores.  Since 2008, Howard has been advising retail developers as a Senior Managing Director  of GlassRatner Advisory & Capital Group LLC.  Based on his knowledge and experience, the  Court concludes that Howard is qualified to offer his expert opinions concerning fair market rent.  Trial Tr. (10/19) at 215:6-17, 216:9-217:1; PX 166.080-089.

76.     Howard was first retained in April 2017 and was asked to examine the master leases related to the SLB Transactions and compare them to what he "would expect to see  in the market at the time that the transaction transpired."  Trial Tr. (10/19) at 214:19-24, 217:16.  Howard assembled a team to assist him, and together they gathered and reviewed documents  in connection with the preparation of a written report.  *Id.* at

217:20-218:18.

77.    Howard's methodology was a classic "comparable transaction" analysis. After reviewing the Garrison CIM and Spirit confidential memorandum, Howard and his team used various databases to establish a "market rent" in each relevant geographic market. Howard and his team also visited each of the properties that was subject to the SLB transactions and conducted physical inspections to assess particular characteristics. Trial Tr. (10/19) at 220:13-221:13.

78.    Howard compiled various schedules that included his "comparable transactions." The primary sources for Howard's comparable transactions were Duff & Phelps (commissioned by Spirit), Garrison, and CoStar. Howard focused on supermarkets (excluding all non-grocer tenants), eliminated smaller stores, and broke his "comps" down by geographical area. Trial Tr. (10/19) at 221:17-227:3.

79.    Howard's ultimate conclusions are that the SLB Leases were, in the aggregate, (a) $3.55 million above market on an annual basis, and (b) $17 million above market over the life of the leases. Trial Tr. (10/19) at 227:4-229:15; PX 166 (tables 11 and 11(a)).

80.    Defendants offered the expert testimony of John Satter to rebut Howard's conclusions. Satter's principal criticism was that Howard did not provide for an annual rent escalation clause. This is a significant point because all of the SLB Leases were subject to annual rent increases. On cross-examination, however, Satter was forced to admit that Howard had reviewed each of the 79 third-party leases that Albertson's assigned to Haggen as part of the Albertson's Acquisition, and not a single one contained an annual rent escalation clause. Trial Tr. (10/20) at 266:14-268:1.

81.     In light of the sound methodology employed, and the reasonableness of Howard's decision not to include an annual rent escalation clause, the Court finds that Howard's opinions are credible, and the SLB Leases were above market to the extent determined by Howard.

C.     The PropCo Leases/Rents

82.     Simultaneous with the transfer of the fee-owned real estate to the PropCo Entities pursuant to the Contribution Agreements, Comvest caused the PropCo Leases to be executed pursuant to which the OpCo Entities were required to pay rent to their corporate cousins, the PropCo Entities. Notably, when the stores subject to the PropCo Leases were owned by Albertson's, they paid "nominal rent" of about $100 per store per year – a peppercorn – "[j]ust enough so that we have some consideration." Albertson's (Beckstrom) Tr. at 16:8-18:22, 22:23-23:7.

83.     The Court finds, as a matter of fact, that the PropCo Leases did not result from arm's length negotiations. Comvest unilaterally decided the terms of the PropCo Leases and directed Akerman to prepare them, and Anderson signed all of the PropCo Leases on behalf of both the "landlords" and the "tenants." Trial Tr. (10/17) at 63:9-21, 261:13-24; PX 692-703. Trial Tr. (10/17) at 253:14-20, 254:14-21, 262:22-264:1. However, the Committee stipulated that the rental rates were not above market.

D.     The Subleases (Ground Leases)

84.     As with the Contribution Agreements and the PropCo Leases, Comvest also dictated the terms of the subleases between the PropCo Entities and the OpCo Entities pertaining to the ground leases.

85.     According to Niegsch, at the time of the Albertson's Acquisition, Albertson's had a number of third-party ground leases.  Comvest transferred the ground leases to the PropCo Entities and caused the OpCo Entities to enter into "subleases" at "market rates" with the PropCo Entities, pocketing the difference between the actual rent due under the ground leases and what Comvest determined the market rent to be.  Trial Tr. (10/17) at 64:10-65:12.  Each of the stores subject to a ground lease was forced to take a rent increase. Prior to the Albertson's Acquisition, the stores subject to the ground leases did not pay any additional "rent" to any Albertson's affiliate.  Albertson's (Beckstrom) Tr. at 25:4-22, 27:7-31:25.  Here, again, the Committee stipulated that the leases were at market rates.

E.     Comvest's Domination Of The Transactions And Terms

86.     Caple admitted that Comvest: (a) controlled the Haggen enterprise, (b) structured the Albertson's Acquisition, (c) determined to pursue the SLB transactions, (d) made the decision to enter into each applicable agreement, (e) authorized Caple, as Manager, to enter into the APA, (f) approved the PropCo Advance in August 2015, (g) approved the commencement of these bankruptcy cases, and (h) decided which Haggen entities would file for bankruptcy and which would not.  Trial Tr. (10/16) at 146:3-147:18.

X.     Comvest's "Investment" In Haggen

87.     Defendants have repeatedly asserted that Comvest contributed nearly $200 million into the Albertson's Acquisition, comprised of the legacy stores with an alleged value of $100 to $140 million and an "equity investment" of $50 million. *See*, e.g., Hearing Tr. (9/26/17) at 26:24-27:2; Def. Trial Br. at 1, 2, 4, 29-30.

A.    <u>The Value Of Comvest's Interest In The Legacy Stores Was $26.5 million</u>

88.    As part of the Albertson's Acquisition, Comvest "contributed" the legacy stores by placing Haggen, Inc. on the "OpCo" side of the new corporate structure. Defendants contend that the value of the legacy stores was $100 million. Trial Tr. (10/16) at 50:21-51:7, 96:20-97:2; Def. Trial Br. at 1, 4, 29. At trial, Caple asserted that the Haggen legacy stores were worth between $100 to 140 million. Trial Tr. (10/16) at 269:17-21.

89.    The best evidence of the value of Comvest's equity interest in the legacy stores is Comvest's contemporaneous communications to its investors. Comvest reported to its investors that as of December 31, 2014 (the time of the Albertson's Acquisition) Comvest's equity interest in Haggen was worth $26.5 million. Trial Tr. (10/16) at 274:20- 276:7; PX 636.

B.    <u>Comvest Never Intended To Make An "Equity Investment"</u>

90.    Comvest contends that it made an "equity contribution" of $50 million in the OpCo Entities in connection with the Albertson's Acquisition.[5] Trial Tr. (10/16) at 67:9-10; Def. Trial Br. at 1, 29. While Comvest "invested" (and lost) $50 million, the evidence conclusively establishes that Comvest did not intend to make an "equity investment" of any kind; rather, Comvest believed it was really making a short-term "bridge loan" at the insistence of the sellers.

91.    Comvest did not believe that Haggen needed a $50 million "equity investment" to capitalize the OpCo Entities; rather, Albertson's and Cerberus insisted

---

[5] Comvest actually "invested" $51.5 million, not $50 million, so that it could and did pay itself a "management fee" of 3%, or $1.5 million. Trial Tr. (10/17) at 47:24-48:6. The Committee seeks to recover this $1.5 million "management fee" under Counts 64 and 65 of the Complaint.

that Comvest put the money in and keep it there until Albertson's was paid in full, which Comvest expected to occur within 30 days after the closing of the last store in June. Trial Tr. (10/16) at 128:21-129:14, 131:6-12.

92.    On December 3, 2014, when seeking approval of the Haggen bid, the Deal Team told the IC that even though Comvest was putting in $50 million, it would "have no risk outside its basis" because (a) half the money would be used to pay back an existing Haggen loan that Comvest had guaranteed (thereby eliminating a potential $25 million obligation), (b) the balance was expected to be repaid to Comvest in the form of a tax distribution later in the SLB and conversion processes, and (c) Comvest was also contemplating making dividend distributions equal to its "investment" by selling ground leases and leveraging the PropCo Entities' real estate.  Trial Tr. (10/16) at 129:15-133:13, Trial Tr. (10/17) at 142:10-18; PX 19.004, 19.012 (setting forth Comvest's "Real Estate Strategy Between Sign and Close/Comvest Dividend").

93.    At trial, Caple admitted that $20 million from the proceeds of Haggen's pre-existing loan was used to pay Comvest a dividend. Trial Tr. (10/16) at 129:15-130:25; PX 19.004. In other words, half of Comvest's $50 million "equity investment" was used to pay off a $25 million loan previously taken out by Haggen, Inc. that was guaranteed by Comvest, and where most of the proceeds ($20 million) was previously used to pay Comvest a dividend.

94.    On January 27, 2015, before Haggen closed on the first Albertson's store, Falk sought confirmation that its "investment" would be risk-free and quickly recovered. Niegsch assured Falk that Haggen did not need Comvest's $50 million "to fund this transaction," but the Deal Team agreed to it because Cerberus required it. Trial Tr.

(10/17) at 46:3-13 PX 33.001. Comvest characterized the so-called "equity investment" as a "bridge loan" because as the Deal Team told the IC in December Comvest intended to quickly recover the $50 million as soon as it could.  Trial Tr. (10/17) at 47:18-23; 48:7-49:3; PX 33.

95.    Comvest devised other methods by which it planned to quickly recover its "investment." The ABL that Comvest negotiated with PNC enabled it to use up to $50 million of the OpCo Entities' ABL credit line for purposes of paying Comvest dividends. Thus, the ABL provided that a $50 million dividend could be paid to Comvest (a) after Haggen received at least $300 million of SLB transaction proceeds (which Haggen was already under contract to receive), (b) after the store conversion process was complete, (c) as long as Haggen was not in default, and (d) as long as Haggen would still have 15% of the maximum availability after paying the dividend.  PNC (Goldstein) Tr. at 126:21-130:12; PX 370.070.  *See also* Trial Tr. (10/17) at 204:4-206:21.

XI.    Haggen Suffers An Immediate Meltdown Post-Closing

96.    On December 10, 2014, Albertson's, as sellers, and Holdings, as the buyer, entered into the APA.  PTO ¶¶ 35-36, 47.  On January 27, 2015, the FTC issued an order directing Albertson's and Safeway to, among other things, divest the 146 stores to Holdings. PX 314.006.  Thereafter, Haggen closed on the stores on a rolling basis starting in February 2015.   Haggen's demise was swift, began immediately, and continued unabated for seven months, ending in its September 2015 bankruptcy filing and complete liquidation.

97.    Among the more significant issues that Haggen confronted was the pricing of their products. ATK and others had identified pricing issues as substantial risks.

37

98.     Haggen's pricing strategy was simple – do not change any prices. Trial Tr. (10/19) at 30:13-17.  Haggen did not execute this basic strategy.  According to Barnett, "very early on in the process we became aware that our pricing was not where we wanted it to be" because the prices were too high.  Trial Tr. (10/17) at 198:1-8. Shaner also knew that pricing problems emerged with the opening of OpCo South's very first store and believed they would be catastrophic if not corrected. Thus, Shaner called for a "SKU by SKU analysis and action plan . . . ASAP before we go well down the [acquisition and conversion path].  We can't have some 12 week systemic program to fix.  Needs urgent attention now." PX 159.

99.     Shaner conceded that the pricing problems were "very serious," stating they could cause customers to "get angry" and never return; further, Haggen would "never get a second chance to make a first impression." Nevertheless, Haggen continued to open stores knowing that these pricing problems persisted.  Trial Tr. (10/19) at 33:7-34:1.  *See also id.* at 30:18-32:15, 36:21-25.

100.    Shaner was not alone.  Clougher, the CEO of OpCo South, also knew about pricing issues on the very first day and admitted that Haggen continued to acquire, convert, and open stores knowing that the pricing issues – including over 4,000 pricing errors -- had not been solved.  Trial Tr. (10/19) at 118:20-22, 119:7-9, 120:7-121:15, 124:6-8; *see also* Trial Tr. (10/16) at 298:25-300:3 (showing Comvest knew of the pricing issues "early on" but never raised the issue with the Monitor and had no knowledge that anyone had done so on Haggen's behalf).  Shaner claimed that Haggen hired SuperValu as the pricing manager because Albertson's was using their system and they assumed it would "work effectively" for Haggen. Shaner was forced to admit that Haggen and Comvest

were "totally and completely wrong" about their assessment of SuperValu's capabilities. Trial Tr. (10/19) at 35:16- 36:2.

101.    Even though the initial plan was to maintain prices, Caple, after learning of the pricing issues that were antagonizing its customers, directed Haggen to raise its prices – a strategy with which Shaner disagreed. Trial Tr. (10/19) at 37:21-38:15; PX 159.

102.    Haggen's "partner," SuperValu, saw other mistakes and deficiencies that it believed contributed to Haggen's demise.  For example, SuperValu did not believe that Haggen's marketing and merchandising capabilities were sufficient to handle the enormous expansion that was contemplated, asserting that Haggen "did not have the – both the talent nor the numbers of people in merchandising to adequately negotiate, make decisions, set up pricing, and manage a large chain," assertions that SuperValu contends were repeatedly conveyed to Haggen. SuperValu (Collison) Tr. at 166:12-167:12.

103.    The consequences of these decisions and deficiencies were immediate and catastrophic.  By April 2015, just a few weeks after closing on the first store, Haggen was already falling well short of projections across all converted stores.  Trial Tr. (10/16) at 151:25-152:3; PX 11.003. By June 2015, the IC was informed that same store sales were "down 20-25% since Haggen took ownership of the stores." Trial Tr. (10/16) at 155:8-11; PX 16.004.

104.    On June 16, 2015, the Deal Team presented a "deck" to the IC in which it disclosed that while 10% of the stores had yet to be acquired and converted, Haggen was going to face a liquidity shortfall in July 2015. Trial Tr. (10/16) at 154:2-155:7; PX 16.004.

105.    As of July 13, 2015, Haggen had only $25 million of liquidity, but owed approximately $10 million to contractors and was "disputing the $43M in inventory

payments to Albertson's." Trial Tr. (10/16) at 161:25-162:22; PX 18.003.

106.    On July 28, 2015, PNC declared a default and a "springing event" under the ABL.  PNC (Goldstein) Tr. at 150:16, 182:2-10; PX 375. A "springing event" occurs when a borrower's availability falls below a specified threshold and, from PNC's perspective, it could be an indication that a borrower is in distress.  PNC (Goldstein) Tr. at 189:2-15.

107.    Caple testified that he did not believe PNC's notice of default to be "really terribly relevant." According to Caple, the event of default "wasn't as big an issue as the liquidity issues that we needed to work through" such that he could not even recall whether Haggen or Comvest ever disputed PNC's declarations of default (as established in the Forbearance Agreement (PX 254.002), where Haggen acknowledged that six separate events of default had occurred as of August 21, 2015, and were continuing).  Trial Tr. (10/16) at 167:1-168:20.

XII.    <u>Comvest Tries To Find A Third-Party Lender</u>

108.    Beginning in June and continuing through early August of 2015, as the OpCo Entities faced plummeting sales and a liquidity shortfall, Comvest tried without success to arrange for third party financing.  Notably, however, neither Comvest nor Haggen ever sought to obtain a loan from a third party to be extended directly to the OpCo Entities.  Trial Tr. (10/17) at 22:24-23:11, 132:11-16.  Caple testified at trial that he "didn't believe that anybody was going to make a loan to OpCo, given its current state." Trial Tr. (10/16) at 171:20-172:8.

109.    Niegsch told Citibank that Comvest was not pursuing a loan on behalf of the OpCo Entities because it had no unencumbered assets and its financial performance struggled making a subordinated loan a "fairly risky loan." Trial Tr. (10/17) at 27:5-29:20;

PX 113.  Caple could not identify a person or entity who was asked to make a loan to OpCo in the Summer of 2015 besides the PropCo Entities.  Trial Tr. (10/16) at 290:14-292:2.  *See also* Trial Tr. (10/17) at 208:8-18.

A.    UBS Is "Spooked" By Financial Performance And The
      Risk That The OpCo Entities Would File For Bankruptcy

110.    By June 2015, with the OpCo Entities facing a liquidity shortfall, the situation was urgent and Niegsch's negotiations with UBS shifted from obtaining a loan to pay Comvest a dividend to obtaining a loan for the purpose of supporting the OpCo Entities.  Trial Tr. (10/16) at 170:2-15; Trial Tr. (10/17) at 15:22-18:6; PX 36.

111.    On June 16, 2015, the Deal Team provided an update to the IC and proposed the following solution to Haggen's liquidity shortfall:  (a) a $55 million loan would be taken from UBS against the PropCo Entities' real estate, (b) the PropCo Entities would sell four ground leases for $16.4 million, (c) the resulting $71.4 million would be upstreamed to Holdings, and (d) Comvest would cause Holdings to distribute to the OpCo Entities amounts sufficient to address the liquidity shortfall, and the balance would be paid as a dividend to Comvest.  Trial Tr. (10/16) at 157:22-160:10; PX 16.015.

112.    During the course of the negotiations, Niegsch told UBS that the OpCo Entities were "underperforming."  UBS demanded that Haggen represent and warrant that the OpCo Entities were not considering a bankruptcy filing.  Comvest refused to give UBS the requested representation and warranty.  Trial Tr. (10/16) at 174:24- 175:5; Trial Tr. (10/17) at 18:11-22:3.  Consequently, UBS got "spooked" and refused to make a loan to the PropCo Entities secured by a lien on the PropCo Entities' unencumbered real estate.  Trial Tr. (10/16) at 170:22-25, 174:13-23.

B.    Comvest And Priddy Decline To Make A Loan
Due To "Equitable Subordination" Concerns

113.    On July 17, 2015, Caple reached out to Robert Priddy (a former Comvest

partner) to gauge his interest in making a loan to the PropCo Entities secured by a first

lien on the real estate.  Trial Tr. (10/16) at 171:1-19; PX 1.

114.    In his e-mail, Caple informed Priddy that:  (1) the OpCo Entities were facing

a liquidity shortfall, (2) Haggen had "lost all of the price focused customers" but had not

"yet had the time to attract quality focused customers," (3) Haggen's sales were down 20

to 30%, (4) Haggen was expected to close stores, and (5) UBS got "spooked," terminated

negotiations, and left Haggen and Comvest "at the altar." Trial Tr. (10/16) at 172:9-174:12;

PX 1.

115.    Caple also told Priddy that Comvest decided not to make a loan directly to

the OpCo Entities because it had "concerns about equitable subordination given that

[Comvest was] equity." PX 1. *See also* Clark Tr. at 44:21-45:14 (detailing whether he

discussed issues of "equitable subordination" in the context of the contemplated PropCo

Advance, Clark testified:  "If I may answer your [question] in a different way.  I think the

discussion was more, how do we do this such that it is a loan that we're making?  So I

know that might be semantics but that was the spirit of the discussion.").

116.    Caple described the "equitable subordination" issue and related internal

discussions at Comvest as follows:

Q:    Can you explain to the judge what concerns you had about equitable
subordination for Comvest.

A:    Yeah, I'm not a lawyer, but my understanding is any time you make
a loan into a business where you also own equity, there's a chance
albeit, my understanding is it's a very small one but there's a

chance that you can become equitably subordinated. At the time here, my partners were not at all happy about how this deal was going, to say the least, and putting additional money in with additional risk was a big issue and, you know, any issue was something that they were concerned about, even a very small percentage-type issue.

Q:    And you discussed that precise topic with your colleagues at Comvest, right?

A:    Yes.

Q:    In fact, you specifically discussed the risks associated with equitable subordination, right?

A:    And I don't remember the exact conversation, but I remember them having concerns.

Q:    And you while you don't have a specific recollection, you believe you discussed the issue of equitable subordination at the investment committee to try to understand the risk, correct?

A:    Yeah, I certainly remember them having real concerns about anything that might, you know.

Trial Tr. (10/16) at 175:6-176:14; PX 1.

117.    Due to his prior association with Comvest, Priddy expressed concerns that he might also be implicated by issues of "equitable subordination if he chose to act as a lender." Priddy, nevertheless, proposed onerous terms for a loan. There is, however, no evidence that Comvest ever responded or otherwise pursued a loan with Priddy. *See* PX 1.

C.    PNC Refused to Provide an Overadvance

118.    After UBS and terminated negotiations, Comvest asked PNC to provide an overadvance to the OpCo Entities. But PNC knew at the time that the OpCo Entities had no unencumbered assets, were running out of liquidity, losing money, and had laid off

hundreds of employees.   PNC also knew that Haggen was looking to sell assets to generate liquidity and avoid running out of cash, that sales in the grocery stores were off by well more than 20% relative to projections, and that Haggen had fared poorly on other financial metrics.  PNC (Goldstein) Tr. at 166:7-169:5; PX 377.

119.    Consequently, PNC concluded that Haggen's request for an overadvance "didn't make sense from a lender's perspective," and PNC decided not to even bring the request to the syndicate lenders for consideration. Trial Tr. (10/17) at 26:3-23; PNC (Goldstein) Tr. at 171:16-20, 173:17-174:18, 175:9-176:13; PX 39.002.  On August 3, 2015, PNC imposed a $2.5 million "availability block" thereby restricting that portion of the borrowing base from being available to Haggen. PNC asserted a right to restrict availability under the circumstances and did so because it perceived Haggen to be in distress and sought to mitigate its own risks. PNC (Goldstein) Tr. at 179:2-183:25; PX 379.

XIII.   The PropCo Advance

A.    Citibank Refuses To Lend Against PropCo's Real Property

120.    In early August 2015, after exhausting all other options, Comvest asked Citibank to provide a loan that would ultimately become the source of the funds used for the PropCo Advance.  PX 113.009.

121.    Citibank and a Comvest entity, CIP IV, had a pre-existing banking relationship dating back to at least 2010 when they first entered into a revolving credit line facility.  On August 2, 2012, Citibank and CIP IV amended that credit facility and Citibank increased the line to $100 million (the "Fund IV Revolver").[6]   The Fund IV

_____

[6] More precisely, the borrowers under the Fund IV Revolver were CIP IV and Comvest Investment Partners IV, L.P. PX 431.

Revolver has been available to CIP IV on a continuous basis since 2010. Citibank (Raeburn) Tr. at 16:8-21, 17:5- 18:14, 19:6-20:14; PX 431.

122.    In the end, the only loan Citibank would agree to make was a "qualified borrower loan" under the Fund IV Revolver to a to-be-formed, wholly-owned Comvest entity for which Comvest would provide a full guaranty. Trial Tr. (10/17) at 29:21-30:20; Citibank (Raeburn) Tr. at 76:21-77:25; PX 113.001-003. According to Citibank, the parties would "create a qualified borrower loan whereby Comvest designates an entity in which it has ownership as a qualified borrower.  That loan would be guaranteed by Comvest . . . [T]o the extent that Comvest has to repay the facility under the terms of the guarantee, it can in turn seek repayment from the qualified borrower that it guaranteed the facility for." Citibank (Raeburn) at 75:20-76:7; PX 113.

B.    The Multi-Step Process Employed To Fund The PropCo Advance

123.    Like the Albertson's Acquisition itself, the funding of the PropCo Advance required a fair amount of financial engineering by Comvest and the creation of another new corporate entity.

124.    In its simplest form, the PropCo Advance was funded as follows: (1) Citibank advanced $25 million to a newly-formed "qualified borrower" formed and owned by Comvest, Property Lender, and the loan was guaranteed by Comvest, (2) Property Lender then advanced $25 million to the PropCo Entities, secured by a lien on the PropCo Entities' real estate, and (3) the PropCo Entities in turn advanced $25 million to the OpCo Entities, purportedly secured by a second lien on the OpCo Entities' assets behind PNC (and ahead of the OpCo Entities' unsecured creditors).

125.    On August 7, 2015, the PropCo Entities, as lenders, and the OpCo Entities, as borrowers, entered into the PropCo Agreement pursuant to which the PropCo Entities agreed to advance up to $25 million to the OpCo Entities.  PX 244.  Comvest caused the PropCo Agreement to be signed knowing that it did not have: (a) an agreement with Citibank with respect to a funding source for the PropCo Advance (the agreement with Citibank was not signed until August 12, 2015), or (b) as discussed in more detail below, PNC's consent to a subordinated lien on the OpCo Entities' assets (the Intercreditor Agreement was not signed until August 21, 2015).

126.    The PropCo Agreement provided, among other things, that interest on the PropCo Advance was to begin on "_____,_____, 2015" and the loan would mature on "April ____, 2016." PX 244 §§3.1, 13.1 [sic]  The PropCo Agreement also purported to grant to the PropCo Entities "a continuing security interest in and to and Lien on all of its Collateral, whether now owned or existing or hereafter created, acquired or arising and wheresoever located." PX 244 §4.1. "Collateral" was defined to include, among other things, "all" of the OpCo Entities' receivables, equipment and fixtures, general intangibles, inventory, contract rights, and the proceeds thereof.  PX 244.007 (definition of "Collateral").

127.    On August 7, 2015, the OpCo Entities issued the PropCo Notes, one in favor of PropCo North in the amount of $12,640,750, and one in favor of PropCo South in the amount of $12,359,250.

128.    Comvest created Haggen Property Lender, LLC as a wholly-owned affiliate to serve as the qualified borrower under the Fund IV Revolver, so that it could act as the conduit between Citibank and the PropCo Entities.  Citibank (Raeburn) Tr. at 79:4-18;

99:12- 100:9, 100:18-101:3; PX 113, PX 438. On August 12, 2015, consistent with the negotiations, Citibank, Comvest, and its newly-formed entity, Property Lender, completed the Qualified Borrower loan (pursuant to which Citibank agreed to advance $25 million to Property Lender, guaranteed by Comvest) by executing the following documents: (a) the "Qualified Borrower's Representation Letter" (pursuant to which Property Lender made certain representations and warranties to Citibank and otherwise agreed to borrow up to $25 million from Citibank, subject to the terms of the "Credit Agreement"), (b) the "Qualified Borrower Promissory Note" (pursuant to which Property Lender and Comvest promised to pay $25 million to Citibank in accordance with the terms set forth therein), and (c) the "Notice of Advance" (pursuant to which Property Lender and Comvest asked Citibank to advance $3,792,225.01 to PropCo North, and $3,707,774.99 to PropCo South (or, $7.5 million in the aggregate), on August 12, 2015). Citibank (Raeburn) Tr. at 109:11-110:23, 112:13-20; 117:15-119:7; PX 439; PX 248; PX 247.

129.    Also on August 12, 2015, Property Lender, as lender, and the PropCo Entities, as borrowers, entered into a "Loan Agreement" pursuant to which, among other things, Property Lender agreed to advance $25 million to the PropCo Entities on the Closing Date (*i.e.*, August 12, 2015).  PX 251.  Even though only $7.5 million was being advanced that day, the PropCo Entities also tendered a "Promissory Note" to Property Lender in the face amount of $25 million, purportedly secured by "the Security Instrument and the other Loan Documents." PX 252.

130.    At the time it obtained the initial $7.5 million advance on August 12, 2015, Comvest knew that the OpCo Entities did not have PNC's consent to grant a second lien on the OpCo Entities' assets, but the IC nevertheless approved of the request for an initial

advance of $7.5 million because the situation was desperate and Comvest needed to "ensure OpCo ha[d] the liquidity to meet its obligations [the following day] and cover payroll later" in the week.  Trial Tr. (10/17) at 31:2-34:18; PX 41.001 (Niegsch told the IC that "the PropCo loan to OpCo will not have a 2nd lien in OpCo until the forbearance agreement with the entire bank group is agreed on and executed," something that did not occur until August 21, 2015).

131.    On August 21, 2015, the applicable parties executed the Forbearance Agreement and the Intercreditor Agreement.  PX 254; PX 255.

132.    As Comvest knew, the OpCo Entities could not grant a second lien on their assets without PNC's consent.  Trial Tr. (10/17) at 32:7-34:17 ("We would not have the liens filed until the forbearance agreement was executed."). By amending the definitions of "Permitted Encumbrances" and "Permitted Indebtedness," PNC provided the requisite consent in the Forbearance Agreement on August 21, 2015.  PX 254.005-006.

133.    Comvest authorized Haggen to sign the Forbearance Agreement knowing that the Debtors were required to, among other things, acknowledge six existing events of default, and the indebtedness under the ABL in excess of $173 million. Trial Tr. (10/17) at 34:19-36:22; PX 254.  The Forbearance Agreement also provided, among other things, that:

- The Borrowers (as defined) had to pay all of PNC's out-of-pocket expenses (including attorneys' and advisor fees) (Section 1(c));

- The Credit Agreement was amended to include Haggen's alleged claims against Albertson's in the definition of "Commercial Tort Claims" so that those claims would be included in PNC's collateral (Section 2 (c));

- PNC reduced substantially the Maximum Revolving Advance Amount and the Maximum Swing Loan Advance Amount (Section 2 (e)-(f));

- A more restrictive formula for calculating Revolving Advances was adopted (Section 2(j)); and

- The Borrowers had to adhere to a 13-week cash flow forecast and comply with other reporting obligations (Section 2 (o), (q)).

PX 254.

134.    The PropCo Entities, the OpCo Entities, and PNC also entered into an Intercreditor Agreement as of August 21, 2015.  PX 255. Pursuant to the Intercreditor Agreement, the PropCo Advance was "subordinated to the prior payment in full in cash" of all amounts owed under the ABL, and the PropCo Entities' liens against the OpCo Entities' assets were subordinated to PNC's liens against those assets.  Trial Tr. (10/17) at 37:4-38:4; PX 255.004-.005.  In other words, as conditions to the PropCo Advance, the PropCo Entities were forced to agree that they could not recover the principal and interest under the PropCo Advance on "April ___, 2016" [sic], until PNC was first fully repaid $173 million (plus interest) in cash.

135.    On August 21, 2015, (a) the PropCo Entities filed UCC-1 Financing Statements against the OpCo Entities, taking a "blanket lien" against OpCo Entities' assets (although the PropCo Entities' liens were subordinated to PNC's liens pursuant to the Intercreditor Agreement), and (b) Property Lender and Comvest tendered two "Notices of Advance" to Citibank in the aggregate amount of $17.5 million (the balance of the $25 million advance); the funds bypassed Property Lender and were sent by Citibank directly to the PropCo Entities.  Citibank (Raeburn) Tr. at 120:10-121:4, 122:4-14, 122:23-123:21; DX 772-774; PX 440-441; PX 254; PX 255.

D.      The OpCo Entities Paid Wages In Excess Of $25
        Million Between August 14, 2015 And The Petition Date

136.    As described above, the PropCo Advance was disbursed in two parts, with

$7.5 million being advanced on August 12, 2015, and $17.5 million being advanced on

August 21, 2015. The record shows that the OpCo Entities paid employee wages of

approximately $25 million from August 14, 2015, through the Petition Date, some of

which was already in arrears when the advances were made.

137.    The Court takes judicial notice of the Wage Motion.   Fed. R. Evid. 201. The

Wage Motion states that "historically, the Debtors' combined gross aggregate payroll

liability is approximately $26.4 million per month." Wage Motion at ¶ 9.  Haggen Inc.

employees were paid approximately $2.1 million bi-weekly, Haggen OpCo North

employees were paid approximately $1.9 million weekly, and Haggen OpCo South

employees were paid approximately $3.6 million weekly.

138.    The Wage Motion also stated that the most recent payroll before the Petition

Date was made (i) to employees of Haggen OpCo North and Haggen OpCo South on

September 4, 2015, for the period ending on August 29, 2015, and (ii) to employees of

Haggen Inc. on August 28, 2015, for the period ending August 22, 2015.  *Id.* ¶ 10.  Based

on the foregoing, the Court finds, as a matter of fact, that the OpCo Entities paid wages

as follows (stated in millions):

|              | PropCo South | PropCo North | Haggen, Inc. |
|--------------|--------------|--------------|--------------|
| August 14    | $3.6         | $1.9         | $2.1         |
| August 21    | $3.6         | $1.9         |              |
| August 28    | $3.6         | $1.9         | $2.1         |
| September 4  | $3.6         | $1.9         |              |
| **TOTAL**    | **$14.4**    | **$6.6**     | **$4.2**     |

139.    Based on the foregoing, the Court concludes that the OpCo Entities used the proceeds of the PropCo Advance to pay wages in arrears of approximately $25 million between August 14, 2015, and the Petition Date.

D.    <u>Flaton's Recharacterization Analysis</u>

140.    Carol Flaton offered expert testimony on behalf of the Committee with respect to its claim to recharacterize the PropCo Advance as an equity contribution (Count 71 of the Complaint) Defendants did not offer a rebuttal witness.

141.    The Committee asked Flaton to assess the facts and circumstances surrounding the PropCo Advance and evaluate whether the transaction "looked more like a debt transaction or an equity transaction" and whether it was "inappropriately disguised as a loan and instead should be recharacterized and treated as an equity contribution." Trial Tr. (10/18) at 144:8-12; PX 118 at 5.

142.    Flaton has been a managing director at Zolfo Cooper, the Committee's financial advisor, for four years.  During her time at Zolfo, Flaton has provided financial advisory and management services to debtors, creditors, and committees.  Prior to joining Zolfo Cooper, Flaton spent approximately six years at Lazard Freres, where she served as a managing director advising public and private companies, creditors, and equity holders in complex restructurings.  Before that, Flaton spent, collectively, approximately thirteen years at Credit Suisse/Credit Suisse First Boston (1995-2006) and Citibank (2006-2008), working in lending, finance, and risk management.  In sum, Flaton has spent over thirty years in the fields of banking and finance, including positions in leveraged finance, lending, capital markets, and risk management, with a specialization in financial restructuring.  Trial Tr. (10/18) at143:23-145:21, 149:15-21; PX 118 at 39 (Appendix A).

143.    Based on the foregoing, the Court finds that Flaton is qualified to offer expert testimony on the questions presented to her.

144.    Flaton's ultimate conclusion is that the PropCo Advance "looked more like an equity transaction than a debt transaction."  More particularly, Flaton stated that, in her opinion, based on her extensive experience in analyzing loans, debt exchanges, debt refinances, distressed company situations and equity/capital raises:

> [D]espite how the PropCo Loan was documented and recorded in OpCo's financial statements, I believe the facts and circumstances that existed at the time the PropCo Loan was made, including OpCo's financial condition, strongly indicate that an independent third party lender would not have provided additional financing to OpCo on the same or similar terms to the PropCo Loan such that the PropCo Loan was more representative of a equity contribution than a loan.

Trial Tr. (10/18) at 145:22-146:2; PX 118 at 10.

145.    In reaching her conclusions, Flaton utilized the eleven-factor *Roth Steel* test and evaluated the facts and circumstances that existed at the time the PropCo Advance was made "from the perspective of a restructuring, finance and investment banking professional." Trial Tr. (10/18) at 146:3-8; PX 118 at 5.  *See Roth Steel Tube Co. v. Comm'r*, 800 F. 2d 625 (6th Cir. 1986).

146.    In order to analyze the PropCo Advance in context, Flaton reviewed certain documents and events, including: (a) "very early… internal memos and e-mails saying that there was a liquidity problem," (b) the refusal by third parties, including UBS and PNC, to extend credit (UBS refused to lend against the PropCo real estate, and PNC refused to provide an "overadvance"), and (c) PNC's July 28, 2015, declaration of a default under the ABL and (d) Comvest's refusal to lend directly to the OpCo Entities due to concerns about "equitable subordination." Trial Tr. (10/18) at 150:1-151:24; PX 118

at 16. Flaton explained how these events related to her opinions:

> A:    Well, again, I was asked to look at a transaction which occurred in August [2015]. And the question really was, is this a transaction that a third party independent lender, would they make a loan, a piece of debt into this type of a situation. So it's important to understand the condition of the company that's being lent into and some of the facts around it and the trajectory.  And it's all besides being, you know, not great, sales were down and I think they were substantially off their budget from EBITDA to the tune of I think $80 million in this July [2015] timeframe.  It was all happening very quickly.  So, you know, you've had an acquisition of stores, but it literally did not transpire from day one the way it was meant to.

Trial Tr. (10/18) at 151:25-152:15.

147.    Flaton also analyzed the series of steps required to get the $25 million from Citibank to the OpCo Entities: (a) Citibank agreed to advance $25 million to a newly-formed entity, Property Lender (wholly-owned by Comvest, at Citibank's insistence), secured by a guaranty from Comvest, (b) Haggen Property Lender then agreed to advance $25 million to the PropCo Entities, taking a lien on the PropCo Entities' real estate, and (c) Comvest then caused the PropCo Entities to agree to advance $25 million to the OpCo Entities, taking a second lien on the OpCo Entities' assets in return.  Trial Tr. (10/18) at 152:16-154:8; PX 118 at 17.

148.    With that background, Flaton analyzed the PropCo Advance in the context of the eleven *Roth Steel* factors.  The Court will discuss Flaton's testimony and opinion in the "Conclusions of Law" section.

XIV.    Comvest's IC Expected The Real Estate To Be Unencumbered
        And Available For Comvest's Benefit In A "Disaster Scenario"

149.    The IC members "were not happy about" having to use the PropCo Entities' real estate to fund the OpCo Entities' liquidity shortfall.  Trial Tr. (10/16) at 177:1-19.  The evidence shows, and the Court concludes, that when it approved the Albertson's

Acquisition, the IC relied on, among other things, the Deal Team's assertions that the real estate assets would (a) be transferred to PropCo Entities and remain unencumbered; which (b) would, among other things, provide Comvest with substantial downside protection "even in complete disaster/liquidation scenarios."

150.    The Court's conclusions in this regard are based on PX 20, PX 45, PX 190 (collectively, the "Clark/Marrero E-mails"), and PX 189. During the relevant time, Clark was a managing director at Comvest and a member of the IC. Clark Tr. at 8:9-9:22. Clark was not named as a defendant in this action and did not testify live.  The Court has, however, admitted into evidence and reviewed Clark's videotaped deposition.[7]   196.

151.    From the outset, Comvest focused on the valuable real estate available in a potential deal with Albertson's.   In that regard, prior to approving Haggen's entry into the Albertson's Acquisition, the IC was expressly informed that, among other things: (a) Haggen was acquiring substantial real assets significantly below the appraised value;(PX 23, PX 26, and PX 30) (b) the real estate would mitigate the operational risks (Trial Tr. (10/17) at 56:19-58:19; PX 30.006) (c) by transferring the real estate to the PropCo Entities and shielding it from the operational risks, Comvest would be protected in a "downside scenario" (PX 20.002) and (d) Comvest would make "multiples of [its] money" even in downside scenarios (PX 45.002, PX 190.001).

152.    By June 2015, Haggen faced substantial challenges and the issues concerning the protection afforded by the real estate came to the fore.  On June 16, 2015, the Deal Team informed the IC that, among other things, even though the conversion

---

[7]  The Court found Clark to be very careful and deliberate in his deposition testimony but does not share the Committee's view that he was "evasive."

process was not complete, same stores sales were down 20 to 25% and Haggen faced a liquidity shortfall. At around that time, Clark believed that Haggen could fail. Clark Tr. at 40:8-41:6.  To address Haggen's liquidity shortfall, the Deal Team proposed leveraging the PropCo Entities' real property to support the OpCo Entities.  Clark Tr. at 23:18-24:7, 25:18-26:9, 30:4-31:4; PX 16.004, 015.

153.    The Deal Team's proposal struck a nerve with the IC because it contradicted what they had been led to believe.  Caple recalled that "a number" of IC members specifically told him that "they were under the impression that Comvest could still get its money back in Haggen through the real estate, even in a disaster scenario" with the OpCo Entities. Trial Tr. (10/16) at 177:20-24; *see also* Trial Tr. (10/16) at 177:25-179:7 (showing Caple recalled Clark telling him that he was "under the belief that the underlying real estate value was money good in a disaster scenario"). Caple's recollections in this regard are consistent with an e-mail that Clark sent to Marrero on July 14, 2015. Clark's e-mail stated, among other things, that:

- PropCo/Downside
  - Under the impression/belief that the underlying real estate value was money-good in a disaster scenario

- News to Michael [Niegsch] and us that PropCo value seems encumbered
  - ABS payable
  - SLB guarantee
  - Relied on this downside protection when approving the deal

Clark Tr. at 97:24-98:15; PX 20.

154.    A few weeks later, Clark and Marrero collaborated on a more expansive version of Clark's e-mail. On Sunday, August 2, 2015, Clark and Marrero took turns wordsmithing a set of "observations" concerning Caple. Clark Tr. 72:15-76:22, 77:25-

79:10; PX 190.   Marrero then reorganized certain of the issues and presented the final

document to Falk the following day.   The issues set forth in these documents were the

subject of numerous discussions among IC members.   Clark Tr. at 64:14-65:23, 67:8-68:4,

69:11-16, 69:19-71:6, 80:3-20.   The version that Marrero presented to Falk stated, among

other things, that:

- We must avoid IC discussion from being a "sell job"
  - IC relied on strong assertions that we would make multiples of our money on Haggen in even complete disaster/liquidation scenarios.

      . . .

- We must carefully lay out [a] "likely case" as well as a "downside" case reflecting negative outcomes and the quantification of these financially
  - Guarantees and ABS Liabilities at Holdings not understood by the IC and/or Deal team.

  - We should not rely on [Deal] Team's "best thinking" but rather show sensitivities with thoughtful assumptions on both upside and down.

PX 45 (emphasis added).

155.    Every member of the IC except Caple agreed with the substance of these

communications.   Nevertheless, after the Deal Team was unable to obtain a loan from

unrelated third parties, Comvest's IC begrudgingly authorized the PropCo Entities to

make the PropCo Advance, with certain IC members warning that they would not likely

consent to the use of the PropCo Entities' assets again.  PX 42.

A.    <u>Rodriguez's Failure to Recall is not Credible</u>

156.    At trial, Rodriguez was unable to recall participating in any discussions or

communications concerning the Clark/Marrero e-mails.   The Court is highly skeptical

that Rodriguez was able to recall details of conversations that preceded the Albertson's

Acquisition, but was unable to remember any aspect of the critical (and more recent) discussions that took place in the summer of 2015 while Haggen was melting down and the IC was being asked to leverage the PropCo Entities' real estate to support the OpCo Entities.  Trial Tr. (10/18) at 114:5- 120:23.

157.    Rodriguez's complete failure to recall anything about these discussions is particularly concerning because Clark testified that Rodriguez was directly involved in addressing the issues raised in the Clark/Marrero e-mails.  According to Clark:

- The Clark/Marrero e-mails were "prepared in conjunction" with Falk and Rodriguez for the purpose of giving Caple "feedback" (Comvest (Clark) Tr. at 61:16-62:7)

- Clark believed that Falk and Rodriguez met with Caple to discuss the observations on PX 45. (*Id.* at 69:11-16)

- Rodriguez, Falk, Marrero, and Clark discussed the substance of PX 45 in various combinations and subsets of groups in August 2015 (*Id.* at 70:9-71:6) and

- Clark spoke with Rodriguez about the issues set forth in PX 190, and believed that "a version of this document was shared with [Rodriguez] as well." (*Id.* at 80:3-20).

158.    Based on Clark's testimony, the Court finds that Rodriguez's failure to recall discussing any aspect of the Clark/Marrero e-mails was not credible. Consequently, the Court will draw a negative inference with respect to all of Rodriguez's testimony.

XV.    <u>Defendants' Blame Of Others</u>

159.    The Defendants contend that Haggen failed for three reasons: pricing issues, supply issues, and unfair competition. Defendants also contend that there were three -- and only three – culprits: Willard Bishop, SuperValu, and Albertson's.  Trial Tr.

(10/16) at 82:16-87:10; Trial Tr. (10/17) at 9:1-10; Def. Trial Br. at 21-25.

A.    Willard Bishop Pricing Problems

160.    Defendants contend that Willard Bishop contributed to the pricing problems that led to Haggen's demise.  Neither Haggen nor Comvest took any steps to hold Willard Bishop accountable for the damage it allegedly did with respect to pricing issues other than to discontinue working with them.  Trial Tr. (10/17) at 9:11-13, 9:24-10:13; Trial Tr. (10/19) at 193:19-20, 194:5-14, 195:13-17, 211:5-7.

B.    SuperValu - Pricing And Supply Problems

161.    Defendants contend that SuperValu contributed to the pricing and supply problems that led to Haggen's demise.  Neither Haggen nor Comvest took any steps to hold SuperValu accountable for the damage it allegedly did with respect to the pricing and supply issues (other than to have "lots of discussions" with them). Trial Tr. (10/17) at 10:14-11:13. Indeed, as Barnett admitted, neither Haggen nor Comvest ever withheld payment from SuperValu, negotiated a reduction in the amounts due to SuperValu, or commenced an action against SuperValu.  Trial Tr. (10/17) at 195:6-16; *see also* SuperValu (Collison) Tr. at 68:20- 69:7 (highlighting Haggen timely paid all amounts due to SuperValu), 78:18-79:12 (showing Haggen never attempted to terminate the Transition Services Agreement (the "TSA") (PX 271), and never invoked the "Dispute Resolution Clause" in Section 6.2(c) of the TSA).

162.    The Debtors, certain non-Debtor affiliates (including the PropCo Entities), Comvest, and the Committee entered into a Settlement Agreement with Albertson's and Cerberus that was filed at Docket No. 1312-2 in the main case on January 27, 2016 (the "Settlement Agreement").  PX 117.   Pursuant to the Settlement Agreement, SuperValu

was released from "any and all claims, demands, causes of action or sums owed, foreseeable or unforeseeable, which are based on conduct or inaction that occurred before" the closing of each store. Neither Comvest nor the Debtors received any monetary compensation in exchange for their release of SuperValu. *Id.* at .009-010.

C.    Defendants Allegations Against Albertson's

163.    Defendants contend that Albertson's engaged in unfair competition and contributed to the problems that led to Haggen's demise.  Trial Tr. (10/16) at 84:19-85:1, 86:6- 87:10; Trial Tr. (10/17) at 9:19-22, 11:4-6; Def. Trial Br. at 3, 23-25.

164.    On June 29, 2015, Haggen sent Albertson's a letter identifying certain allegedly wrongful conduct, and informing Albertson's that Haggen was withholding $43 million in inventory payments (the "Demand Letter"). PX 266. Prior to that time, Haggen had timely made all of the payments to Albertson's that it was required to make under the APA, but the OpCo Entities faced a liquidity shortfall at that time.  Trial Tr. (10/17) at 11:4-18; Albertson's (Ewing) Tr. at 164:25-165:14; PX 16.004; PX 18.003.

165.    In the Demand Letter, Haggen asserted that Albertson's had breached the APA and identified four specific instances of allegedly wrongful conduct. PX 266. Specifically, Haggen complained of (a) "Improper Transfer of Inventory out of Purchased Store(s)," (b) "Overstocking and Understocking of Inventory" (Haggen identified one store, acquired on February 26, 2015, where the inventory was allegedly so low that Haggen was forced to purchase approximately $208,000 of inventory to "help refill the store," and another store where a bakery manager was allegedly instructed to "purchase and/or bake 2 times her normal inventory levels" thereby causing Haggen to purchase unneeded baked goods at that store, as well as other similar issues concerning inventory),

59

(c) "Failure to Advertise in the Ordinary Course of Business" (describing as "intentional misconduct" discrete problems relating to advertising that lasted a week. FTC (Frangie) Tr. at 142:3-23, 148:14-149:9); Albertson's (Cummins) Tr. at 38:21- 39:14, 40:25-45:14), and (d) "Misuse of Confidential Information and Failure to Use Commercially Reasonable Efforts to Preserve Existing Relationships" (alleging that Albertson's "substantially increased their advertising and marketing in the stores being acquired, and that Albertson's did so "based upon their knowledge of the Store Closing cadence" (Trial Tr. (10/16) at 301:1-20)). PX 266. Haggen also notified Albertson's for the first time that it would "not make further payments of the Inventory Purchase Price" under the APA until Haggen completed its investigation and the matters "have been satisfactorily resolved." Trial Tr. (10/16) at 163:12-22; PX 266.006. According to Albertson's, Haggen had therefore not raised any issues concerning the pricing of inventory, and had not availed itself of the dispute resolution procedures in Section 6 of the APA, at any time prior to the date of the Demand Letter. Albertson's (Ewing) Tr. at 166:7-21.

166.    Albertson's asserts that, far from engaging in "anti-competitive" conduct, Albertson's extended considerable courtesies to Haggen and made best efforts to cooperate during the store conversion process, including participating in weekly (or more frequent) meetings. Albertson's (Crandall) Tr. at 109:15-112:15, 161:13- 164:9, 60:17-62:12; Albertson's (Cummins) Tr. at 19:10-21:15, 45:25-47:20. The Court also notes that Albertson's met with the Monitor on a regular basis, and submitted "Compliance Reports" to the FTC, to report on the progress of the conversions and address all issues concerning Haggen. Albertson's (Williams) Tr. at 141:15-159:23, 136:4- 16, 136:25-137:22, 160:6-176:12, 177:18:183:2; PX 598-610.

167.    The uncontroverted evidence shows that, at the time the Demand Letter was sent, Haggen faced a liquidity shortfall and knew that it would be unable to pay Albertson's approximately $43 million when it became due in July 2015. Trial Tr. (10/16) at 161:25-163:4, 164:3-24; PX 18.003. Indeed, the Deal Team virtually admitted that the Demand Letter was pretextual in their July 2015 report to the IC, writing:

> Assuming the [Albertson's] inventory payments and conversion capex payables can continue to be delayed, the latest daily liquidity model shows Haggen getting very close to negative liquidity at the beginning of August and then going negative on August 21.  If Haggen misses its plan targets or needs to begin paying off its delayed one-time payables it will hit negative liquidity sooner.

PX 18.03.

168.    The uncontroverted evidence also shows that (with the exception of the issue concerning the advertising described above) no one from Haggen or Comvest complained to the FTC or the Monitor about Albertson's allegedly anti-competitive conduct until mid-July, and even those complaints came as a result of inquires placed by the FTC that were prompted by news reports concerning employee layoffs at Haggen. Trial Tr. (10/17) at 12:20-13:18; Trial Tr. (10/19) at 38:21-39-24, 127:20-23, 128:21-129:2, 198:16-199:23; FTC (Frangie) Tr. at 137:25-146:12 (although Haggen's counsel identified numerous reasons for Haggen's struggles, including that "the Haggen brand and format did not seem to be catching on in California," only one of which was the "significant competitive response" from Albertson's).

169.    On July 17, 2015, less than three weeks after receiving the Demand Letter, Albertson's sued Holdings in the Superior Court of the State of California, Case No. BC 588598 (the "Albertson's Action"). Trial Tr. (10/16) at 165:7-166:6; Trial Tr. (10/17) at

11:22-13:1; PX 306. Albertson's asserted claims for breach of contract, anticipatory breach of contract (repudiation), fraud, and breach of the implied covenant of good faith and fair dealing, all in an effort to recover the $43 million that was then due or about to become due. PX 306.

170.    On September 1, 2015, just six days before the Petition Date, Haggen filed a responsive action against Albertson's in which it sought $1 billion in damages ("Haggen's Action"). PX 613.

171.    Albertson's Action and Haggen's Action were resolved in the subsequent bankruptcy where the Court approved the Settlement Agreement.  PX 117.  The Settlement Agreement effectively embodied a "walk away." Pursuant to its terms (a) Albertson's was obligated to pay $5.75 million into a creditor trust, (b) Albertson's was to receive an unsecured claim against Holdings in the amount of $8.25 million, and assign such claim to the creditor trust, and (c) the parties exchanged mutual general releases. PX 117.004-009. Comvest acknowledged its belief that this was a "fair and equitable resolution to the billion dollar lawsuit that was brought." Trial Tr. (10/17) at 13:19-15:2.

172.    Based on the foregoing, the Court concludes that the pricing, supply and anti-competitive issues allegedly caused by Willard Bishop, SuperValu, and Albertson's were not the primary cause of Haggen's demise.

XVI.    Comvest's Projections

A.    Comvest's Projections Were Wrong

173.    Prior to the Albertson's Acquisition, Comvest prepared projections of Haggen's future financial performance. These projections formed the predicate for determining the OpCo Entities' liquidity needs and capitalization.  In the final version of

projections presented to the IC, Comvest's "base case" assumed that Haggen would enjoy same store sales growth of 4.9% in the first year leading to earnings of $78.2 million. Based on these projections, Comvest underestimated the OpCo Entities' liquidity needs. For the reasons set forth below, the Court concludes that Comvest's "base case" was wrong and the overly optimistic assumptions caused the OpCo Entities to be undercapitalized from their December 2014 inception.

174.    Comvest's industry consultant, ATK, created the 4.9% same store sales growth rate that was incorporated into Comvest's base case. Trial Tr. (10/20) at 106:14-16.

175.    During his direct examination, Hooper testified that ATK's same store sales growth rate was based on certain objective data, "net promoter scores" and "word clouds," case studies, and the erroneous assumption that Haggen's supermarket "resets" would occur during or prior to store conversions.  Trial Tr. (10/20) at 106:14-113:17.  The data that ATK relied upon included factors such as industry growth, population growth, and inflation, and its own generalized belief "that the business could grow based on the strength of the brand and the strength of the proposition." Trial Tr. (10/20) at 105:18-24, 106:23-107:3.

176.    ATK also relied on "net promoter scores" that showed Haggen's customers in Washington and Oregon had a positive view of the grocery chain. According to ATK, a "net promoter score" is a consumer survey designed to measure the strength of a brand because it shows "the loyalty and the connection of the relationship that the consumer has with the brand." Trial Tr. (10/20) at 107:12-14, 108:4-8.

177.    Finally, Hooper testified that ATK's same store sales growth rate was also based, in part, on the assumption that Haggen's "resets" would occur during or prior to the conversions, an assumption that ATK specifically advised Haggen would have a significant impact on expected sales growth. PX 107.024. The Court heard considerable testimony about the meaning of "resets" and "conversions." The Court need not determine the precise meaning of these terms because the evidence shows that Haggen did not complete any "resets" prior to store conversions.

178.    At trial, Caple admitted that total store resets were not supposed to occur as part of the conversion process because the stores came stocked with inventory that Haggen had to sell before it could do resets.  Trial Tr. (10/16) at 150:24-151:24.  Shaner also admitted that the "decision was made to not do the reset" until later in 2015, and observed that resets "are extraordinary, literally moving tens of thousands of products takes about a week and that is in consideration of doing nothing else in the store."  Trial Tr. (10/19) at 13:22-15:15.

179.    The evidence shows that the scope and timing of the Project had no precedent: an 18-store chain expanding eight-fold by acquiring 146 stores spread out over five states (including three where Haggen had no prior market presence), and where entrenched competition would remain.  The entire transaction (the scope of which changed over time from an initial 22 stores in Washington and Oregon in late August 2014, to ultimately 146 stores in five states by November 2014) was negotiated in less than four months; Haggen had just several months to develop conversion plans, hire hundreds of workers and managers, and create the "infrastructure" necessary to run a business of this magnitude; and Comvest and Haggen willingly agreed to acquire and convert all of

the stores in just 120 days (which the FTC extended to 150).

180.    David MacGreevey, an expert who testified on behalf of the Committee, presented a compelling analysis of "comparable" transactions showing that the Albertson's Acquisition was far greater in size, and was to be completed in a substantially shorter time frame, than any recent "comparable" transaction.  Trial Tr. (10/18) at 36:6-37:11; PX 106.018.  Even Shaner admitted that he had never seen a transaction of this magnitude. Trial Tr. (10/19) at 39:25-40:6.

181.    Based on Hooper's testimony, Comvest's projections failed to take into account and were inconsistent with the actual pre-Albertson's Acquisition results of the Haggen legacy stores and the stores being acquired from Albertson's and Safeway.  The evidence shows that sales at the legacy stores contracted in each of the four years from 2010 through 2013, before growing, but by only 0.5% in 2014 (when Comvest claims it engineered a turnaround at Haggen). Sales for the targeted stores also contracted or rose modestly (less than 2%) until 2014. PX 19.017; PX 26.008; PX 632.011.  Notably, these historical results were attained without any of the risks that Haggen faced.  Trial Tr. (10/16) at 115:16-117:6; Trial Tr. (10/17) at 142:19- 145:24; DX 79.006; PX 8.004.  The Court is unable to reconcile the historical sales results, achieved without any of the foreseeable transactional or execution risks that Haggen confronted, with Comvest's projected base case 4.9% same store sales growth rate in the year immediately after the closing.

182.    On October 31, 2015, ATK circulated another set of projections, including an "upside case," a base case, and a "downside case."  The assumptions in the upside case were modified to assume even stronger same store sales growth in the second and third years.  PX 157.005. On cross-examination, Shaner initially testified that he no longer

had "heartburn" after receiving ATK's revised projections, and that he couldn't recall whether he agreed with the concerns expressed by Genser.  Shaner was forced to recant that testimony after seeing that he, and Genser, and Barnett all expressed considerable concerns about ATK's later set of projections:

- Genser stated, among other things, that he did not "believe the downside case [was] draconian enough" and that "year one could be worse that [sic] what is presented and it never bounces back."

- Barnett expressed the view that "the downside is not a good representation of just how far 'down' could be, and therefore does not accurately represent both the Branding risk (SoCal) and Executional risk (both).  My concern is that ATK presents, and therefore legitimizes the 'worst case,' which we know is not really the worst case."

- Shaner wrote: "I am strongly in Ira and Blake's camp. There are so many moving parts, and so much turmoil to manage through, that I think it's only prudent to be keenly aware of the potential downside risk scenarios . . . [w]e are eliminating banners that have a presence for years, and while somewhat tarnished, still maintain a loyal customer base . . . I believe in the Haggen brand's ability over time, [but] the challenges to sales and ebitda in years 1-2 are significant."

Trial Tr. (10/19) at 24:22-29:5; PX 157.

183.    In essence, Shaner maintained the very same concerns that he told Barnett had caused "heartburn" just days before Shaner was forced to admit that (a) he believed Haggen faced "significant challenge[s]" to sales and EBITDA during the first two years, and (b) that what he "foresaw back in October [2014] was exactly what happened.  Sales and EBITDA in year one were just a disaster." Trial Tr. (10/19) at 29:6-12.

184.    In response to the concerns expressed by Genser, Shaner, and Barnett, Niegsch claimed to have prepared a "real bad downside case" showing the operating companies "barely" having any liquidity after "cutting down Capex and G&A and

stretching payables for more breathing room in that scenario." PX 157.003. Niegsch relied on the "real bad downside case" to dismiss the substantial concerns that ATK's "downside scenarios" did not sufficiently take into account the transaction and execution risks, yet Niegsch could not identify the "real bad downside case," and could not recall ever presenting it to, or discussing it with, the IC (or anyone else). Trial Tr. (10/17) at 136:24-139:24; Trial Tr. (10/19) at 101:13-18; PX 625.

185.    While the Court never saw Niegsch's "real bad downside case," the evidence shows that Comvest's downside scenarios never showed the OpCo Entities losing any money. Trial Tr. (10/16) at 295:11-296:1. Indeed, prior to the time it approved Haggen's bid, the IC was never presented with a scenario that showed the OpCo Entities earning less than $40 million per year. Trial Tr. (10/17) at 62:7-12. Thus, although the Deal Team's downside projections assumed same store sales would decline by 5% in the first year (PX 19.026), the Deal Team changed other assumptions that mitigated the impact of the projected loss of sales such that Haggen still showed profits of almost $50 million in the first year.

XVII.    The Court Accepts As Credible MacGreevey's Opinion
That The OpCo Entities were Insolvent and Undercapitalized

186.    David MacGreevey offered expert testimony on the Committee's behalf concerning whether the OpCo Entities were insolvent and undercapitalized on the date of the APA (*i.e.*, December 10, 2014), and each day thereafter through the Petition Date. Trial Tr. (10/18) at 5:14-19. MacGreevey did not opine on the solvency of the PropCo Entitites or Holdings.

187.    MacGreevey's ultimate conclusion is that the OpCo Entities were insolvent and undercapitalized as of the date of the APA and each day thereafter.  Trial Tr. (10/18) at 7:19-8:2. For the reasons set forth below, while the Court finds that MacGreevey was an able witness, the Court does not credit his opinion and finds that the OpCo Entities were not insolvent and undercapitalized at the signing of the APA.

188.    MacGreevey is well-qualified to offer his expert opinion on issues of insolvency.  He has spent more than fifteen years in the restructuring and finance arenas, including more than seven years in the restructuring group at Duff & Phelps (and its predecessor, Chanin Capital Partners), and two years in the Restructuring and Special Situations practice of Macquarie Capital, before joining Zolfo Cooper LLC ("Zolfo Cooper") in 2011.  MacGreevey has represented creditors and creditors' committees in a wide variety of cases and industries and has advised stakeholders on strategic transactions, including restructurings, mergers and acquisitions, and capital raises.  Trial Tr. (10/18) at 5:20-6:6; PX 106.064.

189.    MacGreevey testified that working with projections and forecasts of future financial performance, including developing and critiquing projections, business plans, and liquidity forecasts, is one of his and Zolfo Cooper's "key competencies." MacGreevey has performed these services across a wide array of industries, including retail. While MacGreevey has some experience in the grocery sector (in particular, as advisor to the creditors' committee in A&P, a prior bankruptcy case), he does not hold himself out as an expert in that industry.   Trial Tr. (10/18) at 6:7-7:5.

190.    MacGreevey was asked to render his opinions in early 2017. A team of professionals at Zolfo Cooper assisted MacGreevey.   Together, they gathered and

reviewed information and spent "hundreds of hours" on the project.  Trial Tr. (10/18) at 10:23-12:8; PX 106.067-71.  Ultimately, MacGreevey prepared a written report setting forth his opinions, the methodologies utilized, and the bases for his opinions.  Trial Tr. (10/18) at 8:12-9:4; PX 106.

191.    Comvest's base case incorporated ATK's 4.9% same store sales growth rate. In contrast, MacGreevey's base case assumed that same store sales would contract by 8.6% in the first year.

192.    Multiple parties reviewed OpCo's financials including the same store sales growth projections developed by ATK. These parties included the Deal Team, the Haggen management team, the IC, multiple lenders, the Sale Leaseback Counterparties, SuperValu, the FTC, and Unified Grocers. None of these parties ever argued that ATK's same store sales growth projections for OpCo were unreasonable. *See* Trial Tr. (10/16) at 218:9–25, 219:18–220:1, 223:4–24, 233:4–9 (Caple); Trial Tr. (10/17) at 89:21–90:7, 98:22–99:4, 99:20–100:15 (Niegsch).

193.    The basis for MacGreevey's assertion that Haggen should have projected negative 8.6% same store sales growth as opposed to positive 4.9% same store sales growth is that MacGreevey believes that Haggen should have applied ATK's "pre-renovation" projection numbers rather than "post-renovation" projection numbers.  Trial Tr. (10/17) at 56:19–57:10. MacGreevey did not develop his own numbers, but chose from a table in an ATK spreadsheet that had pre-renovation and post-renovation projections. *Id.* at 49:14–22. ATK used the post-renovation numbers rather than the pre-renovation numbers in developing their same store sales projections. *Id.* at 57:21–58:5. Hooper testified that, based on his conversations with Haggen and Comvest as well as his review

of the capital expenditure budget, it was appropriate to project the post-renovation

benefit for OpCo. Trial Tr. (10/20) at 119:6–24 (Hooper).

194.    Hooper also testified as to multiple other reasons it was reasonable to

project positive same store sales growth for OpCo. These reasons included, among others:

- Net Promoter Score: ATK performed a consumer survey of over 1,000 people to determine Haggen's net promoter score. Trial Tr. (10/20) at 109:20–21; 110:21–111:2 (Hooper); DX0072-0013. Haggen's high net promoter score in comparison to the net promoter score for Albertson's and Safeway gave ATK confidence that the brand could and would be successful.  Trial Tr. (10/20) at 109:22–110:8 (Hooper);

- Word Cloud Surveys: ATK also performed a "word cloud" survey on over 1,000 people to see what words they associated with shopping at Haggen, Albertson's and Safeway. *Id.* at 112:16–18. The word cloud survey supported the thesis that Haggen could keep the Albertson's and Safeway customers who cared primarily about price and location while also attracting the Haggen customers who also cared about freshness, local products, organic products, and other key words. *Id.* at 111:16–112:15.

- Case Studies: ATK also analyzed prior grocery store conversions in the form of case studies to support their projection that OpCo would experience positive same store sales growth. i*d.* at 112:19–113:17. Based on a review of the case studies, ATK placed Haggen on the top  half of its two-by-two grids signifying ATK's view that renovations were being performed prior to the banner conversion. i*d.* at 119:6–24.

195.    MacGreevey relied in significant part on a series of capital expenditure

ranges contained in a chart provided in an ATK presentation indicating a certain capital

expenditure range associated with a "refresh," a "minor remodel," and a "major

remodel." Trial Tr. (10/18) at 21:18–23:13, 63:24–64:10 (MacGreevey); DX0041-0002.

Those ranges, however, were not produced by ATK.  Hooper testified that instead those

ranges were provided by "the storyteller" *i.e.* the people that ATK interviewed—from

Winn Dixie who observed the store conversions in that case study. Trial Tr. (10/20) at

113:18–115:10 (Hooper); DX041-0002. And the Winn Dixie case study qualified as a "store reset/remodel" according to ATK's own analysis. DX0041-0009.

196.     Hooper testified that the plans to "Haggenize" the stores would fit within his view of a renovation. Trial Tr. (10/20) at 119:6–24 (Hooper). Thus, Hooper disagreed with MacGreevey and believed that post-renovation rather than pre-renovation numbers should be used in projecting same store sales growth. *Id.*

197.     The Court finds that it was reasonable for Haggen and Comvest to rely on the same store sales projections developed by ATK. The overwhelming weight of the evidence indicates that Haggen intended to and did perform renovations at the acquired stores prior to reopening those stores under the Haggen banner.

198.     MacGreevey also made an adjustment to "fix" certain operating costs rather than leave those costs variable as in the Management Base Case. Trial Tr. (10/18) at 75:14–78:4 (MacGreevey).   If MacGreevey's adjustment to projected same store sales growth is rejected, then MacGreevey admits there is no impact to his adjustment to "fix" certain costs. *Id.* at 75:14–76:23 (MacGreevey). One of the costs MacGreevey determined should be 100% fixed was labor costs. *Id.* at 76:24–78:4 (MacGreevey).   Shaner, Clougher and Hooper, all of whom (unlike MacGreevey) have extensive grocery experience, each testified that labor costs are not fixed in the grocery industry. Trial Tr. (10/19) at 93:2–14 (Shaner), 188:5–189:12 (Clougher); Trial Tr. (10/20) at 103:19–104:11 (Hooper) ("Q. In grocery is labor a fixed cost or a variable cost? A. Labor is commonly understood to be very variable.").

199.     MacGreevey also "corrected" the Management Base Case by adjusting the store cadence to match the actual cadence and by implementing a $10 million minimum

cash requirement in his liquidity calculation. Trial Tr. (10/18) at 78:5–16 (MacGreevey). The PNC Credit Agreement does not require a $10 million minimum cash requirement when calculating liquidity and evaluating whether a springing event had occurred. *Id.* at 78:25–79:23 (MacGreevey). Further, the actual store cadence would not have been known or knowable as of the signing date of the APA. *Id.* at 79:24–80:17 (MacGreevey). The Court finds MacGreevey's "corrections" and "adjustments" to the Management Base Case unpersuasive.

200.    Defendants elicited expert testimony from Montague in rebuttal to MacGreevey's testimony on solvency.  Montague disagreed with the conclusions of MacGreevey and found MacGreevey's solvency analysis to be unreliable. Trial Tr. (10/20) Tr. at 204:18–22 (Montague). Montague testified that, under the management's base case assumptions, OpCo would pass all three solvency tests: the "Cash Flow Test," the "Capital Adequacy Test," and the "Balance Sheet Test." *Id.* at 191:15–17, 193:18–20, 194:11–195:2 (Montague).

201.    The Court finds that OpCo was solvent and not undercapitalized as of the signing of the APA.

## CONCLUSIONS OF LAW

### I.    THE COMMITTEE HAS FAILED TO PROVE ACTUAL FRAUD.

What would be an important claim in this case is one that the Committee did not bring, failed to prove, namely, that any Defendant committed fraud on any OpCo creditor.  There was no allegation of any intent by the Defendants to actively mislead the OpCo creditors, there was no justifiable reliance by the OpCo creditors on a misrepresentation, and there were no damages to the OpCo creditors directly caused by

a misrepresentation. The Committee cannot meet any element of common law fraud. *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003).

The Committee's theory is nonetheless based on fraud. They seek to "avoid" transfers from Holdings to PropCo, but avoiding those transfers will not result in any additional money going to the OpCo creditors. The Committee alleges a breach of fiduciary duty claim, but the duties and the allegations do not match, especially when Holdings has always been solvent. The Committee seeks to add substantive consolidation (as a makeshift alter ego theory) on other claims to rearrange the corporate structure. Yes, the bankruptcy happened very quickly, despite Defendants' efforts and the rapidity of the business failure was shocking. The Committee challenged the events but fell short of proving fraud. One of the reasons for incorporating in Delaware is its well-established respect for the corporate form. As the Delaware Supreme Court recently explained, "Delaware courts take the corporate form and corporate formalities very seriously," because it would "upset the contractual expectations" of the parties to conflate separate entities. *Culverhouse v. Paulson & Co.*, 133 A.3d 195, 199–200 (Del. 2016) (internal quotation marks omitted). "It is only the exceptional case where a court will disregard the corporate form." *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990); *see also Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012) ("Delaware courts take the corporate form and corporate formalities very seriously . . . [and] will disregard the corporate form only in the exceptional case.").

The certainty allows businesses to determine which risks, and how much risk, they wish to take in new ventures. The Committee challenges these fundamental tenets of Delaware law, asking the Court to disregard Holdings' separate existence and distribute

its assets to creditors of its subsidiaries, OpCo. This runs counter to the well-established rule that "parent and subsidiary corporations are separate entities, having separate assets and liabilities. . . . [H]ence, the parent's creditors have no claim to the subsidiary's assets, and vice versa." *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) (citations omitted). If relief were granted on the present facts, disregard for the corporate form would be inconsistent with the expectations that businesses manifest in selecting Delaware as the site of incorporation.

## II.     THE CLAIM FOR SUBSTANTIVE CONSOLIDATION (COUNT 72)

The Court rejects the Committee's claim to substantively consolidate the PropCo Entities with Holdings and the OpCo Entities. To be entitled to substantive consolidation, the Committee has the burden of proving that the Debtors and the PropCo Entities disregarded their corporate separateness "so significantly" that "their creditors relied on the breakdown of entity borders and treated them as one legal entity." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). The Committee, however, offered no evidence that the OpCo Entities' creditors "actually or reasonably" relied on any breakdown of the entities' corporate separateness. *Id.* at 212.  Even if the Committee could meet its burden, an opponent of substantive consolidation can still preclude application of the remedy by showing that other creditors "actually relied on debtors' separate existence," and would be "adversely affected" by substantively consolidating the various entities. *Id.* Here, it is undisputed that some of Holdings' creditors did actually rely on the Debtors' corporate separateness and would be adversely affected by substantive consolidation. Accordingly, substantive consolidation is inappropriate in this case.

A.    <u>Legal Standard For Substantive Consolidation</u>

Substantive consolidation in the Third Circuit is governed by *Owens Corning*. There, the Third Circuit analyzed the approaches to substantive consolidation utilized by other circuits, and then adopted a straightforward approach that differs meaningfully from the approaches in those circuits. *See id*. For example, the court explicitly rejected the "*Auto-Train*" approach, which it described as "fail[ing] to capture completely the few times that substantive consolidation may be considered and then, when it does hit one chord, it allows a threshold not sufficiently egregious and too imprecise for easy measure." *Id.* at 210 (*citing In re Auto– Train Corp.*, 810 F.2d 270, 276 (D.C. Cir. 1987)). The court also rejected the "checklist" approach—utilized, for example, in the Second Circuit—because it "often results in rote following of a form containing factors where courts tally up and spit out a score without an eye on the principles that give the rationale for substantive consolidation (and why, as a result, it should so seldom be in play)." *Id.* at 210.  The Court rejects the Committee's attempt to rely on non-Third-Circuit case law that does not apply the *Owens Corning* test.

The Committee relies on *Stop & Go of Am., Inc. v. Stop & Go Shops, Inc. (In re Stop & Go of America, Inc.)*, 49 B.R. 743 (Bankr. D. Mass. 1985).  The test adopted by the Third Circuit in *Owens Corning* is exactly the opposite of the test used in *Stop & Go*. The *Owens Corning* court announced a hard and fast rule that substantive consolidation was never allowed where creditors were aware of and relied on the debtors' corporate separateness. 419 F.3d at 212 (holding that substantive consolidation is not available where creditors can prove "they are adversely affected and actually relied on debtors' separate existence."). The *Stop & Go* court, on the other hand, applied a very different standard, in

which substantive consolidation was favored where the creditors understood the separate corporate nature of the debtors. 49 B.R. at 750 ("[T]he Court cannot find that the defendants were ignorant of the relationship of the companies."). These conflicting standards cannot be reconciled, and the Court is bound to follow the lead of the Third Circuit.

In crafting the Third Circuit test, the *Owens Corning* court identified several important principles. One "fundamental ground rule" is that courts must limit "the cross-creep of liability by respective entity separateness" because "the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances." *Id.* at 211. Another important principle is that substantive consolidation is "extreme" and "imprecise," and that this "rough justice remedy should be rare" and "one of last resort after considering and rejecting other remedies." *Id.* (emphasis added). Based on these principles, the Third Circuit concluded that substantive consolidation is available when "prepetition [the debtors] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity." *Id.* The *Owens Corning* court also stated that substantive consolidation is available when "postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id.* at 211. The Committee, however, has stated that its alleged entitlement to substantive consolidation flows from the Debtors and Defendants supposed prepetition disregard for corporate separateness. *See* D.I. 111 at 19 ("Ultimately, for the PropCo Entities to be consolidated, the Committee must show that, prepetition, they disregarded corporate separateness so significantly that their creditors relied on the breakdown of

entity borders and treated them as one legal entity."). The Committee has not offered any evidence to support a finding that the assets and liabilities are so scrambled that separating them would hurt all creditors.

The Third Circuit went on to break down the elements of a substantive consolidation claim. First, the Committee must prove that the "parties' prepetition dealings" revealed "corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity." *Owens Corning*, 419 F.3d at 212. Second, a proponent of substantive consolidation must prove that "in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity." *Id.* This prong has dual requirements: the creditor must not only prove actual reliance, but also that such reliance was "reasonable." *Id.* Simple ignorance of the debtors' corporate structure does not satisfy this test. *Id.* Third, if the first two prongs are met, an opponent of substantive consolidation can still preclude application of the remedy by showing that other creditors "actually relied on debtors' separate existence," and would be "adversely affected" by substantively consolidating the various entities. *Id.*

Finally, there is a split of authority regarding whether substantive consolidation is an appropriate remedy at all where, as here, the Committee seeks the consolidation of debtors and non-debtors. What is clear is that the burden on the Committee in establishing a right to this "extreme" and "rare" remedy is ratcheted up even further when seeking consolidation of a non-debtor entity. *See In re Howland*, 674 F. App'x 482, 488 (6th Cir. 2017) ("Substantive consolidation is an 'extreme' measure, only to be used 'sparingly,' especially when consolidating a non-debtor entity.") (*citing Owens Corning*, 419 F.3d at 208–09, 211).

B.    Creditor Reliance

It is important to consider the burden of proof for substantive consolidation. "Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation." *Owens Corning*, 419 F.3d at 212. As the proponent of substantive consolidation, the Committee has the burden of proving that creditors "actually and reasonably" relied on a belief that the OpCo, PropCo, and SLB Entities were the same entity. *Id.* ("Proponents who are creditors must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity."); *see also Howland*, 674 F. App'x at 489 (holding that "the trustee's proposed amended complaint is devoid of any factual allegations that any creditor relied on the debtors' disregard of corporate formalities in making a business decision in connection with either entity" and dismissing the trustee's substantive consolidation claim). The Committee does not even attempt to meet this burden. Instead, they argue that there "was no public disclosure of the PropCo/OpCo structure" and that in the absence of public disclosure, the OpCo creditors' "lack of knowledge was a foregone conclusion." Trial Tr. (10/16) at 11:12–18; 11:22–24 (Morris). This argument changes the standard from "reasonable reliance" to mere ignorance and improperly shifts the burden of proof from the Committee to Defendants.

There is a difference between mere ignorance of debtors' corporate structure and "actual and reasonable reliance" on the debtors' supposed unity. The Third Circuit in *Owens Corning* did not rule that substantive consolidation is appropriate whenever debtors fail to publicize their corporate structure. Privately held companies rarely, if ever, issue public announcements about their corporate legal structure; and the

Committee's argument would change substantive consolidation from a "rare" and "extreme" remedy to one that would be available in many bankruptcies. *Owens Corning*, 419 F.3d at 211. Instead, the *Owens Corning* court set a standard of actual and reasonable reliance. *See id.* at 212. This requires a creditor to engage in some minimal level of inquiry, such as asking whether the OpCo Entities owned any real property. Creditors, if interested, also had the option of checking the publicly available real property records to see who owned the real property upon which the stores sat. Had the OpCo Entities' creditors been interested and checked the real property records, they would have discovered recorded deeds showing that Albertson's conveyed the real property at issue to Spirit, GIG, and the PropCo Entities, not the OpCo Entities. *See, e.g.,* DX0219; DX0232; DX0250; DX0251; DX0268. They also would have discovered the publicly recorded Memoranda of Lease disclosing that the OpCo Entities were tenants, and that they did not own the real property. *See, e.g.,* DX0265; DX0323. Publicly recorded deeds constitute constructive notice. *See, e.g., Sixty-01 Ass'n of Apartment Owners v. Parsons*, 314 P.3d 1121, 1125 (Wash. Ct. App. 2013) ("A recorded deed constitutes constructive notice of the interest acquired."). *See also* Ariz. Rev. Stat. § 33-416 ("The record of a grant, deed or instrument in writing authorized or required to be recorded, which has been duly acknowledged and recorded in the proper county, shall be notice to all persons of the existence of such grant, deed or instrument . . . .").

The Committee failed to prove any actual or reasonable creditor reliance. The Committee is arguing that Defendants must prove that not one of the OpCo Entities' thousands of unsecured creditors relied on the mistaken belief that the OpCo Entities owned the real property. This is logistically impossible and inconsistent with the *Owens*

*Corning* test which places the burden of proving actual and reasonable creditor reliance squarely on the Committee's shoulders. *See* 419 F.3d at 212. The Committee has not even attempted to meet this burden, and this precludes substantive consolidation. *Id.*

Even though it was not their burden, Defendants did introduce evidence regarding four of the OpCo Entities' largest creditors—indeed, this was the only evidence regarding creditor reliance that was admitted at trial. The evidence shows that none of these creditors actually or reasonably relied on the Debtors' supposed unity with the PropCo and SLB Entities. Spirit, GIG, and Unified Grocers all knew that the OpCo Entities were separate companies that did not own any real property. Pepsi's corporate representative testified that they conducted no investigation and did not care whether or not the OpCo Entities owned any real property. *See* Trial Tr. (10/19) at 82:8– 83:10 (Pepsi Stipulation). This is consistent with the experience of the Haggen management team, who all testified that (a) trade creditors never ask whether a grocery store owns real estate before extending credit, and (b) a trade creditor has never refused to extend credit to a grocery store on the basis that the grocery store does not own any real estate. *See* Trial Tr. (10/17) at 230:7–18 (Barnett); Trial Tr. (10/19) at 50:10–24, 80:8–81:17 (Shaner); Trial Tr. (10/19) at 148:18–149:7, 172:8–174:9 (Clougher). Unified Grocers, who ultimately did $13-14 million of business per week with the OpCo Entities, actively sought a guarantee from the PropCo Entities on its extension of credit to the OpCo Entities, was denied, and made the business decision to extend credit to the OpCo Entities anyway.   In addition, some creditors such as Starbucks, MoneyGram, and TopCo extended credit after receiving a copy of the OpCo Entities' pro forma financial statements. *See* DX0217–DX0218 (Starbucks received OpCo pro forma); DX0177– DX0178 (TopCo received OpCo pro

forma); DX0204–DX0205 (MoneyGram received OpCo pro forma). The pro forma financial statements do not identify any real property and have a substantial line item for "rent expense." As such, these creditors had in their possession financial statements from the OpCo Entities showing that "OpCo" did not own the real property upon which the stores operated.

In the Court's summary judgment ruling, it explained that "[t]he Committee will have the opportunity at trial to prove what creditors did not know and relied upon," and that "[a]fter trial, the Court will be in a better position to determine the creditors' recovery rights." D.I. 136 at 8. The trial has come and gone. Every single creditor that testified said that they either knew of or did not care about the Debtors' corporate structure. Not one creditor testified that they actually and reasonably relied on the Debtors' supposed unity with the PropCo and SLB Entities.

C.    Harm From Substantive Consolidation.

In addition to failing the first prong of the *Owens Corning* test, substantive consolidation is unavailable here because the record is clear that Holdings' creditors "actually relied on debtors' separate existence" and would be "adversely affected" by substantive consolidation. *Owens Corning*, 419 F.3d at 212.

Spirit and GIG entered into leases with the OpCo Entities whereby the OpCo Entities agreed to pay rent to Spirit and GIG for use of the grocery stores. *See* DX0226; DX0235. Both Spirit and GIG negotiated for and received a guarantee on these rental payments from Holdings. *See* DX0242; DX0396. In doing so, Spirit and GIG understood the separate corporate existence between the OpCo Entities and Holdings, recognized that there was value in having an otherwise separate entity be liable for the rental

payments, and understood that through the guarantees they would have access to assets that they (and other creditors of the OpCo Entities) would otherwise not have. As Spirit's corporate representative explained, having these guarantees provided a "feature that mitigates our risk in doing the transaction." D. Rosenberg Dep. at 52.18–53:6.

Substantive consolidation would be devastating on Holdings' creditors. These creditors would see their recovery drop from 100% to as little as 21%. *See* Trial Tr. (10/20) at 177:13–17; 178:6–13 (Montague). And the OpCo Entities' creditors would receive a windfall, as their recoveries would increase from 0% to over 20%. Trial Tr. (10/20) at 223:22–25 (Montague).

At that same hearing, the Committee's counsel argued that the prejudice to Holdings' creditors should be ignored because it was an "intercreditor" issue that could be addressed by a consensual plan. The Committee's counsel went so far as to promise such a consensual plan in a matter of days. See 9/26/17 Hr'g Tr. at 19:9–10 ("I hope to file the plan today, but I think it's just a matter of days . . . .") (Feinstein). It has been approximately four months, and no such plan has been filed.

III.    THE HOLDINGS FRAUDULENT TRANSFER CLAIMS (COUNTS 1–19, 39–65).

Fraudulent transfer is a statutory remedy that allows creditors to avoid transfers and return property to a debtor that originally owned it. 11 U.S.C. § 548. Here, the Committee is seeking to avoid transfers from Holdings to PropCo and Holdings to Comvest. If successful, the result of these claims will be that the transferred property is returned to the Holdings estate. *Id.*

Holdings' creditors are already being paid in full. The Committee's ultimate goal is to take Holdings' property and distribute it to OpCo creditors who have never been

Holdings creditors. The Committee is seeking a veil piercing remedy, but has not even attempted to satisfy the stringent requirements under Delaware law to pierce the corporate veil. *Sears,* 744 F. Supp. at 1305 ("It is only the exceptional case where a court will disregard the corporate form."). The Committee has argued that these legal defects in their fraudulent transfer claims can be overlooked because they "presuppose" the validity of the Debtor's corporate structure. This ignores that "Delaware courts take the corporate form and corporate formalities very seriously." The Court is bound to do the same in applying Delaware law. *Vichi v. Koninklijke Philipps Elec. N.V.*, 62 A. 3d 26, 48-49 (Del. Ch. 2012).

This is not a case of fraudulent transfer. Holdings, the only Debtor that has ever held the property at issue, is solvent, and is paying its creditors in full. The Committee is trying to seize property that never belonged to OpCo, and distribute it to OpCo creditors that have never had a claim against Holdings. But OpCo's creditors lack standing to sue on behalf of Holdings for fraudulent transfer, and any recovery would not benefit Holdings' creditors who are to be repaid in full. *See Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80, 94 (S.D.N.Y. 2008); *see also In re New Life Adult Med. Day Care Ctr., Inc.*, 2014 WL 6851258, at *6 (Bankr. D.N.J. Dec. 3, 2014).

A.    Legal Standard For Fraudulent Transfer

Fraudulent transfer is a legal, not an equitable, remedy. *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1508 (1st Cir. 1987). Whether alleged under state law under 11 U.S.C. § 544, or under 11 U.S.C. § 548, the claim arises under statute, and each of the statutory elements must be met to impose liability. *See* 11 U.S.C. § 548; *see also* 11 U.S.C. § 544. The remedies available are limited to those enumerated by statute. *Id.*

To allege a claim for fraudulent transfer under state law, the Committee must be a creditor of the transferor. *See, e.g. Fidelity Nat'l Title Ins. Co. v. Schroeder*, 179 Cal. App. 4th 834, 841 (Cal. Ct. App. 2009). Likewise, "the Bankruptcy Code's avoidance provisions can only be asserted to benefit a creditor of the debtor in question." *Adelphia*, 390 B.R. at 94. "An obligation or transfer cannot be avoided as a fraudulent transfer or preference under sections 544, 547 and 548 of the Bankruptcy Code when doing so would not benefit any creditor of the particular debtor that incurred the obligation or made the transfer." *Id.* at 93.

Fraudulent transfer claims may not be brought where they offer no benefit to creditors of the transferor's estate. *Adelphia*, 390 B.R. at 95 ("Under the principles of federal jurisdiction, a party does not have standing to sue where the party is not able to allege an injury that is likely to be redressed by the relief sought."). No recovery is allowed if it would not provide any benefit to actual creditors of the transferor. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 969 (Bankr. D. Del. 1994); *Whiteford Plastics Co. v. Chase Nat'l Bank of New York City*, 179 F.2d 582, 584 (2d Cir. 1950) ("'It would be mockery of justice to [avoid a transaction] in the right of non-existing creditors.") (internal citation omitted). This rule precludes recovery actions when the transferor is solvent and the transferor's creditors are all being paid in full. *See New Life*, 2014 WL 6851258, at *6.

Both the Bankruptcy Code and analogous state laws distinguish between claims for "actual" fraudulent transfer and "constructive" fraudulent transfer. Compare 11 U.S.C. § 548(a)(1)(A) with 11 U.S.C. § 548(a)(1)(B). To prove actual fraud, the plaintiff must show that the transfer was made with "actual intent to hinder, delay or defraud" the transferor's creditors. 11 U.S.C. § 548(a)(1)(A). Constructive fraud, on the other hand,

occurs when an insolvent transferor makes a transfer for less than reasonably equivalent value. *See* 11 U.S.C. § 548(a)(1)(B). The plaintiff has the burden of proof under either theory of recovery. No claim for actual fraudulent transfer can succeed where the plaintiff fails to prove actual intent to hinder, delay or defraud the transferor's creditors. *See, e.g.,* *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009). And no claim for constructive fraudulent transfer can succeed where the plaintiff fails to prove both (i) insolvency at the time of transfer, and (ii) failure of the transferor to receive reasonably equivalent value. *See, e.g., Burch v. Opus LLC (In re Opus East, LLC)*, 528 B.R. 30, 51, 83 (Bankr. D. Del. 2015) ("The plaintiff bears the burden of proving insolvency by a preponderance of the evidence…" while "[t]he burden of proof is on the Trustee to establish that less than reasonably equivalent value was received by the Debtor for the allegedly fraudulent transfers.")

B.    Fraudulent Transfer Claims (Both Actual And
      Constructive) Involving Transfers By Holdings

As a matter of law, the Committee is precluded from prosecuting a claim for fraudulent transfer against Holdings on behalf of persons who are not creditors of Holdings. *Adelphia*, 390 B.R. at 95. At bottom, the Committee is seeking to recover assets transferred from Holdings to the PropCo Entities used to pay OpCo creditors. This violates well-established rules of law and stops all of the fraudulent transfer claims directed at Holdings, including (i) the contribution to the PropCos, and (ii) the payment of the $1.5 million management fee from Holdings to Comvest.

Under state fraudulent transfer law, the Committee lacks standing to seek recovery on behalf of persons who are not creditors of Holdings. *In re Global Grounds*

*Greenery, LLC*, 405 B.R. 659, 662 (Bankr. D. Ariz. 2009) (stating "[t]here is no dispute that the Uniform Fraudulent Transfer Act, as adopted in Arizona and elsewhere, only creates causes of action for creditors of the transferor"); *In re ShendaTech, Inc.*, 519 B.R. 292, 303–04 (D. Nev. 2014) (holding that, under Nevada's Uniform Fraudulent Transfer Act, a creditor is the only party with standing to bring a claim); *Fidelity Nat'l Title*, 179 Cal. App. 4th at 841 (holding that, under California's Uniform Fraudulent Transfer Act, a fraudulent transfer may only be attacked by the creditor injured from the transfer); *Douglas v. Hill*, 148 Wash. App. 760, 765 (Wash. Ct. App. 2009) (holding that "under the definitions provided in the UFTA, a creditor need only have a right to collect a payment to void a fraudulent transfer"); *Norris v. R & T Mfg., LLC*, 265 Or. App. 672, 676 (Or. Ct. App. 2014) (holding that, to establish a claim under the Oregon Uniform Fraudulent Transfers Act, a plaintiff must prove that it "has a claim as a creditor that arose before or after the transfer was made"); *Fisher v. Kelly*, 46 P. 146, 149 (Or. 1896) ("[B]efore a person can attack a transfer of personal property, either actual or constructive, he must show himself to be a creditor . . . ."). This rule acts as an absolute bar to all of the Committee's state law claims alleging fraudulent transfer by Holdings.

Holdings has sufficient assets to pay all of its creditors in full but this is also a bar to fraudulent transfer claims under the Bankruptcy Code. *Adelphia*, 390 B.R. at 94 ("[T]he Bankruptcy Code's avoidance provisions can only be asserted to benefit a creditor of the debtor in question."). This case is highly analogous to *Adelphia*. The debtors in *Adelphia* included the parent company Adelphia Communications Corporation ("Adelphia") and several of its subsidiaries (the "Obligor Debtors"). *See id.* at 83–85. Like in this case, the creditors' committee asserted fraudulent transfer claims for transfers made by the

Obligor Debtors in an attempt to increase the recovery for Adelphia's creditors.

In a detailed opinion, the court explained that fraudulent transfer claims could only proceed where they would generate a recovery for creditors of the specific transferor entities; it was not enough that the claims sought a recovery for creditors of a separate corporate affiliate. *See id.* at 94–95. "Given that the creditors of the Obligor Debtors have received full payment with interest under the Plans, it follows that these creditors do not stand to benefit from recovery on the Bankruptcy Claims at issue here, and the [Adelphia Recovery Trust] does not have standing to bring these claims on their behalf." *Id.* at 95. The court held that bankruptcy courts must look to the actual transferor entity, and determine whether any of the transferor's creditors have unpaid claims. *See id.* The court further concluded that where all transferor creditors are being paid in full, no party has standing to sue for fraudulent transfer, whether under state law or 11 U.S.C. § 548. *See id.* at 92–97

In *Adelphia*, as here, the Adelphia Recovery Trust sought to cure its lack of standing by arguing that the bankruptcy court had previously granted the creditors' committee procedural standing to commence its adversary proceeding, and by invoking its rights as a hypothetical lien creditor. *See id.* at 88–89, 96. The court rejected this argument, explaining that the bankruptcy court's order allowing the creditors' committee to pursue claims did not resolve "the question of whether the Creditors' Committee had standing to prosecute specific claims." *Id.* at 88–89. Further, the court noted that the rights of the creditors' committee as a hypothetical lien creditor were limited to asserting claims that would actually lead to an a recovery for the creditors of the transferor entity. *Id.* at 93 ("[A]n obligation or transfer cannot be avoided as a fraudulent transfer or preference

under sections 544, 547 and 548 of the Bankruptcy Code when doing so would not benefit any creditor of the particular debtor that incurred the obligation or made the transfer.").

Many courts have held that fraudulent transfer claims are improper where, as here, the creditors of the transferor are being paid in full. *See New Life*, 2014 WL 6851258, at *6 ("[E]ven applying the broadest application of the 'benefit to the estate' requirement, there is no conceivable benefit to the estate, either directly or indirectly. The Plan provided for full payment of all creditor claims. . . ."). Likewise, in *Adelphia*, the plaintiff argued that recovery would benefit creditors of the parent *Adelphia*. The court explained that this was insufficient, because there was no benefit to the creditors of the actual transferors:

> [N]o creditors of the Obligor Debtors, the specific debtors whose transfers and obligations the ART seeks to avoid, would benefit from recovery on these claims, as all creditors have been paid in full with interest under the Plans, and no creditors have been issued shares of the ART. It is therefore impossible to see how any recovery by the ART could result in any benefit, direct or indirect, to the creditors of the Obligor Debtors.

*Adelphia*, 390 B.R. at 97. Here, the solvent debtor is the parent company (Holdings), meaning that even if the Committee is successful in transferring property from the PropCo Entities to Holdings, it still would not benefit the creditors at Holdings' subsidiaries (the OpCo Entities) because the Committee has not sued to pierce the corporate veil. *Regency Holdings*, 216 B.R. at 375 ("As a rule, parent and subsidiary corporations are separate entities, having separate assets and liabilities. . . . [H]ence, the parent's creditors have no claim to the subsidiary's assets, and vice versa.") (citations omitted). To recover from Holdings after avoiding transfers from Holdings to the PropCo Entities, the Committee had to have separately pled a claim for veil piercing in

the Complaint. The Committee did not. The Committee pled a claim for substantive consolidation but, as discussed, this claim fails because the Committee fails the *Owens Corning* test.

<u>The Intent to Delay, Hinder, or Defraud Creditors.</u>

The claims alleging actual fraudulent transfer by Holdings also fail because the Committee has failed to prove that Holdings actually intended to defraud any of its creditors. To the contrary, the record shows that Holdings kept all of the Haggen-related assets in wholly-owned subsidiaries and Holdings' creditors are estimated to recover 100 percent of their claims.

The Committee argues that Holdings intended to defraud the OpCo Entities' creditors. *See* D.I. 111 at 2 ("Comvest structured the transactions in a manner intended to hinder, delay or defraud the OpCo Entities' unsecured creditors."). This argument fails as a matter of fact and law.

The evidence showed that the OpCo Entities were capitalized as fully as Defendants believed necessary, and the testimony was that Comvest and its directors worked for OpCo Entities' success. In addition, almost none of the badges of fraud are present here. The transfers of the right to acquire real property to the PropCo Entities were not concealed. The deeds conveying the property from Albertson's property-holding companies to the PropCo Entities, Spirit, and GIG were publicly recorded. *See*, *e.g.*, DX0219; DX0232; DX0250; DX0251; DX0268. Holdings was not under threat of suit when the transfers were made. The transfers were not for substantially all of Holdings' assets, as it continued to own the valuable membership interests of its wholly-owned subsidiaries. Holdings did not "abscond" indeed, it is willing and able to pay all of its

89

creditors. Holdings received equivalent value for the transfers because the property was placed in its wholly- owned subsidiaries. And finally, Holdings has at all times been solvent. Simply put, there is no evidence of an intent to defraud. The evidence showed Defendants intended to build and grow a business.

The Committee did not prove that the use of the OpCo/PropCo legal structure was intended to defraud creditors. The Committee has stated that the OpCo/PropCo structure "is what's on trial" here, but admitted that these OpCo/PropCo corporate structures are not themselves improper. Trial Tr. (10/16) at 8:9–10 ("This chart, Your Honor, is what's on trial.") (Morris); 9/26/17 Hr'g Tr. 50:6–7 ("There is nothing, per se, wrong about the PropCo and OpCo structure.") (Feinstein). Witnesses provided extensive testimony about the business and financial reasons for using this type of structure. *See* Trial Tr. (10/17) at 90:8–91:25 (Niegsch); *id.* at 161:1–25 (Barnett); *see also* Trial Tr. (10/18) at 184:14–19 (Flaton) (calling "OpCo/PropCo structures" "fairly common" in the "business world"). The Committee has not cited a single case in which maintaining a preexisting OpCo/PropCo structure amounted to a fraudulent transfer. The Court believes there are none.

But even if there was an actual attempt to defraud the OpCo Entities' creditors, that would still not provide the basis for a claim alleging fraudulent transfer by Holdings to the PropCo Entities. The statutory text is clear: 11 U.S.C. § 548 only allows courts to avoid transfers made with an intent to defraud the transferor's creditors, *i.e.*, Holdings. The Court may avoid a transfer if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was

incurred, indebted." 11 U.S.C. § 548(a)(1)(A). The law could not be clearer: Section 548 limits claims for fraudulent transfer to transfers that harm the transferor's creditors, not the creditors of some other entity.

The Committee's case theory is ultimately that Comvest undercapitalized the OpCo Entities. Even if intentionally undercapitalized, that would not have given rise to a claim for fraudulent transfer. Intentional undercapitalization has a number of remedies at law and equity, but a legal claim for fraudulent transfer is not one of them. Section 548 requires a "transfer." There is no such thing as a claim for fraudulent non-transfer.

      C.    <u>Holdings' Solvency at the Time of the Transfer</u>.

It is the Committee's burden to prove that Holdings was insolvent at the time it made the transfer. *See In re EBC I, Inc.*, 380 B.R. 348, 354 (Bankr. D. Del. 2008). Here, there is no evidence that Holdings was insolvent. And the Committee cannot seriously contend that Holdings is insolvent now, as its whole theory of the case is premised on recovering value from Holdings' equity and using it to pay the OpCo Entities' creditors. Instead, in its Opposition Brief to Defendants' Motion for Partial Summary Judgment, the Committee argues that if the Court grants the separate relief of substantive consolidation, then Holdings would be rendered insolvent and its claims for constructive fraudulent transfer could proceed. *See* D.I. 111 at 28. This argument fails for three reasons.

First, substantive consolidation "eliminates constructively fraudulent transfer avoidance claims" among the consolidated entities. *In re Bauman*, 535 B.R. 289, 301 (Bankr. C.D. Ill. 2015) (This is because "the consolidated estate is augmented and diminished in equal amounts . . . ."). If the Court grants substantive consolidation, then the claims for constructive fraudulent transfer all fail. *Id.*

Second, for purposes of constructive fraudulent transfer, solvency is measured at the time of the transfer. *See In re R.M.L., Inc.*, 92 F.3d 139, 154 (3d Cir. 1996) (holding that "solvency is measured at the time the debtor transferred value, not at some later or earlier time"). Even if Holdings is rendered insolvent by some future ruling, that does not retroactively make Holdings insolvent at the time of transfer. *Id.*

Third, the Committee did not introduce any evidence that establishes that if the Court consolidated all of the entities together, then Holdings was insolvent at the time of the transfers in question. The Committee's expert has testified that the OpCo Entities may have been insolvent from the moment that the APA was signed, but the Committee's expert did not testify that if you consolidated the OpCo and PropCo Entities' assets and liabilities, then that hypothetical consolidated entity was insolvent when the new stores were acquired.

D.    Holdings Received Reasonably Equivalent Value.

The Committee has the burden of establishing that Holdings did not receive reasonably equivalent value when it transferred the right to acquire the real property from Albertson's to the PropCo Entities. *See In re Key3Media Grp., Inc.*, 336 B.R. 87, 94 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006) (*citing Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991)). The Committee failed to meet this burden because it is undisputed that the PropCo Entities are—and at all times were—solvent, wholly- owned subsidiaries of Holdings.

Courts recognize that a transfer to a solvent, wholly-owned subsidiary does not amount to a fraudulent transfer. *In re DVI, Inc.*, 326 B.R. 301, 306 (Bankr. D. Del. 2005) (concluding that where a debtor "made a contribution to a solvent wholly-owned entity,

92

the Committee would not be able to state a fraudulent transfer claim."). The reasoning behind this rule is sound. It is not fraudulent to allocate property to a solvent, wholly-owned subsidiary because the transferor receives value equal to the transferred asset. *See Branch v. F.D.I.C.*, 825 F. Supp. 384, 399–400 (D. Mass. 1993) ("The Court is aware of no case in which transfers to a solvent subsidiary have been determined to be for less than equivalent value."). That is exactly what happened in this case where the transfer was to downstream wholly-owned subsidiaries.



It is undisputed that the non-debtor PropCo Entities are solvent, meaning that the value of the transferred property is ultimately available to satisfy any claims made by Holdings' creditors. *See also In re First City Bancorporation of Tex., Inc.*, 1995 WL 710912, at *18 n.9 (Bankr. N.D. Tex. May 15, 1995) ("[A] transfer to a wholly-owned solvent subsidiary is often for reasonably equivalent value, because the value of the parent's stock interest in the subsidiary may be correspondingly increased . . . .").

E.    This Case Is Distinguishable From *Mervyn's*.

Throughout these proceedings, the Committee has argued that this case is analogous to *Mervyn's*. Mervyn's was a longstanding department store chain owned by

the Dayton Hudson Corporation. *See In re Mervyn's Holdings, LLC*, 426 B.R. 488, 492 (Bankr. D. Del. 2010). In 2003, in order to devote more resources and attention to its Target line of stores, Dayton Hudson Corporation spun off the entire Mervyn's business in an equity transaction, transferring the membership interest in Mervyn's LLC to Mervyn's Holdings LLC. *See id.* at 493. The private equity sponsors that owned Mervyn's Holdings thus acquired Mervyn's LLC as an ongoing enterprise with many preexisting creditors and liabilities. *Id.*

For decades, Mervyn's LLC and its predecessor corporation had owned both operating assets and valuable real property. *Id.* As part of the 2003 sale, the real property was "stripped" *i.e.*, transferred from Mervyn's LLC to "bankruptcy remote" entities outside of the Mervyn's ownership structure for "virtually no consideration." *Id.* at 500. The "MDS Companies" that received the real property were ultimately owned by the same private equity sponsors, but were not subsidiaries of Mervyn's Holdings. *Id.* at 498. The effect of this transaction was that the real estate assets were taken from the company and transferred to an entity outside the reach of Mervyn's LLC's creditors in a transaction that allegedly rendered Mervyn's LLC insolvent. *Id.* Mervyn's LLC's creditors went from holding claims against a solvent company with substantial real estate assets to holding claims against an insolvent shell company.

The central holding of *Mervyn's* was that it is improper to acquire an entity that has held real property and operating assets together for years, and then transfer the real property to a separate entity (PropCo) in a transaction that renders the predecessor entity (OpCo) insolvent and prejudices the predecessor entity's longstanding, preexisting creditors. That is not what happened here, because:

94

1.      Albertson's held the real property and operating assets in an OpCo/PropCo structure prior to the Albertson's Acquisition;

2.      The Albertson's Acquisition was an asset sale—not a stock sale—which means that Holdings did not acquire a preexisting entity with preexisting creditors;

3.      The OpCo Entities themselves had no preexisting creditors, and at no time did they ever own any real estate;

4.      Holdings transferred the real property downstream to wholly-owned subsidiaries;

5.      There is no evidence that Holdings is, or ever was, insolvent;

6.      The Committee is not seeking to collapse the entire transaction; and

7.      The Court now has the benefit of the evidence presented at trial, whereas the Court in Mervyn's was bound to "accept as true all factual allegations" on what was a pending motion dismiss.

The Albertson's Acquisition was an asset sale—not a stock sale—which means that Holdings did not acquire a preexisting entity with preexisting creditors. In *Mervyn's*, the private equity sponsors bought an ongoing entity—with preexisting creditors—that had held the real property and operating assets together for years. *Id.* at 493. Here, the OpCo Entities' creditors extended credit to an entirely new entity that had never done business before the Albertson's Acquisition and that never owned real property.

In *Mervyn's*, the Court noted that the transfer of the real property from Mervyn's LLC to the MDS Companies had a "devastating" effect on Mervyn's LLC, the transferor. *Id.* at 498. Here, there was no devastating effect on the transferor, because Holdings—not the OpCo Entities—was the transferor and Holdings transferred the real property downstream to wholly-owned subsidiaries (the PropCo Entities). This means that the property was not transferred outside the reach of any Holdings creditor because the

value of the real property sat at Holdings' wholly-owned subsidiaries. The property likewise was not transferred outside the reach of the OpCo Entities' creditors, because it was never available to them in the first place. The Committee has not and cannot show that Holdings was insolvent at any point in time.

This case is also distinguishable from *Mervyn's* because the Committee is not seeking to unwind all of the transfers. There is no claim asserting that any of the payments to Albertson's were fraudulent, and there is likewise no claim seeking to unwind rent payments to Spirit or GIG. The Committee alleges that the OpCo Entities paid above market rent to both Spirit and GIG, but has not sued them or sought to avoid the transfers.

The relief that the Committee seeks is thus simultaneously too broad and too narrow. It seeks to "unwind" transfers that never occurred and to recover property for the OpCo Entities' estates that they never owned in the first place. The Committee is also seeking to unwind only half of the transaction, collapsing and unwinding internal transfers to wholly-owned subsidiaries, while leaving the related payments and transfers to Albertson's, Spirit, and GIG in place. This has no support in the law and is unlike anything that took place in Mervyn's.

In *Mervyn's*, the Court ruled that it was appropriate to "collapse" the transaction, so that Target could be treated as a transferee even though the transfer of the real property took place after Target sold Mervyn's Holdings. *Id*. at 497 ("Instead of focusing on one of several transactions, a court should consider the overall financial consequences these transactions have on the creditors."). Because the Committee is not asserting any claims against Albertson's, such collapse is not needed here. *Id.* But, importantly, even if the Court did collapse the transfers in this case, that does not mean that any of the claims for

fraudulent transfer survive.

Collapsing a transaction is not the same thing as a finding of fraudulent transfer; it is merely a tool to allow the Court to view the overall economic effect of a transfer. *Id.* After a court collapses a transaction, it still needs to apply traditional fraudulent transfer rules to see if there was any fraudulent transfer. *Id.*  If the transactions here are collapsed, the result is a simple transfer of real property from Albertson's (the original transferor) to PropCo (the ultimate transferee). Collapsing the transactions does not save the Committee's claims because at no intermediate step of any of the transactions did OpCo ever have any interest in the real property. That is a clear difference from *Mervyn's*, in which Mervyn's LLC had owned the real property for years.

In addition, the Court may only collapse the "transaction." The collapse doctrine does not allow the court to collapse separate entities, or pierce the corporate veil, or disregard the corporate form. *Id.* To collapse "entities" under Delaware law, a plaintiff must satisfy the stringent veil piercing elements, something the Committee has not even attempted to do here.  *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. at 1305.

This case is also different from *Mervyn's* because in *Mervyn's* the unpaid creditors were creditors of the transferor (Mervyn's LLC) and had standing to sue, and because avoiding the transfer and returning the property to the transferor would actually benefit the transferor's creditors. As discussed above, the transferor in this case is Holdings.  The OpCo Entities' creditors do not have standing to sue on behalf of Holdings and avoiding the transfers in question would provide no benefit to Holdings' creditors.

Finally, the procedural posture of this case is different from the procedural posture in *Mervyn's*.  *Mervyn's* resolved a motion to dismiss filed by Target, the former owner of

Mervyn's LLC. Here, the Court has the benefit of the evidence presented at trial. The evidence presented at trial shows that this case is not *Mervyn's*.[8]

IV.    THE OPCO ENTITIES' FRAUDULENT TRANSFER CLAIMS (COUNTS 20–38).

The only fraudulent transfer claims for transfers made by the OpCo Entities are for rent payments made by OpCo North and South to the PropCo Entities to lease the 28 Retained Properties. D.I. 1 at Counts 20–38.[9] OpCo North and South did not own any real property, and therefore these leases were necessary for the operation of OpCo North and South's grocery stores. Moreover, the Committee has stipulated that the rental payments and obligations were market. Accordingly, the Committee has failed to show that these rental obligations under the PropCo Leases were constructively or actually fraudulent. In addition, the Committee has failed to provide any cognizable evidence of damages.

A.    The PropCo Leases Were For Reasonably Equivalent Value.

The Committee cannot meet the burden to prove a constructive fraudulent transfer because the OpCo Entities' rental obligations under their leases with the PropCo Entities were at market rates. Under Section 548(a)(1)(B) and its state law analogues, it is an essential element of a constructive fraudulent transfer claim that the transfer is not for reasonably equivalent value. 11 U.S.C. § 548(a)(1)(B). The Committee bears the burden of establishing this element. *See In re Key3Media Grp.*, 336 B.R at 94. Throughout its

---

[8] In Count 78 of the Complaint, the Committee objects to the allowance of claims due to pending avoidance actions. D.I. 1 at ¶¶ 759–61. The Committee makes its objection based on Counts 1–65 of the Complaint. *Id.* at ¶ 760. For reasons set forth in these Conclusions of Law, the Court rejects Counts 1–65 of the Complaint. Under such circumstances, Count 78 also fails.

[9] In Count 76 of the Complaint, the Committee asserts that "if any of the PropCo Leases are avoided, the PropCo Entities' Lease Claims must be disallowed." D.I. 1 at ¶ 750. This claim is just an extension of the Committee's fraudulent transfer claims related to the leases with the PropCo Entities (Counts 20–38). When those claims fail, this claim fails.

Complaint, the Committee alleged that these rent payments were "above-market," but discovery has not proved this theory. The Committee has now stipulated in the Pretrial Order that "Plaintiff will not offer any evidence that the rents paid by Operations and the OpCo Entities to the PropCo Entities were above-market." D.I. 142 at 21. Paying fair market rent for access to real property that the OpCo Entities needed to operate their business is a textbook example of reasonably equivalent value. That should be the end of the inquiry for the constructive fraudulent transfer claims.

In light of these facts, the Committee now argues that, while the rents were market, the OpCo Entities "did not receive reasonably equivalent value for their incurrence of long-term lease obligations as they were incapable of sustaining ordinary course business operations in the leased locations beyond a few months." D.I. 111 at 38. The Committee analogizes its argument to offering a dying patient a 10-year car lease. *See* 9/26/17 Hr'g. Tr. at 61:22–62:6. But this analogy shows the defect in the Committee's argument. The leasehold estate given to the OpCo Entities had value, just as the right to use a car has value. And the Committee has stipulated that the monthly rent due under the lease was reasonably equivalent to that value.

Further, the OpCo Entities assumed many of the PropCo Leases in the larger bankruptcy because the leases were in the best interest of the Debtors' estate. This assumption bars the Committee's fraudulent transfer claims with respect to these leases as a matter of law. *See In re Network Access Solutions., Corp.*, 330 B.R. 67, 76 (Bankr. D. Del. 2005). In order to approve this assumption, the Court found that the assumption of these leases was "in the best interest of the Debtors," and this finding is now the law of the case. *See, e.g.*, Order Authorizing The Debtors To Assume Certain Unexpired Leases, Case

15-11874, D.I. 1716 at 1 ("[T]he relief requested in the Motion and provided for herein is in the best interest of the Debtors."). It would not have been a "sound exercise of [debtors'] business judgment to assume the [leases] if it was not receiving equivalent value for the payments it was making under the agreements." *Network Access Solutions*, 330 B.R. at 76. Even if the Committee's claim is limited to the rejected leases, the Committee failed to offer evidence as to what the value of those leases was, and whether or not it was reasonably equivalent to the rent due under those leases. This evidentiary failure resolves these claims in Defendants' favor.

Finally, the Committee conflates its available remedies. The Committee is seeking to recoup the monthly rents actually paid by the OpCo Entities. D.I. 142 at 52 (Committee seeks to "recover all amounts paid under the PropCo Leases.").[10] But this cannot be the case, because in exchange for these payments the OpCo Entities actually received the right to operate, and did operate, on the real property. At most, the Committee's available remedy would be to avoid the future rent payments for the rejected leases. The future rent payments already form the basis of the PropCo Entities' lease rejection claim, which the Committee seeks to disallow in this case. *See* D.I. 1 at Count 76.

B.    The Actual Fraudulent Transfer Claims.

To support a claim of actual fraudulent transfer, the Committee must prove that the PropCo Entities signed the PropCo Leases with an "actual intent to hinder, delay, or

---

[10] Notably, the Committee has not set forth any calculation of the "amounts paid under the PropCo leases" meaning that the Court has no ability to assign damages. The Committee's damages would be limited to the PropCo Leases that were not assumed in the bankruptcy, and the stores opened on a rolling basis over the course of months. The calculation of the amount of rent is difficult.

defraud" the OpCo Entities' creditors. 11 U.S.C. § 548. To be clear, the OpCo Entities did not own real estate so the PropCo Leases were necessary to operate their business for those 28 stores, and the Committee has stipulated that the the PropCo Leases were at (or below) market. The Committee has failed to prove their constructive or actual fraudulent transfer claims based on rent payments owed under the PropCo Leases.

V.    BREACH OF FIDUCIARY DUTY CLAIMS AT HOLDINGS (COUNTS 66 & 68).

The Committee alleges in Counts 66 and 68 that Comvest (as the controlling shareholder) breached its fiduciary duty to Holdings and that Holdings' Managers breached their fiduciary duty to Holdings. D.I. 1 at ¶¶ 669, 689–693. These are legally and factually unsupported. First, Holdings was solvent and therefore all the fiduciary duties were to act in the interest of Holdings' equity—not, as the Committee claims, its creditors and subsidiaries. Second, the Committee's allegations are, for the most part, challenging arm's length transactions with third parties, and such conduct is protected by the Business Judgment Rule. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971). Finally, the Committee is seeking damages sufficient to make every single creditor at every level of the Haggen corporate structure whole, yet it made no effort to present any evidence of this hypothetical amount. The Committee did not disclose any evidence of damages in discovery, it did not present any such evidence at trial, and now there is nothing in the record to support its damages request.

A.    Legal Standard For Breach Of Fiduciary Duty

Delaware courts recognize that a parent company does not owe fiduciary duties to its direct or indirect subsidiaries. *See Trenwick Am. Litig. Tr. v. Ernst & Young, LLP*, 906 A.2d 168, 173– 74 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d

438 (Del. 2007). Similarly, directors of a parent corporation do not owe fiduciary duties to subsidiary corporations. *Id.*

When analyzing breach of fiduciary duty claims, Delaware courts apply one of three standards of review: (a) the Business Judgment Rule, (b) enhanced scrutiny, or (c) entire fairness. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). "The business judgment rule is the default standard of review." *Id.* The Business Judgment Rule provides a "powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'" *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (*quoting Sinclair Oil*, 280 A.2d at 720).

The burden is on the plaintiff to show that the Business Judgment Rule is not applicable. *See Solomon v. Armstrong*, 747 A.2d 1098, 1111–12 (Del. Ch. 1999) ("Under the business judgment rule, the burden of pleading and proof is on the party challenging the decision to allege facts to rebut the presumption."). A plaintiff faces "an uphill battle" to carry this burden of proof. *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *9 (Del. Ch. Oct. 24, 2014); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

One circumstance that can trigger entire fairness review is when a controlling shareholder engages in a "conflicted transaction." *Crimson Expl.*, 2014 WL 5449419 at *12. The mere presence of a controlling shareholder, however, will not trigger the "entire fairness" review. *Id.* Instead, the plaintiff must show the controlling shareholder either: (a) stood on both sides of the transaction at issue, or (b) "compete[d] with the common

[shareholder]" by obtaining a personal benefit that the other shareholders did not receive. *Id*. at *14 ("In sum, triggering entire fairness review requires the controller or control group to engage in a conflicted transaction. The conflicted transaction could involve standing on both sides of the transaction . . . or receiving different consideration than other stockholders."); *In re Synthes Inc. S'holder Litig.*, 50 A.3d 1022, 1034 (Del. Ch. 2012) (recognizing that in order to trigger the "entire fairness standard," the plaintiff must prove that the controller derived a personal, financial benefit "to the exclusion of, and detriment to, the minority stockholders") (citations omitted).

Courts recognize contractual agreements where the fiduciary duties have been limited. *See Ross Holding & Mgmt. Co. v. Advance Realty Grp., LLC*, 2014 WL 4374261, at *12 (Del. Ch. Sept. 4, 2014) ("Nonetheless, where such default rules have been clearly supplanted or modified, those contractual choices will be respected."). For example, Delaware law permits the members of a limited liability company to adopt provisions in its operating agreement that limit "any and all liabilities for breach of contract and breach of duties (including fiduciary duties)" with the exception of "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." 6 Del. C. § 18-1101(e). These "exculpatory clauses" immunize managers from claims for breach of the duty of care, but not claims for an act of bad faith or breach of loyalty. *Stone v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006). In addition, when an exculpatory clause immunizes the managers of a limited liability corporation from breach of fiduciary duty claims, a controlling equity holder is likewise immunized. *See Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *16 (Del. Ch. July 26, 2010) (recognizing, in dismissing a claim for breach of the duty of care based upon the exculpatory clause that mentioned

only directors, that "a controlling stockholder cannot be held liable for a breach of the duty of care when the directors are exculpated.").

It is well settled that a plaintiff alleging a breach of fiduciary duty claim must prove its damages by a preponderance of the evidence. *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010). The Court cannot award damages that are based on mere speculation or conjecture where a plaintiff has failed to adequately prove damages. *See id*; *see also Cline v. Grelock*, 2010 WL 761142, at *2 (Del. Ch. Mar. 2, 2010) (holding that despite the fact that the defendant had breached its fiduciary duty the plaintiff recovered nothing because it had failed to prove any damages).

### B. The Committee Wrongly Asserts That A Solvent Holdings Should Act In The Interest Of Holdings' Subsidiaries Or Creditors.

The Committee told the Court that Holdings' Managers owed the Debtors fiduciary obligations, implying that they owed duties to Holdings' subsidiaries such as the OpCo Entities. D.I. 1 ¶ 693. This is contrary to established law. "Under settled principles of Delaware law, a parent corporation does not owe fiduciary duties to its wholly-owned subsidiaries or their creditors." *Trenwick*, 906 A.2d at 191. Because Holdings does not owe any fiduciary duties to its subsidiaries, that means that "directors of a corporate parent" do not owe fiduciary duties to a subsidiary. *Id.* at 191–92. "Delaware law does not blithely ignore corporate formalities and the [plaintiff] has not explained how the [parent's] directors, as opposed to [the parent], can be deemed to be a 'controlling stockholder' group that owes fiduciary duties to a subsidiary." *Trenwick*, 906 A.2d at 194,. Further, when dealing with multiple layers of parents and subsidiaries, the corporate veil likely must be pierced at each level. *See, e.g., In re The Heritage Org.*, 413 B.R.

438, 514 (Bankr. N.D. Tex. 2009) (interpreting Delaware corporate law and holding that the veil piercing test must be applied to and satisfied at each level of ownership). The Committee did not assert a claim to pierce the corporate veil of any entity.

Separately, the Committee argues that its breach of fiduciary duty claim is that Holdings' Managers and Comvest (as a controlling shareholder) acted "for Comvest's benefit" "at the expense of the Debtors' unsecured creditors." D.I. 1 at ¶ 695 (emphasis added). However, Holdings is currently solvent and was solvent at the time of the Albertson's Acquisition and the Challenged Transactions. The Committee has presented no evidence or expert testimony to the contrary. This fact is crucial because it means that the controlling Managers at Holdings were "obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988); *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 184 (Del. Ch. 2014) ("The fiduciary duties of the directors and officers require that the subsidiary be managed for the benefit of the controller [equity-holders], and the fiduciary duties imposed on the controller self- referentially require the same thing."). Solvent companies are not obligated to act for the benefit of creditors. The Committee is wrong when it tells the Court that its breach of fiduciary claim is based on Holdings' obligations to "unsecured creditors" or Holdings' subsidiaries rather than equity. Accordingly, to prove a breach of fiduciary duty to a solvent Holdings, the Committee must prove that Defendants acted contrary to the interests of Holdings' equity, and Comvest owns nearly all the equity in Holdings. The Committee's Complaint is clear that it is alleging a breach because Holdings should have been acting for the benefit of Holdings' creditors and its subsidiaries' creditors. D.I. 1 at

¶¶ 693, 695. Even though Holdings was owned by both Comvest (80%) and HHI, Corp. (20%), this does not change the analysis. The alleged benefits to Comvest were also benefits to HHI.  Both had an indirect interest in the PropCo Entities. In addition, there was no dilution of HHI's shares in Holdings. *See* G. Hall Dep. at 36:20–23.

> C.  The Committee's Duty Of Care Claim Fails
>     Due To An Enforceable Exculpatory Clause.

The Holdings' Operating Agreement contains an exculpatory provision. It states as follows: "Any fiduciary duties (including duties of care, disclosure or loyalty) that a Manager might otherwise have to the Company or Members of the Company are hereby eliminated, except to the extent as otherwise provided by law." *See* DX0641 at ¶ 12.11. (hereinafter the "Exculpatory Clause"). The Exculpatory Clause immunizes Holdings' Managers from any claim for a breach of the duty of care. *See Stone*, 911 A.2d at 369–70. Additionally, because Holdings' Managers are immune from any claim for a breach of the duty of care, Comvest (as the controlling equity member) is also immune from liability for breach of the duty of care.  *See Shandler*, 2010 WL 2929654, at *16. As a result, the Court need only examine, under the Business Judgment Rule, whether Comvest and Holdings' Managers breached their duty of loyalty or acted in bad faith with the Albertson's Acquisition.  They did not.

> D.  Comvest and Holdings' Managers Fiduciary
>     Duties to Holdings (Counts 66 and 68).

Delaware courts are clear that a breach of fiduciary duty analysis must occur on a company-by-company and director-by-director basis. *See In re Rural Metro Corp. S'holders Litig.*, 102 A.3d 205, 252 (Del. Ch. 2014) ("Liability is assessed on a director-by-director basis."). Once the Court separates out the specific parties, the specific duties, and the

specific breaches, it is clear that the Committee's claims fail.

       1.    The Committee Failed to Prove That Comvest
           Was on Both Sides of the Transaction.

The Committee alleges that both the "Albertson's Acquisition" and the "Challenged Transactions" violated Comvest's and Holdings' Managers' duties for essentially the same reasons. D.I. 1 ¶¶ 670, 695–96. The Albertson's Acquisition claims allege, in essence, that the company's business plan was unrealistic and that the business decision to acquire the new stores was grossly negligent. The Challenged Transaction claims assert that the use of an OpCo/PropCo structure deprived OpCo and its creditors of needed capital. *Id.* Both theories fail. It is undisputed that the "Albertson's Acquisition" was an arm's length transaction negotiated with Albertson's, protected by the Business Judgment Rule, and (ii) the "Challenged Transactions" did not cause any party any harm.

There is no evidence that Comvest stood on both sides of the Albertson's Acquisition. The plain language of the APA shows the agreement was between Albertson's—actually Albertson's LLC and Albertson's Holdings LLC—and Holdings. *See* DX0517. There is no evidence that Comvest had any financial interest in Albertson's such that Comvest could be accused of owning an interest in the entity that was on the other side of the transaction. The evidence shows that Cerberus—another private equity firm—owned Albertson's, and that Cerberus made several demands on Comvest in order to complete the deal, including requiring Comvest to make a $50 million infusion into Holdings. Trial Tr. (10/17) at 48:17–49:3 (Niegsch). Likewise, there is no evidence that Comvest (or any other party) stood on both sides of the leases between the OpCo Entities

and Spirit/GIG. Spirit and GIG are both sophisticated third parties. The negotiations of rent payments with them are classic examples of conduct protected by the Business Judgment Rule.

There is also no evidence that Comvest derived a personal or financial benefit from the Albertson's Acquisition to the exclusion or detriment of the other shareholder, HHI. Prior to the Albertson's Acquisition, Comvest and HHI owned 80 percent and 20 percent of Holdings, respectively. *See* D.I. 1 at ¶ 77; D.I. 142 at ¶ 55. Although Comvest invested $50 million of equity into Holdings as part of the Albertson's Acquisition, HHI's interest in Holdings was not diminished at all. *See* D.I. 1 at ¶ 82; D.I. 142 at ¶ 58. HHI's representative confirmed that HHI was never asked to invest any additional funds into Holdings and yet its equity interest in Holdings never changed. *See* G. Hall Dep. at 36:20–23. Because Comvest was not on both sides of the Albertson's Acquisition and did not receive a benefit that HHI did not receive, the Committee has failed to prove that Comvest was conflicted in the Albertson's Acquisition.

As for the claims relating to the Challenged Transactions, these are essentially a repeat of the Committee's theory that the use of an OpCo/PropCo structure amounted to fraudulent transfer. The Committee argues that "Comvest" stood on both sides of (i) the contribution agreements to PropCo and (ii) the OpCo PropCo leases. D.I. 1 at ¶¶ 670, 695–96. But this is simply not true. It was Holdings and its wholly-owned subsidiaries that were parties to the contribution agreements and the OpCo/PropCo leases. The transfers among Holdings and its subsidiaries benefited Haggen's other shareholders, the Haggen family, to the exact same extent they benefitted Comvest. Because all of Haggen's shareholders, both Comvest and HHI, received the exact same treatment under

all of the Challenged Transactions, there is no basis for applying the entire fairness standard and all of the Challenged Transactions are protected by the Business Judgment Rule. *See Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *10 (Del. Ch. Aug. 30, 2013); *Synthes Inc.*, 50 A.3d at 1034.

Even applying the complete fairness standard, these transactions do not amount to breaches of any fiduciary duty because the Committee admits there is nothing wrong with an OpCo/PropCo structure. 9/26/17 Hr'g Tr. 50:6–7 (Feinstein). The contribution of the real property from Holdings to PropCo did not harm any party. It had no effect on any Holdings shareholder or creditor, because the property simply went from being held by Holdings to its wholly-owned subsidiary. Holdings received value that was exactly equivalent to the transferred property. *DVI*, 326 B.R. at 306.  This transaction likewise caused no prejudice to OpCo because it never owned the real property in the first place. Likewise, none of the rent payments by OpCo amount to a breach of fiduciary duty. While the Committee initially alleged that the rent payments from OpCo to PropCo were above market, they later stipulated that the rental payments and obligations were priced at market.

The Committee is ultimately arguing that the failure to capitalize OpCo harmed the OpCo creditors, but not only did Comvest have no duty to capitalize OpCo with the real property, it had no fiduciary duties to the OpCo creditors whatsoever. *Trenwick*, 906 A.2d at 191. None of the Challenged Transactions can thus form the basis of any claim for breach of fiduciary duty. *Id.*

2.    The Committee Failed to Prove that the Comvest
       Managers Were Not Independent and Disinterested.

Caple, Niegsch, and Rodriguez, whom the Committee refers to as the "Comvest Managers," were three of the five members of Holdings' Board of Managers. *See* D.I. 142 at ¶¶ 24–29). The Committee contends the Comvest Mangers lacked independence and were not disinterested board members because they were infected with Comvest's alleged conflict.   *See* D.I. 144 at 34–35. As a result of this lack of independence and disinterestedness by a majority of Holdings' Board, the Committee contends that Holdings' Board was not independent and therefore their actions are subject to the entire fairness review.

The Committee, however, has failed to prove that the Comvest Managers lacked independence or disinterestedness. For disinterestedness, the Committee presented no evidence that any of the Comvest Managers appeared on both sides of the Albertson's Acquisition. The Committee likewise presented no evidence that any Comvest Manager derived any personal benefit from any of those transactions. Simply put, the Committee failed to prove that any of the Comvest Managers lacked disinterestedness.

With regard to independence, the Committee's only evidence is that the Comvest Managers worked for Comvest. *See* D.I. 144 at 34–35. However, the fact that the Comvest Managers worked for Comvest is not relevant to the issue of whether the Comvest Managers were independent. *See Crimson Expl.*, 2014 WL 5449419, at *21 (recognizing that the fact that board members worked for and had been appointed by the alleged controlling shareholder was irrelevant in independence analysis of members because controller itself was not conflicted). This is especially so since Comvest itself was not

conflicted. The Committee presented no other evidence of how the Comvest Managers lacked independence.

The Committee failed to show that the Comvest Managers actually lacked independence or disinterestedness. In turn, this means that the Committee failed to prove that Holdings' Board lacked independence or disinterestedness. Accordingly, entire fairness review does not apply in this case, and the Court will utilize the Business Judgment Rule when reviewing Defendants' actions.

3.    Comvest and Holdings' Managers Duty of Loyalty.

The Committee alleged that Comvest and Holdings' Managers acted in bad faith in relation to their duties owed to Holdings in consummating the Albertson's Acquisition and in setting up the corporate structure. *See* D.I. 1 at ¶¶ 672–674, 694–698. With regard to participating in the Albertson's Acquisition, the evidence showed that Comvest and Holdings' Managers acted reasonably, intending to advance Holdings' best interest. *See Stone*, 911 A.2d at 369. As Holdings' Managers all testified, Comvest spent hundreds of hours running different financial models and scenarios to determine whether Holdings could succeed with the Albertson's Acquisition. Comvest spent millions of dollars on experts to address potential risks associated with the acquisition in an effort to make sure it succeeded. Likewise, the evidence showed that the OpCo/PropCo structure was instituted for sound business purposes that fall squarely within the scope of the Business Judgment Rule. The Committee failed to present any evidence that Comvest and Holdings' Managers intentionally acted with any purpose other than what was in Holdings' best interest.

111

The evidence showed that the Defendants expended their best efforts and did all they could to work for Haggen's success. When the stores experienced pricing issues or supply issues, Comvest gathered its Deal Team and Management Team together to address those issues. It was "all hands on deck." Trial Tr. (10/17) at 242:4–243:1 (Barnett). They spent extensive time with Supervalu and Willard Bishop, who had been hired to prevent these very pricing issues from happening, to come up with a plan to address the problems, all in an effort to enable Holdings' OpCo subsidiaries to succeed. *Id.* Clougher and Shaner both testified that they thought the pricing issues had been addressed, only to find new pricing issues pop up at the next store.

When faced with sufficient evidence of improper conduct by Albertson's, whether by design or in reality, Comvest and Holdings' Managers took steps to remedy the situation. They withheld more than $40 million in payments owed to Albertson's and then filed a lawsuit against Albertson's. While in hindsight they might have taken different actions that could have resulted in different outcomes, Delaware law will not "impose retroactive fiduciary obligation simply because [the fiduciary's] chosen business strategy did not pan out." *Trenwick*, 906 A.2d at 173. Under the review of the Business Judgment Rule, Comvest actions were reasonable and realistic.

The evidence also proved that the OpCo/PropCo structure was utilized for sound business purposes protected by the Business Judgment Rule. In the Albertson's Acquisition, Comvest saw two distinct businesses—a grocery store operation and a real estate business—with two distinct time horizons that had two distinct business plans. Indeed, the corporate structure was set up in a way that Comvest and Holdings' Managers believed would maximize the effectiveness of both OpCo and PropCo, all for

the benefit of Holdings. Trial Tr. (10/17) at 90:8–92:7 (Niegsch). When carrying out their fiduciary duties, Comvest's actions needed only "be reasonable, not perfect," a standard that is easily met here. *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

There is no evidence that Comvest received anything more or different than what other Haggen shareholders received by virtue of the Albertson's Acquisition or the OpCo/PropCo corporate structure. Holdings' Managers did not receive any personal benefits from the Albertson's Acquisition or the corporate structure. There was no self-dealing by Comvest or Holdings' Managers. In the absence of any disparate treatment of any other shareholder, there can be no claim for breach of the duty of loyalty or good faith to Holdings. *BF Bolthouse*, 2013 WL 5210220, at *10; *Synthes Inc.*, 50 A.3d at 1034.

E.    Damages.

The Committee has failed to present any evidence of damages to Holdings. The Committee promised in its Complaint to prove damages "in an amount to be determined at trial." D.I. 1 ¶ 677 (emphasis added). According to the Pre-Trial Order, for each of the breach of fiduciary duty claims, the Committee seeks "damages in an amount equal to the OpCo Entities' unsatisfied liabilities." D.I. 142 at 52. As a starting point, the Committee is suing the Managers and shareholders of Holdings for all "unsatisfied liabilities" two corporate levels lower. The Committee did not present an expert on the "unsatisfied liabilities" or a witness from the Debtors who testified. At the close of the Committee's case, there was only one piece of evidence in the record regarding the amount of unsatisfied liabilities—the Claims Register, P-620—and the Committee stipulated to the Court that it was not using the claims register to establish a damages claim.  Trial Tr. (10/20) at 37:13–18; *see also id.* at 31:3–16 ("we're not offering it for the

truth of the matter asserted."), 40:1–16, 42:8–14 (Morris).

The request for all of OpCo's "unsatisfied liabilities" is speculative and unproven. The Committee had an obligation under Delaware law and the Federal Rules of Civil Procedure, as incorporated into this adversary proceeding, to present concrete evidence at trial. It did not. The Committee's damages theory constitutes speculation founded upon uncertainty. *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003); *Cline*, 2010 WL 761142, at *2-3 (holding that the plaintiff was entitled to no damages, despite the defendant's breach of fiduciary duty, where the plaintiff failed to present any evidence of damages). The Court therefore rejects the Committee's claim.

## VI.    THE OFFICERS' AND DIRECTORS' FIDUCIARY DUTIES (COUNT 67).

The Committee lumps together all of the individual defendants into the category of "Officers and Directors." D.I. 1 at ¶¶678–87. It is necessary to address the individual Defendant's alleged breach of fiduciary duty vis-à-vis each Debtor. Unlike the earlier counts, the Committee brings these claims against the Directors and Officers at every Debtor, not just Holdings. The legal standard for breach of fiduciary duty does not change for this claim.

At the outset it is clear that the Directors tried hard to make Haggen succeed. None of them experienced any benefit from the downfall of Haggen, and all of them suffered personal loss due to the failure of the Haggen businesses. *See*, *e.g.*, Trial Tr. (10/19) at 93:18–94:14 (Shaner).

A.      <u>John Caple's Fiduciary Duties</u>.

In addition to being a manager of Holdings, Caple was also an officer of Holdings. *See* D.I. 142 at ¶ 24. Because the claim is limited to Caple's actions at the Holdings level it fails for many of the same reasons that the nearly identical claim against Caple in his role as a Manager of Holdings failed. The Exculpatory Provision limited Caple's fiduciary duties as a manager of Holdings to the duty of loyalty and a lack of bad faith. At trial, the Committee failed to distinguish Caple's actions as a manager of Holdings from any action he took as an officer of Holdings. In such a situation, Delaware law allows the officer/manager to invoke the exculpatory clause that otherwise mentions only a manager. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994) (where plaintiff failed to distinguish the defendants' acts as officers from their actions as directors, the exculpatory clause precluded all claims for breach of duty of care for those directors/officers); *Continuing Creditors' Comm of Star Telecomms. Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 464 (D. Del. 2004) (an exculpatory clause that applied to directors also applied to claims asserted against an officer who was also a director). As such, in his capacity as an officer of Holdings, Caple can only be liable for a breach of the duty of loyalty and for acts in bad faith.

The Committee presented no evidence that Caple was on both sides of the Albertson's Acquisition or that he personally benefitted from the transaction. Thus, there is no evidence that he breached his fiduciary duty of loyalty to Holdings. Nor is there any evidence that Caple acted in bad faith at any point as an officer of Holdings. Caple, like everyone at Comvest and Haggen, relied on the subject matter expertise of the numerous advisors they hired.  The rationale for the OpCo/PropCo structure was explained at trial,

there were two different businesses with two different business plans and two different time horizons. The evidence showed that Caple did not intentionally abandon any of his duties to Holdings. To the contrary. Caple spent enormous time and effort trying to make Holdings successful. While in the end it did not prove successful, to fulfill his fiduciary duties Caple needed only to act reasonably, not perfectly.

Caple was also a director of Haggen, Inc. *See* D.I. 142 at ¶ 24. Haggen, Inc.'s Restated Articles of Incorporation contain an exculpatory provision in Article 8, which states as follows: "A director of this corporation shall not be liable to this corporation or its shareholders for monetary damages for conduct as a Director." *See* DX0638. This provision limited Caple's fiduciary duties to the duty of loyalty and an absence of bad faith. The Committee failed to present any evidence that as a director of Haggen, Inc., Caple received any personal benefit from the Albertson's Acquisition or from the creation of the OpCo/PropCo structure while a director of Haggen, Inc. As such, the Committee failed to prove Caple breached his duty of loyalty to Haggen, Inc.  As explained above, when Haggen, Inc. and the other OpCo Entities (OpCo North and OpCo South) experienced problems, Caple did not abandon his duties. He, Niegsch and the entire management team had "all hands on deck" meetings in an effort to help Haggen, Inc. survive. In the end, they were unsuccessful. But this does not mean that Caple acted in bad faith at any point.

B.    Cecilio Rodriguez's Fiduciary Duties.

The Court found Rodriquez to be an untruthful witness.  He "remembered" very few of the facts about the Project which the Court finds to be highly unlikely and disturbing.

Rodriguez occupied nearly all of the same positions as Caple. In addition to being a manager of Holdings, Rodriguez was also an officer of Holdings. *See* D.I. 142 at ¶ 25. The Committee failed to present any evidence at trial that distinguished Rodriguez's actions as a manager of Holdings from his actions as an officer of Holdings. The Exculpatory Clause therefore applies to Rodriguez's actions as an officer of Holdings. As such, in his capacity as an officer of Holdings, Rodriguez can only be liable for a breach of the duty of loyalty and for acts in bad faith. The Committee presented no evidence that Rodriguez was on both sides of the Albertson's Acquisition or that he personally benefitted from the transaction. Nor is there any evidence that he acted in bad faith. When the OpCo Entities needed money to meet payroll, Rodriguez was instrumental in allowing the PropCo Entities to loan $25 million to the OpCo Entities in an effort to make the entire Holdings' enterprise successful. Thus, Rodriguez did not breach his duty of loyalty or act in bad faith.

Rodriguez was also a director of Haggen, Inc. *See* D.I. 142 at ¶ 25. He is therefore covered by the exculpatory provision in Article 8 of Haggen, Inc.'s Restated Articles of Incorporation. *See* DX0638. This provision limited Rodriguez's fiduciary duties to a duty of loyalty and an absence of bad faith conduct toward Haggen, Inc. The Committee failed to present any evidence that as a director of Haggen, Inc., Rodriguez received any personal benefit from the Albertson's Acquisition or from the creation of the corporate structure while a director of Haggen, Inc. Rodriguez acted to advance the best interest of Haggen, Inc. Thus, Rodriguez did not breach his duty of loyalty or act in bad faith toward Haggen, Inc.

C.    John Clougher's Fiduciary Duties.

Like Caple and Rodriguez, Clougher was both a manager and an officer of Holdings. *See* D.I. 142 at ¶ 27. The Exculpatory Clause therefore applies to Clougher's actions as an officer of Holdings. As such, in his capacity as an officer of Holdings, Clougher can only be liable for a breach of the duty of loyalty and for bad faith acts. Yet, the Committee presented no evidence that Clougher was on both sides of either the Albertson's Acquisition or the Challenged Transactions or that he personally benefitted from either. Thus, there is no evidence he breached his fiduciary duty of loyalty to Holdings.

Nor is there any evidence he acted in bad faith. The Committee presented no evidence that Clougher intentionally acted at any time with the purpose of anything other than advancing the best interest of the Holdings enterprise. Nor did the Committee present any evidence that Clougher acted in conscious disregard of his duties to Holdings. Clougher testified he spent hundreds of hours in the weeks leading up to the Albertson's Acquisition meeting, planning and testing various models and business plans to ensure that Holdings could be successful. After signing the APA, Clougher spent countless hours preparing for and then executing the store conversions. He also worked very hard trying to make the Holdings enterprise succeed.

Under the Business Judgment Rule, an officer's actions need only be reasonable and realistic, not perfect. *See Lyondell*, 970 A.2d at 243. Clougher is only liable for a breach of the duty of due care if the Committee proves he acted with gross negligence, and the Committee can only satisfy this burden if it proves that Clougher deliberately failed to fully inform himself of the information reasonably available. *Opus East*, 528 B.R. at 56.

None of these requirements are met.

The evidence at trial showed that Clougher availed himself of expert counsel and considered all available information.  For example, Clougher relied on ATK's projections for same store sales. Trial Tr. (10/19) at 154:13–18 (Clougher) Clougher testified that he believed that the projections were reasonable. Clougher's belief that the projections were reasonable was based upon the time and effort he spent on the business plan in the months leading up to the APA Signing Date and the presentations to the FTC. *Id.* PNC Bank had also provided an untapped $210 million ABL facility to the OpCo Entities to operate their business. Moreover, the OpCo Entities would have access to a $50 million equity infusion from Comvest. Further, the OpCo Entities were expected to receive, and ultimately did receive, approximately $50 million in excess proceeds from the sale-leaseback transactions.

The record shows extensive evidence that Clougher made every effort to work for Haggen's success both before and after the acquisition of the new stores. He retained an experienced management that worked tirelessly on the conversions. Clougher testified that after the FTC awarded Haggen the stores, he and the rest of the Haggen Management Team spent extensive time and energy preparing to "Haggenize" each store and to hire the necessary staff. Clougher, Shaner, Barnett and Anderson all testified that the changes in the stores had the effect that they hoped—they looked and felt like the legacy Haggen stores.

Clougher also retained both SuperValu and Willard Bishop to make sure that the new Haggen stores properly priced the products.  The evidence showed that once pricing problems arose, Clougher, Shaner, and other Haggen management worked hard to solve

the pricing problems that arose.

In sum, the trial proved that Clougher relied on reasonable projections from industry experts to ensure that OpCo was adequately capitalized. He worked with both experienced Haggen management and outside experts and had sound reasons for concluding that the OpCo companies would succeed. The Committee presented no evidence that Clougher was grossly negligent in reaching that conclusion. All the Committee has done is point to the ultimate failure of OpCo and argue post hoc that there must have been some improper conduct, but this is the exact sort of hindsight challenge that the Business Judgment Rule prohibits. *Cede*, 634 A.2d at 361.

D.    <u>William Shaner's Fiduciary Duties</u>.

Like Caple, Rodriguez and Clougher, Shaner was both a manager and an officer of Holdings. *See* D.I. 142 at ¶ 29. The Exculpatory Clause therefore applies to Shaner's actions as an officer of Holdings. Shaner was also a director of Haggen, Inc., and so is entitled to the protection of the exculpatory provisions contained in Haggen, Inc.'s Articles of Incorporation.  As such, in his capacity as an officer of Holdings, Shaner can only be liable for a breach of the duty of loyalty and for bad faith acts. The Committee presented no evidence that Shaner was on both sides of the Albertson's Acquisition or the Challenged Transactions, or that he personally benefitted from either. Thus, there is no evidence he breached his fiduciary duty of loyalty to Holdings.

Nor is there any evidence he acted in bad faith. The Committee presented no evidence that Shaner intentionally acted at any time with the purpose of anything other than advancing the best interest of the Holdings enterprise. Nor did the Committee present any evidence that Shaner acted in conscious disregard of his duties to Holdings.

Shaner testified that he spent hundreds of hours in the weeks leading up to submitted the bid for the Albertson's Acquisition meeting, planning, and testing various models and business plans to ensure that Holdings would be successful. After the APA Signing Date, Shaner spent countless hours preparing for and then executing the store conversions. He also worked very hard trying to make the Holdings enterprise successful. Shaner further sold his house in Missouri, abandoned other lucrative business opportunities, and moved out to California to make the enterprise successful.

Like Clougher, the evidence is that Shaner sought expert advice, and personally worked hard with Haggen management to make the company a success. Shaner was aware of ATK's projections for same store sales growth and believed that they were reasonable. Shaner testified that he believed that OpCo South did not need to own the real estate to be successful. Shaner described the tremendous efforts spent converting the stores. OpCo South personnel took over the stores at 12:01 a.m. on the day each store closed and then quickly launched many workers to convert the Albertson's stores into a Haggen store. Shaner testified that he felt they had accomplished the task with all of the stores, accomplishing that "wow" factor they had hoped to get. Trial Tr. (10/19) at 65:3–66:16 (Shaner). All of these actions are squarely protected by the business judgment rule, and none of them show any bad faith or breach of fiduciary duty. *Cede*, 634 A.2d at 361.

E.    Blake Barnett's Fiduciary Duties.

Barnett was an officer of Holdings, Haggen, Inc., and OpCo North. *See* D.I. 142 at 28. Like the other officers, directors and managers, Barnett participated in all of the discussions and planning leading up the APA Signing Date and the meeting with the FTC. Like the other officers, directors, managers, PNC, Spirit, GIG and the FTC, Barnett

believed that ATK's same-store sales projections were reasonable. The Committee offered no evidence to show that Barnett's reliance on these projections, even if flawed, was unreasonable. The Committee presented no evidence that Barnett received any personal benefit from the Albertson's Acquisition or that he stood on both sides of the transaction. The Committee presented no evidence that Barnett believed that OpCo North or Haggen, Inc. needed access to the real estate or the liquidity therefrom in order to make the operations a success. The Committee offered no evidence that Barnett put the interests of any entity ahead of Holdings, Haggen, Inc., or OpCo North. Summarily, the Committee offered no evidence to rebut the presumption that Barnett's actions were reasonable and in the best interest of the companies of which he was an officer.

F.    Derrick Anderson's Fiduciary Duties.

Anderson was an officer of Holdings, OpCo North, OpCo South and Haggen, Inc. *See* D.I. 142 at ¶ 30. The Committee presented no evidence that Anderson received any personal benefit from the Albertson's Acquisition or for the creation of the corporate structure. The Committee likewise presented no evidence that Anderson intentionally abandoned any of this duties or took any action that put another entity ahead of the interests of the companies of which he was an officer. The undisputed evidence at trial showed just the opposite. Anderson had been a long-standing Haggen employee who visited various stores as they were converted and made an effort to ensure that the conversion process, including the onboarding of new labor unions, occurred efficiently and effectively. In an effort to ensure the effective implementation of the conversion process, Anderson had agreed to make himself available to sign the necessary paperwork that the company's lawyers advised him to sign, as well as to effectuate the various

licensing paperwork that sometimes required him to be fingerprinted at different points throughout the process.

There was no dispute that the various Debtor and non-debtor entities needed to execute numerous documents in order to effectively convert the Albertson's stores to Haggen stores. Anderson testified that there were literally hundreds of documents to sign, and that often he was the only person consistently available to ensure the necessary legal documents were signed. There is likewise no dispute that he only signed the papers that had first been reviewed and approved by Haggen's lawyers. The Committee did not present any evidence that Anderson signed any document that had not been fully vetted by Haggen's lawyers. And the law recognizes that the Contribution Agreements that Anderson signed were entirely appropriate transactions. As set forth above, Delaware law has recognized that a party's transfer of interest to a solvent, wholly- owned subsidiary does not constitute a fraudulent transfer. *DVI*, 326 B.R. at 301, 306 (finding that where a debtor "made a contribution to a solvent wholly-owned entity, the Committee would not be able to state a fraudulent transfer claim."). Therefore, there was nothing illegal, inappropriate or unreasonable about Anderson executing documents that (a) had been first vetted by counsel, and (b) transferred Holdings' right to acquire the Real Property to the PropCo and SLB Entities.

When the transaction is reviewed under the Business Judgment Rule, the Committee failed to present evidence to overcome the presumption that the actions taken by Comvest, Holdings' Managers, and each of the Officers and Directors was reasonable and in the best interest of the individual companies. As a result, Defendants respectfully request that the Court enter judgment in favor of Defendants on Counts 66–68 of the

Complaint.

> G.    The Committee Is Estopped From Challenging The Decision To
>        Enter The PropCo Leases or Spirit/GIG Leases Which Were
>        <u>Assumed In The Bankruptcy</u>.

The Committee alleges, in part, that Comvest and Holdings' Managers breached

their fiduciary duty to Holdings by choosing "to enter into the PropCo Leases and pay

rent thereunder." D.I. 1 ¶¶ 676, 698. The Committee also challenges the decision to enter

the GIG and Spirit Leases, which are defined as part of the vague term "Challenged

Transactions." *Id.* ¶ 149. The Committee's decision to challenge these leases wholesale is

particularly troubling because the Debtors assumed close to half of the PropCo Leases

and Spirit/GIG leases. *See, e.g., In re HH Liquidation, LLC, et al*, Case No. 15-11874, D.I.

843, 910, 1005, 718 , 719, 861, 862, 847, 964, 2080, 1550, 1775.  When the Court approved

the assumption of leases, it found at the Debtors request that the leases were "in the best

interest of the Debtors." *See, e.g.,* Order Authorizing The Debtors To Assume Certain

Unexpired Leases, Case 15-1874, D.I. 1716 at 1 ("the relief requested in the Motion and

provided herein is in the best interest of the Debtors.").  The Committee did not object.

Because assuming a contract under 11 U.S.C. § 365 requires a finding that the

contract "was in the best interests" of the debtor, this finding judicially estops a breach of

fiduciary duty claim related to the contract. *Network Access Solutions*, 330 B.R. at 77

("[J]udicial estoppel prevents the Committee from supporting the assumption of the

agreements as a sound exercise of NAS's business judgment and then attempting to

recover all authorized, contractual payments as fraudulent transfers or breaches of

fiduciary duties."); *see also In re Vision Metals, Inc.*, 327 B.R. 719, 723 (Bankr. D. Del. 2005)

(applying judicial estoppel to challenges against an assumed contract). To the extent that

the Committee aims to salvage this contention by focusing only on the rejected leases, there is no evidence to distinguish why certain leases would be a breach of fiduciary duty and other nearly identical leases would be in the best interest of the Debtors. This fundamental inconsistency defeats any claim of breach of fiduciary duty that relates to the PropCo Leases or the Spirit/GIG Leases.

       H.    <u>Damages</u>.

The Committee seeks "damages in an amount equal to the OpCo Entities' unsatisfied liabilities" for this claim. D.I. 142 at 52. These damages are as inappropriate and unproven here as they were for Counts 66 and 68 explained earlier.

VII.    COMMITTEE STANDING TO PURSUE BREACH OF FIDUCIARY
       <u>DUTY CLAIMS AGAINST LIMITED LIABILITY COMPANIES</u>.

Separately and independently from the merits of the fiduciary duty claims, the Committee does not have standing to pursue the breach of fiduciary duty claims on behalf of any Debtor that is a limited liability company: Haggen Holdings, LLC, Haggen Operations Holdings, LLC, Haggen OpCo North, LLC, Haggen OpCo South, LLC, and Haggen Acquisition, LLC (hereinafter the "LLC Debtors"). The Court will therefore enter judgment in Defendants' favor on the Committee's breach of fiduciary duty claims relating to the LLC Debtors. Standing implicates subject matter jurisdiction, and such objections can be raised at any time during a proceeding by either the parties or the court. *See In re Harold*, 296 B.R. 868, 871 (Bankr. M.D. Fla. 2003) (collecting numerous cases holding that standing is not waivable and may be raised at any time). A standing order does not act as a bar to raising the standing issue. *See Adelphia*, 390 B.R. at 92. Defendants explicitly reserved "all defenses" in the Committee's Standing Order. D.I. 1858-1 at 4; *see*

*also* D.I. 24 at 185 (Defendants asserted "standing" as an affirmative defense).

Delaware law recognizes that "creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (emphasis omitted). This is based on the language of Section 327 of the Delaware General Corporation Law, 8 Del. C. §327, which provides a non-exclusive limitation on derivative standing. *CMV V., LLC v. Bax*, 6 A.3d 238, 242 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011). In contrast, the Delaware Limited Liability Company Act ("LLC Act") is clear and unambiguous about who can bring a derivative action: the plaintiff "must be a member or an assignee." 6 Del. C. § 18-1002; *Bax*, 6 A.3d at 241. "'[A] statute, clear and unambiguous on its face, need not and cannot be interpreted by a court . . . .'" *Id.* at 241. The Committee is neither a member nor an assignee. Under the plain language of the statute, the Committee has no standing to bring a breach of fiduciary duty claim. The Court's ruling in *In re Golden Guernsey Dairy, LLC*, is not to the contrary. 548 B.R. 410, 413 (Bankr. D. Del. 2015). Unlike a Chapter 7 trustee, which is empowered by statute to act as "the sole representative of the estate with the authority to sue and be sued," a creditors committee is a collection of unsecured creditors. *Id.* Its rights to assert derivative claims are limited to the derivative standing of its members, none of whom have standing as creditors of a Delaware LLC to assert derivative claims of breach of fiduciary duty on behalf of the company. *CMV V., LLC v. Bax*, 6 A.3d 238, 242 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011).

The Court of Chancery in *Bax* addressed the equity of its ruling and disagreed that the holding "generates an absurd distinction between insolvent corporations, where

126

creditors can sue derivatively, and insolvent LLCs, where they cannot . . . [because] there is nothing absurd about different legal principles applying to corporations and LLCs." *Id.* at 249. The underpinnings of Delaware's corporate law and the law of limited liability companies are different. *Id.* at 249–50. Barring a creditor from derivative standing does not conflict with the purpose of the LLC Act because the LLC Act itself gives "maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." *Id.* at 250 (citing 6 Del. C. § 18-1101(b)). Further, there is no inequity or prejudice to creditors because they "are presumed to be 'capable of protecting themselves through the contractual agreements that govern their relationships with firms.'" *Id.* (internal citation omitted). Limiting a creditor's right to sue derivatively, therefore, comports with the parties' bargained-for rights and the principles of freedom of contract that are legislated in the LLC Act. *Id.* In sum, the Committee has no standing to pursue the breach of fiduciary duty claims against the LLC Debtors.

VIII.   UNJUST ENRICHMENT CLAIMS (COUNTS 73–75).

The Committee has made claims for unjust enrichment.  While the Committee challenges several transactions—including the contribution of real estate assets from Holdings' to the PropCo and SLB Entities and the PropCo Leases—each is governed by express, written contracts precluding an unjust enrichment claim. Moreover, even if the transactions were not governed by written contracts, the Committee has failed to prove the necessary elements of unjust enrichment, and has failed to carry its burden for proving damages.

A.    <u>Choice Of Law.</u>

A claim for unjust enrichment is governed by state-law. Choice of law principles

point to six different states governing the different transactions being challenged by the

Committee as unjust enrichments: Arizona, California, Delaware, Nevada, Oregon, and

Washington.

"[B]oth Delaware and federal choice of law principles apply the 'most significant

relationship test' found in section 188 of the Restatement Second of Conflict of Laws to

determine which jurisdiction's laws will apply to a written or unwritten contract claim."

*In re Fleming Cos., Inc.*, 347 B.R. 163, 168 (Bankr. D. Del. 2006) (applying California law to

an unjust enrichment claim because the "place of performance" and the alleged

"overpayments" occurred in California even though California was not the Debtor's

principal place of business nor its place of incorporation). In this case, the state with the

"most significant relationship" likely depends on the allegation *i.e.*, where the specific

services were performed or where the real estate exists.  Fortunately these states have

similar elements and legal requirements for unjust enrichment allowing the Court to

focus on the legal principles common to these states rather than engaging in state-by-state

choice of law analyses.

B.    <u>Legal Standard For Unjust Enrichment.</u>

As a threshold matter, "an action for unjust enrichment cannot lie in the face of an

express contract." 66 Am. Jur. 2d Restitution and Implied Contracts § 22. This statement

is true for all of the various states that could govern the Committee's unjust enrichment

claims. *See, e.g.*, *MacDonald v. Hayner*, 715 P.2d 519, 523 (Wash. Ct. App. 1986) ("The courts

will not allow a claim for unjust enrichment in contravention of a provision in a valid

express contract."); *see also In re Direct Response Media, Inc.*, 466 B.R. 626, 661 (Bankr. D. Del. 2012) ("exercise of [the defendant's] contractual rights" is "not an impoverishment to the Debtor or any creditor or an unjust enrichment" and therefore "the unjust enrichment count is dismissed."). Moreover, a written contract defeats a claim for unjust enrichment even if the defendant is not a signatory to the contract. *See AM Gen. Holdings LLC on behalf of Ilshar Capital LLC v. Renco Grp., Inc.*, 2013 WL 5863010, at *15 (Del. Ch. Oct. 31, 2013) (dismissing unjust enrichment claim against a parent of a co-defendant signatory and reasoning it is "irrelevant that [the defendant] is not a signatory" because "the alleged unjust enrichment arises from a relationship governed by contract").

Assuming there is no contract governing the action, unjust enrichment requires proof of five elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010); *see also Wang Elec., Inc. v. Smoke Tree Resort, LLC*, 283 P.3d 45, 49 (Ariz. Ct. App. 2012) (same).[11] Unjust enrichment seeks to "restore[] [the plaintiff] to a previous position" "by restoring the very property that the claimant gave up" or "a money equivalent." Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011).

A claim of unjust enrichment also requires a "direct relationship" between the alleged enrichment and impoverishment. *Vichi*, 62 A.3d at 61 (granting summary judgment to dismiss unjust enrichment because plaintiff "failed to adduce sufficient

---

[11] The Committee also adopted this five element test for unjust enrichment. D.I. 144 at 36 (*citing Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).

evidence" to prove a "direct relationship"); *Pa. Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 485 (D. Del. 2010) ("[U]njust enrichment" requires plaintiff "to establish the requisite causal nexus between the alleged wrongful conduct . . . and the injuries suffered."). Because unjust enrichment focuses on a direct exchange of value, it cannot create an ongoing obligation (even where the parties are corporate affiliates): "[t]here is no obligation of a parent [corporation] to stand by for the life of its 'child' to be sure it is always profitable." *Opus East*, 528 B.R. at 103–04 (entering judgment in favor of defendant on unjust enrichment claim).

Even though unjust enrichment is an equitable remedy, the plaintiff still has the "burden" to "show the value of his or her services." *Strong v. Beydoun*, 166 Cal. App. 4th 1398, 1404, (Ct. App. 2008); 66 Am. Jur. 2d Restitution and Implied Contracts § 87 (The plaintiff "has the burden" of "proving the amount and value" of "services or materials in question.").

C.    There Are Express, Written Contracts Governing The Transactions.

The Committee's unjust enrichment claims fail because each alleged enrichment is governed by an express written contract. 66 Am. Jur. 2d Restitution and Implied Contracts § 22 ("[A]n action for unjust enrichment cannot lie in the face of an express contract."). This is to be expected because the Committee is largely challenging the Albertson's Acquisition, which is the result of hundreds of individual contracts.

1.    Allegations Against the PropCo Entities (Count 75).

In Count 75, the Committee alleges unjust enrichment because "[t]he Debtors conferred benefits on the PropCo Entities by entering into the Contribution Agreements and the PropCo Leases." D. I. 1 ¶ 743. Count 75 represents two separate allegations: (1)

Holdings contributed real estate assets to the PropCo Entities via the Contribution Agreements, and (2) the OpCo Entities paid rent via the PropCo Leases. The first is governed by express, written Contribution Agreements. *See* DX0506, DX0586–DX0601. The second is governed by express, written PropCo Leases. DX0783–DX0809. Simply put, Count 75 fails because the claims cannot lie in the face of the express Contribution Agreements and PropCo Leases.

2.    Allegations Against the SLB Entities (Count 74).

In Count 74, the Committee alleges unjust enrichment because "[t]he OpCo Entities conferred a benefit on the SLB Entities by entering into above-market leases in connection with the Sale Leaseback Transactions thereby artificially increasing the price that the SLB Entities received for the sale of the SLB Properties." D.I. 1 ¶ 743. Count 74 also has two steps: (1) the OpCo Entities entered into leases with Spirit and GIG, and (2) the SLB Entities sold real estate to Spirit/GIG. The first step is governed by the Spirit and GIG Leases, which are express, written contracts. *See* DX0507, DX0602–DX0628 (GIG Leases) & DX0511, DX0827–DX0844 (Spirit Leases). In addition, the sale of real estate from the SLB Entities to Spirit/GIG were all governed by written contracts. DX0845–DX0850 (Spirit); DX0629–DX0636 (GIG). Count 74 similarly fails due to the existence of written contracts.

3.    Allegations Against Comvest (Count 73).

In Count 73, the Committee alleges unjust enrichment because "[t]he Debtors conferred benefits on Comvest by entering into the Challenged Transactions, including but not limited to the Contribution Agreements and the PropCo Leases." D.I. 1 ¶ 731. The allegations related to the "Contribution Agreement" and the "PropCo Leases" fail for the

reasons stated above.  *See also* DX0517 (Asset Purchase Agreement between Albertson's and Holdings).   It does not matter that Comvest was not a signatory to the Contribution Agreements or the PropCo Leases because the purported enrichments were governed by those contracts. *See AM Gen. Holdings*, 2013 WL 5863010, at *15 (holding that it is "irrelevant that [the defendant] is not a signatory" because "the alleged unjust enrichment arises from a relationship governed by contract"); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891–92 (Del. Ch. 2009) (noting that the plaintiffs "cannot use a claim for unjust enrichment to extend the obligations of a contract to [defendants] who are not parties to the contract."). The Committee is effectively arguing that there was a benefit to the PropCo Entities that would increase the equity owned by Holdings which would increase the share of the equity owned by Comvest.  The Committee has also alleged that Comvest "will unjustly benefit from [the] PropCo Entities' claim relating to the PropCo Advance [i.e. PropCo Loan]." D.I. 144 at 37. This loan and the resulting claims in the bankruptcy were governed by the PropCo Loan Agreement (DX0416), an express, written contract.  The existence of express contracts defeats Count 73.

      D.     Separately, The Committee Cannot Satisfy The Elements Of Unjust <u>Enrichment.</u>

The Committee in its Trial Brief promised to prove that Comvest was unjustly enriched by its "scheme to establish the PropCo/OpCo structure and impose the intercompany PropCo Leases on the OpCo Entities." D.I. at 144 at 37. Even setting aside the fatal flaw that this entire "scheme" was governed by written, express contracts, the Committee still failed to prove the necessary elements of unjust enrichment.

First, the OpCo Entities suffered no "impoverishment" by Holdings' decision to place the real estate assets in the PropCo Entities through an OpCo/PropCo structure. Unjust enrichment is meant to "restore" a party to "to a previous position" by "restoring the very property that the claimant gave up" or "a money equivalent." Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011). Because the OpCo Entities never possessed the real estate assets, the Committee cannot ask the Court to "restore" the OpCo Entities to a position where they owned the real estate. In addition, because the OpCo Entities never owned the real estate, they had no reasonable expectation of "compensation" by Holdings' decision to place certain assets in the PropCo Entities rather than in the OpCo Entities. *See Moses*, 2014 WL 12577167, at *10.

Second, the decision to use a PropCo/OpCo corporate structure is a common business practice, and therefore it is not unjust or unfair to the OpCo Entities. More generally, unjust enrichment cannot be used as the Committee seeks to do here to create an "obligation of a parent" corporation "to stand by for the life of its 'child' to be sure it is always profitable." *Opus East*, 528 B.R. at 103.

Third, the OpCo Entities' agreement to pay fair market rent under the PropCo Leases does not create an unjust enrichment. After substantial discovery, the Committee has stipulated that "Plaintiff will not offer any evidence that the rents paid by Operations or the OpCo Entities to the PropCo Entities were above-market." D.I. 142 at 21. In other words, the OpCo Entities paid fair market rent under the PropCo Leases for access to land they needed to operate the stores. That is the definition of a fair market transaction with no enrichment or impoverishment, let alone an unjust enrichment.  *See Nemec*, 991 A.2d at 1130.

Fourth, the Committee's assertion that the OpCo Entities' leases with Spirit and GIG resulted in a benefit to the SLB Entities does not meet the elements of unjust enrichment. As an initial matter, the contemporaneous documents and parties to the transaction agree that the Spirit/GIG Leases were arm's length negotiations.  The Court accepts the testimony of the Committee's Expert, Howard, that the rents charged by Spirit/GIG were above market.  But, the Committee is not suing Spirit or GIG. At best, the Committee's legal theory is that the OpCo Entities may have provided some benefit to GIG and Spirit. However, GIG and Spirit are not defendants here and they owe no duty to the OpCo Entities.

Finally, the Committee's assertion that Comvest was unjustly enriched through the Albertson's Acquisition is unfounded because Comvest lost money on the transaction. Comvest invested $50 million in equity, it placed its valuable portfolio company (Haggen, Inc.) within reach of the OpCo Entities' creditors, and it contributed the $49 million in excess proceeds from the sale-leaseback transactions to the OpCo Entities. There cannot be a claim for unjust enrichment when the defendant lost money in the transaction. In sum, the Committee has not proven the elements of unjust enrichment.

E.    Evidence To "Value" The Alleged Enrichment.

The Committee's alleged damages for unjust enrichment are unsupported and bear no connection to the unjust enrichment theories it posits. According to the Pre-Trial Order, the Committee is seeking "the net equity value of Holdings (after the payment of all claims other than to equity holders) (Count 73)" and "the value of the assets currently owned by each of the PropCo Entities and the SLB Entities (Counts 74 and 75)." D.I. 142

at 52. In other words, the Committee is claiming that the entire value of PropCo is somehow an unjust benefit that was bestowed upon it by the OpCo Entities.

To recover under unjust enrichment, the plaintiff has the "burden" to "show the value of his or her services." *Strong*, 83 Cal.Rptr.3d at 635-36; 66 Am. Jur. 2d Restitution and Implied Contracts § 87 ("In an action for quantum meruit or unjust enrichment," plaintiff "has the burden" of "proving the amount and value" of "services or materials in question."). In *McKenna v. Singer*, the plaintiff sought unjust enrichment for services rendered to GEC Holdings, and at trial "put forth damages evidence related to the value of GEC Holdings." 2017 WL 3500241, at *21 (Del. Ch. July 31, 2017). The court held that the plaintiff failed to carry its "burden of establishing an unjust enrichment" because "the proper calculation of damages" is not the value of the entity to which it provided services but "the fair market value of the [plaintiff's] services minus the [amount] they were paid." *Id.* The Committee's theory has the same flaw. Rather than seeking the precise value of the benefit (i.e. assets or services) provided by OpCo, the Committee is simply seeking the full value of the PropCo Entities (or the net value minus Holdings' creditors). Accordingly, with respect to the Committee's evidence of damages, they have not "carried their burden." *Id.*

## IX.    THE RECHARACTERIZATION CLAIM (COUNT 71).

The Committee seeks to recharacterize the $25 million PropCo Loan into equity. Both the Committee's expert and Defendants agree that the parties to the PropCo Loan intended it to be an instrument of debt, not equity. Under the Third Circuit case law, that alone is sufficient to reject the claim because "the intent of the parties" is the "determinative inquiry." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006). The

evidence is clear that the parties intended the PropCo Loan to be secured debt as shown by the written agreements and their treatment of the loan. Moreover, the PropCo Loan served a rescue financing to the OpCo Borrowers and even the Committee's expert admits that the loan was a benefit to the OpCo creditors.

A.    Legal Standard For Recharacterization.

The Third Circuit has held that in evaluating a claim to recharacterize a purported debt into equity, the "determinative inquiry" "is the intent of the parties as it existed at the time of the transaction." *SubMicron*, 432 F.3d at 457. The Court's role is to determine whether "the party infusing funds [did] so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)." *Id.* at 456. Given this inquiry, recharacterization is an unusual remedy where an advance is secured.

While the recharacterization inquiry can be broad, the goal is to look at the evidence to determine "what the parties actually intended." *Id.* Accordingly, unlike equitable subordination, "[r]echaracterization has nothing to do with inequitable conduct." *Fedders*, 405 B.R. at 554. One way to evaluate intent is to look at whether the parties accounted for the advance as a loan or equity. *SubMicron*, 432 F.3d at 457 (holding that "numerous facts to support a debt characterization" including "1999 notes were recorded as secured debt on *SubMicron's* 10Q SEC filing."). In addition, courts have identified related agreements, such as forbearance agreements between creditors, to be strong evidence of intent. *See, e.g.*, *In re Optim Energy, LLC*, 2014 WL 1924908, at *9 (Bankr. D. Del. May 13, 2014), *aff'd*, 527 B.R. 169 (D. Del. 2015) ("[T]he fact that the parties entered

into the Forbearance Agreement lends support to the existence of a true creditor relationship.").

Where there is ambiguity with the parties' intent, courts in the Third Circuit have at times turned to various multi-factor tests to aid their analysis. One such test is the 11-factor *AutoStyle* test developed by the Sixth Circuit. *See In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749–50 (6th Cir. 2001). The Third Circuit warned that these factors are not a "mechanistic scorecard" to be tallied. *SubMicron*, 432 F.3d at 456. Indeed, many Delaware courts have turned away from the *AutoStyle* factors into a more streamlined seven-factor test that focuses more on recharacterization in the context of insolvency — with factors that focus on whether "voting rights" exist and "certainty of payment." *Id.* at 455 n.8. *See also In re Color Tile, Inc.*, 2000 WL 152129, at *4 (D. Del. Feb. 9, 2000) (considering the Delaware seven- factor analysis); *In re Liberty Brands, LLC*, 2014 WL 4792053, at *3 (Bankr. D. Del. Sept. 25, 2014) (considering the Delaware seven factors); *In re USDigital, Inc.*, 443 B.R. 22, 52 (Bankr. D. Del. 2011) ("Courts in the Third Circuit have applied a seven-factor test" for recharacterization).  While these various factors are potentially "pertinent," the "overarching inquiry" is to determine "what the parties actually intended." *Id.* at 455–56 ("[I]n the end, [the form of the advance] is no more than an indicator of what the parties actually intended and acted on.").

If recharacterization of an investment from debt to equity is warranted, the characterization occurs "*ab initio,*" from the beginning of the investment. *United States v. State Street Bank & Tr. Co.*, 520 B.R. 29, 74 (Bankr. D. Del. 2014) (citing *AutoStyle*, 269 F.3d at 747–48). Accordingly, the advance does not disappear; instead it becomes equity in the borrowing parties with all the rights and privileges associated with equity.

B.    <u>The Parties Intended The Loan To Be Secured Debt</u>.

The Committee's claim for recharacterization of the PropCo Loan from debt into equity fails because the "determinative inquiry" on this issue "is the intent of the parties as it existed at the time of the transaction."  Here, the parties intended it to be a loan. *SubMicron*, 432 F.3d at 457.

The intent for the PropCo Loan to be debt is manifest. The PropCo Loan document is 107 pages laying out in detail the terms and conditions of the lending arrangement. *See* DX0416. It has an interest rate, borrowing conditions, and it explicitly refers to the investment as a "loan." DX0416-0004 (titled "Term Loan and Security Agreement), DX0416-0004 (defines OpCo North, OpCo South, and Haggen, Inc. as "Borrowers" and defines PropCo North and PropCo South as "lenders"), DX0416-0024 & 0028 (interest equals "Term Loan Rate" of "8%" with a "Default Rate" of 12%), DX0416-0054–59 (listing "Events of Default" and remedies after default). The loan was secured by all the assets of the OpCo Borrowers. *See* DX0416-00029 ("[E]ach Borrower hereby pledges and grants to Agent . . . a continuing security interest in and to and Lien on all of its Collateral.").  *See* P-245 at P-245.002 & P-245.005. The PropCo Entities entered an Intercreditor Agreement with PNC—the asset- backed lender for the OpCo Entities—to delineate and formalize the terms between the two creditor classes. *See* DX0425 (Intercreditor Agreement: referring to PropCo Entities as "Subordinated Lenders"). The OpCo Borrowers entered a Forbearance Agreement with PNC where both sides formally recognized the loan from PropCo. *See* DX0427 (Forbearance Agreement). Together there are hundreds of pages of legal documents signed by PropCo Lenders, by OpCo Borrowers, and by PNC clearly announcing the PropCo Loan as debt. The Committee concedes that both sides accounted

for the investment as a loan on their books. Trial Tr. (10/18) at 197:18–23 (Flaton). To be clear, at no point in time have the PropCo Entities ever owned any equity in OpCo North, OpCo South, or Haggen, Inc. Trial Tr. (10/18) at 217:10–20 (Flaton).  Indeed, the relationship between these entities was that of landlord (PropCo) and tenant (OpCo). The circumstances of the PropCo Loan demonstrate that the parties to the instrument intended it as debt.

While the facts support the Defendants' view that the PropCo Loan is debt, the Court need not evaluate the circumstances in detail because there is no real disagreement regarding intent. The testimony of witnesses at trial is consistent with the intent of the PropCo Loan to be debt. *See*, *e.g.*, Trial Tr. (10/16) at 268:7–24 (Caple); Trial Tr. (10/19) at 112:12–14 (Clougher). On the other side, the Committee put forward a recharacterization expert, Flaton, who reviewed the evidence surrounding the loan and came to the same conclusion—that the parties to the PropCo Loan intended it to be a loan:

> Q. And you agree that based on your review of the evidence, you believe that the PropCo lenders intended that the PropCo to OpCo loan was an extension of credit. Isn't that correct?
>
> A. Yes, I do believe that.
>
> Q. And similarly from the perspective of the OpCo borrowers, you agree that a representative of each OpCo borrower signed an agreement that said they were taking an extension of credit. Isn't that correct?
>
> A. Yes.
>
> Q. And you agree that the PropCo/OpCo loan document taken as a whole is an instrument evidencing indebtedness.  Isn't that correct?
>
> A. I think I testified before it's not a normal agreement, but it's intended to be.
>
> Q. An instrument evidencing indebtedness.

A. Yes.

Trial Tr. (10/18) at 194:13–195:4 (Flaton). Flaton further placed her conclusion on intent

in context. She recognized that the PropCo Loan had real economic significance with $25

million moving from the PropCo Entities to the OpCo Entities. *Id.* at 197:10–20. It was a

condition precedent to the OpCo Entities' forbearance agreement. *Id.* at 209:21–210:25.

Despite her wealth of experience, she could not recall a single case where a court

recharacterized a secured loan to equity, let alone a transaction with a 70 page loan

document, or one with an Intercreditor Agreement. *Id.* at 170:3–22. On these facts alone,

there is no dispute over the intent of the PropCo Lenders or the OpCo Borrowers as to

the nature of the investment.

In light of this evidence, the Committee has asked the Court to set aside the intent

of the parties because the "recharacterization factors," *i.e.,* the *AutoStyle* factors, which

the Committee favors over the other sets of factors—"apply with full force here." D.I. 144

at 28. In other words, the Committee is asking this Court to apply a "scoreboard"

approach to recharacterization even though there is no dispute of "what the parties

actually intended." This is contrary to the Third Circuit precedent where "intent" is the

"determinative inquiry." *SubMicron*, 432 F.3d at 457.   In sum, the PropCo Loan was

intended to be debt by the OpCo Borrowers and the PropCo Lenders (as admitted by the

Committee's own expert), and therefore it must be characterized as debt.

In its Trial Brief, the Committee propounds the argument that "subjective intent is

irrelevant" based on a single case from the Fifth Circuit from forty years ago. D.I. 144 at

28 (*citing Slappey Drive Indus. Park v. United States*, 561 F.2d 572, 583 (5th Cir. 1977)).

Simply put, that case is not the law of the Third Circuit. Presenting evidence of

recharacterization is merely a way to divine "what the parties actually intended" when there is ambiguity or disagreement. *SubMicron*, 432 F.3d at 455–56); *see also In re Shubh Hotels Pittsburgh, LLC*, 476 B.R. 181, 189 (Bankr. W.D. Pa. 2012) ("Allowing the Shubh Hotels' hindsight characterization of the Advances to prevail over its confessed intent at the time the Advances were made, would run contrary to this well established precedent.").

      C.    <u>The Multi-Factor Tests, Establish That The PropCo Loan Is Debt</u>.

Both the PropCo Lenders and the OpCo Borrowers intended the PropCo Loan to be debt. The Committee and its recharacterization expert, Flaton, focus exclusively on the eleven *AutoStyle* factors ignoring the other "pertinent" factors identified by courts in the Third Circuit. Even were the Court to adopt the *AutoStyle* factors, they would favor treating the PropCo Loan as debt, especially when placed in the proper legal and factual context. The same is true of the additional factors identified by Delaware courts.

      1.    The Eleven *AutoStyle* Factors Weigh in Favor of Treating the PropCo Loan as Debt.

<u>Factor 1 - The names given to instruments, if any, evidencing the indebtedness</u>: The PropCo Entities signed a 107-page written agreement titled "Term Loan and Security Agreement" (the "Loan Agreement") with the OpCo Entities. DX0416. The instrument's name clearly evidences a secured loan. Even the Committee agrees that this evidences debt. Trial Tr. (10/18) at 155:2–15, 211:1–8 (Flaton).

<u>Factor 2 - The presence or absence of a fixed maturity date and schedule of payments</u>: The PropCo Loan provides that the loan's maturity date is "April, 2016." DX0416-0060. The Committee is asking the Court to take the blank in the Agreement (i.e., whether it is

April 1 or April 30) and conclude that there is no maturity date at all. Courts regularly interpret imperfect contracts and resolve such minor ambiguities through common sense and extrinsic evidence. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (noting that when a contract is "susceptible of different interpretations" there is "ambiguity," and the court "must look beyond the language" to "ascertain the parties' intentions."). Indeed, treating the PropCo Loan as if it had no maturity date would render several of the Loan Agreement's provisions meaningless as they rely on the defined term "Maturity Date." *See* DX0416 at §§ 2.6, 3.1, 13.1, and 16.2(b)(iii). Courts do not require perfect documentation to evidence intent to create a debt. *See SubMicron*, 432 F.3d at 458 (characterizing an advance as a debt despite "numerous mistakes and errors when generating notes"); *In re Liberty Brands, LLC*, 2014 WL 4792053, at *5 (Bankr. D. Del. Sept. 25, 2014) (holding that the parties intended the "Miller Loan" to be debt even though it "was not documented" at all for six months). A written contract with a formal "Maturity Date" and obligations related to such a date weigh in favor of the parties' intending to create a debt instrument.

Factor 3 - The presence or absence of a fixed rate of interest and interest payments: The absence of "a fixed rate of interest and interest payments" is "a strong indication that the investment was a capital contribution." *See In re Broadstripe, LLC*, 444 B.R. 51, 95–96 (Bankr. D. Del. 2010). The PropCo Loan provides that the interest shall accrue at 8% per annum (Term Loan Rate) and that all accrued and unpaid interest is due in full on the Maturity Date. DX0416- 0024 & 0028. In the event of a default, the interest rate increases to 12%. DX0416-0024 & 0028, DX0416-0054–59 (listing "Events of Default" and remedies after default). According to the Intercreditor Agreement, the interest payable to the

PropCo Lenders would accrue, but no interest could be paid until the PNC Revolving Agreement was paid in full. But "deferral of interest payments does not by itself mean that the parties converted a debt transaction to equity since the defendants still expected to be repaid." *AutoStyle*, 269 F.3d at 751; *Broadstripe*, 444 B.R. at 96 ("presence of PIK interest is not decisive" of the recharacterization analysis "especially in a distressed investment context."). *See also State Street Bank*, 520 B.R. at 79 ("The Junior PIK Notes reflect all indicia of indebtedness, including the issuance of notes with payment at a fixed interest rate (although payment of interest was deferred)."). Overall, this factor favors the treatment of the PropCo Loan as debt because there was a fixed rate of interest accruing over time.

Factor 4 - The source of repayments (whether repayment is dependent on success): Under this factor, "[i]f the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *In re Friedman's Inc.*, 452 B.R. 512, 521 (Bankr. D. Del. 2011) (internal citation omitted); *State Street Bank*, 520 B.R. at 76 ("all extensions of credit depend on a company's success, and that risk alone—without more—does not indicate that they are capital contributions."). The PropCo Loan and the Intercompany Note provide that the PropCo Entities have an absolute right to payment *i.e.*, repayment is not contingent on success of the business. DX0416 at §§ 2.3, 2.6; Intercompany Note at 1. Moreover, the PropCo Loan was secured by the assets of the OpCo Borrowers. The evidence is clear that the OpCo Borrowers had sufficient unencumbered collateral to pay the PropCo Loan even in the event of a liquidation. Trial Tr. (10/17) at 113:21–115:4, 128:23–129:9 (Niegsch).

Flaton asserts that because the PropCo Loan is "underneath the ABL" "it will require success of the business in order to get repaid." Trial Tr. (10/18) at 160:23–161:2 (Flaton). While Flaton's statement could be true if the PNC Loan was undersecured, that was not the case. Flaton agreed that "where a secured lender has adequate collateral, they are not dependent on the success of the business for repayment because they have the collateral." Trial Tr. (10/18) at 215:7–20 (Flaton). The testimony by the fact witnesses (plus the outcome of the bankruptcy sales and even the fact of this lawsuit) shows that there was adequate collateral for repayment of the secured PropCo Loan. Notably, Flaton "never attempted to value the collateral at the OpCo." *Id.* Accordingly, the PropCo Loan did not depend on the success of the OpCo Borrowers because there was sufficient unencumbered collateral to repay the loan, even in a liquidation scenario.

<u>Factor 5 - The adequacy or inadequacy of capitalization</u>: Defendants acknowledge that the OpCo Borrowers were not adequately capitalized in August 2015. Narrowly evaluated, this factor would weigh in favor of characterizing the PropCo Loan as equity.

This factor, however, has limited weight where an "existing lender . . . extend[s] additional credit to a distressed borrower as a means to protect its existing loans." *In re Radnor Holdings Corp.*, 353 B.R. 820, 839 (Bankr. D. Del. 2006); *see also SubMicron*, 432 F.3d at 457 ("When existing lenders make loans to a distressed company…traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company."). Admittedly, the PropCo Lenders were not preexisting lenders to the OpCo Borrowers. But the PropCo Lenders did have a preexisting contractual relationship with OpCo North and OpCo South: they were parties to long-

term lease agreements—with the PropCo Lenders as landlord and OpCo North and South as tenant. DX0783–DX0809. The PropCo Lenders did not want the value of those leases to evaporate due to quickly deteriorating problems with the tenants. Accordingly, the logic for limiting the weight of the capitalization factor for an "existing lender" applies with equal force to the PropCo Lenders because they had a preexisting interest in their long-term leases with the OpCo Entities to protect. *See Radnor Holdings Corp.*, 353 B.R. at 839.

Factor 6 - The identity of interest between the creditor and the stockholder:  Under this factor, "[i]f stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated." *See Broadstripe*, 444 B.R. at 97 (citations omitted); *see also In re Exide Techs., Inc.*, 299 B.R. 732, 741 (Bankr. D. Del. 2003) (holding that this factor favored debt because "the advances were made not by stockholders, and not in proportion to respective stock ownership."). The PropCo Entities owned no equity in OpCo North, OpCo South, or Haggen, Inc. at the time of the PropCo Loan (or any time thereafter). Therefore, the PropCo Entities could not "make advances in proportion to their respective stock ownership" because they owned no equity. But the OpCo Entities and the PropCo Entities had common indirect ownership by Holdings and Comvest. Accordingly, this factor is mixed: a narrow interpretation of the factor favors debt (since PropCo Entities owned no stock in the OpCo Entities), but a broader interpretation could potentially favor a characterization of equity (due to common, indirect ownership).

Factor 7 - The security, if any, for the advances: The OpCo Borrowers pledged all of their assets as security pursuant to the Loan Agreement. DX0416. at § 4.1. The Promissory Notes also evidence that they were "secured." P-245 at P-245.002 & P-245.005. Both the

Loan Agreement and the Promissory Notes are dated August 7, 2015. Contrary to the documentation, Flaton testified that she understood that the PropCo Loan was "unsecured" until the Intercreditor Agreement was signed with PNC on August 21, 2015. Trial Tr. (10/18) at 163:3–14 (Flaton). Her belief is that a default on the PNC ABL Agreement made it such that "there was no ability for [the OpCo Borrowers] to actually sign a security agreement." *Id.* It is true that the OpCo Borrowers' pledge of their assets to the PropCo Lenders on August 7, 2015 without PNC's approval constituted an "Event of Default" under the PNC Revolving Loan Agreement. DX0699-0042–43 (Permitted Encumbrances), 699-0110-114 (Negative Covenants). But the PNC Revolving Loan Agreement did not prevent the OpCo Borrowers from pledging their collateral to the PropCo Lenders. This is clear from the Forbearance Agreement where PNC agreed to forebear the "Event of Default" but there was no change to the security status of the PropCo Loan. DX0427-0005–6 (allowing the "Liens" under the "PropCo Special Advance" and "Initial Provisional Funding" to no longer be an "Event of Default"). From the signing of the PropCo Loan Agreement on August 7, 2015, the money advanced to OpCo was secured.

The security interest was created on August 7, 2015 with the first advance, but that security interest was not perfected (through the filing of a Financing Statement) until August 21, 2015. DX0772–DX0774 (UCC Financing Statements). Regardless, the legal documents are clear: the PropCo Loan was secured and fully perfected prior to the bankruptcy filing.

<u>Factor 8 - The corporation's ability to obtain financing from outside lending institutions</u>:

Where "no reasonable creditor would have acted in the same manner" it is "evidence that the advances were capital contributions rather than loans." *AutoStyle*, 269 F.3d at 752. Admittedly, the PropCo Lenders were not "outside lending institutions" and, given the time constraints, the OpCo Entities were not able to find an outside lender. Flaton testified that this factor favors equity because the record does not contain evidence that any outside lender was offering to lend to the OpCo Entities at the time. Trial Tr. (10/18) at 164:9–165:11 (Flaton).

The issue with Flaton's approach is that it ignores the fact that the PropCo Loan was fully secured. Niegsch testified that in August 2015 he believed that the OpCo Borrowers had "asset value" that "exceeded the ABL by more than $25 million." Trial Tr. (10/17) at 128:23–129:9 (Niegsch).   Indeed, he was proven right by the eventual sale of the assets where the sale exceeded the PNC ABL plus the PropCo Loan amount. Trial Tr. (10/17) at 113:21–115:4 (Niegsch). The choice not to pursue outside lenders was due to "the speed that it needed to get a loan." Trial Tr. (10/16) at 185:4–186:25 (Caple). Flaton did not perform any analysis of whether a reasonable outside lender would have made a loan directly to OpCo, especially if OpCo had had more time. *See* Trial Tr. (10/18) at 218:3–13 (Flaton).   Accordingly, Flaton's opinion is little more than a recitation of the factual record. The OpCo Entities did not have time to pursue new outside lenders and educate them regarding the value of the OpCo Entities' unencumbered collateral. Defendants will admit that it is unlikely that a lender would have loaned unsecured money to the OpCo Entities in August 2015. But it is reasonable to believe that a lender would have offered, like the PropCo Lenders, a secured loan where the unencumbered

assets were more than sufficient to cover the amount of the loan.

Factor 9 - The extent to which the advances were subordinated to the claims of outside creditors:  This factor only supports the Committee if there was "subordination of advances to claims of all other creditors." *AutoStyle*, 269 F.3d at 752-53.  While the PropCo Loan was subordinated to the PNC ABL, it was superior to all other creditors. Trial Tr. (10/18) at 218:19–219:4 (Flaton agreed that assuming no recharacterization the PropCo Loan "will be paid ahead of the general unsecured creditors."). Flaton misinterprets this factor in her testimony at trial. She testified that "ultimately if [the PropCo Loan is] down toward the bottom of the stack, it's looking more like equity than anything else." Trial Tr. (10/18) at 165:22–24 (Flaton). But the factor does not look at whether the PropCo Loan is subordinated to the senior, secured creditor. It looks at whether the PropCo Loan is subordinated to "all other creditors." *See Broadstripe*, 444 B.R. at 101 ("Subordination of advances to claims of all other creditors indicates that the advances were capital contributions, not loans.") (citations omitted).  Accordingly, this factor favors a characterization of debt.

Factor 10 - The extent to which the advances were used to acquire capital assets:  "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *AutoStyle*, 269 F.3d at 752.  The record evidence is consistent that the PropCo Loan was used for working capital—not to acquire capital assets. Trial Tr. (10/18) at 166:5–8 (Flaton) ("This in fact was used for working capital and paying payroll."). Even the Committee agrees that this factor favors the Defendants' view that the PropCo Loan is debt. See Trial Tr. (10/18) at 219:10–19 (Flaton).

<u>Factor 11 - The presence or absence of a sinking fund to provide repayments</u>:  Courts have recognized that, where a loan is "secured with liens," the "need for any sinking fund" is "obviated" and this factor will not weigh in favor of recharacterization. *AutoStyle*, 269 F.3d at 753. Here, the PropCo Loan is secured, obviating any need for a sinking fund and rendering this factor irrelevant. The Third Circuit cautions that the *AutoStyle* factors (or any set of factors) are not a "scorecard" to be tallied.   *SubMicron*, 432 F.3d at 456.   But taken together, and evaluated in context, these factors overwhelmingly favor the view that the parties to the PropCo Loan intended it to be debt.

### 2.    Additional Factors Identified by Delaware Courts.

In addition to the *AutoStyle* factors, Delaware courts have considered several other factors in evaluating a recharacterization inquiry. Among other factors, these courts evaluate the "certainty of payment in the event of the corporation's insolvency or liquidation." *SubMicron*, 432 F.3d at 456 n.8; *Liberty Brands*, 2014 WL 4792053, at *5. The "certainty of payment" factor cuts straight to what a lender cares about when making a loan, especially in a distressed situation. In the seven-factor test, this "certainty of payment" factor effectively replaces the more amorphous *AutoStyle* factors of capitalization, whether outside lenders would have lent, and source of repayments. Given the unencumbered collateral at the OpCo Borrowers available to the PropCo Lenders, the "certainty of payment" factor would weigh heavily in favor of treating the PropCo Loan as debt.

Another factor is the "presence or absence of voting rights" because equity is frequently associated with voting rights in the company. *SubMicron*, 432 F.3d at 456 n.8 (3d Cir. 2006); *Liberty Brands*, 2014 WL 4792053, at *5. Here, the PropCo Loan does not

offer the PropCo Entities any voting rights in the OpCo Borrowers. Accordingly the lack of voting rights suggests that the PropCo Loan is debt.

Another factor frequently cited by courts to evaluate intent is how the parties accounted for the advance on their financial statements and accounting records. *SubMicron*, 432 F.3d at 457 (citing numerous facts to support debt characterization including "1999 notes [that] were recorded as secured debt on SubMicron's 10Q SEC filing and UCC-1 financing statements."); *see also Liberty Brands*, 2014 WL 4792053, at *4 ("Sunflower loan was at all times denominated as 'Loan Payable to Sunflower' on the Debtor's books."). It is undisputed that PropCo and OpCo accounted for the PropCo Loan as a loan. Trial Tr. (10/18) at 197:21–23 (Flaton) ("Q. And both sides to the loan accounted for it as a loan on their books. Isn't that correct?  A. I believe that's correct. Yes.").

Overall, even focusing on the various factors, the PropCo Loan has characteristics more similar to debt. In *Liberty Brands*, the court evaluated the "Sunflower Loan" where there was "no (i) written documentation of the Sunflower loan, (ii) maturity date, (iii) schedule of payments, or (iv) fixed rate of interest" and the "loan depended on the Debtor's success." *Liberty Brands*, 2014 WL 4792053, at *3–4. The Sunflower Loan was "not secured." *See* Findings of Fact and Conclusions of Law, *In re Liberty Brands, LLC*, No. 07-10645 (MFW), D.I. 226 at ¶ 111. Even with these factors favoring equity, the court found that the parties intended it to be a loan because it was "denominated as 'Loan Payable to Sunflower' on the Debtor's books," key witnesses "considered" it to be a loan, and the lender did not acquire voting rights. *See Liberty Brands*, 2014 WL 4792053 at *3–4. If the "Sunflower Loan" is treated as debt, then there can be no doubt that the PropCo Loan is a true loan. *See Id.* In sum, even using various multi-factor tests to divine the intent of the

150

parties, the PropCo Loan will be treated as debt.

D.     The PropCo Loan Was Rescue Financing That Benefited OpCo's Creditors.

Recharacterization is designed to treat an investment consistent with the "the intent of the parties." *SubMicron*, 432 F.3d at 456. At its core, the PropCo Loan is the type of rescue financing that courts aim to preserve. The PropCo Loan fits the characteristics of a rescue financing as described by Flaton: the PropCo Loan was "made by non-traditional lenders," it was "secured by collateral," and it "is subordinate to the existing debt on the structure." Trial Tr. (10/18) at 199:4–24 (Flaton) (describing characteristics of a typical rescue loan). Moreover, Flaton testified that based on her experience the PropCo Loan was "good for OpCo's creditors" and that she would have advised them to accept the money:

> Q. And you agree that the additional $25 million in capital into this failing situation was a good fact for OpCo's creditors. Isn't that correct?
>
> A. Yes. Any cash coming in would be a good fact for OpCo's creditors.
>
> Q. In fact, if you had been advising the OpCos in August of 2015, you would not have advised them to reject a term loan from the OpCos. Isn't that correct?
>
> A. I would not have advised them to reject cash coming in.

Trial Tr. (10/18) at 197:24–198:17 (Flaton). The alternative to the PropCo Loan was missing payroll, "Employees don't show up," and likely a freefall bankruptcy. Trial Tr. (10/17) at 117:1– 16 (Niegsch); *see also* Trial Tr. (10/16) at 304:12–305:2 (Caple). As Flaton testified, "freefall bankruptcies can be destructive of value" and such a freefall could cause the Debtors' creditors to suffer. Trial Tr. (10/18) at 221:8–19 (Flaton). From a practical standpoint, the PropCo Loan provided much needed liquidity that was used in

part to pay OpCo's creditors while ultimately allowing for an organized descent into bankruptcy.

Courts have frequently worried that an overly aggressive recharacterization regime could deter good-faith rescue financing for struggling companies. *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 234 (4th Cir. 2006) ("In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good- faith loans."); *In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1152 (10th Cir. 2015) ("[P]lacing too heavy an emphasis on undercapitalization in our recharacterization analysis would create an 'unhealthy deterrent effect,' causing business owners to fear that, should their 'rescue efforts' fail, a court will . . . 'too quickly refuse to treat their cash infusions as loans.'") (citations omitted). An overly aggressive recharacterization regime could eliminate efficient, good-faith rescue financing to the detriment of creditors. In addition, going forward it could nudge corporations into specific jurisdictions to avoid recharacterization risk. Regardless, it would be an "unhealthy deterrent" to punish the PropCo Lenders for stepping in and protecting value at the OpCo Borrowers—to the benefit of OpCo's creditors—through rescue financing.

IX.    THE COMMITTEE'S EQUITABLE SUBORDINATION CLAIMS
       (COUNTS 69, 70, AND 77).

The Court should also reject the Committee's claims to equitably subordinate the $25 million PropCo Loan or any proofs of claim filed (or to be filed) by the PropCo Entities (the "PropCo Proofs of Claim") to the claims of the unsecured creditors (Counts 69 and 77). These claims, which are against the PropCo Entities, fail because the Committee has not shown that there was any inequitable conduct on the part of the PropCo Entities or

that the OpCo Entities' creditors were harmed.

A.     Legal Standard for Equitable Subordination.

The doctrine of equitable subordination, codified in section 510(c) of the Bankruptcy Code, authorizes a bankruptcy court to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c). The Third Circuit requires a movant to establish three elements before a court may subordinate a creditor's claim: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir. 2009) (quotations and brackets omitted) (*citing Benjamin v. Diamond* (*In re Mobile Steel Co.*), 563 F.2d 692, 699–700 (5th Cir. 1977)). Equitable subordination is "an extraordinary remedy which is applied sparingly." *See, e.g.*, *In re Epic Capital Corp.*, 307 B.R. 767, 773 (D. Del. 2004); *see also Radnor Holdings*, 353 B.R. at 840 (describing equitable subordination as a "drastic" and "unusual" remedy).

"Courts recognize three general categories of behavior that may constitute inequitable conduct: 1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or alter ego." *In re Epic Capital Corp.*, 290 B.R. 514, 524 (Bankr. D. Del. 2003). While the burden of proof on the movant "is less demanding when the respondent is an insider," *id.*, it is axiomatic that "[i]nsider status alone . . . is insufficient to warrant subordination." *In re Nutri/Sys. of Fla. Assocs.*, 178 B.R. 645, 657 (E.D. Pa. 1995). In addition, obtaining a security

interest—without more—is not inequitable conduct. *See Optim Energy*, 527 B.R. at 177. Neither is undercapitalization "without evidence of deception about the debtors' financial condition or other misconduct." *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 349 (7th Cir. 1997); *AutoStyle*, 269 F.3d at 747 ("Undercapitalization alone is insufficient to justify the subordination of insider claims."); *Alternate Fuels*, 789 F.3d at 1155 (reasoning that "undercapitalization is not in itself inequitable conduct"). This makes sense, as "[a]ny other analysis would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a floundering company." *AutoStyle*, 269 F.3d at 747 (*citing In re Octagon Roofing*, 157 B.R. 852, 858 (N.D. Ill. 1993)).

Finally, equitable subordination and recharacterization are distinct claims that "address distinct concerns." *SubMicron*, 432 F.3d at 454. While the recharacterization inquiry focuses on "the proper characterization" of an advance "in the first instance," equitable subordination "is apt when equity demands that the payment priority of claims of an otherwise legitimate creditor be changed to fall behind those of other claimants." *Id.* The Third Circuit has described the equitable subordination doctrine as "remedial, not penal, and it should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct." *Id.* at 462 (emphasis added). "The critical inquiry," therefore, when evaluating an equitable subordination claim "is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated." *In re Hedged-Invs. Assocs., Inc.*, 380 F.3d 1292, 1300 (10th Cir. 2004).

B.    The PropCo Entities Did Not Act Inequitably In
Making A Secured Loan To The OpCo Entities.

The Committee's claims to equitably subordinate the PropCo Loan fail because the

Committee has not shown that the PropCo Entities engaged in any inequitable conduct.

In its Complaint, the Committee alleges two types of misconduct:

1.    The PropCo Entities took "security interests" in the OpCo Entities in
exchange for the PropCo Loan "at a time when the Debtors were insolvent,
unable to pay their debts as they became due, and left with unreasonably
small capital"; and

2.    Comvest "engaged in a pattern of misconduct and inequitable
conduct at the expense of the Debtors . . . . including by engineering and
executing the Challenged Transactions."

D.I. 1 at ¶¶ 703, 704, 710. The first allegation does not warrant the subordination of the

PropCo Loan; the second allegation asserts misconduct by the wrong party (Comvest)

and is not supported by the evidence.

As for the first allegation, neither that the PropCo Entities took security interests

in the OpCo Entities nor that the Debtors were in dire financial straits when the PropCo

Loan was executed constitute conduct sufficient to support equitable subordination.

Taking a security interest does not constitute inequitable conduct. *See Optim Energy*, 527

B.R. at 177 ("It is not inequitable for a lender, even an insider lender, to obtain a lien on

the borrower's assets in order to secure its position above creditors in the event of the

borrower's default."). This is especially so where, as here, the security interest was taken

in conjunction with a loan that generated $45 million in additional liquidity at the OpCo

Entities. *See* Trial Tr. (10/18) at 153:8–154:8 (Flaton); Trial Tr. (10/17) at 107:25–108:11

(Niegsch). The fact that the OpCo Entities were in financial distress when the PropCo

Loan was made does not change the analysis. Courts consistently hold that insider loans

to distressed companies will not *ipso facto* be subordinated. *AutoStyle*, 269 F.3d at 747;

*Sinclair v. Barr* (*In re Mid-Town Produce Terminal, Inc.*) 599 F.2d 389, 392 (10th Cir. 1979)

("To hold the debt may be subordinated [solely on the basis of the insider nature of the

transaction] would discourage owners from trying to salvage a business, and require all

contributions [from insiders] to be made in the form of equity capital."). This is sound

policy, as "[t]he penalty for attempting to save the corporation should not be

subordination." *Matter of Rego Crescent Corp.*, 23 B.R. 958, 964 (Bankr. E.D.N.Y. 1982).

As for the second allegation, the Committee has not demonstrated that the PropCo

Entities engaged in any inequitable conduct. Indeed, the Committee does not even allege

that the PropCo Entities engaged in any inequitable conduct; rather it claims that

Comvest engaged in inequitable conduct, and that conduct should be imputed to the

PropCo Entities. *See* D.I. 1 at ¶¶ 704, 705. Comvest's alleged conduct should not be

imputed to the PropCo Entities. *See*, *e.g.*, *Official Comm. of Unsecured Creditors of Sunbeam*

*Corp. v. Morgan Stanley & Co., Inc.* (*In re Sunbeam Corp.*), 284 B.R. 355, 369 (Bankr. S.D.N.Y.

2002) (holding that the committee's allegations regarding the control exercised by a

corporate parent that advised the debtor on corporate acquisitions over the decision by a

corporate affiliate to finance such acquisitions were insufficient to hold the corporate

affiliate liable for the parent's alleged misconduct, and thus to equitably subordinate

affiliate's claim on that basis); *Official Comm. of Unsecured Creditors of Champion Enter., Inc.*

*v. Credit Suisse* (*In re Champion Enter., Inc.*), 2010 WL 3522132, at *10 (Bankr. D. Del. Sept.

1, 2010) (dismissing complaint because "courts commonly hold that equitable

subordination must be based on the claimant's own acts" and plaintiff failed to allege

inequitable conduct on the part of the claimants themselves).

Even if Comvest's conduct could be imputed to the PropCo Entities, the allegation that Comvest engaged in inequitable conduct is not borne out by the evidence. The Committee alleges that the "Challenged Transactions" constituted inequitable conduct. None of the Challenged Transactions were inequitable.

The Committee defined the "Challenged Transactions" as (1) the creation of the OpCo/PropCo corporate structure, (2) the downstream contributions of the right to acquire real property from Holdings to the wholly- owned PropCo and SLB Entities, (3) the sale-leaseback transactions with Spirit and GIG, and (4) the imposition of above-market leases on the OpCo Entities.

First, the Committee admitted repeatedly in this case that there is nothing wrong with creating an OpCo/PropCo corporate structure. *See*, *e.g.*, Trial Tr. at 50:6–7 (Feinstein) ("There is nothing, per se, wrong about the PropCo and OpCo structure."). Second, as described above, there is nothing fraudulent or inequitable about a corporation contributing value to its wholly-owned subsidiaries. Third, the evidence shows that the sale-leaseback transactions were the product of arm's length negotiations, and that except for the Sprint and GIG leases, the resulting leases were not above market. *See* D. Rosenberg (Spirit) Dep. at 131:2–4; M. West (HFF) Dep. at 173:7–11, 173:17–18; DX0222-0023; DX0131-0013; DX0439-0001. Fourth, the Committee concedes that the leases between the PropCo and OpCo Entities were not above market. *See* D.I. 142 at 21 ("Plaintiff will not offer any evidence that the rents paid by Operations and the OpCo Entities to the PropCo Entities were above-market.").

The Committee also has not shown that either the PropCo Entities or Comvest engaged in any of the "three general categories of behavior that may constitute

inequitable conduct." *Epic Capital*, 290 B.R. at 524. The Committee has not demonstrated, for example, that Defendants engaged in any conduct that would constitute fraud, illegality, or breach of fiduciary duty. The evidence adduced at trial shows that the OpCo Entities were not undercapitalized at the outset of the Albertson's Acquisition. The case law is also clear that undercapitalization of the debtor at the time it entered into a secured loan with a lender does not constitute inequitable conduct, absent something more. *See, e.g., In re Filtercorp, Inc.*, 163 F.3d 570, 583-84 (9th Cir. 1998) (holding that the insolvency of the debtor at the time it entered into secured loan transactions with claimants, standing alone, is insufficient to require subordination of claimants' claims). The Committee has not shown, much less alleged, that the OpCo Entities were mere instrumentalities or alter egos of either the PropCo Entities or Comvest.

Ultimately, just as with so many of its other claims, the Committee's complaint is that "[f]rom the outset this transaction was set up in such a way that it was going to benefit Comvest whether, you know, heads I win tails you lose." Trial Tr. (10/20) at 88:7–10 (Feinstein). The evidence clearly shows that the PropCo Entities did not engage in any inequitable conduct. As a result, the Committee cannot make out a prima facie case for equitable subordination.

C.    The PropCo Loan Did Not Harm the OpCo Entities' Unsecured Creditors.

The Committee also has the burden to show that the PropCo Loan harmed the unsecured creditors at the OpCo Entities or bestowed an unfair advantage on the PropCo Entities. The Committee's position as to this element is two-fold: if the PropCo Loan "is allowed as a secured claim," then (a) the OpCo Entities' creditors will be harmed "because there will be $25 million (plus interest) less to satisfy their claims"; and (b) it

"will confer an unfair advantage to the PropCo Entities by ratifying Comvest's decision to use the Debtors' assets under dire circumstances to try to protect its own equity investment." D.I. 144 at 31. The evidence does not support either position.

The unsecured creditors were not injured by the PropCo Loan. Indeed, the evidence shows that they were the primary beneficiary of it. The PropCo Loan directly resulted in the infusion of $25 million in the OpCo Entities in August 2015. *See* DX0416; Trial Tr. (10/18) Tr. at 197:18–20 (Flaton). That money was used to make payroll and to pay then-existing obligations to the very same unsecured creditors that the Committee represents. *See* Trial Tr. (10/18) at 166:5–8 (Flaton) ("This in fact was used for working capital and paying payroll."). The PropCo Loan was also a condition precedent for unlocking $20 million of additional liquidity: as part of the Forbearance and Intercreditor Agreements, PNC provided an additional $20 million of availability under the PNC Revolver. *See* Trial Tr. (10/18) at 198:15–19 (Flaton). These funds, $45 million in total, reduced the OpCo Entities' debt and were designed to give the OpCo Entities time to execute a turnaround plan. *See* Trial Tr. (10/17) at 108:5–109:2 (Niegsch). The evidence also shows that, absent the PropCo Loan, the OpCo Entities would have descended into a freefall bankruptcy, which would have destroyed value and left the unsecured creditors worse off. *See* Trial Tr. (10/17) at 117:6–16 (Niegsch); Trial Tr. (10/18) at 220:23–221:25 (Flaton). As a result, the unsecured creditors benefited from this additional working capital; they were not harmed.

The Committee's own expert agrees that the unsecured creditors were better off because of the PropCo Loan than they otherwise would have been. During cross-examination, Flaton admitted that, from the perspective of the OpCo Entities' creditors,

it was a good thing for the OpCo Entities to receive the proceeds of the PropCo Loan. *See* Trial Tr. (10/18) at 197:24–198:3 (Flaton). She further admitted that had she been advising the OpCo Entities, she would not have advised them to turn down the PropCo Loan. *See* Trial Tr. (10/18) at 198:4–7 (Flaton). Flaton also testified that, in her view, the PropCo Loan was better than market, as nobody else would have made a loan to the OpCo Entities on as good of terms as the PropCo Loan. *See* Trial Tr. (10/18) at 217:21–218:2 (Flaton). In other words, not only did the OpCo Entities' creditors benefit from the additional liquidity in the short run, they did so on terms that were favorable to them over the long run.

The PropCo Loan also did not confer an "unfair advantage" on the PropCo Entities vis-à-vis the OpCo Entities. The PropCo Loan was an attempt to rescue the OpCo Entities. Had that attempt been successful, the OpCo Entities' creditors would have benefitted tremendously from a healthy grocery brand that would have been able to pay its creditors. Comvest would also have been a beneficiary of that success, but to say that Comvest's attempt to "protect its own equity investment" constitutes an "unfair advantage" is to ignore the benefits that the unsecured creditors would have reaped. The Committee's argument also ignores the short term benefits that the unsecured creditors reaped as a direct result of the PropCo Loan. As discussed above, there are important policy reasons to encourage loans from insiders to companies in dire straits, as insiders are often a company's last best chance to avoid a bankruptcy filing. *See AutoStyle*, 269 F.3d at 747; *Mid-Town Produce*, 599 F.2d at 392.

Importantly, this is not a case where the PropCo Entities improved their priority position vis-à-vis other creditors on an existing debt on the eve of bankruptcy. Courts

160

often equitably subordinate attempts by insiders to improve their recovery on existing debts through the last minute taking of a security interest. For example, in *State Street Bank*, the court found inequitable conduct and harm to creditors when an insider-noteholder implemented a plan in conjunction with a debtor's management to convert its preexisting debt to secured status and obtain priority over other creditors. 520 B.R. at 82; *see also In re Le Café Crème, Ltd.*, 244 B.R. 221, 236 (Bankr. S.D.N.Y. 2000) (finding evidence of inequitable conduct and creditor harm when insider- shareholders used the debtor to repay themselves first on preexisting debt, and then extended additional credit on a secured basis to exchange their equity interest).

Here, the PropCo Entities took a security interest at the OpCo Entities in conjunction with a loan of $25 million. Prior to that loan, the PropCo Entities had not extended any debt to the OpCo Entities. The simple fact that the unsecured creditors were subordinate to the PropCo Loan does not, in and of itself, establish that they were harmed. *See*, *e.g.*, *Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc.* (*In re Midway Games Inc.*), 428 B.R. 303, 319 (Bankr. D. Del. 2010) (dismissing equitable subordination claim and reasoning that although the challenged transactions may have "buried the creditor beneath more debt than would have been the case had the Debtor filed for bankruptcy beforehand, the Committee did not allege that the Debtor suffered harm"). After all, "[a]ttaining a higher priority of repayment is a major motivation behind secured lending." *Optim Energy*, 527 B.R. at 177.

The PropCo Loan was a real economic transaction that provided real benefits to the OpCo Entities and its creditors. It is not the kind of transaction that should lead to equitable subordination.

D.    <u>The PropCo Proofs Of Claim Also Should Not Be Equitably Subordinated.</u>

Finally, the Committee has not established that the PropCo Proofs of Claim should be equitably subordinated because there is no evidence that the PropCo Entities acted inequitably or that the OpCo Entities were harmed. As discussed above, the Committee has not established that the PropCo Entities acted inequitably in any way.  In addition, the PropCo Proofs of Claim stem directly from the leases that the PropCo and OpCo Entities entered into so that the OpCo Entities could operate the stores. The Committee has already stipulated that the rent that the PropCo Entities charged to the OpCo Entities were not above-market. *See* D.I. 142 at 21.  Accordingly, the Committee did not show that the PropCo Entities acted inequitably with regard to those leases or that the OpCo Entities were harmed by inflated rental rates.

<u>CONCLUSION</u>

For the foregoing reasons, the Court finds in favor of the Defendants on all Counts of the Complaint.   An Order will issue.

Dated:  January 22, 2018

_____
KEVIN GROSS, U.S.B.J.

## GLOSSARY OF DEFINED TERMS

All capitalized terms not defined in the text shall be defined in accordance with these definitions.

| Term | Definition |
| --- | --- |
| A&M | Alvarez & Marsal, an advisor retained by Haggen in 2015 |
| ABL | The Revolving Credit and Security Agreement dated February 12, 2015 among PNC Bank, National Association, as Agent, PNC Bank and other party thereto, as Lenders and Haggen, Inc., OpCo North and OpCo South, as Borrowers |
| Acquisition | HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC) |
| Akerman | Akerman, LLP, counsel to Comvest and Haggen in connection with the Albertson's Acquisition |
| Albertson's | Albertson's LLC and Albertson's Holdings LLC |
| Albertson's Acquisition | The December 2014 transaction whereby Holdings agreed to acquire 146 grocery stores and related real estate assets from Albertson's |
| Anderson | Derrick Anderson, Defendant and at relevant times corporate secretary of various Haggen entities |
| APA | The Asset Purchase Agreement dated as of December 10, 2014, between Albertson's LLC and Albertson's Holdings LLC, as sellers, and Holdings, as buyer |
| ATK | ATKearney |
| Bankruptcy Code | Title 11 of the United States Code |
| Barnett | Blake Barnett, Defendant and at relevant times CFO of various Haggen entities |
| BofA | Bank of America |
| Caple | John Caple, Defendant and at relevant times Partner of Comvest, member of Comvest's IC and Deal Team |
| Cerberus | Cerberus Capital Management, L.P., the owner of Albertson's |
| CGH | Comvest Group Holdings, LLC |
| CHH III | Comvest Haggen Holdings III, LLC |
| CHH IV | Comvest Haggen Holdings IV, LLC |
| CIP III | Comvest Investment Partners III, L.P. |
| CIP IV | Comvest Investment Partners IV, L.P. |
| Citibank | Citibank, National Association, and party to, inter alia, that certain $25,000,000 Qualified Borrower Note among Citibank, Property Lender, CIP IV, and Comvest Investment Partners IV-A, L.P. dated August 12, 2015 |
| Clark | Thomas Clark, Partner of Comvest Partners and member of Comvest's IC |
| Clougher | John Clougher, Defendant and at relevant times CEO of various Haggen entities |
| Committee | Official Committee of Unsecured Creditors |
| Comvest | Comvest Advisors, CGH, CIP III, CIP IV, CHH III, and CHH IV |
| Comvest Advisors | Comvest Advisors, LLC |

| Contribution Agreement | An agreement pursuant to which Holdings transferred, directly or indirectly, rights to Real Property to one of the PropCo Entities or one of the SLB Entities |
|---|---|
| Deal Team | Caple, Niegsch and Scholl |
| Debtors | HH Liquidation, LLC (f/k/a Haggen Holdings, LLC), HH Operations, LLC (f/k/a Haggen Operations Holdings, LLC), HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC), HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC), HH Acquisition, LLC (f/k/a Haggen Acquisition, LLC), and HH Legacy, Inc. (f/k/a Haggen, Inc.) |
| Defendants | The Individual Defendants, Comvest, the PropCo Entities, and the SLB Entities |
| Falk | Michael Falk, CEO, Managing Partner and Co-Founder of Comvest Partners, and Member of Comvest's IC |
| Forbearance Agreement | The Forbearance Agreement, Second Amendment to Revolving Credit and Security Agreement and First Amendment to Guarantor Security Agreement dated as of August 21, 2015, among Haggen, Inc., OpCo North, and OpCo South, as borrowers, Operations and Acquisition, as guarantors, JPMorgan Chase Bank, N.A. and Keybank, N.A. as co-syndication agents, and PNC, as agent for the lenders |
| FTC | Federal Trade Commission |
| Garrison | GIG TCG Wave Holdings, LLC and its affiliates |
| Garrison Lease | That certain Master Land and Building Lease dated February 17, 2015, between Garrison, as landlord, and OpCo South and OpCo North, as tenants, and any amendments thereto |
| Garrison SLB Agreement | The Purchase and Sale Agreement and Joint Escrow Instructions dated December 4, 2014, between Holdings and Garrison, and any amendments thereto |
| Garrison SLB Properties | Those nineteen (19) parcels of real estate (and improvements) located in Arizona, California, Nevada, Oregon, and Washington that the SLB Entities sold pursuant to the Garrison SLB Agreement |
| Genser | Ira Genser, at relevant times partner at Operating Advisory Group, LLC, consultants to Haggen |
| Haggen | The entire Haggen enterprise as it may have existed at the referenced time period, including all subsidiaries and affiliates, and without regard to whether any entity was a debtor at the referenced time period |
| Haggen SLB | Haggen SLB, LLC, an SLB Entity managed by its sole member, Acquisition |
| Haggen, Inc. | HH Legacy, Inc. (f/k/a Haggen, Inc.) |
| HHI | HHI, Corp. |
| Holdings | HH Liquidation, LLC (f/k/a Haggen Holdings, LLC) |
| IC | Comvest's Investment Committee, comprising voting members Falk, Marrero, Rodriguez, Clark and Caple, and observer Louis |

| | |
|---|---|
| | Colosimo |
| Intercreditor Agreement | The Intercreditor Agreement dated as of August 21, 2015, among PNC, as agent for itself and the other lenders, PropCo North and PropCo South, as subordinated lenders, and Haggen, Inc., OpCo North, and OpCo South, as obligors |
| Individual Defendants | Defendants Anderson, Barnett, Caple, Clougher, Niegsch, Rodriguez, and Shaner |
| Marrero | Roger Marrero, Managing Partner of Comvest Partners, and member of Comvest's IC |
| Monitor | FTC-appointed monitor, Richard King |
| Niegsch | Michael Niegsch, at relevant times Vice President of Comvest and member of Comvest's Deal Team |
| OpCo Entities | OpCo North and OpCo South |
| OpCo North | HH OpCo North, LLC (f/k/a Haggen OpCo North, LLC), an OpCo Entity solely owned by Operations |
| OpCo South | HH OpCo South, LLC (f/k/a Haggen OpCo South, LLC), an OpCo Entity solely owned by Operations |
| Operations | HH Operations, LLC (f/k/a Haggen Operations Holding, LLC), the holding company for the OpCo Entities, whose membership interests are solely owned by Holdings |
| Owned Properties | The twenty-eight (28) parcels of real property (fee owned or ground leases), that Holdings contributed, directly or indirectly, to the PropCo Entities pursuant to the Contribution Agreements |
| Petition Date | September 8, 2015, the date the Debtors filed voluntary petitions for relief under the Bankruptcy Code |
| Plaintiff | The Official Committee of Unsecured Creditors |
| PNC | PNC Bank, National Association, Haggen's ABL lender |
| PropCo Advance | The $25 million advance provided by the PropCo Entities to the OpCo Entities pursuant to the PropCo Agreement |
| PropCo Agreement | That certain Term Loan and Security Agreement dated as of August 7, 2015, between the OpCo Entities and the PropCo Entities, and any amendments thereto |
| PropCo Entities | PropCo North, PropCo South and Property Holdings |
| PropCo Leases | The leases and subleases entered into between an OpCo Entity and a PropCo Entity, and any amendments thereto |
| PropCo North | Haggen Property North, LLC, a PropCo Entity managed by its sole member, Property Holdings |
| PropCo Notes | The promissory notes that the OpCo Entities issued in favor of PropCo North and PropCo South, respectively, on August 7, 2015 |
| PropCo South | Haggen Property South, LLC, a PropCo Entity managed by its sole member, Property Holdings |
| Property Holdings | Haggen Property Holdings, LLC, a PropCo Entity managed by its sole member, Holdings |
| Property Holdings II | Haggen Property Holdings II, LLC, an SLB Entity managed by its sole member, Holdings |

| Property Holdings III | Haggen Property Holdings III, LLC |
|---|---|
| Property Lender | Haggen Property Lender, LLC |
| PTO | Final Pretrial Order, entered on October 6, 2017, at Docket No. 142 |
| Rodriguez | Cecilio Rodriguez, Defendant and CFO of Comvest, and member of Comvest's IC |
| Safeway | Safeway, Inc. |
| Sale Leaseback Transaction | The transactions whereby certain of the real property subject to Contribution Agreements was first transferred to an SLB Entity and then immediately resold to third parties |
| Scholl | Lucas Scholl, at all relevant times, an Associate with Comvest Partners and member of the Deal Team |
| Shaner | William Shaner, Defendant and at relevant times CEO of OpCo South |
| SLB Entities | Property Holdings II and Haggen SLB |
| SLB Properties | The Real Property that was subject to the Contribution Agreements and that was first transferred to an SLB Entity and then immediately resold to third parties |
| Spirit | Spirit Master Funding IV, LLC and its affiliates. |
| Spirit Lease | The Master Lease Agreement, together with any amendments thereto, and any related documents pursuant to which Spirit leased certain of the Spirit SLB Properties to Operations |
| Spirit SLB Agreement | The Purchase and Sale Agreement and Joint Escrow Instructions signed on November 24, 2014, by Holdings and Spirit, and any amendments thereto |
| Spirit SLB Properties | Those twenty (20) parcels of real estate (and improvements) located in Arizona, California, Nevada, Oregon, and Washington that the SLB Entities sold pursuant to the Spirit SLB Agreement |
| Supervalu | Supervalu, Inc. |